# Exhibit 22

*Electronic Privacy Information Center v. Department of Justice*

Plaintiff's Motion for a Preliminary Injunction



January 28, 2006

# Bush Presses On in Legal Defense for Wiretapping

By ERIC LICHTBLAU and ADAM LIPTAK

WASHINGTON, Jan. 27 — President Bush, defending the wiretapping program he ordered soon after the Sept. 11 attacks, declared a few days ago that "there's no doubt in my mind it is legal." So resolute is Mr. Bush, in fact, that he and his senior aides made this assertion, or some variation of it, at least 48 times in the last week.

Despite the administration's arguments, many legal scholars — both conservatives and liberals — say they remain skeptical about Mr. Bush's assertion that the Constitution and a September 2001 authorization to use military force provided legal justification for wiretapping phone calls and e-mail messages on American soil without a warrant.

But if nothing else, legal and political analysts say, Bush administration officials appear to have succeeded in framing the legal debate on their own terms and daring critics of the National Security Agency operation to prove them wrong.

"It's a very astute strategy," said Peter J. Spiro, a law professor at the University of Georgia. "They don't have much to work with legally, but they're framing these justifications in constitutional terms to a public audience. That may serve them well."

The Bush administration has been vigorous in its legal defense of the surveillance program, first in a six-page Justice Department letter to Congress on Dec. 22, then in an expanded, 42-page "white paper" last week, and finally in a barrage of speeches, news conferences and news media appearances by Mr. Bush and his most senior aides this week.

On Friday, the Justice Department capped the week's blitz with a 27-point rebuttal to its critics labeled "Myth V. Reality."

The first "myth" listed: "The N.S.A. program is illegal."

A detailed analysis this month from the nonpartisan Congressional Research Service challenged the administration's legal arguments. After this week's news media blitz, the White House's defense continues to draw mixed, and sometimes surprising reviews from legal scholars.

Some legal experts who have written in favor of an expansive conception of executive power voiced doubts about the surveillance program, and one of them said that the Justice Department's fullest defense, in its "white paper," cited his work out of context.

Another conservative scholar, enlisted by the Bush administration to defend the program, said that while he thought the program was legal because of the president's inherent constitutional authority, he believed the administration's public defense had fallen short.

"I don't think they've made the strongest case," said Robert F. Turner, a professor at the University of Virginia law school who was asked by the Justice Department to do news media appearances in defense of the N.S.A. program. "No one's really making the case about the constitutional issues here, and I don't think the P.R. side of this was handled very well."

Some liberals, on the other hand, said the administration's arguments had substantial force. Cass Sunstein, a law professor at the University of Chicago who has taken liberal positions on many issues, said: "The administration's legal arguments are definitely plausible. I think it's a very close case."

Mr. Bush himself said in an interview broadcast Friday by CBS News that he wrestled with the legal issues before he approved the program. "It wasn't an easy to decision to make," he said.

The president said he had to be "convinced" by administration lawyers that he had the power to order wiretaps without warrants. "I said, how come we can't use the procedures" established for getting an emergency warrant retroactively within 72 hours after it is executed, "and they said it won't work," he said.

But Mr. Bush said in the interview that he believed his power had limits even in

wartime. "I don't think a president can order torture, for example. I don't think a president can order the assassination of a leader of another country with which we're not at war," he said. "There are clear red lines."

In the six weeks since the N.S.A. program was disclosed, the administration has sought to flesh out its public justifications with new details — highlighting, for instance, George Washington's interception of British mail, or giving details on how long it can take to get a wiretap warrant — but the basic thrust of its case has remained the same.

It rests on two main contentions: that the president has the inherent constitutional authority to order wiretaps without warrants in protecting national security, and that Congress gave him that authority, at least implicitly, on Sept. 14, 2001, when it authorized Mr. Bush to use "all necessary and appropriate military force" against those responsible for the attacks.

Laurence H. Tribe, a law professor at Harvard, said he was not persuaded by the White House's assertions about the president's inherent power to protect the country. "It basically says that if national security in a time of an undefined war that has no predictable or defined end requires him to take some step, he can," Professor Tribe said.

But John R. Schmidt, a former Justice Department official in the Clinton administration who is now in private practice, said the Constitution certainly authorized spying on the enemy without a warrant.

"The president starts out with authority to carry out surveillance on a foreign power that has attacked this country," Mr. Schmidt said.

Mr. Schmidt noted that the Foreign Intelligence Surveillance Court of Review, made up of three federal appeals court judges, addressed this issue in 2002 and said that it took for granted that the president had the inherent constitutional authority to conduct searches without warrants. "It's utterly indefensible for people to say that there is no plausible legal justification when the only judicial statement on this is a flat statement that the president has this authority," Mr. Schmidt said.

Some legal analysts say, however, that the appellate court was giving its assessment of past decisions and that all of the earlier precedents examined surveillance before the 1978 Foreign Intelligence Surveillance Act, which set up wiretap laws in response to Watergate-era abuses.

The administration's second argument is that that use of force resolution approved by Congress also authorized the surveillance program. In a section of the white paper making that point, the Justice Department quoted from a Harvard Law Review article last year by two former Bush administration lawyers to support its argument. The article discussed a 2004 Supreme Court decision, and the quoted sentence said that "the clear inference is that the A.U.M.F." — the authorization to use military force — "authorizes what the laws of war permit."

"That's obviously taken out of the context of a larger discussion," said Curtis A. Bradley, one of the article's authors and now a law professor at Duke. "I don't know of anything in the laws of war that contemplates this sort of surveillance," he said.

Professor Sunstein said "there is a reasonable argument that many have made" that the specific prohibition under FISA against wiretaps without warrants "is more specific and so overcomes the more general authorization to use force."

But there are two counterarguments, Professor Sunstein said. First, the force authorization, limited as it is to Al Qaeda and its allies, may be said to be the more specific law. Second, he continued, "if there's a doubt about which controls, we should construe F.I.S.A. not to apply to create a conflict with a presidential claim of inherent constitutional authority."

The crucial Supreme Court decision in this area, from 2004, is Hamdi v. Rumsfeld. It said the force authorization allowed the detention of an American citizen captured on a foreign battlefield in a conventional war notwithstanding a specific law prohibiting detentions without an act of Congress.

"That's probably their best argument," Professor Bradley said, referring to the Hamdi decision's understanding of the force resolution. "But the ability to use force includes the ability to capture the people you're using force against." As for the surveillance program, he added, "the connection between that is not as tight."

The Hamdi decision itself also drew some distinctions. "Certainly," Justice Sandra Day O'Connor wrote in her opinion, "we agree that indefinite detention for the purpose of interrogation is not authorized."

The administration has lately relied heavily on historical precedents for spying, but many scholars found them unpersuasive or inapt.

"Before FISA," Professor Bradley said, "it may have been the case that the president had the authority to do this kind of surveillance. What the Department of Justice is trying to do is use the prior practice to support the present program when the present program is a violation of a duly enacted statute."

John C. Yoo, a former Justice Department official and an architect of the Bush administration's legal strategy, said he welcomed the administration's public defense of the surveillance program.

"If you compare it to the last big issue," said Professor Yoo, who now teaches law at the University of California at Berkeley, "which was the interrogation debate, they are not having their legal positions dictated by people who are leaking to the press. The administration is now really admirably explaining itself fully and is sticking to its guns. Neither thing happened last time."

Several law professors said that evaluation of the legality of the current program had been clouded by earlier arguments about detentions and interrogations.

"The Justice Department's plausible legal arguments have less credibility than they might because they are associated with argument that have less legal grounding," Professor Sunstein said.

Professor Tribe saw it differently. "The defense of the spying program is like the 13th chime of a clock," he said. "It underscores your doubts about everything that has gone before."

*Barclay Walsh contributed reporting for this article.*