# Exhibit 18

*Electronic Privacy Information Center v. Department of Justice*,
No. 06-0096 (HHK)

*American Civil Liberties Union et al. v. Department of Justice*,
No. 06-214 (HHK)

Opposition to Defendant's Expedited Motion for Relief From the
Court's Order of February 16, 2006

**Goodling, Monica**

| | |
|---|---|
| **From:** | USDOJ- Office of Public Affairs |
| **Sent:** | Friday, December 16, 2005 3:56 PM |
| **To:** | USDOJ- Office of Public Affairs |
| **Subject:** | TRANSCRIPT OF REMARKS BY ATTORNEY GENERAL ALBERTO R. GONZALES AT THE 'INNOCENCE LOST' INITIATIVE PRESS CONFERENCE |
| | |
| **Attachments:** | Picture (Metafile); Picture (Metafile) |

 # Department of Justice

FOR IMMEDIATE RELEASE
FRIDAY, DECEMBER 16, 2005
WWW.USDOJ.GOV

AG
(202) 514-2007
TDD (202) 514-1888

### TRANSCRIPT OF REMARKS BY ATTORNEY GENERAL ALBERTO R. GONZALES AT THE 'INNOCENCE LOST' INITIATIVE PRESS CONFERENCE

MR. GONZALES:  Good afternoon.  I am joined by Assistant Director Chris Swecker from the FBI, Assistant Attorney General Alice Fisher of the Criminal Division, and John Rabun, Vice President of the National Center for Missing and Exploited Children.

We're here to talk about import successes in the "Innocence Lost" initiative, an ongoing national investigation into child prostitution in the United States.

Our society has no place for those who prey on children and no tolerance for child prostitution or sex trafficking.  And that's why the Justice Department launched the Innocence Lost initiative more than two years ago to help stop this terrible practice.

Within the past two days, we've unsealed indictments and criminal complaints in Pennsylvania, New Jersey, Michigan and Hawaii, charging more than 30 individuals with crimes related to child prostitution.  And we've arrested 19 people for their alleged roles in this sex trafficking across America.  And several more perpetrators remain at large, and we're working to bring them to justice.

As a result of these recent investigations and arrests, we have rescued more than 30 children from prostitution.  Some were as young as 12 years old.

The abhorrent acts alleged in these charges include children being herded around the country as sex slaves, forced to work as prostitutes in brothels and at truck stops, and beaten at the hands of pimps and peddlers.

In one case, young children were coaxed into the car of a defendant and then held for days with threat of physical harm if they tried to escape.  These young girls were forced to perform sex acts while the defendants watched and collected money from patrons.

The alleged perpetrators of these crimes will, we hope, be brought to justice as a result of these arrests and indictments.  They are, of course, presumed innocent unless and until proven guilty.



As part of Innocence Lost, the National Center for Missing and Exploited Children brings together federal, state and local law enforcement for a joint training program. The results to date have been impressive. In two-and-a-half years, 200 child victims have been rescued, and we've collected more than 500 arrests, 70 indictments and 67 convictions.

These numbers represent remarkable progress. Thanks in large part to the efforts of local law enforcement, we've nearly doubled the number of arrests, indictments and convictions in just the last few months.

Today we add to those totals. But the true impact of the Innocence Lost initiative can only be measured in human terms. We have a responsibility to protect America's children. So we're continuing to track down those who would steal away their hopes and dreams in this despicable manner.

Bearing this responsibility are a number of investigators, prosecutors and professional staff from the Justice Department, the FBI, the National Center for Missing and Exploited Children, and state and local law enforcement agencies across the country. And I'd like to thank them for the work that has led to today's successes and their continued diligence in this important effort.

Thank you.

MR. SWECKER:  Thank you, Mr. Attorney General. And I want to thank the Justice Department and the Attorney General's personal support behind this initiative. This is something that we know is near and dear to his heart.

Now I want to underscore what he just said. As you know, the domestic trafficking of children for the purpose of prostitution is a significant crime problem and is national in scope. According to a study by the University of Pennsylvania, there are approximately 300,000 youth currently at risk of becoming victims of commercial and sexual exploitation in the United States.

The average age of a child who enters into prostitution is 14, with some as young as 9 years old. A large percentage of these children run away from home because of physical, sexual and psychological abuse. Prostitution is a continuation of the victim's sexual exploitation, not the beginning. These children are victimized many times over, not just by the predators that entice them or force them into prostitution, but also by the customers, and even the legal system, which often fails to treat them like victims.

To combat this heinous crime, in June '03, the FBI launched a national initiative in conjunction with the Justice Department, CEOS, called Innocence Lost. Our mission was to establish taskforces, share intelligence and train personnel on how to identify and disrupt these highly organized rings that lure children into prostitution.

An important part of this effort was training. In the spring of '03, we teamed with the National Center for Missing and Exploited Children, DOJ's Child Exploitation and Obscenity Section, to provide training to interdisciplinary teams of FBI agents, local law enforcement officers and social service providers. Six such training sessions were held at the National Center for Missing and Exploited Children and sponsored by them, and over 350 key personnel have been trained. The partnership between NCMEC, CEOS and out state and local partners was a major factor in the over 100 percent jump in arrests just in the last year.

The mobility and multi-jurisdictional nature of these investigations made it critical for law enforcement to join together and enlist our community partners to address this matter. Initially, 14 field offices were identified as having the highest incidence of child prostitution.

In your packet you'll find a map, and I hope also a CD that has the pictures of the outstanding fugitives in this case.

These cases are manpower intensive, intelligence-driven and make use of not only standard techniques but very technical surveillance-type techniques, undercover operations, cooperating witnesses, et cetera. Over 500 arrests in the last two years.

I would encourage you also to go to our website, www.fbi.gov. That's where we also have the pictures of the fugitives also posted. So, if you get a chance to promote the website, we would ask that people go there and they can pick up the pictures of the fugitives that we have outstanding. And we need the public's help in trying to get them apprehended.

Thank you very much. And let me introduce John Rabun, Vice President and Chief Operating Officer of the National Center for Missing and Exploited Children.

MR. RABUN: This is a momentous occasion, because in my history, first as a minister, second as a trained social worker, and third as a law enforcement officer, for 34 years in crimes against children work, trying to protect children, this Attorney General directed the entire Justice Department, including the FBI, to pay attention to kids. That's what this is all about.

These are not the little waifs that we like to see on the advocacy cards that come, you know, about missing children. These are not the little bitty, you know, knee-high sized kids that are so cute. These are teenagers, many of which don't even recognize that they're victims. They're hidden. They're hidden not only from us, the public, they're hidden from us in law enforcement. We haven't had the skills to know who they are, what they look like, how they act, what they do, where they do it. We hear about them.

But we like to think that that happens in other countries. That never would happen, you know, in Washington. It would never happen where I live in Herndon. Certainly wouldn't happen wherever you live. We're wrong. It happens in all of those places.

This initiative has helped train law enforcement to recognize those hidden victims, to deal appropriately with them, not just in the way we've always as law enforcement officers dealt with adult criminals. We know how to do that. These are children, even when some of them don't act like it.

This has been a huge undertaking, and one that continues to go on, and I trust will go on, as we further train local and state law enforcement at the Center to support the federal effort. There are trained social workers accompanying these officers so that these kids are treated in the right -- and I mean in a therapy sense -- treated in the right way.

This is a multi-disciplinary effort. That's what we're all about. It's incredible. And I want to take a second to thank Ms. Fisher for giving us Drew Oosterbaan, the head of CEOS, to work with us; to thank Chris for giving us Dave Johnson, the Unit Chief, and Agent McFinnerty, who works at our offices, Jamie Codsence, who is the analyst who works at our office, because we've shown together, as a team, a private sector charity, the U.S. Justice Department, that if we're willing to work together, we in fact can rescue the kids.

And Mr. Attorney General, it's more than words come to me, you know, to have the might and the majesty of the United States Department of Justice, you know, come forward to save kids and to say you count is unbelievable from where I sit. And it's particularly poignant, I think, in a day when we of a people of the Book say, "For to us, a child is born."

Thank you, Attorney General.

MR. GONZALES: Questions?

QUESTION:  What was your role in providing the legal justification for the President's decision in 2002 to approve NSA?

MR. GONZALES:  Questions relating to this operation first. Any questions relating to the program? Okay.

And let me just say that as you know, we do not comment and will not comment on intelligence matters. We are engaged in a struggle against terrorism, and the President feels a constitutional duty to wage that war aggressively in order to defend the American people, but to do so in a way that is consistent with the Constitution, and consistent with the laws. He understands the duty not only to defend this country, but to defend civil liberties. And that's my answer to your question.

Yes ma'am?

QUESTION:  Sir, there is a statute on the books, 18 USC 2511.2(f), that says electronic surveillance must be conducted -- excuse me -- only according to the rules of FISA. Did this Executive Order amount to an effective repeal of 2511 --

MR. GONZALES:  Again, I'm not going to talk about the New York Times story or about ongoing -- possible ongoing intelligence.

QUESTION:  Will you follow the law?

MR. GONZALES:  Of course we follow. I just gave my answer to that question as to whether or not we follow the law. Our priorities are to defend this country and to do it in a way that's consistent with the law.

Yes?

QUESTION:  General, I know you say -- you're saying you cannot comment because it's an ongoing intelligence matter, but --

MR. GONZALES:  What I said, I don't -- if I said that, let me clarify that. We're not going to comment on intelligence matters.

QUESTION:  But don't the American people deserve to know what the country is doing, the government is doing in the name of security?

MR. GONZALES:  Well, let me just say, as a general matter, without commenting on a particular -- on a particular story or on a particular program, there are ways that the American people may be advised about the activities of its government. For example, there may be classified briefings that are provided to members on the Hill. And as you know, as you well know, that oftentimes there are decisions made in laws that reflect a decision by Congress that certain kinds of communications need not be shared, that they are privileged. There are certain kinds of communications recognized in our courts that deserve confidentiality, certain matters related to privilege.

And so there is a basis. You don't -- there is a basis or -- types of information that for a variety of reasons, national security being one, that it is important to try to maintain confidentiality.

I certainly respect and understand the need for the American people to understand what their government is doing. And, obviously, we respect that and we try to make information available to the American people, but we also have a corresponding duty to ensure that national security is protected.

QUESTION: Let me ask a question on the other end of this, if I may.

MR. GONZALES: Can I take a question from anybody else?

QUESTION: Well, I mean, let me try another way to see if I can draw you out just a little bit. Understanding that you're not going to confirm any program, but if a program of the kind that we're talking about did exist --

MR. GONZALES: I'm not going to talk about -- answer a hypothetical question.

QUESTION: The question is whether or not it could be helpful with prosecutions, or whether this kind of information --

MR. GONZALES: Let me just say --

QUESTION: -- can be useful to prosecutions --

MR. GONZALES: Let me just say that winning the war on terror requires winning the war of information. We are dealing with a very dangerous, very patient, very diabolical enemy who wants to harm America. And in order to be effective dealing with this enemy, we need to have information. That's very, very important. And so we will be aggressive in obtaining that information, but we will always do so in a manner that's consistent with our legal obligations.

Last question.

QUESTION: I just wanted to ask you on the other end of this, will you undertake or have you been asked to undertake an investigation into how this information was leaked?

MR. GONZALES: Again, we normally would not comment as to whether or not the Department is involved in an investigation or engaged in an investigation.

Okay.

QUESTION: I'm not sure where things stand at this very moment, but what's the latest you're hearing and how do operate without a Patriot Act for the -- if that's what comes to be here?

MR. GONZALES: We're not even thinking that way. We are working hard to get the reauthorization approved by the Senate. It's very important to the Department, and so I'm optimistic that we'll be able to continue to use these tools beyond December 31st.

QUESTION: I hear cloture did not happen.

MR. GONZALES: I haven't heard that, so, I can't comment on that.

Thank you.

###