# Exhibit 20 (Part I)

*Electronic Privacy Information Center v. Department of Justice*,
No. 06-0096 (HHK)

*American Civil Liberties Union et al. v. Department of Justice*,
No. 06-214 (HHK)

Opposition to Defendant's Expedited Motion for Relief From the
Court's Order of February 16, 2006



**U.S. Department of Justice**

*Washington, D.C. 20530*

January 19, 2006

## LEGAL AUTHORITIES SUPPORTING THE ACTIVITIES OF THE NATIONAL SECURITY AGENCY DESCRIBED BY THE PRESIDENT

As the President has explained, since shortly after the attacks of September 11, 2001, he has authorized the National Security Agency ("NSA") to intercept international communications into and out of the United States of persons linked to al Qaeda or related terrorist organizations. The purpose of these intercepts is to establish an early warning system to detect and prevent another catastrophic terrorist attack on the United States. This paper addresses, in an unclassified form, the legal basis for the NSA activities described by the President ("NSA activities").

### SUMMARY

On September 11, 2001, the al Qaeda terrorist network launched the deadliest foreign attack on American soil in history. Al Qaeda's leadership repeatedly has pledged to attack the United States again at a time of its choosing, and these terrorist organizations continue to pose a grave threat to the United States. In response to the September 11th attacks and the continuing threat, the President, with broad congressional approval, has acted to protect the Nation from another terrorist attack. In the immediate aftermath of September 11th, the President promised that "[w]e will direct every resource at our command—every means of diplomacy, every tool of intelligence, every tool of law enforcement, every financial influence, and every weapon of war—to the destruction of and to the defeat of the global terrorist network." President Bush Address to a Joint Session of Congress (Sept. 20, 2001). The NSA activities are an indispensable aspect of this defense of the Nation. By targeting the international communications into and out of the United States of persons reasonably believed to be linked to al Qaeda, these activities provide the United States with an early warning system to help avert the next attack. For the following reasons, the NSA activities are lawful and consistent with civil liberties.

The NSA activities are supported by the President's well-recognized inherent constitutional authority as Commander in Chief and sole organ for the Nation in foreign affairs to conduct warrantless surveillance of enemy forces for intelligence purposes to detect and disrupt armed attacks on the United States. The President has the chief responsibility under the Constitution to protect America from attack, and the Constitution gives the President the authority necessary to fulfill that solemn responsibility. The President has made clear that he will exercise all authority available to him, consistent with the Constitution, to protect the people of the United States.



In the specific context of the current armed conflict with al Qaeda and related terrorist organizations, Congress by statute has confirmed and supplemented the President's recognized authority under Article II of the Constitution to conduct such warrantless surveillance to prevent further catastrophic attacks on the homeland. In its first legislative response to the terrorist attacks of September 11th, Congress authorized the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" of September 11th in order to prevent "any future acts of international terrorism against the United States." Authorization for Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (Sept. 18, 2001) (reported as a note to 50 U.S.C.A. § 1541) ("AUMF"). History conclusively demonstrates that warrantless communications intelligence targeted at the enemy in time of armed conflict is a traditional and fundamental incident of the use of military force authorized by the AUMF. The Supreme Court's interpretation of the AUMF in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), confirms that Congress in the AUMF gave its express approval to the military conflict against al Qaeda and its allies and thereby to the President's use of all traditional and accepted incidents of force in this current military conflict—including warrantless electronic surveillance to intercept enemy communications both at home and abroad. This understanding of the AUMF demonstrates Congress's support for the President's authority to protect the Nation and, at the same time, adheres to Justice O'Connor's admonition that "a state of war is not a blank check for the President," *Hamdi*, 542 U.S. at 536 (plurality opinion), particularly in view of the narrow scope of the NSA activities.

The AUMF places the President at the zenith of his powers in authorizing the NSA activities. Under the tripartite framework set forth by Justice Jackson in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-38 (1952) (Jackson, J., concurring), Presidential authority is analyzed to determine whether the President is acting in accordance with congressional authorization (category I), whether he acts in the absence of a grant or denial of authority by Congress (category II), or whether he uses his own authority under the Constitution to take actions incompatible with congressional measures (category III). Because of the broad authorization provided in the AUMF, the President's action here falls within category I of Justice Jackson's framework. Accordingly, the President's power in authorizing the NSA activities is at its height because he acted "pursuant to an express or implied authorization of Congress," and his power "includes all that he possesses in his own right plus all that Congress can delegate." *Id.* at 635.

The NSA activities are consistent with the preexisting statutory framework generally applicable to the interception of communications in the United States—the Foreign Intelligence Surveillance Act ("FISA"), as amended, 50 U.S.C. §§ 1801-1862 (2000 & Supp. II 2002), and relevant related provisions in chapter 119 of title 18.[1] Although FISA generally requires judicial approval of electronic surveillance, FISA also contemplates that Congress may authorize such surveillance by a statute other than FISA. *See* 50 U.S.C. § 1809(a) (prohibiting any person from intentionally "engag[ing] . . . in electronic surveillance under color of law except as authorized

---

[1] Chapter 119 of title 18, which was enacted by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510-2521 (2000 & West Supp. 2005), is often referred to as "Title III."

by statute"). The AUMF, as construed by the Supreme Court in *Hamdi* and as confirmed by the history and tradition of armed conflict, is just such a statute. Accordingly, electronic surveillance conducted by the President pursuant to the AUMF, including the NSA activities, is fully consistent with FISA and falls within category I of Justice Jackson's framework.

Even if there were ambiguity about whether FISA, read together with the AUMF, permits the President to authorize the NSA activities, the canon of constitutional avoidance requires reading these statutes in harmony to overcome any restrictions in FISA and Title III, at least as they might otherwise apply to the congressionally authorized armed conflict with al Qaeda. Indeed, were FISA and Title III interpreted to impede the President's ability to use the traditional tool of electronic surveillance to detect and prevent future attacks by a declared enemy that has already struck at the homeland and is engaged in ongoing operations against the United States, the constitutionality of FISA, as applied to that situation, would be called into very serious doubt. In fact, if this difficult constitutional question had to be addressed, FISA would be unconstitutional as applied to this narrow context. Importantly, the FISA Court of Review itself recognized just three years ago that the President retains constitutional authority to conduct foreign surveillance apart from the FISA framework, and the President is certainly entitled, at a minimum, to rely on that judicial interpretation of the Constitution and FISA.

Finally, the NSA activities fully comply with the requirements of the Fourth Amendment. The interception of communications described by the President falls within a well-established exception to the warrant requirement and satisfies the Fourth Amendment's fundamental requirement of reasonableness. The NSA activities are thus constitutionally permissible and fully protective of civil liberties.

BACKGROUND

## A.    THE ATTACKS OF SEPTEMBER 11, 2001

On September 11, 2001, the al Qaeda terrorist network launched a set of coordinated attacks along the East Coast of the United States. Four commercial jetliners, each carefully selected to be fully loaded with fuel for a transcontinental flight, were hijacked by al Qaeda operatives. Two of the jetliners were targeted at the Nation's financial center in New York and were deliberately flown into the Twin Towers of the World Trade Center. The third was targeted at the headquarters of the Nation's Armed Forces, the Pentagon. The fourth was apparently headed toward Washington, D.C., when passengers struggled with the hijackers and the plane crashed in Shanksville, Pennsylvania. The intended target of this fourth jetliner was evidently the White House or the Capitol, strongly suggesting that its intended mission was to strike a decapitation blow on the Government of the United States—to kill the President, the Vice President, or Members of Congress. The attacks of September 11th resulted in approximately 3,000 deaths—the highest single-day death toll from hostile foreign attacks in the Nation's history. These attacks shut down air travel in the United States, disrupted the Nation's financial markets and government operations, and caused billions of dollars in damage to the economy.

3

On September 14, 2001, the President declared a national emergency "by reason of the terrorist attacks at the World Trade Center, New York, New York, and the Pentagon, and the continuing and immediate threat of further attacks on the United States." Proclamation No. 7463, 66 Fed. Reg. 48,199 (Sept. 14, 2001). The same day, Congress passed a joint resolution authorizing the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" of September 11th, which the President signed on September 18th. AUMF § 2(a). Congress also expressly acknowledged that the attacks rendered it "necessary and appropriate" for the United States to exercise its right "to protect United States citizens both at home and abroad," and in particular recognized that "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States." *Id.* pmbl. Congress emphasized that the attacks "continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States." *Id.* The United States also launched a large-scale military response, both at home and abroad. In the United States, combat air patrols were immediately established over major metropolitan areas and were maintained 24 hours a day until April 2002. The United States also immediately began plans for a military response directed at al Qaeda's base of operations in Afghanistan. Acting under his constitutional authority as Commander in Chief, and with the support of Congress, the President dispatched forces to Afghanistan and, with the assistance of the Northern Alliance, toppled the Taliban regime.

As the President made explicit in his Military Order of November 13, 2001, authorizing the use of military commissions to try terrorists, the attacks of September 11th "created a state of armed conflict." Military Order § 1(a), 66 Fed. Reg. 57,833 (Nov. 13, 2001). Indeed, shortly after the attacks, NATO—for the first time in its 46-year history—invoked article 5 of the North Atlantic Treaty, which provides that an "armed attack against one or more of [the parties] shall be considered an attack against them all." North Atlantic Treaty, Apr. 4, 1949, art. 5, 63 Stat. 2241, 2244, 34 U.N.T.S. 243, 246; *see also* Statement by NATO Secretary General Lord Robertson (Oct. 2, 2001), *available at* http://www.nato.int/docu/speech/2001/s011002a.htm ("[I]t has now been determined that the attack against the United States on 11 September was directed from abroad and shall therefore be regarded as an action covered by Article 5 of the Washington Treaty . . . ."). The President also determined in his Military Order that al Qaeda and related terrorists organizations "possess both the capability and the intention to undertake further terrorist attacks against the United States that, if not detected and prevented, will cause mass deaths, mass injuries, and massive destruction of property, and may place at risk the continuity of the operations of the United States Government," and concluded that "an extraordinary emergency exists for national defense purposes." Military Order, § 1(c), (g), 66 Fed. Reg. at 57,833-34.

## B.    THE NSA ACTIVITIES

Against this unfolding background of events in the fall of 2001, there was substantial concern that al Qaeda and its allies were preparing to carry out another attack within the United States. Al Qaeda had demonstrated its ability to introduce agents into the United States undetected and to perpetrate devastating attacks, and it was suspected that additional agents were

likely already in position within the Nation's borders. As the President has explained, unlike a conventional enemy, al Qaeda has infiltrated "our cities and communities and communicated from here in America to plot and plan with bin Laden's lieutenants in Afghanistan, Pakistan and elsewhere." Press Conference of President Bush (Dec. 19, 2005), *available at* http://www.white-house.gov/news/releases/2005/12/20051219-2.html ("President's Press Conference"). To this day, finding al Qaeda sleeper agents in the United States remains one of the paramount concerns in the War on Terror. As the President has explained, "[t]he terrorists want to strike America again, and they hope to inflict even more damage than they did on September the 11th." *Id.*

The President has acknowledged that, to counter this threat, he has authorized the NSA to intercept international communications into and out of the United States of persons linked to al Qaeda or related terrorist organizations. The same day, the Attorney General elaborated and explained that in order to intercept a communication, there must be "a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda." Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence, *available at* http://www.whitehouse.gov/news/releases/2005/12/20051219-1.html (Dec. 19, 2005) (statement of Attorney General Gonzales). The purpose of these intercepts is to establish an early warning system to detect and prevent another catastrophic terrorist attack on the United States. The President has stated that the NSA activities "ha[ve] been effective in disrupting the enemy, while safeguarding our civil liberties." President's Press Conference.

The President has explained that the NSA activities are "critical" to the national security of the United States. *Id.* Confronting al Qaeda "is not simply a matter of [domestic] law enforcement"—we must defend the country against an enemy that declared war against the United States. *Id.* To "effectively detect enemies hiding in our midst and prevent them from striking us again . . . we must be able to act fast and to detect conversations [made by individuals linked to al Qaeda] so we can prevent new attacks." *Id.* The President pointed out that "a two-minute phone conversation between somebody linked to al Qaeda here and an operative overseas could lead directly to the loss of thousands of lives." *Id.* The NSA activities are intended to help "connect the dots" between potential terrorists. *Id.* In addition, the Nation is facing "a different era, a different war . . . people are changing phone numbers . . . and they're moving quick[ly]." *Id.* As the President explained, the NSA activities "enable[] us to move faster and quicker. And that's important. We've got to be fast on our feet, quick to detect and prevent." *Id.* "This is an enemy that is quick and it's lethal. And sometimes we have to move very, very quickly." *Id.* FISA, by contrast, is better suited "for long-term monitoring." *Id.*

As the President has explained, the NSA activities are "carefully reviewed approximately every 45 days to ensure that [they are] being used properly." *Id.* These activities are reviewed for legality by the Department of Justice and are monitored by the General Counsel and Inspector General of the NSA to ensure that civil liberties are being protected. *Id.* Leaders in Congress from both parties have been briefed more than a dozen times on the NSA activities.

5

C.    THE CONTINUING THREAT POSED BY AL QAEDA

Before the September 11th attacks, al Qaeda had promised to attack the United States. In 1998, Osama bin Laden declared a "religious" war against the United States and urged that it was the moral obligation of all Muslims to kill U.S. civilians and military personnel. *See* Statement of Osama bin Laden, Ayman al-Zawahiri, et al., *Fatwah Urging Jihad Against Americans*, published in Al-Quds al-'Arabi (Feb. 23, 1998) ("To kill the Americans and their allies—civilians and military—is an individual duty for every Muslim who can do it in any country in which it is possible to do it, in order to liberate the al-Aqsa Mosque and the holy mosque from their grip, and in order for their armies to move out of all the lands of Islam, defeated and unable to threaten any Muslim."). Al Qaeda carried out those threats with a vengeance; they attacked the U.S.S. Cole in Yemen, the United States Embassy in Nairobi, and finally the United States itself in the September 11th attacks.

It is clear that al Qaeda is not content with the damage it wrought on September 11th. As recently as December 7, 2005, Ayman al-Zawahiri professed that al Qaeda "is spreading, growing, and becoming stronger," and that al Qaeda is "waging a great historic battle in Iraq, Afghanistan, Palestine, and even in the Crusaders' own homes." Ayman al-Zawahiri, videotape released on Al-Jazeera television network (Dec. 7, 2005). Indeed, since September 11th, al Qaeda leaders have repeatedly promised to deliver another, even more devastating attack on America. *See, e.g.*, Osama bin Laden, videotape released on Al-Jazeera television network (Oct. 24, 2004) (warning United States citizens of further attacks and asserting that "your security is in your own hands"); Osama bin Laden, videotape released on Al-Jazeera television network (Oct. 18, 2003) ("We, God willing, will continue to fight you and will continue martyrdom operations inside and outside the United States . . . ."); Ayman Al-Zawahiri, videotape released on the Al-Jazeera television network (Oct. 9, 2002) ("I promise you [addressing the 'citizens of the United States'] that the Islamic youth are preparing for you what will fill your hearts with horror"). Given that al Qaeda's leaders have repeatedly made good on their threats and that al Qaeda has demonstrated its ability to insert foreign agents into the United States to execute attacks, it is clear that the threat continues. Indeed, since September 11th, al Qaeda has staged several large-scale attacks around the world, including in Indonesia, Madrid, and London, killing hundreds of innocent people.

ANALYSIS

I.    THE PRESIDENT HAS INHERENT CONSTITUTIONAL AUTHORITY TO ORDER WARRANTLESS FOREIGN INTELLIGENCE SURVEILLANCE

As Congress expressly recognized in the AUMF, "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States," AUMF pmbl., especially in the context of the current conflict. Article II of the Constitution vests in the President all executive power of the United States, including the power to act as Commander in Chief of the Armed Forces, *see* U.S. Const. art. II, § 2, and authority over the conduct of the Nation's foreign affairs. As the Supreme Court has explained, "[t]he President is the sole organ of the nation in its external relations, and its sole representative with

foreign nations." *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 319 (1936) (internal quotation marks and citations omitted). In this way, the Constitution grants the President inherent power to protect the Nation from foreign attack, *see, e.g., The Prize Cases,* 67 U.S. (2 Black) 635, 668 (1863), and to protect national security information, *see, e.g., Department of the Navy v. Egan,* 484 U.S. 518, 527 (1988).

   To carry out these responsibilities, the President must have authority to gather information necessary for the execution of his office. The Founders, after all, intended the federal Government to be clothed with all authority necessary to protect the Nation. *See, e.g., The Federalist* No. 23, at 147 (Alexander Hamilton) (Jacob E. Cooke ed. 1961) (explaining that the federal Government will be "cloathed with all the powers requisite to the complete execution of its trust"); *id.* No. 41, at 269 (James Madison) ("Security against foreign danger is one of the primitive objects of civil society . . . . The powers requisite for attaining it must be effectually confided to the federal councils."). Because of the structural advantages of the Executive Branch, the Founders also intended that the President would have the primary responsibility and necessary authority as Commander in Chief and Chief Executive to protect the Nation and to conduct the Nation's foreign affairs. *See, e.g., The Federalist* No. 70, at 471-72 (Alexander Hamilton); *see also Johnson v. Eisentrager,* 339 U.S. 763, 788 (1950) ("this [constitutional] grant of war power includes all that is necessary and proper for carrying these powers into execution") (citation omitted). Thus, it has been long recognized that the President has the authority to use secretive means to collect intelligence necessary for the conduct of foreign affairs and military campaigns. *See, e.g., Chicago & S. Air Lines v. Waterman S.S. Corp.,* 333 U.S. 103, 111 (1948) ("The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world."); *Curtiss-Wright,* 299 U.S. at 320 ("He has his confidential sources of information. He has his agents in the form of diplomatic, consular and other officials."); *Totten v. United States,* 92 U.S. 105, 106 (1876) (President "was undoubtedly authorized during the war, as commander-in-chief . . . to employ secret agents to enter the rebel lines and obtain information respecting the strength, resources, and movements of the enemy").

   In reliance on these principles, a consistent understanding has developed that the President has inherent constitutional authority to conduct warrantless searches and surveillance within the United States for foreign intelligence purposes. Wiretaps for such purposes thus have been authorized by Presidents at least since the administration of Franklin Roosevelt in 1940. *See, e.g., United States v. United States District Court,* 444 F.2d 651, 669-71 (6th Cir. 1971) (reproducing as an appendix memoranda from Presidents Roosevelt, Truman, and Johnson). In a Memorandum to Attorney General Jackson, President Roosevelt wrote on May 21, 1940:

   You are, therefore, authorized and directed in such cases as you may approve, after investigation of the need in each case, to authorize the necessary investigation agents that they are at liberty to secure information by listening devices directed to the conversation or other communications of persons suspected of subversive activities against the Government of the United States, including suspected spies. You are requested furthermore to limit these investigations so conducted to a minimum and limit them insofar as

7

possible to aliens.

*Id.* at 670 (appendix A). President Truman approved a memorandum drafted by Attorney General Tom Clark in which the Attorney General advised that "it is as necessary as it was in 1940 to take the investigative measures" authorized by President Roosevelt to conduct electronic surveillance "in cases vitally affecting the domestic security." *Id.* Indeed, while FISA was being debated during the Carter Administration, Attorney General Griffin Bell testified that "the current bill recognizes no inherent power of the President to conduct electronic surveillance, and I want to interpolate here to say that *this does not take away the power [of] the President under the Constitution.*" Foreign Intelligence Electronic Surveillance Act of 1978: Hearings on H.R. 5764, H.R. 9745, H.R. 7308, and H.R. 5632 Before the Subcomm. on Legislation of the House Comm. on Intelligence, 95th Cong., 2d Sess. 15 (1978) (emphasis added); *see also Katz v. United States,* 389 U.S. 347, 363 (1967) (White, J., concurring) ("Wiretapping to protect the security of the Nation has been authorized by successive Presidents."); *cf.* Amending the Foreign Intelligence Surveillance Act: Hearings Before the House Permanent Select Comm. on Intelligence,103d Cong. 2d Sess. 61 (1994) (statement of Deputy Attorney General Jamie S. Gorelick) ("[T]he Department of Justice believes, and the case law supports, that the President has inherent authority to conduct warrantless physical searches for foreign intelligence purposes . . . .").

The courts uniformly have approved this longstanding Executive Branch practice. Indeed, every federal appellate court to rule on the question has concluded that, even in peacetime, the President has inherent constitutional authority, consistent with the Fourth Amendment, to conduct searches for foreign intelligence purposes without securing a judicial warrant. *See In re Sealed Case,* 310 F.3d 717, 742 (Foreign Intel. Surv. Ct. of Rev. 2002) ("[A]ll the other courts to have decided the issue [have] held that the President did have inherent authority to conduct warrantless searches to obtain foreign intelligence information . . . . *We take for granted that the President does have that authority and, assuming that is so, FISA could not encroach on the President's constitutional power.*") (emphasis added); *accord, e.g., United States v. Truong Dinh Hung,* 629 F.2d 908 (4th Cir. 1980); *United States v. Butenko,* 494 F.2d 593 (3d Cir. 1974) (en banc); *United States v. Brown,* 484 F.2d 418 (5th Cir. 1973). *But cf. Zweibon v. Mitchell,* 516 F.2d 594 (D.C. Cir. 1975) (en banc) (dictum in plurality opinion suggesting that a warrant would be required even in a foreign intelligence investigation).

In *United States v. United States District Court,* 407 U.S. 297 (1972) (the "*Keith*" case), the Supreme Court concluded that the Fourth Amendment's warrant requirement applies to investigations of wholly *domestic* threats to security—such as domestic political violence and other crimes. But the Court in the *Keith* case made clear that it was not addressing the President's authority to conduct *foreign* intelligence surveillance without a warrant and that it was expressly reserving that question: "[T]he instant case requires no judgment on the scope of the President's surveillance power with respect to the activities of foreign powers, within or without this country." *Id.* at 308; *see also id.* at 321-22 & n.20 ("We have not addressed, and express no opinion as to, the issues which may be involved with respect to activities of foreign powers or their agents."). That *Keith* does not apply in the context of protecting against a foreign attack has been confirmed by the lower courts. After *Keith,* each of the three courts of appeals

8

that have squarely considered the question have concluded—expressly taking the Supreme Court's decision into account—that the President has inherent authority to conduct warrantless surveillance in the foreign intelligence context. *See, e.g., Truong Dinh Hung,* 629 F.2d at 913-14; *Butenko,* 494 F.2d at 603; *Brown,* 484 F.2d 425-26.

From a constitutional standpoint, foreign intelligence surveillance such as the NSA activities differs fundamentally from the domestic security surveillance at issue in *Keith.* As the Fourth Circuit observed, the President has uniquely strong constitutional powers in matters pertaining to foreign affairs and national security. "Perhaps most crucially, the executive branch not only has superior expertise in the area of foreign intelligence, it is also constitutionally designated as the pre-eminent authority in foreign affairs." *Truong,* 629 F.2d at 914; *see id.* at 913 (noting that "the needs of the executive are so compelling in the area of foreign intelligence, unlike the area of domestic security, that a uniform warrant requirement would . . . unduly frustrate the President in carrying out his foreign affairs responsibilities"); *cf. Haig v. Agee,* 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.").[2]

The present circumstances that support recognition of the President's inherent constitutional authority to conduct the NSA activities are considerably stronger than were the circumstances at issue in the earlier courts of appeals cases that recognized this power. All of the cases described above addressed inherent executive authority under the foreign affairs power to conduct surveillance in a peacetime context. The courts in these cases therefore had no occasion even to consider the fundamental authority of the President, as Commander in Chief, to gather intelligence in the context of an ongoing armed conflict in which the United States already had suffered massive civilian casualties and in which the intelligence gathering efforts at issue were specifically designed to thwart further armed attacks. Indeed, intelligence gathering is particularly important in the current conflict, in which the enemy attacks largely through clandestine activities and which, as Congress recognized, "pose[s] an unusual and extraordinary threat," AUMF pmbl.

Among the President's most basic constitutional duties is the duty to protect the Nation from armed attack. The Constitution gives him all necessary authority to fulfill that responsibility. The courts thus have long acknowledged the President's inherent authority to take action to protect Americans abroad, *see, e.g., Durand v. Hollins,* 8 F. Cas. 111, 112 (C.C.S.D.N.Y. 1860) (No. 4186), and to protect the Nation from attack, *see, e.g., The Prize Cases,* 67 U.S. at 668. *See generally Ex parte Quirin,* 317 U.S. 1, 28 (1942) (recognizing that

---

[2] *Keith* made clear that one of the significant concerns driving the Court's conclusion in the domestic security context was the inevitable connection between perceived threats to domestic security and political dissent. As the Court explained: "Fourth Amendment protections become the more necessary when the targets of official surveillance may be those suspected of unorthodoxy in their political beliefs. The danger to political dissent is acute where the Government attempts to act under so vague a concept as the power to protect 'domestic security.'" *Keith,* 407 U.S. at 314; *see also id.* at 320 ("Security surveillances are especially sensitive because of the inherent vagueness of the domestic security concept, the necessarily broad and continuing nature of intelligence gathering, and the temptation to utilize such surveillances to oversee political dissent."). Surveillance of domestic groups raises a First Amendment concern that generally is not present when the subjects of the surveillance are foreign powers or their agents.

the President has authority under the Constitution "to direct the performance of those functions which may constitutionally be performed by the military arm of the nation in time of war," including "important incident[s] to the conduct of war," such as "the adoption of measures by the military command . . . to repel and defeat the enemy"). As the Supreme Court emphasized in the *Prize Cases*, if the Nation is invaded, the President is "bound to resist force by force"; "[h]e must determine what degree of force the crisis demands" and need not await congressional sanction to do so. *The Prize Cases,* 67 U.S. at 670; *see also Campbell v. Clinton,* 203 F.3d 19, 27 (D.C. Cir. 2000) (Silberman, J., concurring) ("[T]he *Prize Cases* . . . stand for the proposition that the President has independent authority to repel aggressive acts by third parties even without specific congressional authorization, and courts may not review the level of force selected."); *id.* at 40 (Tatel, J., concurring) ("[T]he President, as commander in chief, possesses emergency authority to use military force to defend the nation from attack without obtaining prior congressional approval."). Indeed, "in virtue of his rank as head of the forces, [the President] has certain powers and duties with which Congress cannot interfere." *Training of British Flying Students in the United States,* 40 Op. Att'y Gen. 58, 61 (1941) (Attorney General Robert H. Jackson) (internal quotation marks omitted). In exercising his constitutional powers, the President has wide discretion, consistent with the Constitution, over the methods of gathering intelligence about the Nation's enemies in a time of armed conflict.

## II. THE AUMF CONFIRMS AND SUPPLEMENTS THE PRESIDENT'S INHERENT POWER TO USE WARRANTLESS SURVEILLANCE AGAINST THE ENEMY IN THE CURRENT ARMED CONFLICT

In the Authorization for Use of Military Force enacted in the wake of September 11th, Congress confirms and supplements the President's constitutional authority to protect the Nation, including through electronic surveillance, in the context of the current post-September 11th armed conflict with al Qaeda and its allies. The broad language of the AUMF affords the President, at a minimum, discretion to employ the traditional incidents of the use of military force. The history of the President's use of warrantless surveillance during armed conflicts demonstrates that the NSA surveillance described by the President is a fundamental incident of the use of military force that is necessarily included in the AUMF.

### A. THE TEXT AND PURPOSE OF THE AUMF AUTHORIZE THE NSA ACTIVITIES

On September 14, 2001, in its first legislative response to the attacks of September 11th, Congress gave its express approval to the President's military campaign against al Qaeda and, in the process, confirmed the well-accepted understanding of the President's Article II powers. *See* AUMF § 2(a).[3] In the preamble to the AUMF, Congress stated that "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States," AUMF pmbl., and thereby acknowledged the President's inherent constitutional authority to defend the United States. This clause "constitutes an extraordinarily

---

[3] America's military response began before the attacks of September 11th had been completed. *See The 9/11 Commission Report* 20 (2004). Combat air patrols were established and authorized "to engage inbound aircraft if they could verify that the aircraft was hijacked." *Id.* at 42.

10

sweeping recognition of independent presidential *constitutional* power to employ the war power to combat terrorism." Michael Stokes Paulsen, Youngstown *Goes to War,* 19 Const. Comment. 215, 252 (2002). This striking recognition of presidential authority cannot be discounted as the product of excitement in the immediate aftermath of September 11th, for the same terms were repeated by Congress more than a year later in the Authorization for Use of Military Force Against Iraq Resolution of 2002. Pub. L. No. 107-243, pmbl., 116 Stat. 1498, 1500 (Oct. 16, 2002) ("[T]he President has authority under the Constitution to take action in order to deter and prevent acts of international terrorism against the United States . . . ."). In the context of the conflict with al Qaeda and related terrorist organizations, therefore, Congress has acknowledged a broad executive authority to "deter and prevent" further attacks against the United States.

The AUMF passed by Congress on September 14, 2001, does not lend itself to a narrow reading. Its expansive language authorizes the President "to use *all necessary and appropriate force* against those nations, organizations, or persons *he determines* planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001." AUMF § 2(a) (emphases added). In the field of foreign affairs, and particularly that of war powers and national security, congressional enactments are to be broadly construed where they indicate support for authority long asserted and exercised by the Executive Branch. *See, e.g., Haig v. Agee,* 453 U.S. 280, 293-303 (1981); *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 543-45 (1950); *cf. Loving v. United States,* 517 U.S. 748, 772 (1996) (noting that the usual "limitations on delegation [of congressional powers] do not apply" to authorizations linked to the Commander in Chief power); *Dames & Moore v. Regan,* 453 U.S. 654, 678-82 (1981) (even where there is no express statutory authorization for executive action, legislation in related field may be construed to indicate congressional acquiescence in that action). Although Congress's war powers under Article I, Section 8 of the Constitution empower Congress to legislate regarding the raising, regulation, and material support of the Armed Forces and related matters, rather than the prosecution of military campaigns, the AUMF indicates Congress's endorsement of the President's use of his constitutional war powers. This authorization transforms the struggle against al Qaeda and related terrorist organizations from what Justice Jackson called "a zone of twilight," in which the President and the Congress may have concurrent powers whose "distribution is uncertain," *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 637 (1952) (Jackson, J., concurring), into a situation in which the President's authority is at is maximum because "it includes all that he possesses in his own right plus all that Congress can delegate," *id.* at 635. With regard to these fundamental tools of warfare—and, as demonstrated below, warrantless electronic surveillance against the declared enemy is one such tool—the AUMF places the President's authority at its zenith under *Youngstown.*

It is also clear that the AUMF confirms and supports the President's use of those traditional incidents of military force against the enemy, wherever they may be—on United States soil or abroad. The nature of the September 11th attacks—launched on United States soil by foreign agents secreted in the United States—necessitates such authority, and the text of the AUMF confirms it. The operative terms of the AUMF state that the President is authorized to use force "in order to prevent any future acts of international terrorism against the United States," *id.,* an objective which, given the recent attacks within the Nation's borders and the continuing use of air defense throughout the country at the time Congress acted, undoubtedly

contemplated the possibility of military action within the United States. The preamble, moreover, recites that the United States should exercise its rights "to protect United States citizens both *at home* and abroad." *Id.* pmbl. (emphasis added). To take action against those linked to the September 11th attacks involves taking action against individuals within the United States. The United States had been attacked on its own soil—not by aircraft launched from carriers several hundred miles away, but by enemy agents who had resided in the United States for months. A crucial responsibility of the President—charged by the AUMF and the Constitution—was and is to identify and attack those enemies, especially if they were in the United States, ready to strike against the Nation.

The text of the AUMF demonstrates in an additional way that Congress authorized the President to conduct warrantless electronic surveillance against the enemy. The terms of the AUMF not only authorized the President to "use all necessary and appropriate force" against those responsible for the September 11th attacks; it also authorized the President to "determine[]" the persons or groups responsible for those attacks and to take all actions necessary to prevent further attacks. AUMF § 2(a) ("the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons *he determines* planned, authorized, committed, or aided the terrorist attacks that occurred on September 11th, 2001, or harbored such organizations or persons") (emphasis added). Of vital importance to the use of force against the enemy is locating the enemy and identifying its plans of attack. And of vital importance to identifying the enemy and detecting possible future plots was the authority to intercept communications to or from the United States of persons with links to al Qaeda or related terrorist organizations. Given that the agents who carried out the initial attacks resided in the United States and had successfully blended into American society and disguised their identities and intentions until they were ready to strike, the necessity of using the most effective intelligence gathering tools against such an enemy, including electronic surveillance, was patent. Indeed, Congress recognized that the enemy in this conflict poses an "unusual and extraordinary threat." AUMF pmbl.

The Supreme Court's interpretation of the scope of the AUMF in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), strongly supports this reading of the AUMF. In *Hamdi*, five members of the Court found that the AUMF authorized the detention of an American within the United States, notwithstanding a statute that prohibits the detention of U.S. citizens "except pursuant to an Act of Congress," 18 U.S.C. § 4001(a). *See Hamdi*, 542 U.S. at 519 (plurality opinion); *id.* at 587 (Thomas, J., dissenting). Drawing on historical materials and "longstanding law-of-war principles," *id.* at 518-21, a plurality of the Court concluded that detention of combatants who fought against the United States as part of an organization "known to have supported" al Qaeda "is so fundamental and accepted an incident to war as to be an exercise of the 'necessary and appropriate force' Congress has authorized the President to use." *Id.* at 518; *see also id.* at 587 (Thomas, J., dissenting) (agreeing with the plurality that the joint resolution authorized the President to "detain those arrayed against our troops"); *accord Quirin*, 317 U.S. at 26-29, 38 (recognizing the President's authority to capture and try agents of the enemy in the United States even if they had never "entered the theatre or zone of active military operations"). Thus, even though the AUMF does not say anything expressly about detention, the Court nevertheless found that it satisfied section 4001(a)'s requirement that detention be congressionally authorized.

12

The conclusion of five Justices in *Hamdi* that the AUMF incorporates fundamental "incidents" of the use of military force makes clear that the absence of any specific reference to signals intelligence activities in the resolution is immaterial. *See Hamdi,* 542 U.S. at 519 ("[I]t is of no moment that the AUMF does not use specific language of detention.") (plurality opinion). Indeed, given the circumstances in which the AUMF was adopted, it is hardly surprising that Congress chose to speak about the President's authority in general terms. The purpose of the AUMF was for Congress to sanction and support the military response to the devastating terrorist attacks that had occurred just three days earlier. Congress evidently thought it neither necessary nor appropriate to attempt to catalog every specific aspect of the use of the forces it was authorizing and every potential preexisting statutory limitation on the Executive Branch. Rather than engage in that difficult and impractical exercise, Congress authorized the President, in general but intentionally broad terms, to use the traditional and fundamental incidents of war and to determine how best to identify and engage the enemy in the current armed conflict. Congress's judgment to proceed in this manner was unassailable, for, as the Supreme Court has recognized, even in normal times involving no major national security crisis, "Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take." *Dames & Moore,* 453 U.S. at 678. Indeed, Congress often has enacted authorizations to use military force using general authorizing language that does not purport to catalogue in detail the specific powers the President may employ. The need for Congress to speak broadly in recognizing and augmenting the President's core constitutional powers over foreign affairs and military campaigns is of course significantly heightened in times of national emergency. *See Zemel v. Rusk,* 381 U.S. 1, 17 (1965) ("[B]ecause of the changeable and explosive nature of contemporary international relations . . . Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas.").

*Hamdi* thus establishes the proposition that the AUMF "clearly and unmistakably" authorizes the President to take actions against al Qaeda and related organizations that amount to "fundamental incident[s] of waging war." *Hamdi,* 542 U.S. at 519 (plurality opinion); *see also id.* at 587 (Thomas, J., dissenting). In other words, *"[t]he clear inference is that the AUMF authorizes what the laws of war permit."* Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism,* 118 Harv. L. Rev. 2048, 2092 (2005) (emphasis added). Congress is presumed to be aware of the Supreme Court's precedents. Indeed, Congress recently enacted legislation in response to the Court's decision in *Rasul v. Bush,* 542 U.S. 466 (2004)—which was issued the same day as the *Hamdi* decision—removing habeas corpus jurisdiction over claims filed on behalf of confined enemy combatants held at Guantanamo Bay. Congress, however, has not expressed any disapproval of the Supreme Court's commonsense and plain-meaning interpretation of the AUMF in *Hamdi.*[4]

---

[4] This understanding of the AUMF is consistent with Justice O'Connor's admonition that "a state of war is not a blank check for the President," *Hamdi,* 542 U.S. at 536 (plurality opinion). In addition to constituting a fundamental and accepted incident of the use of military force, the NSA activities are consistent with the law of armed conflict principle that the use of force be necessary and proportional. *See* Dieter Fleck, *The Handbook of Humanitarian Law in Armed Conflicts* 115 (1995). The NSA activities are proportional because they are minimally invasive and narrow in scope, targeting only the international communications of persons reasonably believed to be linked to al Qaeda, and are designed to protect the Nation from a devastating attack.

B.  WARRANTLESS ELECTRONIC SURVEILLANCE AIMED AT INTERCEPTING ENEMY
COMMUNICATIONS HAS LONG BEEN RECOGNIZED AS A FUNDAMENTAL
INCIDENT OF THE USE OF MILITARY FORCE

The history of warfare—including the consistent practice of Presidents since the earliest days of the Republic—demonstrates that warrantless intelligence surveillance against the enemy is a fundamental incident of the use of military force, and this history confirms the statutory authority provided by the AUMF.  Electronic surveillance is a fundamental tool of war that must be included in any natural reading of the AUMF's authorization to use "all necessary and appropriate force."

As one author has explained:

It is *essential* in warfare for a belligerent to be as fully informed as possible about the enemy—his strength, his weaknesses, measures taken by him and measures contemplated by him.  This applies not only to military matters, but . . . anything which bears on and is material to his ability to wage the war in which he is engaged.  *The laws of war recognize and sanction this aspect of warfare.*

Morris Greenspan, *The Modern Law of Land Warfare* 325 (1959) (emphases added); *see also* Memorandum for Members of the House Permanent Select Comm. on Intel., from Jeffrey H. Smith, *Re: Legal Authorities Regarding Warrantless Surveillance of U.S. Persons* 6 (Jan. 3, 2006) ("Certainly, the collection of intelligence is understood to be necessary to the execution of the war.").  Similarly, article 24 of the Hague Regulations of 1907 expressly states that "the employment of measures necessary for obtaining information about the enemy and the country [is] considered permissible." *See also* L. Oppenheim, *International Law* vol. II § 159 (7th ed. 1952) ("War cannot be waged without all kinds of information, about the forces and the intentions of the enemy . . . .  To obtain the necessary information, it has always been considered lawful to employ spies . . . ."); Joseph R. Baker & Henry G. Crocker, *The Laws of Land Warfare* 197 (1919) ("Every belligerent has a right . . . to discover the signals of the enemy and . . . to seek to procure information regarding the enemy through the aid of secret agents."); *cf.* J.M. Spaight, *War Rights on Land* 205 (1911) ("[E]very nation employs spies; were a nation so quixotic as to refrain from doing so, it might as well sheathe its sword for ever. . . .  Spies . . . are indispensably necessary to a general; and, other things being equal, that commander will be victorious who has the best secret service.") (internal quotation marks omitted).

In accordance with these well-established principles, the Supreme Court has consistently recognized the President's authority to conduct intelligence activities.  *See, e.g., Totten v. United States,* 92 U.S. 105, 106 (1876) (recognizing President's authority to hire spies); *Tenet v. Doe,* 544 U.S. 1 (2005) (reaffirming *Totten* and counseling against judicial interference with such matters); *see also Chicago & S. Air Lines v. Waterman S.S. Corp.,* 333 U.S. 103, 111 (1948) ("The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports neither are not and ought not to be published to the world."); *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 320 (1936) (The President "has his confidential sources of information.  He has his agents in the form of diplomatic,

14

consular, and other officials."). Chief Justice John Marshall even described the gathering of intelligence as a military duty. *See Tatum v. Laird,* 444 F.2d 947, 952-53 (D.C. Cir. 1971) ("As Chief Justice John Marshall said of Washington, 'A general must be governed by his intelligence and must regulate his measures by his information. It is his duty to obtain correct information . . . . '") (quoting Foreword, U.S. Army Basic Field Manual, Vol. X, circa 1938), *rev'd on other grounds,* 408 U.S. 1 (1972).

The United States, furthermore, has a long history of wartime surveillance—a history that can be traced to George Washington, who "was a master of military espionage" and "made frequent and effective use of secret intelligence in the second half of the eighteenth century." Rhodri Jeffreys-Jones, *Cloak and Dollar: A History of American Secret Intelligence* 11 (2002); *see generally id.* at 11-23 (recounting Washington's use of intelligence); *see also Haig v. Agee,* 471 U.S. 159, 172 n.16 (1981) (quoting General Washington's letter to an agent embarking upon an intelligence mission in 1777: "The necessity of procuring good intelligence, is apparent and need not be further urged."). As President in 1790, Washington obtained from Congress a "secret fund" to deal with foreign dangers and to be spent at his discretion. Jeffreys-Jones, *supra,* at 22. The fund, which remained in use until the creation of the Central Intelligence Agency in the mid-twentieth century and gained "longstanding acceptance within our constitutional structure," *Halperin v. CIA,* 629 F.2d 144, 158-59 (D.C. Cir. 1980), was used "for all purposes to which a secret service fund should or could be applied for the public benefit," including "for persons sent publicly and secretly to search for important information, political or commercial," *id.* at 159 (quoting Statement of Senator John Forsyth, Cong. Debates 295 (Feb. 25, 1831)). *See also Totten,* 92 U.S. at 107 (refusing to examine payments from this fund lest the publicity make a "secret service" "impossible").

The interception of communications, in particular, has long been accepted as a fundamental method for conducting wartime surveillance. *See, e.g.,* Greenspan, *supra,* at 326 (accepted and customary means for gathering intelligence "include air reconnaissance and photography; ground reconnaissance; observation of enemy positions; *interception of enemy messages, wireless and other*; examination of captured documents; . . . and interrogation of prisoners and civilian inhabitants") (emphasis added). Indeed, since its independence, the United States has intercepted communications for wartime intelligence purposes and, if necessary, has done so within its own borders. During the Revolutionary War, for example, George Washington received and used to his advantage reports from American intelligence agents on British military strength, British strategic intentions, and British estimates of American strength. *See* Jeffreys-Jones, *supra,* at 13. One source of Washington's intelligence was intercepted British mail. *See* Central Intelligence Agency, *Intelligence in the War of Independence* 31, 32 (1997). In fact, Washington himself proposed that one of his Generals "contrive a means of opening [British letters] without breaking the seals, take copies of the contents, and then let them go on." *Id.* at 32 ("From that point on, Washington was privy to British intelligence pouches between New York and Canada."); *see generally* Final Report of the Select Committee to Study Governmental Operations with respect to Intelligence Activities (the "Church Committee"), S. Rep. No. 94-755, at Book VI, 9-17 (Apr. 23, 1976) (describing Washington's intelligence activities).

15

More specifically, warrantless electronic surveillance of wartime communications has been conducted in the United States since electronic communications have existed, *i.e.,* since at least the Civil War, when "[t]elegraph wiretapping was common, and an important intelligence source for both sides." G.J.A. O'Toole, *The Encyclopedia of American Intelligence and Espionage* 498 (1988). Confederate General J.E.B. Stuart even "had his own personal wiretapper travel along with him in the field" to intercept military telegraphic communications. Samuel Dash, et al., *The Eavesdroppers* 23 (1971); *see also* O'Toole, *supra*, at 121, 385-88, 496-98 (discussing Civil War surveillance methods such as wiretaps, reconnaissance balloons, semaphore interception, and cryptanalysis). Similarly, there was extensive use of electronic surveillance during the Spanish-American War. *See* Bruce W. Bidwell, *History of the Military Intelligence Division, Department of the Army General Staff:* 1775-1941, at 62 (1986). When an American expeditionary force crossed into northern Mexico to confront the forces of Pancho Villa in 1916, the Army "frequently intercepted messages of the regime in Mexico City or the forces contesting its rule." David Alvarez, *Secret Messages* 6-7 (2000). Shortly after Congress declared war on Germany in World War I, President Wilson (citing only his constitutional powers and the joint resolution declaring war) ordered the censorship of messages sent outside the United States via submarine cables, telegraph, and telephone lines. *See* Exec. Order No. 2604 (Apr. 28, 1917). During that war, wireless telegraphy "enabled each belligerent to tap the messages of the enemy." Bidwell, *supra*, at 165 (quoting statement of Col. W. Nicolai, former head of the Secret Service of the High Command of the German Army, *in* W. Nicolai, *The German Secret Service* 21 (1924)).

As noted in Part I, on May 21, 1940, President Roosevelt authorized warrantless electronic surveillance of persons suspected of subversive activities, including spying, against the United States. In addition, on December 8, 1941, the day after the attack on Pearl Harbor, President Roosevelt gave the Director of the FBI "temporary powers to direct all news censorship and to *control all other telecommunications traffic* in and out of the United States." Jack A. Gottschalk, *"Consistent with Security". . . . A History of American Military Press Censorship,* 5 Comm. & L. 35, 39 (1983) (emphasis added). *See* Memorandum for the Secretaries of War, Navy, State, and Treasury, the Postmaster General, and the Federal Communications Commission from Franklin D. Roosevelt (Dec. 8, 1941). President Roosevelt soon supplanted that temporary regime by establishing an office for conducting such electronic surveillance in accordance with the War Powers Act of 1941. *See* Pub. L. No. 77-354, § 303, 55 Stat. 838, 840-41 (Dec. 18, 1941); Gottschalk, 5 Comm. & L. at 40. The President's order gave the Government of the United States access to "communications by mail, cable, radio, or other means of transmission passing between the United States and any foreign country." *Id. See also* Exec. Order No. 8985, § 1, 6 Fed. Reg. 6625, 6625 (Dec. 19, 1941). In addition, the United States systematically listened surreptitiously to electronic communications as part of the war effort. *See* Dash, *Eavesdroppers* at 30. During World War II, signals intelligence assisted in, among other things, the destruction of the German U-boat fleet by the Allied naval forces, *see id.* at 27, and the war against Japan, *see* O'Toole, *supra*, at 32, 323-24. In general, signals intelligence "helped to shorten the war by perhaps two years, reduce the loss of life, and make inevitable an eventual Allied victory." Carl Boyd, *American Command of the Sea Through Carriers, Codes, and the Silent Service: World War II and Beyond* 27 (1995); *see also* Alvarez, *supra*, at 1 ("There can be little doubt that signals intelligence contributed significantly to the

16

military defeat of the Axis."). Significantly, not only was wiretapping in World War II used "extensively by military intelligence and secret service personnel in combat areas abroad," but also "by the FBI and secret service in this country." Dash, *supra*, at 30.

In light of the long history of prior wartime practice, the NSA activities fit squarely within the sweeping terms of the AUMF. The use of signals intelligence to identify and pinpoint the enemy is a traditional component of wartime military operations—or, to use the terminology of *Hamdi*, a "fundamental and accepted . . . incident to war," 542 U.S. at 518 (plurality opinion)—employed to defeat the enemy and to prevent enemy attacks in the United States. Here, as in other conflicts, the enemy may use public communications networks, and some of the enemy may already be in the United States. Although those factors may be present in this conflict to a greater degree than in the past, neither is novel. Certainly, both factors were well known at the time Congress enacted the AUMF. Wartime interception of international communications made by the enemy thus should be understood, no less than the wartime detention at issue in *Hamdi*, as one of the basic methods of engaging and defeating the enemy that Congress authorized in approving "*all* necessary and appropriate force" that the President would need to defend the Nation. AUMF § 2(a) (emphasis added).

*      *      *

Accordingly, the President has the authority to conduct warrantless electronic surveillance against the declared enemy of the United States in a time of armed conflict. That authority derives from the Constitution, and is reinforced by the text and purpose of the AUMF, the nature of the threat posed by al Qaeda that Congress authorized the President to repel, and the long-established understanding that electronic surveillance is a fundamental incident of the use of military force. The President's power in authorizing the NSA activities is at its zenith because he has acted "pursuant to an express or implied authorization of Congress." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring).

## III.    THE NSA ACTIVITIES ARE CONSISTENT WITH THE FOREIGN INTELLIGENCE SURVEILLANCE ACT

The President's exercise of his constitutional authority to conduct warrantless wartime electronic surveillance of the enemy, as confirmed and supplemented by statute in the AUMF, is fully consistent with the requirements of the Foreign Intelligence Surveillance Act ("FISA").[5] FISA is a critically important tool in the War on Terror. The United States makes full use of the authorities available under FISA to gather foreign intelligence information, including authorities to intercept communications, conduct physical searches, and install and use pen registers and trap and trace devices. While FISA establishes certain procedures that must be followed for these authorities to be used (procedures that usually involve applying for and obtaining an order from a special court), FISA also expressly contemplates that a later legislative enactment could

---

[5] To avoid revealing details about the operation of the program, it is assumed for purposes of this paper that the activities described by the President constitute "electronic surveillance," as defined by FISA, 50 U.S.C. § 1801(f).

authorize electronic surveillance outside the procedures set forth in FISA itself. The AUMF constitutes precisely such an enactment. To the extent there is any ambiguity on this point, the canon of constitutional avoidance requires that such ambiguity be resolved in favor of the President's authority to conduct the communications intelligence activities he has described. Finally, if FISA could not be read to allow the President to authorize the NSA activities during the current congressionally authorized armed conflict with al Qaeda, FISA would be unconstitutional as applied in this narrow context.

A.     THE REQUIREMENTS OF FISA

FISA was enacted in 1978 to regulate "electronic surveillance," particularly when conducted to obtain "foreign intelligence information," as those terms are defined in section 101 of FISA, 50 U.S.C. § 1801. As a general matter, the statute requires that the Attorney General approve an application for an order from a special court composed of Article III judges and created by FISA—the Foreign Intelligence Surveillance Court ("FISC"). *See* 50 U.S.C. §§ 1803-1804. The application must demonstrate, among other things, that there is probable cause to believe that the target is a foreign power or an agent of a foreign power. *See id.* § 1805(a)(3)(A). It must also contain a certification from the Assistant to the President for National Security Affairs or an officer of the United States appointed by the President with the advice and consent of the Senate and having responsibilities in the area of national security or defense that the information sought is foreign intelligence information and cannot reasonably be obtained by normal investigative means. *See id.* § 1804(a)(7). FISA further requires the Government to state the means that it proposes to use to obtain the information and the basis for its belief that the facilities at which the surveillance will be directed are being used or are about to be used by a foreign power or an agent of a foreign power. *See id.* § 1804(a)(4), (a)(8).

FISA was the first congressional measure that sought to impose restrictions on the Executive Branch's authority to engage in electronic surveillance for foreign intelligence purposes, an authority that, as noted above, had been repeatedly recognized by the federal courts. *See* Americo R. Cinquegrana, *The Walls (and Wires) Have Ears: The Background and First Ten Years of the Foreign Intelligence Surveillance Act of 1978*, 137 U. Penn. L. Rev. 793, 810 (1989) (stating that the "status of the President's inherent authority" to conduct surveillance "formed the core of subsequent legislative deliberations" leading to the enactment of FISA). To that end, FISA modified a provision in Title III that previously had disclaimed any intent to have laws governing wiretapping interfere with the President's constitutional authority to gather foreign intelligence. Prior to the passage of FISA, section 2511(3) of title 18 had stated that "[n]othing contained in this chapter or in section 605 of the Communications Act of 1934 . . . shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities." 18 U.S.C. § 2511(3) (1970). FISA replaced that provision with an important, though more limited, preservation of authority for the President. *See* Pub. L. No. 95-511, § 201(b), (c), 92 Stat. 1783, 1797 (1978), codified at 18 U.S.C. § 2511(2)(f) (West Supp. 2005) (carving out from statutory regulation only the acquisition of intelligence information from "international or foreign communications" and

18

"foreign intelligence activities . . . involving a foreign electronic communications system" as long as they are accomplished "utilizing a means other than electronic surveillance as defined in section 101" of FISA. Congress also defined "electronic surveillance," 50 U.S.C. § 1801(f), carefully and somewhat narrowly.[6]

In addition, Congress addressed, to some degree, the manner in which FISA might apply after a formal declaration of war by expressly allowing warrantless surveillance for a period of fifteen days following such a declaration. Section 111 of FISA allows the President to "authorize electronic surveillance without a court order under this subchapter to acquire foreign intelligence information for a period not to exceed fifteen calendar days following a declaration of war by the Congress." 50 U.S.C. § 1811.

The legislative history of FISA shows that Congress understood it was legislating on fragile constitutional ground and was pressing or even exceeding constitutional limits in regulating the President's authority in the field of foreign intelligence. The final House Conference Report, for example, recognized that the statute's restrictions might well impermissibly infringe on the President's constitutional powers. That report includes the extraordinary acknowledgment that "[t]he conferees agree that the establishment by this act of exclusive means by which the President may conduct electronic surveillance does not foreclose a different decision by the Supreme Court." H.R. Conf. Rep. No. 95-1720, at 35, *reprinted in* 1978 U.S.C.C.A.N. 4048, 4064. But, invoking Justice Jackson's concurrence in the *Steel Seizure* case, the Conference Report explained that Congress intended in FISA to exert whatever power Congress constitutionally had over the subject matter to restrict foreign intelligence surveillance and to leave the President solely with whatever inherent constitutional authority he might be able to invoke against Congress's express wishes. *Id.* The Report thus explains that "[t]he intent of the conferees is to apply the standard set forth in Justice Jackson's concurring opinion in the Steel Seizure Case: 'When a President takes measures incompatible with the express or implied

---

[6] FISA's legislative history reveals that these provisions were intended to exclude certain intelligence activities conducted by the National Security Agency from the coverage of FISA. According to the report of the Senate Judiciary Committee on FISA, "this provision [referencing what became the first part of section 2511(2)(f)] is designed to make clear that the legislation does not deal with international signals intelligence activities as currently engaged in by the National Security Agency and electronic surveillance conducted outside the United States." S. Rep. No. 95-604, at 64 (1978), *reprinted in* 1978 U.S.C.C.A.N. 3904, 3965. The legislative history also makes clear that the definition of "electronic surveillance" was crafted for the same reason. *See id.* at 33-34, 1978 U.S.C.C.A.N. at 3934-36. FISA thereby "adopts the view expressed by the Attorney General during the hearings that enacting statutory controls to regulate the National Security Agency and the surveillance of Americans abroad raises problems best left to separate legislation." *Id.* at 64, 1978 U.S.C.C.A.N. at 3965. Such legislation placing limitations on traditional NSA activities was drafted, but never passed. *See National Intelligence Reorganization and Reform Act of 1978: Hearings Before the Senate Select Committee on Intelligence, 95th Cong., 2d Sess. 999-1007 (1978) (text of unenacted legislation). And Congress understood that the NSA surveillance that it intended categorically to exclude from FISA could include the monitoring of international communications into or out of the United States of U.S. citizens. The report specifically referred to the Church Committee report for its description of the NSA's activities, S. Rep. No. 95-604, at 64 n.63, 1978 U.S.C.C.A.N. at 3965-66 n.63, which stated that "the NSA intercepts messages passing over international lines of communication, some of which have one terminal within the United States. Traveling over these lines of communication, especially those with one terminal in the United States, are messages of Americans . . . ." S. Rep. 94-755, at Book II, 308 (1976). Congress's understanding in the legislative history of FISA that such communications could be intercepted outside FISA procedures is notable.

19

will of Congress, his power is at the lowest ebb, for then he can rely only upon his own constitutional power minus any constitutional power of Congress over the matter.'" *Id.* (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U.S. 579, 637 (1952) (Jackson, J., concurring)); *see also* S. Rep. No. 95-604, at 64, *reprinted in* 1978 U.S.C.C.A.N. at 3966 (same); *see generally* Elizabeth B. Bazen et al., Congressional Research Service, *Re: Presidential Authority to Conduct Warrantless Electronic Surveillance to Gather Foreign Intelligence Information* 28-29 (Jan. 5, 2006). It is significant, however, that Congress did not decide conclusively to continue to push the boundaries of its constitutional authority in wartime. Instead, Congress reserved the question of the appropriate procedures to regulate electronic surveillance in time of war, and established a fifteen-day period during which the President would be permitted to engage in electronic surveillance without complying with FISA's express procedures and during which Congress would have the opportunity to revisit the issue. *See* 50 U.S.C. § 1811; H.R. Conf. Rep. No. 95-1720, at 34, *reprinted in* 1978 U.S.C.C.A.N. at 4063 (noting that the purpose of the fifteen-day period following a declaration of war in section 111 of FISA was to "allow time for consideration of any amendment to this act that may be appropriate during a wartime emergency").

**B.    FISA CONTEMPLATES AND ALLOWS SURVEILLANCE AUTHORIZED "BY STATUTE"**

Congress did not attempt through FISA to prohibit the Executive Branch from using electronic surveillance. Instead, Congress acted to bring the exercise of that power under more stringent congressional control. *See, e.g.,* H. Conf. Rep. No. 95-1720, at 32, *reprinted in* 1978 U.S.C.C.A.N. 4048, 4064. Congress therefore enacted a regime intended to supplant the President's reliance on his own constitutional authority. Consistent with this overriding purpose of bringing the use of electronic surveillance under *congressional* control and with the commonsense notion that the Congress that enacted FISA could not bind future Congresses, FISA expressly contemplates that the Executive Branch may conduct electronic surveillance outside FISA's express procedures if and when a subsequent statute authorizes such surveillance.

Thus, section 109 of FISA prohibits any person from intentionally "engag[ing] . . . in electronic surveillance under color of law *except as authorized by statute.*" 50 U.S.C. § 1809(a)(1) (emphasis added). Because FISA's prohibitory provision broadly exempts surveillance "authorized by statute," the provision demonstrates that Congress did not attempt to regulate through FISA electronic surveillance authorized by Congress through a subsequent enactment. The use of the term "statute" here is significant because it strongly suggests that *any* subsequent authorizing statute, not merely one that amends FISA itself, could legitimately authorize surveillance outside FISA's standard procedural requirements. *Compare* 18 U.S.C. § 2511(1) ("Except as otherwise specifically provided *in this chapter* any person who—(a) intentionally intercepts . . . any wire, oral, or electronic communication[] . . . shall be punished . . . .") (emphasis added); *id.* § 2511(2)(e) (providing a defense to liability to individuals "conduct[ing] electronic surveillance, . . . as authorized by *that Act [FISA]*") (emphasis added). In enacting FISA, therefore, Congress contemplated the possibility that the President might be permitted to conduct electronic surveillance pursuant to a later-enacted statute that did not

20

incorporate all of the procedural requirements set forth in FISA or that did not expressly amend FISA itself.

To be sure, the scope of this exception is rendered less clear by the conforming amendments that FISA made to chapter 119 of title 18—the portion of the criminal code that provides the mechanism for obtaining wiretaps for law enforcement purposes. Before FISA was enacted, chapter 119 made it a criminal offense for any person to intercept a communication except as specifically provided in that chapter. *See* 18 U.S.C. § 2511(1)(a), (4)(a). Section 201(b) of FISA amended that chapter to provide an exception from criminal liability for activities conducted pursuant to FISA. Specifically, FISA added 18 U.S.C. § 2511(2)(e), which provides that it is not unlawful for "an officer, employee, or agent of the United States . . . to conduct electronic surveillance, as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978, as authorized by that Act." *Id.* § 2511(2)(e). Similarly, section 201(b) of FISA amended chapter 119 to provide that "procedures in this chapter [or chapter 121 (addressing access to stored wire and electronic communications and customer records)] and the Foreign Intelligence Surveillance Act of 1978 shall be the exclusive means by which electronic surveillance, as defined in section 101 of such Act, and the interception of domestic wire, oral, and electronic communications may be conducted." *Id.* § 2511(2)(f) (West Supp. 2005).[7]

The amendments that section 201(b) of FISA made to title 18 are fully consistent, however, with the conclusion that FISA contemplates that a subsequent statute could authorize electronic surveillance outside FISA's express procedural requirements. Section 2511(2)(e) of title 18, which provides that it is "not unlawful" for an officer of the United States to conduct electronic surveillance "as authorized by" FISA, is best understood as a safe-harbor provision. Because of section 109, the protection offered by section 2511(2)(e) for surveillance "authorized by" FISA extends to surveillance that is authorized by any other statute and therefore excepted from the prohibition of section 109. In any event, the purpose of section 2511(2)(e) is merely to make explicit what would already have been implicit—that those authorized by statute to engage in particular surveillance do not act unlawfully when they conduct such surveillance. Thus, even if that provision had not been enacted, an officer conducting surveillance authorized by statute (whether FISA or some other law) could not reasonably have been thought to be violating Title III. Similarly, section 2511(2)(e) cannot be read to require a result that would be manifestly unreasonable—exposing a federal officer to criminal liability for engaging in surveillance authorized by statute, merely because the authorizing statute happens not to be FISA itself.

Nor could 18 U.S.C. § 2511(2)(f), which provides that the "procedures in this chapter . . . and the Foreign Intelligence Surveillance Act of 1978 shall be the exclusive means by which electronic surveillance . . . may be conducted," have been intended to trump the commonsense approach of section 109 and preclude a subsequent Congress from authorizing the President to engage in electronic surveillance through a statute other than FISA, using procedures other than those outlined in FISA or chapter 119 of title 18. The legislative history of section 2511(2)(f) clearly indicates an intent to prevent the President from engaging in surveillance except as

---

[7] The bracketed portion was added in 1986 amendments to section 2511(2)(f). *See* Pub. L. No. 99-508 § 101(b)(3), 100 Stat. 1848, 1850.

21