# Exhibit 20 (Part II)

*Electronic Privacy Information Center v. Department of Justice*,
No. 06-0096 (HHK)

*American Civil Liberties Union et al. v. Department of Justice*,
No. 06-214 (HHK)

Opposition to Defendant's Expedited Motion for Relief From the
Court's Order of February 16, 2006

authorized by Congress, *see* H.R. Conf. Rep. No. 95-1720, at 32, *reprinted in* 1978
U.S.C.C.A.N. 4048, 4064, which explains why section 2511(2)(f) set forth all then-existing
statutory restrictions on electronic surveillance. Section 2511(2)(f)'s reference to "exclusive
means" reflected the state of statutory authority for electronic surveillance in 1978 and cautioned
the President not to engage in electronic surveillance outside congressionally sanctioned
parameters. It is implausible to think that, in attempting to limit the *President's* authority,
Congress also limited its own future authority by barring subsequent Congresses from
authorizing the Executive to engage in surveillance in ways not specifically enumerated in FISA
or chapter 119, or by requiring a subsequent Congress specifically to amend FISA and section
2511(2)(f). There would be a serious question as to whether the Ninety-Fifth Congress could
have so tied the hands of its successors. *See, e.g., Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135
(1810) (noting that "one legislature cannot abridge the powers of a succeeding legislature");
*Reichelderfer v. Quinn*, 287 U.S. 315, 318 (1932) ("[T]he will of a particular Congress . . . does
not impose itself upon those to follow in succeeding years"); *Lockhart v. United States*, 126 S.
Ct. 699, 703 (2005) (Scalia, J., concurring) (collecting precedent); 1 W. Blackstone,
Commentaries on the Laws of England 90 (1765) ("Acts of parliament derogatory from the
power of subsequent parliaments bind not"). In the absence of a clear statement to the contrary,
it cannot be presumed that Congress attempted to abnegate its own authority in such a way.

Far from a clear statement of congressional intent to bind itself, there are indications that
section 2511(2)(f) cannot be interpreted as requiring that *all* electronic surveillance and domestic
interception be conducted under FISA's enumerated procedures or those of chapter 119 of title
18 until and unless those provisions are repealed or amended. Even when section 2511(2)(f) was
enacted (and no subsequent authorizing statute existed), it could not reasonably be read to
preclude all electronic surveillance conducted outside the procedures of FISA or chapter 119 of
title 18. In 1978, use of a pen register or trap and trace device constituted electronic surveillance
as defined by FISA. *See* 50 U.S.C. §§ 1801(f), (n). Title I of FISA provided procedures for
obtaining court authorization for the use of pen registers to obtain foreign intelligence
information. But the Supreme Court had, just prior to the enactment of FISA, held that chapter
119 of title 18 did not govern the use of pen registers. *See United States v. New York Tel. Co.*,
434 U.S. 159, 165-68 (1977). Thus, if section 2511(2)(f) were to be read to permit of no
exceptions, the use of pen registers for purposes other than to collect foreign intelligence
information would have been unlawful because such use would not have been authorized by the
"exclusive" procedures of section 2511(2)(f), *i.e.*, FISA and chapter 119. But no court has held
that pen registers could not be authorized outside the foreign intelligence context. Indeed, FISA
appears to have recognized this issue by providing a defense to liability for any official who
engages in electronic surveillance under a search warrant or court order. *See* 50 U.S.C.
§ 1809(b). (The practice when FISA was enacted was for law enforcement officers to obtain
search warrants under the Federal Rules of Criminal Procedure authorizing the installation and
use of pen registers. *See S. 1667, A Bill to Amend Title 18, United States Code, with Respect to
the Interception of Certain Communications, Other Forms of Surveillance, and for Other
Purposes: Hearing Before the Subcomm. On Patents, Copyrights and Trademarks of the Senate*

*Comm. on the Judiciary*, 99th Cong. 57 (1985) (prepared statement of James Knapp, Deputy Assistant Attorney General, Criminal Division)).[8]

In addition, section 2511(2)(a)(ii) authorizes telecommunications providers to assist officers of the Government engaged in electronic surveillance when the Attorney General certifies that "no warrant or court order is required by law [and] that all statutory requirements have been met." 18 U.S.C. § 2511(2)(a)(ii).[9] If the Attorney General can certify, in good faith, that the requirements of a subsequent statute authorizing electronic surveillance are met, service providers are affirmatively and expressly authorized to assist the Government. Although FISA does allow the Government to proceed without a court order in several situations, *see* 50 U.S.C. § 1805(f) (emergencies); *id.* § 1802 (certain communications between foreign governments), this provision specifically lists only Title III's emergency provision but speaks generally to Attorney General certification. That reference to Attorney General certification is consistent with the historical practice in which Presidents have delegated to the Attorney General authority to approve warrantless surveillance for foreign intelligence purposes. *See, e.g., United States v. United States District Court*, 444 F.2d 651, 669-71 (6th Cir. 1971) (reproducing as an appendix memoranda from Presidents Roosevelt, Truman, and Johnson). Section 2511(2)(a)(ii) thus suggests that telecommunications providers can be authorized to assist with warrantless electronic surveillance when such surveillance is authorized by law outside FISA.

In sum, by expressly and broadly excepting from its prohibition electronic surveillance undertaken "as authorized by statute," section 109 of FISA permits an exception to the "procedures" of FISA referred to in 18 U.S.C. § 2511(2)(f) where authorized by another statute, even if the other authorizing statute does not specifically amend section 2511(2)(f).

### C.    THE AUMF IS A "STATUTE" AUTHORIZING SURVEILLANCE OUTSIDE THE CONFINES OF FISA

The AUMF qualifies as a "statute" authorizing electronic surveillance within the meaning of section 109 of FISA.

First, because the term "statute" historically has been given broad meaning, the phrase "authorized by statute" in section 109 of FISA must be read to include joint resolutions such as

---

[8] Alternatively, section 109(b) may be read to constitute a "procedure" in FISA or to incorporate procedures from sources other than FISA (such as the Federal Rules of Criminal Procedure or state court procedures), and in that way to satisfy section 2511(2)(f). But if section 109(b)'s defense can be so read, section 109(a) should also be read to constitute a procedure or incorporate procedures not expressly enumerated in FISA.

[9] Section 2511(2)(a)(ii) states:

Notwithstanding any other law, providers of wire or electronic communication service, . . . are authorized by law to provide information, facilities, or technical assistance to persons authorized by law to intercept . . . communications or to conduct electronic surveillance, as defined [by FISA], if such provider . . . has been provided with . . . a certification in writing by [specified persons proceeding under Title III's emergency provision] or the Attorney General of the United States that no warrant or court order is required by law, that all statutory requirements have been met, and that the specific assistance is required.

the AUMF. *See American Fed'n of Labor v. Watson*, 327 U. S. 582, 592-93 (1946) (finding the term "statute" as used in 28 U.S.C. § 380 to mean "a compendious summary of various enactments, by whatever method they may be adopted, to which a State gives her sanction"); Black's Law Dictionary 1410 (6th ed. 1990) (defining "statute" broadly to include any "formal written enactment of a legislative body," and stating that the term is used "to designate the legislatively created laws in contradistinction to court decided or unwritten laws"). It is thus of no significance to this analysis that the AUMF was enacted as a joint resolution rather than a bill. *See, e.g., Ann Arbor R.R. Co. v. United States*, 281 U.S. 658, 666 (1930) (joint resolutions are to be construed by applying "the rules applicable to legislation in general"); *United States ex rel. Levey v. Stockslager*, 129 U.S. 470, 475 (1889) (joint resolution had "all the characteristics and effects" of statute that it suspended); *Padilla ex rel. Newman v. Bush,* 233 F. Supp. 2d 564, 598 (S.D.N.Y 2002) (in analyzing the AUMF, finding that there is "no relevant constitutional difference between a bill and a joint resolution"), *rev'd sub nom. on other grounds, Rumsfeld v. Padilla*, 352 F.3d 695 (2d Cir. 2003), *rev'd*, 542 U.S. 426 (2004); *see also* Letter for the Hon. John Conyers, Jr., U.S. House of Representatives, from Prof. Laurence H. Tribe at 3 (Jan. 6, 2006) (term "statute" in section 109 of FISA "of course encompasses a joint resolution presented to and signed by the President").

Second, the longstanding history of communications intelligence as a fundamental incident of the use of force and the Supreme Court's decision in *Hamdi v. Rumsfeld* strongly suggest that the AUMF satisfies the requirement of section 109 of FISA for statutory authorization of electronic surveillance. As explained above, it is not necessary to demarcate the outer limits of the AUMF to conclude that it encompasses electronic surveillance targeted at the enemy. Just as a majority of the Court concluded in *Hamdi* that the AUMF authorizes detention of U.S. citizens who are enemy combatants without expressly mentioning the President's long-recognized power to detain, so too does it authorize the use of electronic surveillance without specifically mentioning the President's equally long-recognized power to engage in communications intelligence targeted at the enemy. And just as the AUMF satisfies the requirement in 18 U.S.C. § 4001(a) that no U.S. citizen be detained "except pursuant to an Act of Congress," so too does it satisfy section 109's requirement for statutory authorization of electronic surveillance.[10] In authorizing the President's use of force in response to the September 11th attacks, Congress did not need to comb through the United States Code looking for those restrictions that it had placed on national security operations during times of peace and designate with specificity each traditional tool of military force that it sought to authorize the President to use. There is no historical precedent for such a requirement: authorizations to use

---

[10] It might be argued that Congress dealt more comprehensively with electronic surveillance in FISA than it did with detention in 18 U.S.C. § 4001(a). Thus, although Congress prohibited detention "except pursuant to an Act of Congress," it combined the analogous prohibition in FISA (section 109(a)) with section 2511(2)(f)'s exclusivity provision. *See* Letter to the Hon. Bill Frist, Majority Leader, U.S. Senate, from Professor Curtis A. Bradley *et al.* at 5 n.6 (Jan. 9, 2006) (noting that section 4001(a) does not "attempt[] to create an exclusive mechanism for detention"). On closer examination, however, it is evident that Congress has regulated detention far more meticulously than these arguments suggest. Detention is the topic of much of the Criminal Code, as well as a variety of other statutes, including those providing for civil commitment of the mentally ill and confinement of alien terrorists. The existence of these statutes and accompanying extensive procedural safeguards, combined with the substantial constitutional issues inherent in detention, *see, e.g., Hamdi*, 542 U.S. at 574-75 (Scalia, J., dissenting), refute any such argument.

military force traditionally have been couched in general language. Indeed, prior administrations have interpreted joint resolutions declaring war and authorizing the use of military force to authorize expansive collection of communications into and out of the United States.[11]

Moreover, crucial to the Framers' decision to vest the President with primary constitutional authority to defend the Nation from foreign attack is the fact that the Executive can act quickly, decisively, and flexibly as needed. For Congress to have a role in that process, it must be able to act with similar speed, either to lend its support to, or to signal its disagreement with, proposed military action. Yet the need for prompt decisionmaking in the wake of a devastating attack on the United States is fundamentally inconsistent with the notion that to do so Congress must legislate at a level of detail more in keeping with a peacetime budget reconciliation bill. In emergency situations, Congress must be able to use broad language that effectively sanctions the President's use of the core incidents of military force. That is precisely what Congress did when it passed the AUMF on September 14, 2001—just three days after the deadly attacks on America. The Capitol had been evacuated on September 11th, and Congress was meeting in scattered locations. As an account emerged of who might be responsible for these attacks, Congress acted quickly to authorize the President to use "all necessary and appropriate force" against the enemy that he determines was involved in the September 11th attacks. Under these circumstances, it would be unreasonable and wholly impractical to demand that Congress specifically amend FISA in order to assist the President in defending the Nation. Such specificity would also have been self-defeating because it would have apprised our adversaries of some of our most sensitive methods of intelligence gathering.[12]

Section 111 of FISA, 50 U.S.C. § 1811, which authorizes the President, "[n]otwithstanding any other law," to conduct "electronic surveillance without a court order under this subchapter to acquire foreign intelligence information for a period not to exceed fifteen calendar days following a declaration of war by Congress," does not require a different reading of the AUMF. *See also id.* § 1844 (same provision for pen registers); *id.* § 1829 (same provision for physical searches). Section 111 cannot reasonably be read as Congress's final word on electronic surveillance during wartime, thus permanently limiting the President in all

---

[11] As noted above, in intercepting communications, President Wilson relied on his constitutional authority and the joint resolution declaring war and authorizing the use of military force, which, as relevant here, provided "that the President [is] authorized and directed to employ the entire naval and military forces of the United States and the resources of the Government to carry on war against the Imperial German Government; and to bring the conflict to a successful termination all of the resources of the country are hereby pledged by the Congress of the United States." Joint Resolution of Apr. 6, 1917, ch. 1, 40 Stat. 1. The authorization did not explicitly mention interception of communications.

[12] Some have suggested that the Administration declined to seek a specific amendment to FISA allowing the NSA activities "because it was advised that Congress would reject such an amendment," Letter to the Hon. Bill Frist, Majority Leader, U.S. Senate, from Professor Curtis A. Bradley *et al.* 4 & n.4 (Jan. 9, 2005), and they have quoted in support of that assertion the Attorney General's statement that certain Members of Congress advised the Administration that legislative relief "would be difficult, if not impossible." *Id.* at 4 n.4. As the Attorney General subsequently indicated, however, the difficulty with such specific legislation was that it could not be enacted "without compromising the program." *See* Remarks by Homeland Security Secretary Chertoff and Attorney General Gonzales on the USA PATRIOT Act (Dec. 21, 2005), *available at* http://www.dhs.gov/dhspublic/ display?content=5285.

25

circumstances to a mere fifteen days of warrantless military intelligence gathering targeted at the enemy following a declaration of war. Rather, section 111 represents Congress's recognition that it would likely have to return to the subject and provide additional authorization to conduct warrantless electronic surveillance outside FISA during time of war. The Conference Report explicitly stated the conferees' "inten[t] that this [fifteen-day] period will allow time for consideration of any amendment to this act that may be appropriate during a wartime emergency." H.R. Conf. Rep. No. 95-1720, at 34, *reprinted in* 1978 U.S.C.C.A.N. at 4063. Congress enacted section 111 so that the President could conduct warrantless surveillance while Congress considered supplemental wartime legislation.

Nothing in the terms of section 111 disables Congress from authorizing such electronic surveillance as a traditional incident of war through a broad, conflict-specific authorization for the use of military force, such as the AUMF. Although the legislative history of section 111 indicates that in 1978 some Members of Congress believed that any such authorization would come in the form of a particularized amendment to FISA itself, section 111 does not require that result. Nor could the Ninety-Fifth Congress tie the hands of a subsequent Congress in this way, at least in the absence of far clearer statutory language expressly requiring that result. *See supra,* pp. 21-22; *compare, e.g.,* War Powers Resolution, § 8, 50 U.S.C. § 1547(a) ("Authority to introduce United States Armed Forces into hostilities . . . shall not be inferred . . . from any provision of law . . . unless such provision specifically authorizes [such] introduction . . . and states that it is intended to constitute specific statutory authorization within the meaning of this chapter."); 10 U.S.C. § 401 (stating that any other provision of law providing assistance to foreign countries to detect and clear landmines shall be subject to specific limitations and may be construed as superseding such limitations "only if, and to the extent that, such provision specifically refers to this section and specifically identifies the provision of this section that is to be considered superseded or otherwise inapplicable"). An interpretation of section 111 that would disable Congress from authorizing broader electronic surveillance in that form can be reconciled neither with the purposes of section 111 nor with the well-established proposition that "one legislature cannot abridge the powers of a succeeding legislature." *Fletcher v. Peck,* 10 U.S. (6 Cranch) at 135; *see supra* Part II.B. For these reasons, the better interpretation is that section 111 was not intended to, and did not, foreclose Congress from using the AUMF as the legal vehicle for supplementing the President's existing authority under FISA in the battle against al Qaeda.

The contrary interpretation of section 111 also ignores the important differences between a formal declaration of war and a resolution such as the AUMF. As a historical matter, a formal declaration of war was no longer than a sentence, and thus Congress would not expect a declaration of war to outline the extent to which Congress authorized the President to engage in various incidents of waging war. Authorizations for the use of military force, by contrast, are typically more detailed and are made for the *specific purpose* of reciting the manner in which Congress has authorized the President to act. Thus, Congress could reasonably expect that an authorization for the use of military force would address the issue of wartime surveillance, while a declaration of war would not. Here, the AUMF declares that the Nation faces "an unusual and extraordinary threat," acknowledges that "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States," and

provides that the President is authorized "to use all necessary and appropriate force" against those "he determines" are linked to the September 11th attacks. AUMF pmbl., § 2. This sweeping language goes far beyond the bare terms of a declaration of war. *Compare, e.g.*, Act of Apr. 25, 1898, ch. 189, 30 Stat. 364 ("First. That war be, and the same is hereby declared to exist . . . between the United States of America and the Kingdom of Spain.").

Although legislation that has included a declaration of war has often also included an authorization of the President to use force, these provisions are separate and need not be combined in a single statute. *See, e.g., id.* ("Second. That the President of the United States be, and he hereby is, directed and empowered to use the entire land and naval forces of the United States, and to call into the actual service of the United States the militia of the several states, *to such extent as may be necessary to carry this Act into effect*.") (emphasis added). Moreover, declarations of war have legal significance independent of any additional authorization of force that might follow. *See, e.g.*, Louis Henkin, *Foreign Affairs and the U.S. Constitution* 75 (2d ed. 1996) (explaining that a formal state of war has various legal effects, such as terminating diplomatic relations, and abrogating or suspending treaty obligations and international law rights and duties); *see also id.* at 370 n.65 (speculating that one reason to fight an undeclared war would be to "avoid the traditional consequences of declared war on relations with third nations or even . . . belligerents").

In addition, section 111 does not cover the vast majority of modern military conflicts. The last declared war was World War II. Indeed, the most recent conflict prior to the passage of FISA, Vietnam, was fought without a formal declaration of war. In addition, the War Powers Resolution, enacted less than five years before FISA, clearly recognizes the distinctions between formal declarations of war and authorizations of force and demonstrates that, if Congress had wanted to include such authorizations in section 111, it knew how to do so. *See, e.g.*, 50 U.S.C. § 1544(b) (attempting to impose certain consequences 60 days after reporting the initiation of hostilities to Congress "unless the Congress . . . has declared war *or has enacted a specific authorization for such use*" of military force) (emphasis added). It is possible that, in enacting section 111, Congress intended to make no provision for even the temporary use of electronic surveillance without a court order for what had become the legal regime for most military conflicts. A better reading, however, is that Congress assumed that such a default provision would be unnecessary because, if it had acted through an authorization for the use of military force, the more detailed provisions of that authorization would resolve the extent to which Congress would attempt to authorize, or withhold authorization for, the use of electronic surveillance.[13]

---

[13] Some have pointed to the specific amendments to FISA that Congress made shortly after September 11th in the USA PATRIOT Act, Pub. L. No. 107-56, §§ 204, 218, 115 Stat. 272, 281, 291 (2001), to argue that Congress did not contemplate electronic surveillance outside the parameters of FISA. *See* Memorandum for Members of the House Permanent Select Comm. on Intel. from Jeffrey H. Smith, *Re: Legal Authorities Regarding Warrantless Surveillance of U.S. Persons* 6-7 (Jan. 3, 2006). The USA PATRIOT Act amendments, however, do not justify giving the AUMF an unnaturally narrow reading. The USA PATRIOT Act amendments made important corrections in the general application of FISA; they were not intended to define the precise incidents of military force that would be available to the President in prosecuting the current armed conflict against al Qaeda and its allies. Many removed long-standing impediments to the effectiveness of FISA that had contributed to the

27

\*        \*        \*

The broad text of the AUMF, the authoritative interpretation that the Supreme Court gave it in *Hamdi*, and the circumstances in which it was passed demonstrate that the AUMF is a statute authorizing electronic surveillance under section 109 of FISA. When the President authorizes electronic surveillance against the enemy pursuant to the AUMF, he is therefore acting at the height of his authority under *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

### D.    THE CANON OF CONSTITUTIONAL AVOIDANCE REQUIRES RESOLVING IN FAVOR OF THE PRESIDENT'S AUTHORITY ANY AMBIGUITY ABOUT WHETHER FISA FORBIDS THE NSA ACTIVITIES

As explained above, the AUMF fully authorizes the NSA activities. Because FISA contemplates the possibility that subsequent statutes could authorize electronic surveillance without requiring FISA's standard procedures, the NSA activities are also consistent with FISA and related provisions in title 18. Nevertheless, some might argue that sections 109 and 111 of FISA, along with section 2511(2)(f)'s "exclusivity" provision and section 2511(2)(e)'s liability exception for officers engaged in FISA-authorized surveillance, are best read to suggest that FISA requires that subsequent authorizing legislation specifically amend FISA in order to free the Executive from FISA's enumerated procedures. As detailed above, this is not the better reading of FISA. But even if these provisions were ambiguous, any doubt as to whether the AUMF and FISA should be understood to allow the President to make tactical military decisions to authorize surveillance outside the parameters of FISA must be resolved to avoid the serious constitutional questions that a contrary interpretation would raise.

It is well established that the first task of any interpreter faced with a statute that may present an unconstitutional infringement on the powers of the President is to determine whether the statute may be construed to avoid the constitutional difficulty. "[I]f an otherwise acceptable

---

maintenance of an unnecessary "wall" between foreign intelligence gathering and criminal law enforcement; others were technical clarifications. *See In re Sealed Case,* 310 F.3d 717, 725-30 (Foreign Int. Surv. Ct. Rev. 2002). The "wall" had been identified as a significant problem hampering the Government's efficient use of foreign intelligence information well before the September 11th attacks and in contexts unrelated to terrorism. *See, e.g., Final Report of the Attorney General's Review Team on the Handling of the Los Alamos National Laboratory Investigation* 710, 729, 732 (May 2000); General Accounting Office, *FBI Intelligence Investigations: Coordination Within Justice on Counterintelligence Criminal Matters Is Limited* (GAO-01-780) 3, 31 (July 2001). Finally, it is worth noting that Justice Souter made a similar argument in *Hamdi* that the USA PATRIOT Act all but compelled a narrow reading of the AUMF. *See* 542 U.S. at 551 ("It is very difficult to believe that the same Congress that carefully circumscribed Executive power over alien terrorists on home soil [in the USA PATRIOT Act] would not have meant to require the Government to justify clearly its detention of an American citizen held on home soil incommunicado."). Only Justice Ginsburg joined this opinion, and the position was rejected by a majority of Justices.

Nor do later amendments to FISA undermine the conclusion that the AUMF authorizes electronic surveillance outside the procedures of FISA. Three months after the enactment of the AUMF, Congress enacted certain "technical amendments" to FISA which, *inter alia,* extended the time during which the Attorney General may issue an emergency authorization of electronic surveillance from 24 to 72 hours. *See* Intelligence Authorization Act for Fiscal Year 2002, Pub. L. No. 107-108, § 314, 115 Stat. 1394, 1402 (2001). These modifications to FISA do not in any way undermine Congress's previous authorization in the AUMF for the President to engage in electronic surveillance outside the parameters of FISA in the specific context of the armed conflict with al Qaeda.

construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems." *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) (citations omitted); *Ashwander v. TVA*, 297 U.S. 288, 345-48 (1936) (Brandeis, J., concurring). Moreover, the canon of constitutional avoidance has particular importance in the realm of national security, where the President's constitutional authority is at its highest. *See Department of the Navy v. Egan*, 484 U.S. 518, 527, 530 (1988); William N. Eskridge, Jr., *Dynamic Statutory Interpretation* 325 (1994) (describing "[s]uper-strong rule against congressional interference with the President's authority over foreign affairs and national security"). Thus, courts and the Executive Branch typically construe a general statute, even one that is written in unqualified terms, to be implicitly limited so as not to infringe on the President's Commander in Chief powers.

Reading FISA to prohibit the NSA activities would raise two serious constitutional questions, both of which must be avoided if possible: (1) whether the signals intelligence collection the President determined was necessary to undertake is such a core exercise of Commander in Chief control over the Armed Forces during armed conflict that Congress cannot interfere with it at all and (2) whether the particular restrictions imposed by FISA are such that their application would impermissibly impede the President's exercise of his constitutionally assigned duties as Commander in Chief. Constitutional avoidance principles require interpreting FISA, at least in the context of the military conflict authorized by the AUMF, to avoid these questions, if "fairly possible." Even if Congress intended FISA to use the full extent of its constitutional authority to "occupy the field" of "electronic surveillance," as FISA used that term, during peacetime, the legislative history indicates that Congress had not reached a definitive conclusion about its regulation during wartime. *See* H.R. Conf. Rep. No. 95-1720, at 34, *reprinted in* 1978 U.S.C.C.A.N. at 4063 (noting that the purpose of the fifteen-day period following a declaration of war in section 111 of FISA was to "allow time for consideration of any amendment to this act that may be appropriate during a wartime emergency"). Therefore, it is not clear that Congress, in fact, intended to test the limits of its constitutional authority in the context of wartime electronic surveillance.

Whether Congress may interfere with the President's constitutional authority to collect foreign intelligence information through interception of communications reasonably believed to be linked to the enemy poses a difficult constitutional question. As explained in Part I, it had long been accepted at the time of FISA's enactment that the President has inherent constitutional authority to conduct warrantless electronic surveillance for foreign intelligence purposes. Congress recognized at the time that the enactment of a statute purporting to eliminate the President's ability, even during peacetime, to conduct warrantless electronic surveillance to collect foreign intelligence was near or perhaps beyond the limit of Congress's Article I powers. The NSA activities, however, involve signals intelligence performed in the midst of a congressionally authorized armed conflict undertaken to prevent further hostile attacks on the United States. The NSA activities lie at the very core of the Commander in Chief power, especially in light of the AUMF's explicit authorization for the President to take *all* necessary and appropriate military action to stop al Qaeda from striking again. The constitutional principles at stake here thus involve not merely the President's well-established inherent

29

authority to conduct warrantless surveillance for foreign intelligence purposes during peacetime, but also the powers and duties expressly conferred on him as Commander in Chief by Article II.

Even outside the context of wartime surveillance of the enemy, the source and scope of Congress's power to restrict the President's inherent authority to conduct foreign intelligence surveillance is unclear. As explained above, the President's role as sole organ for the Nation in foreign affairs has long been recognized as carrying with it preeminent authority in the field of national security and foreign intelligence. The source of this authority traces to the Vesting Clause of Article II, which states that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1. The Vesting Clause "has long been held to confer on the President plenary authority to represent the United States and to pursue its interests outside the borders of the country, subject only to limits specifically set forth in the Constitution itself and to such statutory limitations as the Constitution permits Congress to impose by exercising one of its enumerated powers." *The President's Compliance with the "Timely Notification" Requirement of Section 501(b) of the National Security Act,* 10 Op. O.L.C. 159, 160-61 (1986) ("*Timely Notification Requirement Op.*").

Moreover, it is clear that some presidential authorities in this context are beyond Congress's ability to regulate. For example, as the Supreme Court explained in *Curtiss-Wright,* the President "*makes* treaties with the advice and consent of the Senate; but he alone negotiates. Into the field of negotiation the Senate cannot intrude; and Congress itself is powerless to invade it." 299 U.S. at 319. Similarly, President Washington established early in the history of the Republic the Executive's absolute authority to maintain the secrecy of negotiations with foreign powers, even against congressional efforts to secure information. *See id.* at 320-21. Recognizing presidential authority in this field, the Executive Branch has taken the position that "congressional legislation authorizing extraterritorial diplomatic and intelligence activities is superfluous, and . . . statutes infringing the President's inherent Article II authority would be unconstitutional." *Timely Notification Requirement Op.,* 10 Op. O.L.C. at 164.

There are certainly constitutional limits on Congress's ability to interfere with the President's power to conduct foreign intelligence searches, consistent with the Constitution, within the United States. As explained above, intelligence gathering is at the heart of executive functions. Since the time of the Founding it has been recognized that matters requiring secrecy—and intelligence in particular—are quintessentially executive functions. *See, e.g., The Federalist No. 64,* at 435 (John Jay) (Jacob E. Cooke ed. 1961) ("The convention have done well therefore in so disposing of the power of making treaties, that although the president must in forming them act by the advice and consent of the senate, yet he will be able to manage the business of intelligence in such manner as prudence may suggest."); *see also Timely Notification Requirement Op.,* 10 Op. O.L.C. at 165; *cf. New York Times Co. v. United States,* 403 U.S. 713, 729-30 (1971) (Stewart, J., concurring) ("[I]t is the constitutional duty of the Executive—as a matter of sovereign prerogative and not as a matter of law as the courts know law—through the promulgation and enforcement of executive regulations, to protect the confidentiality necessary to carry out its responsibilities in the field of international relations and national defense.").

30

Because Congress has rarely attempted to intrude in this area and because many of these questions are not susceptible to judicial review, there are few guideposts for determining exactly where the line defining the President's sphere of exclusive authority lies. Typically, if a statute is in danger of encroaching upon exclusive powers of the President, the courts apply the constitutional avoidance canon, if a construction avoiding the constitutional issue is "fairly possible." *See, e.g., Egan,* 484 U.S. at 527, 530. The only court that squarely has addressed the relative powers of Congress and the President in this field suggested that the balance tips decidedly in the President's favor. The Foreign Intelligence Surveillance Court of Review recently noted that all courts to have addressed the issue of the President's inherent authority have "held that the President did have inherent authority to conduct warrantless searches to obtain foreign intelligence information." *In re Sealed Case,* 310 F.3d 717, 742 (Foreign Intel. Surv. Ct. of Rev. 2002). On the basis of that unbroken line of precedent, the court "[took] for granted that the President does have that authority," and concluded that, "assuming that is so, FISA could not encroach on the President's constitutional power." *Id.*[14] Although the court did not provide extensive analysis, it is the only judicial statement on point, and it comes from the specialized appellate court created expressly to deal with foreign intelligence issues under FISA.

But the NSA activities are not simply exercises of the President's general foreign affairs powers. Rather, they are primarily an exercise of the President's authority as Commander in Chief during an armed conflict that Congress expressly has authorized the President to pursue. The NSA activities, moreover, have been undertaken specifically to prevent a renewed attack at the hands of an enemy that has already inflicted the single deadliest foreign attack in the Nation's history. The core of the Commander in Chief power is the authority to direct the Armed Forces in conducting a military campaign. Thus, the Supreme Court has made clear that the "President alone" is "constitutionally invested with the entire charge of hostile operations." *Hamilton v. Dillin,* 88 U.S. (21 Wall.) 73, 87 (1874); *The Federalist* No. 74, at 500 (Alexander Hamilton). "As commander-in-chief, [the President] is authorized to direct the movements of the naval and military forces placed by law at his command, and to employ them in the manner he may deem most effectual to harass and conquer and subdue the enemy." *Fleming v. Page,* 50 U.S. (9 How.) 603, 615 (1850). As Chief Justice Chase explained in 1866, although Congress has authority to legislate to support the prosecution of a war, Congress may not "*interfere[] with the command of the forces and the conduct of campaigns.* That power and duty belong to the President as commander-in-chief." *Ex parte Milligan,* 71 U.S. (4 Wall.) 2, 139 (1866) (Chase, C.J., concurring in judgment) (emphasis added).

The Executive Branch uniformly has construed the Commander in Chief and foreign affairs powers to grant the President authority that is beyond the ability of Congress to regulate. In 1860, Attorney General Black concluded that an act of Congress, if intended to constrain the President's discretion in assigning duties to an officer in the army, would be unconstitutional:

> As commander-in-chief of the army it is your right to decide according to your

---

[14] In the past, other courts have declined to express a view on that issue one way or the other. *See, e.g., Butenko,* 494 F.2d at 601 ("We do not intimate, at this time, any view whatsoever as the proper resolution of the possible clash of the constitutional powers of the President and Congress.").

own judgment what officer shall perform any particular duty, and as the supreme executive magistrate you have the power of appointment. Congress could not, if it would, take away from the President, or in anywise diminish the authority conferred upon him by the Constitution.

*Memorial of Captain Meigs,* 9 Op. Att'y Gen. 462, 468 (1860). Attorney General Black went on to explain that, in his view, the statute involved there could probably be read as simply providing "a recommendation" that the President could decline to follow at his discretion. *Id.* at 469-70.[15]

Supreme Court precedent does not support claims of congressional authority over core military decisions during armed conflicts. In particular, the two decisions of the Supreme Court that address a conflict between asserted wartime powers of the Commander in Chief and congressional legislation and that resolve the conflict in favor of Congress—*Little v. Barreme,* 6 U.S. (2 Cranch) 170 (1804), and *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579 (1952)—are both distinguishable from the situation presented by the NSA activities in the conflict with al Qaeda. Neither supports the constitutionality of the restrictions in FISA as applied here.

*Barreme* involved a suit brought to recover a ship seized by an officer of the U.S. Navy on the high seas during the so-called "Quasi War" with France in 1799. The seizure had been based upon the officer's orders implementing an act of Congress suspending commerce between the United States and France and authorizing the seizure of American ships bound *to* a French port. The ship in question was suspected of sailing *from* a French port. The Supreme Court held that the orders given by the President could not authorize a seizure beyond the terms of the

---

[15] Executive practice recognizes, consistent with the Constitution, some congressional control over the Executive's decisions concerning the Armed Forces. *See, e.g.,* U.S. Const. art. I, § 8, cl. 12 (granting Congress power "to raise and support Armies"). But such examples have not involved congressional attempts to regulate the actual conduct of a military campaign, and there is no comparable textual support for such interference. For example, just before World War II, Attorney General Robert Jackson concluded that the Neutrality Act prohibited President Roosevelt from selling certain armed naval vessels and sending them to Great Britain. *See Acquisition of Naval and Air Bases in Exchange for Over-Age Destroyers,* 39 Op. Att'y Gen. 484, 496 (1940). Jackson's apparent conclusion that Congress could control the President's ability to transfer war material does not imply acceptance of direct congressional regulation of the Commander in Chief's control of the means and methods of engaging the enemy in conflict. Similarly, in *Youngstown Sheet & Tube Co. v. Sawyer,* the Truman Administration readily conceded that, if Congress had prohibited the seizure of steel mills by statute, Congress's action would have been controlling. *See* Brief for Petitioner at 150, *Youngstown,* 343 U.S. 579 (1952) (Nos. 744 and 745). This concession implies nothing concerning congressional control over the methods of engaging the enemy.

Likewise, the fact that the Executive Branch has, at times, sought congressional ratification after taking unilateral action in a wartime emergency does not reflect a concession that the Executive lacks authority in this area. A decision to seek congressional support can be prompted by many motivations, including a desire for political support. In modern times, several administrations have sought congressional authorization for the use of military force while preserving the ability to assert the unconstitutionality of the War Powers Resolution. *See, e.g., Statement on Signing the Resolution Authorizing the Use of Military Force Against Iraq,* 1 Pub. Papers of George Bush 40 (1991) ("[M]y request for congressional support did not . . . constitute any change in the long-standing positions of the executive branch on either the President's constitutional authority to use the Armed Forces to defend vital U.S. interests or the constitutionality of the War Powers Resolution."). Moreover, many actions for which congressional support has been sought—such as President Lincoln's action in raising an Army in 1861—quite likely fall primarily under Congress's core Article I powers.

statute and therefore that the seizure of the ship not in fact bound *to* a French port was unlawful. *See* 6 U.S. at 177-78. Although some commentators have broadly characterized *Barreme* as standing for the proposition that Congress may restrict by statute the means by which the President can direct the Nation's Armed Forces to carry on a war, the Court's holding was limited in at least two significant ways. First, the operative section of the statute in question applied only to *American* merchant ships. *See id.* at 170 (quoting Act of February 9, 1799). Thus, the Court simply had no occasion to rule on whether, even in the limited and peculiar circumstances of the Quasi War, Congress could have placed some restriction on the orders the Commander in Chief could issue concerning direct engagements with enemy forces. Second, it is significant that the statute in *Barreme* was cast expressly, not as a limitation on the conduct of warfare by the President, but rather as regulation of a subject within the core of Congress's enumerated powers under Article I—the regulation of foreign commerce. *See* U.S. Const., art. I, § 8, cl. 3. The basis of Congress's authority to act was therefore clearer in *Barreme* than it is here.

*Youngstown* involved an effort by the President—in the face of a threatened work stoppage—to seize and to run steel mills. Congress had expressly considered the possibility of giving the President power to effect such a seizure during national emergencies. It rejected that option, however, instead providing different mechanisms for resolving labor disputes and mechanisms for seizing industries to ensure production vital to national defense.

For the Court, the connection between the seizure and the core Commander in Chief function of commanding the Armed Forces was too attenuated. The Court pointed out that the case did not involve authority over "day-to-day fighting in a theater of war." *Id.* at 587. Instead, it involved a dramatic extension of the President's authority over military operations to exercise control over an industry that was vital for producing equipment needed overseas. Justice Jackson's concurring opinion also reveals a concern for what might be termed foreign-to-domestic presidential bootstrapping. The United States became involved in the Korean conflict through President Truman's unilateral decision to commit troops to the defense of South Korea. The President then claimed authority, based upon this foreign conflict, to extend presidential control into vast sectors of the domestic economy. Justice Jackson expressed "alarm[]" at a theory under which "a President whose conduct of foreign affairs is so largely uncontrolled, and often even is unknown, can vastly enlarge his mastery over the internal affairs of the country by his own commitment of the Nation's armed forces to some foreign venture." *Id.* at 642.

Moreover, President Truman's action extended the President's authority into a field that the Constitution predominantly assigns to Congress. *See id.* at 588 (discussing Congress's commerce power and noting that "[t]he Constitution does not subject this lawmaking power of Congress to presidential or military supervision or control"); *see also id.* at 643 (Jackson, J., concurring) (explaining that Congress is given express authority to "'raise and *support* Armies'" and "'to *provide* and *maintain* a Navy'") (quoting U.S. Const. art. I, § 8, cls. 12, 13). Thus, *Youngstown* involved an assertion of executive power that not only stretched far beyond the

33

President's core Commander in Chief functions, but that did so by intruding into areas where Congress had been given an express, and apparently dominant, role by the Constitution.[16]

The present situation differs dramatically. The exercise of executive authority involved in the NSA activities is not several steps removed from the actual conduct of a military campaign. As explained above, it is an essential part of the military campaign. Unlike the activities at issue in *Youngstown*, the NSA activities are directed at the enemy, and not at domestic activity that might incidentally aid the war effort. And assertion of executive authority here does not involve extending presidential power into areas reserved for Congress. Moreover, the theme that appeared most strongly in Justice Jackson's concurrence in *Youngstown*—the fear of presidential bootstrapping—does not apply in this context. Whereas President Truman had used his inherent constitutional authority to commit U.S. troops, here Congress expressly provided the President sweeping authority to use "all necessary and appropriate force" to protect the Nation from further attack. AUMF § 2(a). There is thus no bootstrapping concern.

Finally, *Youngstown* cannot be read to suggest that the President's authority for engaging the enemy is less extensive inside the United States than abroad. To the contrary, the extent of the President's Commander in Chief authority necessarily depends on where the enemy is found and where the battle is waged. In World War II, for example, the Supreme Court recognized that the President's authority as Commander in Chief, as supplemented by Congress, included the power to capture and try agents of the enemy in the United States, even if they never had "entered the theatre or zone of active military operations." *Quirin,* 317 U.S. at 38.[17] In the present conflict, unlike in the Korean War, the battlefield was brought to the United States in the most literal way, and the United States continues to face a threat of further attacks on its soil. In short, therefore, *Youngstown* does not support the view that Congress may constitutionally prohibit the President from authorizing the NSA activities.

The second serious constitutional question is whether the particular restrictions imposed by FISA would impermissibly hamper the President's exercise of his constitutionally assigned duties as Commander in Chief. The President has determined that the speed and agility required to carry out the NSA activities successfully could not have been achieved under FISA.[18] Because the President also has determined that the NSA activities are necessary to the defense of

---

[16] *Youngstown* does demonstrate that the mere fact that Executive action might be placed in Justice Jackson's category III does not obviate the need for further analysis. Justice Jackson's framework therefore recognizes that Congress might impermissibly interfere with the President's authority as Commander in Chief or to conduct the Nation's foreign affairs.

[17] It had been recognized long before *Youngstown* that, in a large-scale conflict, the area of operations could readily extend into the continental United States, even when there are no major engagements of armed forces here. Thus, in the context of the trial of a German officer for spying in World War I, it was recognized that "[w]ith the progress made in obtaining ways and means for devastation and destruction, the territory of the United States was certainly within the field of active operations" during the war, particularly in the port of New York, and that a spy in the United States might easily have aided the "hostile operation" of U-boats off the coast. *United States ex rel. Wessels v. McDonald,* 265 F. 754, 764 (E.D.N.Y. 1920).

[18] In order to avoid further compromising vital national security activities, a full explanation of the basis for the President's determination cannot be given in an unclassified document.

the United States from a subsequent terrorist attack in the armed conflict with al Qaeda, FISA would impermissibly interfere with the President's most solemn constitutional obligation—to defend the United States against foreign attack.

Indeed, if an interpretation of FISA that allows the President to conduct the NSA activities were not "fairly possible," FISA would be unconstitutional as applied in the context of this congressionally authorized armed conflict. In that event, FISA would purport to *prohibit* the President from undertaking actions necessary to fulfill his constitutional obligation to protect the Nation from foreign attack in the context of a congressionally authorized armed conflict with an enemy that has already staged the most deadly foreign attack in our Nation's history. A statute may not "*impede* the President's ability to perform his constitutional duty," *Morrison v. Olson*, 487 U.S. 654, 691 (1988) (emphasis added); *see also id.* at 696-97, particularly not the President's most solemn constitutional obligation—the defense of the Nation. *See also In re Sealed Case*, 310 F.3d at 742 (explaining that "FISA could not encroach on the President's constitutional power").

Application of the avoidance canon would be especially appropriate here for several reasons beyond the acute constitutional crises that would otherwise result. First, as noted, Congress did not intend FISA to be the final word on electronic surveillance conducted during armed conflicts. Instead, Congress expected that it would revisit the subject in subsequent legislation. Whatever intent can be gleaned from FISA's text and legislative history to set forth a comprehensive scheme for regulating electronic surveillance during peacetime, that same intent simply does not extend to armed conflicts and declared wars.[19] Second, FISA was enacted during the Cold War, not during active hostilities with an adversary whose mode of operation is to blend in with the civilian population until it is ready to strike. These changed circumstances have seriously altered the constitutional calculus, one that FISA's enactors had already recognized might suggest that the statute was unconstitutional. Third, certain technological changes have rendered FISA still more problematic. As discussed above, when FISA was enacted in 1978, Congress expressly declined to regulate through FISA certain signals intelligence activities conducted by the NSA. *See supra*, at pp. 18-19 & n.6.[20] These same factors weigh heavily in favor of concluding that FISA would be unconstitutional as applied to the current conflict if the canon of constitutional avoidance could not be used to head off a collision between the Branches.

---

[19] FISA exempts the President from its procedures for fifteen days following a congressional declaration of war. *See* 50 U.S.C. § 1811. If an adversary succeeded in a decapitation strike, preventing Congress from declaring war or passing subsequent authorizing legislation, it seems clear that FISA could not constitutionally continue to apply in such circumstances.

[20] Since FISA's enactment in 1978, the means of transmitting communications has undergone extensive transformation. In particular, many communications that would have been carried by wire are now transmitted through the air, and many communications that would have been carried by radio signals (including by satellite transmissions) are now transmitted by fiber optic cables. It is such technological advancements that have broadened FISA's reach, not any particularized congressional judgment that the NSA's traditional activities in intercepting such international communications should be subject to FISA's procedures. A full explanation of these technological changes would require a discussion of classified information.

\*          \*          \*

As explained above, FISA is best interpreted to allow a statute such as the AUMF to authorize electronic surveillance outside FISA's enumerated procedures. The strongest counterarguments to this conclusion are that various provisions in FISA and title 18, including section 111 of FISA and section 2511(2)(f) of title 18, together require that subsequent legislation must reference or amend FISA in order to authorize electronic surveillance outside FISA's procedures and that interpreting the AUMF as a statute authorizing electronic surveillance outside FISA procedures amounts to a disfavored repeal by implication. At the very least, however, interpreting FISA to allow a subsequent statute such as the AUMF to authorize electronic surveillance without following FISA's express procedures is "fairly possible," and that is all that is required for purposes of invoking constitutional avoidance. In the competition of competing canons, particularly in the context of an ongoing armed conflict, the constitutional avoidance canon carries much greater interpretative force.[21]

## IV.    THE NSA ACTIVITIES ARE CONSISTENT WITH THE FOURTH AMENDMENT

The Fourth Amendment prohibits "unreasonable searches and seizures" and directs that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and

---

[21] If the text of FISA were clear that nothing other than an amendment to FISA could authorize additional electronic surveillance, the AUMF would impliedly repeal as much of FISA as would prevent the President from using "all necessary and appropriate force" in order to prevent al Qaeda and its allies from launching another terrorist attack against the United States. To be sure, repeals by implication are disfavored and are generally not found whenever two statutes are "capable of co-existence." *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1018 (1984). Under this standard, an implied repeal may be found where one statute would "unduly interfere with" the operation of another. *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 156 (1976). The President's determination that electronic surveillance of al Qaeda outside the confines of FISA was "necessary and appropriate" would create a clear conflict between the AUMF and FISA. FISA's restrictions on the use of electronic surveillance would preclude the President from doing what the AUMF specifically authorized him to do: use all "necessary and appropriate force" to prevent al Qaeda from carrying out future attacks against the United States. The ordinary restrictions in FISA cannot continue to apply if the AUMF is to have its full effect; those constraints would "unduly interfere" with the operation of the AUMF.

Contrary to the recent suggestion made by several law professors and former government officials, the ordinary presumption against implied repeals is overcome here. *Cf.* Letter to the Hon. Bill Frist, Majority Leader, U.S. Senate, from Professor Curtis A. Bradley et al. at 4 (Jan. 9, 2006). First, like other canons of statutory construction, the canon against implied repeals is simply a presumption that may be rebutted by other factors, including conflicting canons. *Connecticut National Bank v. Germain,* 503 U.S. 249, 253 (1992); *see also Chickasaw Nation v. United States,* 534 U.S. 84, 94 (2001); *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 115 (2001). Indeed, the Supreme Court has declined to apply the ordinary presumption against implied repeals where other canons apply and suggest the opposite result. *See Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 765-66 (1985). Moreover, *Blackfeet* suggests that where the presumption against implied repeals would conflict with other, more compelling interpretive imperatives, it simply does not apply at all. *See* 471 U.S. at 766. Here, in light of the constitutional avoidance canon, which imposes the overriding imperative to use the tools of statutory interpretation to avoid constitutional conflicts, the implied repeal canon either would not apply at all or would apply with significantly reduced force. Second, the AUMF was enacted during an acute national emergency, where the type of deliberation and detail normally required for application of the canon against implied repeals was neither practical nor warranted. As discussed above, in these circumstances, Congress cannot be expected to work through every potential implication of the U.S. Code and to define with particularity each of the traditional incidents of the use of force available to the President.

particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The touchstone for review of government action under the Fourth Amendment is whether the search is "reasonable." *See, e.g., Vernonia Sch. Dist. v. Acton,* 515 U.S. 646, 653 (1995).

As noted above, *see* Part I, all of the federal courts of appeals to have addressed the issue have affirmed the President's inherent constitutional authority to collect foreign intelligence without a warrant. *See In re Sealed Case,* 310 F.3d at 742. Properly understood, foreign intelligence collection in general, and the NSA activities in particular, fit within the "special needs" exception to the warrant requirement of the Fourth Amendment. Accordingly, the mere fact that no warrant is secured prior to the surveillance at issue in the NSA activities does not suffice to render the activities unreasonable. Instead, reasonableness in this context must be assessed under a general balancing approach, "'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *United States v. Knights,* 534 U.S. 112, 118-19 (2001) (quoting *Wyoming v. Houghton,* 526 U.S. 295, 300 (1999)). The NSA activities are reasonable because the Government's interest, defending the Nation from another foreign attack in time of armed conflict, outweighs the individual privacy interests at stake, and because they seek to intercept only international communications where one party is linked to al Qaeda or an affiliated terrorist organization.

## A.    THE WARRANT REQUIREMENT OF THE FOURTH AMENDMENT DOES NOT APPLY TO THE NSA ACTIVITIES

In "the criminal context," the Fourth Amendment reasonableness requirement "usually requires a showing of probable cause" and a warrant. *Board of Educ. v. Earls,* 536 U.S. 822, 828 (2002). The requirement of a warrant supported by probable cause, however, is not universal. Rather, the Fourth Amendment's "central requirement is one of reasonableness," and the rules the Court has developed to implement that requirement "[s]ometimes . . . require warrants." *Illinois v. McArthur,* 531 U.S. 326, 330 (2001); *see also, e.g., Earls,* 536 U.S. at 828 (noting that the probable cause standard "is peculiarly related to criminal investigations and may be unsuited to determining the reasonableness of administrative searches where the Government seeks to prevent the development of hazardous conditions") (internal quotation marks omitted).

In particular, the Supreme Court repeatedly has made clear that in situations involving "special needs" that go beyond a routine interest in law enforcement, the warrant requirement is inapplicable. *See Vernonia,* 515 U.S. at 653 (there are circumstances "'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable'") (quoting *Griffin v. Wisconsin,* 483 U.S. 868, 873 (1987)); *see also McArthur,* 531 U.S. at 330 ("When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable."). It is difficult to encapsulate in a nutshell all of the different circumstances the Court has found to qualify as "special needs" justifying warrantless searches. But one application in which the Court has found the warrant requirement inapplicable is in circumstances in which the Government faces

37

an increased need to be able to react swiftly and flexibly, or when there are at stake interests in public safety beyond the interests in ordinary law enforcement. One important factor in establishing "special needs" is whether the Government is responding to an emergency that goes beyond the need for general crime control. *See In re Sealed Case*, 310 F.3d at 745-46.

Thus, the Court has permitted warrantless searches of property of students in public schools, *see New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985) (noting that warrant requirement would "unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools"), to screen athletes and students involved in extracurricular activities at public schools for drug use, *see Vernonia*, 515 U.S. at 654-55; *Earls*, 536 U.S. at 829-38, to conduct drug testing of railroad personnel involved in train accidents, *see Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 634 (1989), and to search probationers' homes, *see Griffin*, 483 U.S. 868. Many special needs doctrine and related cases have upheld *suspicionless* searches or seizures. *See, e.g., Illinois v. Lidster*, 540 U.S. 419, 427 (2004) (implicitly relying on special needs doctrine to uphold use of automobile checkpoint to obtain information about recent hit-and-run accident); *Earls*, 536 U.S. at 829-38 (suspicionless drug testing of public school students involved in extracurricular activities); *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 449-55 (1990) (road block to check all motorists for signs of drunken driving); *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) (road block near the border to check vehicles for illegal immigrants); *cf. In re Sealed Case*, 310 F.3d at 745-46 (noting that suspicionless searches and seizures in one sense are a greater encroachment on privacy than electronic surveillance under FISA because they are not based on any particular suspicion, but "[o]n the other hand, wiretapping is a good deal more intrusive than an automobile stop accompanied by questioning"). To fall within the "special needs" exception to the warrant requirement, the purpose of the search must be distinguishable from ordinary general crime control. *See, e.g., Ferguson v. Charleston*, 532 U.S. 67 (2001); *City of Indianapolis v. Edmond*, 531 U.S. 32, 41 (2000).

Foreign intelligence collection, especially in the midst of an armed conflict in which the adversary has already launched catastrophic attacks within the United States, fits squarely within the area of "special needs, beyond the normal need for law enforcement" where the Fourth Amendment's touchstone of reasonableness can be satisfied without resort to a warrant. *Vernonia*, 515 U.S. at 653. The Executive Branch has long maintained that collecting foreign intelligence is far removed from the ordinary criminal law enforcement action to which the warrant requirement is particularly suited. *See, e.g.*, Amending the Foreign Intelligence Surveillance Act: Hearings Before the House Permanent Select Comm. on Intelligence,103d Cong. 2d Sess. 62, 63 (1994) (statement of Deputy Attorney General Jamie S. Gorelick) ("[I]t is important to understand that the rules and methodology for criminal searches are inconsistent with the collection of foreign intelligence and would unduly frustrate the President in carrying out his foreign intelligence responsibilities. . . . [W]e believe that the warrant clause of the Fourth Amendment is inapplicable to such [foreign intelligence] searches."); *see also In re Sealed Case*, 310 F.3d 745. The object of foreign intelligence collection is securing information necessary to protect the national security from the hostile designs of foreign powers like al Qaeda and affiliated terrorist organizations, including the possibility of another foreign attack on the United States. In foreign intelligence investigations, moreover, the targets of surveillance

38

often are agents of foreign powers, including international terrorist groups, who may be specially trained in concealing their activities and whose activities may be particularly difficult to detect. The Executive requires a greater degree of flexibility in this field to respond with speed and absolute secrecy to the ever-changing array of foreign threats faced by the Nation.[22]

In particular, the NSA activities are undertaken to prevent further devastating attacks on our Nation, and they serve the highest government purpose through means other than traditional law enforcement.[23] The NSA activities are designed to enable the Government to act quickly and flexibly (and with secrecy) to find agents of al Qaeda and its affiliates—an international terrorist group which has already demonstrated a capability to infiltrate American communities without being detected—in time to disrupt future terrorist attacks against the United States. As explained by the Foreign Intelligence Surveillance Court of Review, the nature of the "emergency" posed by al Qaeda "takes the matter out of the realm of ordinary crime control." *In re Sealed Case*, 310 F.3d at 746. Thus, under the "special needs" doctrine, no warrant is required by the Fourth Amendment for the NSA activities.

## B.    THE NSA ACTIVITIES ARE REASONABLE

As the Supreme Court has emphasized repeatedly, "[t]he touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Knights*, 534 U.S. at 118-19 (quotation marks omitted); *see also Earls*, 536 U.S. at 829. The Supreme Court has found a search reasonable when, under the totality of the circumstances, the importance of the governmental interests outweighs the nature and quality of the intrusion on the individual's Fourth Amendment interests. *See Knights*, 534 U.S. at 118-22. Under the standard

---

[22] Even in the domestic context, the Supreme Court has recognized that there may be significant distinctions between wiretapping for ordinary law enforcement purposes and domestic national security surveillance. *See United States v. United States District Court*, 407 U.S. 297, 322 (1972) ("*Keith*") (explaining that "the focus of domestic [security] surveillance may be less precise than that directed against more conventional types of crime" because often "the emphasis of domestic intelligence gathering is on the prevention of unlawful activity or the enhancement of the Government's preparedness for some possible future crisis or emergency"); *see also United States v. Duggan*, 743 F.2d 59, 72 (2d Cir. 1984) (reading *Keith* to recognize that "the governmental interests presented in national security investigations differ substantially from those presented in traditional criminal investigations"). Although the Court in *Keith* held that the Fourth Amendment's warrant requirement does apply to investigations of purely *domestic* threats to national security—such as domestic terrorism, it suggested that Congress consider establishing a lower standard for such warrants than that set forth in Title III. *See id.* at 322-23 (advising that "different standards" from those applied to traditional law enforcement "may be compatible with the Fourth Amendment if they are reasonable both in relation to the legitimate need of the Government for intelligence information and the protected rights of our citizens"). *Keith's* emphasis on the need for flexibility applies with even greater force to surveillance directed at *foreign* threats to national security. *See* S. Rep. No. 95-701, at 16 ("Far more than in domestic security matters, foreign counterintelligence investigations are 'long range' and involve 'the interrelation of various sources and types of information.'") (quoting *Keith*, 407 U.S. at 322). And flexibility is particularly essential here, where the purpose of the NSA activities is to prevent another armed attack against the United States.

[23] This is not to say that traditional law enforcement has no role in protecting the Nation from attack. The NSA activities, however, are not directed at bringing criminals to justice but at detecting and preventing plots by a declared enemy of the United States to attack it again.

balancing of interests analysis used for gauging reasonableness, the NSA activities are consistent with the Fourth Amendment.

With respect to the individual privacy interests at stake, there can be no doubt that, as a general matter, interception of telephone communications implicates a significant privacy interest of the individual whose conversation is intercepted. The Supreme Court has made clear at least since *Katz v. United States,* 389 U.S. 347 (1967), that individuals have a substantial and constitutionally protected reasonable expectation of privacy that their telephone conversations will not be subject to governmental eavesdropping. Although the individual privacy interests at stake may be substantial, it is well recognized that a variety of governmental interests—including routine law enforcement and foreign-intelligence gathering—can overcome those interests.

On the other side of the scale here, the Government's interest in engaging in the NSA activities is the most compelling interest possible—securing the Nation from foreign attack in the midst of an armed conflict. One attack already has taken thousands of lives and placed the Nation in state of armed conflict. Defending the Nation from attack is perhaps the most important function of the federal Government—and one of the few express obligations of the federal Government enshrined in the Constitution. *See* U.S. Const. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, *and shall protect each of them against Invasion . . . .*") (emphasis added); *The Prize Cases,* 67 U.S. (2 Black) 635, 668 (1863) ("If war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force."). As the Supreme Court has declared, "[i]t is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee,* 453 U.S. 280, 307 (1981).

The Government's overwhelming interest in detecting and thwarting further al Qaeda attacks is easily sufficient to make reasonable the intrusion into privacy involved in intercepting one-end foreign communications where there is "a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda." Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence, *available at* http://www.whitehouse.gov/news/releases/2005/12/20051219-1.html (Dec. 19, 2005) (statement of Attorney General Gonzales); *cf. Edmond,* 531 U.S. at 44 (noting that "the Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up to thwart an imminent terrorist attack" because "[t]he exigencies created by th[at] scenario[] are far removed" from ordinary law enforcement). The United States has already suffered one attack that killed thousands, disrupted the Nation's financial center for days, and successfully struck at the command and control center for the Nation's military. And the President has stated that the NSA activities are "critical" to our national security. Press Conference of President Bush (Dec. 19, 2005). To this day, finding al Qaeda sleeper agents in the United States remains one of the preeminent concerns of the war on terrorism. As the President has explained, "[t]he terrorists want to strike America again, and they hope to inflict even more damage than they did on September 11th." *Id.*

Of course, because the magnitude of the Government's interest here depends in part upon the threat posed by al Qaeda, it might be possible for the weight that interest carries in the balance to change over time. It is thus significant for the reasonableness of the NSA activities that the President has established a system under which he authorizes the surveillance only for a limited period, typically for 45 days. This process of reauthorization ensures a periodic review to evaluate whether the threat from al Qaeda remains sufficiently strong that the Government's interest in protecting the Nation and its citizens from foreign attack continues to outweigh the individual privacy interests at stake.

Finally, as part of the balancing of interests to evaluate Fourth Amendment reasonableness, it is significant that the NSA activities are limited to intercepting international communications where there is a reasonable basis to conclude that one party to the communication is a member or agent of al Qaeda or an affiliated terrorist organization. This factor is relevant because the Supreme Court has indicated that in evaluating reasonableness, one should consider the "efficacy of [the] means for addressing the problem." *Vernonia*, 515 U.S. at 663; *see also Earls*, 536 U.S. at 834 ("Finally, this Court must consider the nature and immediacy of the government's concerns and the efficacy of the Policy in meeting them."). That consideration does not mean that reasonableness requires the "least intrusive" or most "narrowly tailored" means for obtaining information. To the contrary, the Supreme Court has repeatedly rejected such suggestions. *See, e.g., Earls*, 536 U.S. at 837 ("[T]his Court has repeatedly stated that reasonableness under the Fourth Amendment does not require employing the least intrusive means, because the logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.") (internal quotation marks omitted); *Vernonia*, 515 U.S. at 663 ("We have repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment."). Nevertheless, the Court has indicated that some consideration of the efficacy of the search being implemented—that is, some measure of fit between the search and the desired objective—is relevant to the reasonableness analysis. The NSA activities are targeted to intercept international communications of persons reasonably believed to be members or agents of al Qaeda or an affiliated terrorist organization, a limitation which further strongly supports the reasonableness of the searches.

In sum, the NSA activities are consistent with the Fourth Amendment because the warrant requirement does not apply in these circumstances, which involve both "special needs" beyond the need for ordinary law enforcement and the inherent authority of the President to conduct warrantless electronic surveillance to obtain foreign intelligence to protect our Nation from foreign armed attack. The touchstone of the Fourth Amendment is reasonableness, and the NSA activities are certainly reasonable, particularly taking into account the nature of the threat the Nation faces.

## CONCLUSION

For the foregoing reasons, the President—in light of the broad authority to use military force in response to the attacks of September 11th and to prevent further catastrophic attack expressly conferred on the President by the Constitution and confirmed and supplemented by

41

Congress in the AUMF—has legal authority to authorize the NSA to conduct the signals intelligence activities he has described. Those activities are authorized by the Constitution and by statute, and they violate neither FISA nor the Fourth Amendment.