# Exhibit 25

*Electronic Privacy Information Center v. Department of Justice*,
No. 06-0096 (HHK)

*American Civil Liberties Union et al. v. Department of Justice*,
No. 06-214 (HHK)

Opposition to Defendant's Expedited Motion for Relief From the
Court's Order of February 16, 2006



# Department of Justice

**FOR IMMEDIATE RELEASE**  
**THURSDAY, JANUARY 19, 2006**  
**WWW.USDOJ.GOV**

OPA  
(202) 514-2007  
TDD (202) 514-1888

## TRANSCRIPT OF CONFERENCE CALL WITH STEVEN G. BRADBURY ON RELEASE OF DETAILED LEGAL ANALYSIS OF THE NSA ACTIVITIES DESCRIBED BY THE PRESIDENT

WASHINGTON, D.C.

**MR. ROEHRKASSE:** Thank you very much. This is Brian Roehrkasse in the Office of Public Affairs. Thank you for joining us in this conference call today. Today's briefing will be on the record with Steven G. Bradbury, who is the Acting Assistant Attorney General for the Office of Legal Counsel.

We would ask that as you participate in this call today, if you are not asking a question, would you please keep your phones on mute to cut down any background or interference. Today's call is on the record, as I mentioned, but not for broadcast.

When you ask a question, please state your name and the organization that you're calling from. We have disseminated the materials, including a cover letter from the Attorney General and the white paper that's been prepared by the Department of Justice that's been disseminated to Congress now. If you don't have a copy of it, please feel free to call our office, and we can provide you with a copy of that.

For now I'll turn it over to Steve.

**MR. BRADBURY:** Yeah, again, this is Steve Bradbury, Acting Assistant Attorney General for the Office of Legal Counsel. And as you probably know, today the Department is releasing a white paper which contains a detailed legal analysis of the NSA activities described recently by the President. And these are the activities as the President described them that involves interception by the NSA of international communications coming into or going out of the U.S. where a party to the communication is linked to al Qaeda or related terrorist organizations.

And back on December 22nd, the Department sent a letter to the chairs and ranking members of the intelligence committees in Congress explaining in summary form the legal basis for the NSA activities described by the President.

1



What we're doing today, at the request of the Attorney General, is providing to members of Congress and also releasing publicly what is a more thorough and detailed analysis of the points that were covered in that letter from Assistant Attorney General for Legislative Affairs, Will Moschella, of December 22nd. So what you'll see in the white paper is a summary overview of the analysis, a background section, and then several parts of the analysis.

And again, as explained in that December letter, but treated in a much more comprehensive fashion in today's white paper, the activities that were described by the President involved the establishment of what is an early warning system to detect and prevent another catastrophic terrorist attack on the United States in the wake of the attacks of September 11th, and in the context of the ongoing armed conflict with al Qaeda and its allies.

And the fundamental basis, legal basis, for the President's authority to initiate such a system of military signals intelligence surveillance for the protection of the country is of course his authority under Article II of the Constitution, which assigns him the primary role in foreign relations on behalf of the United States, and the role as Commander in Chief.

And under that authority, the President has the duty to take action as necessary to protect the country, particularly in a time of armed conflict following what was the deadliest attack on the U.S. soil in the history of the nation.

And the Constitution, not surprisingly, gives the President authority necessary to take those actions in carrying out that duty. And the authority specifically under Article II to undertake warrantless surveillance during time of armed conflict is well established in the history of the country and has been something that presidents have done virtually in every armed conflict that the country has been involved in, certainly all of the major wars.

In addition, of course, in the days following 9/11, Congress passed the White resolution, which was the authorization for the use of military force, passed by Congress on September 14th and signed into law by the President on September 18th, 2001. And in that authorization, Congress expressly recognized that the President does have authority to take action to protect the country in order to prevent a further attack on the United States. And Congress gave its support, confirmed the President's authority and supplemented his constitutional authority with a very broad authorization statement, that the President can use all necessary force as he determines necessary to protect the country from further attack.

As we explained back in our December 22nd letter and is set forth more fully in this white paper, we believe that that statutory authorization contains within it necessary incident to the use of military force, the ability to undertake what is intelligence, communications intelligence, targeted at the enemy in the currently armed conflict, particularly when you're talking about an enemy that has already attacked the United States from within the country, and where there are agents of the enemy who may be hiding out in the country unbeknownst to the government, you have to be able to identify who they are, where they are, in order to prevent a further attack.

As we explain in the white paper, there's a lengthy history of practice in all armed conflicts of undertaking such military intelligence for defensive purposes. And so it's -- it is a normal and traditional incident of the use of force that fits comfortably within the broad language of the authorization.

Now then the next question is, is the activity that the President has described consistent with FISA, the Foreign Intelligence Surveillance Act. And as we explain in detail, we believe it is.

And we don't think you need to get the difficult question of the constitutional balance between the branches and whether FISA could be constitutionally applied in certainly circumstances in the context of war to impose restrictions or prohibitions on the President's ability to defend the country, and that's because FISA itself acknowledges the possibility that Congress would separate authorize by statute the President to conduct this kind of surveillance, because FISA prohibits electronic surveillance except as authorized by statute.

And the authorization for the use of military force is a statute, and as we develop in this paper, it is precisely we believe the type of statute, the type of broad authorization that you would expect Congress to pass in the context of an armed conflict in the wake of a catastrophic attack like the attacks of 9/11.

And so, therefore, the use of this authority in the way the President has described is consistent with FISA and the procedures of FISA.

We then go on to explain at length in here that if there's any doubt about that question, if there's an ambiguity in FISA as to whether the authorization for the use of military force can be read in harmony with FISA, then that ambiguity must be construed in favor of the President's ability to use this authority in order to avoid any serious constitutional question that would arise about the constitutionality of the FISA restrictions.

And by the way, for purposes of this analysis, we're assuming that the NSA activities that the President has described would otherwise constitute electronic surveillance for purposes of FISA. WE're not saying that's the case, but we're assuming for purposes of the analysis that that would be the case.

And in the course -- you'll see in the course of that discussion of FISA, we talk here in depth about aspects of the FISA statute that have been raised by others, including the Declaration of War provisions in FISA, the exclusive means language in FISA. We get into all of that in great detail.

The final part of the white paper addresses the Fourth Amendment issues, the civil liberties protections, and explains that this activity, which is focused on international communications, which is reviewed by the President and senior advisors every 45 days, and which is determined based on the latest intelligence to be necessary to protect the country, is the kind of activity that falls well within established areas where warrant would not be required. Because it's based on needs and serves purposes that go well beyond routine law

3

enforcement. So it's a special use aspect of the Fourth Amendment where a warrant is not required, where the touchstone for Fourth Amendment purposes is reasonableness. And with everything that's at stake, and with all the limitations and in this narrow context, we think it's comfortably within the reasonableness requirement of the Fourth Amendment.

So that's an overview of what you'll see in the white paper. What we tried to do is get into much more detail that we previously have and address some of the points that have been made by others in the public discussion about these activities.

So I'm happy to take any questions that people have at this point.

**MR. ROEHRKASSE:** Okay. When you ask your questions again, if you could please remember to state your name and the name of the organization that you're from. So please, let's go ahead and begin.

**QUESTION:** Mr. Bradbury, Pete Williams from NBC News.

I'm a little puzzled about why the reasoning here isn't somewhat circular. You say that you believe the court's opinion in Hamdi, which of course expressed -- I just re-read that section. It looks only at the question of whether the detention of enemy combatants is authorized by the use of military force authorization.

**MR. BRADBURY:** Yes.

**QUESTION:** It is not the general -- it doesn't go on to say, "and anything else the President has to do in wartime is okay, too." It's limited solely to enemy combatants. You say Hamdi, that the Hamdi decision gets you there, and then you say that the authorization of use of military force also solves your FISA conflict problem. But one conclusion depends on the other. I mean, isn't this somewhat circular?

**MR. BRADBURY:** Well, I guess you would say, Pete, that we don't -- we don't say the Hamdi decision gets us there. I understand that the Hamdi case -- the court case is only focused on one particular issue. The issue before the court was detention of U.S. citizens who are enemy combatants.

Of course, the court wouldn't have a holding that goes beyond that context.

All we're saying is that the reasoning that the majority of the -- the majority of the court applied in Hamdi to conclude that the authorization for the use of military force is an act of Congress that authorized, even though it doesn't say anything about detention, it authorized detention of a U.S. citizen such that it satisfied the requirements of Section 18 USC Section 4001(a), which says that no U.S. citizen shall be detained except pursuant to an Act of Congress.

And so in getting to that conclusion, what the court said is that the authorization for the use of military force expressly and unmistakably encompasses all of the traditional incidents of

4

the use of force and --

**QUESTION:** Well, but it doesn't say that.

**MR. BRADBURY:** But it uses the language to explain that detention of an enemy combatant is an -- is expressly in the -- is unmistakably a traditional incident of the use of -- and that's what -- that's what the authorization for the use of force is getting at.

But of course, the court didn't have to go on to say -- didn't have to hold that what this means is the President can do anything, and it didn't have to hold -- I'm not saying it held electronic surveillance of the enemy is part of that.

What we have set forth in the white paper is a history of the practice of the country in wartime to demonstrate that communications intelligence targeted at the enemy is one of the traditional and fundamental incidents of the use of force. And that's the only point.

**QUESTION:** Mr. Bradbury, this is Larry Abramson with National Public Radio.

Are you saying that the Foreign Intelligence Surveillance Act is basically null and void until the war on terror is over and that there's no real role for the Foreign Intelligence Surveillance Court during this period?

**MR. BRADBURY:** Absolutely not. The FISA statute is a very valuable tool on the -- in the war on terror, and actually the department and the government have made full and extensive use of FISA since 9/11. The number of FISA applications has ramped up exponentially since 9/11.

So FISA is not a moribund statute. FISA is an extremely valuable tool, and is used to the fullest by the -- by the government.

**QUESTION:** Well, it's the cumulative knowledge that FISA was meant to deal with the gathering of foreign intelligence surveillance, and now you're saying that the President has the authority to do that without the court, so why would there be a need for two separate tracks for gathering the same information?

**MR. BRADBURY:** Well, FISA is a very valuable tool, and it enables very extensive surveillance, including domestic -- particularly domestic surveillance, where you're talking about a foreign intelligence purpose.

And the statute allows the government to undertake such surveillance and make use of that surveillance for law enforcement purposes, for intelligence purposes -- extremely valuable tool and one that is geared very extensively.

I think all we're saying is that, first of all, when Congress enacted FISA in 1978, that really wasn't the final word on how the government and the President might respond in time of war, in actual armed conflict, particularly following the sort of unprecedented catastrophic

5

attack on the United States that we had in 9/11.

And we believe that if you look at FISA by its terms and particularly its legislative history, as well, that it was very evident that Congress, while some Member of Congress clearly had the intent of regulating or restricting the foreign intelligence surveillance activities of the -- of the President, that the question of what would happen in an actual armed conflict where the government was at war, where the country was at war and had been attacked, what you see is that Congress -- Congress left open the possibility that subsequent Congresses would enact specific authorizations, or different statutory authorizations, to address the circumstances that might arise, and we think that's exactly what the authorization for the use of military force is, because if you read the authorization for the use of military force to exclude that fundamental incident of force, which is very essential, sort of a first step in the use of force, which is communications intelligence, signals intelligence targeted at your enemy to try to even identify who your enemy is and where he is, that -- that -- that that's a natural incident of the -- of the authorization and that that's how Congress chose to deal with the current, the specific circumstances of the current armed conflict.

**QUESTION:** Jim Angle -- over at Fox. Could I ask you a question about why you're going through all of these other things?

Many national security experts say if you collected the information overseas, and the person targeted is overseas, which is the explanation the Attorney General has given, the vice president has given, then that does not require a FISA warrant even if one end is in the U.S. Is that true, and if so, why not just say that FISA doesn't apply in these situations?

**MR. BRADBURY:** Well, that's true, and depending on the circumstances, Jim, in certain circumstances that may be true. In other circumstances, where you have one end in the U.S., it may not.

And again, I can't get into -- I'm really not in a position to get into operational details about the particular activities of the NSA, and that's why I say that, for purposes of this white paper, we're just assuming, for purposes of this legal analysis, the activities in question would constitute electronic surveillance that would be covered by the procedures of FISA -- otherwise be covered.

**QUESTION:** But unless you target someone in the United States, you're saying, it does -- unless you target them, it does not -- in other words, it's not incidental -- then it does not require a FISA warrant; is that correct?

**MR. BRADBURY:** FISA has a multi-layered and complicated definition of electronic surveillance, which is what FISA -- it doesn't mean electronic surveillance in the colloquial sense. Not all electronic surveillance, as we might think of it, would be covered by FISA. But it has a very specific definition.

And part of the definition is, if it's a -- if it's electronic surveillance that particularly -- or a particular U.S. person.

6

Another part of it is if it's electronic surveillance over a wire, a wire -- of wire communications that are acquired in the United States, and it doesn't -- and it doesn't talk about specifically targeting a particular U.S. person.

QUESTION: Mr. Bradbury, it's Mike Isikoff with Newsweek.

The authorization for force in -- after 9/11 related to the people who authorized, harbored, committed, or aided in the planning and commission of the 9/11 attacks, the first sentence of your white paper here says, "The President is authorized electronic surveillance against persons linked to al Qaeda or related terrorist organizations." Who -- has "related terrorist organizations" been defined? What is the standard you're using here for who this program can apply to?

MR. BRADBURY: Mike, I'm going to have to answer that in just very general terms, because the specifics would get into the details of the activities, and I'm just not in a position to talk about the classified aspects of the activities. That's why I sort of kept it at that level of generality.

But I think there are well-established and ordinary principles from -- one source being traditional laws of war and the principles of laws of war about who is affiliated with, associated with, allied with your enemy for purposes of the -- the kind of rules of engagement, if you will, in the ongoing armed conflict.

So I think under sort of traditional law of war principles, you don't want to focus that unreasonably narrowly, because that's just impractical.

I mean, the -- what we're dealing with here obviously is an enemy that metastizes, diffuses, changes form, uses different names, uses different cells, front organizations, et cetera, and so that's sort of the nature of the enemy.

QUESTION: Just to follow up on that, though, of course, FISA isn't restricted to people having anything to do with al Qaeda. It is any, you know, designated foreign terrorist organization or foreign power. But the authorization that you're -- you know, the 9/11 authorization in Afghanistan is restricted to al Qaeda. And I'm wondering whether the NSA program uses the broader FISA standard, which would be any terrorist organization, whether it had anything to do with al Qaeda or not, or if you have a more narrowly focused one.

And I'm still unclear from your answer just what this -- you know, what this -- are there any written standards here at all as to who or what applies?

MR. BRADBURY: Well, again, Mike, really, if there were such written standards, and let's assume there are, that would all be part of the classified program, obviously. It would be part of the activity that -- at the NSA and the authorization that the NSA within, you know, is undertaking.

Obviously, the program, the activities that the President described remain classified in all respects. That the President has talked about the activities to the American people does not mean that the program is no longer classified.

And so I guess that's as much as I can say. I am talking about what the President had described.

**QUESTION:** So you're not going to answer whether the AUMS definition is being followed under NSA?

**MR. BRADBURY:** No, I'm -- I'm saying that we believe the authorization for the use of military force and the definitions and -- and the -- there's (inaudible) incidents that go along with that to cover the activities that the President has described.

**QUESTION:** This is Bob Dees with Cox Newspapers. I have a quick two-parter.

One is, you assert in your summary that the President has -- is the sole organ for the nation with respect to foreign affairs. I'm wondering how that squares with things like the War Powers Act and other aspects of Congressional authority.

And second, how do you respond to people who are going to read this paper as a sort of blank check giving the President limitless power in a time of war?

**MR. BRADBURY:** No, I think the activities that the President has described are narrowly tailored.

We're talking about only international communications where one end is overseas, and we're talking about only communications where one party to the communication is -- there's a reasonable basis to believe that one party to the communication is an agent or member of al Qaeda or an affiliated terrorist organization, and again, only international communications. One end must be outside the United States.

So it's -- it's -- it is narrowly focused. It is not domestic surveillance. It is not broad surveillance of U.S. citizens, et cetera. It's not surveillance of domestic groups or -- that get into the sort of issues that were raised in the past with the abuses that were examined by the Church Commission.

In that way, the program was designed to protect -- to be protective of civil liberties and consistent with (inaudible) and it undergoes periodic review for that -- for that purpose.

In terms of the -- so in terms of the blank check point, as I've tried to -- as I've tried to explain, it is limited by what is a traditional historically recognized incident of the use of military force, and is not a -- is not a blank check that says the President can do anything he wants.

In terms of the sole organ, that's of course a quote from the Supreme Court, and really what that means, it goes back to principles enunciated by the founders in the Federalist Papers that when it comes to responding to external threats to the country, protecting the country in wartime, when it comes to interactions with foreign powers, the government was designed to have a single executive who could act nimbly and agilely with speed as necessary to do that.

And in that sense, the President is the primary organ. Of course, we're not saying that Congress has no role in time of war. There are well-recognized authorities for Congress in the Constitution --

**MR. ROEHRKASSE:** We have time for two more questions.

**QUESTION:** Steve, this is Kevin Johnson at USA Today.

Can you -- are you saying that the AUMF supersedes FISA where they're in conflict, specifically in Section 1811 that says the President, through the Attorney General, may authorize electronic surveillance without a court order for a period not to exceed 15 calendar days following a declaration of war by Congress? How does that square with what you're saying, or is what you're saying that the AUMF supersedes anything where they're in conflict?

**MR. BRADBURY:** We're not saying -- we don't need to say that the AUMF has repealed FISA or supersedes FISA, though there are, frankly, decent arguments on that point, which again we explained in the paper, but rather, FISA itself contains an express provision that says, except as authorized by statute.

So it's reasonably read to include -- to contemplate the possibility of an exception where Congress, by special statute, provides for -- provides a separate authority.

And so it's completely consistent with FISA. You don't -- there isn't a direct conflict. There isn't a tension.

This is a Category 1 case under Justice Jackson's concurring opinion in Youngstown Sheet and Tube. It's a case where, as properly construed, the authorization for the use of military force is a congressional endorsement of support for the President's use of his constitutional authority, and the two are married, and we're in a Category 1 situation.

**QUESTION:** Steve, it's Andrew Cohen with CBS News. Let me ask you a question.

It's hard to read this white paper of yours without also considering the two complaints that were filed earlier in the week, and I'm wondering, to what extent should we consider this white paper a preview of what you're going to say when you begin to defend those? And also, what do you guys say to people like Christopher Hitchins, who what everyone thinks of his writing is no enemy force? How are you going to resolve the issues that are raised by those journalists and by those attorneys who are saying that, you know, their

9

communications, their rights are being affected by your surveillance efforts?

**MR. BRADBURY:** Well, first of all, I guess I'd say I'm not a litigator, I'm not part of that effort, and obviously the government represented by the department will respond in due course to the complaints that have been filed.

This white paper that we're talking about today was not at all prepared or issued as a public (inaudible) in connection with the litigation, was requested by the Attorney General to provide a deeper and fuller analysis for purposes -- primarily for purposes of Congress and -- and the public generally to get a better understanding of the analysis that the department has gone through to conclude that the activities the President has described are lawful in all respects.

**MR. ROEHRKASSE:** Perfect. Thank you very much. Again, for those that may have joined late, this call was on the record with Acting Assistant Attorney General Steven G. Bradbury, and that's Acting Assistant Attorney General for the Office of Legal Counsel.

If you have not received the document, please feel free to call our office and we'll send it to you.

**QUESTION:** Thank you.

**MR. BRADBURY:** Thank you.

**MR. ROEHRKASSE:** All right, thanks.

###