## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | ) ) | |
| | ) | Civil Action No. 06-0096 (HHK) |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| DEPARTMENT OF JUSTICE, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |
| | ) | |
| AMERICAN CIVIL LIBERTIES UNION, et al., | ) ) | |
| | ) | Civil Action No. 06-00214 (HHK) |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| DEPARTMENT OF JUSTICE, | ) ) | |
| | ) | **CONSOLIDATED CASES** |
| Defendant. | ) ) | |
| _____ | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the United States

Department of Justice hereby respectfully moves this Court for judgment as a matter of law. The

reasons for this motion are set forth in defendant's Memorandum of Points and Authorities in

Support of the Motion for Summary Judgment filed herewith.

Dated: September 15, 2006.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General, Civil Division

KENNETH J. WAINSTEIN
United States Attorney

JOSEPH H. HUNT
Director, Federal Programs Branch

ELIZABETH J. SHAPIRO
Assistant Director, Federal Programs Branch

_____/s/ Rupa Bhattacharyya_____
RUPA BHATTACHARYYA (VA# 38877)
Attorneys, Federal Programs Branch
Civil Division, U. S. Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, D.C.  20044
Tel: (202) 514-3146
Fax: (202) 318-7593
Email: rupa.bhattacharyya@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ELECTRONIC PRIVACY INFORMATION       )
CENTER,                              )
                                     )        Civil Action No. 06-0096 (HHK)
      Plaintiff,                     )
                                     )
         v.                     )
                                     )
DEPARTMENT OF JUSTICE,               )
                                     )
      Defendant.                     )
_____)
                                     )
AMERICAN CIVIL LIBERTIES UNION, et al., )
                                     )        Civil Action No. 06-00214 (HHK)
      Plaintiff,                     )
                                     )
         v.                     )
                                     )
DEPARTMENT OF JUSTICE,               )
                                     )        **CONSOLIDATED CASES**
      Defendant.                     )
_____)


## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INDEX OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1.    The Terrorist Surveillance Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    2.    Plaintiffs' FOIA Requests and DOJ's Responses . . . . . . . . . . . . . . . . . . . . . . . 2

        EPIC's December 16, 2005 Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            Office of the Attorney General and OLP Response . . . . . . . . . . . . . . . . . 4
            OIPR Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
            OLC Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        ACLU's December 20, 2005, Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            Office of the Attorney General and ODAG Response . . . . . . . . . . . . . . . 8
            Civil Division Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            Criminal Division Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            Civil Rights Division Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            FBI Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            OLC Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            EOUSA Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        NSAF's December 21/22, 2005, Request . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            Office of the Attorney General Response . . . . . . . . . . . . . . . . . . . . . . 14
            OLC Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT:  DOJ IS ENTITLED TO SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . 15

I.     DOJ'S DOCUMENT SEARCHES WERE ADEQUATE . . . . . . . . . . . . . . . . . . . . . . . 18

    A.    The Office of the Deputy Attorney General Conducted a Reasonable Search . . 20

    B.    The Office of Legal Counsel Conducted a Reasonable Search . . . . . . . . . . . . 21

    C.    The Office of Intelligence Policy and Review Conducted a Reasonable
        Search . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    D.    The Criminal Division Conducted a Reasonable Search . . . . . . . . . . . . . . . . . 22

      E.      The Federal Bureau of Investigation Conducted a Reasonable Search . . . . . . . . 23

II      DOJ PROPERLY WITHHELD RECORDS UNDER FOIA . . . . . . . . . . . . . . . . . . . . . 24

      A.      DOJ Properly Withheld Records Under Exemption One . . . . . . . . . . . . . . . . . 27

            1.      ODAG Properly Withheld Records Under Exemption One . . . . . . . . . 31

            2.      OLC Properly Withheld Records Under Exemption One . . . . . . . . . . . 34

            3.      OIPR Properly Withheld Records Under Exemption One . . . . . . . . . . . 36

            4.      The FBI Properly Withheld Records Under Exemption One . . . . . . . . 37

            5.      The NSA Properly Withheld Records Referred to it For Processing
                  Under Exemption One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

      B.      DOJ Properly Withheld Records Under Exemption Two . . . . . . . . . . . . . . . . 41

      C.      DOJ Properly Withheld Records Under Exemption Three . . . . . . . . . . . . . . . 45

      D.      DOJ Properly Withheld Records Under Exemption Five . . . . . . . . . . . . . . . . 53

      E.      DOJ Properly Withheld Information Under Exemption Six . . . . . . . . . . . . . . 62

      F.      DOJ Properly Withheld Records Under Exemption Seven . . . . . . . . . . . . . . . 67

            1.      ODAG Properly Withheld Records Under Exemptions 7(A)
                  and 7(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

            2.      The Criminal Division Properly Withheld Records Under
                  Exemption 7(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

            3.      The FBI Properly Withheld Records Under Exemptions 7(A), 7(C),
                  7(D), and 7(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

## INDEX OF EXHIBITS

| Tab | Exhibit |
|-----|---------|
| A | Redacted Declaration of Steven G. Bradbury, Acting Assistant Attorney General, Office of Legal Counsel |
| B | Executive Order 12958, 60 Fed. Reg. 19825 (Apr. 17, 1995), as amended by Executive Order 13292, 68 Fed. Reg. 15315 (Mar. 25, 2003) |
| C | Redacted Declaration of James A. Baker, Counsel, Office of Intelligence Policy and Review |
| D | March 8, 2006, Letter from the Office of Information and Privacy to the Electronic Privacy Information Center |
| E | Declaration of Thomas G. McIntyre, Chief, Freedom of Information Act/Privacy Act Unit, Criminal Division |
| F | March 7, 2006, Letter from the Civil Division to the Electronic Privacy Information Center |
| G | Redacted Declaration of J. Patrick Rowan, Associate Deputy Attorney General |
| H | March 7, 2006, Letter from the Civil Division to the American Civil Liberties Union |
| I | April 13, 2006, Letter from the Civil Division to the American Civil Liberties Union |
| J | Redacted Declaration of David M. Hardy, Section Chief, Record/Information Dissemination Section, Records Management Division, Federal Bureau of Investigation |
| K | March 16, 2006, Letter from the Executive Office of United States Attorneys to the American Civil Liberties Union |
| L | March 8, 2006, Letter from the Office of Information and Privacy to the National Security Archive Fund |
| M | Declaration of Louis F. Giles, Director of Policy, National Security Agency |
| N | Declaration of Joseph B., Deputy Chief of Staff for Operations and Support, Signals Intelligence Directorate, National Security Agency |

## INTRODUCTION

Plaintiffs in this case, the Electronic Privacy Information Center ("EPIC"), the American Civil Liberties Union ("ACLU"), and the National Security Archive Fund ("NSAF"), challenge the decision of various components of the United States Department of Justice ("DOJ" or the "Department") to withhold documents responsive to their separate requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Plaintiffs' FOIA requests seek documents from DOJ relating to the highly classified Terrorist Surveillance Program, an intelligence collection program authorized by the President of the United States after the terrorist attacks of September 11, 2001, in order to detect and prevent another catastrophic attack on the United States. In light of the grave dangers to the national security that could result if DOJ is compelled to disclose information relating to this sensitive method of gathering intelligence critical to the defense of the United States, DOJ has properly refused to disclose certain exempt information responsive to plaintiffs' requests, and has otherwise responded properly under FOIA. DOJ, accordingly, hereby seeks summary judgment under Federal Rule of Civil Procedure 56.

## BACKGROUND

### 1. __The Terrorist Surveillance Program__.

Following the devastating attacks of September 11, 2001, the President of the United States authorized the National Security Agency ("NSA") to intercept international communications into and out of the United States of persons linked to al Qaeda or related terrorist organizations (hereinafter, the "Terrorist Surveillance Program," or "TSP"). See Declaration of John D. Negroponte, Director of National Intelligence ("DNI Decl."), attached as Ex. D to the Declaration of Steven G. Bradbury, Acting Assistant Attorney General, Office of

Legal Counsel ("OLC") ("Bradbury Decl.")[1], ¶¶ 16-17; Bradbury Decl. ¶¶ 18-20.  In order to

intercept a communication under the TSP, there must be a reasonable basis to conclude that one

party to the communication is located outside the United States and that one party to the

communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an

organization affiliated with al Qaeda.  DNI Decl. ¶ 17.  Thus, the TSP is a targeted and focused

program intended to help "connect the dots" between known and potential terrorists and their

affiliates, id.; Bradbury Decl. ¶ 19, and serves as an early warning system established in order to

detect and prevent another catastrophic attack on the United States.  Bradbury Decl. ¶ 19.  As

attested to by the Director of National Intelligence, the TSP is critical to the national security of

the United States.  DNI Decl. ¶ 16.

The President publicly acknowledged the existence of the TSP on December 17, 2005.

Bradbury Decl. ¶ 20.  As the President has made clear, however, details about the TSP remain

highly classified and subject to special access restrictions under the criteria set forth in Executive

Order 12958, 60 Fed. Reg. 19825 (Apr. 17, 1995), as amended by Executive Order 13292, 68

Fed. Reg. 15315 (Mar. 25, 2003).[2]  Bradbury Decl. ¶ 20.  Unauthorized disclosure of information

regarding the TSP can reasonably be expected to cause exceptionally grave damage to the

national security of the United States, see generally DNI Decl. ¶¶ 21-35, and, thus, pursuant to

the criteria outlined in Executive Order 12958, as amended, information related to the TSP is

---

[1]  Both the DNI Declaration and the Bradbury Declaration are classified in part under the provisions of Executive Order 12958, 60 Fed. Reg. 19825 (Apr. 17, 1995), as amended by Executive Order 13292, 68 Fed. Reg. 15315 (Mar. 25, 2003), and are lodged with the Court for its in camera, ex parte review.  See Defendant's Notice of Lodging of Classified Exhibits, filed contemporaneously herewith.  A redacted version of the Bradbury Declaration, to which a redacted version of the DNI Declaration is an exhibit, is attached hereto as Ex.A.

[2]  All citations herein to Executive Order 12958 are to the Order as amended by Executive Order 13292.  A copy of the amended Executive Order is attached as Ex. B hereto.

classified TOP SECRET.  Id. ¶ 20 (citing Executive Order 12958, as amended, §§ 1.4 (c), (d), (e), and (g)).  Moreover, because information related to the TSP involves or derives from particularly sensitive intelligence sources and methods, it is subject to the special access and handling procedures reserved for Sensitive Compartmented Information ("SCI").  Id.[3]

As DNI Negroponte describes in his declaration, loss of accurate intelligence information derived from the TSP could result in the catastrophic failure of the early warning system that the President has established to detect and prevent the next terrorist attack.  See generally DNI Decl. ¶¶ 21-35.

**2.  Plaintiffs' FOIA Requests and DOJ's Responses.**

*EPIC's December 16, 2005, Request.*  By letters dated December 16, 2005,  plaintiff EPIC requested under FOIA agency records "from September 11, 2001, to the present concerning a presidential order or directive authorizing the National Security Agency ('NSA'), or any other component of the intelligence community, to conduct domestic surveillance without the prior authorization of the Foreign Intelligence Surveillance Court ('FISC')."  EPIC stated that the records it sought included "but were not limited to" the following:

   a.    an audit of NSA domestic surveillance activities;

   b.    guidance or a "checklist" to help decide whether probable cause exists to
          monitor an individual's communications;

   c.    communications concerning the use of information obtained through NSA
          domestic surveillance as the basis for DOJ surveillance applications to the
          FISC; and

_____

[3]  "Access to Sensitive Compartmented Information ("SCI") requires clearance beyond the 'Top Secret' level.  SCI is classified information that is required to be handled exclusively within formal access control systems established by the Director of [National] Intelligence."  Guillot v. Garrett, 970 F.2d 1320, 1322 n. 1 (4th Cir. 1992); see also DNI Decl. ¶¶ 8, 20; Bradbury Decl. ¶ 24.

> d.    legal memoranda, opinions or statements concerning increased domestic surveillance, including one authored by John C. Yoo shortly after September 11, 2001 discussing the potential for warrantless use of enhanced electronic surveillance techniques.

Id. EPIC's FOIA requests were directed to four components of the Department of Justice – the Office of the Attorney General, See Pl's Mot. for Preliminary Injunction (Docket No. 3), Ex. 7; the Office of Intelligence Policy and Review ("OIPR"), see id., Ex. 8; the Office of Legal Counsel ("OLC"), see Bradbury Decl. Ex. A; and the Office of Legal Policy ("OLP"), Pl's Mot. for Preliminary Injunction, Ex. 10.[4] In each of these components, EPIC sought expedited processing, invoking the Department's FOIA regulations, 28 C.F.R. §§ 16.5(d)(1)(ii) & (iv).

**Office of the Attorney General and OLP Response.** Following litigation in this Court over EPIC's request for preliminary injunctive relief, on March 8, 2006, the Department's Office of Information and Privacy ("OIP") responded to EPIC's request on behalf of the Office of Attorney General and OLP. Ex. D. Those offices released 15 responsive documents, totaling 85 pages, without excision; released two additional documents, totaling two pages, with excisions made pursuant to Exemption Six of FOIA, 5 U.S.C. § 552(b)(6); and withheld in full 46 documents, totaling 99 pages, pursuant to Exemption Five of FOIA, 5 U.S.C. § 552(b)(5). OIP also advised EPIC that it had located a one-page email that originated with OIPR, which was also withheld in full pursuant to Exemption Five. On March 20, 2006, OIP provided EPIC with a preliminary index of the documents identified in OIP's March 8, 2006, letter, and plaintiffs have advised that they do not challenge either the excisions or withholding of these documents.

Also on March 8, the Department's Criminal Division, which received a three-page document by referral from OIP on behalf of the Office of the Attorney General and/or OLP,

---

[4] With the exception of the addressees, the EPIC FOIA requests are identical in their particulars.

advised EPIC by letter that the document was properly released with redactions pursuant to FOIA Exemptions Six and Seven, 5 U.S.C. §§ 552(b)(6) & (7)(C).  See Declaration of Thomas J. McIntyre, Chief, Freedom of Information Act/Privacy Act Unit, Criminal Division ("McIntyre Decl."), attached as Ex. E hereto, ¶ 10 & Ex. 8.  Plaintiffs have advised that they do not challenge the redaction of this document.

On March 7, 2006, the Civil Division also responded to EPIC concerning a document referred by OIP on behalf of the Office of the Attorney General and/or OLP, see Ex. F, and advised that the one-page document was withheld in full under Exemption Five of FOIA, 5 U.S.C. § 552(b)(5).  Plaintiffs have advised that they do not challenge the withholding of this document.

*OIPR Response.*  On May 8, 2006, OIPR responded to EPIC's request, advising that it had identified 136 responsive records, that two documents, totaling 15 pages, were released in full, and that 15 documents were being withheld in full pursuant to FOIA Exemptions One, 5 U.S.C. § 552(b)(1), Three, id. § 552(b)(3), Five, id. § 552(b)(5); Six, id. § 552(b)(6), and Seven, id. §§ 552(b)(7)(A) & (7)(C).  See Declaration of James A. Baker, Counsel for Intelligence Policy, OIPR ("Baker Decl.") ¶ 11 & Ex. A.[5]  OIPR also advised that 24 documents required further consultations and that the remaining 95 documents had been referred to other agencies or components of the Department for processing.  Id. ¶ 12; but see id. n.1 & ¶ 17.[6]

*OLC Response.*  OLC provided an interim response to EPIC's request on March 8, 2006.

_____

[5]  The Baker Declaration is classified in part under the provisions of Executive Order 12958, as amended, and is lodged with the Court for its in camera, ex parte review.  See Defendant's Notice of Lodging of Classified Exhibits, filed contemporaneously herewith.  A redacted version of the Baker Declaration is attached hereto as Ex. C.

[6]  As noted in Mr. Baker's declaration, OIPR ultimately consulted on 34 records or categories of records and referred 85.  Baker Decl. ¶ 12 n.1.

See Bradbury Decl. ¶ 8 & Ex. E.  At that time, OLC advised that its search of its unclassified files had been completed, released five documents, totaling 63 pages, and withheld an additional 290 documents, totaling 4740 pages, in full pursuant to FOIA Exemption Five, 5 U.S.C. § 552(b)(5).  OLC provided EPIC with a preliminary log of these documents on March 20, 2006, and plaintiffs have advised that they do not challenge the withholding of these documents. See Bradbury Decl. ¶ 10.

On July 21, 2006, OLC further responded to EPIC's request, advising that it had identified 158 responsive records or categories of records in its classified files.  See Bradbury Decl. ¶ 11 & Ex. H.  Of those, OLC advised that 79 had been referred to other agencies or components of the Department for processing, and that, as to 62 of the referrals, OLC had been asked to convey that these documents were properly withheld in full pursuant to FOIA Exemptions One, 5 U.S.C. § 552(b)(1),  and Three, id. § 552(b)(3), and that certain of these documents also contained information subject to Exemptions Two, id. § 552(b)(2), Five, id. § 552(b)(5), and Seven, id. § 552(b)(7).  Id.  Of the remaining 79 records or categories of records, OLC identified two additional copies of a document that previously had been released,[7] and withheld the remainder of the documents in full under a combination of FOIA Exemptions One, Three, and Five.  Bradbury Decl. ¶ 11 & Ex. H; but see id. ¶ 11 n. 1 & ¶ 27. [8] OLC also advised

---

[7]  The document is a 42-page January 19, 2006, memorandum from the Department entitled "Legal Authorities Supporting the Activities of the National Security Agency Described by the President," referenced herein as the "White Paper."

[8]  As noted in Mr. Bradbury's declaration, as a result of certain inadvertent errors, the responsive record counts were misstated in OLC's letter of July 21, 2006.  See Bradbury Decl. ¶ 11 n.1.  As correctly described in the declaration, OLC ultimately identified 157 responsive records or categories of records, referred 66 of those records to other components of the Department or other federal agencies, and, after appropriate consultations, withheld 91 records or categories of records under the exemptions allowed by FOIA.  Id.; see also id. ¶ 27.

that it had identified responsive records that were not considered "agency records" as defined by FOIA; these documents were not processed by OLC.

    ***ACLU's December 20, 2005, Request.***  The ACLU's December 20, 2005, request sought the disclosure of "any presidential order(s) authorizing the NSA to engage in warrantless electronic surveillance and/or warrantless physical searches in the United States, created from September 11, 2001, to the present," as well as documents in multiple additional categories, including "any record(s), document(s), file(s), communication, memorandum(a), agreement(s), and/or instruction(s), created from September 11, 2001 to the present about . . . any presidential order(s) authorizing the NSA to engage in warrantless electronic surveillance and/or warrantless physical searches in the United States"; "the policies, procedures and/or practices of the NSA" in thirteen identified categories relating to "warrantless electronic surveillance"; "the constitutionality, legality, and/or propriety of warrantless electronic surveillance and/or warrantless physical searches in the United States"; "any Justice Department legal reviews of the program and its legal rationale"; and the number and types of communications and individuals subject to surveillance.  See Bradbury Decl. Ex. B.  Like EPIC, ACLU also sought expedited processing.

    ACLU's request was addressed to DOJ's Justice Management Division's FOIA/PA Referral Unit ("JMD"), which is authorized by regulation to receive requests where a requester "cannot determine where within the Department to send [a] request," and to "forward [the] request to the component(s) it believes most likely to have the records [sought]."  28 C.F.R. § 16.3(a).  The ACLU's request was forwarded by JMD to seven components: the Office of the Attorney General, the Office of the Deputy Attorney General  ("ODAG"), the Civil Division, the Civil Rights Division, the Criminal Division, the Federal Bureau of Investigation ("FBI"), OLC,

and the Executive Office of United States Attorneys ("EOUSA").

*Office of the Attorney General and ODAG Response.* On March 8, 2006, the OIP made an interim response to the ACLU's request on behalf of the Office of Attorney General and ODAG. Declaration of J. Patrick Rowan, Deputy Associate Attorney General, ODAG ("Rowan Decl."), ¶ 10 & Ex. A.[9] At that time, those offices released 15 responsive documents, totaling 85 pages, without excision; released two additional documents, totaling two pages, with excisions made pursuant to Exemption Six of FOIA, 5 U.S.C. § 522(b)(6); and withheld in full 46 documents, totaling 99 pages, pursuant to Exemption Five of FOIA, 5 U.S.C. § 552(b)(5). Id. Ex. A. OIP also advised ACLU that it had located a one-page email that originated in OIPR, which was also withheld in full pursuant to Exemption Five. Id. On March 20, 2006, OIP provided ACLU with a preliminary index of these documents, and plaintiffs have advised that they do not challenge either the excisions or withholding of these documents.

Also on March 8, the Department's Criminal Division, which received a three-page document by referral from OIP on behalf of the Office of the Attorney General and/or ODAG, advised ACLU by letter that the document was properly released with redactions pursuant to FOIA Exemptions Six and Seven, 5 U.S.C. §§ 552(b)(6) & (7)(C). See McIntyre Decl. ¶ 10 n.3 & Ex. 11. Plaintiffs have advised that they do not challenge the redaction of this document.

On March 7, 2006, the Civil Division also responded to ACLU concerning a document referred by OIP on behalf of the Office of the Attorney General and/or ODAG, see Ex. H, and advised that the one-page document was withheld in full under Exemption Five of FOIA, 5

---

[9] The Rowan Declaration is classified in part under the provisions of Executive Order 12958, as amended, and is lodged with the Court for its in camera, ex parte review. See Defendant's Notice of Lodging of Classified Exhibits, filed contemporaneously herewith. A redacted version of the Rowan Declaration is attached hereto as Ex. G.

U.S.C. § 552(b)(5).  Plaintiffs have advised that they do not challenge the withholding of this document.

On July 21, 2006, OIP further responded to ACLU's request on behalf of the Office of the Attorney General and ODAG.  See Rowan Decl. ¶ 10 & Ex. B.  OIP released an additional 129 pages in full and withheld 18 pages under FOIA Exemption Five, 5 U.S.C. § 552(b)(5).  OIP also identified an additional record uncovered in its search that was a congressional document and not an "agency record," as defined by FOIA, and thus was not processed in response to the ACLU's request.  Id. Ex. B.  Plaintiffs have advised that they do not challenge OIP's response as to these documents.

At the same time, OIP, on behalf of ODAG, also indicated that it had identified 58 responsive agency records or categories of records in ODAG's classified files.  Rowan Decl. ¶ 13 & Ex. B.  OIP advised that 53 of these records had been referred to other agencies or Department components for processing, and that the remaining five records were withheld under a combination of Exemptions One, 5 U.S.C. § 552(b)(1), Three, id. § 552(b)(3), Five, id. § 552(b)(5), and Seven, id. § 552(b)(7)(A).  Id.

*Civil Division Response.*  On April 13, 2006, the Civil Division responded to the ACLU, advising that it had identified ten documents responsive to ACLU's request.  Ex. I.  Nine of these documents were referred by the Civil Division to three other components of the Department of Justice:  three to OIP on behalf of the Office of the Attorney General and the Office of Public Affairs, all public documents which previously had been released; five to OLC, including the previously released White Paper and four other documents that were duplicates of documents identified on OLC's March 20, 2006, preliminary index as withheld in full under Exemption Five, 5 U.S.C. § 552(b)(5); and one to OIPR, which was a duplicate of the document previously

-9-

identified on OIP's March 20, 2006, preliminary index as withheld in full under Exemption Five, id., on OIPR's behalf.  See Ex. D.  The remaining document was identical to the document referred by OIP that was identified in the Civil Division's letter of March 7, 2006, see Ex. H, as withheld under Exemption Five, 5 U.S.C. § 552(b)(5).  As noted above, plaintiffs have advised that they do not challenge the withholding of these documents.

   ***Criminal Division Response.***  On May 10, 2006, the Criminal Division made a further response to the ACLU advising that it had located certain responsive documents.  In particular, the Criminal Division advised that it had copies of the White Paper, which previously had been released, as well as drafts of that document identical to those processed by OLC in response to the ACLU's request.  See McIntyre Decl. ¶ 4 & Ex. 3.  The Criminal Division did not further process these documents.  The Criminal Division also advised that "[t]o the extent that the Criminal Division maintains any other information related to . . . your request such information would have been compiled solely in connection with an investigation of the unauthorized disclosure of classified information concerning the Terrorist Surveillance Program (the "leak investigation") or in connection with other pending criminal prosecutions or investigations." Id. ¶ 5 & Ex. 3.  Any such responsive information was withheld by the Criminal Division under FOIA Exemption Seven, 5 U.S.C. § 552(b)(7)(A).  Id.  The Criminal Division also noted that additional, overlapping exemptions may apply to portions of the same information including but not limited to FOIA Exemptions One, id. § 552(b)(1); Three, id. § 552(b)(3); Five, id. § 552(b)(5); Six, id. § 552(b)(6); and other subparagraphs of Seven, id. §§ 552(b)(7)(C) & (7)(D).  Id.

   ***Civil Rights Division Response.***  The Civil Rights Division, upon receipt of the ACLU's FOIA request from JMD re-routed that request to JMD on the grounds of error, as it had no

-10-

responsive documents.  Plaintiffs have advised that they do not challenge the response of the Civil Rights Division.

   ***FBI Response***.  On March 24, 2006, the FBI made an interim response to the ACLU's request.  See Declaration of David M. Hardy, Section Chief, Record/Information Dissemination Section, Records Management Division, FBI ("Hardy Decl."), ¶ 23 & Ex. B.[10]  At that time, FBI identified 257 pages of responsive records, released 100 pages with no redactions, and withheld the remaining 157 pages pursuant to Exemption Five of FOIA, 5 U.S.C. § 552(b)(5).  Hardy Decl. Ex. B.

   On July 21, 2006, the FBI further responded to ACLU's request advising that it had identified additional responsive records, but that all such records were being withheld in full pursuant to FOIA Exemptions One, 5 U.S.C. § 552(b)(1), Two, id. § 552(b)(2), Three, id. § 552(b)(3), Five, id. § 552(b)(5), Six, id. § 552(b)(5), and Seven, id. §§ 552(b)(7)(A), (7)(C), (7)(D), 7(E), and (7)(F).  See Hardy Decl. ¶ 25 & Ex. C.

   ***OLC Response.***  OLC provided an interim response to ACLU's request on March 8, 2006.  See Bradbury Decl. ¶ 8 & Ex. F.  At that time, OLC advised that its search of its unclassified files had been completed, released five documents, totaling 63 pages, and withheld an additional 290 documents, totaling 4740 pages, in full pursuant to FOIA Exemption Five, 5 U.S.C. § 552(b)(5).  OLC provided ACLU with a preliminary log of these documents on March 20, 2006, and plaintiffs have advised that they do not challenge the withholding of these documents.  See Bradbury Decl. ¶ 10.

---

[10]   The Hardy Declaration is classified in part under the provisions of Executive Order 12958, 60 Fed. Reg. 19825 (Apr. 17, 1995), as amended by Executive Order 13292, 68 Fed. Reg. 15315 (Mar. 25, 2003), and is lodged with the Court for its in camera, ex parte review. See Defendant's Notice of Lodging of Classified Exhibits, filed contemporaneously herewith.  A redacted version of the Hardy Declaration is attached hereto as Ex. J.

On July 21, 2006, OLC further responded to ACLU's request, advising that it had identified 158 responsive records or categories of records in its classified files. See Bradbury Decl. ¶ 11 & Ex. I. Of those, OLC advised that 79 had been referred to other agencies or components of the Department for processing, and that, as to 62 of the referrals, OLC had been asked to convey that these documents were properly withheld in full pursuant to FOIA Exemptions One, 5 U.S.C. § 552(b)(1), and Three, id. § 552(b)(3), and that certain of these documents also contained information subject to Exemptions Two, id. § 552(b)(2), Five, id. § 552(b)(5), and Seven, id. § 552(b)(7). Id. Of the remaining 79 records or categories of records, OLC identified two additional copies of the White Paper, which previously had been released, and withheld the remainder of the documents in full under a combination of FOIA Exemptions One, Three, and Five. Bradbury Decl. ¶ 11 & Ex. I; but see id. ¶ 11 n. 1 & ¶ 27.[11]

Also on July 21, OLC responded to the ACLU with respect to 30 documents referred to it by ODAG. See Bradbury Decl. ¶ 12 & Ex. I. As to these documents, OLC explained that 21 were duplicative of documents processed by OLC and were withheld for the same reasons. The remaining nine documents were withheld in full under FOIA Exemptions One and Five. OLC also advised that it had identified responsive records that were not considered "agency records" as defined by FOIA; these documents were not processed by OLC. Id.

***EOUSA Response.*** On March 16, 2006, EOUSA responded to the ACLU's request by advising that, consistent with Department regulations, 28 C.F.R. § 16.3(b), EOUSA required clarification of the request before it could proceed further. Ex. K. More specifically, EOUSA advised that Department regulations required a FOIA requester to "reasonably describe" the records sought, 28 C.F.R. § 16.3(b); accord 5 U.S.C. § 552(a)(3)(A), and that, "since EOUSA and

---

[11] See note 8, supra.

[United States Attorneys' Office] files are located in more than 100 separate offices throughout the country," EOUSA could not conduct an appropriate search without a more focused request, including identification of which offices the ACLU wished to have searched.  Id.  As required by DOJ regulations, see 28 C.F.R. § 16.3(b), EOUSA advised ACLU that "[a]bsent such clarification, your request cannot be considered properly received . . . and no further action will be taken on it.  Once you have corrected the above deficiencies, you may submit a new request for the records you seek."  Id.  Thus, on March 16, 2006, EOUSA's file on ACLU's December 20, 2005, request was closed.  Id.

Undersigned counsel is advised that on May 4, 2006, ACLU submitted a new request to EOUSA identifying three offices in EOUSA headquarters, and 40 United States Attorneys' Offices in 19 states plus the District of Columbia that it wished to have searched.  New files have been opened with respect to this request, which remains pending at the administrative stage; pursuant to an agreement between counsel, EOUSA's response to the ACLU on the new request is not addressed in this motion.

**NSAF's December 21/22, 2005, Request.**  By letters dated December 21, 2005, to OLC and December 22, 2005, to OIP on behalf of the Office of the Attorney General, plaintiff NSAF sought copies of "[a]ll memoranda, legal opinions, directives or instructions from the Attorney General, Assistant Attorney General, or the Office of Legal Counsel (OLC), issued between September 11, 2001, and December 21, 2005, regarding the government's legal authority for surveillance activity, wiretapping, eavesdropping, and other signals intelligence operations directed at communications from or to U.S. citizens," including "all documents discussing the President's surveillance authority under the September 2001 congressional use of force resolution as well as the President's independent ability to authorize signals intelligence activities."  Like

EPIC and ACLU, NSAF, by a follow-up letter dated January 9, 2006, requested expedited

processing.

>    ***Office of the Attorney General Response.***  On March 8, 2006, OIP, on behalf of the

Office of the Attorney General responded to NSAF's request.  <u>See</u> Ex. L.  OIP advised NSAF that

15 documents, totaling 85 pages, had been identified as responsive and were being released in

full.  OIP also advised NSAF that "because [its] request was processed concurrently with the

request from . . . [EPIC] and . . . [the ACLU]," its response included "records that are not

responsive to your request."  <u>Id.</u>  This response constituted a full grant of NSAF's request by the

Office of the Attorney General.  <u>Id.</u>[12]

>    ***OLC Response.***  On March 8, 2006, OLC advised NSAF that a search of its unclassified

files had identified no responsive documents.  Bradbury Decl. ¶ 9 & Ex. G.  On July 21, 2006,

OLC further responded to NSAF and advised that a small number of responsive documents have

been identified in OLC's classified files, but that these documents were withheld under FOIA

Exemptions One, 5 U.S.C. § 552(b)(1), Three, <u>id.</u> § 553(b)(3), and Five, <u>id.</u> § 552(b)(5).

Bradbury Decl. ¶ 13 & Ex. J.  OLC also advised that it had identified responsive records that were

not considered "agency records" as defined by FOIA; these documents were not processed by

OLC.  <u>Id.</u>

---

[12]  On March 7 and March 8, respectively, the Civil and Criminal Divisions responded to NSAF with respect to the documents referred by OIP discussed above.  Neither of these documents, in fact, was considered responsive to NSAF's request but were referred because NSAF's request was processed concurrently with EPIC's and ACLU's.  <u>See</u> Ex. L; McIntyre Decl. ¶ 10 & Ex. 9.  In any event, NSAF, like EPIC and ACLU, has advised that it does not challenge these responses.

## ARGUMENT

## DOJ IS ENTITLED TO SUMMARY JUDGMENT

The FOIA's "basic purpose" reflects a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989). "Congress recognized, however, that public disclosure is not always in the public interest." Central Intelligence Agency v. Sims, 471 U.S. 159, 167 (1985). The FOIA is designed to achieve a "workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." John Doe, 493 U.S. at 152 (quoting H.R. Rep. No. 1497, 89th Cong., 2 Sess. 6 (1966), reprinted in 1966 U.S.C.C.A.N. 2416, 2423); see also American Civil Liberties Union v. U.S. Dept. of Justice ("ACLU I"), 265 F. Supp. 2d 20, 27 (D.D.C. 2003) (Huvelle, J.) ("it must be recognized that FOIA represents a carefully considered balance between the right of the public to know what their government is up to and the often compelling interest that the government maintains in keeping certain information private, whether to protect particular individuals or the national interest as a whole").

To that end, FOIA mandates disclosure of government records unless the requested information falls within one of nine enumerated exceptions, see 5 U.S.C. § 552(b). "A district court only has jurisdiction to compel an agency to disclose improperly withheld agency records," i.e., records that do "not fall within an exemption." Minier v. Central Intelligence Agency, 88 F.3d 796, 803 (9th Cir. 1996) (emphasis by the court); see also 5 U.S.C. § 552(a)(4)(B) (providing jurisdiction only to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld. . . ."); Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 150 (1980) ("Under 5 U.S.C. § 552(a)(4)(B)[,] federal

jurisdiction is dependent upon a showing that an agency has (1) 'improperly' (2) 'withheld' (3)

'agency records.'").  Despite the "liberal congressional purpose" of FOIA, the statutory

exemptions must be given "meaningful reach and application."  <u>John Doe</u>, 493 U.S. at 152.

"Requiring an agency to disclose exempt information is not authorized. . . ."  <u>Minier</u>, 88 F.3d at

803 (quoting <u>Spurlock v. Fed. Bureau of Investigation</u>, 69 F.3d 1010, 1016 (9th Cir. 1995)).

     The government bears the burden of proving that the withheld information falls within the

exemptions it invokes.  5 U.S.C. § 552(a)(4)(b).  Summary judgment should be granted if the

movant has shown, when the facts are viewed in the light most favorable to the nonmovant, that

there are no genuine issues of material fact and that the movant is entitled to judgment as a matter

of law.  Fed. R. Civ. P. 56(c); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Greene

v. Dalton</u>, 164 F.3d 671, 674 (D.C. Cir. 1999).  A party opposing a motion for summary judgment

"may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific

facts showing that there is a genuine issue for trial."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

242, 248 (1986) (quoting <u>First Nat'l Bank of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253, 288

(1968)).  In a FOIA case, the court may award summary judgment to an agency on the basis of

information provided in affidavits or declarations that describe "the documents and the

justifications for nondisclosure with reasonably specific detail, demonstrate that the information

withheld logically falls within the claimed exemption, and are not controverted by either contrary

evidence in the record nor by evidence of agency bad faith."  <u>Military Audit Project v. Casey</u>, 656

F.2d 724, 738 (D.C. Cir.1981).

     In evaluating the applicability of FOIA exemptions for purposes of deciding this summary

judgment motion, the Court must be mindful that the information sought by plaintiff "implicat[es]

national security, a uniquely executive purview."  <u>Center for Nat'l Security Studies v. U.S. Dept.</u>

of Justice, 331 F.3d 918, 926 (D.C. Cir. 2003), cert. denied, 540 U.S. 1104 (2004). Both the

Supreme Court and the Court of Appeals have specifically recognized the "propriety of deference

to the executive in the context of FOIA claims which implicate national security." Id. at 927-28

(citing, inter alia, Sims, supra; McGehee v. Casey, 718 F.2d 1137 (D.C. Cir. 1983)); see also

Center for Nat'l Security Studies, 331 F.3d at 927 ("terrorism or other special circumstances"

might warrant "heightened deference to the judgments of the political branches") (citing Zadvydas

v. Davis, 533 U.S. 678, 696 (2001)).

Indeed, courts have routinely and repeatedly emphasized that "weigh[ing] the variety of

complex and subtle factors in determining whether disclosure of information may lead to an

unacceptable risk of compromising the [nation's] intelligence-gathering process" is a task best left

to the Executive Branch and not attempted by the judiciary. Sims, 471 U.S. at 180; see also

Center for Nat'l Security Studies, 331 F.3d at 928 ("the judiciary is in an extremely poor position

to second-guess the executive's judgment in [the] area of national security"); Halperin v. Central

Intelligence Agency, 629 F.2d 144, 148 (D.C. Cir. 1980) ("Judges . . . lack the expertise necessary

to second-guess [] agency opinions in the typical national security FOIA case"). Thus, courts

have "consistently deferred to executive affidavits predicting harm to the national security, and

have found it unwise to undertake searching judicial review." Center for Nat'l Security Studies,

331 F.3d at 927. Instead, "[a]t least in the national security context, the reviewing court must give

'substantial weight'" to an agency's declarations. ACLU I, 265 F. Supp. 2d at 27 (quoting King v.

Dept. of Justice, 830 F.2d 210, 217 (D.C. Cir. 1987)).

Moreover, as courts have repeatedly noted, when evaluating the propriety of an agency's

FOIA response, it must be remembered that, under FOIA, the Government has no capacity to

distinguish between FOIA requesters. See Bassiouni v. Central Intelligence Agency, 392 F.3d

244, 246 (7th Cir. 2004) (noting that "any member of the public may invoke the FOIA, and the agency must disregard the requester's identity."), <u>cert</u>. <u>denied</u>, ___ U.S. ___, 125 S. Ct. 2945 (2005). Any information determined to be available to plaintiffs here is also available to the next requester to seek it, whether that requester is an individual in Peoria, a political interest group, "North Korea's secret police [or] Iran's counterintelligence service," <u>id.</u>, or a member of al Qaeda. Where national security interests of the type identified herein are implicated, the harms to national security that would result from compelling release of the sorts of information sought by plaintiffs in their FOIA requests cannot be underestimated. "Hostile entities," <u>id.</u>, including agents of al Qaeda and its affiliates, would no doubt be greatly interested in the opportunity to lay bare the details of the United States' intelligence gathering programs.

Given these standards of review, as the discussion below and the accompanying declarations demonstrate, all of the information withheld by DOJ here plainly falls within exemptions to FOIA's disclosure requirements. DOJ is thus entitled to summary judgment.

## I.    DOJ'S DOCUMENT SEARCHES WERE ADEQUATE.

To obtain summary judgment on the issue of the adequacy of the records search, an agency must show that "viewing the facts in the light most favorable to the requester, . . . it has conducted a search reasonably calculated to uncover relevant documents." <u>Steinberg v. Dept. of Justice</u>, 23 F.3d 548, 552 (D.C. Cir.1994) (<u>citing</u> <u>Weisberg v. Dept. of Justice</u>, 745 F.2d 1476, 1485 (D.C. Cir. 1984)) (internal quotes omitted). An agency must show that it made a "good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." <u>Ogelsby v. U.S. Dept. of the Army</u>, 920 F.2d 57, 68 (D.C. Cir. 1990); <u>accord</u> <u>Campbell v. U.S. Dept. of Justice</u>, 164 F.3d 20, 27 (D.C. Cir. 1998). An agency's search need not be exhaustive, merely reasonable. See <u>Western Ctr. for Journalism v.</u>

Internal Revenue Serv., 116 F. Supp. 2d 1, 8 (D.D.C. 2000) (Kollar-Kotelly, J.) (citing Shaw v. Dept. of State, 559 F. Supp. 1053, 1057 (D.D.C. 1983)), aff'd, 22 Fed. Appx. 14 (D.C. Cir. 2001); see also Meeropol v. Meese, 790 F.2d 942, 952-53 (D.C. Cir. 1986) ("[i]t would be unreasonable to expect even the most exhaustive search to uncover every file") (emphasis in original); Judicial Watch v. Rossotti, 285 F. Supp. 2d 17, 26 (D.D.C. 2003) (Collyer, J.) ("Perfection is not the standard by which the reasonableness of a FOIA search is measured.").

        In establishing the guidelines under which a Court is to evaluate the adequacy of a FOIA search, the Court of Appeals has stressed that the process of conducting a "reasonable" search is a process that requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise" and is "hardly an area in which the courts should attempt to micro-manage the executive branch." Schrecker v. U.S. Dept. of Justice, 349 F.3d 657, 662 (D.C. Cir. 2003) (quoting Johnson v. Exec. Office for U.S. Attorneys, 310 F.3d 771, 776 (D.C. Cir. 2002)). Thus, there is no "bright-line set of steps for an agency to take" in searching in response to a FOIA request. Schrecker, 349 F.3d at 662; rather, "the adequacy of an agency's search is measured by a 'standard of reasonableness' and is dependent upon the circumstances." Id. (quoting Truitt v. Dept. of State, 897 F.2d 540, 542 (D.C. Cir. 1990)) (internal citation omitted). In examining the adequacy of an agency's search, therefore, the Court must not address "whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate." Steinberg, 23 F.3d at 551 (citing Weisberg, 745 F.2d at 1485). In the absence of "countervailing evidence" or "substantial doubt," agency affidavits or declarations describing such a reasonable and adequate search are sufficient to demonstrate an agency's compliance with FOIA. See Iturralde v. Comptroller of Currency, 315 F.3d 311, 314

(D.C. Cir. 2003) (citations omitted).[13]

### A.    The Office of the Deputy Attorney General Conducted a Reasonable Search.

As described in the Declaration of J. Patrick Rowan, Ex. G, ODAG conducted two separate searches, one to identify unclassified documents responsive to the ACLU request, and one to identify classified documents responsive to that request. As described above, ODAG's processing of unclassified documents is not challenged, and thus that search, conducted by OIP, which ordinarily responds to FOIA requests directed at ODAG, see Rowan Decl. ¶ 10, is not discussed further herein.

As to the classified documents maintained by ODAG, due to the substantial national security concerns associated with any unauthorized disclosure of these documents and their high level of classification, all ODAG documents related to the TSP are kept in a segregated and locked file cabinet to which only those with appropriate security clearances have access. Id. ¶ 12. This cabinet, which itself is maintained in a secured space approved for the storage of classified material, was searched in response to the ACLU's request, and ODAG does not maintain classified documents responsive to this request in any other location. Id.

Because responsive classified documents cannot be maintained outside of this secured cabinet due to their classification level, ODAG's search was calculated to identify every such document, and thus easily qualifies as adequate under FOIA. See Campbell, 164 F.3d at 27; Steinberg, 23 F.3d at 548; Ogelsby, 920 F.2d at 68; Weisberg, 745 F.2d at 1485.

---

[13] In light of the fact that plaintiffs have advised that they do not intend to challenge the withholding of any document by the Office of the Attorney General, OLP, the Civil Division, or the Civil Rights Division, see supra at 4-5, 8-11, the searches conducted by these offices are not further discussed herein.

B.      **The Office of Legal Counsel Conducted a Reasonable Search.**

Like ODAG, OLC conducted two separate searches for responsive material; one for unclassified material and one for classified material.  See Bradbury Decl. ¶ 25-26.  As described above, OLC's processing of unclassified documents is not challenged, and thus that search is not discussed further herein.

Also like ODAG, OLC maintains classified documents relating to the TSP in segregated and locked file cabinets that are themselves kept in a secured room to which only persons with appropriate security clearances have access.  See Bradbury Decl. ¶ 26.[14]  These cabinets were searched in response to the requests made by EPIC, the ACLU, and the NSAF.  Id.  Because responsive classified documents cannot be maintained outside of these secured cabinets due to their high level of classification, OLC's search was calculated to identify every such document, and thus easily qualifies as adequate under FOIA.  See Campbell, 164 F.3d at 27; Steinberg, 23 F.3d at 548; Ogelsby, 920 F.2d at 68; Weisberg, 745 F.2d at 1485.

C.      **The Office of Intelligence Policy and Review Conducted a Reasonable Search.**

Like ODAG and OLC, OIPR's TSP-related documents are classified and thus their distribution is limited to a certain number of OIPR staff with security clearances appropriate for the program.  Baker Decl. ¶ 10.  OIPR's search encompassed the policy files, electronic communications (email), and offices of these staff persons.  Id.[15]  As with ODAG and OLC,

---

[14]  Certain OLC staff also have access to a classified email system maintained in OIPR. As result of logistical difficulties, including those associated with OIPR's forced displacement from its workspace following the flooding of the main Department of Justice Building on or about June 26, 2006, the processing of any responsive documents maintained on this classified email system has not been completed, see Bradbury Decl. ¶ 26 n. 3, and as allowed by the Court's Scheduling Order of July 27, 2006 (Docket No. 24), is not addressed further herein.

[15]  For the reasons discussed in the Declaration of Mr. Baker, OIPR can neither confirm nor deny the existence of information responsive to the EPIC request in its operational files.

-21-

OIPR's search of these files, offices, and cabinets was reasonably calculated to identify responsive documents, and thus easily qualifies as adequate under FOIA. See Campbell, 164 F.3d at 27; Steinberg, 23 F.3d at 548; Ogelsby, 920 F.2d at 68; Weisberg, 745 F.2d at 1485.

### D.    The Criminal Division Conducted a Reasonable Search.

Upon receipt of the ACLU's request from JMD, the Criminal Division's FOIA/Privacy Act Unit searched its components and sections for responsive records. See McIntyre Decl. ¶ 6. Specifically, based on its expertise in identifying those offices within the Criminal Division most likely to have records responsive to any particular FOIA request, the Criminal Division initiated a search for records responsive to the ACLU's request in its Office of Enforcement Operations' Title III Unit, its Counterterrorism Section, its Domestic Security Section, and its Counterespionage Section. Id. Each of these sections searched their files and reported the extent of their possession of potentially responsive records. Id. at ¶ 7.

The Criminal Division's search was tailored to identify those personnel likely to have responsive records in light of their high level of classification and the limited personnel with security clearances to access such information. This search was reasonably formulated to identify responsive records. It easily qualifies as adequate under FOIA. See Campbell, 164 F.3d at 27; Steinberg, 23 F.3d at 548; Ogelsby, 920 F.2d at 68; Weisberg, 745 F.2d at 1485.

---

See Baker Decl. ¶¶ 36-38. In particular, OIPR cannot confirm or deny the existence of records pertaining to EPIC's specific request for "communications concerning the use of information obtained through [the TSP] as the basis for DOJ surveillance applications to the FISC," because, as a general matter, "OIPR cannot confirm or deny whether any particular method of surveillance is used to support FISA applications without disclosing the use or exploitation of particular intelligence sources or methods, which falls explicitly within the categories of properly classified information set forth in Executive Order 12958, as amended, § 1.4(c). Id. ¶ 36; see also DNI Decl. ¶ 35. Thus, OIPR did not search its operations files, as allowed by decisions such as Phillippi v. Central Intelligence Agency, 546 F.2d 1009 (D.C. Cir.1976) and Gardels v. Central Intelligence Agency, 689 F.2d 1100, 1103 (D.C. Cir. 1982).

**E.      The Federal Bureau of Investigation Conducted a Reasonable Search.**

The FBI uses the Central Records System ("CRS"), a system that enables it to maintain all information which it has acquired in the course of fulfilling its mandated law enforcement responsibilities, to conduct searches in response to FOIA and Privacy Act requests.  See Hardy Decl. ¶¶ 26-30 (describing in detail the CRS).  In response to the ACLU's FOIA request, which the FBI received from JMD on February 28, 2006, see id. ¶ 20, the FBI initiated a search of this records system.  Id. ¶ 22.

The generalized and broad nature of the ACLU's FOIA request, see Hardy Decl. Ex. A, however, does not lend itself naturally to the standard CRS searches that defendant typically conducts in response to specific requests for FBI investigative files, id. ¶ 31, particularly because the subject matter of the request is relatively recent, and thus responsive records may not yet have been indexed to the CRS.  Id.  As a result, in addition to its standard CRS search, FBI sent two internal Electronic Communications seeking to identify additional responsive documents. See id. ¶ 31.  The first, dated March 2, 2006, sought documents from the Director's Office, the Office of the General Counsel, the Counterterrorism Division, the Office of Public Affairs, and the Office of Congressional Affairs.  Id. ¶ 22.  The second, dated June 23, 2006, again sought documents from the same divisions and offices previously identified as likely sources of responsive documents, as well as from the Counterintelligence Division and the Inspection Division.  Id. ¶ 24.  Through this search, as well as "an individualized inquiry of those FBIHQ employees most likely to possess potentially responsive records," the FBI obtained a set of documents deemed to be responsive to the ACLU's FOIA request.

The FBI's system of records and search techniques fully meet the standards of adequacy and reasonableness established under the FOIA.  See, e.g., Brunetti v. Fed. Bureau of

Investigation, 357 F. Supp. 2d 97, 103 (D.D.C. 2004) (finding adequate search where FBI

conducted a CRS search that produced one responsive file and noting that FBI declaration

"describes in great detail the structure of the FOIA unit of the FBI and the various processes

involved in implementing a search," including the CRS indices).  In this case, moreover, the FBI

went beyond its standard CRS search.  It twice requested potentially responsive records from each

FBI Headquarters Division or Office likely to have responsive records, and also conducted an

individualized inquiry among those employees most likely to have such records.

      In sum, the FBI, like the other components addressed herein, "made a good faith effort to

search for the records requested," and "its methods were reasonably expected to produce the

information requested.'"  Kidd v. Dept. of Justice, 362 F. Supp. 2d 291, 294 (D.D.C. 2005)

(Kennedy, J.) (citation omitted); see also id. at 294-95 (granting summary judgment in favor of

DOJ on basis of declaration that attested to the records and databases searched, the general

processes in the searches, the search terms used, the search dates, the offices which conducted

searches, and the records located); see also Campbell, 164 F.3d at 27; Steinberg, 23 F.3d at 548;

Ogelsby, 920 F.2d at 68; Weisberg, 745 F.2d at 1485.  As each of the components have met their

burden of demonstrating the adequacy of their searches in response to plaintiffs' FOIA requests,

the Court should enter summary judgment on this issue in favor of the Department.

## II.     DOJ PROPERLY WITHHELD RECORDS UNDER FOIA.

      By this motion, DOJ moves for summary judgment with respect to the determinations

made to withhold the following under the exemption provisions of FOIA:

1.     Five records or categories of records withheld by ODAG in response to the request of

     ACLU, see Rowan Decl. ¶ 13;

2.     Ninety-one records or categories of records withheld by OLC in response to the requests of

        EPIC, ACLU, and NSAF, see Bradbury Decl. ¶ 27;[16]

3.     Thirty records or categories of records withheld by OLC that were referred by ODAG in

        response to the request of ACLU, see Bradbury Decl. ¶ 27; Rowan Decl. ¶ 13 & n.1;

4.     Sixty records or categories of records withheld by OLC that were referred by OIPR in

        response to the request of EPIC, see Bradbury Decl. ¶ 27;

5.     Eight  records or categories of records withheld by OLC that were referred by the FBI in

        response to the request of ACLU, see Bradbury Decl. ¶ 27; Hardy Decl. ¶ 142;

6.     Sixty records or categories of records withheld by OIPR in full, and two records withheld

        in part, in response to the request of EPIC, see Baker Decl. ¶ 17 & Ex. C;

7.     Fourteen records or categories of records withheld by OIPR that were referred by OLC in

        response to the requests of EPIC, ACLU and NSAF, see Baker Decl. ¶ 17 & Ex. C:

        Bradbury Decl. ¶ 11 n.1 & Ex. K;

8.     Five records or categories of records withheld by OIPR that were referred by ODAG in

        response to the request of ACLU, see Baker Decl. ¶ 17 & Ex. C; Rowan Decl. ¶ 13 n.1.

9.     One record withheld by OIPR that was referred by the FBI in response to the request of

        ACLU, see Baker Decl. ¶ 17 & Ex. C; Hardy Decl. ¶ 142.

10.    Records withheld by the Criminal Division in response to the request of ACLU,

        see McIntyre Decl. ¶ 11-37;

11.    Records withheld by FBI in response to the request of ACLU, see Hardy Decl. ¶ 32;

---

[16]   The NSAF withholdings are a small subcategory of the documents withheld in
response to the EPIC and ACLU requests, as described in the Bradbury Decl. ¶ 39 n. 6 & ¶ 62
n.7.

12.     Four records withheld by FBI that were referred by ODAG in response to the request of

        ACLU, see Hardy Decl. ¶ 147;

13.     One record withheld by FBI that was referred by OLC in response to the requests of EPIC,

        ACLU and NSAF, see Hardy Decl. ¶ 148;

14.     Four records withheld by FBI that were referred by OIPR in response to the request of

        EPIC, see Hardy Decl. ¶ 147;

15.     Records referred to the NSA by OLC in response to the requests of EPIC, ACLU, and

        NSAF, by ODAG in response to the request by ACLU, by OIPR in response to the request

        by EPIC, and by FBI in response to the request by ACLU.  See Declaration of Louis F.

        Giles, Director of Policy, NSA, attached hereto as Ex. M; Declaration of Joseph B. ("NSA

        Decl."), Deputy Chief of Staff for Operations and Support, Signals Intelligence

        Directorate, NSA, attached hereto as Ex. N.[17]

        As to each of these categories of records, DOJ has met its burden of demonstrating that the

withheld records fall within the FOIA exemptions invoked by each component.[18]  As a result, DOJ

is entitled to the entry of summary judgment with respect to its responses to the FOIA requests

made by all three plaintiffs.

_____

        [17]    Although the substance of the declaration provided by the second NSA declarant may
be placed on the public record, the identity of that declarant cannot be publicly revealed.
See NSA Decl. n.1.

        [18]    In addition to the records properly determined to be withheld by DOJ components,
both OLC and the FBI identified certain records that did not constitute agency records because
they were subject to an express reservation of control by another federal entity.  See Bradbury
Decl. ¶ 77; Hardy Decl. ¶ 143.  These documents do not constitute "agency records" as defined
by FOIA.  See Dept. of Justice v. Tax Analysts, 492 U.S. 136, 144 (1989); United We Stand
American v. Internal Revenue Serv., 359 F.3d 595 (D.C. Cir. 2004).  Thus, they were properly
excluded from processing by these components.

## A.      DOJ Properly Withheld Records Under Exemption One.[19]

Exemption One allows an agency to protect records that are:  (1) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy, and (2) are in fact properly classified pursuant to Executive Order.  See 5 U.S.C. § 552 (b)(1).  Exemption One thus "establishes a specific exemption for defense and foreign policy secrets, and delegates to the President the power to establish the scope of that exemption by executive order."  Military Audit Project, 656 F.2d at 737.

Section 1.2(a)(4) of Executive Order 12958, as amended, states that an agency may classify information that fits into one or more of the Executive Order's categories for classification when the appropriate classification authority "determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security."  68 Fed. Reg. 15315, 15315 (March 25, 2003).  In order to properly invoke Exemption One, the agency must provide "detailed and specific" information demonstrating both "why the material has been kept secret and why such secrecy is allowed by the terms of an existing executive order."  ACLU I, 265 F. Supp. 2d at 27.

An agency's burden in this regard is "not especially onerous."  ACLU I, 265 F. Supp. 2d at 29.  The issue for the Court is whether "on the whole record, the Agency's judgment objectively survives the test of reasonableness, good faith, specificity and plausibility in the field of foreign

---

[19]  For ease of reading, each of the applicable FOIA exemptions invoked by DOJ are addressed herein in the order in which they appear in the statute.  As the declarations provided in support of this motion amply demonstrate, however, the vast majority of the records or categories of records withheld by DOJ are exempt from disclosure under more than one Exemption.  See, e.g., Bradbury Decl. Ex. K; Baker Decl. Ex. C.  With respect to any record subject to such overlapping claims of Exemption, this Court need only find any one Exemption applicable in order to grant summary judgment to the Department.  See Fund for Constitutional Gov't v. Nat'l Archives and Records Serv., 656 F.2d 856, 864 n.19 (D.C. Cir. 1981).

intelligence in which [the agency] is expert and has been given by Congress a special role."

Gardels v. Central Intelligence Agency, 689 F.2d 1100, 1105 (D.C. Cir. 1982).  Although the

agency bears the burden of proving its claim for exemption, see 5 U.S.C. § 552(a)(4)(B), because

agencies have "unique insights" into the adverse effects that might result from public disclosure of

classified information, the courts must accord "substantial weight" to an agency's affidavits

justifying classification.  Miller v. Casey, 730 F.2d 773, 776 (D.C. Cir. 1984); Military Audit

Project, 656 F.2d at 738.

Thus, to carry its burden of demonstrating the propriety of its decisions supporting its

Exemption One position, DOJ must simply demonstrate a "logical connection between the

information and the claimed exemption . . . ."  ACLU I, 265 F. Supp. 2d at 29-30.  In reviewing

the claims made by DOJ, the Court "is not to conduct a detailed inquiry to decide whether it

agrees with the agency's opinions . . . ."  Halperin, 629 F.2d at 148; see Weissman v. Central

Intelligence Agency, 565 F.2d 692, 697 (D.C. Cir. 1997) (recognizing that "[f]ew judges have the

skill or experience to weigh the repercussions of disclosure of intelligence information").  To do

so would violate the principle of according substantial weight to the expert opinion of the agency.

See Miller, 730 F.2d at 776; Military Audit Project, 656 F.2d at 738.  Instead, the Court must

"take seriously the government's predictions about the security implications of releasing particular

information to the public . . . ," ACLU I, 265 F. Supp. 2d at 28, and "recognize that the executive

branch departments responsible for national security and national defense have unique insights

and special expertise concerning the kind of disclosures that may be harmful."  Id. at 27 (citing

Krikorian v. Dept. of State, 984 F.2d 461, 464 (D.C. Cir. 1993); Salisbury v. United States, 690

F.2d 966, 970 (D.C. Cir. 1982); and Military Audit Project, 656 F.2d at 738).

The Exemption One claims made by the Department here are supported by the Declaration

of John D. Negroponte, Director of National Intelligence.  DNI Negroponte is the head of the

United States' Intelligence Community and the principal adviser to the President, the National

Security Council, and the Homeland Security Council on national security matters.  Id. ¶ 11.  As

such, the DNI has "access to all intelligence related to the national security that is collected by any

department, agency, or other entity of the United States, id. ¶ 15, and so, is fully cognizant of the

strategies and priorities of the Intelligence Community as reflected by the entirety of the U.S.

intelligence operation.  The DNI is also the Executive Branch official charged with safeguarding

classified information and for establishing the procedures under which classified information is

handled and stored so as to avoid any unauthorized disclosure, DNI Decl. ¶ 14, is specifically

authorized by Congress to protect intelligence sources and methods.  Id. ¶ 14; see 50 U.S.C.

§ 403-1(i)(1).

        Relying upon his expertise and exercising his responsibilities to the Intelligence

Community, the DNI has identified with particularity the exceptionally grave harms to national

security that are reasonably expected to occur if information regarding the TSP is compelled to be

disclosed.  See generally DNI Decl. ¶¶ 22-35.  In particular, DNI Negroponte identifies seven

categories of information that cannot be disclosed without causing grave harms to national

security, including "(1) any classified intelligence information concerning the continuing threat to

the United States posed by al Qaeda and its affiliates that forms the basis for the President's

authorization and reauthorization of the TSP"; DNI Decl. ¶ 22; see also id. ¶ 26; "(2) any

operational details concerning the technical methods by which the NSA intercepts

communications under the TSP"; id. ¶ 22; see also id. ¶¶ 27-28;  and "(7) any information that

would reveal or tend to reveal whether someone is a target of surveillance under the TSP."

Id. ¶ 22; see also id. ¶ 35.  In the classified portions of his declaration, DNI Negroponte also

discusses certain additional categories of information relating to the TSP that cannot be disclosed without exceptionally grave consequences for national security.  See DNI Decl. ¶¶ 22-23, 29-34. For each of these categories of information, the DNI explains "from the perspective of the Intelligence Community, the significant harms that would be done to United States intelligence gathering in the war against terror" if documents that contain information falling within these categories are compelled to be disclosed.  Id. ¶ 4.

        As the DNI attests, information in the seven categories he identifies is specifically authorized to be classified by the express terms of Executive Order 12958, as amended.  See DNI Decl. ¶ 20.  In particular, information relating to the TSP concerns "intelligence activities (including special activities), intelligence sources or methods, or cryptology," Exec. Order 12958, as amended, § 1.4(c); "foreign relations or foreign activities of the United States, including confidential sources," id. § 1.4(d); "scientific, technological, or economic matters relating to the national security, which includes defense against transnational terrorism," id. § 1.4(e); and "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security, which includes defense against transnational terrorism," id. § 1.4(g), the disclosure of which "reasonably could be expected to cause exceptionally grave damage to the national security of the United States."  Id. § 1.2(a)(1).

        Relying upon the express finding by the President contained in Executive Order 129258, as amended, that such information is properly classified and upon his own expertise in identifying those categories of information that cannot be disclosed without jeopardizing the national security of the United States, the DNI concludes that the disclosure of classified information falling within any the seven categories he identifies "would cause exceptionally grave harm to the national security of the United States and render the nation more vulnerable to another terrorist attack."

Id. ¶ 25.  Thus, under Executive Order 12958, as amended, accordingly, information related to the TSP is classified TOP SECRET, DNI Decl. ¶ 20, and moreover, is subject to the special access and handling requirements reserved for Sensitive Compartmented Information or "SCI."  Id.  In light of these classification levels, and the exceptionally grave harms to the national security that would result from their disclosure, the DNI "fully support[s] and defend[s] any determination made to withhold information responsive to FOIA requests that seek disclosure of classified information related to the TSP."  Id.

As discussed in detail below, and in the declarations filed in support of this motion, each of the components of the Department that maintains classified records relating to the TSP withheld information that falls within one or more of the seven categories of information identified by the DNI as information that cannot be disclosed without causing exceptionally grave harm to national security.  Because the DNI's description of the harms that would result from the compelled disclosure of this information is more than sufficient to establish its proper classification under Executive Order 12958, as amended, the Department's Exemption One claims must be upheld.

### 1.    ODAG Properly Withheld Records Under Exemption One.

The five responsive records or categories of records withheld by ODAG that remain at issue in this litigation are all classified, see Rowan Decl. ¶¶ 16-25, and thus, are all properly exempt from disclosure under Exemption One.  As the Declaration of Mr. Rowan makes clear, the classified documents withheld by ODAG fall into two distinct groups.  First, ODAG withheld records relating to certain federal criminal prosecutions, where criminal defendants who were alerted to the existence of the TSP by publication of a news report in The New York Times sought information as to whether the NSA's activities had any effect on their pending criminal cases.

See Rowan Decl. ¶¶ 16-17.  In many of these cases, the federal government made a filing with the presiding court, under the provisions of the Classified Information Procedures Act, 18 U.S.C. App. 3, to address these requests for information and related allegations.  Id. ¶ 17.  Each of these filings was classified and was provided only to the Court and not to the criminal defendant or to his counsel.  Id.

  Disclosure of these documents would disclose the United States' response to the question posed in each of these criminal cases, namely, whether the particular criminal defendant at issue was a target of surveillance by the NSA.  See Rowan Decl. ¶¶ 18-19.  Such information is itself properly classified and cannot be disclosed without compromising additional classified information.  As the DNI explains:

> To confirm or deny whether any individual has been the target of communications surveillance under the TSP would disclose specifically, and in a more general sense, who is and is not being targeted – thus compromising that collection and providing our adversaries clues regarding those individuals who may or may not be available as a secure means of communication.  Confirmation of a target's identity would immediately disrupt the flow of accurate intelligence as the target takes steps to evade detection or to manipulate the information received.  Denying that any particular individual is targeted is itself unworkable, and itself revealing, in cases where an individual may, indeed, be targeted.  A refusal to confirm or deny only in cases where surveillance is occurring, of course, would effectively disclose and compromise that surveillance, and thus the accumulation of these responses would reveal, more broadly the method by which surveillance under the TSP is conducted.

DNI Decl. ¶ 35; see also Rowan Decl. ¶ 18.  Thus, as the DNI concludes, "the only viable way for the Intelligence Community to protect this intelligence collection mechanism . . . is neither to confirm nor deny whether someone has been targeted or subject to intelligence collection, regardless of whether the individual has been targeted." Id.

  As described in the Declaration of Mr. Rowan, disclosure of the classified filings made in the criminal proceedings he describes would "reveal or tend to reveal whether a particular person

is a target of surveillance."[20]  DNI Decl. ¶ 35; see Rowan Decl. ¶¶ 18-19.  "[B]ecause the documents filed in the various criminal cases were filed in response to inquiries concerning the identification of targets of the TSP, they cannot be disclosed regardless of whether the filings confirm or deny the allegations to which they responded."  Rowan Decl. ¶ 19.

        Courts have routinely accepted that, when discussing sensitive targeting information, federal agencies whose intelligence or law enforcement activities would be compromised by accumulated disclosures of the type described by the DNI and Mr. Rowan have the right, and indeed, the responsibility, to refuse to confirm or deny such information.  For example, in Marrera v. U.S. Dept. of Justice, 622 F. Supp. 51, 53 (D.D.C. 1985), this Court upheld, under Exemption One, an agency decision to refuse to confirm or deny whether particular individuals were the subject of surveillance under a FISC warrant.  Similarly, in Gordon v. Fed. Bureau of Investigation, 388 F. Supp. 2d 1028, 1037 (N.D. Cal. 2005), the court upheld the agency's refusal to confirm or deny whether particular individuals were on a terrorist watch list.  And, in Gardels, 689 F.2d at 1104, the Court of Appeals upheld the agency's refusal to confirm or deny the identity of persons with whom it had covert contacts.

        Thus, "when a pattern of responses itself reveals classified information, the only way to keep secrets is to maintain silence uniformly."  Bassiouni, 392 F.3d at 246.  "To say otherwise would result in the frequent, routine exposure of intelligence information, sources, and methods and would severely undermine surveillance activities in general, causing exceptional harm to the national security of the United States."  DNI Decl. ¶ 35.  Mr. Rowan's declaration plainly establishes that disclosure of the responsive information identified by ODAG would cause these

---

        [20]  Nothing in this brief or the accompanying declaration should be construed as either such a confirmation or a denial.

harms, and thus, the documents drafted and filed in the criminal cases where TSP-related inquiries were made are properly subject to withholding under Exemption One of FOIA.

The second set of documents withheld by ODAG comprises two additional records or categories of records which have been withheld under FOIA Exemptions One, Three and Five. See Rowan Decl. ¶¶ 24-26. This memorandum, as described by Mr. Rowan, contains classified information regarding the operation of the TSP, see Rowan Decl. ¶ 25, and, as explained by the DNI, such information cannot be disclosed without compromising the national security of the United States: "Detailed knowledge of the methods and practices of the U.S. Intelligence Community agencies must be protected from disclosure because such knowledge would be of material assistance to those who would seek to penetrate, detect, prevent, or damage the intelligence efforts of the United States, including efforts by this country to counter international terrorism." DNI Decl. ¶ 27; see also id. ¶ 28. As the DNI further explained, "even the release of what appears to be the most innocuous information about the TSP poses the substantial risk that our adversaries will be able to piece together sensitive information about how the Program operates." Id. ¶ 24. Information regarding the details of TSP's operation contained in these documents, accordingly, cannot be disclosed.

Because all of the responsive information withheld by ODAG falls squarely within the categories of information identified by the DNI as information that cannot be disclosed without causing exceptionally grave harm to the national security of the United States, ODAG properly withheld these records under FOIA's Exemption One, and is entitled to summary judgment.

> 2.    OLC Properly Withheld Records Under Exemption One.

As described in the Declaration of Steven G. Bradbury, Ex. A, with few exceptions, the records or categories of records withheld by OLC are currently and properly classified because

they contain information that falls into the categories described by the DNI.[21]  As fully described

in the Declaration of Mr. Bradbury, OLC withheld information that "would reveal or tend to

reveal operational details concerning the technical methods by which NSA intercepts

communications under the TSP," DNI Decl. ¶ 27; see also id. ¶¶ 22, 28.  See, e.g., Bradbury Decl.

¶¶ 32 (withholding documents that contain "classified information regarding the terms of the

President's authorization of the TSP, which if disclosed, would compromise the effectiveness of

the Program to the detriment of national security"), 69 (withholding informal communications "to

and from OLC and other federal government agencies containing attorney-client communications

regarding very specific questions about the TS"); see also id. ¶¶ 40, 42-47, 54-59, 65, 75.  OLC

also withheld "information that would reveal or tend to reveal whether a particular person is a

target of surveillance," DNI Decl. ¶ 35; see also id. ¶ 22.  See Bradbury Decl. ¶¶ 48-53.  For

example, OLC withheld "records or categories of records relating to the criteria used for targeting

and the appropriateness of targeting certain groups or individuals under the TSP," id. ¶ 48, and

"records or categories of records that contain reporting with respect to the intelligence successes

achieved through the use of the TSP."  Id. ¶ 49.  For the reasons described above and detailed

more fully in the supporting declarations, this sort of information cannot be disclosed without

causing exceptionally grave harm to the national security of the United States.  As such, it is

properly withheld under Exemption One.

  OLC also withheld "classified intelligence information concerning the continuing threat to

the United States posed by al Qaeda and its affiliates that forms the basis for the President's

---

  [21]  Certain documents maintained in OLC's classified files are, in fact, unclassified, but
are so maintained for convenience.  Among the 91 responsive documents withheld by OLC,
see Bradbury Decl. ¶ 27, only the following unclassified documents were identified by OLC as
withheld in full: OLC 18, 84, 146, 201 and OIPR 60.  These documents are not subject to
Exemption One but are withheld under other exemptions.  See Bradbury Decl. Ex. K.

authorization and reauthorization of the TSP," DNI Decl. ¶ 22; see Bradbury Decl. ¶¶ 33, 35.  As

the DNI attests, information in this category cannot be disclosed without causing exceptionally

grave harm to the national security of the United States.  DNI Decl. ¶¶ 22, 26.  Similarly, OLC

withheld information in additional categories identified by the DNI as material that cannot be

disclosed without causing exceptionally grave harm to the national security of the United States.

See DNI Decl. ¶¶ 22, 29-34; Bradbury Decl. ¶¶ 42-47; 54-59.  The DNI has described, with

particularity the harms that would arise from the disclosure of the types of information withheld

by OLC, see DNI Decl. ¶¶ 22, 26, 29-34; see also Bradbury Decl. ¶¶ 42-47; 54-59.  Although that

description cannot be provided on the public record without itself disclosing classified

information, the information contained in these declarations is "detailed and specific," and

demonstrates clearly "why the material has been kept secret and why such secrecy is allowed by

the terms of an existing executive order."  ACLU I, 265 F. Supp. 2d at 27.  Accordingly, OLC

properly withheld all of its classified records or categories of records under Exemption One, and

is entitled to summary judgment.

    3.    OIPR Properly Withheld Records Under Exemption One.

    As described in the Declaration of James A. Baker, the records or categories of records

withheld by OIPR are currently and properly classified and thus exempt from disclosure by FOIA

Exemption One.  In particular, the "vast majority of documents withheld by OIPR concern its

dealings with the Foreign Intelligence Surveillance Court ('FISC')."  Baker Decl. ¶ 19; see id.

¶¶ 22-39.  Proceedings before the FISC must be conducted "in such a manner as will protect its

secrecy."  See Baker Decl. ¶ 21.  Moreover, as Mr. Baker describes, the withheld documents

contain information concerning the operation of the TSP and other information which falls

squarely into the categories of information identified by the DNI.  See Baker Decl. ¶¶ 19-22, 24-

31, 33, 35.  As the DNI attests, information that falls within the categories he describes cannot be

disclosed without causing exceptionally grave harm to the national security of the United States.

DNI Decl. ¶¶ 22-35.  As a result, OIPR properly withheld these documents under Exemption One,

and it is entitled to summary judgment.

                4.        The FBI Properly Withheld Records Under Exemption One.

      As described in the Declaration of David M. Hardy, the FBI withheld records relating to

several categories of information because they were classified.  See Hardy Decl. ¶¶ 40-43; see

also ¶¶ 44-50 (identifying three general categories of withheld information including information

concerning "intelligence activities and methods utilized by the FBI for gathering intelligence

data," id. ¶ 44).  As further attested to by Mr. Hardy, the FBI specifically reviewed each of the

documents it identified as responsive, and in consultation with the NSA, as well as based on the

classification determinations reflected in the DNI Declaration, determined that the information at

issue remains classified pursuant to the provisions of Executive Order 12958, as amended, §§ 1.4

(c), (e), and (g).  Hardy Decl. ¶ 40.

      Specifically, as Mr. Hardy describes, "United States intelligence-gathering efforts in the

ongoing war against terror would be significantly harmed if documents that contain classified

information about the TSP are compelled to be disclosed."  Id. ¶ 51.  The classified portions of

Mr. Hardy's declaration identify the classified records or categories of records withheld by the

FBI, and demonstrate that these records directly implicate the categories of information identified

by the DNI as information that cannot be disclosed without causing exceptionally grave harm to

the national security of the United States.  See Hardy Decl. ¶¶ 39-53.  In light of these

determinations, and the "substantial weight" owed to them by this Court, see ACLU I, 265 F.

Supp. 2d at 27, it is plain that, as with each of the other DOJ components described above, the

FBI has properly withheld responsive records or categories of records under Exemption One, and is entitled to summary judgment.

          5.    <u>The NSA Properly Withheld Records Referred to it For Processing Under Exemption One.</u>

As explained in depth in the declaration of Louis F. Giles, Director of Policy of the NSA, Ex. M, and in the Declaration of Joseph B., Deputy Chief of Staff for the Operations and Support for the Signals Intelligence Directorate, Ex. N, NSA cannot be compelled to disclose the documents referred to NSA by OLC, ODAG, OIPR, and FBI, as any disclosure of details regarding the TSP can be reasonably expected to cause exceptionally grave harm to the national security of the United States.

One of NSA's primary functions is the collection of signals intelligence ("SIGINT"). Giles Decl. ¶ 3; Executive Order 12333, 46 Fed. Reg. 59941, § 1.12(b) (setting forth the responsibilities of the NSA). NSA's SIGINT mission includes obtaining information from foreign electromagnetic signals and intercepting communications necessary to the national defense, national security, or the conduct of foreign affairs of the United States. <u>Id.</u> Information produced by SIGINT is relevant to a wide range of issues, including military order of battle; threat warnings and readiness; arms proliferation; terrorism; and foreign aspects of international narcotics trafficking. Giles Decl. ¶ 5.

The SIGINT collection mission of NSA provides national policy makers and the intelligence community with highly reliable foreign intelligence information. Giles Decl. ¶ 4. This information is often critical to the formulation of U.S. foreign policy and the support of U.S. military operations around the world. <u>Id.</u> ¶ 5. Foreign intelligence information produced by NSA as a result of its SIGINT mission is often unobtainable by other means. <u>Id.</u>

NSA's ability to produce foreign intelligence information depends upon its access to

foreign and international electronic communications. Giles Decl. ¶ 7. Thus, NSA has developed

a sophisticated worldwide SIGINT collection network to acquire these communications. Id. ¶ 6.

The technological infrastructure that supports NSA's foreign intelligence information collection

has taken years to develop at a substantial cost and untold human effort. Id. It relies on

sophisticated collection and processing technology that is designed to keep pace with challenging

new technological developments. Id. ¶ 4.

       A fundamental tenet of NSA's communications collection process is that the identity of

specific communications (referred to as "targets"), the degree of success in exploiting these

targets, the vulnerability of particular foreign communications, and the extent of any cryptologic

successes are matters that must be maintained in the strictest secrecy. Giles Decl. ¶ 8. This is

because NSA's SIGINT technology is both expensive and fragile. Id. ¶ 7; see also NSA Decl.

Ex. C, ¶ 5. Disclosure of the identities of targets, the degree of success or weakness in exploiting

those targets, the vulnerabilities of particular foreign communications, and the extent of any

cryptologic success would encourage countermeasures by the targets of NSA's efforts. Giles

Decl. ¶ 8. Public disclosure of either the capability to collect specific communications or the

substance of the information itself can easily alert targets to the vulnerability of their

communications. Id. ¶ 7; see also NSA Decl. ¶ 5. Thus, disclosure of even a single

communication has the potential to reveal the intelligence collection techniques that are applied

against targets around the world. Giles Decl. ¶ 7.

       Once alerted that NSA is targeting their communications, a target can easily frustrate

SIGINT collection by taking steps to evade detection, to manipulate the information that NSA

receives, or to implement other countermeasures aimed at undermining NSA's operations, such

as, for example, using different communications techniques or utilizing a different

communications link.  NSA Decl. ¶¶ 5, 13; <u>see also</u> Giles Decl. ¶ 7.  If a target is successful in defeating an intercept operation, all of the intelligence from that source is lost until and unless NSA can establish a new and equivalent exploitation of the target's signals.  Giles Decl. ¶ 8.  If a source becomes unavailable, the military, national policymakers, and the intelligence community must operate without the information such signals provided.  Giles Decl. ¶ 8.  These intelligence losses are extremely harmful to the national security of the United States.  <u>Id.</u>; NSA Decl. ¶ 5.

The description of the fragility of NSA's signals intelligence process fully supports NSA's need to protect any document that contains details regarding the operation of the TSP.  As courts have long recognized, it is "inherently logical," <u>see</u> <u>Hayden</u>, 608 F.2d at 1388, that disclosure of the number of targets of a classified surveillance program or the number of communications that are intercepted – both among the information specifically sought by plaintiffs' FOIA requests – would provide potential targets of that program with data that they could use to determine their likelihood of being intercepted.  Moreover, as the NSA describes, "[e]ven the release of general information about the TSP poses the substantial risk that our adversaries will be able to piece together sensitive information about how the program operates."  NSA Decl. ¶ 17.

The harms that result from any such understanding of U.S. intelligence gathering methods are substantial:  "if an individual learns or suspects that his signals are or may be targeted by the NSA for collection, he can take steps to evade detection, to manipulate the information that NSA receives, or to implement other countermeasures aimed at undermining NSA's operations."  NSA Decl. ¶ 5.  "The resulting loss of accurate intelligence from such a source deprives U.S. policy makers of information critical to U.S. interest, and in the case of the TSP, could result in the catastrophic failure of the early warning system that the President has established to detect and prevent the next terrorist attack."  <u>Id.</u>

Indeed, courts have long recognized that sensitive information of this nature, if disclosed, when coupled with other available or unconfirmed information could provide further insight into the United States' intelligence strategies.  See Sims, 471 U.S. at 178 ("What may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context"); Center for Nat'l Security Studies, 331 F.3d at 928 ("things that did not make sense to the District Judge would make all too much sense to a foreign counter-intelligence specialist who could learn much about this nation's intelligence gathering capabilities from what these documents revealed about sources and methods"); Fitzgibbon, 911 F.2d at 763 ("each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance itself") (quoting Gardels, 689 F.2d at 1106, in turn, quoting Halperin v. Central Intelligence Agency, 629 F.2d 144, 150 (D.C. Cir. 1980)).

Because NSA has determined that "all responsive referred records were currently and properly classified," NSA Decl. ¶ 9, and has specifically articulated the grave harms to national security that would result from their disclosure, each of the components that referred records to NSA is entitled to summary judgment as to those referrals.

### B.    DOJ PROPERLY WITHHELD RECORDS UNDER EXEMPTION TWO.

Information that is "related solely to the internal personnel rules and practices of an agency" is exempt from disclosure pursuant to Exemption 2.  5 U.S.C. § 552(b)(2).  Exemption 2 applies to materials "'used for predominantly internal purposes.'"  Schiller v. National Labor Relations Bd, 964 F.2d 1205, 1207 (D.C. Cir. 1992) (quoting Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051, 1073 (D.C. Cir. 1981) (en banc)).  This exemption has been held to protect two types of information:  (1) information the release of which would risk

circumvention of agency regulations or statutes, see Crooker, 670 F.2d at 1074, and (2) "routine matters of merely internal interest," id. at 1069 (citation omitted).  See also Founding Church of Scientology of Washington, D.C., Inc. v. Smith, 721 F.2d 828, 831 n.4 (D.C. Cir. 1983) (material is exempt if it "relates to trivial administrative matters of no genuine public interest").  The former application of the exemption is known as "high 2," while the latter is known as "low 2."  See Wiesenfelder v. Riley, 959 F. Supp. 532, 535 (D.D.C. 1997).

The FBI has invoked this Exemption and has demonstrated that it did so properly.  Specifically, the FBI has asserted the applicability of Exemption Two with respect to two categories of information.  First, the FBI has claimed the "high 2" protection of Exemption Two with respect to specific "internal operational and law enforcement support procedures," and its practices relating to "its intelligence information-gathering and cooperation with the NSA."  Hardy Decl. ¶ 54; see generally id. ¶¶ 55-57.

As the classified portions of Mr. Hardy's declaration explain, the withheld information – much of which is also protected under Exemption 7(E) , which protects "techniques and procedures of law enforcement investigations or prosecutions," 5 U.S.C. § 552(b)(7)(E), see infra at 72, 78-79 – clearly meets the criteria for protection under Exemption 2.  First, the information meets Exemption 2's threshold requirement because it is "predominantly internal," i.e., it is "used for predominantly internal purposes."  Schiller, 964 F.2d at 1207; see Hardy Decl. ¶ 56.  The information is "predominantly internal" because these techniques and procedures relate to internal law enforcement information used by the FBI.  See, e.g., Crooker, 670 F.2d at 1073-74 (finding exempt from disclosure ATF training manual on surveillance techniques); Delta Limited v. Customs and Border Protection Bureau, 384 F. Supp. 2d 138, 147-48 (D.D.C. 2005) (finding "procedures, guidelines and techniques utilized by the agency in an operational environment"

-42-

were predominantly internal and exempt as "high 2" information), vacated in part on other

grounds, 393 F. Supp. 2d 15 (D.D.C. 2005).

Second, information relating to these techniques and procedures qualifies for the "high 2"

exemption because the FBI has reasonably determined that disclosure of its law enforcement

techniques would "impede the effectiveness of the internal law enforcement procedures of the FBI

and the intelligence-gathering procedures of the FBI's fellow intelligence agencies as it engages in

counterterrorism activities." Hardy Decl. ¶ 54; see id. ¶¶ 55-57; see also, e.g., Gordon, 388 F.

Supp. 2d at 1036-37 (Exemptions 2 and 7(E) properly invoked over materials created in course of

maintenance of terrorist watch lists because terrorists could educate themselves about watch list

procedures and devise ways to circumvent watch lists); Delta Limited, 384 F. Supp. 2d at 147-48

(withholding proper under Exemption 2 because disclosure would "reveal procedures, guidelines,

and techniques used by the [Customs and Border Protection Bureau] in an operational

environment, thereby benefitting those attempting to violate the law and detection" and "would

'aid those who seek to circumvent CBP operations and thus [harm] the agency's effective conduct

of its mission.'") (quoting declaration); Blanton v. Dept. of Justice, 63 F. Supp. 2d 35, 43 (D.D.C.

1999) (upholding FBI's invocation of Exemption 2 to withhold "information about administrative

practices and procedures pertaining to internal functions and policies of the FBI as they relate to

the 'use of specialized technical equipment,' the release of which might provide the public 'with

insight into the internal handling' of investigations involving race crimes") (internal quotations

refer to FBI's Vaughn declaration); Voinche v. Fed. Bureau of Investigation, 940 F. Supp. 323,

332 (D.D.C. 1996) (finding proper withholding under Exemptions 2 and 7(E) information relating

to the "safety procedures afforded to the Supreme Court and its Justices," among other things); cf.

Center for Nat'l Security Studies, 331 F.3d at 928-29 (finding that even information that seems

innocuous or trivial in isolation "could be of great use to al Qaeda in plotting future terrorist attacks" because it would allow knowledgeable persons to piece together a "composite picture" of September 11 attacks investigation and enable terrorists to devise countermeasures).

As in the context of Exemption One, the agency's predictive judgments about the risks of disclosure in this area are entitled to particular deference because disclosure implicates national security concerns. These determinations are peculiarly within the expertise of the FBI and, thus, requires that the FBI's predictive judgment be afforded heightened deference. Indeed, the Court of Appeals recently re-emphasized the need for such deference in a similar case involving counterterrorism law enforcement efforts:

> The need for deference in this case is just as strong as in earlier cases. America faces an enemy just as real as its former Cold War foes, with capabilities beyond the capacity of the judiciary to explore. Exemption 7(A) explicitly requires a predictive judgment of the harm that will result from disclosure of information. . . . It is abundantly clear that the government's top counterterrorism officials are well-suited to make this predictive judgment. Conversely, the judiciary is in an extremely poor position to second-guess the executive's judgment in this area of national security.

Center for Nat'l Security Studies, 331 F.3d at 928. Just as this mandated deference is required in the Exemption 7(A) context, it is also required, where, as here, the predictive judgment about a risk to national security relates to Exemptions 2 and 7(E). See id. ("Judicial deference depends on the substance of the danger posed by disclosure – that is, harm to national security – not the FOIA exemption invoked.").

As the cases cited above demonstrate, and Mr. Hardy's declaration establishes, the FBI's withholding of responsive information where disclosure would compromise the continued effective use of the law enforcement techniques and methods Mr. Hardy discusses is entirely proper under Exemption Two of FOIA.

Second, the FBI has also withheld under Exemption Two, in conjunction with Exemptions

Six, 5 U.S.C. § 552(b)(6), and 7(C), id. § 552(b)(7)(C), business telephone, fax and pager

numbers of FBI Special Agents, FBI support employees, and other federal government personnel.

As Mr. Hardy describes, this sort of information relates "to the internal practices [of the federal

government], in that they are tools utilized by personnel in the performance of their jobs."  Hardy

Decl. ¶ 58.  Disclosure of such information "could subject these individuals to harassing contacts

(via telephone, fax or pager) which could disrupt official business, including impeding

government personnel from conducting and concluding intelligence and law enforcement matters

in a timely manner."  Id.  In particular, to disclose the names of federal, state, or local law

enforcement officials or supporting staff who work on sensitive terrorism investigations could

subject them to harassment and disrupt the performance of duties that, of necessity, often require a

low profile.  See Hardy Decl. ¶¶ 115-121.  Because internal contact information such as this

constitutes a "routine matter[] of merely internal interest," Crooker, 670 F.2d at 1069; see also

Hardy Decl. ¶ 58-59,  its withholding under Exemption Two should be upheld.  Accordingly, the

FBI is entitled to summary judgment on its Exemption Two claims.

## C.    DOJ PROPERLY WITHHELD RECORDS UNDER EXEMPTION THREE.

Much of the information sought by plaintiffs' requests was properly withheld by DOJ

pursuant to Exemption Three of FOIA.  Exemption Three, which is set forth at 5 U.S.C.

§ 552(b)(3), is intended to protect information from disclosure under FOIA that Congress has

separately determined warrants special protection.  Thus, FOIA "does not apply to matters that

are  − . . . specifically exempted from disclosure by statute . . . provided that such statute (A)

requires that the matters be withheld from the public in such a manner as to leave no discretion on

the issue, or (B) establishes particular criteria for withholding or refers to particular types of

matters to be withheld."  Id.  In examining an Exemption Three claim, a court must determine first

whether the claimed statute is a statute of exemption under FOIA, and second whether the withheld material satisfies the criteria of the exemption statute.  See Sims, 471 U.S. at 167; Fitzgibbon v. Central Intelligence Agency, 911 F.2d 755, 761 (D.C. Cir. 1990).

Evaluating whether documents are properly withheld under Exemption Three presents considerations "distinct and apart from the other eight exemptions."  Fitzgibbon, 911 F.2d at 761 (quoting Ass'n of Retired R.R. Workers v. U.S. R.R. Retirement Bd., 830 F.2d 331, 336 (D.C. Cir. 1987)).  When Congress has enacted statutes that particularly identify certain categories of information that are exempt from public disclosure notwithstanding the requirements of FOIA, Congress makes "manifest" its intent to require the withholding of documents falling within the terms of those statutes.  Fitzgibbon, 911 F.2d at 761; see also id. at 764 ("exemption statutes were congressionally designed to shield processes at the very core of the intelligence agencies – intelligence-collection and intelligence-source evaluation").  "A specific showing of potential harm to national security . . . is irrelevant to the language of [an Exemption Three statute].  Congress has already, in enacting the statute, decided that disclosure of [the specified information] is potentially harmful."  Hayden v. National Security Agency, 608 F.2d 1381, 1390 (D.C. Cir. 1979).  Thus, as the Court of Appeals has explained, "'Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage.'"  Fitzgibbon, 911 F.2d at 761-62 (quoting Assoc. of Retired R.R. Workers, 830 F.2d at 336, and Goland v. Central Intelligence Agency, 607 F.2d 339, 350 (D.C. Cir. 1978)).

Several protective statutes encompass the documents sought by plaintiffs, and thus justify the withholding of those documents under FOIA Exemption Three.  Foremost among them is

Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No.

108-458, 118 Stat. 3638 (Dec. 17, 2004), codified at 50 U.S.C. § 403-1(i)(1).  This statute requires

the Director of National Intelligence to "protect intelligence sources and methods from

unauthorized disclosure."  It is "settled" that this statute falls within Exemption Three.  Gardels,

689 F.2d at 1103 (discussing predecessor statute applicable to Central Intelligence Agency

("CIA"), which provided that "the Director of Central Intelligence shall be responsible for

protecting intelligence sources and methods from unauthorized disclosure"); accord Sims, 471

U.S. at 167-68, 193 (1985); see also Fitzgibbon, 911 F.2d at 761 ("There is thus no doubt that [the

predecessor CIA statute] is a proper exemption statute under exemption 3").

　　　　The second applicable statute is Section 6 of the National Security Agency Act of 1959,

Pub. L. No. 86-36, § 6, 73 Stat. 63, 64, codified at 50 U.S.C. § 402 note, which provides:

> [N]othing in this Act or any other law . . . shall be construed to require the
> disclosure of the organization or any function of the National Security Agency, of
> any information with respect to the activities thereof, or of the names, titles,
> salaries, or number of persons employed by such agency.

Id.  It is well-established that Section 6 "is a statute qualifying under Exemption 3."  The

Founding Church of Scientology of Washington, D.C., Inc. v. Nat'l Security Agency, 610 F.2d

824, 828 (D.C. Cir. 1979); accord Hayden v. Nat'l Security Agency, 608 F.2d 1381, 1389 (D.C.

Cir. 1979).  Section 6 reflects a "congressional judgment that, in order to preserve national

security, information elucidating the subjects specified ought to be safe from forced exposure."

Church of Scientology, 610 F.2d at 828.  In enacting Section 6, Congress was "fully aware of the

'unique and sensitive' activities of the [NSA] which require 'extreme security measures.'"

Hayden, 608 F.2d at 1390 (citing legislative history).  Thus, as the Court of Appeals has held,

"[t]he protection afforded by section 6 is, by its very terms, absolute.  If a document is covered by

section 6, [the government] is entitled to withhold it. . . ."  Linder v. Nat'l Security Agency, 94

F.3d 693, 698 (D.C. Cir. 1996).

The third applicable statute is 18 U.S.C. § 798.  This statute prohibits, on pain of criminal penalty, the disclosure of various kinds of classified information, including information "concerning the communications intelligence activities of the United States."  Id.  Specifically, 18 U.S.C. § 798(a) provides, in pertinent part, that:

> Whoever knowingly and willfully communicates, furnishes, transmits or otherwise makes available to an unauthorized person, or publishes, or uses in any manner prejudicial to the safety or interest of the United States . . . any classified information . . . (3) concerning the communication intelligence activities of the United States . . . shall be fined under this title or imprisoned for not more than ten years, or both.

Id.  The term "communication intelligence" means "all procedures and methods used in the interception of communications and the obtaining of information from such communications by other than the intended recipients."  Id. § 798(b).  This statute clearly identifies matters to be withheld from the public and refers to particular types of matters to be withheld.  See 5 U.S.C. § 552(b)(3).  Thus, this statute qualifies as an Exemption Three statute under FOIA.  See Florida Immigrant Advocacy Ctr. v. Nat'l Security Agency, 380 F. Supp. 2d 1332, 1340 (S.D. Fla. 2005) ("Other exempting statutes include . . . 18 U.S.C. § 798"); Winter v. Nat'l Security Agency, 569 F. Supp. 545 (S.D. Cal. 1983) (18 U.S.C. § 798 is a "statute[] within Exemption 3").

As with the Exemption One claims, the Exemption Three claims made by the Department here are supported by the Declaration of John D. Negroponte, Director of National Intelligence.  Bradbury Decl. Ex. D.  The DNI is the Executive Branch official specifically authorized by Congress to protect intelligence sources and methods.  Id. ¶ 14; see 50 U.S.C. § 403-1(i)(1).

Relying upon his expertise and exercising his responsibilities to the Intelligence Community, the DNI has identified with particularity seven categories of  information which, if compelled to be disclosed, would compromise United States intelligence sources and methods.

See DNI Decl. ¶ 22.  These categories include: "(1) any classified intelligence information concerning the continuing threat to the United States posed by al Qaeda and its affiliates that forms the basis for the President's authorization and reauthorization of the TSP," DNI Decl. ¶ 22; see also id. ¶ 26; "(2) any operational details concerning the technical methods by the NSA intercepts communications under the TSP," id. ¶ 22; see also id. ¶¶ 27-28;  and "(7) any information that would reveal or tend to reveal whether someone is a target of surveillance under the TSP."  Id. ¶ 22; see also id. ¶ 35.  Moreover, in the classified portions of his declaration, DNI Negroponte also discusses certain additional categories of information relating to the TSP where disclosure would similarly compromise intelligence sources and methods.  See DNI Decl. ¶¶ 22-23, 29-34.

Although, as described above, the DNI has also specifically described the multitude of harms to the national security that would result from any compelled disclosure of information falling within each of these seven categories, a showing of harm is "irrelevant" to the successful assertion of Exemption Three.  See Hayden, 608 F.2d at 1390.  It is similarly irrelevant whether information for which the protection of Exemption Three is sought is classified pursuant to Executive Order.  See Gardels, 689 F.2d at 1107 (noting that "Exemption 3 is independent of Exemption 1 and may be invoked independently" and finding that classification under Executive Order is "not a prerequisite for application of [an] Exemption 3 statute").  All that is necessary is that the information withheld "logically" falls within the categories outlined by the statutes. Hayden, 608 F.2d at 1387.  The declarations filed by DNI and on behalf of each component that withheld documents under this Exemption fully meet this test.

As DNI Negroponte explains, the TSP is "itself a method of intelligence gathering."  DNI Decl. ¶ 3.  As such, disclosure of any information describing the program in more detail including

information that relates to its operation or that more specifically identifies its targets falls

"logically" within the category of information that the DNI is authorized by statute to protect.

Such information relates to a "method" of collecting intelligence, and Congress and the Courts

have long recognized the necessity for preventing the disclosure of such information.  The

authority to protect intelligence sources and methods from disclosure is rooted in the "practical

necessities of modern intelligence gathering," Fitzgibbon, 911 F.2d at 761, and has been described

by the Supreme Court as both "sweeping," Sims, 471 U.S. at 169, and "wide-ranging."  Snepp v.

United States, 444 U.S. 507, 509 (1980).  Sources and methods constitute "the heart of all

intelligence operations," Sims, 471 U.S. at 167, and "[i]t is the responsibility of the [intelligence

community], not that of the judiciary to weigh the variety of complex and subtle factors in

determining whether disclosure of information may lead to an unacceptable risk of compromising

the . . . intelligence-gathering process."  Id. at 180.  In the words of this Court, the "sources and

methods" exemption provided to the U.S. Intelligence Community is a "near blanket FOIA

exemption," and is "only a short step [from] exempting all [intelligence agency] records from

FOIA."  Whalen v. U.S. Marine Corps, 407 F. Supp. 2d 54, 59 n.5 (D.D.C. 2005) (Leon, J.)

(quoting Minier v. Central Intelligence Agency, 88 F.3d 796, 801 (9th Cir. 1996)) (both

discussing predecessor statute applicable to the Central Intelligence Agency).

As described in the Declarations of Mr. Rowan, Mr. Bradbury, Mr. Baker, Mr. Hardy, and

the declarations provided in support of the withholding decisions made by the NSA, and as is

apparent from a review of the plaintiffs' FOIA requests on their face, the documents responsive to

plaintiffs' requests seek exactly the information that constitutes "the heart of all intelligence

operations."  Sims, 471 U.S. at 167.  Plaintiffs seek information related to the terms of the

President's authorization of the TSP (EPIC, ACLU), but see DNI Decl. ¶¶ 26-28; Bradbury Decl.

-50-

¶¶ 30-41; the policies or procedures of the NSA and other federal agencies used in implementing this method of intelligence collection, (EPIC, ACLU), but see DNI Decl. ¶ 27-34; Rowan Decl. ¶¶ 24-26; Bradbury Decl. ¶¶ 32-33, 48-59, 65, 67-68, 75; Baker Decl. ¶¶ 19-25; Hardy Decl. ¶ 62; NSA Decl. ¶ 13-15, 19-22; the targets of the TSP (ACLU, EPIC), but see DNI Decl. ¶ 35; Rowan Decl. ¶¶ 16-19; Bradbury Decl. ¶¶ 48-53; Baker Decl. ¶ 36-38; Hardy Decl. ¶ 62; NSA Decl. ¶¶ 24-28; and legal opinions and analysis concerning the TSP (EPIC, ACLU & NSAF), but see Rowan Decl. ¶¶ 24-26; Bradbury Decl. ¶ 60-75; Baker Decl. ¶ 22-23, 25, 27-30, 32, 34; NSA Decl. ¶ 29.[22]

All of the information that would be responsive to these sorts of requests is specifically identified by the DNI as information relating to intelligence sources and methods of the United States and thus subject to both strict and "sweeping," Sims, 471 U.S. at 169, statutory protection. The terms of the authorization of the TSP and the policies or procedures used in implementing it are operational details that cannot be disclosed without compromising this method of intelligence collection.  See DNI Decl. ¶ 26-28; Bradbury Decl. ¶¶ 30-41, 42-47, 54-59, 65, 67, 71, 75; NSA Decl. ¶ 13-15, 19-22.  Similarly, the targets of the TSP cannot be disclosed without compromising both the sources of U.S. intelligence information and, more broadly, the method by which intelligence is collected from those sources.  See DNI Decl. ¶ 35; Rowan Decl. ¶¶ 16-19; Bradbury Decl. ¶¶ 48-53; Baker Decl. ¶ 28, 36-38; NSA Decl. ¶ 24-28.  And, legal analysis, of course, is not conducted in a vacuum.  Instead, it is inextricably intertwined with the facts of the matter as to which a legal opinion is rendered.  Those facts implicate both the operation of the TSP and its targets and thus, documents responsive to plaintiffs' requests, as more specifically

---

[22] As Mr. McIntyre describes, moreover, certain information withheld by the Criminal Division similarly concerns the operation of the TSP, and is likewise withheld.  See McIntyre Decl. ¶ n. 5.

identified in the supporting declarations, and the exhibits filed in support thereof, see Bradbury Decl. Ex. K; Baker Decl. Ex. C, contain information that is strictly protected by the DNI's assertion of his statutory authority to protect intelligence sources and methods.  See also DNI Decl. ¶¶ 22-35 (describing additional categories of information that must be withheld under the DNI's statutory authority).  Defendant's assertion of Exemption Three as a basis for withholding responsive information that falls into the categories identified by the DNI, declaration, accordingly, must be upheld.[23]

In addition to the DNI's statutory authority, the NSA has its own independent authority to protect a wide range of information relating to its activities.  Specifically, Section 6 of the National Security Agency Act of 1959, Pub. L. No. 86-36, § 6, 73 Stat. 63, 64, codified at 50 U.S.C. § 402 note, provides that "nothing in this Act or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, of any information with respect to the activities thereof . . . ."  As the Court of Appeals has specifically noted, "[n]owhere in the legislative history of [Section 6] does Congress express any intent to limit the effect of the clear statutory language."  Hayden, 608 F.2d at 1390.  Thus, the Courts have recognized NSA's protections under Section 6 to be "broader" even than the sweeping and wide-ranging exemption afforded to the other intelligence agencies.  See id. ("In light of the peculiar NSA security needs . . ., Congress certainly had rational grounds to enact for the NSA a protective statute broader than the CIA's.").

The TSP is a signals intelligence activity conducted by the NSA.  See NSA Decl. ¶ 4; see also DNI Decl. ¶ 16.  As such, information relating to the TSP falls squarely within the

---

[23] The FBI also withheld additional information under Exemption Three, which is discussed in the classified portions of Mr. Hardy's declaration.  See Hardy Decl. ¶ 60.

protection of Section 6, which specifically authorizes the withholding of "any information with respect to the activities" of the NSA.  As explained in the declarations offered in support of the NSA's decision to withhold information that was referred to it by various components of the Department of Justice, information relating to the TSP cannot be disclosed without violating the intent behind this explicit and plainly-worded statutory command.  See NSA Decl. ¶ 16.  As the Court have recognized, "[t]he protection afforded by Section 6 is, by its very terms, absolute.  If a document is covered by Section 6, NSA is entitled to withhold it." Linder, 94 F.3d at 698.  NSA, accordingly, properly withheld all of the information referred to it under this broad authority.  By the same token, each of the Department components which maintains other documents that were derived from or contain information related to NSA activities are also entitled to the benefit of this broad protection.  Thus, under Section 6 of the National Security Act, 50 U.S.C. § 402 note, as well as under Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-1(i)(1), the Department's Exemption Three claims must be upheld in their entirety.

### D.    DOJ Properly Withheld Records under Exemption Five.

Exemption Five allows the agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Exemption Five ensures that members of the public cannot "obtain through FOIA what they could not ordinarily obtain through discovery undertaken in a lawsuit against the agency."  Schiller v. Nat'l Labor Relations Bd., 964 F.2d 1205, 1208 (D.C. Cir. 1992) (citation omitted).  As a result, Exemption Five "exempt[s] those documents . . . normally privileged in the civil discovery context."  Id. (citations omitted)).

Of the ordinary litigation privileges available to DOJ, the deliberative process privilege,

the attorney-client privilege, the attorney-work product doctrine, and the presidential

communications privilege are applicable here.

　　　　*The Deliberative Process Privilege.*  Documents covered by the deliberative process

privilege include those "reflecting advisory opinions, recommendations and deliberations

comprising part of a process by which governmenta; decisions and policies are formulated."  Nat'l

Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975) (citation omitted).  As

the Supreme Court has explained:

> The deliberative process privilege rests on the obvious realization that officials will
> not communicate candidly among themselves if each remark is a potential item of
> discovery and front page news, and its object is to enhance the quality of agency
> decisions by protecting open and frank discussion among those who make them
> within the Government.

Dept. of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9 (2001) (internal

quotation marks and citations omitted).  FOIA's inclusion of the deliberative process privilege

among its exemptions "reflect[s] the legislative judgment that the quality of administrative

decision-making would be seriously undermined if agencies were forced to 'operate in a fishbowl'

because the full and frank exchange of ideas on legal or policy matters would be impossible."

Tax Analysts v. Internal Revenue Serv., 117 F.3d 607, 617 (D.C. Cir.1997).

　　　　An agency record must satisfy three conditions to qualify for the deliberative process

privilege.  It must be "inter-agency or intra-agency," 5 U.S.C. § 552(b)(5), that is, "its source must

be a Government agency," Klamath, 532 U.S. at 8; and it must be both "predecisional" and

"deliberative."  In re Sealed Case, 121 F.3d 729, 737 (D.C. Cir. 1997) (citations omitted).  "To

establish that a document is predecisional, the agency need not point to an agency final decision,

but merely establish what deliberative process is involved, and the role that the documents at issue

played in that process."  Judicial Watch v. Export-Import Bank, 108 F. Supp. 2d 19, 35 (D.D.C.

2000) (citation omitted).  A record is "deliberative" when "it reflects the give-and-take of the

consultative process."  Wolfe v. Department of Health and Human Servs., 839 F.2d 768, 774

(D.C. Cir. 1988) (citation and internal quotation marks omitted) (en banc).

"There should be considerable deference to the [agency's] judgment as to what constitutes

. . . 'part of the agency give-and-take – of the deliberative process – by which the decision itself is

made.'"  Chemical Mfrs. Ass'n v. Consumer Prod. Safety Comm'n, 600 F. Supp. 114, 118

(D.D.C. 1984) (Oberdorfer, J.) (quoting Vaughn v. Rosen, 523 F.2d 1136, 1144 (D.C. Cir. 1975)).

The agency is best situated "to know what confidentiality is needed 'to prevent injury to the

quality of agency decisions . . . .'"  Chemical Mfrs., 600 F. Supp. at 118 (quoting Nat'l Labor

Relations Bd. , 421 U.S. at 151).

*The Attorney-Client Privilege.*  In general, the attorney-client privilege applies when a

client communicates something to his or her lawyer with the intent that it remain confidential and

for the purposes of securing "either (i) an opinion on law or (ii) legal services or (iii) assistance in

some legal proceedings."  In re Lindsey, 158 F.3d 1263, 1270 (D.C. Cir. 1998) (citing In re Sealed

Case, 737 F.2d 94, 98-99 (D.C. Cir. 1984)).  The privilege also encompasses any opinions given

by an attorney to his client based upon facts communicated by the client.  See, e.g., Mead Data

Central, Inc. v. U.S. Dep't of the Air Force, 566 F.2d 242, 254 n.25 (D.C. Cir. 1977).  In the FOIA

context, the requirement that the attorney-client privilege involve confidential communications is

satisfied if the communications suggest that "the government is dealing with its attorneys as

would any private party seeking advice to protect personal interests. . . ."  Coastal States Gas

Corp. v. Dept. of Energy, 617 F.2d 854, 863 (D.C. Cir. 1980).

*The Attorney Work Product Doctrine.*   The attorney-work product doctrine prevents the

disclosure of  "documents prepared in anticipation of foreseeable litigation, even if no specific

claim is contemplated." Schiller, 964 F.2d at 1208. It applies so long as "some articulable claim, likely to lead to litigation" has arisen. Coastal States, 617 F.2d at 865. The doctrine, thus, protects information generated by legal counsel where "the document can fairly be said to have been prepared or obtained because of the prospect of litigation." In re Sealed Case, 146 F.3d 881, 884 (D.C. Cir. 1998)

      In particular, the work-product doctrine also shields activities designed to forestall or prevent litigation. Thus, the Court of Appeals has noted:

> [i]t is often prior to the emergence of specific claims that lawyers are best equipped either to help clients avoid litigation or to strengthen available defenses should litigation occur. . . . If lawyers had to wait for specific claims to arise before their writings could enjoy work-product protection, they would not likely risk taking notes about such matters or communicating in writing with colleagues, thus severely limiting their ability to advise clients effectively. . . . Discouraging lawyers from engaging in the writing, note-taking, and communications so critical to effective legal thinking would . . . "demoraliz[e]" the legal profession, and "the interests of the clients and the cause of justice would be poorly served."

In re Sealed Case, 146 F.3d at 886 (quoting Hickman v. Taylor, 329 U.S. 495, 511 (1947)); see also Cities Serv. Co. v. Fed. Trade Comm'n, 627 F. Supp. 827, 832 (D.D.C. 1984) (documents which relate to "possible settlement discussions pertaining to foreseeable litigation are protected under the attorney work-product privilege").

      ***The Presidential Communications Privilege.*** The Supreme Court has recognized a "presumptive privilege for Presidential communications" founded on the "President's generalized interest in confidentiality." United States v. Nixon, 418 U.S. 683, 708 (1974) ("Nixon I"), and the Court of Appeals has specifically identified that privilege as one falling within the ambit of those covered by Exemption Five of FOIA. See Judicial Watch, Inc. v. Dept. of Justice, 365 F.3d 1108, 1113 (D.C. Cir. 2004). The Supreme Court found the presidential communications privilege "necessary to guarantee the candor of presidential advisers and to provide '[a] President

and those who assist him . . . [with] free[dom] to explore alternatives in the process of shaping

policies and making decisions and to do so in a way many would be unwilling to express except

privately."  In re Sealed Case, 121 F.3d 729, 743 (D.C.Cir.1997) (quoting Nixon I, 418 U.S. at

708, 94 S.Ct. 3090).  The President "occupies a unique position in the constitutional scheme,"

Nixon v. Fitzgerald, 457 U.S. 731, 749(1982), and thus, the Court of Appeals has recognized a

"great public interest" in preserving "the confidentiality of conversations that take place in the

President's performance of his official duties" because such confidentiality is necessary in order

to protect "the effectiveness of the executive decision-making process."  Nixon v. Sirica, 487 F.2d

700, 717 (D.C. Cir.1973); In re Sealed Case, 121 F.3d at 742.

    The presidential communications privilege protects "communications 'in performance of

[a President's] responsibilities,' 'of his office,' and made 'in the process of shaping policies and

making decisions.' ' " Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 449 (1977) ("Nixon II" ). The

privilege is  "closely affiliated" with the deliberative process privilege, but, unlike that privilege, it

"applies to documents in their entirety, and covers final and post-decisional materials as well as

pre-deliberative ones."  In re Sealed Case, 121 F.3d at 745; see also id. at 744 ("Even though the

presidential privilege is based on the need to preserve the President's access to candid advice,

none of the cases suggests that it encompasses only the deliberative or advice portions of

documents").

    As is clear from a review of the declarations filed in support of defendant's motion for

summary judgment and the exhibits filed in support thereof, the vast majority of documents

withheld by DOJ are drafts, related deliberative exchanges and attorney notes, or memoranda and

legal analysis conducted for and at the request of individuals or entities with which the various

components of the Department have an attorney-client relationship, or which contain information

communicated by those individuals or agencies for review by the Department.  See Rowan Decl.

¶¶ 21, 24; Bradbury Decl. ¶¶ 32-33, 36-37, 47, 53, 58, 60-74 & Ex. K; Baker Decl. ¶¶ 23, 25, 27,

29, 32, 34 & Ex. C; McIntyre Decl. ¶¶ 22-23, 26; Hardy Decl. ¶¶ 64-73; NSA Decl. ¶¶ 21-23, 29.

As Mr. Hardy describes, "as a whole, the [withholdings under] Exemption 5 . . . reflect an

internal, on-going dialogue among and between FBI personnel, DOJ personnel, and other federal

agency personnel, including NSA and other Intelligence Community personnel, with regard to the

operation of the TSP. . . .All of the material withheld pursuant to Exemption (b)(5) reflects a fluid,

continuous and on-going deliberative set of discussions among decision makers and contributors

to the TSP dialogue, and the role . . . federal agencies play in this significant national security

initiative."  Hardy Decl. ¶ 67(a).  The presence of that internal, ongoing dialogue is reflected in

each of the other declarations, see Rowan Decl. ¶¶  21, 24; Bradbury Decl. ¶¶ 32-33, 36-37, 47,

53, 58, 60-74; Baker Decl. ¶¶ 23, 25, 27, 29, 32, 34, McIntyre Decl. ¶¶ 22-23, 26, and, as a result,

all of the materials identified by these components as falling within the scope of the Exemption

are protected from disclosure.  See, e.g., City of Virginia Beach v. U.S. Dept. of Commerce, 995

F.2d 1247, 1253 (4th Cir. 1993) (deliberative process "protects 'recommendations, draft

documents, proposals, suggestions, and other subjective documents which reflect the personal

opinions of the writer rather than the policy of the agency'") (quoting Coastal States Gas Corp. v.

Dept. of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980)).

    As the Declarations of Mr. Rowan, Mr. Bradbury, Mr. Baker, and Mr. Hardy

comprehensively explain, "[d]raft documents by their very nature, are typically predecisional and

deliberative." Exxon Corp. v. Dept. of Energy, 585 F. Supp. 690, 698 (D.D.C. 1983); see Rowan

Decl. ¶¶ 21, 24; Bradbury Decl. ¶¶ 32-33, 36-37, 47, 53, 58, 60-74; Baker Decl. ¶¶ 23, 25, 27, 29,

32, 34; Hardy Decl. ¶ 67(a); see also Dudman Communications Corp. v. Dept. of the Air Force,

815 F.2d 1565, 1568-69 (D.C. Cir. 1987); City of Virginia Beach, 995 F.2d at 1253; Town of

Norfolk v. U.S. Army Corps of Engineers, 968 F.2d 1438, 1458 (1st Cir. 1992).  Disclosure of

such documents would fundamentally compromise the manner in which personnel throughout the

Department fulfill their responsibilities to review, advise, and consult with respect to the ongoing

operations of the Executive Branch.  See Rowan Decl. ¶¶ 21, 24; Bradbury Decl. ¶¶ 32-33, 36-37,

47, 53, 58, 60-74; Baker Decl. ¶¶ 23, 25, 27, 29, 32, 34; Hardy Decl. ¶ 67(a); see also Dudman,

815 F.2d at 1569 (disclosure of "decisions to insert or delete material or to change a draft's focus

or emphasis – would stifle the creative thinking and candid exchange of ideas necessary to

produce good historical work"); Russell v. Dep't of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir.

1982) (recognizing that disclosure of draft manuscript "could lead to confusion of the public").

     Similarly, the disclosure of attorney notes and inter- and intra-agency deliberative

exchanges relating to the resolution of issues raised by any matter being actively considered by the

Department, would inhibit the full and fair exchange of ideas and recommendations that is

necessary to the formulation of Executive Branch policy and would markedly alter the process by

which such policies are made.  See Rowan Decl. ¶¶ 21, 24; Bradbury Decl. ¶¶ 32-33, 36-37, 47,

53, 58, 60-74; Baker Decl. ¶¶ 23, 25, 27, 29, 32, 34; McIntyre Decl. ¶¶ 22-23, 26; Hardy Decl.

¶¶ 67(b) & (c); see also Judicial Watch of Florida, Inc. v. Dept. of Justice, 102 F. Supp. 2d 6,

12-15 & n.7 (D.D.C. 2000) (handwritten notes appropriately withheld because notes are related to

decisionmaking process) (citing cases); Conoco, Inc. v. Dept. of Justice, 687 F.2d 724, 727-28 (3d

Cir. 1982) (handwritten notes constitute intra-agency memoranda for purposes of Exemption 5);

New York Public Interest Research Group v. U.S. Environmental Protection Agency, 249 F.

Supp. 2d 327, 338-39 (S.D.N.Y. 2003).  Moreover, disclosure of such documents would severely

compromise the confidentiality of attorney client communications both in the Department and

among the federal agencies.  See, e.g., Hardy Decl. ¶ 72 ("[d]isclosure of these communications

would breach the confidential relationships between [FBI attorneys, DOJ attorneys, and FBI

Special Agents and support personnel] and would repress and stifle such critical communication

in the future."); see also Bradbury Decl. ¶¶ 32-33, 36-37, 47, 53, 58, 60-74; Baker Decl. ¶¶ 23, 25,

27, 29, 32, 34.

Similarly, talking points, plans, proposals and briefing papers generally constitute

privileged deliberative material.  Such papers are typically prepared to assist decisionmakers in

making decisions or in communicating those decisions to the public and the press.  See, e.g.,

Bradbury Decl. ¶¶ 72-73; Baker Decl. ¶¶ 23, 25, 27, 29, 32, 34.  Disclosure of "work plans, status

reports, briefings, opinion papers, and proposals" would "stifle the candor necessary in an

agency's policy making process."  Hornbostel v. U.S. Dept. of the Interior, 305 F. Supp. 2d 21, 31

(D.D.C. 2003); see also Thompson v. Dept. of the Navy, 1995 WL 527344, at *4 (D.D.C. 1997);

see also Access Reports v. Dept. of Justice, 926 F.2d 1192, 1196-97 (D.C. Cir. 1991)

(memorandum regarding "study of how to shepherd the FOIA bill through Congress" protected, as

are "communications . . . contributing to deliberations about whether to introduce legislation");

Hunt v. U.S. Marine Corps, 935 F. Supp. 46, 52 (D.D.C. 1996) ("point papers" prepared in the

"midst of [agency's] deliberative process to assist officers in their formulation of a final decision"

exempt from disclosure); Klunzinger v. IRS, 27 F. Supp. 2d 1015, 1026-27 (W.D. Mich. 1998)

(briefing paper for Commissioner exempt).

Documents prepared for purposes of litigation similarly cannot be disclosed without

compromising the process by which attorneys make decisions in the context of the adversarial

trial process and would fundamentally disrupt the manner in which attorneys prepare to litigate

cases through the court system.  Documents identified as falling within the terms of this

protection, accordingly, are properly withheld under Exemption Five.  See Rowan Decl. ¶¶ 21, 24

(withholding draft and deliberative materials prepared in anticipation of the government's filings

in certain federal criminal cases); McIntyre Decl. ¶¶ 24-25; Hardy Decl. ¶ 74-77 (same);

see also Bradbury Decl. ¶ 54-59, 67; Baker Decl. ¶¶ 19-30 (withholding document concerning

OIPR's dealings with the FISC).

       Finally, disclosure of memoranda and other legal advice prepared internally for

Department use or in the course of providing legal advice and assistance to client federal agencies

and to the President of the United States are also subject to protection.  These documents

constitute or reflect confidential attorney-client communications, as well as deliberative advice

provided to support the formulation of Executive Branch policies.  See Southam News v. U.S.

Immigration & Naturalization Serv., 674 F.Supp. 881, 886 (D.D.C.1987) (opinion letter on legal

questions regarding the criteria used to evaluate certain applicants for visas was protected because

it was generated in the course of a deliberative process); Morrison v. U.S. Dept. of Justice, Civ. A.

No. 87-3394, 1988 WL 47662, at *1 (D.D.C. April 29, 1988) (undisputed that OLC opinions

regarding constitutionality of new legislation were within the scope of the deliberative process

privilege); see also Int'l Paper Co. v. Fed. Power Comm'n, 438 F.2d 1349, 1358-59 & n. 3 (2d

Cir.1971) (memoranda from the Federal Power Commission's general counsel containing "legal

analysis and recommendations, legal conclusions, and policy recommendations" were protected

from disclosure under Exemption 5 because these items were part of the agency's deliberative

process and not final orders); Brinton v. Dept. of State, 636 F.2d 600, 604-05 (D.C.Cir.1980)

(legal opinions prepared by the State Department's Office of the Legal Adviser were not "final

opinions" and therefore were protected by the deliberative process privilege: "There can be no

doubt that such legal advice, given in the form of intra-agency memoranda prior to any agency

decision on the issues involved, fits exactly within the deliberative process rationale for

Exemption 5").

 As such, legal opinions authored by OLC and others cannot be disclosed without

compromising both the Department's attorney-client relationship with other Executive Branch

agencies and the multi-tiered process by which Executive Branch decisions are made.  See Rowan

Decl. ¶¶ 24-26; Bradbury Decl. ¶¶ 60-64; Baker Decl. ¶¶ 32-35.  As Mr. Bradbury explains:

> Protecting the confidentiality of documents that contain such advice is essential in
> order to ensure both that creative and even controversial legal arguments and
> theories may be explored candidly, effectively, and in writing and to ensure that
> Executive Branch officials will continue to request legal advice from OLC on such
> sensitive matters.
>  Especially in light of the Nation's ongoing fight against global terrorism,
> and the public interest in the effective performance of these activities, the need of
> the President and the heads of the Executive Branch departments and agencies for
> candid, thoroughly considered legal advice in considering potential executive
> actions is compelling.

Bradbury Decl. ¶¶ 63-64.  In light of these compelling concerns, and because these sorts of

documents are protected by the deliberative process and attorney-client communication privileges,

and where the advice is provided to the President for purposes of aiding his decision-making

process, by the presidential communications privilege as well, the Department's Exemption Five

claims must be upheld in full.

 **E.     DOJ Properly Withheld Information under Exemption Six.**

 Each of the Department components responding to the various FOIA requests at issue here

withheld the names of private individuals and Department and other government agency staff, as

well as those individuals' personal information such as addresses (including email addresses),

telephone numbers, and cellular phone numbers, which occasionally appear in the responsive

documents.  See Baker Decl. ¶ 40; Bradbury Decl. ¶ 28; Rowan Decl. ¶¶ 22-23; McIntyre Decl.

¶¶ 27-32; Hardy Decl. ¶¶ 81-95.[24]  These withholdings were proper under Exemption Six of

FOIA, 5 U.S.C. § 552(b)(6).[25]

Exemption Six allows an agency to withhold "personnel and medical files and similar files

the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  Id.

Review of any agency's withholding under Exemption Six proceeds in "two stages": first, the

Court must decide whether the information is subject to protection under the Exemption; and

second, the Court must determine whether disclosure would constitute a "clearly unwarranted

invasion of personal privacy."  Washington Post Co. v. U.S. Dept. of Health and Human Servs.,

690 F.2d 252, 260 (D.C. Cir. 1982).  With respect to the first stage, the threshold for the

application of Exemption Six is "minimal."  Id.  The requirement of files "similar" to personnel or

medical files has been read broadly to encompass any "information which applies to a particular

individual."  United States Dept. of State v. Washington Post Co., 456 U.S. 595, 602 (1982);

accord New York Times Co. v. Nat'l Aeronautics & Space Admin., 920 F.2d 1002, 1006 (D.C.

Cir. 1990) ("the threshold for application of Exemption 6 is crossed if the information merely

'applies to a particular individual'") (citation omitted).

Here, the information withheld by the various components was contained in the official

files of these components and consisted of the names of private individuals and Department and

other government agency staff as well as other information relating to these individuals such as

---

[24]  As a matter of general practice, DOJ does not withhold the names of certain high-level
Department officials, but does withhold their personal information such as home addresses,
personal telephone numbers and personal email addresses.  The disclosure of this sort of
information compromises the personal privacy of these individuals, but sheds no light on the
inner workings of the Department.

[25]  As discussed further, infra, certain these withholdings are also proper under Exemption
7(C) of FOIA.

their addresses (including email addresses), telephone numbers, and cellular phone numbers.

See Baker Decl. ¶ 40; Bradbury Decl. ¶ 28; Rowan Decl. ¶¶ 22-23; McIntyre Decl. ¶¶ 27-32;

Hardy Decl. ¶¶ 81-95.  This information easily clears the "minimal" threshold necessary to allow

its protection under Exemption Six.  Washington Post Co., 690 F.2d at 260.

 In order to determine whether disclosure of information would constitute a clearly

unwarranted invasion of personal privacy, the Court is required to "balance the public interest in

disclosure against the privacy interests" of the individuals.  Washington Post Co., 690 F.2d at 260.

The "only public interest" to be considered under the FOIA is the extent to which disclosure

"advances 'the citizens' right to be informed about what their government is up to.'"  Hertzberg v.

Veneman, 273 F. Supp. 2d 67, 87 (D.D.C. 2003) (quoting Nat'l Ass'n of Home Builders v.

Norton, 309 F.3d 26, 34 (D.C. Cir. 2002) (in turn quoting United States Dept. of Justice v.

Reporters Comm. For Freedom of Press, 489 U.S. 749, 773 (1989)).

 This purpose "is not fostered by disclosure of information about private citizens . . . that

reveals little or nothing about an agency's own conduct."  Hertzberg, 273 F. Supp. 2d at 87

(quoting Reporters Committee, 489 U.S. 749, 773 (1989); see also Reporters Comm., 489 U.S. at

774 ("FOIA's central purpose is to ensure that the Government's activities be opened to the sharp

eye of public scrutiny, not that information about private citizens that happens to be in the

warehouse of the Government be so disclosed.") (emphasis by court).

 Moreover, the Courts have recognized that there is a particularly strong privacy interest

implicated with respect to identities of private individuals mentioned in materials related to law

enforcement.  See SafeCard Services, Inc. v. SEC, 926 F.2d 1197, 1205 (D.C.Cir.1991)  (privacy

interests of third parties mentioned in law enforcement files are "substantial," while "[t]he public

interest in disclosure [of third-party identities] is not just less substantial, it is insubstantial");

Voinche, 940 F. Supp. at 329-30 (approving under exemption 6 the withholding of names of

individuals mentioned during the course of routine matters with the FBI); see also McIntyre Decl.

¶¶ 32-33; Hardy Decl. ¶¶ 88-95 (describing the specific justifications for withholding the

identities of three categories of private individual whose names appear in FBI records, third

parties of investigative interest, id. ¶¶ 88-90; third parties interviewed by the FBI, id. ¶¶ 91-93;

and third parties who are merely mentioned in FBI records, id. ¶¶ 94-95).

        In processing plaintiffs' FOIA requests, each Department component weighed the personal

privacy interests involved and determined that release of personally identifying information

concerning the individuals identified in Department files was clearly unwarranted.  See Rowan

Decl. ¶¶ 22-23; Bradbury Decl. ¶ 28; Baker Decl. ¶ 40; McIntyre Decl. ¶ 33; Hardy Decl. ¶ 79.

Those determinations are well-founded.  See Hertzberg, 273 F. Supp. 2d at 87 (disclosure of the

personally identifying information of private individuals is "not compelled" under FOIA);

see also Blazy v. Tenet, 979 F. Supp. 10, 24 (D.D.C. 1997) (affirming CIA decision to redact

names of private individuals contained in responsive documents where the "names of non-Agency

personnel mentioned . . . do not shed light on the workings of the CIA"), aff'd, 1998 WL 315583

(D.C. Cir. 1998).

        Additionally, it is well-established that "government officials have a legitimate interest in

preserving the secrecy of matters that conceivably could subject them to annoyance or harassment

in either their official or private lives." Baez v. U.S. Dept. of Justice, 647 F.2d 1328, 1339 (D.C.

Cir. 1980); Lesar v. U.S. Dept. of Justice, 636 F.2d 472, 487 (D.C. Cir. 1980) (same); Hunt v.

Fed. Bureau of Investigation, 972 F.2d 286, 288 (9th Cir. 1992) (government employees have

"legitimate interest in keeping private matters that could conceivably subject them to annoyance

or harassment.").   More specifically, where, as here, government officials are involved in work

related to the national security and classified at high levels, they are likely to be subject to a

heightened level of embarrassing and potentially harassing inquiries.  See Rowan Decl. ¶ 23;

Baker Decl. ¶ 40; Hardy Decl. ¶¶ 83-87.[26]

This Court has found that identifying information of the sort at issue here was properly

redacted pursuant to Exemption Six in a case involving airline security screening:

> As "advocates for security measures that may be unpopular," [federal] employees
> are likely to experience annoyance or harassment following the disclosure of their
> involvement with the [airline security screening] program.  Furthermore, unfettered
> access to the identities of those who help to formulate policy for airline security
> screening programs could have substantial security implications.  The documents
> released by the defendants will likely be published on the Internet once released to
> the plaintiff, and it is likely that readers of the plaintiffs' reports, including media
> reporters as well as private individuals, would seek out the employees mentioned
> for further information.

Elec. Privacy Info. Ctr. v. Dept. of Homeland Security, 384 F. Supp. 2d 100, 116-17 (D.D.C.

2005) ("EPIC") (citations and footnotes omitted).  These privacy and security concerns are no less

salient in this case.

Moreover, as with information relating to private individuals, no public interest is served

by the disclosure of personal information relating to Department or other federal agency staff,

such as home addresses or personal email addresses or telephone numbers.  See Voinche, 940 F.

Supp. at 330 ("[T]here is no reason to believe that the public [would] obtain a better

understanding of the workings of various agencies by learning the identities of" the individuals

---

[26] In particular, the two documents released in part by OIPR were redacted in part to
eliminate the personal information relating to Department staff involved in an investigation
initiated by the Office of Personal responsibility and to law enforcement personnel associated
with the leak investigation.  See Baker Decl. ¶ 41.  The release of this information serves no
public purpose but could subject these personnel to harassment and undue public attention to the
detriment of the performance of their work, and redaction is, accordingly, appropriate under
Exemption Six.  Moreover, because these investigations relate to the Department's law
enforcement mission, the redaction of this information from these two documents is also proper
under Exemption 7(C), see infra at 70-71, 73-74, 76, 77-78.

associated with the documents."), Schwarz v. Dept. of the Treasury, 131 F. Supp. 2d 142, 150 (D.D.C. 2000) (Kennedy, J.) (disclosure of federal employees' names contained in federal records "would not contribute to the public understanding of government functions").

Accordingly, because all of the withheld information is protected under Exemption 6, as well as, in certain cases, under the significantly broader privacy protections of Exemption 7(C), see infra at 70-71, 73-74, 76, 77-78, the Court should grant summary judgment to DOJ on its invocation of this Exemption.

### F.    DOJ Properly Withheld Records under Exemption Seven.

Records compiled for law enforcement purposes are exempt from disclosure if the disclosure could reasonably be expected to cause one of the harms enumerated in any of the six subparts of Exemption Seven.  See 5 U.S.C. § 552(b)(7).  The applicable subparts invoked by the Department in response the plaintiffs' FOIA requests are 7(A), 7(C), 7(D), and 7(E), each of which is discussed in detail herein.

Documents are compiled for law enforcement purposes within the meaning of Exemption Seven's threshold requirement if:  (1) the activity that gives rise to the documents is related to the enforcement of federal laws or the maintenance of national security; and (2) the nexus between the activity and one of the agency's law enforcement duties is based on information sufficient to support at least a "colorable claim" of its rationality.  See Keys v. U.S. Dept. of Justice, 830 F.2d 337, 340 (D.C. Cir. 1987); Blanton v. U.S. Dept. of Justice, 63 F.Supp.2d 35, 44 (D.D.C. 1999). Essentially, this threshold showing requires "that the defendant show a nexus between the agency's activities and a legitimate law enforcement purpose." Coleman v. Federal Bureau of Investigation, 13 F. Supp. 2d 75, 83-84 (D.D.C. 1998).

Here, the components of the Department which here invoked Exemption Seven  – ODAG,

the Criminal Division, and the FBI – are components specializing in law enforcement and each

has explained why the documents at issue meet the threshold requirement that they be compiled

for law enforcement purposes.  See Rowan Decl. ¶¶ 16-20; McIntyre Decl. ¶ 12; Hardy Decl.

¶¶ 96-98.  These claims of law enforcement purpose are entitled to deference.  Center for Nat'l

Security Studies, 331 F.3d at 926; see also Blanton, 63 F. Supp.2d at 44 ("[l]aw enforcement

agencies such as the FBI face a lesser burden with regard to showing a legitimate law enforcement

purpose behind the compilation of such records than do other agencies.").  Moreover, as

exhaustively discussed above and in the supporting declarations, the TSP is a program particularly

and specifically geared towards the maintenance of the national security; as such, the documents

identified by these components as subject to a claim of Exemption Seven easily meet FOIA's

threshold requirement.

  ***Exemption 7(A).***  Exemption 7(A) of the FOIA authorizes the withholding of "records or

information compiled for law enforcement purposes, but only to the extent that the production of

such law enforcement records or information . . . could reasonably be expected to interfere with

enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  To satisfy its burden justifying the

applicability of this Exemption, the government need only demonstrate that (1) a law enforcement

proceeding is pending or prospective, and (2) release of the information could reasonably be

expected to cause some articulable harm to the proceeding.  Voinche v. Fed. Bureau of

Investigation, 46 F. Supp. 2d 26, 31 (D.D.C. 1999).

  With respect to the showing of harm to a law enforcement proceeding required to invoke

Exemption 7(A), courts have long accepted that Congress intended the Exemption to apply

whenever the government's case could be harmed by the premature release of evidence or

information, or when disclosure could impede any necessary investigation prior to the

enforcement proceeding.  See, e.g., National Labor Relations Bd. v. Robbins Tire and Rubber Co.,

437 U.S. 214, 232 (1978) ("[T]he release of information in investigatory files prior to the

completion of an actual, contemplated enforcement proceeding was precisely the kind of

interference that Congress continued to want to protect against.").

      Moreover, the Government's burden in demonstrating interference with law enforcement

proceedings under Exemption 7(A) has been significantly relaxed by Congress.  Section

552(b)(7)(A) originally provided for the withholding of information that "would interfere with

enforcement proceedings," but the Freedom of Information Reform Act of 1986 amended that

language and replaced it with the phrase "could reasonably be expected to interfere with"

enforcement proceedings.  See Pub. L. No. 99-570, § 1802, 100 Stat. 3207, 3207-48 (emphasis

added).  Courts have repeatedly recognized that this change in the statutory language substantially

broadens the scope of the exemption.  See, e.g., Manna v. DOJ, 51 F.3d 1158, 1164 n.5 (3d Cir.

1995) (purpose of 1986 amendment was "to relax significantly the standard for demonstrating

interference with enforcement proceedings"); Alyeska Pipeline Service Co. v. U.S. Environmental

Protection Agency, 856 F.2d 309, 311 n.18 (D.C. Cir. 1988) (holding that district court's

improper reliance on pre-amendment version of Exemption 7(A) "required EPA to meet a higher

standard than FOIA now demands").

      Finally, it is well-established that the applicability of Exemption 7(A) may be

demonstrated generically, based on the category of records involved, rather than on a document-

by-document basis.  See Robbins Tire, 437 U.S. at 236.  Thus, courts have routinely accepted

affidavits in Exemption 7(A) cases that specify the distinct, generic categories of documents at

issue and the harm that could result from their release, rather than requiring extensive, detailed

itemizations of each document.  See, e.g., Spannaus v. U.S. Dept. of Justice, 813 F.2d 1285,

1288 (4th Cir. 1987) ("The Supreme Court has rejected the argument that [Exemption 7(A)] requires particularized showings of interference, holding instead that the Government may justify nondisclosure in a generic fashion."); see also Solar Sources, Inc. v. United States, 142 F.3d 1033, 1037 (7th Cir. 1998) ("The Government need not establish that release of a particular document would actually interfere with an enforcement proceeding," but rather that "with respect to particular kinds of enforcement proceedings, disclosure of particular kinds of investigatory records while a case is pending would generally interfere with enforcement proceedings.") (first emphasis in original and subsequent emphases added) (quoting Robbins Tires, 437 U.S. at 236).

**Exemption 7(C).**  Exemption 7(C) protects from disclosure "records or information compiled for law enforcement purposes" to the extent that the disclosure of law enforcement records or information "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).[27]  In applying Exemption 7(C), a court should "balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested information."  Davis v. U.S. Dept. of Justice, 968 F.2d 1276, 1281 (D.C. Cir. 1992).  However, here as under Exemption 6, courts recognize the considerable stigma inherent in being associated with law enforcement proceedings and accordingly "do[] not require a balance tilted emphatically in favor of disclosure" when reviewing a claimed 7(C) exemption. Bast v. Dept. of Justice, 665 F.2d 1251, 1254 (D.C. Cir. 1981).

Courts have also construed the public interest component narrowly, noting that the public interest "must be assessed in light of FOIA's central purpose," which, as under Exemption 6, "is not fostered by disclosure about private citizens that is accumulated in various governmental files

---

[27] The 1986 amendments to the FOIA changed the language in this exemption from "would constitute" to "could reasonably be expected to constitute."

but that reveals little or nothing about an agency's own conduct." Nation Magazine, Wash. Bur.

v. Customs Serv., 71 F.3d 885, 894 (D.C. Cir. 1995) (quotation marks and citation omitted).  In

weighing this balance, the Court of Appeals has established "a categorical rule that an agency

must exempt from disclosure the names of and identifying information about private individuals

appearing in an agency's law enforcement files unless that information is necessary to confirm or

refute compelling evidence that the agency is engaged in illegal activity." AFL-CIO v. Fed.

Election Comm'n, 177 F. Supp. 2d 48, 61 (D.D.C. 2001) (emphasis in original), aff'd 333 F.3d

168 (D.C. Cir. 2003); see also Mack v. Dept. of Navy, 259 F. Supp. 99, 106 (D.D.C. 2003)

("our court of appeals has categorically held that the names and addresses of private individuals

appearing in law enforcement files are exempt from disclosure unless they are necessary to

confirm or refute compelling evidence of illegal agency activity"); Schiffer v. Fed. Bureau of

Investigation, 78 F. 3d 1405, 1410 (9th Cir. 1996) (recognizing "little to no" public interest in

disclosure of persons in FBI file where no evidence of FBI wrongdoing).

   **_Exemption 7(D)._**  Informants are entitled to the protection of 5 U.S.C. § 552(b)(7)(D),

which permits the withholding or redacting of law enforcement records the release of which

"could reasonably be expected to disclose the identity of a confidential source . . . and, in the case

of a record or information compiled by a criminal law enforcement authority in the course of a

criminal investigation . . . information furnished by a confidential source."  Unlike 7(C),

exemption 7(D) requires no balancing of public and private interests. See Dow Jones & Co., Inc.

v. Dept. of Justice, 917 F.2d 571, 575-76 (D.C. Cir. 1990).  The exemption applies if the agency

establishes that a source has provided information under either an express or implied promise of

confidentiality. See Williams v. FBI, 69 F.3d 1155, 1159 (D.C. Cir. 1995).  A confidential source

is one who "provided information under an express assurance of confidentiality or in

circumstances from which such an assurance could be reasonably inferred." U.S. Dept. of Justice v. Landano, 508 U.S. 165, 172 (1993) (internal quotation and citation omitted).

*Exemption 7(E).*  Records compiled for law enforcement purposes may be withheld under Exemption 7(E) if release of the information "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).

The protection afforded by Exemption 7(E) is categorical for information related to law enforcement techniques.  See Smith v. Bureau of Alcohol, Tobacco and Firearms, 977 F. Supp. 496, 501 (D.D.C. 1997); Fisher v. Dept. of Justice, 772 F. Supp. 7, 12 n. 9 (D.D.C. 1991), aff'd, 968 F.2d 92 (D.C. Cir. 1992).  Even if a law enforcement technique itself has been disclosed, but the public is not generally aware of the manner and circumstances in which the technique is employed, or the specific methods used by the particular agency, Exemption 7(E) still applies. See, e.g., Blanton, 63 F. Supp. 2d at 49-50; Coleman v. Federal Bureau of Investigation, 13 F. Supp. 2d 75, 83-84 (D.D.C. 1998).  In some cases, even commonly known procedures have been protected from disclosure when "circumstances of their usefulness . . . may not be widely known," Wickline v. FBI, 1994 WL 549756, *5 (D.D.C. 1994), or when their use "in concert with other elements of an investigation and in their totality directed toward a specific investigative goal [] constitute a 'technique' which merits protection to ensure it future effectiveness." D'Alessandro v. U.S. Dept. of Justice, 1991 WL 35519, *4 (D.D.C. 1991) (citation omitted).  It is sometimes not possible to describe a technique, even in very general terms, without disclosing the very information being withheld.  See, e.g., Smith, 977 F. Supp. at 501.

1.    ODAG Properly Withheld Records Under Exemptions 7(A) and 7(C).

As described in the Declaration of Mr. Rowan, ODAG withheld documents relating to

various federal criminal proceedings in which federal criminal defendants sought information

regarding whether they were targeted for surveillance under the TSP under Exemption 7(A),

which authorizes the withholding of documents where disclosure would interfere with an ongoing

law enforcement proceeding, 5 U.S.C. § 552(b)(7)(A). See Rowan Decl. ¶¶ 16-17.  In certain of

these cases, the United States made a filing in response to these requests for information, but these

responses were uniformly made for the Court's in camera, ex parte review  pursuant to the

provisions of the Classified Information Procedures Act, 18 U.S.C. App. 3.  Rowan Decl. ¶ 17.  In

each of the cases that generated documents responsive to plaintiffs' requests, the relief sought by

the criminal defendant was denied.  Id. ¶ 20.  Moreover, each of these cases remains ongoing at

some stage of the federal criminal process.  Id.

As Mr. Rowan describes, compelled disclosure of these sealed federal court filings, as well

as the drafts and deliberative materials underlying them, would interfere with these ongoing

federal criminal proceedings: "to compel disclosure of these documents now – where the claims

of illegal or allegedly unconstitutional surveillance raised by the criminal defendants have been

rejected by the presiding judge without finding it necessary to provide the Government's filings to

either the concerned criminal defendants or their counsel – would necessarily interfere with an

ongoing law enforcement proceeding."  Rowan Decl. ¶ 20.  As a result, these documents are

exempt from disclosure under FOIA Exemption 7(A).

ODAG has also withheld certain information under FOIA Exemption 7(C), which exempts

information found in law enforcement files where disclosure would compromise personal privacy.

See 5 U.S.C. § 552(b)(7)(C).  As Mr. Rowan describes, many of the documents withheld by

ODAG identify the law enforcement agents who provided information regarding any particular criminal case, and other third party individuals.  Rowan Decl. ¶ 23.  Because these documents are compiled in the course of a law enforcement proceedings, the names and other personally identifying information of these agents and other individuals should not be disclosed.  To disclose the names of federal, state, or local law enforcement officials or supporting staff who work on sensitive terrorism investigations could subject them to harassment and disrupt the performance of duties that, of necessity, often require a low profile.  See id.; see also, e.g., Hardy Decl. ¶¶ 115-121 (identifying similar concerns);  McIntyre Decl. ¶ 32 (same); see also EPIC, 384 F. Supp. 2d at 116-17 (quoted above).  Similarly, to identify third-party individuals who might be mentioned in a law enforcement file constitutes an unwarranted invasion of privacy and should not be required to be disclosed.  5 U.S.C. § 552(b)(7)(C); Rowan Decl. ¶ 22; see Safecard Services, Inc. v. Securities and Exchange Commission, 926 F.2d 1197, 1206 (D.C. Cir. 1991) ("We now hold categorically that, unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure.").

ODAG's claims under Exemption Seven, accordingly, should be upheld.

　　　　2.　　The Criminal Division Properly Withheld Records Under Exemptions 7(A), 7(C), and 7(D).

The records identified by the Criminal Division as responsive to plaintiffs' requests consist of records compiled in the course of an ongoing criminal investigation into the unauthorized disclosure, or "leak," of classified information concerning the TSP and involving related allegations of violation of federal law.  See McIntyre Decl. ¶ 12.  These records accordingly, meet the threshhold requirement of Exemption Seven that they be compiled for law enforcement purposes.  These records fall into three categories: "classified copies of [FBI] '302'

-74-

reports (specifically, reports and summaries of witness interviews, as well as related attorney

notes;" unclassified documents relating to "attorney work product and case development matters,"

and a "classified chronology of events related to the leak investigation." McIntyre Decl. ¶ 16.

These documents contain information related to "potential subjects of the investigation";

"prospective and investigative theories" concerning the investigation; "facts relevant to the

investigation," and "the initial and developing focus of the investigation." Id.

Information of this sort is clearly protected under Exemption 7(A) due to the fact that its

disclosure "could reasonably be expected to result in interference with the on-going [law

enforcement] proceedings. McIntyre Decl. ¶ 18. Thus, as cogently explained in the Declaration

of Mr. McIntyre,

> [f]or example, prematurely disclosing documents relating to witnesses in ongoing
> inquiries and investigations could result in witness tampering or intimidation;
> could lead to alteration, tailoring, or construction of testimony; and could
> discourage the continued cooperation of these witnesses as well as of other
> knowledgeable individuals. Likewise, disclosure of attorney work product and
> other documents related either to the government's initial inquiries or to the
> development of the government's cases could prematurely reveal the direction,
> focus and scope of the inquiries; the evidence developed to date and the reliance
> placed by the government on that evidence; the government's strategies; and the
> strengths and weaknesses of the government's cases. Prematurely revealing such
> information could also provide the targets and subjects with undue insight into the
> development of the government's cases, could enable them to devise strategies to
> counter prosecutorial efforts, and could impair the government's ability to present
> its most effective case. Finally, disclosure of evidentiary material obtained by the
> government could likewise provide targets and subjects with insight into the
> government's case against them; could enable such individuals to alter, tailor or
> destroy evidence, as well as to fabricate alibis, or could otherwise assist such
> individuals in circumventing the investigation.

Id. This detailed and specific description of the harms to an ongoing criminal proceeding likely to

result from disclosure of the documents maintain by the criminal division fully justifies their

withholding under FOIA Exemption 7(A). See, e.g., Kay v. Fed. Communications Comm'n, 976

F. Supp. 23, 38 (D.D.C. 1997) (records exempt under 7(A) because disclosure could "reveal the

scope, direction, and nature" of the investigation, and could thereby allow the target to potentially

circumvent the proceeding), aff'd 172 F.3d 919 (D.C. Cir. 1998).

These records are also properly withheld under Exemption 7(C). As described by Mr.

McIntyre, and as described above, personally identifying information relating to government

agency staff, law enforcement officers, and private individuals is properly withheld under this

Exemption because there is relatively little public interest in its disclosure, and, particular where

such information appears in files compiled for purposes of law enforcement such as those

maintained by the Criminal Division, disclosure is unwarranted. See McIntyre Decl. ¶ 33;

see also National Archives and Records Admin. v. Favish, 541 U.S. 157, 165-66 (2004); Judicial

Watch, Inc. v. Dept. of Justice, 365 F.3d 1108, 1125 (D.C. Cir. 2004) (noting Congress's intent to

afford law enforcement materials significantly more expansive privacy protection than that

available under Exemption 6).

So too, as Mr. McIntyre describes, certain of the records compiled in the course of the leak

investigation contain information relating to confidential sources which is categorically protected

from disclosure under Exemption 7(D). See McIntyre Decl. ¶¶ 34-37. Any sources providing

information to that investigation must be protected as "[t]here can be no doubt that . . . the nature

of the crime is such consequence that anyone with relevant knowledge would expect that their

statements would not be publicly divulged unless and until such disclosure is absolutely essential

for law enforcement purposes." Id. ¶ 36. Because premature disclosure of a source could result in

the loss of sources "through retaliation against the sources for past disclosure or because of the

source's fear of future disclosure," FOIA expressly provides "comprehensive" protection against

disclosure of source information. Id. ¶ 35. Withholding information relating to confidential

sources, accordingly, is proper under Exemption 7(D) of FOIA.

3.    The FBI Properly Withheld Records Under Exemptions 7(A), 7(C), 7(D),  and 7(E).

Like the Criminal Division, the FBI also withheld a variety of records related to the ongoing criminal leak investigation under FOIA Exemption 7(A), including evidentiary or investigative materials, see Hardy Decl. ¶ 109; and administrative materials, see id. ¶ 110, which take a variety of forms, such as Electronic Communications ("Ecs"), FD 302 Forms, and Investigative Notes, see id. ¶ 107.  Because the release of any of this information would interfere with the ongoing leak investigation for many of the same reasons identified in detail in the Declaration of Mr. McIntyre, see McIntyre Decl. ¶ 18, and for the additional reasons set forth in the Declaration of Mr. Hardy, see Hardy Decl. ¶¶ 99-111, the FBI's invocation of Exemption 7(A) should be upheld.[28]

The FBI also properly withheld information whose disclosure would compromise personal privacy under Exemption 7(C).  As discussed above, personally identifying information relating to FBI special agents, support personnel, and other government agency staff, was withheld due to the invasion of privacy that would be occasioned by its disclosure.  See supra at 62-67.  As noted above, when information that implicates personal privacy appears in the context of records compiled for purposes of law enforcement, i.e., when those records are subject to protection under Exemption 7(C), as well as under Exemption Six, the Supreme Court and D.C. Circuit have emphasized Congress's intent to afford law enforcement materials significantly more expansive privacy protection than that available under Exemption 6.  See Favish, 541 U.S. at 165-66; Judicial Watch, Inc., 365 F.3d at 1125.  As a result, all of the personally identifying information

---

[28]  The FBI also withheld additional documents pursuant to FOIA Exemption 7(A), which are discussed in more detail in the classified portions of Mr. Hardy's declaration.  See Hardy Decl. ¶ 111.

identified by Mr. Hardy, <u>see</u> Hardy Decl. ¶¶ 112-129 – including personal information concerning

FBI Special Agents, and FBI support personnel, <u>id.</u> ¶¶ 115-119; other federal government

employees, <u>id.</u> ¶¶ 120-121; third parties of investigative interest, <u>id.</u> ¶¶ 122-124; third parties

interviewed, <u>id.</u> ¶¶ 125-127; and third parties who are merely mentioned in FBI records,

<u>id.</u> ¶¶ 128-129 – is properly exempt under Exemption 7(C).

     The FBI also specifically invoked Exemption 7(D) to protect information where disclosure

could "reasonably be expected to disclose the identity of a confidential source . . . [or] information

furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D). As Mr. Hardy explains,

information relating to confidential sources must be protected because:

> [t]he release of a source's identity would forever eliminate that source as a future
> means of obtaining information. In addition, when the identity of one source is
> revealed, that revelation has a chilling effect on the activities and cooperation of
> other sources. It is only with the understanding of complete confidentiality
> (whether express or implied), that the aid of such sources can be enlisted, and only
> through this confidence that these sources can be persuaded to continue providing
> valuable assistance in the future."

Hardy Decl. ¶ 131. For these and the other reasons explained in Mr. Hardy's declaration, <u>see</u> <u>id.</u>

¶¶ 130-135, the FBI's assertion of Exemption 7(D) must be sustained.

     Finally, the FBI also properly withheld information under Exemption 7(E), which protects

"techniques and procedures for law enforcement investigations or prosecutions," 5 U.S.C.

§ 552(7)(E), because, as demonstrated in the section on Exemption 2 and the Declaration of Mr.

Hardy, disclosure would risk circumvention of the law, <u>see</u> <u>supra</u> at 41-45; <u>see also</u> Hardy Decl.

¶¶ 136-139; <u>see</u> <u>Voinche</u>, 940 F. Supp. at 332 (information relating to protection of Supreme

Court and Justices protected under Exemption 7(E), as well as "high 2" exemption); <u>Gordon</u>, 388

F. Supp. 2d at 1035-37 (materials created in course of maintenance of terrorist watch lists

protected under Exemption 7(E), as well as Exemption 2, because terrorists could educate

themselves about watch list procedures and devise ways to circumvent watch lists).

Information such as that identified by Mr. Hardy is entitled to categorical protection under Exemption 7(E).  See Smith, 977 F. Supp. at 501; see also Librach v. Fed. Bureau of Investigation, 587 F.2d 372, 373 (8th Cir. 1978) (proper to withhold under Exemption 7(E) documents pertaining to relocation of a witness because disclosure "would jeopardize the effectiveness of the Witness Security Program").  Accordingly, because this information was properly withheld under Exemption 7(E), as well as under Exemption 2, the FBI should be granted summary judgment as to its invocation of these Exemptions.

* * *

Each of the plaintiffs' FOIA requests at issue in this litigation seeks specific and detailed information related to one of the most highly classified activities currently conducted by the federal government.  As the DNI has made clear, the TSP is a program critical to the national security of the United States, see DNI Decl. ¶ 25, and information relating to the TSP "must be protected from disclosure because such knowledge would be of material assistance to those who would seek to penetrate, detect, prevent, or damage the intelligence efforts of the United States, including efforts by this country to counter international terrorism."  DNI Decl. ¶ 27.

As fully explained in the comprehensive declarations filed in this case, disclosure of the information sought by plaintiffs in these cases would cause a multitude of specific and tangible harms – harms to the national security of the United States, to critical activities of the Intelligence Community, to effective law enforcement and counterterrorism initiatives, to the process by which government decisions are made, to intra-Departmental and inter-agency attorney-client confidences, to the decision-making processes of the President of the United States, and to individuals, both government employees and others, whose personal information happens to

appear in responsive documents.  In the context of the ongoing war against terror, and with respect to a program whose purpose is to "detect and prevent the next terrorist attack," DNI Decl. ¶ 17; NSA Decl. ¶ 3, disclosure of information that could give rise to such consequential harms has the potential to be disastrous by "render[ing] the nation more vulnerable to another terrorist attack."  DNI Decl. ¶ 25; see also NSA Decl. ¶ 5 .  Moreover, as the DNI has noted, "even the release of what appears to be the most innocuous information about the TSP poses the substantial risk that our adversaries will be able to piece together sensitive information about how the Program operates."  DNI Decl. ¶ 24; see also NSA Decl. ¶ 17.  Thus, as each component has determined, no portion of any of the responsive records can be disclosed without implicating the same serious consequences.  See, e.g., Bradbury Decl. ¶ 78; Baker Decl. ¶ 39.

For all of the reasons discussed in this motion and in the supporting declarations, the records or categories of records withheld by the Department that are responsive to plaintiffs' requests fall squarely within the categories of information that Congress specifically exempted from FOIA on the grounds that "public disclosure is not always in the public interest."  Sims, 471 U.S. at 167.  These consolidated cases firmly demonstrate the truth of that wise observation.

## CONCLUSION

For the reasons stated herein and in the supporting declarations, DOJ has acted properly in responding to the FOIA requests submitted by each of the plaintiffs in this case.  As a result, the Department is entitled to summary judgment pursuant to Federal Rule of Civil Procedure 56.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General, Civil Division

KENNETH J. WAINSTEIN
United States Attorney

-80-

JOSEPH H. HUNT
Director, Federal Programs Branch

ELIZABETH J. SHAPIRO
Assistant Director, Federal Programs Branch

_____/s/ Rupa Bhattacharyya_____
RUPA BHATTACHARYYA (VA# 38877)
Attorneys, Federal Programs Branch
Civil Division, U. S. Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, D.C.  20044
Tel: (202) 514-3146
Fax: (202) 318-7593
Email: rupa.bhattacharyya@usdoj.gov

Dated: September 15, 2006.