IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | ) ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 06-00096 (HHK) |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |
| ————————————————— | ) | |
| | ) | |
| AMERICAN CIVIL LIBERTIES UNION, et al., | ) ) | |
| | ) | Civil No. 06-00214 (HHK) |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |
| ————————————————— | ) | |

## REDACTED DECLARATION OF STEVEN G. BRADBURY

I, Steven G. Bradbury, declare as follows:

1.    **(U)**  I am the Acting Assistant Attorney General for the Office of Legal Counsel ("OLC" or "Office") of the United States Department of Justice ("DOJ" or "Department"). OLC is responsible for assisting the Attorney General in the discharge of his responsibilities as legal adviser to the President and to the heads of the Executive Branch departments and agencies. For the most part, OLC performs a purely advisory role, providing legal advice and assistance. In my capacity as the Acting Assistant Attorney General for OLC, I supervise all operations of OLC, including its response to requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

2.    **(U)** The information contained in this declaration is based on my personal knowledge, information and belief, and on information provided to me in my official capacity as Acting Assistant Attorney General for OLC.

3.    **(U)** I am aware of the December 16, 2005, FOIA request made by the Electronic Privacy Information Center ("EPIC"), the December 20, 2005, FOIA request made by the American Civil Liberties Union ("ACLU"), and the December 21, 2005, FOIA request made by the National Security Archive Fund ("NSAF"), that are the subjects of this litigation.  OLC received the EPIC request on December 16, 2005; it received the ACLU request, which was routed through the Justice Management Division, on February 27, 2006, and it received the NSAF request on December 22, 2005.  Copies of those requests as received by OLC are attached hereto as Exs. A, B, & C, respectively.

4.    **(U)** Each of plaintiffs' FOIA requests seeks information regarding the Terrorist Surveillance Program ("TSP"), a highly classified signals intelligence program which was acknowledged by the President in his radio address of December 17, 2005.  Since assuming the position of Acting Assistant Attorney General for OLC on February 4, 2005, my duties have required me to become familiar with that program.

5.    **REDACTED**

6.    **(U)** In particular, as a result of being entrusted with such highly classified information, I have been informed as to the harms that are likely to result should information regarding the Program be disclosed without proper authorization and have been instructed as to the proper procedures to follow to ensure that classified information is not so disclosed.  OLC has followed these procedures without exception.

7.    **(U)** I provide this declaration to address OLC's responses to the three FOIA requests made by EPIC, the ACLU, and the NSAF, and to provide the justifications for OLC's determination

that certain responsive documents must be withheld as exempt from disclosure under FOIA. In

making its withholding determinations, OLC and those acting on its behalf have consulted with the

National Security Agency ("NSA"), the Office of the Director of National Intelligence ("DNI"), and

other federal agencies and officials regarding the harm to national security that would result from

disclosure of the documents identified in this declaration. In particular, I have reviewed the

Declaration of John D. Negroponte, Director of National Intelligence ("DNI Decl."), attached hereto

as Ex. D, provided in support of withholdings in all TSP-related FOIA matters, and have relied upon

his expert assessment of the harm to the national intelligence program that would result from

disclosure of documents related to the TSP.

### (U) OLC'S RESPONSE TO PLAINTIFFS' FOIA REQUESTS

8.    **(U)** On March 8, 2006, OLC made its initial response to EPIC and ACLU, indicating

that a search of OLC's unclassified files had been completed and that documents responsive to both

requests had been identified. At that time, OLC released five documents, totaling 63 pages, and

indicated that additional documents were being withheld pursuant to the exemptions recognized by

FOIA. Exs. E & F.

9.    **(U)** On that same date, OLC informed plaintiff NSAF that no documents responsive

to its request were located in OLC's unclassified files. Ex. G.

10.    **(U)** On March 20, 2006, OLC provided EPIC and ACLU with a preliminary index of

the documents withheld from the unclassified files. That index identified 290 documents, totaling

approximately 4740 pages, which were withheld pursuant to FOIA's Exemption Five, 5 U.S.C.

§ 552 (b)(5), which pertains to certain inter- and intra-agency communications protected by the

deliberative process, attorney-client, attorney work product, and presidential communications

privileges. It is my understanding that plaintiffs subsequently advised counsel for the Department

that plaintiffs did not intend to challenge OLC's withholding of these documents, and thus, they are not further discussed herein.

11.    **(U)** On July 21, 2006, OLC notified EPIC and ACLU that the search of its classified files had been completed, resulting in the identification of 158 records or categories of records responsive to plaintiffs' requests. Ex. H & I. That letter advised EPIC and ACLU that a certain number of these records or categories of records were referred to other agencies or to other components of the Department of Justice for processing. OLC further advised EPIC and ACLU that the remaining records were being withheld as exempt from disclosure under FOIA Exemption One, 5 U.S.C. § 552(b)(1), which protects documents that are currently and properly classified pursuant to Executive Order, and FOIA Exemption Three, 5 U.S.C. § 552(b)(3), which protects documents that are exempted from disclosure under FOIA by federal statute, as well as FOIA Exemption Five, 5 U.S.C. § 552(b)(5).[1] Id.

12.    **(U)** On July 21, 2006, OLC also provided ACLU with a response with respect to 30 records referred to OLC for processing by the Office of the Deputy Attorney General ("ODAG"). Ex. I at 2. These records, twenty-one of which were duplicative of documents already identified by OLC, were also withheld as exempt from disclosure under FOIA Exemptions One, Three, and Five. Id.

13.    **(U)** On July 21, 2006, OLC notified the National Security Archive Fund that it had located a small number of documents responsive to its request in its classified files, but that these documents were withheld as exempt from disclosure under FOIA Exemptions One, Three, and Five. Ex. J.

---

[1]    **(U)** As a result of certain inadvertent errors, the responsive record counts were misstated in OLC's letter of July 21, 2006. As correctly described further herein, OLC ultimately identified 157 responsive records or categories of records, referred 66 of those records or categories of records to other components of the Department or other federal agencies, and, after appropriate consultations, withheld 91 records or categories of records under the exemptions provided for by FOIA.

### (U)  CLASSIFICATION OF DECLARATION

14.  **REDACTED**

15.  **REDACTED**

16.  **REDACTED**

17.  **REDACTED**

### (U)  THE TERRORIST SURVEILLANCE PROGRAM

18.  **(U)**  On September 11, 2001, al Qaeda terrorists attacked the United States.  The attacks of September 11 resulted in approximately 3,000 deaths—the highest single-day death toll from hostile foreign attacks in the Nation's history.  In addition, these attacks shut down air travel in the United States, disrupted the Nation's financial markets and government operations, and caused billions of dollars of damage to the economy.

19.  **(U)**  Following those attacks, the President of the United States authorized the National Security Agency to intercept international communications into and out of the United States of persons linked to al Qaeda or related terrorist organizations (hereinafter, "Terrorist Surveillance Program" or "TSP").  The TSP is a targeted and focused program intended to help "connect the dots" between known and potential terrorists and their affiliates.  In order to intercept a communication under the TSP, there must be reasonable grounds to believe that one party to the communication is located outside the United States and that at least one party to the communication is a member or agent of al Qaeda or an affiliated terrorist organization.  The TSP, which operates in the context of the ongoing armed conflict with al Qaeda and its allies, is an early warning system with one purpose:  to detect and prevent another catastrophic attack on the United States in the wake of the attacks of September 11th.

20.  **(U)**  The TSP is a program critical to the national security of the United States.  The President publicly acknowledged the existence of the Program on December 17, 2005.  Although the

existence of the TSP is now publicly acknowledged, and some facts about the Program have been disclosed, the President has made clear that sensitive information about the nature, scope, operation, and effectiveness of the Program remains classified and cannot be disclosed without causing exceptionally grave harm to U.S. national security.

21.    **REDACTED**

22.    **REDACTED**[2]

23.    **REDACTED**

24.    **(U)** Because of the grave harms to national security that might result from disclosure of operational details regarding the TSP, and pursuant to the criteria outlined in Executive Order 12958, as amended, information related to the TSP is classified TOP SECRET, and is subject to the special access and handling requirements reserved for "Sensitive Compartmented Information," ("SCI"), because it involves or derives from particularly sensitive intelligence sources and methods. See DNI Decl. ¶¶ 8, 20. All TSP-related information maintained by OLC is maintained in accordance with these access and handling requirements.

## (U) ADEQUACY OF SEARCH

25.    **(U)** Upon receiving the FOIA requests at issue in this case, OLC conducted a search of its unclassified files. We searched my files as well as the files of the OLC staff attorneys and Deputy Assistant Attorney Generals who are principally responsible for matters involving the TSP. The files were searched both electronically, through Microsoft Word and WordPerfect directories, and in hard copy. In addition, the electronic mail messages ("e-mails") of OLC staff relating to the TSP were reviewed either electronically or in hard copy. OLC also has a computer database which contains the full text of unclassified documents authored by the Office since 1945. OLC searches this voluminous central file by conducting a keyword search of this database. A keyword search was

---

[2] **REDACTED**

performed in this database for documents relating to the plaintiffs' FOIA requests. In sum, this search was reasonably likely to uncover all unclassified documents responsive to plaintiffs' FOIA requests.

26. **(U)** With respect to the classified documents maintained in OLC files, because of their sensitive nature, all documents maintained by OLC relating to the TSP are kept in segregated and locked file cabinets to which only those with the necessary security clearances are allowed access. These file cabinets are themselves located in a secure facility approved for the storage of SCI material. Documents in these cabinets were reviewed for purposes of locating documents responsive to plaintiffs' request, and OLC does not maintain any significant number of classified documents relating to the TSP in any other location.[3]

### (U) DOCUMENTS WITHHELD

27. **(U)** This declaration addresses OLC's justifications under FOIA Exemptions One, Three, and Five, for withholding the 91 records or categories of records identified by OLC as withheld in full, as well as eight documents referred by the Federal Bureau of Investigation ("FBI"), and 30 documents referred by the Office of the Deputy Attorney General ("ODAG"), plus nine additional documents identified by ODAG in which it was determined that OLC equities were at stake. Furthermore, this declaration also addresses certain of the 66 records or categories of records

---

[3] **(U)** Certain OLC staff attorneys have accounts on a classified email system physically located in the Department's Office of Intelligence Policy and Review ("OIPR"). For logistical reasons including OIPR's forced displacement from their workspace as a result of the flooding of the Main Department of Justice building on or about June 26, 2006, the documents maintained on this email system have not yet been searched. Nonetheless, because access to this classified email system was provided to OLC staff so that they might communicate with their counterparts in other federal agencies in the furtherance of their work with more efficiency and speed than allowed by in-person or secure telephone or facsimile communications, I fully anticipate that any responsive documents identified in this system will be subject to withholding under the same exemptions and for the same reasons as the other documents described herein. In other words, OLC communications sent through this dedicated classified system are almost always deliberative exchanges among government agency staff about highly classified matters, and are subject to the attorney-client privilege, and thus, will most likely be subject to withholding under Exemptions One, Three, Five, and Six.

maintained by OLC that were referred to other components of the Department or other federal agencies, but (1) as to which OLC has consulted with such agencies or components and each has asked OLC to respond on its behalf, or (2) as to which OLC has independent equities. Finally, this declaration addresses 60 records or categories of records referred to OLC for processing by the Office of Intelligence Policy and Review ("OIPR") in response to the request made by the ACLU, as to which no administrative response to that plaintiff has been made. OLC has reviewed the records referred by OIPR and has determined that 36 of them are not responsive to the ACLU's request; the remaining 24 records are described further herein. All of the documents described in this declaration are collectively referred to as documents withheld by OLC.

28.    **(U)**  In addition to Exemptions One, Three, and Five, many of the documents withheld by OLC contain information that must be withheld to prevent against an unwarranted invasion of personal privacy. This information includes the names of third-party individuals (non-government employees) as well as OLC and other government agency staff, and their personal information (such as addresses (including email addresses), home telephone numbers, or cellular phone numbers) that occasionally appear in the documents. There is no legitimate public interest in the release of this information, as its disclosure would shed no light on the activities of the Department of Justice but could subject these individuals to unwanted public attention, harassment, or embarrassment. Thus, information of this type that appears in these documents is withheld by OLC under FOIA Exemption Six, 5 U.S.C. § 552(b)(6).

29.    **(U)**  The documents withheld by OLC under Exemptions One, Three, Five, and Six fall into six categories, which are discussed below. For the convenience of the Court, a chart, attached as Ex. K, is provided which identifies the records or categories of records described in this declaration in numerical order and cross-references the paragraphs of the declaration in which the justification for their withholding is explained or indicates if the record is one for which a different

agency or component will respond. Because certain documents contain the equities of OLC as well as another component or agency, in certain cases, documents discussed below may also be discussed in another declaration.

### (U) A. Records or Categories of Records Relating to The President's Authorization of the TSP.

30.    **(U)** The TSP, by its terms, expires approximately every 45 days unless it is reauthorized. The President is responsible for reauthorizing the Program. The President's reauthorization determination is based on: reviews undertaken by the Intelligence Community[4] and the Department of Justice of the current threat to the United States posed by al Qaeda and its affiliates, a strategic assessment of the continuing importance of the Program to the national security of the United States, and assurances that safeguards continue to protect civil liberties. The Attorney General is involved in reviewing the legality of the Program.

31.    **(U)** Members of this Office provide legal advice and counsel to the President and the Attorney General as they make periodic decisions regarding reauthorization of the TSP.

32.    **(U)** Certain records or categories of records associated with this reauthorization process were withheld by OLC. Many of these records are drafts on which OLC comments have been sought or notes of OLC attorneys relating to the various stages of the authorization process. These records or categories of records, specifically, OLC 34, 67, 74, 78, 93, and 101; ODAG 10, 17,

---

[4] **(U)** As used herein, the "Intelligence Community" includes the Office of the Director of National Intelligence; the Central Intelligence Agency; the National Security Agency; the Defense Intelligence Agency; the National Geospatial-Intelligence Agency; the National Reconnaissance Office; other offices within the Department of Defense which collect specialized national intelligence through reconnaissance programs; the intelligence elements of the military services, the Federal Bureau of Investigation, the Department of the Treasury, the Department of Energy, the Drug Enforcement Administration, and the Coast Guard; the Bureau of Intelligence and Research of the Department of State; the elements of the Department of Homeland Security concerned with the analysis of intelligence information; and such other elements of any other department or agency as may be designated by the President, or jointly designated by the DNI and heads of the department or agency concerned, as an element of the Intelligence Community. See 50 U.S.C. § 401a(4).

18, 19, 48, and 65; OIPR 141; and FBI 7, totaling **REDACTED** pages and related electronic files,[5] contain classified information regarding the terms of the President's authorization of the TSP, which, if disclosed, would compromise the effectiveness of the Program to the detriment of national security. See DNI Decl. ¶ 26.

33.    **REDACTED**

34.    **(U)** In the process of compiling its FOIA response, OLC has conferred with the intelligence agencies that provided or compiled this information and they have advised that to disclose such sensitive intelligence information would both endanger the sources from which it was obtained and compromise the capabilities of the United States Intelligence Community to continue to secure such intelligence information in the future. See also DNI Decl. ¶ 26. They advise that such a result would have a devastating effect on U.S. national security. This material, accordingly, is properly and currently classified and is exempt from disclosure under FOIA Exemption One.

35.    **(U)** In addition, intelligence information relating to the activities of al Qaeda and its affiliates is sensitive intelligence information that is subject to statutory protection under the National Security Act of 1947, as amended, which protects intelligence sources and methods from disclosure. See 50 U.S.C. § 403-1(i)(1); see also DNI Decl. ¶¶ 22, 26. The information contained in these documents was derived from these sources and methods and, as described by DNI Negroponte, its disclosure risks compromising the safety and effectiveness of these intelligence capabilities. As a result, this information is also exempt under FOIA Exemption Three.

36.    **(U)** In addition, all of the records or categories of records identified in paragraph 32, supra, with the exception of FBI 7, are drafts provided to OLC or other Department components for inter-agency review and comment, or related notes of OLC staff. These records are deliberative in

---

[5] **(U)** Throughout this declaration, the page totals may reflect both identical and non-identical copies of referenced documents. In the publicly filed version of this declaration, the totals are redacted in conformity with the concerns articulated by the DNI. See DNI Decl. ¶ 24.

two respects. First, they are deliberative in the sense that they are drafts and thus, the documents themselves, and the handwritten comments and notes made on or about them by OLC attorneys, reflect the internal deliberations surrounding the composition of the final product. Second, they are deliberative in the sense that even the final product is intended only as a recommendation in support of the ultimate decision to be made by the President, namely, the decision to reauthorize the TSP. Moreover, because these records contain communications shared by other federal agencies that contribute to the process of evaluating whether the TSP remains necessary to the war on terror, and because these documents seek OLC's legal opinion regarding applicable legal standards, these documents contain attorney-client communications. Thus, their disclosure would gravely injure the fair and frank exchange of ideas and recommendations between executive departments and violate the confidential exchange of information and advice critical to the maintenance of an attorney-client relationship.

37.    **(U)** Finally, all the records or categories of records identified in paragraph 32, supra, with the exception of FBI 7, were collected and compiled in the course of advising the President as to his decision regarding the reauthorization of the TSP, and, therefore, are protected by the Presidential Communications Privilege, which protects communications between the President and his top advisers relating to decisions made by the President.

38.    **(U)** For all of these reasons, the records or categories of records identified in paragraph 32, supra, with the exception of FBI 7, are properly exempt from disclosure under FOIA Exemption Five.

39.    **REDACTED**[6]

---

[6] **(U)** Of these, OLC 63, 64, 114, and 115; and ODAG 3, were determined to be responsive to the NSAF request, which sought only "memoranda, legal opinions, directives or instructions from the Attorney General, Assistant Attorney General or Office of Legal Counsel (OLC), issued between September 11, 2001, and December 21, 2005, regarding the government's legal authority for surveillance activity, wiretapping, eavesdropping, and other

40.    **REDACTED**

41.    **(U)**  For the reasons discussed in paragraphs 39-41, <u>supra</u>, OLC 51, 63, 64, 114, and

115; ODAG 3 and 40; OIPR 138, 139, and 140; and FBI 4 and 5, are currently and properly

classified, reflect information that cannot be disclosed with compromising intelligence gathering

methods, and are protected by the deliberative process privilege, the attorney-client communications

privilege, and the presidential communications privilege.  Accordingly, these records or categories

of records are properly withheld under Exemptions One, Three, and Five.

### B. HEADING REDACTED

42.    **REDACTED**

43.    **REDACTED**

44.    **REDACTED**

45.    **REDACTED**

46.    **REDACTED**

47.    **(U)**  Accordingly, the OLC records or categories of records described in this section,

specifically, OLC 35, 36, 37, 75 and 207, and ODAG 12, totaling **REDACTED** pages plus related

electronic files are properly withheld under Exemption One, as well as under Exemption Three.  To

the extent, moreover, that the documents are drafts, notes, or internal recommendations, they are also

exempt under Exemption Five, as their disclosure would damage the internal give-and-take

necessary to agency decision-making.

---

signals intelligence operations directed at communications from or to U.S. citizens," including
"all documents discussing the President's surveillance authority under the September 2001
congressional use of force resolution as well as the President's independent authority to
authorize signals intelligence activities."  <u>See</u> Ex. C.  Other than the documents identified in
footnote 7, <u>infra</u>, none of the other documents discussed in this declaration were determined to
be responsive to the NSAF request.

## C. (U) Records or Categories of Records Relating to Targets of the TSP.

48.    **(U)**  As described by the President, under the TSP, the NSA targets communications where there are reasonable grounds to believe that one party to the communication is located outside the United States and that at least one party to the communication is a member or agent of al Qaeda or an affiliated terrorist organization.  OLC has been part of an extensive inter-agency process designed to identify those organizations that are properly considered to be affiliated with al Qaeda for purposes of this targeting and to develop the criteria to be applied when identifying potential targets.  OLC thus withheld records or categories of records relating to the criteria used for targeting and the appropriateness of targeting certain groups or individuals under the TSP.  These records or categories of records, OLC 76, 107, 139, 144, and 200, ODAG 23 and 24, and OIPR 9, totaling **REDACTED** pages and related electronic files, are exempt from disclosure under Exemptions One, Three, and Five, for the reasons explained below.

49.    **(U)**  OLC also withheld records or categories of records that contain reporting with respect to the intelligence successes achieved through the use of the TSP, specifically, OLC 78 and 145, and ODAG 10, 15, 16, 17, 18, and 19, totaling **REDACTED** pages.  These documents are also exempt from disclosure under FOIA Exemptions One, Three, and Five for the reasons explained below.

50.    **(U)**  First, as described by DNI Negroponte, as a matter of course, the United States does not publicly confirm or deny whether any individual is subject to surveillance activities of the type described herein, because to do so would tend to reveal actual targets.  See DNI Decl. ¶ 35.  For example, if any member of the Intelligence Community were to confirm that any specific individuals are not targets of surveillance, but later refused to comment (as it would have to) in a case involving an actual target, a person could easily deduce by comparing such responses that the person in the latter case is a target.  The harm of revealing targets of foreign intelligence surveillance is obvious.

If an individual learns or suspects that his communications are or may be targeted for intelligence collection, he can take steps to evade detection, to manipulate the information received, or to implement other countermeasures aimed at undermining U.S. intelligence operations. The resulting loss of accurate intelligence from such a source deprives U.S. policy makers of information critical to U.S. interests, and in the case of the TSP, could result in the catastrophic failure of the early warning system that the President has established to detect and prevent the next terrorist attack  See DNI Decl. ¶ 35.

51.    **REDACTED**

52.    **REDACTED**

53.    **(U)** Finally, in addition to being properly withheld under Exemption One and Three as described above, all of the documents identified in this section were created or collected as part of an ongoing inter-agency deliberative process aimed at making decisions as to which individuals and entities are to be targeted by the TSP. Moreover, although factual information is ordinarily not subject to deliberative process protection, in this case the selection of the specific facts considered by the Department and other agencies involved in this process would reveal the nature of the process and the specific information recommended to be considered when determining whether to target an entity or individual under the TSP. Disclosure of these records or categories of records would compromise the inter-agency deliberative process and deter the fulsome exchange of ideas and information intended to assist in that process, to the detriment of informed government decision-making. Such documents are protected by the deliberative process privilege, and thus are properly withheld under Exemption Five.

## D. HEADING REDACTED

54.    **REDACTED**

55.    **REDACTED**

56.    **REDACTED**

57.    **REDACTED**

58.    **REDACTED**

59.    **REDACTED**

### E. (U) Records or Categories of Records Relating to Legal Opinions of OLC.

60.    **(U)** The principal function of OLC is to assist the Attorney General in his role as legal adviser to the President and to other departments and agencies in the Executive Branch. In connection with this function, OLC prepares memoranda addressing a wide range of legal questions involving operations of the Executive Branch, and participates in assisting in the preparation of legal documents and providing more informal legal advice as necessary and requested. A significant portion of OLC's work can be divided into two categories. First, OLC renders opinions that resolve disputes within the Executive Branch on legal questions. Second, OLC performs a purely advisory role as legal counsel to the Attorney General, providing confidential legal advice both directly to the Attorney General, and through him or on his behalf, to the White House and other components of the Executive Branch.

61.    **(U)** All of the documents withheld by OLC under this category, as well as many of the other documents described in other sections of this declaration, were prepared or received by OLC in its role of assisting the Attorney General in the discharge of his responsibilities as legal adviser to the President and heads of the Executive Branch departments and agencies. In preparing and receiving these documents, OLC was performing a purely advisory role, providing legal advice and assistance. Although on rare occasions, specific OLC memoranda have been drafted with the expectation that they will be made public, and although some OLC documents are ultimately selected for publication, generally OLC memoranda are prepared with the expectation that they will be held in confidence, and that is of course the case with classified documents.

62.    **(U)**  OLC withheld several final memoranda that are responsive to plaintiffs' FOIA requests.  These documents, specifically, OLC 16, 54, 59, 62, 85, 113, 129, 131, 132, 133, and 146; ODAG 1, 2, 5, 6, 38, 2, and 52; OIPR 28, 29 and 37; and FBI 42 and 51, total **REDACTED** pages as well as related electronic files.[7]  All of these memoranda were prepared with the expectation that they would be held in confidence, and to the best of my knowledge, they have been held in confidence.

63.    **(U)**  Compelled disclosure of these advisory and pre-decisional documents would cause substantial harm to the deliberative process of the Department of Justice and the Executive Branch and disrupt the attorney-client relationship between the Department and the President and other officers of the Executive Branch.  Attorneys in OLC are often asked to provide advice and analysis with respect to very difficult and unsettled issues of law.  Frequently, such issues arise in connection with highly complex and sensitive operations of the Executive Branch.  It is essential to the mission of the Executive Branch that OLC legal advice, and the development of that advice, not be inhibited by concerns about public disclosure.  Protecting the confidentiality of documents that contain such advice is essential in order to ensure both that creative and even controversial legal arguments and theories may be explored candidly, effectively, and in writing, and to ensure that Executive Branch officials will continue to request legal advice from OLC on such sensitive matters.

---

[7]  **(U)**  Of these, OLC 54, 85, 113, 129, 131, 132 and 133; ODAG 1, 2, 5, 6 and 51; and OIPR 28 and 37 were determined to be responsive to the NSAF request, which sought only "memoranda, legal opinions, directives or instructions from the Attorney General, Assistant Attorney General or Office of Legal Counsel (OLC), issued between September 11, 2001, and December 21, 2005, regarding the government's legal authority for surveillance activity, wiretapping, eavesdropping, and other signals intelligence operations directed at communications from or to U.S. citizens," including "all documents discussing the President's surveillance authority under the September 2001 congressional use of force resolution as well as the President's independent authority to authorize signals intelligence activities."  See Ex. C. Other than the documents identified in footnote 6, supra, none of the other documents discussed in this declaration were determined to be responsive to that request.

64.    **(U)** Particularly in light of the Nation's ongoing fight against global terrorism, and the public interest in the effective performance of these activities, the need of the President and the heads of Executive Branch departments and agencies for candid, thoroughly considered legal advice in considering potential executive actions is particularly compelling. Thus, all of the documents identified in paragraph 62, supra, constitute documents subject to the deliberative process and attorney client privileges, and moreover, those provided to assist the President directly are also subject to the presidential communications privilege. As such, all of these documents are properly withheld as exempt under FOIA Exemption Five.

65.    **REDACTED**

66.    **(U)** In addition to the final, confidential memoranda described above, OLC also withheld drafts, notes, and attorney comments relating to the preparation of these memoranda or to the preparation or development of other legal advice offered by OLC, specifically, OLC 40, 41, 42, 53, 60, 83, 86, 87, 88, 89, 90, 108, 203, 204, and 205, as well as ODAG 8, 43, 44, 45, 49, 50, 51,[8] and 53, OIPR 1, 2, 32, 33, 34, 35, 82, and 142, and FBI 19 and 58, totaling **REDACTED** pages as well as related electronic files. Drafts and notes of this sort are, by their very nature, predecisional and deliberative.[9] Release of these drafts and notes would seriously inhibit and otherwise hinder the deliberations and frank discussions among attorneys within OLC when preparing legal advice, and would interfere with the relationship between OLC and its client agencies by undermining the process through which information pertinent to any particular legal analysis being performed by OLC is shared. OLC attorneys and officials at the agencies they are assisting would become inhibited and cautious in written expression of their preliminary analyses of legal issues, as well as

---

[8] **(U)** ODAG 50 and 51 are nonresponsive final OLC memoranda, but contain responsive attorney notes.

[9] **(U)** Some of the final, confidential memoranda identified in paragraph 66, supra, also contain handwritten marginalia and highlighting. These notations, where responsive, are also exempt for the reasons identified in this paragraph.

their identification of options and submission of recommendations, to the great detriment of the attorney-client relationship and the Government's deliberative process.

67.    **REDACTED**

68.    **(U)**  Finally, because these drafts and notes contain or reference highly classified material concerning the operation of the TSP, their disclosure implicates the same concerns regarding the release of classified information and the potential harm to intelligence sources and methods identified above and in the Declaration of DNI Negroponte, see DNI Decl. ¶¶ 22-35.  Thus, all of the documents identified in paragraph 66, supra, are properly withheld under Exemptions One, Three, and Five.

69.    **(U)**  In addition to the documents described above, OLC withheld certain documents, specifically, OLC 8, 9, 26, 27, 28, 29, 32, 43, 61, 71, 77, 79, 94, 102, 103, 106, 118, 119, 120, 121, 123, 140, 141, 142, 143, 206, and 208; ODAG 21 and 22; and OIPR 75 and 129, totaling **REDACTED** pages, as well as related electronic files, which are informal communications (facsimile transmissions and electronic mail messages) to and from OLC and other federal government agencies containing attorney-client communications regarding very specific questions about the TSP and corresponding attorney advice, or notes relating to such communications.

70.    **(U)**  For example, OLC 27 is a one-page handwritten note recording that an OLC attorney recommended to the NSA General Counsel that certain language be included in documentation supporting collection of various communications under the TSP.  Similarly, OLC 208 is a facsimile transmission from an attorney at OLC to an attorney at NSA seeking factual clarification regarding the operation of a particular technical aspect of the TSP so as to inform future advice regarding the Program.

71.    **(U)**  These sorts of communications contain information protected by the attorney-client privilege and the deliberative process privilege.  It is essential to the quality and effectiveness

of the decisionmaking process leading to the provision of OLC advice that client agencies provide OLC with all relevant facts and with their candid arguments and recommendations regarding legal questions presented to us. To disclose such communications between OLC attorneys and our federal agency clients would fundamentally disrupt the attorney-client relationship and would deter federal agencies from seeking timely and appropriate legal advice. Such documents are properly withheld under Exemption Five of FOIA. Moreover, because of the content of these documents, disclosure of these communications implicates the same concerns regarding the release of classified information and the potential harm to intelligence sources and methods identified above and in the Declaration of DNI Negroponte, see DNI Decl. ¶¶ 22-35. Thus, all of the records or categories of records identified in paragraph 69, supra, are also properly withheld under Exemptions One and Three.

### F. (U) Briefing Materials and Talking Points.

72.    (U) OLC has withheld various briefing materials and talking points that were created within the Department to assist senior Administration officials in addressing various points about the TSP. These documents, specifically, OLC 7, 46, 65, 80, 81, 82, 84, 116, 125, 126, 134, and 202; ODAG 34, 41 and 54; and OIPR 13 and 137, total **REDACTED** pages as well as related electronic files.

73.    (U) Briefing materials and talking points are by their very nature deliberative, as they reflect an attempt by the drafters succinctly to summarize particular issues and provide key background information in an effort to anticipate questions or issues that may be raised at a briefing or other situation in which such documents are used. Thus, these materials attempt to ensure that senior Administration officials are prepared to respond in any particular setting by providing draft answers in response to anticipated questions. Because these draft answers may or may not be used or may be modified by the speakers in any particular setting, these materials reflect the exchange of ideas and suggestions that accompanies all decision-making, and in many cases they also reflect

assessments by attorneys and other staff about issues on which they have been asked to make recommendations or provide advice.

74.    **(U)**  In addition to these briefing materials and talking points, OLC also maintains additional copies of the White Paper, OLC 105, which has previously been released to plaintiffs, and withheld drafts of that document, OLC 116 and 201; and OIPR 60, as deliberative under Exemption Five.  Although the White Paper was drafted for public release, certain early drafts of this document may contain classified materials, and thus, to that extent, those drafts are also withheld under Exemptions One and Three for the reasons discussed above.

75.    **REDACTED**

76.    **(U)**  Finally, OLC withheld OLC 117 and FBI 18, several copies of a letter from Senator J.D. Rockefeller, Vice Chairman, Senate Select Committee on Intelligence, to Lt. Gen. Keith B. Alexander, NSA, with copies to the Attorney General and the Director of National Intelligence, totaling **REDACTED** pages, which sought additional information relating to the "NSA Warrantless Surveillance Program(s)."  The questions posed by Senator Rockefeller are classified because they seek information regarding operational details of the TSP and cannot be disclosed without harming national security.  Thus, this document is properly exempt from disclosure under FOIA Exemption One and Three for all of the reasons set forth above and in the Declaration of DNI Negroponte.  See DNI Decl. ¶¶ 22-35.

### G.  (U)  Records that Are Not Agency Records

77.    **(U)**  OLC has temporary possession of three records, OLC 56, 57, 58, which are documents created by the President or his immediate staff in the course of carrying out the official duties of the President, namely the authorization of the TSP.  These documents were provided to OLC for purposes of assisting OLC with completing its work but are subject to an express reservation of control by the White House.  Other than taking steps to ensure that these highly

classified documents are maintained in a secure environment, OLC has no authority to distribute

these records or to dispose of them. As such, they are not "agency records," as that term is defined

in FOIA, and thus were not processed by OLC in response to the three FOIA requests at issue in this

litigation.

*          *          *

78.     **(U)** In exercising its responsibilities under FOIA, OLC has determined that each of

the documents described herein must be withheld in full. Given the exceptionally grave harm that

would be done to national security if United States intelligence sources and methods were

compromised as a result of the disclosure of any classified detail concerning the TSP without proper

authorization, I am confident that no portion of any of the documents withheld in full by OLC that is

responsive to the FOIA requests at issue in this litigation may be disclosed without compromising

the exemptions discussed at length herein.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _____September 15, 2006_____          _____
                                                  STEVEN G. BRADBURY
                                                  Acting Assistant Attorney General

# epic.org

EXHIBIT A
Bradbury Decl.

December 16, 2005

1718 Connecticut Ave NW

Suite 200

Washington DC 20009

USA

+1 202 483 1140 [tel]

+1 202 483 1248 [fax]

www.epic.org

VIA FACSIMILE — (202) 514-0563

Elizabeth Farris, Supervisory Paralegal
Office of Legal Counsel
Department of Justice
Room 5515, 950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

RE:   Freedom of Information Act Request and Request for Expedited
      Processing

Dear Ms. Farris:

This letter constitutes an expedited request under the Freedom of Information Act
("FOIA"), 5 U.S.C. § 552, and is submitted to the Department of Justice ("DOJ")
Office of Legal Counsel on behalf of the Electronic Privacy Information Center
("EPIC").

We are seeking agency records (including but not limited to electronic records) from
September 11, 2001 to the present concerning a presidential order or directive
authorizing the National Security Agency ("NSA"), or any other component of the
intelligence community, to conduct domestic surveillance without the prior
authorization of the Foreign Intelligence Surveillance Court ("FISC").

The existence of such an order and the DOJ's familiarity with it was reported in an
article entitled *Bush Lets U.S. Spy on Callers Without Courts* that appeared on the
front page of the New York Times this morning (see attached article). The records
requested by EPIC include (but are not limited to) the following items mentioned in
this article:

1.  an audit of NSA domestic surveillance activities;

2.  guidance or a "checklist" to help decide whether probable cause exists to
    monitor an individual's communications;

3.  communications concerning the use of information obtained through NSA
    domestic surveillance as the basis for DOJ surveillance applications to the
    FISC; and

4. legal memoranda, opinions or statements concerning increased domestic surveillance, including one authored by John C. Yoo shortly after September 11, 2001 discussing the potential for warrantless use of enhanced electronic surveillance techniques.

Request for Expedited Processing

This request clearly meets the standard for expedited processing under applicable Department of Justice regulations because it involves a "matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv). In addition, this request pertains to a matter about which there is an "urgency to inform the public about an actual or alleged Federal government activity," and the request is made by "a person primarily engaged in disseminating information." 5 U.S.C. § 552(a)(6)(E)(v)(II). A copy of this request has been provided to the Director of Public Affairs as required by 28 C.F.R. § 16.5(d)(2).

The government activity at issue here — President Bush's authorization of warrantless domestic surveillance, and the DOJ's knowledge of and relationship to such surveillance — raises serious legal questions about the government's intelligence activity and has received considerable media attention in the past few hours. The New York Times reported on its front page this morning:

> Months after the Sept. 11 attacks, President Bush secretly authorized the National Security Agency to eavesdrop on Americans and others inside the United States to search for evidence of terrorist activity without the court-approved warrants ordinarily required for domestic spying, according to government officials.

> Under a presidential order signed in 2002, the intelligence agency has monitored the international telephone calls and international e-mail messages of hundreds, perhaps thousands, of people inside the United States without warrants over the past three years in an effort to track possible "dirty numbers" linked to Al Qaeda, the officials said.

> *     *     *

> In mid-2004, concerns about the program expressed by national security officials, government lawyers and a judge prompted the Bush administration to suspend elements of the program and revamp it.

> For the first time, the Justice Department audited the N.S.A. program, several officials said. And to provide more guidance, the Justice Department and the agency expanded and refined a checklist to follow in deciding whether probable cause existed to start monitoring someone's communications, several officials said.

2

A complaint from Judge Colleen Kollar-Kotelly, the federal judge who oversees the Federal Intelligence Surveillance Court, helped spur the suspension, officials said. The judge questioned whether information obtained under the N.S.A. program was being improperly used as the basis for F.I.S.A. wiretap warrant requests from the Justice Department, according to senior government officials. While not knowing all the details of the exchange, several government lawyers said there appeared to be concerns that the Justice Department, by trying to shield the existence of the N.S.A. program, was in danger of misleading the court about the origins of the information cited to justify the warrants.

One official familiar with the episode said the judge insisted to Justice Department lawyers at one point that any material gathered under the special N.S.A. program not be used in seeking wiretap warrants from her court.

*       *       *

[S]enior Justice Department officials worried what would happen if the N.S.A. picked up information that needed to be presented in court. The government would then either have to disclose the N.S.A. program or mislead a criminal court about how it had gotten the information.

*       *       *

The legal opinions that support the N.S.A. operation remain classified, but they appear to have followed private discussions among senior administration lawyers and other officials about the need to pursue aggressive strategies that once may have been seen as crossing a legal line, according to senior officials who participated in the discussions.

For example, just days after the Sept. 11, 2001, attacks on New York and the Pentagon, Mr. [John C.] Yoo, the Justice Department lawyer, wrote an internal memorandum that argued that the government might use "electronic surveillance techniques and equipment that are more powerful and sophisticated than those available to law enforcement agencies in order to intercept telephonic communications and observe the movement of persons but without obtaining warrants for such uses."

James Risen and Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, NY Times, Dec. 15, 2005 at A1.

The matter has raised serious questions about the constitutionality of the NSA's domestic surveillance activities. According to the New York Times article, "some officials familiar with the continuing operation have questioned whether the surveillance has stretched, if not crossed, constitutional limits on legal searches." The article also states that "nearly a dozen current and former officials, who were granted anonymity because of the classified nature of the program, discussed it with reporters for The New York Times because of their concerns about the operation's legality and oversight. Furthermore, the Washington Post reported, "Congressional sources familiar with limited aspects of the

3

program would not discuss any classified details but made it clear there were serious questions about the legality of the NSA actions." Dan Eggen, *Bush Authorized Domestic Spying*, Washington Post, Dec. 16, 2005, at A01 (attached hereto).

In addition, this subject has unquestionably been the subject of widespread and exceptional media interest. In addition to the New York Times and Washington Post, hundreds of local and national media organizations reported on this matter throughout the United States this morning. In fact, a Google News search identified approximately 316 news stories on the NSA's domestic surveillance (Google News results attached hereto).

Furthermore, at least one congressional committee will be investigating the NSA's domestic surveillance activities in the coming days. Senator Arlen Specter, Chairman of the Senate Judiciary Committee, said that the surveillance at issue is "wrong, clearly and categorically wrong . . . This will be a matter for oversight by the Judiciary committee as soon as we can get to it in the new year — a very, very high priority item.'" *Specter Says Senate to Probe Report U.S. Broke Law on Spying, Bloomberg*.com, Dec. 16, 2005 (attached hereto). It is critical for Congress and the public to have as much information as possible about the DOJ's role in this surveillance to fully consider and determine its propriety.

The purpose of EPIC's request is to obtain information directly relevant to the DOJ's knowledge of and relationship to the NSA's domestic intelligence activities. The records requested therefore clearly meet both standards for expedited processing.

Further, as I explain below in support of our request for "news media" treatment, EPIC is "primarily engaged in disseminating information."

<u>Request for "News Media" Fee Status</u>

EPIC is a non-profit, educational organization that routinely and systematically disseminates information to the public. This is accomplished through several means. First, EPIC maintains a heavily visited Web site (www.epic.org) that highlights the "latest news" concerning privacy and civil liberties issues. The site also features scanned images of documents EPIC obtains under the FOIA. Second, EPIC publishes a bi-weekly electronic newsletter that is distributed to over 15,000 readers, many of whom report on technology issues for major news outlets. The newsletter reports on relevant policy developments of a timely nature (hence the bi-weekly publication schedule). It has been published continuously since 1996, and an archive of past issues is available at our Web site. Finally, EPIC publishes and distributes printed books that address a broad range of privacy, civil liberties and technology issues. A list of EPIC publications is available at our Web site.

For the foregoing reasons, EPIC clearly fits the definition of "representative of the news media" contained in the FOIA. Indeed, the U.S. District Court for the District of Columbia has specifically held that EPIC is "primarily engaged in disseminating information" for the purposes of expedited processing, *American Civil Liberties*

*Union v. Department of Justice*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004), and is a "representative of the news media" for fee waiver purposes, *Electronic Privacy Information Center v. Department of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003). Based on our status as a "news media" requester, we are entitled to receive the requested records with only duplication fees assessed. Further, because disclosure of this information will "contribute significantly to public understanding of the operations or activities of the government," as described above, any duplication fees should be waived.

Thank you for your consideration of this request. As the FOIA provides, I will anticipate your determination on our request for expedited processing within ten (10) calendar days. Should you have any questions about this request, please feel free to call me at (202) 483-1140 ext. 112.

Under penalty of perjury, I hereby affirm that the foregoing is true and correct to the best of my knowledge.

Sincerely,

Marcia Hofmann
Director, Open Government Project

Enclosures

5

ANN BEESON
ASSOCIATE LEGAL DIRECTOR

**ACLU**
AMERICAN CIVIL LIBERTIES UNION

EXHIBIT B
Bradbury Decl.

December 20, 2005

FOIA/PA Mail Referral Unit
Justice Management Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW.
Washington, DC 20530-0001.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2601
F/212.549.2651
ABEESON@ACLU.ORG
WWW.ACLU.ORG

Re:   **REQUEST UNDER FREEDOM OF INFORMATION ACT /
Expedited Processing Requested**

Attention:

   This letter constitutes a request by the American Civil Liberties Union
and the American Civil Liberties Union Foundation ("ACLU") under the
Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and the Department of
Justice implementing regulations, 28 CFR § 16.11.[1]

I.   **The Request for Information**

   The ACLU seeks disclosure of any presidential order(s) authorizing
the NSA to engage in warrantless electronic surveillance[2] and/or warrantless
physical searches in the United States, created from September 11, 2001 to the
present.[3]

---

[1] The American Civil Liberties Union Foundation is a 501(c)(3) organization that provides
legal representation free of charge to individuals and organizations in civil rights and civil
liberties cases, and educates the public about civil rights and civil liberties issues.  The
American Civil Liberties Union is a separate non-profit, non-partisan, 501(c)(4) membership
organization that educates the public about the civil liberties implications of pending and
proposed state and federal legislation, provides analyses of pending and proposed legislation,
directly lobbies legislators, and mobilizes its members to lobby their legislators.
[2] The term "electronic surveillance" includes but is not limited to warrantless acquisition of
the contents of any wire or radio communication by an electronic, mechanical, or other
surveillance device, and the warrantless installation or use of an electronic, mechanical, or
other surveillance device for monitoring to acquire information, other than from a wire or
radio communication.
[3] This request does not include surveillance authorized by 50 U.S.C. §§ 1802 or 1822(a).

In addition, the ACLU seeks disclosure of any record(s),[4] document(s), file(s), communications, memorandum(a), order(s), agreement(s) and/or instruction(s), created from September 11, 2001 to the present, about:

1. any presidential order(s) authorizing the NSA to engage in warrantless electronic surveillance and/or warrantless physical searches in the United States;

2. the policies, procedures and/or practices of the NSA:

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

   a. for identifying individuals, organizations or entities to subject to warrantless electronic surveillance and/or warrantless physical searches in the United States, including but not limited to any "checklist to follow in deciding whether probable cause existed to start monitoring someone's communications,"[5] or a requirement that there be a "clear link" between terrorist organizations and individuals subject to such surveillance;[6]

   b. for gathering information through warrantless electronic surveillance and/or warrantless physical searches in the United States;

   c. governing the maintenance and/or storage of information described in paragraph 2(b) above;

   d. for analyzing and using information described in paragraph 2(b) above;

   e. for sharing information described in paragraph 2(b) above with other government agencies;

---

[4] The term "records" as used herein includes all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audio tapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies.
[5] James Risen and Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, New York Times, Dec. 16, 2005, at A1, A16.
[6] Transcript, President Bush's Address, Dec. 17, 2005, available at http://www.nytimes.com/2005/12/17/politics/17text-bush.html

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

    f.  for sharing information described in paragraph 2(b) above to be "used as the basis for F.I.S.A. warrant requests from the Justice Department,"[7] or any other form of warrant;

    g.  for cross referencing information described in paragraph 2(b) above with information about other individuals, organizations, or groups;

    h.  for cross-referencing information described in paragraph 2(b) above with information in any database;

    i.  to suspend and/or terminate warrantless electronic surveillance and/or physical searches in the United States by the NSA;

    j.  governing the destruction of information described in paragraph 2(b) above;

    k.  for protecting the privacy of individuals who are subject to warrantless electronic surveillance and/or warrantless physical searches in the United States;

    l.  for consulting with, or obtaining approval from, the Justice Department or other departments, agencies, and/or executive branch officials before engaging in warrantless electronic surveillance and/or warrantless physical searches in the United States;

    m.  any minimization procedure, as that term is defined in 50 U.S.C. § 1801(h), for information described in paragraph 2(b) above;

3.  the name of other government agencies with whom the information described in part 2(b) above is shared;

4.  the date on which:

    a.  President Bush signed an order permitting the NSA to engage in warrantless electronic surveillance and/or warrantless physical searches in the United States;

---

[7] Risen and Lichtblau, Dec. 16., at A16.

3

   b. the NSA began engaging in warrantless electronic surveillance and/or warrantless physical searches in the United States;[8]

5. the constitutionality, legality, and/or propriety of warrantless electronic surveillance and/or warrantless physical searches in the United States;

6. any Justice Deparment "legal reviews of the program and its legal rationale."[9]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

7. any actual or potential violations of, or deviations from, any policy, procedure or practice related to warrantless electronic surveillance and/or warrantless physical searches in the United States by the NSA;

8. any investigation, inquiry, or disciplinary proceeding initiated in response to any actual or potential violations of, or deviations from, any policy, procedure or practice related to warrantless electronic surveillance and/or warrantless physical searches in the United States by the NSA;

9. any Department of Justice audit of any NSA program carrying out warrantless electronic surveillance and/or warrantless physical searches in the United States;[10]

10. the number of:

   a. individuals who have been subjected to warrantless electronic surveillance in the United States by the NSA since September 11, 2001;

---

[8] It is unclear when the NSA began its domestic surveillance program and when the President provided written authorization for it to do so. On December 18, 2005, the New York Times reported that the NSA "first began to conduct warrantless surveillance on telephone calls and e-mail messages between the United States and Afghanistan months before President Bush officially authorized a broader version of the agency's special domestic collection program." Eric Lichtblau and James Risen, *Eavesdropping Effort Began Soon After Sept. 11 Attacks*, New York Times, Dec. 18, 2005.

[9] Eric Lichtblau and David E. Sanger, *Administration Cites War Vote in Spying Case*, New York Times, Dec. 20, 2005.

[10] Risen and Lichtblau, Dec. 16, at A16 (describing such an audit as taking place on or after 2004).

4

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

    b.   individuals who have been subjected to warrantless physical searches in the United States by the NSA since September 11, 2001;

    c.   organizations or entities that have been subjected to warrantless electronic surveillance in the United States by the NSA since September 11, 2001;

    d.   organizations or entities that have been subjected to warrantless physical searches in the United States by the NSA since September 11, 2001;

11. the average and maximum[11] number of:

    a.   individuals who have been the target of warrantless electronic surveillance in the United States by the NSA at any one time since September 11, 2001;

    b.   individuals who have been the target of warrantless physical searches in the United States by the NSA at any one time since September 11, 2001;

    c.   organizations or entities that have been the target of warrantless electronic surveillance in the United States by the NSA at any one time since September 11, 2001;

    d.   organizations or entities that have been the target of warrantless physical searches in the United States by the NSA at any one time since September 11, 2001;

12. the number of individuals who have been subjected to warrantless electronic surveillance and/or warrantless physical searches in the United States by the NSA who are United States citizens, lawful permanent residents, recipients of non-immigrant visas, lawful visitors without visas, and undocumented immigrants, respectively;

13. the types of communications that have been subjected to warrantless electronic surveillance by the NSA, including but not limited to whether such communications were carried out via telephone, email,

---

[11] The New York Times reports that "officials familiar with [the program] say the N.S.A. eavesdrops without warrants on up to 500 people in the United States at any time." Risen and Lichtblau, Dec. 16, at A16.

instant messaging, chat, Voice Over IP, other Internet-based communications technologies, or in-person conversation;

14. elements of the NSA's warrantless surveillance program in the United States that were suspended or revamped after, "[i]n mid-2004, concerns about the program [were] expressed by national security officials, government lawyers and a judge"; [12]

15. concerns expressed by national security officials, government lawyers, judges and others regarding the NSA's warrantless surveillance program; [13]

16. the number of instances in which the Attorney General has authorized warrantless electronic surveillance and/or phsycial searches under 50 U.S.C. §§ 1802 or 1822(a), and copies of each certification; and

17. President Bush's periodic reauthorization of the NSA's warrantless surveillance in the United States, including but not limited to the frequency with which the President reviews the surveillance program, the exact number of times the President has reauthorized the program, the basis and/or criteria for continued authorization of the program, and other government officials, departments, and/or agencies involved in the review process. [14]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[12] Risen and Lichtblau, Dec. 16, at A16.

[13] *Id.*

[14] On December 17, 2005, President Bush said:
> The activities I authorized are reviewed approximately every 45 days. Each review is based on a fresh intelligence assessment of terrorist threats to the continuity of our government and the threat of catastrophic damage to our homeland. During each assessment, previous activities under the authorization are reviewed. The review includes approval by our nation's top legal officials, including the attorney general and the counsel to the president. I have reauthorized this program more than 30 times since the Sept. 11 attacks and I intend to do so for as long as our nation faces a continuing threat from Al Qaeda and related groups.

Transcript, President Bush's Address, December 17, 2005, available at http://www.nytimes.com/2005/12/17/politics/17text-bush.html. *See also* David E. Sanger, *In Address, Bush Says He Ordered Domestic Spying*, New York Times, December 18, 2005.

## II.    <u>Limitation of Processing Fees</u>

The ACLU requests a limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by . . . a representative of the news media . . .") and 28 C.F.R. §§ 16.11(c)(1)(i), 16.11(d)(1) (search and review fees shall not be charged to "representatives of the news media."). As a "representative of the news media," the ACLU fits within this statutory and regulatory mandate. Fees associated with the processing of this request should, therefore, be limited accordingly.

The ACLU meets the definition of a "representative of the news media" because it is "an entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience." <u>National Security Archive v. Department of Defense</u>, 880 F.2d 1381, 1387 (D.C. Cir. 1989).

The ACLU is a national organization dedicated to the defense of civil rights and civil liberties. Dissemination of information to the public is a critical and substantial component of the ACLU's mission and work. Specifically, the ACLU publishes newsletters, news briefings, right-to-know documents, and other educational and informational materials that are broadly disseminated to the public. Such material is widely available to everyone, including individuals, tax-exempt organizations, not-for-profit groups, law students and faculty, for no cost or for a nominal fee through its public education department. The ACLU also disseminates information through its heavily visited web site: http://www.aclu.org/. The web site addresses civil rights and civil liberties issues in depth, provides features on civil rights and civil liberties issues in the news, and contains many thousands of documents relating to the issues on which the ACLU is focused. The website specifically includes features on information obtained through the FOIA. See, e.g., www.aclu.org/patriot_foia; www.aclu.org/torturefoia; http://www.aclu.org/spyfiles. The ACLU also publishes an electronic newsletter, which is distributed to subscribers by e-mail.

In addition to the national ACLU offices, there are 53 ACLU affiliate and national chapter offices located throughout the United States and Puerto Rico. These offices further disseminate ACLU material to local residents, schools and organizations through a variety of means including their own websites, publications and newsletters. Further, the ACLU makes archived

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

7

material available at the American Civil Liberties Union Archives, Public
Policy Papers, Department of Rare Books and Special Collections, Princeton
University Library.  ACLU publications are often disseminated to relevant
groups across the country, which then further distribute them to their members
or to other parties.

Depending on the results of the Request, the ACLU plans to
"disseminate the information" gathered by this Request "among the public"
through these kinds of publications in these kinds of channels.  The ACLU is
therefore a "news media entity."  Cf. Electronic Privacy Information Ctr. v.
Department of Defense, 241 F.Supp.2d 5, 10-15 (D.D.C. 2003) (finding non-
profit public interest group that disseminated an electronic newsletter and
published books was a "representative of the media" for purposes of FOIA).

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Finally, disclosure is not in the ACLU's commercial interest.  The
ACLU is a "non-profit, non-partisan, public interest organization."  See
Judicial Watch Inc. v. Rossotti, 326 F.3d 1309, 1310 (D.C. Cir. 2003).  Any
information disclosed by the ACLU as a result of this FOIA will be available
to the public at no cost.

## III.    Waiver of all Costs

The ACLU additionally requests a waiver of all costs pursuant to 5
U.S.C. §552(a)(4)(A)(iii) ("Documents shall be furnished without any charge .
. . if disclosure of the information is in the public interest because it is likely to
contribute significantly to public understanding of the operations or activities
of the government and is not primarily in the commercial interest of the
requester.").  Disclosure in this case meets the statutory criteria, and a fee
waiver would fulfill Congress's legislative intent in amending FOIA.  See
Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309, 1312 (D.C. Cir. 2003)
("Congress amended FOIA to ensure that it be 'liberally construed in favor of
waivers for noncommercial requesters.'").

Disclosure of the requested information is in the public interest.  This
request will further public understanding of government conduct; specifically,
the NSA's warrantless electronic surveillance and/or physical searches in the
United States.  This type of government activity concretely affects many
individuals and implicates basic privacy, free speech, and associational rights
protected by the Constitution.

Moreover, disclosure of the requested information will aid public understanding of the implications of the President's decision to permit the NSA to engaging in warrantless electronic surveillance and/or physical searches in the United States and, consequently, to circumvent the judicial oversight required by the Foreign Intelligence Surveillance Act of 1978.[15] Congress passed this Act in response to scandalous revelations about widespread political surveillance by the FBI under the leadership of J. Edgar Hoover. Following those revelations, Congress convened hearings and established a commission to investigate the government's abuses and explore how best to prevent future excesses. The hearings, chaired by Idaho Senator Frank Church, revealed that the government had infiltrated civil rights and peace groups, had burglarized political groups to gain information about their members and activities, and had "swept in vast amounts of information about the personal lives, views, and associations of American citizens."[16] Understanding the current scope of the NSA's warrantless surveillance is, therefore, crucial to the public's interest in understanding the legality and consequences of the President's order and the NSA's current surveillance practices.

As a nonprofit 501(c)(3) organization and "representative of the news media" as discussed in Section II, the ACLU is well-situated to disseminate information it gains from this request to the general public and to groups that protect constitutional rights. Because the ACLU meets the test for a fee waiver, fees associated with responding to FOIA requests are regularly waived for the ACLU.[17]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[15] 50 U.S.C. § 1801 *et seq.*

[16] INTELLIGENCE ACTIVITIES AND THE RIGHTS OF AMERICANS, BOOK II: FINAL REPORT OF THE SELECT COMMITTEE TO STUDY GOVERNMENTAL OPERATIONS WITH RESPECT TO INTELLIGENCE ACTIVITIES. UNITED STATES SENATE. APRIL 26, 1976. *Available at* http://www.icdc.com/~paulwolf/cointelpro/churchfinalreportIIa.htm.

[17] For example, in May 2005, the United States Department of Commerce granted a fee waiver to the ACLU with respect to its request for information regarding the radio frequency identification chips in United States passports. In March 2005, the Department of State granted a fee waiver to the ACLU with regard to a request submitted that month regarding the use of immigration laws to exclude prominent non-citizen scholars and intellectuals from the country because of their political views, statements, or associations. Also, the Department of Health and Human Services granted a fee waiver to the ACLU with regard to a FOIA request submitted in August of 2004. In addition, the Office of Science and Technology Policy in the Executive Office of the President said it would waive the fees associated with a FOIA request submitted by the ACLU in August 2003. In addition, three separate agencies – the Federal Bureau of Investigation, the Office of Intelligence Policy and Review, and the Office of Information and Privacy in the Department of Justice – did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002.

The records requested are not sought for commercial use, and the requesters plan to disseminate the information disclosed as a result of this FOIA request through the channels described in Section II. As also stated in Section II, the ACLU will make any information disclosed as a result of this FOIA available to the public at no cost.

## IV.     Expedited Processing Request

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Expedited processing is warranted because there is "[a]n urgency to inform the public about an actual or alleged federal government activity" by organizations "primarily engaged in disseminating information." 28 CFR § 16.5(d)(1)(ii).[18] This request implicates an urgent matter of public concern; namely, the NSA's potentially extensive warrantless electronic surveillance and/or physical searches in the United States. Such government activity may infringe upon the public's free speech, free association, and privacy rights, which are guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Requests for information bearing upon potential Constitutional violations require an immediate response so that any violations cease and future violations are prevented.

A requestor may also demonstrate the need for expedited processing by showing that the information sought relates to "a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv). The instant request clearly meets these standards as the request relates to possible violations of Constitutional rights by federal law enforcement officials. It took less than a day for Arlen Specter, the Republican chairman of the Senate Judiciary Committee, to pledge that the Senate would hold hearings to investigate the NSA's warrantless surveillance. Jennifer Loven, *Report of NSA Spying Prompts Call for Probe*, San Francisco Chronicle, Dec. 16, 2005. That the President chose to give a rare, live radio address providing additional information about the NSA's warrantless surveillance the day after it was revealed underscores the urgency of the ACLU's request. The urgent and time sensitive nature of the request is also apparent from the widespread and sustained media coverage the NSA's warrantless domestic surveillance activities have garnered. *See, e.g.,* James Risen and Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, New

---

[18] The ACLU is "primarily engaged in disseminating information," as discussed in Sections II and III.

10

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

York Times, Dec. 16, 2005, at A1; Maura Reynolds and Greg Miller, *Congress Wants Answers About Spying on U.S. Citizens*, Pittsburgh Post-Gazette, Dec. 16, 2005; Steven Thomma, *Spying Could Create Backlash on Congress; Public Reaction Hinges on Identity of Targets*, San Jose Mercury News, Dec. 16, 2005; Christine Hauser, *Bush Declines to Discuss Report on Eavesdropping*, New York Times, Dec. 16, 2005; Katherine Shrader, *Lawmakers Say Reported Spy Program Shocking, Call For Investigations*, San Diego Union Tribune, Dec. 16, 2005; Caren Bohan and Thomas Ferraro, *Bush Defends Eavesdropping and Patriot Act*, ABC News, Dec. 17, 2005; Dan Eggan and Charles Lane, *On Hill, Anger and Calls for Hearing Greet News of Stateside Surveillance*, Washington Post, Dec. 17, 2005, at A1; Jennifer Loven, *Bush Defends Secret Spying in U.S.*, San Francisco Chronicle, Dec. 17, 2005; Barton Gellman and Dafna Linzer, *Pushing the Limits of Wartime Powers*, Washington Post, Dec. 18, 2005, at A1; John Diamond, *NSA's Surveillance of Citizens Echoes 1970s Controversy*, USA Today, Dec. 18, 2005; James Kuhnhenn, *Bush Defends Spying in U.S.*, San Jose Mercury News, Dec. 18, 2005; Fred Barbash and Peter Baker, *Gonzales Defends Eavesdropping Program*, Washington Post, Dec. 19, 2005; Todd J. Gillman, *Bush Assails Disclosure of Domestic Spying Program*, San Jose Mercury News, Dec. 19, 2005; David Stout, *Bush Says U.S. Spy Program is Legal and Essential*, New York Times, Dec. 19, 2005; James Gerstenzang, *Bush Vows to Continue Domestic Surveillance*, L.A. Times, Dec. 19, 2005; Terence Hunt, *Bush Says NSA Surveillance Necessary, Legal*, Washington Post, Dec. 19, 2005; George E. Condon, *Bush Says Spying Is Needed To Guard US*, San Diego Union Tribune, Dec. 20, 2005; Jeff Zeleny, *No 'Unchecked Power' In Domestic Spy Furor*, Chicago Tribune, Dec. 20, 2005; Michael Kranish, *Bush Calls Leak of Spy Program Shameful*, Boston Globe, Dec. 20, 2005; Craig Gordon, *For Bush, 9/11 Justifies Eavesdropping*, Newsday, Dec. 20, 2005; Terence Hunt, *Bush Defends Domestic Spying Program as Effective Tool in War on Terror*, Detroit Free Press, Dec. 19, 2005.

Finally, pursuant to applicable regulations and statute, the ACLU expects the determination of this request for expedited processing within 10 calendar days and the determination of this request for documents within 20 days. *See* 28 CFR § 16.5(d)(4); 5 U.S.C. § 552(a)(6)(A)(i).

If this request is denied in whole or in part, we ask that you justify all deletions by reference to specific exemptions to FOIA. The ACLU expects the release of all segregable portions of otherwise exempt material. The ACLU reserves the right to appeal a decision to withhold any information or to deny a waiver of fees.

Thank you for your prompt attention to this matter. Please furnish all applicable records to:

Ann Beeson
Associate Legal Director
American Civil Liberties Union
125 Broad Street, 18th floor
New York, NY 10004

I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief.

Sincerely,

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Ann Beeson
Associate Legal Director
American Civil Liberties Union

EXHIBIT C
Bradbury Decl.

# The National Security Archive

The George Washington University
Gelman Library, Suite 701
2130 H Street, N.W.
Washington, D.C. 20037

Phone: 202/994-7000
Fax: 202/994-7005
nsarchiv@gwu.edu
www.nsarchive.org

December 21, 2005

Elizabeth Farris, Supervisory Paralegal
Office of Legal Counsel
Department of Justice
Room 5515, 950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

RE: **Request under the FOIA, in reply refer to Archive #20051739DOJ025**

Dear Ms. Farris:

Pursuant to the Freedom of Information Act (FOIA), I hereby request copies of the following:

> *All memoranda, legal opinions, directives or instructions from the Attorney General,*
> *Assistant Attorney General, or the Office of Legal Counsel (OLC), issued between*
> *September 11, 2001 and December 21, 2005, regarding the government's legal*
> *authority for surveillance activity, wiretapping, eavesdropping, and other signals*
> *intelligence operations directed at communications to or from U.S. citizens. Please*
> *include all documents discussing the President's surveillance authority under the*
> *September 2001 congressional use of force resolution as well as the President's*
> *independent ability to authorize signals intelligence activities.*

The description of the requested legal opinions in a recent *New York Times* article (David Johnston and Linda Greenhouse, "'01 Resolution is Central to '05 Controversy," *New York Times*, Dec. 20, 2005) suggests that OLC has conducted an analysis as to the proper interpretation of constitutional presidential powers of surveillance. Although some portions of the opinions that specifically identify surveillance measures and technology may be properly classified, at least some portions of these records—namely those reflecting OLC's conclusive opinion as to the legal question at issue—are neither deliberative and predecisional nor inseparable as objective legal determinations that do not reveal particular facts about intelligence sources and methods. Rather, such legal opinions serve to inform the President, and thus are the administration's settled interpretation of a point of law.

Further, it is true that executive branch agencies are entitled to protection of the attorney-client privilege and so under FOIA Exemption 5 are not required to disclose confidential communications that would not be discoverable in ordinary civil litigation. *EPA v. Mink*, 410 U.S. 73, 85 (1973). Courts have held, however, that where the client agency is seeking legal guidance and the responsive communications "do not contain any confidential information *concerning the Agency*," they must be disclosed under FOIA. *Schlefer v. United States*, 702 F.2d 233, 245 (D.C.Cir. 1983). For example, Field Service Advice Memoranda (FSAs)—legal opinions issued at the request of IRS field offices by the IRS Office of Chief Counsel—were ordered disclosed because they did not involve confidential information concerning the IRS but rather answered a legal question in general or objective terms. *Tax Analysts v. IRS*, 117 F.3d 607 (D.C. Cir. 1997).

Moreover, non-disclosure of the OLC opinion does not serve the purposes Congress intended for FOIA Exemption 5: "The disclosure of documents that authoritatively state an agency's position will neither inhibit the free

An Independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act. Publication royalties and tax deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's Budget.

exchange of views within the agency nor confuse the public, because the agency's own purpose in preparing such documents is to obviate the need for further intra-agency deliberation on the matters addressed." *Schlefer*, 702 F.2d at 237. The OLC is not a policy-making body, nor does it, in the context of issuing legal opinions, form part of a deliberative inter-agency process for setting policy; rather, OLC responds to "requests typically deal[ing] with legal issues of particular complexity and importance or about which two or more agencies are in disagreement," conclusively resolving questions or disputes within the executive branch as to a particular legal matter. About OLC, http://www.usdoj.gov/olc/index.html (last visited July 27, 2005).

Disclosure of those portions of the OLC memorandum that contain unclassified, non-confidential factual information or final legal opinions regarding surveillance programs conducted at the direction of the President by the National Security Agency implicate an important public interest and fulfill an underlying purpose of the FOIA. The FOIA "was designed to expose operations of federal agencies to public scrutiny without endangering efficient administration, as means of deterring development and application of a body of secret law." *Providence Journal Co. v. United States Dep't of the Army*, 981 F.2d 552, 556 (1st Cir. 1992). I ask that you provide any releasable materials related to the Department's legal opinions on surveillance of individuals, including U.S. citizens, within the United States. It is critical, at this time in our history, for the American public to know and understand the motives and actions of the Government in the conduct of counter-terrorism operations, and particularly where such operations may infringe on the settled civil liberties guaranteed by the Constitution.

If you regard any of these documents as potentially exempt from the FOIA's disclosure requirements, I request that you nonetheless exercise your discretion to disclose them. As the FOIA requires, please release all reasonably segregable non-exempt portions of documents. To permit me to reach an intelligent and informed decision as to whether or not to file an administrative appeal of any denied material, please describe any withheld records (or portions thereof) and explain the basis for your exemption claims.

As you know, the National Security Archive qualifies for a waiver of search and review fees as a representative of the news media. This request is made as part of a scholarly and news research project and not for commercial use. For details on the Archive's research and publication activities, please see our Web site at the address above. Please notify me before incurring any photocopying costs over $100.

To expedite the release of the requested documents, please disclose them on an interim basis as they become available to you, without waiting until all the documents have been processed. If you have any questions regarding the identity of the records, their location, the scope of the request or any other matters, please call me at (202) 994-7219 or email at adairk@gwu.edu. I look forward to receiving your response within the twenty day statutory time period.

Sincerely yours,

Kristin Adair

An Independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act. Publication royalties and tax deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's Budget.

# The National Security Archive

**The George Washington University**
**Gelman Library, Suite 701**
**2130 H Street, N.W.**
**Washington, D.C. 20037**

**Phone: 202/994-7000**
**Fax: 202/994-7005**
**nsarchiv@gwu.edu**
**www.nsarchive.org**

January 9, 2006

To: Ms. Elizabeth Farris, Supervisory Paralegal, Office of Legal Counsel

From: Meredith Fuchs – National Security Archive
                    On behalf of Kristin Adair

RE: Addendum to Freedom of Information Act Request

**FOIA Number - 20051739DOJ025 – Faxed on 12/22/2005 (Attached)**

I would like to amend Kristin Adair's December 21, 2005 (Faxed on December 22, 2005) FOIA request to request expedited processing.

This FOIA request clearly meets the criteria for expedited processing under applicable provisions of the Freedom of Information Act, 5 U.S.C. § 552 (a)(E), as there exists a "compelling need" to review materials because the information is sought "by a person primarily engaged in disseminating information," and is "urgen[tly] [needed] to inform the public concerning actual or alleged Federal Government activity."

Please keep in mind that the documents requested are specifically and directly associated with an immediate current breaking news story of great general public interest whose focus involves questions regarding the government's integrity, namely the potentially extensive warrentless electronic surveillance activities undertaken within the United States, which affects public confidence. There has been widespread and sustained media coverage of this issue, effort by the President to provide additional information to the public and immediate congressional inquiry into the policies in question. Substantial privacy, free speech and free association concerns would be harmed by the failure to process this request immediately as the current controversy regards government domestic surveillance policy. There is a compelling need to review and release these documents as the current allegations of surveillance activity and the investigation into the legal authority for these actions are an immediate concern to the general public. The value of the information in these records will be lost if the information is not disseminated quickly. See generally 22 C.F.R. § 171.12. I certify that the statements contained in this letter regarding the alleged abuses and public concern are true and correct to the best of my knowledge.

I appreciate your consideration of this addendum and I look forward to your response. If you have any questions or concerns, please contact me at (202) 994-7059 or at mfuchs@gwu.edu.

Sincerely,

Meredith Fuchs
General Counsel

An Independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act. Publication royalties and tax deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's Budget.

EXHIBIT D
Bradbury Decl.

)
**In re: FOIA Litigation Seeking Federal Agency** )
  **Records Relating to the Terrorist** )
  **Surveillance Program** )
)

## REDACTED DECLARATION OF JOHN D. NEGROPONTE, DIRECTOR OF NATIONAL INTELLIGENCE

I, John D. Negroponte, do hereby state and declare as follows:

### (U) INTRODUCTION

1. **(U)** I am the Director of National Intelligence ("DNI") of the United States. I have held this position since April 21, 2005. From June 28, 2004, until appointed to be DNI, I served as United States Ambassador to Iraq. From September 18, 2001, until my appointment in Iraq, I served as the United States Permanent Representative to the United Nations. I have also served as Ambassador to Honduras (1981-1985), Mexico (1989-1993), the Philippines (1993-1996), and as Deputy Assistant to the President for National Security Affairs (1987-1989).

2. **(U)** In the course of my official duties, I have been advised of numerous requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, et seq., directed at various federal agencies seeking documents relating to the Terrorist Surveillance Program, ("TSP"), a controlled access signals intelligence program authorized by the President in response to the attacks of September 11, 2001. Specifically, I have been advised of FOIA requests made by the Electronic Privacy Information Center ("EPIC"), the American Civil Liberties Union ("ACLU"), the National Security Archive Fund ("NSAF"), the People for the American Way ("PFAW"), Judicial Watch, and the New York Times, as well of the lawsuits filed by each of those entities in federal district court challenging the responses made to the FOIA requests by various agencies of the United States Government, including the Department of Justice and its various components,

and the National Security Agency.  Although I understand that each of these parties' FOIA

requests may differ in their particulars, and that they are directed to different federal agencies or

components, I also understand that all of them seek, in one form or another, information relating

to the TSP.

      3.      **(U)**  The purpose of this declaration is to invoke and assert, in my capacity as the

Director of National Intelligence and head of the United States Intelligence Community, the

statutory authority created under the National Security Act of 1947, as amended by Section

102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act of 2004, to protect

intelligence information, sources, and methods.  <u>See</u> 50 U.S.C. § 403-1(i)(1) ("The Director of

National Intelligence shall protect intelligence sources and methods from unauthorized

disclosure").[1]  Disclosure of information that falls within the terms of this statutory protection

would cause exceptionally grave damage to the national security of the United States, and,

indeed, because each of the FOIA requests at issue relates to the TSP – which is itself a method

of intelligence-gathering – the risk is great that disclosure of the information requested would

compromise the effectiveness of intelligence sources and methods.

      4.      **(U)**  In this declaration, I explain, from the perspective of the Intelligence

Community, the significant harms that would be done to United States intelligence gathering in

the ongoing war against terror if documents that contain classified information about the TSP are

compelled to be disclosed.  Although the President publicly acknowledged the existence of the

TSP in December 2005, highly sensitive information about the TSP remains classified and

cannot be disclosed without causing exceptionally grave damage to U.S. national security.

---

[1]  Prior to the creation of the Office of the Director of National Intelligence, the Director of Central Intelligence exercised the Executive Branch's responsibility to protect this information.

5.      **REDACTED**

6.      **(U)** The statements made herein are based on my personal knowledge as well as on information provided to me in my official capacity as the Director of National Intelligence.

### (U) CLASSIFICATION OF DECLARATION

7.      **REDACTED**

8.      **REDACTED**

9.      **REDACTED**

10.     **REDACTED**

### (U) BACKGROUND ON DIRECTOR OF NATIONAL INTELLIGENCE

11.     **(U)** The position of Director of National Intelligence was created by Congress in the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. 108-458, §§ 1011(a) and 1097, 118 Stat. 3638, 3643-63, 3698-99 (2004) (amending sections 102 through 104 of Title I of the National Security Act of 1947). Subject to the authority, direction, and control of the President, the Director of National Intelligence serves as the head of the U.S. Intelligence Community and as the principal adviser to the President, the National Security Council, and the Homeland Security Council for intelligence matters related to the national security. *See* 50 U.S.C. § 403(b)(1), (2).

12.     **(U)** The United States "Intelligence Community" includes the Office of the Director of National Intelligence; the Central Intelligence Agency; the National Security Agency; the Defense Intelligence Agency; the National Geospatial-Intelligence Agency; the National Reconnaissance Office; other offices within the Department of Defense for the collection of specialized national intelligence through reconnaissance programs; the intelligence elements of the military services, the Federal Bureau of Investigation, the Department of the

Treasury, the Department of Energy, the Drug Enforcement Administration, and the Coast

Guard; the Bureau of Intelligence and Research of the Department of State; the elements of the

Department of Homeland Security concerned with the analysis of intelligence information; and

such other elements of any other department or agency as may be designated by the President, or

jointly designated by the DNI and heads of the department or agency concerned, as an element of

the Intelligence Community. See 50 U.S.C. § 401a(4).

13.    (U) The responsibilities and authorities of the Director of National Intelligence

are set forth in the National Security Act, as amended. See 50 U.S.C. § 403-1. These

responsibilities include ensuring that national intelligence is provided to the President, the heads

of the departments and agencies of the Executive Branch, the Chairman of the Joint Chiefs of

Staff and senior military commanders, and the Senate and House of Representatives and

committees thereof. 50 U.S.C. § 403-1(a)(1). The DNI is also charged with establishing the

objectives of, determining the requirements and priorities for, and managing and directing the

tasking, collection, analysis, production, and dissemination of national intelligence by elements

of the Intelligence Community. Id. § 403-1(f)(1)(A)(i) and (ii). The DNI is also responsible for

developing and determining, based on proposals submitted by the heads of agencies and

departments within the Intelligence Community, an annual consolidated budget for the National

Intelligence Program for presentation to the President, and for ensuring the effective execution of

the annual budget for intelligence and intelligence-related activities, and for managing and

allotting appropriations for the National Intelligence Program. Id. § 403-1(c)(1)-(5).

14.    (U) In addition, the National Security Act of 1947, as amended, provides that

"[t]he Director of National Intelligence shall protect intelligence sources and methods from

unauthorized disclosure." 50 U.S.C. § 403-1(i)(1). Consistent with this responsibility, the DNI

4

establishes and implements guidelines for the Intelligence Community for the classification of information under applicable law, Executive orders, or other Presidential directives and access to and dissemination of intelligence. Id. § 403-1(i)(2)(A), (B). In particular, the DNI is responsible for the establishment of uniform standards and procedures for the grant of access to Sensitive Compartmented Information to any officer or employee of any agency or department of the United States, and for ensuring the consistent implementation of those standards throughout such departments and agencies. Id. § 403-1(j)(1), (2).

15.    (U) By virtue of my position as the Director of National Intelligence, and unless otherwise directed by the President, I have access to all intelligence related to the national security that is collected by any department, agency, or other entity of the United States. Pursuant to Executive Order No. 12958, as amended by Executive Order 13292, the President has authorized me to exercise original TOP SECRET classification authority.

### (U) THE TERRORIST SURVEILLANCE PROGRAM

16.    (U) Following the September 11 attacks on the United States, the United States faced an urgent and immediate need for accurate intelligence regarding the threat posed by al Qaeda and affiliated terrorist groups. As a result, the President authorized signals intelligence activities designed to meet that need and to detect and prevent future terrorist attacks. The NSA is the component of the Intelligence Community that is responsible for signals intelligence activities, and the NSA utilizes various sources and methods, including the Terrorist Surveillance Program, to safeguard against the immediate threat of mass-casualty terrorist attacks within the United States. The TSP is critical to the national security of the United States.

17.    (U) The TSP is a targeted and focused program intended to help "connect the dots" between known and potential terrorists and their affiliates. In order to intercept a

5

communication under the TSP, one party to the communication must be located outside the United States and there must be a basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda. Thus, the TSP is an "early warning" system with one purpose: to detect and prevent another catastrophic attack on the United States.

18.    **REDACTED**

19.    **REDACTED**

20.    (**U**) Due to its extraordinary sensitivity, information relating to the TSP is currently classified as TOP SECRET under the standards set forth in Executive Order 12958, as amended. In particular, information relating to the TSP concerns "intelligence activities (including special activities), intelligence sources or methods, or cryptology," Exec. Order 12958, as amended, § 1.4(c); "foreign relations or foreign activities of the United States, including confidential sources"; id. § 1.4(d); "scientific, technological, or economic matters relating to the national security, which includes defense against transnational terrorism," id. § 1.4(e); and "vulnerability or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security, which includes defense against transnational terrorism," id. § 1.4(g), the disclosure of which "reasonably could be expected to cause exceptionally grave damage to the national security of the United States." Id. § 1.2(a)(1). Moreover, information relating to the TSP is also designated as "SCI" and is subject to special access and handling requirements necessary to maintain its strict confidentiality and prevent its unauthorized disclosure.

## (U) ASSERTION OF AUTHORITY
## TO PROTECT INTELLIGENCE SOURCES AND METHODS

21.    (**U**) For the reasons discussed in detail herein, I hereby invoke and assert the

statutory authority held by the Director of National Intelligence under the National Security Act

to protect intelligence sources and methods relating to the TSP.

22.    **(U)** In particular, TSP-related information that falls within my authority to protect

intelligence sources and methods falls within the categories described below:

    (1) **(U)** any classified intelligence information concerning the continuing threat to the United States posed by al Qaeda and its affiliates that forms the basis for the President's authorization and reauthorization of the TSP;

    (2) **(U)** any operational details concerning the technical methods by which the NSA intercepts communications under the TSP;

    (3) **REDACTED**

    (4) **REDACTED**

    (5) **REDACTED**

    (6) **REDACTED**

    (7) **(U)** any information that would reveal or tend to reveal whether someone is a target of surveillance under the TSP.

**(U)** Disclosure of information in each of these categories would compromise the effectiveness of

the sources and methods used by the U.S. Intelligence Community to combat the threat of

international terrorism and, thus, this information falls squarely within my authority to protect

intelligence sources and methods under the National Security Act, as amended. I describe below

each of those categories of information, and then describe the harm that would be caused by the

disclosure of that information.

23.    **REDACTED**

24.    **(U)** Thus, even the release of what appears to be the most innocuous information

about the TSP poses the substantial risk that our adversaries will be able to piece together

sensitive information about how the Program operates. For example, disclosing the dates on

which documents were created, the subjects of the documents, or the volume of documents maintained by agencies involved in the TSP has the potential to reveal information about the capabilities, scope and effectiveness of the Program, which would be utilized by the enemy to allow them to plan their terrorist activities more securely. Thus, in fulfilling my responsibility to protect intelligence sources and methods, I must exercise my statutory authority to protect a full spectrum of information concerning particular intelligence methods in any case where disclosure of such information could reasonably be expected to assist foreign intelligence services or hostile entities such as international terrorist organizations, to the detriment of the United States.

25.    (U) Because the information described in this declaration is critical to the continued successful operation of U.S. intelligence-gathering methods, and because its disclosure would cause exceptionally grave damage to the national security of the United States and render the nation more vulnerable to another terrorist attack, I fully support and defend any determination made to withhold information responsive to FOIA requests that seek the disclosure of classified information related to the TSP.

## (U) DESCRIPTION OF INFORMATION AND HARM FROM DISCLOSURE

26.    **REDACTED**

27.    (U) I also invoke my statutory authority to protect intelligence sources and methods from disclosure with respect to *information that would reveal or tend to reveal operational details concerning the technical methods by which NSA intercepts communications under the TSP.* Detailed knowledge of the methods and practice of the U.S. Intelligence Community agencies must be protected from disclosure because such knowledge would be of material assistance to those who would seek to penetrate, detect, prevent, or damage

the intelligence efforts of the United States, including efforts by this country to counter

international terrorism.

      28.    **REDACTED**

      29.    **REDACTED**

      30.    **REDACTED**

      31.    **REDACTED**

      32.    **REDACTED**

      33.    **REDACTED**

      34.    **REDACTED**

      35.    (**U**) Finally, I invoke my statutory authority to protect intelligence sources and

methods from disclosure with respect to ***information that would reveal or tend to reveal***

***whether a particular person is a target of surveillance***.  To confirm or deny whether any

individual has been the target of communications surveillance under the TSP would disclose

specifically, and in a more general sense, who is and is not being targeted—thus compromising

that collection and providing our adversaries clues regarding those individuals who may or may

not be available to be used as a secure means of communication.  Confirmation of a target's

identity would immediately disrupt the flow of accurate intelligence as the target takes steps to

evade detection or manipulate the information received.  Denying that any particular individual

is targeted also becomes unworkable, and itself revealing, in cases where an individual may,

indeed, be targeted.  A refusal to confirm or deny only in cases where surveillance is occurring,

of course, would effectively disclose and compromise that surveillance, and thus the

accumulation of these responses would reveal, more broadly, the method by which surveillance

under the TSP is conducted.  The only viable way for the Intelligence Community to protect this

intelligence collection mechanism, accordingly, is neither to confirm nor deny whether someone

has been targeted or subject to intelligence collection, regardless of whether the individual has

been targeted.  To say otherwise would result in the frequent, routine exposure of intelligence

information, sources, and methods and would severely undermine surveillance activities in

general, causing exceptionally grave harm to the national security of the United States.

### (U)  CONCLUSION

36.    **REDACTED**

37.    **(U)** For the foregoing reasons, I provide this declaration in my capacity as the

Director of National Intelligence to assert and invoke my statutory authority and responsibility to

protect from disclosure the intelligence information, sources, and methods implicated by the

FOIA requests for information related to the TSP.  Information of the type discussed in this

declaration cannot be disclosed without causing exceptionally grave damage to the national

security of the United States.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: _9/7/2006_

_____

JOHN D. NEGROPONTE
Director of National Intelligence

10

**U.S. Department of Justice**

Office of Legal Counsel

EXHIBIT E
Bradbury Decl.

_Washington, D.C. 20530_

March 8, 2006

Marcia Hofmann
Electronic Privacy Information Center
1718 Connecticut Ave., N.W.
Suite 200
Washington, DC   20009

Dear Ms. Hofmann:

    This is in partial response to your Freedom of Information Act request dated December 16, 2005.  We have completed our search of the unclassified files of the Office of Legal Counsel and have found a large number of documents that are responsive to your request.   Five documents are enclosed.  We are withholding the remaining documents pursuant to Exemption Five of the Act, 5 U.S.C. § 552 (b)(5).  The withheld documents are protected by the deliberative process, attorney-client and attorney workproduct privileges, and a small number of the documents are also protected by the presidential communications privilege.  The documents are not appropriate for discretionary release.  The documents will be identified in a _Vaughn_ index to be provided to you by March 20, 2006.  We have referred documents to the Office of Information and Privacy, which will be responding directly to you.

    Although I am aware that your request is the subject of litigation, I am required by statute and regulation to inform you that you have the right to file an administrative appeal.

Sincerely,

Paul P. Colborn
Special Counsel
Office of Legal Counsel

Enclosures

**U.S. Department of Justice**

Office of Legal Counsel

EXHIBIT F
Bradbury Decl.

_Washington, D.C. 20530_

March 8, 2006

Ann Beeson
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004-2400

Dear Ms. Beeson:

This is in partial response to your Freedom of Information Act request dated December 20, 2005. We have completed our search of the unclassified files of the Office of Legal Counsel and have found a large number of documents that are responsive to your request. Five documents are enclosed. We are withholding the remaining documents pursuant to Exemption Five of the Act, 5 U.S.C. § 552(b)(5). The withheld documents are protected by the deliberative process, attorney-client and attorney workproduct privileges, and a small number of the documents are also protected by the presidential communications privilege. The documents are not appropriate for discretionary release. We have referred documents to the Office of Information and Privacy, which will be responding directly to you.

Although I am aware that your request is the subject of litigation, I am required by statute and regulation to inform you that you have the right to file an administrative appeal.

Sincerely,

Paul P. Colborn
Special Counsel
Office of Legal Counsel

Enclosures

**U.S. Department of Justice**

Office of Legal Counsel

EXHIBIT G
Bradbury Decl.

*Washington, D.C. 20530*

March 8, 2006

Kristin Adair
The National Security Archive
The George Washington University
Gelman Library, Suite 701
2130 H Street, N.W.
Washington, DC   20037

Dear Ms. Adair:

This is in partial response to your Freedom of Information Act request dated December 21, 2005.  We have completed our search of the unclassified files of the Office of Legal Counsel and have identified no documents that are responsive to your request.

Although I am aware that your request is the subject of litigation, I am required by statute and regulation to inform you that you have the right to file an administrative appeal.

Sincerely,

*Paul P. Colborn*

Paul P. Colborn
Special Counsel
Office of Legal Counsel



**U.S. Department of Justice**

Office of Legal Counsel

EXHIBIT H
Bradbury Decl.

| | |
|---|---|
| Office of the Deputy Assistant Attorney General | Washington, D.C. 20530 |

July 21, 2006

Ms. Marcia Hofmann
Electronic Privacy Information Center, Inc.
1718 Connecticut Avenue, NW
Suite 200
Washington, DC 20009

Dear Ms. Hofmann:

  This is in further response to your Freedom of Information Act ("FOIA") request dated December 16, 2005. We have completed our search of the classified files of the Office of Legal Counsel ("OLC") and have found 158 agency records or categories of agency records responsive to your request. Seventy-nine of these records or categories of records have been referred to other agencies or to other components of the Department of Justice for processing and/or consultations. With respect to these referrals, we have been asked to advise you that 62 are classified and/or contain information that is of the type described in Section 6 of the National Security Act of 1959, Pub. L. No. 86-36, 73 Stat. 63, 64, codified at 50 U.S.C. § 402 note, or in Section 102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-l(i)(l). Accordingly, we have been asked to withhold these records or categories of records in full pursuant to Exemptions 1 and 3 of the FOIA, 5 U.S.C. § 552(b)(1), (3). We have also been asked to inform you that certain of these documents may also be subject to additional and overlapping exemptions, including but not limited to Exemption 2, *id.* § 552(b)(2), which protects documents relating to certain internal procedures; Exemption 5, *id.* § 552(b)(5), which protects documents subject to the deliberative process, attorney-client, attorney work product, and presidential communications privileges; and Exemption 7, *id.* § 552(b)(7), which protects certain law enforcement records. Our consultations with respect to the remaining seventeen records or categories of records are ongoing, and you will be advised when determinations are made.

  Of the remaining 79 records, we have identified two additional copies of the January 19, 2006, Department of Justice White Paper, entitled "Legal Authorities Supporting the Activities of the National Security Agency Described by the President," which has previously been released to you. We have also identified numerous copies of various drafts of the White Paper and various talking points, similar to those previously identified in our correspondence of March 20, 2006, and these documents are being withheld in full pursuant to Exemption 5 of the FOIA. Certain early drafts of these documents also contain information that is classified and that is subject to the statutory protections described above, and thus, these are also withheld under

-2-

Exemptions 1 and 3.

Additionally, a January 11, 2002, memorandum for the files is withheld pursuant to Exemption 5 because it contains information subject to the attorney-client and deliberative process privileges. Further, an October 23, 2001, memorandum from this Office to the Office of White House Counsel and another federal agency offering this Office's advice on a legal matter is also withheld pursuant to Exemption 5 because it contains information subject to the deliberative process privilege, the attorney-client privilege, and the presidential communications privilege.

The remaining responsive agency records or categories of records are currently and properly classified and, thus, are being withheld in full pursuant to Exemption 1 of the Act, 5 U.S.C. § 552(b)(l). Additionally, many of these documents contain information of the type described in Section 6 of the National Security Act of 1959, Pub. L. No. 86-36, 73 Stat. 63, 64, codified at 50 U.S.C. § 402 note, and/or Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-l(i)(l), and/or are protected by the deliberative process privilege, the attorney-client privilege, the presidential communications privilege, or the attorney work product doctrine. Thus, the documents subject to these protections are also being withheld pursuant to Exemptions 3 and 5 of the Act, 5 U.S.C. § 552(b)(3), (5).

Please be advised that we have also identified documents responsive to your request that are not agency records as defined in the Act. These documents are not provided.

Although I am aware that your request is the subject of litigation, I am required by statute and regulation to inform you that you have the right to file an administrative appeal.

Sincerely,

John A. Eisenberg
Deputy Assistant Attorney General



**U.S. Department of Justice**

Office of Legal Counsel

EXHIBIT I
Bradbury Decl.

---

Office of the Deputy Assistant Attorney General          Washington, D.C. 20530

July 21, 2006

Ms. Ann Beeson
Associate Legal Director
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004

Dear Ms. Beeson:

This is in further response to your Freedom of Information Act ("FOIA") request dated December 20, 2005. We have completed our search of the classified files of the Office of Legal Counsel ("OLC") and have found 158 agency records or categories of agency records responsive to your request. Seventy-nine of these records or categories of records have been referred to other agencies or to other components of the Department of Justice for processing and/or consultations. With respect to these referrals, we have been asked to advise you that 62 are classified and/or contain information that is of the type described in Section 6 of the National Security Act of 1959, Pub. L. No. 86-36, 73 Stat. 63, 64, codified at 50 U.S.C. § 402 note, or in Section 102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-l(i)(l). Accordingly, we have been asked to withhold these records or categories of records in full pursuant to Exemptions 1 and 3 of the FOIA, 5 U.S.C. § 552(b)(1), (3). We have also been asked to inform you that certain of these documents may also be subject to additional and overlapping exemptions, including but not limited to Exemption 2, *id.* § 552(b)(2), which protects documents relating to certain internal procedures; Exemption 5, *id.* § 552(b)(5), which protects documents subject to the deliberative process, attorney-client, attorney work product, and presidential communications privileges; and Exemption 7, *id.* § 552(b)(7), which protects certain law enforcement records. Our consultations with respect to the remaining seventeen records or categories of records are ongoing, and you will be advised when determinations are made.

Of the remaining 79 records or categories of records, we have identified two additional copies of the January 19, 2006, Department of Justice White Paper, entitled "Legal Authorities Supporting the Activities of the National Security Agency Described by the President," which has previously been released to you. We have also identified numerous copies of various drafts of the White Paper and various talking points, similar to those previously identified in our correspondence of March 20, 2006, and these documents are being withheld in full pursuant to Exemption 5 of the FOIA. Certain early drafts of these documents also contain information that is classified and that is subject to the statutory protections described above, and thus, these are

-2-

also withheld under Exemptions 1 and 3.

Additionally, a January 11, 2002, memorandum for the files is withheld pursuant to Exemption 5 because it contains information subject to the attorney-client and deliberative process privileges. Further, an October 23, 2001, memorandum from this Office to the Office of White House Counsel and another federal agency offering this Office's advice on a legal matter is also withheld pursuant to Exemption 5 because it contains information subject to the deliberative process privilege, the attorney-client privilege, and the presidential communications privilege.

The remaining responsive agency records or categories of records are currently and properly classified and, thus, are being withheld in full pursuant to Exemption 1 of the Act, 5 U.S.C. § 552(b)(l). Additionally, many of these documents contain information of the type described in Section 6 of the National Security Act of 1959, Pub. L. No. 86-36, 73 Stat. 63, 64, codified at 50 U.S.C. § 402 note, and/or Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-l(i)(l), and/or are protected by the deliberative process privilege, the attorney-client privilege, the presidential communications privilege, or the attorney work product doctrine. Thus, the documents subject to these protections are also being withheld pursuant to Exemptions 3 and 5 of the Act, 5 U.S.C. § 552(b)(3), (5).

The Office of the Deputy Attorney General has referred to this Office 30 agency records or categories of records responsive to your request. Twenty-one of these referrals are duplicative of documents already described above and are withheld for the same reasons. Of the remaining documents, seven consist of notes or mental impressions of an OLC attorney and thus are withheld pursuant to Exemption 5 on the grounds that they contain information protected by the deliberative process privilege, the attorney-client privilege, and the attorney work product doctrine. These referrals, moreover, contain information that is classified, and these documents are therefore also withheld under Exemption 1. The remaining two referrals are a May 30, 2003, memorandum from this Office to another federal agency offering this Office's opinion on a legal matter and a draft of that memorandum, both with handwritten marginalia by an OLC attorney. These referrals contain attorney client communications and material protected by the deliberative process privilege and thus are withheld under Exemption 5. Additionally, these documents contain information that is classified and are thus withheld under Exemption 1.

Please be advised that we have also identified documents responsive to your request that are not agency records as defined in the Act. These documents are not provided.

-3-

Although I am aware that your request is the subject of litigation, I am required by statute and regulation to inform you that you have the right to file an administrative appeal.

Sincerely,

*John A. Eisenberg*

John A. Eisenberg
Deputy Assistant Attorney General



**U.S. Department of Justice**

Office of Legal Counsel

EXHIBIT J
Bradbury Decl.

Office of the Deputy Assistant Attorney General                Washington, D.C. 20530

July 21, 2006

Ms. Kristen Adair
The National Security Archive
The George Washington University
Gelman Library, Suite 701
2130 H Street, N.W.
Washington, D.C. 20037

Dear Ms. Adair:

This is in further response to your Freedom of Information Act ("FOIA") request dated December 21, 2005, seeking final "memoranda, legal opinions, directives or instructions from the Attorney General, Assistant Attorney General, or the Office of Legal Counsel (OLC), issued between September 11, 2001 and December 21, 2005," relating to the Terrorist Surveillance Program, described by the President in his December 17, 2005, radio address. We have completed our search of the classified files of the Office of Legal Counsel ("OLC") and have found a small number of documents responsive to your request. These documents are classified and, thus, are being withheld in full pursuant to Exemption 1 of the FOIA, 5, U.S.C. § 552(b)(l). Additionally, these documents are protected by the deliberative process privilege, the attorney-client privilege, and/or the presidential communications privilege, and many of them contain information of the type described in Section 6 of the National Security Act of 1959, Pub. L. No. 86-36, 73 Stat. 63, 64, codified at 50 U.S.C. § 402 note, and/or in Section 102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-l(i)(l). Thus, these documents are also being withheld pursuant to Exemptions 3 and 5 of the FOIA, 5 U.S.C. §§ 552(b)(3), (5).

Please be advised that we have also identified documents responsive to your request that are not agency records as defined in the FOIA. These documents are not provided.

Although I am aware that your request is the subject of litigation, I am required by statute and regulation to inform you that you have the right to file an administrative appeal.

Sincerely,

*John A. Eisenberg*

John A. Eisenberg
Deputy Assistant Attorney General

EXHIBIT K
Bradbury Decl.

## INDEX OF RECORDS OR CATEGORIES OF RECORDS WITHHELD
## BY THE OFFICE OF LEGAL COUNSEL ("OLC")

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| OLC 1 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | OIPR | SAME as ODAG 28 & 30 |
| OLC 2 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | OIPR | |
| OLC 3 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | OIPR | |
| OLC 4 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | NSA | |
| OLC 5 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | | |
| OLC 6 | Draft | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 54-58 | | |
| OLC 7 | Talking Points | (b)(1) (b)(3) (b)(5) | ¶¶ 72-76 | | |
| OLC 8 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | NSA | |
| OLC 9 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | NSA | |
| OLC 10 | Notes | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | | |

---

* Because certain documents implicate the equities of more than one component or agency, the withholding of certain documents may be discussed in more than one declaration.

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| OLC 11 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | | |
| OLC 12 | | | | OIPR | |
| OLC 13 | | | | OIPR | |
| OLC 14 | | | | OIPR | |
| OLC 15 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | NSA | |
| OLC 16 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 62-68 | | SAME as ODAG 38 OIPR 1 & 2 are Drafts |
| OLC 17 | | | | NSA | |
| OLC 18 | Memo | (b)(3) (b)(5) | ¶¶ 54-58 | | SAME as OIPR 25 |
| OLC 19 | Notes | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 54-58 | | |
| OLC 20 | | | | OIPR | |
| OLC 21 | | | | OIPR | SAME as OIPR 79 |
| OLC 22 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | | SAME as ODAG 58 |
| OLC 23 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | | |
| OLC 24 | | | | NSA | |
| OLC 25 | | | | NSA | |
| OLC 26 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | NSA | |
| OLC 27 | Notes | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | | |

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| OLC 28 | Draft | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | | |
| OLC 29 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | NSA | |
| OLC 30 | | | | NSA | |
| OLC 31 | | | | NSA | |
| OLC 32 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | | |
| OLC 33 | | | | NSA | |
| OLC 34 | Notes | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 32-38 | | |
| OLC 35 | Letter | (b)(1) (b)(3) (b)(6) | ¶¶ 39-41 | | |
| OLC 36 | Letter Draft | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 39-41 | | |
| OLC 37 | Letter Draft Memo | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 39-41 | | SAME as ODAG 12 |
| OLC 38 | | | | NSA | |
| OLC 39 | | | | NSA | |
| OLC 40 | Draft Notes | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 66-68 | | |
| OLC 41 | Draft Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 66-68 | NSA | |

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| OLC 42 | Notes | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | |
| OLC 43 | Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 69-71 | NSA | |
| OLC 44 | | | | NSA | |
| OLC 45 | | | | NSA | |
| OLC 46 | Draft Talking Points | (b)(1) (b)(3) (b)(5) | ¶¶ 72-76 | | |
| OLC 47 | | | | NSA | |
| OLC 48 | | | | NSA | |
| OLC 49 | | | | NSA | |
| OLC 50 | | | | NSA | |
| OLC 51 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 39-41 | | |
| OLC 52 | | | | NSA | |
| OLC 53 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | |
| OLC 54 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as ODAG 1 & OIPR 28 |
| OLC 55 | Letter Memo | (b)(1) (b)(3) | ¶ 59 | | |
| OLC 56 | NOT AGENCY RECORD | | ¶ 77 | | |
| OLC 57 | NOT AGENCY RECORD | | ¶ 77 | | |
| OLC 58 | NOT AGENCY RECORD | | ¶ 77 | | |
| OLC 59 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as OIPR 29 |
| OLC 60 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | |

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| OLC 61 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | | |
| OLC 62 | Memo Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as ODAG 52 |
| OLC 63 | Memo Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 39-41 | | SAME as FBI 4 |
| OLC 64 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 39-41 | | SAME as FBI 5 |
| OLC 65 | Briefing Materials | (b)(1) (b)(3) (b)(5) | ¶¶ 72-76 | | |
| OLC 66 | Notes | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 54-58 | | |
| OLC 67 | Notes | (b)(1) (b)(3) (b)(5) | ¶¶ 32-38 | | |
| OLC 68 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | | |
| OLC 69 | Notes | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 54-58 | | |
| OLC 70 | | | | NSA | |
| OLC 71 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | NSA | |
| OLC 72 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | | SAME as ODAG 26 |
| OLC 73 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | | |

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| OLC 74 | Draft Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 32-38 | | |
| OLC 75 | Notes | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 42-47 | | |
| OLC 76 | Notes Draft Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 48-53 | | |
| OLC 77 | Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 69-71 | NSA | |
| OLC 78 | Draft Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 32-38, 48-53 | | |
| OLC 79 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | NSA | |
| OLC 80 | Briefing Materials | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 72-76 | | |
| OLC 81 | Briefing Materials | (b)(1) (b)(3) (b)(5) | ¶¶ 72-76 | | |
| OLC 82 | Briefing Materials | (b)(1) (b)(3) (b)(5) | ¶¶ 72-76 | | |
| OLC 83 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | |
| OLC 84 | Draft | (b)(5) | ¶¶ 72-76 | | |
| OLC 85 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | |

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| OLC 86 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | |
| OLC 87 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | |
| OLC 88 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | |
| OLC 89 | Notes | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | |
| OLC 90 | Notes | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | |
| OLC 91 | | | | OIPR | |
| OLC 92 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | OIPR | |
| OLC 93 | Draft Notes | (b)(1) (b)(3) (b)(5) | ¶¶ 32-38 | | SAME as ODAG 48 |
| OLC 94 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | OIPR | |
| OLC 95 | *INTENTIONALLY LEFT BLANK* | | | | |
| OLC 96 | | | | NSA | |
| OLC 97 | | | | NSA | |
| OLC 98 | | | | NSA | SAME as OIPR 57 |
| OLC 99 | | | | NSA | |
| OLC 100 | Notes | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 54-58 | | |
| OLC 101 | Draft Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 32-38 | | |

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| OLC 102 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | NSA | |
| OLC 103 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | NSA | |
| OLC 104 | Draft Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 54-58 | NSA | |
| OLC 105 | Duplicates of White Paper | NOT EXEMPT | ALREADY RELEASED | | |
| OLC 106 | Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 69-71 | NSA | |
| OLC 107 | Draft Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 48-53 | | |
| OLC 108 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | |
| OLC 109 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | | |
| OLC 110 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | OIPR | |
| OLC 111 | Notes | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 54-58 | | |
| OLC 112 | Draft Notes Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 54-58 | | |
| OLC 113 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as FBI 42 |

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| OLC 114 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 32-38 | | |
| OLC 115 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 32-38 | | SAME as ODAG 3 |
| OLC 116 | Drafts of White Paper | (b)(1) (b)(3) (b)(5) | ¶ 75 | | SAME as OIPR 60 |
| OLC 117 | Letter | (b)(1) (b)(3) | ¶ 76 | | SAME as FBI 18 |
| OLC 118 | Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 69-71 | NSA | |
| OLC 119 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | NSA | |
| OLC 120 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | NSA | |
| OLC 121 | Client Communication Notes | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | | |
| OLC 122 | Notes | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 54-58 | | |
| OLC 123 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | NSA | |
| OLC 124 | Letter Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | NSA | |
| OLC 125 | Briefing Materials | (b)(1) (b)(3) (b)(5) | ¶¶ 72-76 | | SAME as ODAG 41 |

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| OLC 126 | Brief Materials | (b)(1) (b)(3) (b)(5) | ¶¶ 72-76 | | |
| OLC 127 | | | | FBI | |
| OLC 128 | | | | OIPR | SAME as OIPR 12 |
| OLC 129 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as ODAG 6 |
| OLC 130 | Letter | (b)(1) (b)(3) | ¶ 59 | | SAME as ODAG 7 |
| OLC 131 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as ODAG 2, OIPR 37, & FBI 51 |
| OLC 132 | Memo Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as ODAG 5 |
| OLC 133 | Memo Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as ODAG 51 |
| OLC 134 | Talking Points | (b)(1) (b)(3) (b)(5) | ¶¶ 72-76 | | |
| OLC 135 | | | | NSA | |
| OLC 136 | Draft | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 54-58 | | |
| OLC 137 | Draft | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 54-58 | NSA | |
| OLC 138 | | | | OIPR | |
| OLC 139 | Notes | (b)(1) (b)(3) (b)(5) | ¶¶ 48-53 | | |
| OLC 140 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | NSA | |

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| OLC 141 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | NSA | |
| OLC 142 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | | |
| OLC 143 | Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 69-71 | NSA | |
| OLC 144 | Draft Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 48-53 | | |
| OLC 145 | Report | (b)(1) (b)(3) | ¶¶ 48-53 | | SAME as ODAG 16 |
| OLC 146 | Memo Client Communication | (b)(5) (b)(6) | ¶¶ 62-65 | | |
| OLC 147 | | | | NSA | |
| OLC 148 | | | | NSA | |
| OLC 149 | | | | NSA | |
| OLC 150 | | | | NSA | |
| OLC 151 | | | | NSA | |
| OLC 152 | | | | NSA | |
| OLC 153 - 199 | *INTENTIONALLY LEFT BLANK* | | | | |
| OLC 200 | Notes | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 48-53 | | |
| OLC 201 | Drafts of White Paper | (b)(5) | ¶ 75 | | |
| OLC 202 | Talking Points | (b)(1) (b)(3) (b)(5) | ¶¶ 72-76 | | |
| OLC 203 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | |

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| OLC 204 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | |
| OLC 205 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | |
| OLC 206 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | | |
| OLC 207 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 42-47 | | |
| OLC 208 | Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | | |
| **DOCUMENTS REFERRED BY ODAG** | | | | | |
| ODAG 1 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as OLC 54 |
| ODAG 2 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as OLC 131, FBI 51, & OIPR 37 |
| ODAG 3 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 39-41 | | SAME as OLC 115 |
| ODAG 5 | Memo Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as OLC 132 |
| ODAG 6 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as OLC 129 |
| ODAG 7 | Letter Memo | (b)(1) (b)(3) (b)(5) | ¶ 59 | | SAME as OLC 130 |
| ODAG 8 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | FINAL at OLC 59 |

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| ODAG 10 | Draft Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 32-38, 48-53 | | |
| ODAG 12 | Letter | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 42-47 | | SAME as OLC 37 |
| ODAG 15 | Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 48-53 | | |
| ODAG 16 | Client Communication Notes | (b)(1) (b)(3) (b)(5) | ¶¶ 48-53 | | SAME as OLC 145 |
| ODAG 17 | Draft Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 32-38, 48-53 | | |
| ODAG 18 | Draft Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 32-38, 48-53 | | |
| ODAG 19 | Draft Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 32-38, 48-53 | | |
| ODAG 21 | Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 69-71 | | |
| ODAG 22 | Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 69-71 | | |
| ODAG 23 | Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 48-53 | | |
| ODAG 24 | Draft Notes Client Communication | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 48-53 | | |
| ODAG 26 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | | SAME as OLC 72 |
| ODAG 28 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | | SAME as OLC 1 Also referred by ODAG to OIPR |

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| ODAG 30 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | | SAME as OLC 1 <br><br> Also referred by ODAG to OIPR |
| ODAG 33 | Notes | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 54-58 | | |
| ODAG 34 | Briefing Materials | (b)(1) (b)(3) (b)(5) | ¶¶ 72-76 | | SAME as OLC 80 |
| ODAG 38 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as OLC 16 <br><br> OIPR 1 & 2 are Drafts |
| ODAG 40 | Notes | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 39-41 | | |
| ODAG 41 | Briefing Materials | (b)(1) (b)(3) (b)(5) | ¶¶ 72-76 | | SAME as OLC 125 |
| ODAG 42 | Memo Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 32-38 | | |
| ODAG 43 | Notes | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | |
| ODAG 44 | Notes | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | |
| ODAG 45 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | Final at OLC 116 |
| ODAG 48 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 32-38 | | SAME as OLC 93 |
| ODAG 49 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | Final at OLC 54 |

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| ODAG 50 | Notes | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | |
| ODAG 51 | Notes | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | |
| ODAG 52 | Memo Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as OLC 62 |
| ODAG 53 | Draft Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | Final at ODAG 42 |
| ODAG 54 | Talking Points | (b)(1) (b)(3) (b)(5) | ¶¶ 72-76 | | SAME as OLC 46 |
| ODAG 58 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | | SAME as OLC 22 |
| ODAG 65 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 32-38 | | |
| **DOCUMENTS REFERRED BY OIPR** | | | | | |
| OIPR 1 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | Draft of OLC 16 & ODAG 38 |
| OIPR 2 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | Draft of OLC 16 & ODAG 38 |
| OIPR 13 | Talking Points | (b)(1) (b)(3) (b)(5) | ¶¶ 72-76 | | |
| OIPR 25 | Memo | (b)(3) (b)(5) | ¶¶ 54-58 | | SAME as OLC 18 |
| OIPR 27 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | | |
| OIPR 28 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as OLC 54 & ODAG 1 |

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| OIPR 29 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as OLC 59 |
| OIPR 30 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 31 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 32 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | Draft of OLC 54 |
| OIPR 33 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | Draft of OLC 54 |
| OIPR 34 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | Draft of OLC 54 |
| OIPR 35 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | Draft of OLC 54 |
| OIPR 36 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 37 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as OLC 131, FBI 51,and ODAG 2 |
| OIPR 38 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 41 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 43 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 45 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 46 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 47 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 48 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 49 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 50 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 51 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 52 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 55 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 60 | Draft of White Paper | (b)(5) | ¶ 75 | | SAME as OLC 116 |
| OIPR 71 | Internal Email | (b)(5) | ¶¶ 54-58 | | |
| OIPR 75 | Draft | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 69-71 | | |

16

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| OIPR 82 | Notes | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 66-68 | | |
| OIPR 85 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 86 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 87 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 88 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 89 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 90 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 91 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 92 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 93 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 94 | Internal Email | (b)(1) (b)(3) (b)(5) | ¶¶ 54-58 | | |
| OIPR 95 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 97 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 98 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 99 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 100 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 101 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 102 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 103 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 104 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 105 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 106 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 113 | DETERMINED TO BE NONRESPONSIVE | | | | |
| OIPR 129 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 69-71 | | |
| OIPR 137 | Briefing Materials | (b)(1) (b)(3) (b)(5) | ¶¶ 72-76 | | |
| OIPR 138 | Letter | (b)(1) (b)(3) (b)(5) | ¶¶ 39-41 | | |
| OIPR 139 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 39-41 | | |

| NO. | DOCUMENT TYPE | APPLICABLE EXEMPTION(S) | FOR JUSTIFICATION OF EXEMPTION, SEE DECLARATION OF STEVEN G. BRADBURY | SEE ALSO DECLARATION BY OTHER AGENCY OR COMPONENT* | DUPLICATE DOCUMENT |
|---|---|---|---|---|---|
| OIPR 140 | Letter | (b)(1) (b)(3) (b)(5) | ¶¶ 39-41 | | |
| OIPR 141 | Internal Email Notes | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 32-38 | | |
| OIPR 142 | Notes | (b)(1) (b)(3) (b)(5) (b)(6) | ¶¶ 66-68 | | |
| **DOCUMENTS REFERRED BY FBI** | | | | | |
| FBI 4 | Memo Client Communication | (b)(1) (b)(3) (b)(5) | ¶¶ 39-41 | | SAME as OLC 63 |
| FBI 5 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 39-41 | | SAME as OLC 64 |
| FBI 7 | Memo | (b)(1) (b)(3) | ¶¶ 32-38 | | |
| FBI 18 | Letter | (b)(1) (b)(3) | ¶ 76 | | SAME as OLC 117 |
| FBI 19 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | Draft of OLC 54 |
| FBI 42 | Memo | (b)(1) (b)(3) | ¶¶ 62-65 | | SAME as OLC 113 |
| FBI 51 | Memo | (b)(1) (b)(3) (b)(5) | ¶¶ 62-65 | | SAME as ODAG 2, OLC 131 & OIPR 37 |
| FBI 58 | Draft | (b)(1) (b)(3) (b)(5) | ¶¶ 66-68 | | Draft of OLC 54 |