UNCLASSIFIED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) | Civ. A. No. 06-CV-00096 (HHK) |
| AMERICAN CIVIL LIBERTIES UNION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) | Civ. A. No. 06-CV-00214 (HHK)<br><br>**CONSOLIDATED** |

## (U) REDACTED DECLARATION OF DAVID M. HARDY[1]

(U) I, David M. Hardy, declare as follows:

1.    (U) I am currently the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), at Federal Bureau of Investigation Headquarters ("FBIHQ") in Washington, D.C. I have held this position since August 1, 2002. Prior to joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of

---

[1] **REDACTED**

- 1 -

UNCLASSIFIED

Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy.  From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters.  I am also an attorney who has been licensed to practice law in the state of Texas since 1980.

2.      (U)  In my official capacity as Section Chief of RIDS, I supervise approximately 232 employees who staff a total of ten (10) Units and a field operational service center whose collective mission is to effectively plan, develop, direct and manage responses to requests for access to FBI records and information pursuant to the FOIA; Privacy Act; Executive Order 12958, as amended; Presidential, Attorney General and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives.

3.      (U)  My responsibilities also include the review of FBI information for classification purposes as mandated by Executive Order 12958, as amended by Executive Order 13292 (March 25, 2003),[2] and the preparation of declarations in support of Exemption 1 claims asserted under the FOIA.[3]  I have been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to Executive Order 12958, as amended, §§1.3 and 3.1.

4.      (U)  The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

5.      (U)  Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the

---

[2]  (U)  60 Fed. Reg. 19825 (1995) and 68 Fed. Reg. 15315 (2003).

[3]  (U)  5 U.S.C. § 552 (b)(1).

**UNCLASSIFIED**

provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically,

I am aware of the treatment which has been afforded the FOIA request of plaintiff, the American

Civil Liberties Union ("ACLU"), for access to FBIHQ records pertaining to the Terrorist

Surveillance Program ("TSP"). See **Exhibit A** (ACLU's FOIA request)."[4]

6.      **(U)** As a result of extensive search efforts at FBIHQ, numerous pages of

potentially responsive records were identified. After reviewing and processing these records,

which included the elimination of certain pages as either out of scope or not responsive, FBIHQ

made an interim release of 100 pages in full to plaintiff on March 24, 2006. An additional 156

pages were withheld in full pursuant to FOIA Exemption 5, 5 U.S.C. § 552 (b)(5). Additional

search efforts yielded an additional number of responsive records, which the FBI has withheld in

full pursuant to FOIA Exemptions 1, 2, 3, 5, 6, 7(A), 7(C), 7(D), and 7(E), 5 U.S.C. §§ 552 (b)(1),

(b)(2), (b)(3), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

7.      **(U)** This declaration will explain the procedures used to search for, review and

process the FBIHQ records responsive to plaintiff's FOIA request; will address those documents

which have been withheld in full or in part; and will provide a justification for the information

which has been withheld in these records pursuant to asserted FOIA Exemptions 1, 2, 3, 5, 6, 7(A),

7(C), 7(D) and 7(E). In reaching withholding determinations, the FBI has consulted with other

federal agencies and officials with regard to the harm to national security that would result from

disclosure of the documents identified in this declaration. Moreover, I have personally reviewed

the Declaration of John D. Negroponte, Director of National Intelligence ("Negroponte

Declaration"), which I am advised is being filed contemporaneously with this declaration, and

---

[4] **(U)** As of this date, the FBI has not received a FOIA request from either the Electronic Privacy Information Center or the National Security Archive Fund. As a result, this declaration will be addressing solely the FOIA request of plaintiff ACLU, as well as out-going and in-coming referrals of documents to and from other components of DOJ

- 3 -

**UNCLASSIFIED**

UNCLASSIFIED

which is provided in support of withholdings in all TSP-related FOIA matters, and have relied

upon Mr. Negroponte's expert assessment of the harm to the national intelligence program that

would result from disclosure of documents related to the TSP.

### (U) CLASSIFICATION OF DECLARATION

8.    **REDACTED**

9.    **REDACTED**

10.   **REDACTED**

11.   **REDACTED**

### (U) THE TERRORIST SURVEILLANCE PROGRAM ("TSP")

12.    **(U)** Following the September 11, 2001 attacks on the United States, the President

authorized the TSP in order to detect and prevent future terrorist attacks by al Qaeda and its

affiliates. Under the TSP, the NSA intercepts communications as to which it has reasonable

grounds to believe that: (1) one of the communicants is a member or agent of al Qaeda or an

affiliated terrorist organization; and (2) the communication being collected is to or from a foreign

country (i.e., a "one-end" foreign communication).

13.    **(U)** Due to its extraordinary sensitivity, information relating to the TSP is currently

classified as TOP SECRET under the standards set forth in E.O. 12958, as amended. In particular,

and as will be described in further detail infra, information relating to the TSP concerns

"intelligence activities (including special activities), intelligence sources or methods, or

cryptology," E.O. 12958, as amended, § 1.4(c); "scientific, technological, or economic matters

related to the national security, which includes defense against transnational terrorism," id., §

1.4(e); and "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans,

---

and/or other federal government agencies.

UNCLASSIFIED

UNCLASSIFIED

or protection services relating to the national security, which includes defense against international terrorism," id., § 1.4(g), the disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security of the United States. Id. § 1.2(a)(1).

14.    (U)  The President publicly acknowledged the existence of the TSP on December 17, 2005 during a radio address.  As the President has stated, however, details about the TSP remain highly classified and subject to special access restrictions under the criteria set forth in Executive Order 12958, as amended.  Unauthorized disclosure of information regarding the TSP can be expected to cause exceptionally grave damage to the national security of the United States. Thus, pursuant to the criteria outlined in Executive Order 12958, as amended, information related to the TSP is classified and, depending on the information, is usually subject to the special access and handling requirements reserved for "Sensitive Compartmented Information" ("SCI"), because it involves or derives from particularly sensitive intelligence sources and methods.

15.    (U)  Following the President's public acknowledgment of the TSP in December 2005, the Director of the FBI, during a February 2, 2006 hearing of the Senate Select Committee on Intelligence, publicly acknowledged the FBI's involvement in the TSP.  Specifically, FBI Director Mueller stated that the FBI "get[s] a number of leads from the NSA from a number of programs, including the program that's under discussion today. . . . And I can say that leads from that program have been valuable in identifying would-be terrorists in the United States, individuals who were providing material support to terrorists." Transcript at 51.

## HEADING REDACTED

16.    **REDACTED**

UNCLASSIFIED

17.    **REDACTED** [5]

18.    **REDACTED**

## (U) CRIMINAL MEDIA LEAK INVESTIGATION

19.    **REDACTED**

## (U) ADMINISTRATIVE AND LITIGATION HISTORY
## OF PLAINTIFF'S FOIA REQUEST

20.    **(U)** By letter dated December 20, 2005 directed to the FOIA/PA Mail Referral Unit of the Justice Management Division in DOJ -- which in turn forwarded a copy to FBIHQ on February 28, 2006 -- the ACLU seeks access through FOIA to "[a]ny Presidential order(s) authorizing the NSA to engage in warrantless electronic surveillance[ ] [not inclusive of surveillance authorized by 50 U.S.C. §§ 1802 or 1822(a)] and/or warrantless physical searches in the United States, created from September 11, 2001 to the present." In addition, ACLU seeks disclosure of documents related to presidential orders authorizing these practices, policies and procedures, the number of individuals subjected to the program, the types of communications captured by the program, the number of times the Attorney General has authorized warrantless electronic surveillance pursuant to 50 U.S.C. §§ 1802 or 1822(a), and periodic reauthorization of the program by President Bush. (See **Exhibit A**).

21.    **(U)** Plaintiff also requested expedited processing based on an "urgency to inform the public about an actual or alleged federal government activity" and indicated that the request was being made by "a person primarily engaged in disseminating information." 28 C.F.R. § 16.5(d)(1)(ii). In addition, plaintiff sought expedition on the basis that the information sought relates to "a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence. 28 C.F.R. § 16.5(d)(1)(iv). Although the FBI did not specifically make a determination as to ACLU's request for expedition pursuant to 28 C.F.R. § 16.5(d)(1)(ii), it has essentially treated plaintiff's request,

---

[5] **REDACTED**

which was already part of pending district court litigation, in an expeditious manner. (See **Exhibit A**).

22.     (U) One day following receipt of the request from DOJ, on March 1, 2006, RIDS personnel initiated a search of the FBI's Central Records System to identify potentially responsive documents. As a result, March 1, 2006 became the search cut-off date for the identification of responsive records. In addition, RMD sent an Electronic Communication ("EC") dated March 2, 2006, with a four-day deadline, to those Divisions and Offices at FBIHQ most likely to have responsive records – the Director's Office, the Office of the General Counsel ("OGC"), the Counterterrorism Division ("CTD"), the Office of Public Affairs ("OPA") and the Office of Congressional Affairs ("OCA").

23.     (U) This initial search effort resulted in the identification of 257 pages in OCA. In a letter to the ACLU dated March 24, 2006, the FBI notified the ACLU that 257 pages had been reviewed and 100 pages were being released in full; and that an additional 156 pages had been withheld in full pursuant to Exemption 5. Finally, the FBI advised that one document had been referred to the Office of Legislative Affairs ("OLA") at DOJ for consultation. (See **Exhibit B**).

24.     (U) The FBI continued its search efforts following this initial release, which included an additional EC dated June 23, 2006, requesting that the Director's Office, OGC, OPA, OCA, CTD, the Counterintelligence Division ("CID") and the Inspection Division ("INSD") also search for and produce potentially responsive documents, particularly those documents which would not otherwise be serialized and/or indexed in the Central Records System, including internal e-mail traffic.

25.     (U) By letter dated July 21, 2006, the FBI notified plaintiff that it had identified an additional number of documents responsive to its request as a result of searches conducted in the Office of the Director, OGC and CTD, but which the FBI is withholding in full pursuant to FOIA Exemptions 1, 2, 3, 5, 6, 7(A), 7(C), 7(D), 7(E) and 7(F).[6] In addition, the FBI advised that it was

---

[6] (U) Although Exemption 3 was also asserted in the July 21, 2006 letter, to include Section 102A(i)(I) of the

in the process of consulting with other DOJ components and/or other federal agencies with equities in the identified documents and would advise plaintiff of the outcome upon completion of those consultations. Finally, the FBI advised that other DOJ components, including the Office of Intelligence Policy and Review ("OIPR"), Office of the Deputy Attorney General ("ODAG") and Office of the Legal Counsel ("OLC") had referred certain documents to the FBI for consultation, and that the FBI would advise those components how to process the FBI-originated information. (See **Exhibit C**).

### (U) <u>EXPLANATION OF THE FBI'S CENTRAL RECORDS SYSTEM</u>

26.     **(U)** The Central Records System ("CRS"), which is utilized by the FBI to conduct searches in response to FOIA and Privacy Act requests, enables it to maintain all information which it has acquired in the course of fulfilling its mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter or program. Certain records in the CRS are maintained at FBIHQ. Records that are pertinent to specific field offices of the FBI are maintained in those field offices.

27.     **(U)** Access to the CRS is obtained through the General Indices, which are arranged in alphabetical order. The General Indices consist of index cards on various subject matters that are searched either manually or through the automated indices. The entries in the General Indices fall into two categories:

> (a) **(U)** A "main" entry -- A "main" entry, or "main" file, carries the name corresponding with a subject of a file contained in the CRS.
>
> (b) **(U)** A "reference" entry --"Reference" entries, sometimes called "cross-references," are generally only a mere mention or reference to an individual,

---

Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-1(i)(1), the FBI's narrative discussion inadvertently failed to include a discussion of that exemption.

organization, or other subject matter, contained in a document located in another "main" file on a different subject matter.

28.    **(U)** Access to the CRS files in FBI field offices is also obtained through the General Indices (automated and manual), which are likewise arranged in alphabetical order, and consist of an index on various subjects, including the names of individuals and organizations. Searches made in the General Indices to locate records concerning a particular subject are made by searching the subject requested in the index. FBI field offices have automated indexing functions.

29.    **(U)** On or about October 16, 1995, the Automated Case Support ("ACS") system was implemented for all Field Offices, Legal Attaches ("Legats"), and FBIHQ. Over 105 million records were converted from automated systems previously utilized by the FBI. The ACS consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases:

(a) **(U)** Investigative Case Management ("ICM") – ICM provides the ability to open, assign, and close investigative and administrative cases as well as set, assign, and track leads. The Office of Origin ("OO"), which sets leads for itself and other field offices, as needed, opens a case. The field offices that receive leads from the OO are referred to as Lead Offices ("LOs") – formerly known as Auxiliary Offices. When a case is opened, it is assigned a Universal Case File Number ("UCFN"), which is utilized by all FBI field offices, Legats, and FBIHQ that are conducting or assisting in the investigation. Using a fictitious file number "111-HQ-12345" as an example, an explanation of the UCFN is as follows: "111" indicates the classification for the specific type of investigation; "HQ" is the abbreviated form used for the OO of the investigation, which in this case is FBIHQ; and "12345" denotes the individual case file number for the particular investigation.

(b) **(U)** Electronic Case File ("ECF") – ECF serves as the central electronic repository for the FBI's official text-based documents. ECF supports the universal serial concept, in that only the creator of a document serializes it into a file. This provides a single-source entry of serials into the computerized ECF system. All original serials are maintained in the OO case file.

(c) **(U)**  Universal Index ("UNI") – UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases. Only the OO is required to index; however, the LOs may index additional information as needed. UNI, an index of approximately 95 million records, functions to index names to cases, and to search names and cases for use in FBI investigations. Names of individuals or organizations are recorded with identifying applicable information such as date or place of birth, race, sex, locality, Social Security number, address, and/or date of event.

30.  **(U)**  The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the FBI Special Agent ("SA") assigned to work on the investigation, the Supervisory SA ("SSA") in the field office conducting the investigation, and the SSA at FBIHQ. The FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this enormous amount of data, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter or individual.

## **(U)  SEARCHES FOR RECORDS RESPONSIVE TO PLAINTIFF'S REQUEST**

31.  **(U)**  The FBI's search efforts were discussed in detail supra. An initial problem associated with identifying responsive documents is the generalized and broad-ranging nature of plaintiff's FOIA request as it relates to the TSP, which does not lend itself naturally to the standard CRS searches that the FBI typically conducts in response to specific requests for FBI investigative files. This is particularly the case when the subject matter of the request is relatively recent, and many of the records which were ultimately identified as responsive have not yet been indexed to the CRS. Nevertheless, through RIDS ECs, which requested particular FBIHQ Divisions and

UNCLASSIFIED

Offices to search for potentially responsive documents, combined with an individualized inquiry of those FBIHQ employees most likely to possess potentially responsive records, the FBI was able to obtain a set of documents which have ultimately been deemed to be responsive to plaintiff's request.

32.    **REDACTED** [7]

## (U) CATEGORIES OF RECORDS RESPONSIVE TO PLAINTIFF'S REQUEST

33.    **(U)** The responsive documents as a whole are best described as falling into the following general categories:

        (a) **REDACTED**

        (b) **REDACTED**

        (c) **REDACTED** [8,9,10]

        (d) **REDACTED**

        (e) **REDACTED**

        (f) **REDACTED**

        (g) **REDACTED**

        (h) **REDACTED**

        (i) **REDACTED**

## (U) SUMMARY OF JUSTIFICATION CATEGORIES

34.    **(U)** Listed below are the categories used to explain the FOIA exemptions asserted to withhold protected material.

---

[7] **(U)** An additional approximately 127 non-serialized documents were identified by the FBI as containing equities of other DOJ components and/or other federal government agencies and were therefore referred appropriately; see ¶¶ 140-148, infra, for a more detailed discussion of these referrals.

[8] **REDACTED**

[9] **REDACTED**

[10] **REDACTED**

- 11 -

UNCLASSIFIED

UNCLASSIFIED

| CLASSIFICATION MARKING | FOIA CATEGORY | FOIA CATEGORY DESCRIPTION |
|---|---|---|
| (U) | Category (b)(1) | **Classified Information** |
| (U) | Category (b)(2) | **Internal Agency Rules and Practices** |
| **REDACTED** | | • **REDACTED** |
| (U) | | • Internal FBI Business Telephone, Fax and Pager Numbers (Cited in conjunction with (b)(6) and (b)(7)(C)) |
| (U) | Category (b)(3) | **Information Protected by Other Statutes** |
| **REDACTED** | | • **REDACTED** |
| (U) | | • Intelligence Sources and Methods Based On DNI Statute |
| (U) | Category (b)(5) | **Deliberative Process, Attorney/Client and Work Product Privileges** |
| (U) | | • Deliberative Process Privilege |
| (U) | | • Attorney/Client Privilege |
| (U) | | • Attorney Work Product |
| (U) | Category (b)(6) | **Clearly Unwarranted Invasion of Personal Privacy** |
| (U) | | • Names and/or Identifying Information Concerning FBI Special Agents and FBI Support Personnel |
| (U) | | • Names and/or Identifying Information Concerning Other Federal Government Employees |
| (U) | | • Names and/or Identifying Information Concerning Third Parties of Investigative Interest |
| (U) | | • Names and/or Identifying Information Concerning Third Parties Interviewed |
| (U) | | • Names and/or Identifying Information Concerning Third Parties who are Merely Mentioned in FBI Records |
| (U) | Category (b)(7)(A) | **Pending Law Enforcement Investigation** |
| (U) | | • Information Which if Disclosed Would Interfere with the Ongoing Active FBI and DOJ Criminal Investigation of the Unauthorized Disclosure of Classified Information Concerning the TSP |
| (U) | Category (b)(7)(C) | **Unwarranted Invasion of Personal Privacy** |
| (U) | | • Names and/or Identifying Information Concerning FBI Special Agents and FBI |

UNCLASSIFIED

UNCLASSIFIED

| (U) | | Support Personnel |
|-----|-----|-----|
| (U) | | • Names and/or Identifying Information Concerning Other Federal Government Employees |
| (U) | | • Names and/or Identifying Information Concerning Third Parties of Investigative Interest |
| (U) | | • Names and/or Identifying Information Concerning Third Parties Interviewed |
| (U) | | • Names and/or Identifying Information Concerning Third Parties who are Merely Mentioned in FBI records |
| (U) | Category (b)(7)(D) | **Confidential Source Information** |
| | | • Names and/or Identifying Information Provided By Individuals Under an "Express" Assurance of Confidentiality |
| (U) | | • Names and/or Identifying Information Provided By Individuals Under an "Implied" Assurance of Confidentiality |
| (U) | Category (b)(7)(E) | **Investigative Techniques and Procedures** |
| **REDACTED** | | • **REDACTED** |

## (U) APPLICATION OF FOIA EXEMPTION (b)(1) AND E.O. 12958, AS AMENDED

35.   **(U)** The FBI's analysis of the withholding of classified information contained in its

records in a FOIA context is based on the standards articulated in the FOIA statute, 5 U.S.C. § 552

(b)(1). Exemption 1 protects from disclosure those records that are "(A) specifically authorized

under criteria established by an Executive Order to be kept Secret in the interest of national

defense or foreign policy; and (B) are in fact properly classified pursuant to such Executive

Order."

36.   **(U)** The FBI's analysis of whether Exemption 1 permits the withholding of agency

records consists of two significant steps. First, the FBI must determine whether the information

contained in the records is information that satisfies the substantive and procedural criteria of the

applicable Executive Order governing the classification and protection of national security

- 13 -

UNCLASSIFIED

UNCLASSIFIED

information. And second, the FBI has to analyze whether the documents are exempt under FOIA Exemption 1.

37.    **(U)** First therefore, I must determine whether the information in these records is information that satisfies the requirements of the current Executive Order which governs the classification and protection of information that affects the national security.[11]  I must further ensure that the information at issue complies with the various substantive and procedural criteria of the current Executive Order, E.O. 12958, as amended. The current Executive Order that applies to the protection of national security information was amended on March 25, 2003. I am bound by the requirements of E.O. 12958, as amended, when making classification determinations.

38.    **(U)** For information to be properly classified, and thus properly withheld from disclosure pursuant to Exemption 1, the information must meet the requirements set forth in E.O. 12958, as amended, § 1.1 (a):

(a)    **(U)** an original classification authority is classifying the information;

(b)    **(U)** the information is owned by, produced by or for, or is under the control of the United States Government;

(c)    **(U)** the information falls within one or more of the categories of information listed in § 1.4 of this order; and

(d)    **(U)** the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

---

[11] **(U)** Section 6.1 (y) of E.O. 12958, as amended, defines "National Security" as "the national defense or foreign relations of the United States."

- 14 -

UNCLASSIFIED

UNCLASSIFIED

### (U) FINDINGS OF DECLARANT

39.    **REDACTED** [12]

40.    **(U)** In conjunction with consultations with the NSA, as well as based on the classification determinations reflected in the Negroponte Declaration, the FBI has determined that the information at issue warrants continued classification at the Top Secret level pursuant to E.O. 12958, as amended, §§1.4 (c), (e) and (g).

41.    **REDACTED**

42.    **REDACTED**

### HEADING REDACTED

43.    **REDACTED**

### (U) INTELLIGENCE ACTIVITIES, SOURCES AND METHODS

44.    **(U)** E.O. 12958, as amended, § 1.4 (c), exempts from disclosure information which concerns "intelligence activities (including special activities), intelligence sources and methods, or cryptology . . . ." The information withheld consists of intelligence activities and methods utilized by the FBI for gathering intelligence data. "Intelligence activity or method" includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest. "Intelligence method" is used to indicate any procedure (human or non-human) utilized to obtain information concerning such individual or organization. An intelligence activity or method has two characteristics. First, the intelligence activity or method, and information generated by it, is needed by the U.S. Intelligence/Counterintelligence agencies to carry out their missions. Second, confidentiality must be maintained with respect to the activity or method if the viability, productivity and

---

[12] (U) See E.O. 12958, as amended, § 1.2(a)(1).

UNCLASSIFIED

UNCLASSIFIED

usefulness of the activity or method are to be preserved.

45.    **REDACTED**

(a) and (b) **REDACTED**

(c) **REDACTED**

(d) **REDACTED**

(e) **REDACTED**

(f) **REDACTED**

(g) **REDACTED**

(h) **REDACTED**

(i) **REDACTED**

## HEADING REDACTED

46.    **REDACTED**

47.    **REDACTED**

48.    **REDACTED**

49.    **REDACTED**

## HEADING REDACTED

50.    **REDACTED**

## (U) DEFENDANT'S BURDEN OF ESTABLISHING EXEMPTION (b)(1) CLAIMS

51.    **(U)** The classified information withheld in this case pursuant to Exemption 1 has

been examined in light of the body of information available to me concerning the national defense

of the United States. Based upon my personal review of the In Camera, Ex Parte Negroponte

Declaration, also filed in this litigation, I understand that United States intelligence-gathering

efforts in the ongoing war against terror would be significantly harmed if documents that contain

- 16 -

UNCLASSIFIED

UNCLASSIFIED

classified information about the TSP are compelled to be disclosed.  Although the President

acknowledged the existence of the TSP in December 2005, highly sensitive information about the

TSP remains classified and cannot be disclosed without causing exceptionally grave damage to

U.S. national security.  This information was not examined in isolation.  Rather, particular efforts

were made to evaluate each piece of information and what impact disclosure could have on other

sensitive information contained elsewhere in the United States Intelligence Community's files.

Equal consideration was given to the impact that other information, either in the public domain or

likely known or suspected by present or potential adversaries of the United States, would have

upon the information.  As a result, in conjunction with consultations with the NSA, as well as

based on the classification determinations reflected in the Negroponte Declaration, the FBI has

determined that the information at issue warrants continued classification at the Top Secret level

pursuant to E.O. 12958, as amended, §§1.4 (c), (e) and (g).

     52.    **(U)**  In those instances where in my judgment or in the judgment of the appropriate

classification authority disclosure of this information could reasonably be expected to cause

exceptionally grave damage to the national security, and/or grave damage to the national security,

and its withholding outweighed the benefit of disclosure, that information has been designated

classified in the interest of national security at either the "TOP SECRET" or "SECRET" level, and

the FBI has invoked FOIA Exemption 1 to prevent its disclosure.  Likewise, the justifications for

the withheld classified information were prepared with the intent that they be read with

consideration given to the context in which the classified information is found.  This context

includes not only the surrounding classified information but also other information already in the

public domain, as well as information likely known or suspected by other hostile intelligence

entities.

UNCLASSIFIED

UNCLASSIFIED

53.    **REDACTED**

### (U)  FOIA EXEMPTION (b)(2)
### INTERNAL AGENCY RULES AND PRACTICES

54.    **(U)**  5 U.S.C. § 552 (b)(2) exempts from disclosure information "related solely to

the internal personnel rules and practices of an agency."  This exemption encompasses two distinct

categories of records that are internal in nature:  those involving trivial administrative matters of

no genuine public interest ("Low 2") and those, the disclosure of which would risk circumvention

of a statute or regulation ("High 2").  In this case, disclosure of "High 2" information would

impede the effectiveness of the internal law enforcement procedures of the FBI and the

intelligence-gathering procedures of the FBI's fellow intelligence agencies as it engages in

counterterrorism activities.  Disclosure of this information could impede the effectiveness of the

FBI's internal operational and law enforcement support procedures, and its intelligence

information-gathering and cooperation with the NSA.

<div align="center">

**(b)(2)**          **Heading Redacted**

</div>

55.    **REDACTED**

56.    **(U)** *Rationale for Withholding Information:*

   (a)    **REDACTED**

   (b)    **REDACTED**

   (c)    **REDACTED**

57.    **REDACTED**

**(U) (b)(2)**    **Internal Business Telephone, Fax and Pager Numbers**

58.    **(U)**  Exemption (b)(2) has been asserted in conjunction with Exemptions (b)(6) and

(b)(7)(C) to protect the business telephone numbers, fax and pager numbers appearing in

UNCLASSIFIED

documents as they relate to FBI Special Agents, FBI support employees, other federal government personnel. Telephone, fax and pager numbers relate to the internal practices of the FBI, and as applicable, to the internal practices of other federal agencies, in that they are tools utilized by personnel in the performance of their jobs. Disclosure of this information could subject these individuals to harassing contacts (via telephone, fax or pager) which could disrupt official business, including impeding government personnel from conducting and concluding intelligence and law enforcement matters in a timely manner. In this case, the context in which this information is located – i.e., classified and highly sensitive documents – as well as the connection of this information to the TSP, heightens the sensitivity of this information, thereby mandating its protection pursuant to Exemptions 2, 6 and 7(C). Moreover, disclosure of routine internal administrative information such as telephone, fax and pager numbers serves no public benefit, and there is no indication that there is a genuine public interest in the disclosure of this information. Accordingly, because this internal information is related solely to the internal practices of the FBI and other federal government agencies, because disclosure would not serve any public interest, and because disclosure would impede the effectiveness of government personnel, this information has been properly withheld pursuant to Exemption (b)(2) in, but not limited to, the following non-serialized documents: *FBI 98-100, 102, 104, 107, 108, 113, 116, 117, 124, 131-133, 135-140, 142-145, 147-149, 157-159, 161-165, 167, 171, 172, 185, 186, 198-211, 214-220, 225-230, 236-238, 241-246, 254-256, 263, 265, 266, 268, 278-280, 306 and 307.*

59.    **REDACTED**

### (U) EXEMPTION (b)(3)
### STATUTORY EXEMPTIONS

60.    (U) Exemption 3, 5 U.S.C. § 552 (b)(3), permits an agency to withhold from

UNCLASSIFIED

disclosure information which is:

> specifically exempted from disclosure by statute . .  provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

61.    **REDACTED**

(U)    **Intelligence Sources and Methods Based On DNI Statute**

62.    **REDACTED**:

(a) **(U)**  Any classified intelligence information concerning the continuing threat to the United States posed by al Qaeda and its affiliates that forms the basis for the President's authorization and reauthorization of the TSP;

(b) **(U)**  Any operational details concerning the technical methods by which the NSA intercepts communications under the TSP;

(c) **REDACTED**;

(d) **REDACTED**;

(e) **REDACTED**;

(f) **(U)**  Any information that would reveal or tend to reveal whether a particular person is a target of surveillance under the TSP.

**(U)  EXEMPTION (b)(5)**
**DELIBERATIVE PROCESS, ATTORNEY/CLIENT**
**AND WORK PRODUCT PRIVILEGES**

63.    **(U)**  Exemption 5, 5 U.S.C. § 552 (b)(5), allows the FBI to protect information contained in "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." This exemption has been construed to exempt those documents or information normally privileged in the civil discovery

- 20 -

UNCLASSIFIED

context, including, as is the case here, the deliberative process privilege and the attorney-client privilege. This exemption is being asserted for various internal e-mails, draft documents, notes, deliberative internal memoranda and internal reports.

### (U) Deliberative Process Privilege

64.    **(U)** The deliberative process privilege protects the internal deliberations of an agency by exempting from release recommendations, analyses, speculation and other non-factual information prepared in anticipation of agency decision-making. The general purpose of the deliberative process privilege is to prevent injury to the quality of agency decisions. Thus, material that contains or was prepared in connection with the formulation of opinions, advice, evaluations, deliberations, policy formulation, proposals, conclusions or recommendations may properly be withheld. Release of this type of information would have an inhibitive effect upon the development of policy and administrative direction of an agency because it would chill the full and frank discussion among agency personnel regarding a decision. If agency personnel knew that their preliminary opinions, evaluations and comments would be released for public consumption, they may be more circumspect in what they put in writing, and thereby impede a candid discussion of the issues surrounding a decision.

65.    **(U)** To invoke the deliberative process privilege, an agency must show that an allegedly exempt document is both (a) "predecisional" – antecedent to the adoption of agency policy; and the agency must also identify the agency decision or policy to which the document contributed or identify a decision-making process to which a document contributed; and (b) "deliberative" – a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters, reflects the give and take of the consultative process, and bears on the formulation or exercise of agency policy-oriented judgment. Furthermore, an agency must identify the role of a contested document in a specific deliberative process.

66.    **REDACTED**

67.    **(U)** *Rationale for Withholding:*

- 21 -

UNCLASSIFIED

      (a)    **(U)** As a whole, the redactions taken pursuant to Exemption 5, the deliberative process privilege, reflect an internal, on-going dialogue among and between FBI personnel, DOJ personnel, and other federal agency personnel, including NSA and other Intelligence Community personnel, with regard to the operation of the TSP, the operational and investigative information which the FBI derives from the program, and how the FBI can most effectively use information derived from the TSP in its law enforcement efforts. This internal dialogue is reflected in numerous e-mail trails, in draft, predecisional documents (many of which contain handwritten notations), and in internal recommendations for the FBI Director. This dialogue is both (a) "predecisional" – antecedent to the adoption of agency policy – (which in this case is set by DOJ as the agency); and "deliberative" – the numerous drafts and numerous e-mail trails and exchanges reflect a continuous set of deliberations, give and take of the consultative process, with regard to the shaping and finalizing of agency decision-making. All of the material withheld pursuant to Exemption (b)(5) reflects a fluid, continuous and on-going deliberative set of discussions among decision makers and contributors to the TSP dialogue, and the role the FBI and other federal agencies play in this significant national security initiative.

      (b)    **(U)** This material is both pre-decisional and deliberative. It reflects the thinking of individuals, rather than adopted policy of the FBI. E-mail communications, for example, serve as a way for individual FBI employees to communicate with each other about current matters without having to leave their offices. These "discussions," which are memorialized electronically, are part of the critical exchange of ideas and suggestions that accompanies all decision making and typically reflect very preliminary assessments by FBI personnel about issues on which they may be asked to make recommendations. Before the advent of computers, these discussions probably would have occurred only orally, with no record of their existence being maintained. The fact that these discussions are now recorded should not obscure the fact that that they are simply conversations among and between FBI personnel, and, in some instances, with other federal government employees, as the situation requires. These discussions

- 22 -

UNCLASSIFIED

UNCLASSIFIED

are part of the core give and take of agency deliberations. If these kinds of documents are routinely released to the public, FBI employees will be much more circumspect in their online discussions with each other. This lack of candor will seriously impair the FBI's ability to foster the forthright, internal discussions necessary for efficient and proper decision-making. Furthermore, exempting such documents and information from disclosure also protects against public confusion that might result from disclosure of preliminary information and opinions that do not, in fact, reflect the final views or policies of the FBI, and of DOJ. The deliberative process privilege is designed to protect not only documents and information but also the integrity of the deliberative process itself where exposure of the process would result in harm.

(c)    (U) These protected deliberations form an integral part of the decision-making process regarding the development of operational procedures and policy, a dialogue regarding procedures and policies, which, as the documents reflect, continue to change over time. These deliberations and dialogue continue to the present day. The FBI has appropriately asserted Exemption 5, the deliberative process privilege, to protect these candid internal discussions concerning these evolving policies and procedures. The release of the redacted information is likely to chill full, frank, and open internal discussions -- a chilling effect which is all the more dangerous given the important national security interests at stake. I have determined that the redacted material in non-serialized documents, including, but not limited to: *FBI 1, 9-13, 15, 20-22, 24-28, 30, 31, 45, 49, 54-57, 60-113, 116-172, 180-284, 286-298 and 300*, consists of material which is deliberative and has been withheld appropriately pursuant to Exemption 5.

68.    **REDACTED**

(U) **(b)(5)**        **Attorney/Client Communications Privilege**

69.    (U) The attorney-client communications privilege is appropriately asserted when legal advice of any kind is sought, from a professional legal adviser in his or her capacity as such; the communications relating to that purpose are made in confidence by the client; and are, at the

UNCLASSIFIED

client's instance, permanently protected from disclosure by the client or by the legal adviser unless the attorney-client protection is waived. This privilege encompasses confidential communications made to the attorney not only by decision-making personnel but also by lower-echelon employees who possess information relevant to an attorney's advice-rendering function. In addition, the attorney-client privilege covers the two-way communications between a client and an attorney, which relate to legal advice.

70.    (U) Certain of the material which the FBI has withheld in full pursuant to Exemption 5, the attorney-client privilege, contains client-supplied information:

71.    **REDACTED**

72.    (U) *Rationale for Withholding:* These documents consist of numerous internal e-mail trails among and between FBI attorneys and FBI SAs and other FBI support employees regarding operational and legal implications of the TSP; and notes and draft legal documents prepared in connection with legal analysis and opinions regarding operations of the TSP. The information contained in these documents reflects attorney advice, opinions, and recommendations offered at the employees' request by FBI OGC attorneys. It also includes advice solicited by the FBI from DOJ attorneys. These communications/exchanges and documents were generated in a secure internal e-mail/computer system of the FBI, based on client-supplied information regarding various aspects of the TSP. The redacted material taken as a whole reveals the candid exchanges of information among FBI attorneys, FBI SAs and FBI support personnel seeking legal advice regarding the FBI's role and responsibilities with respect to the TSP, and more generally, the FBI's law enforcement and counterterrorism efforts. Disclosure of these communications would breach the confidential relationship between these individuals and repress and stifle such critical communications in the future. For these reasons the FBI has asserted Exemption 5, the attorney-client privilege, to protect these confidential communications in non-serialized documents, including but not limited to: *FBI 17, 27, 28, 31-34, 36, 39, 43, 44, 58, 60-79, 88-93, 98-113, 116-121, 125, 128, 137, 138, 142, 144, 145, 147-157, 160, 169, 183, 184,*

*198-211, 214-220, 223-230, 239-284, 286-298, 301 and 302.*

73.    **REDACTED**

(U)    **(b)(5)**                    **Attorney Work Product Privilege**

74.    **(U)**  The attorney work product privilege protects documents and other memoranda prepared by, or an individual working at the direction of, an attorney, in contemplation or anticipation of litigation.  The purpose of this privilege is to protect the adversarial trial process by insulating the mental impressions and litigation strategy from scrutiny.  The FBI has withheld several documents pursuant to Exemption 5, attorney work product privilege.

75.    **REDACTED**

76.    **(U)** *Rationale for Withholding:*  The work product at issue in this case relates to e-mails and draft declarations prepared by FBI attorneys in connection with various criminal proceedings.  There are also several documents which contain discussions of TSP intelligence collections and how that information has or has not been used in specific criminal cases.  The disclosure of this information would reveal the preliminary mental impressions of FBI attorneys regarding these criminal proceedings, and steps employed by agency counsel in preparing the FBI's filings.  I have determined that the redacted material in non-serialized documents, including, but not limited to *FBI 91-93, 105, 112, 247, 267, 277, 281, 293, 294, 301 and 302*, consists of attorney work product and it has been withheld appropriately pursuant to Exemption 5.

77.    **REDACTED**

### (U)  FOIA EXEMPTION (b)(6)
### CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY

78.    **(U)**  5 U.S.C. § 552 (b)(6) exempts from disclosure "personnel and medical files and similar files when the disclosure of such information would constitute a clearly unwarranted invasion of personal privacy."

79.    **(U)**  When withholding information pursuant to this exemption, the FBI is required to balance the privacy interests of the individuals mentioned in the documents against any public

- 25 -

interest in disclosure. In asserting this exemption, each piece of information is scrutinized to determine the nature and strength of the privacy interest of any individual whose name and/or identifying information appears in the documents at issue. In withholding the information, each individual's privacy interests are balanced against the public's interest in disclosure. The public interest in disclosure of the information is determined by whether the information in question would inform plaintiff or the general public about the FBI's performance of its mission to enforce federal criminal and national security statutes, and/or how the FBI actually conducts its internal operations and investigations. In each instance where information was withheld pursuant to Exemption (b)(6), the FBI determined that the individual's privacy rights outweigh the public interest, and that there is no legitimate public interest in the information at issue. As a result, Exemption (b)(6) has been asserted in conjunction with Exemption (b)(7)(C) to protect information included in, but not limited to, the following non-serialized documents: *FBI 1, 12-13, 20-22, 24, 29, 32-36, 44, 49, 52, 54, 60-91, 94-113, 115-130, 130-174, 177, 179-190, 194, 196-269, 272-285, 287-294, 296, 300, 302-308, 1000, 1008, 1016, 1020, 1029, 1030, 1032-1034, 1051, 1055, 1099 and 1102.*

80.    **REDACTED**

### (U) (b)(6)    Names and/or Identifying Information Concerning FBI Special Agents and FBI Support Personnel

81.    **(U)** The FBI has asserted Exemption (b)(6), in conjunction with Exemption (b)(7)(C), to protect the names and identifying information of FBI Special Agents ("SAs") and FBI support personnel.

82.    **(U)** The FBI has withheld names and/or identifying information of FBI Special Agents ("SAs") and FBI support employees, information which appears throughout the serialized and non-serialized documents. The FBI has asserted Exemption 6 to protect the names and/or identifying information of lower-level SAs and support employees (below Section Chief level). Exemption 6 has not been extended to provide protection for names and/or identifying information

of FBI personnel at the Section Chief, Deputy Assistant Director, and Assistant Director level.

83.    **(U)** FBI SAs and support personnel are assigned to handle a variety of tasks related to counterterrorism and counterintelligence investigations. These individuals are in positions to access information regarding sensitive law enforcement, counterterrorism and national security investigations. They could therefore become the targets of harassing inquiries for unauthorized access to classified and sensitive information if their identities were released. Publicity, adverse or otherwise, regarding any particular activities in which FBI SAs and support employees may engage as part of their official duties may seriously impair their effectiveness in conducting similar future activities. This privacy consideration also protects FBI SAs and support employees from unnecessary, unofficial questioning as to the conduct of their activities, whether or not they are currently employed by the FBI. FBI SAs and support employees conduct official inquiries into violations of various criminal statutes and counterterrorism and national security cases. As part of their duties, they may come into contact with all strata of society conducting searches and making arrests, all of which result in reasonable, but nonetheless serious, disturbances in the lives of individuals. It is possible for a person targeted by such law enforcement action to carry a grudge which may last for years, and to seek revenge on individuals involved in the investigation. The publicity associated with the release of the identity of an FBI SA or support employee in connection with a particular operational activity could trigger hostility towards the SA or support employee by such persons.

84.    **REDACTED**

85.    **(U)** Accordingly, there is a strong privacy interest in protecting the identities of the FBI SAs and support employees whose names and identifying information appear in the documents at issue here, and disclosure of such information would constitute a clearly unwarranted invasion of their personal privacy. There is no public interest to be served by disclosing the identities of FBI SAs or support personnel to the public, and release of this information will not shed light on the operations and activities of the FBI. Exemption (b)(6) has

therefore been asserted in conjunction with Exemption (b)(7)(C) to protect the names and/or identifying information of FBI SAs and FBI support personnel.

### (U) (b)(6)    Names and/or Identifying Information Concerning Other Federal Government Employees

86.    (U) The FBI has asserted Exemption (b)(6) in conjunction with Exemption (b)(7)(C) to protect the names and/or identifying information concerning other lower-level employees of other government agencies whose names and/or identifying information appear throughout both serialized and non-serialized documents.

87.    (U) The identifying information includes telephone numbers, job titles, business addresses and facsimile numbers of these federal employees. These employees have access to sensitive and often highly classified intelligence information; release of their names could subject them to unofficial inquiries and/or harassment, which would result in a clearly unwarranted invasion of their privacy. The rationale for protecting the identities of FBI SAs and FBI support personnel, as discussed earlier, applies with equal force to the protection of the identities of the employees of other federal government agencies. Furthermore, there is no legitimate public interest to be served in releasing these employees' names because such a release would not shed light on the operations and activities of these other agencies. Exemption (b)(6) has therefore been asserted in conjunction with Exemption (b)(7)(C) to protect the names and/or identifying information of other federal government agency employees.

### (U) (b)(6)    Names and/or Identifying Information Concerning Third Parties of Investigative Interest

88.    (U) Exemption (b)(6) has been asserted in conjunction with Exemption (b)(7)(C) to protect the names and/or identifying information of third-party individuals who are of investigative interest to the FBI. For example, during the course of the ongoing criminal media leak investigation, information was developed during interviews of U.S. Government employees and other individuals. Consequently, some of these third party individuals have become of

UNCLASSIFIED

investigative interest to the FBI in this investigation. Disclosure of the identities of these individuals of investigative interest could subject them to embarrassment and harassment as well as undue public attention. Furthermore, disclosure of their identities could result in intimidation and/or threats to their physical safety. Being linked with any investigation carries a strong negative connotation, which is especially acute in this particular investigation inasmuch as public revelation of the TSP has potentially damaged the national security of the United States. The personal privacy of these individuals of investigative interest to the FBI would be severely infringed upon if their identities were released in the context of this ongoing criminal investigation.

89.    **REDACTED**

90.    **(U)** After identifying the substantial privacy interests of these individuals, the FBI balanced their privacy interests against the public interest in disclosure. The FBI could not identify any legitimate public interest in the release of this identifying information because it would not shed any light on the operations and activities of the FBI during the course of the ongoing leak investigation and other counterterrorism investigations. Since the disclosure of this identifying information would constitute a clearly unwarranted invasion of their personal privacy, the FBI has properly asserted Exemption (b)(6) in conjunction with Exemption (b)(7)(C) to protect the names and identifying information of individuals who are of investigative interest to the FBI.

### (U) <u>(b)(6)</u>    <u>Names and/or Identifying Information Concerning Third Parties Interviewed</u>

91.    **REDACTED**

92.    **(U)** Information provided by individuals during an interview is one of the most productive investigative tools utilized by law enforcement agencies. The largest roadblock in

- 29 -

UNCLASSIFIED

UNCLASSIFIED

successfully obtaining the desired information through an interview is the fear of the interviewee

that his or her identity will possibly be publicly exposed and consequently, being harassed,

intimidated or threatened with legal or economic reprisal, or possible physical harm. In order to

surmount these obstacles, persons being interviewed must be assured that their identities will be

held in the strictest confidence by the FBI. The continued access to individuals who are willing to

honestly provide relevant information to further a particular investigation outweighs any benefits

derived from releasing the identities of these individuals. To release the names and identifying

information of these individuals who cooperated with the FBI would not only constitute a clearly

unwarranted invasion of their personal privacy, but could also subject them to harassment,

embarrassment, intimidation, or result in undue public attention. Therefore, the FBI determined

that the disclosure of their identities could reasonably be expected to constitute a clearly

unwarranted invasion of their personal privacy.

93.    (U) After identifying the substantial privacy interests of these individuals, the FBI

balanced their privacy interests against the public interest in disclosure. The FBI could not

identify any legitimate public interest in the release of this identifying information since it would

not shed any light on the operations and activities of the FBI during the course of the ongoing leak

investigation and other counterterrorism investigations. Since the disclosure of this identifying

information would constitute a clearly unwarranted invasion of their personal privacy, the FBI has

properly asserted Exemption (b)(6) in conjunction with Exemption (b)(7)(C) to protect the names

and/or identifying information of individuals who provided information and cooperated with the

FBI.

UNCLASSIFIED

UNCLASSIFIED

### (U)  (b)(6)      Names and/or Identifying Information Concerning Third Parties who are Merely Mentioned in FBI Records

94.    **REDACTED**

95.    **(U)** After identifying the substantial privacy interests of these individuals, the FBI balanced their privacy interests against the public interest in disclosure.  The FBI could not identify any legitimate public interest in the release of this identifying information since it would not shed any light on the operations and activities of the FBI during the course of the ongoing leak investigation and other counterterrorism investigations.  Since the disclosure of this identifying information would constitute a clearly unwarranted invasion of their personal privacy, the FBI has properly asserted Exemption (b)(6) in conjunction with Exemption (b)(7)(C) to protect the names and identifying information of individuals who are merely mentioned.

### (U)  FOIA EXEMPTION 7
### EXEMPTION 7 THRESHOLD

96.    **(U)** Exemption 7 of the FOIA protects from mandatory disclosure records or information compiled for law enforcement purposes, but only to the extent that disclosure could reasonably be expected to cause one of the harms enumerated in one of the sub-parts of the exemption.  See 5 U.S.C. § 552 (b)(7).  In this case, the harms that could reasonably be expected to result from disclosure concern: interference with enforcement proceedings, unwarranted invasion of privacy, identities of and information provided by confidential sources, and highly sensitive law enforcement techniques and operational procedures.

97.    **REDACTED**

98.    **(U)** All of the documents at issue here fall squarely within the law enforcement duties of the FBI, and therefore readily meet the threshold requirement of Exemption 7.  The

UNCLASSIFIED

UNCLASSIFIED

remaining inquiries are whether their disclosure could reasonably be expected to interfere with ongoing law enforcement proceedings, would constitute an unwarranted invasion of personal privacy, would reveal confidential informants, and/or would reveal sensitive law enforcement techniques.

## (U)  EXEMPTION (b)(7)(A)
### PENDING LAW ENFORCEMENT INVESTIGATION

99.    **(U)**  5 U.S.C. § 552 (b)(7)(A) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings . . . ."

100.    **(U)**  Application of this exemption requires the existence of law enforcement records; a pending or prospective law enforcement proceeding; and a reasonable expectation that release of the information would interfere with the enforcement proceeding.  Furthermore, in applying this exemption to the documents in question, <u>Bevis v. U.S. Department of State</u>, 801 F. 2d 1386, 1389 (D.C. Cir. 1986), imposes a three-part procedure.  The government is required to review each document withheld on a document-by-document basis; to group the documents into functional categories and to describe the categories; and to explain why release of each category would interfere with law enforcement proceedings.

101.    **REDACTED**

102.    **REDACTED**

103.    **REDACTED**

**(U)  <u>Reasonable Expectation of Interference with Law Enforcement Proceedings</u>**

- 32 -

UNCLASSIFIED

UNCLASSIFIED

104.  **REDACTED** [13]

105.  **REDACTED**

### (U)  Law Enforcement Records

106.  **REDACTED**

107.  **REDACTED**:

(a)  **(U)  Electronic Communications ("ECs"):**  The EC is a WordPerfect macro which has replaced the traditional correspondence, such as an Airtel and Memorandum, as the primary communication within the FBI.  The purpose of the EC is to communicate within the FBI in a consistent format which can be both uploaded into and downloaded from the FBI's Automated Case Support computer system for purposes of communication, distribution and retention of information.

(b)  **(U)  FD 302 Forms:**  The FD 302 is the primary form used within the FBI to document and record investigative information.  Although it is generally used to document and record information obtained from an interview of an individual, this form is also used to document and record other types of investigative information such as the positive and/or negative results of a search of documentary records, the results of a physical search of a business office, residence or automobile, or the service of Federal Grand Jury subpoenas.

(c)  **(U)  Investigative Notes:**  These are handwritten notes by FBI Agents which contain information similar in nature to the type of information contained in the FD 302 forms, i.e., information obtained from interviews, records searches or physical searches.  The handwritten information contained in these Investigative Notes are then formalized in the format of FD 302 forms and the Investigative Notes are filed in a sub-file for purposes of record-keeping and retention of records.

(d)  **REDACTED**

---

[13]  **REDACTED**

UNCLASSIFIED

(e) **REDACTED**

(f) **REDACTED**

### (U) <u>Functional Categories of Responsive Documents</u>

108.    **(U)** Each responsive document in the ongoing leak investigative file that is being

withheld pursuant to Exemption (b)(7)(A) has been reviewed and categorized for the purpose of

this declaration in terms of the information contained within the document. The information

contained in these responsive documents is not mutually exclusive in terms of functional

categorization. For example, a document such as an EC may serve several functional purposes and

may contain multiple categories of information. An EC could therefore be included in multiple

functional categories as could the information contained within the document. The responsive

documents and evidentiary materials within the ongoing leak investigation file fall within one or

more of the functional categories set out in the following paragraphs.

### (U) <u>Evidentiary and/or Investigative Materials</u>

109.    **REDACTED**

### (U) <u>Administrative Materials</u>

110.    **REDACTED**

111.    **REDACTED**

### (U) <u>FOIA EXEMPTION (b)(7)(C)</u><br><u>UNWARRANTED INVASION OF PERSONAL PRIVACY</u>

112.    **(U)** 5 U.S.C. § 552 (b)(7)(C) exempts from disclosure:

> records or information compiled for law enforcement purposes, but
> only to the extent that the production of such law enforcement
> records or information . . . could reasonably be expected to
> constitute an unwarranted invasion of personal privacy.

113.    **(U)** When withholding information pursuant to this exemption, the FBI is required

to balance the privacy interests of the individuals mentioned in these records against any public

interest in disclosure. In asserting this exemption, each item of information is examined to

determine the degree and nature of the privacy interest of every individual whose name and/or identifying data appears in these records. The public interest in disclosure of this information is determined by whether the information in question would inform plaintiff and the general public about the FBI's performance of its mission to enforce federal criminal and national security statutes and/or how the FBI actually conducts its internal operations and investigations. In each instance where information has been withheld, it has been determined that individual privacy interests are not outweighed by any public interest in disclosure. As a result, Exemption (b)(7)(C) has been asserted in conjunction with Exemption (b)(6) to protect information included in, but not limited to, the following non-serialized documents: *FBI 1, 12-13, 20-22, 24, 29, 32-36, 44, 49, 52, 54, 60-91, 94-113, 115-130, 130-174, 177, 179-190, 194, 196-269, 272-285, 287-294, 296, 300, 302-308, 1000, 1008, 1016, 1020, 1029, 1030, 1032-1034, 1051, 1055, 1099 and 1102.*

114. **REDACTED**

### (U)  (b)(7)(C)        Names and/or Identifying Information Concerning FBI Special Agents and FBI Support Personnel

115. **(U)** The FBI has asserted Exemption (b)(7)(C), in conjunction with Exemption (b)(6), to protect the names and identifying information of FBI SAs and FBI support personnel.

116. **(U)** The FBI has withheld names and/or identifying information of FBI Special Agents ("SAs") and FBI support employees, information which appear throughout the serialized and non-serialized documents. The FBI has asserted Exemption 7(C) to protect the names and/or identifying information of lower-level FBI SAs and support employees (below Section Chief level). Exemption 7(C) has not been extended to provide protection for names and/or identifying information of FBI personnel at the Section Chief, Deputy Assistant Director, and Assistant Director level.

117. **(U)** FBI SAs and support personnel are assigned to handle a variety of tasks related to counter-terrorism and counterintelligence investigations. These individuals are in positions to access information regarding sensitive law enforcement, counter-terrorism and national security

UNCLASSIFIED

investigations. They could therefore become the targets of harassing inquiries for unauthorized access to classified and sensitive information if their identities were released. Publicity, adverse or otherwise, regarding any particular activities in which FBI SAs and support employees may engage as part of their official duties may seriously impair their effectiveness in conducting similar future activities. This privacy consideration also protects FBI SAs and support employees from unnecessary, unofficial questioning as to the conduct of their activities, whether or not they are currently employed by the FBI. FBI SAs and support employees conduct official inquiries into violations of various criminal statutes and counter-terrorism and national security cases. As part of their duties, they may come into contact with all strata of society, conducting searches and make arrests, all of which result in reasonable, but nonetheless serious, disturbances in the lives of individuals. It is possible for a person targeted by such law enforcement action to carry a grudge which may last for years, and to seek revenge on individuals involved in the investigation. The publicity associated with the release of the identity of an FBI SA or support employee in connection with a particular operational activity could trigger hostility towards the SA or support employee by such persons.

      118. **REDACTED**

      119. **(U)** Accordingly, there is a strong privacy interest in protecting the identities of the FBI SAs and support employees whose names and identifying information appear in the documents at issue here, and disclosure of such information would constitute an unwarranted invasion of their personally privacy. There is no public interest to be served by disclosing the identities of FBI SAs or FBI support personnel to the public, and release of this information will not shed light on the operations and activities of the FBI. Exemption (b)(7)(C) has therefore been asserted in conjunction with Exemption (b)(6) to protect FBI SAs and FBI support personnel.

      **(U)** <u>**(b)(7)(C)**</u>      <u>**Names and/or Identifying Information Concerning Other**</u>
                            <u>**Federal Government Employees**</u>

      120. **(U)** The FBI has asserted Exemption (b)(7) (C) in conjunction with Exemption

UNCLASSIFIED

UNCLASSIFIED

(b)(6) to protect the names and/or identifying information concerning other lower-level employees of other government agencies whose names and/or identifying information appear throughout both serialized and non-serialized documents.

121.    **(U)** The identifying information includes telephone numbers, job titles, business addresses and facsimile numbers of these federal employees. These employees have access to sensitive and often highly classified intelligence information; release of their names could subject them to unofficial inquiries and/or harassment, which would result in an unwarranted invasion of their privacy. The rationale for protecting the identities of FBI SAs and FBI support personnel, as discussed earlier, applies with equal force to the protection of the identities of the employees of other federal government agencies. Furthermore, there is no legitimate public interest to be served in releasing these employees' names because such a release would not shed light on the operations and activities of these other agencies. Exemption (b)(7)(C) has therefore been asserted in conjunction with Exemption (b)(6) to protect other federal government agency employees.

### (U) (b)(7)(C)        Names and/or Identifying Information Concerning Third Parties of Investigative Interest

122.    **(U)** Exemption (b)(7)(C) has been asserted in conjunction with Exemption (b)(6) to protect the names and/or identifying information of third-party individuals who are of investigative interest to the FBI. For example, during the course of the ongoing leak investigation, information was developed during interviews of U.S. Government employees and other individuals. Consequently, some of these third party individuals have become of investigative interest to the FBI in this investigation. Disclosure of the identities of these individuals of investigative interest could subject them to embarrassment and harassment as well as undue public attention. Furthermore, disclosure of their identities could result in intimidation and/or threats to their physical safety. Being linked with any investigation carries a strong negative connotation,

- 37 -

UNCLASSIFIED

UNCLASSIFIED

which is especially acute in this particular investigation inasmuch as public revelation of the TSP

has potentially damaged the national security of the United States.  The personal privacy of these

individuals of investigative interest to the FBI would be severely infringed upon if their identities

were released in the context of this ongoing criminal investigation.

      123.    **REDACTED**

      124.    **(U)**  After identifying the substantial privacy interests of these individuals, the FBI

balanced their privacy interests against the public interest in disclosure.  The FBI could not

identify any legitimate public interest in the release of this identifying information since it would

not shed any light on the operations and activities of the FBI during the course of the ongoing leak

investigation and other counter-terrorism investigations.  Since the disclosure of this identifying

information would constitute an unwarranted invasion of their personal privacy, the FBI has

properly asserted Exemption (b)(7)(C) in conjunction with Exemption (b)(6) to protect the names

and identifying information of individuals of investigative interest to the FBI.

      **(U)  (b)(7)(C)**        **Names and/or Identifying Information Concerning Third**
                                      **Parties Interviewed**

125.    **REDACTED**

126.    **(U)**  Information provided by individuals during an interview is one of the most

productive investigative tools utilized by law enforcement agencies.  The largest roadblock in

successfully obtaining the desired information through an interview is the fear of the interviewee

that his or her identity will possibly be publicly exposed and consequently, being harassed,

intimidated or threatened with legal or economic reprisal, or possible physical harm.  In order to

surmount these obstacles, persons being interviewed must be assured that their identities will be

held in the strictest confidence by the FBI.  The continued access to individuals who are willing to

UNCLASSIFIED

UNCLASSIFIED

honestly provide relevant information bearing on a particular investigation outweighs any benefits

derived from releasing the identities of these individuals.  To release the names and identifying

information of these individuals who have cooperated with the FBI would not only constitute an

unwarranted invasion of their personal privacy, but could also subject them to harassment,

embarrassment, intimidation, or result in undue public attention.  Therefore, the FBI determined

that the disclosure of their identities could reasonably be expected to constitute an unwarranted

invasion of their personal privacy.

127.    **(U)** After identifying the substantial privacy interests of these individuals, the FBI

balanced their privacy interests against the public interest in disclosure.  The FBI could not

identify any legitimate public interest in the release of this identifying information since it would

not shed any light on the operations and activities of the FBI during the course of the ongoing leak

investigation and other counterterrorism investigations.  Since the disclosure of this identifying

information would constitute an unwarranted invasion of their personal privacy, the FBI has

properly asserted Exemption (b)(7)(C) in conjunction with Exemption (b)(6) to protect the names

and identifying information of individuals who provided information and cooperated with the FBI.

**(U)  (b)(7)(C)**     <u>**Names and/or Identifying Information Concerning Third**</u>
<u>**Parties who are Merely Mentioned in FBI Records**</u>

128.    **REDACTED**

129.    **(U)** After identifying the substantial privacy interests of these individuals, the FBI

balanced their privacy interests against the public interest in disclosure.  The FBI could not

identify any legitimate public interest in the release of this identifying information since it would

not shed any light on the operations and activities of the FBI during the course of the ongoing

media leak investigation and other counterterrorism investigations.  Since the disclosure of this

UNCLASSIFIED

UNCLASSIFIED

identifying information would constitute an unwarranted invasion of their personal privacy, the

FBI has properly asserted Exemption (b)(7)(C) in conjunction with Exemption (b)(6) to protect the

names and identifying information of individuals who are merely mentioned.

### (U) FOIA EXEMPTION (b)(7)(D)
### CONFIDENTIAL SOURCE INFORMATION

130.    **(U)**  5 U.S.C. § 552 (b)(7)(D) exempts from disclosure:

> records or information compiled for law enforcement purposes, but
> only to the extent that the production of such law enforcement
> records or information . . . could reasonably be expected to disclose
> the identity of a confidential source, including a State, local or
> foreign agency or authority or any private institution which
> furnished information on a confidential basis, and, in the case of a
> record or information compiled by a criminal law enforcement
> agency conducting a lawful national security intelligence
> investigation, information furnished by a confidential source.

131.    **(U)**    Numerous confidential sources report to the FBI on a regular basis and are

"informants" within the common meaning of the term. These sources provide information under a

variety of circumstances, including either an express or an implied assurance of confidentiality.

Releasing the information provided by these sources may likely reveal a confidential source's

identity. The release of a source's identity would forever eliminate that source as a future means of

obtaining information. In addition, when the identity of one source is revealed, that revelation has

a chilling effect on the activities and cooperation of other sources. It is only with the

understanding of complete confidentiality (whether express or implied), that the aid of such

sources can be enlisted, and only through this confidence that these sources can be persuaded to

continue providing valuable assistance in the future. Thus, the information provided by, as well as

the identities of these sources, has been protected pursuant to Exemption (b)(7)(D) in

non-serialized documents, including, but not limited to: *FBI 1, 95-97, 99-101, 154, 170, 181, 182,*

*196, 198, 210, 215, 217, 219, 227, 230, 231, 234, 235, 237, 238, 250 and 308.*

132.    **REDACTED**

UNCLASSIFIED

UNCLASSIFIED

**(U)  (b)(7)(D)**          **Names and/or Identifying Information Provided By Individuals Under an "Express" Assurance of Confidentiality**

133.   **REDACTED**

134.   **(U)** Information provided by individuals and organizations who are sources or during interviews are some of the most productive investigative tools used by law enforcement agencies.  The largest roadblock in successfully obtaining desired information through an interview, for example, is fear by the interviewee of his or her identity possibly being exposed, and consequently being harassed, intimated, or threatened with legal or economic reprisal, or possible physical harm.  In order to surmount these obstacles, persons interviewed must be assured that information received from them will be held in the strictest confidence.  The continued access to sources who are willing to honestly relate pertinent facts bearing upon a particular investigation outweighs any benefits derived from releasing the identities of these sources.  As a result, Exemption (b)(7)(D) has appropriately been asserted to withhold information provided by sources who have been provided "express" assurances of confidentiality.

**(U)  (b)(7)(D)**          **Names and/or Identifying Information Provided By Individuals Under an "Implied" Assurance of Confidentiality**

135.   **REDACTED**

### (U)  FOIA EXEMPTION (b)(7)(E) INVESTIGATIVE TECHNIQUES AND PROCEDURES

136.   **(U)** 5 U.S.C. § 552 (b)(7)(E) provides for the withholding of:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure would reasonably be expected to risk circumvention of the law. . . .

- 41 -

UNCLASSIFIED

In order for this exemption to apply, the use of the technique or procedure at issue must not be well known to the public.

   **(b)(7)(E)**      **Heading Redacted**

137.   **REDACTED**

138.   **(U)** *Rationale for Withholding Information:*

     (a)    **REDACTED**

     (b)    **REDACTED**

     (c)    **REDACTED**

139.   **REDACTED**

### (U)  OUTGOING REFERRALS

140.   **(U)** In the course of searching for and reviewing documents potentially responsive to plaintiff's FOIA request, the FBI identified information and/or documents which originated either with other DOJ components, other federal agencies or both.

141.   **(U)** The FBI has identified among documents contained in the files of OGC personnel a copy of a collection of documents prepared by the Office of the Director of National Intelligence circulated at a January 19, 2006 meeting. The collection of documents is entitled "Executive Branch Responses to Congress Regarding the NSA Program" and consists of a collection of in-coming Congressional correspondence addressed to various Executive Branch agency heads. Consistent with the treatment of similar Congressional documents by other DOJ components, the FBI has determined to exclude these documents as not responsive.

142.   **(U)** The FBI has identified one document which originated with the Office of Intelligence Policy and Review ("OIPR") at DOJ – *FBI 14*. The FBI referred this document to OIPR for direct response, and it will be addressed in a separate declaration supplied by DOJ OIPR.

143.   **(U)** The FBI has identified eight documents and/or portions of documents which originated with the Office of Legal Counsel ("OLC") at DOJ – *FBI 4, 5, 7, 18, 19, 42, 51 and 58*. The FBI referred these documents to OLC for direct response, and they will be addressed in a

UNCLASSIFIED

separate declaration supplied by DOJ OLC. In addition, the FBI has also identified among documents contained in the files of OGC personnel two copies of one DOJ-originated document, dated January 19, 2006, entitled "Legal Authorities Supporting the Activities of the National Security Agency Described by the President," the so-called "White Paper" – *FBI 23*. Having been advised that this document has been provided previously to plaintiff, the FBI will not produce another copy. Finally, the FBI has temporary possession of one document which is a document created by the President of the United States and his immediate staff in the course of carrying the official duties of the President, namely the authorization of the TSP. This document was provided to the OLC for the purpose of assisting OLC with completing its work but is subject to express reservation of control by the White House. Other than taking steps to ensure that this highly classified material is maintained in a secure environment, neither the FBI nor the OLC has the authority to distribute or dispose of this material. As such, this document is not an "agency record" as defined in the FOIA and has therefore not been processed in response to plaintiff's FOIA request.

144.    (U) The FBI identified one document which originated with the Office of Legislative Affairs ("OLA") at DOJ, and accordingly notified plaintiff in its letter dated March 24, 2006 that the FBI had referred this document to OLA for consultation. (See **Exhibit B**). Following discussion with OLA, the FBI was advised that the one-page document was released to plaintiff.

## (U) <u>INCOMING REFERRALS</u>

145.    (U) In the course of responding to the same FOIA request from ACLU, other DOJ components and/or other federal agencies have identified documents and/or portions of documents which originated with the FBI and have referred them to the FBI for either consultation or direct response to ACLU.

146.    **REDACTED**

UNCLASSIFIED

UNCLASSIFIED

147.   **REDACTED**[14]

148.   **(U)**  OLC identified and referred one document which originated with -- and/or contains equities of -- the FBI: *OLC 127.  OLC 127*, which is the same document as *FBI 39*, and consists of memoranda from the FBI to DOJ regarding legal analysis and opinions in connection with the TSP, has been withheld in full pursuant to FOIA Exemptions 1, 2, 5, and 7(E) for the reasons articulated in this declaration, supra.

## **(U)  CONCLUSION**

149.   **(U)**  Plaintiff has been provided with all releasable records responsive to its FOIA request to the FBIHQ.  As demonstrated above, the information which the FBI has withheld consists of information the disclosure of which would: (a) reveal material which is classified; (b) reveal the internal personnel rules and practices and internal operations of the TSP; (c) reveal information protected by statute; (d) reveal material protected by the deliberative process, attorney/client and attorney work product privileges; (e) reveal information which could reasonably be expected to interfere with enforcement proceedings; (f) constitute a clearly unwarranted invasion of privacy, and an unwarranted invasion of privacy; (g) disclose the identities of and information provided by confidential sources and other persons who have provided information to the FBI; and (h) disclose highly sensitive law enforcement techniques and operational procedures.

---

[14] **REDACTED**

UNCLASSIFIED

UNCLASSIFIED

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that **Exhibits A through C** attached hereto are true and correct copies.

Executed this ___13th___ day of September, 2006.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

UNCLASSIFIED

# Exhibit A

ANN BEESON
ASSOCIATE LEGAL DIRECTOR



December 20, 2005

FOIA/PA Mail Referral Unit
Justice Management Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW.
Washington, DC 20530-0001.

MERICAN CIVIL LIBERTIES
'NION FOUNDATION
IATIONAL OFFICE
25 BROAD STREET 18TH FL
'EW YORK, NY 10004-2400
/212 549 2601
/212 549 2651
BEESON@ACLU.ORG
'WW ACLU.ORG

Re:    <u>REQUEST UNDER FREEDOM OF INFORMATION ACT /</u>
       <u>Expedited Processing Requested</u>

Attention:

        This letter constitutes a request by the American Civil Liberties Union
and the American Civil Liberties Union Foundation ("ACLU") under the
Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and the Department of
Justice implementing regulations, 28 CFR § 16.11.[1]

I.      <u>The Request for Information</u>

        The ACLU seeks disclosure of any presidential order(s) authorizing
the NSA to engage in warrantless electronic surveillance[2] and/or warrantless
physical searches in the United States, created from September 11, 2001 to the
present.[3]

---

[1] The American Civil Liberties Union Foundation is a 501(c)(3) organization that provides
legal representation free of charge to individuals and organizations in civil rights and civil
liberties cases, and educates the public about civil rights and civil liberties issues. The
American Civil Liberties Union is a separate non-profit, non-partisan, 501(c)(4) membership
organization that educates the public about the civil liberties implications of pending and
proposed state and federal legislation, provides analyses of pending and proposed legislation,
directly lobbies legislators, and mobilizes its members to lobby their legislators.
[2] The term "electronic surveillance" includes but is not limited to warrantless acquisition of
the contents of any wire or radio communication by an electronic, mechanical, or other
surveillance device, and the warrantless installation or use of an electronic, mechanical, or
other surveillance device for monitoring to acquire information, other than from a wire or
radio communication.
[3] This request does not include surveillance authorized by 50 U.S.C. §§ 1802 or 1822(a).

In addition, the ACLU seeks disclosure of any record(s),[4] document(s), file(s), communications, memorandum(a), order(s), agreement(s) and/or instruction(s), created from September 11, 2001 to the present, about:

1. any presidential order(s) authorizing the NSA to engage in warrantless electronic surveillance and/or warrantless physical searches in the United States;

2. the policies, procedures and/or practices of the NSA:

ISRICAN CIVIL LIBERTIES
ⁿION FOUNDATION

   a. for identifying individuals, organizations or entities to subject to warrantless electronic surveillance and/or warrantless physical searches in the United States, including but not limited to any "checklist to follow in deciding whether probable cause existed to start monitoring someone's communications,"[5] or a requirement that there be a "clear link" between terrorist organizations and individuals subject to such surveillance;[6]

   b. for gathering information through warrantless electronic surveillance and/or warrantless physical searches in the United States;

   c. governing the maintenance and/or storage of information described in paragraph 2(b) above;

   d. for analyzing and using information described in paragraph 2(b) above;

   e. for sharing information described in paragraph 2(b) above with other government agencies;

---

[4] The term "records" as used herein includes all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audio tapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies.
[5] James Risen and Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, New York Times, Dec. 16, 2005, at A1, A16.
[6] Transcript, President Bush's Address, Dec. 17, 2005, available at http://www.nytimes.com/2005/12/17/politics/17text-bush.html

IERICAN CIVIL LIBERTIES
'IGN FOUNDATION

f.  for sharing information described in paragraph 2(b) above to be "used as the basis for F.I.S.A. warrant requests from the Justice Department,"[7] or any other form of warrant;

g.  for cross referencing information described in paragraph 2(b) above with information about other individuals, organizations, or groups;

h.  for cross-referencing information described in paragraph 2(b) above with information in any database;

i.  to suspend and/or terminate warrantless electronic surveillance and/or physical searches in the United States by the NSA;

j.  governing the destruction of information described in paragraph 2(b) above;

k.  for protecting the privacy of individuals who are subject to warrantless electronic surveillance and/or warrantless physical searches in the United States;

l.  for consulting with, or obtaining approval from, the Justice Department or other departments, agencies, and/or executive branch officials before engaging in warrantless electronic surveillance and/or warrantless physical searches in the United States;

m.  any minimization procedure, as that term is defined in 50 U.S.C.§ 1801(h), for information described in paragraph 2(b) above;

3.  the name of other government agencies with whom the information described in part 2(b) above is shared;

4.  the date on which:

a.  President Bush signed an order permitting the NSA to engage in warrantless electronic surveillance and/or warrantless physical searches in the United States;

_____
[7] Risen and Lichtblau, Dec. 16., at A16.

3

1ERICAN CIVIL LIBERTIES
!ION FOUNDATION

    b.  the NSA began engaging in warrantless electronic surveillance and/or warrantless physical searches in the United States;[8]

5.  the constitutionality, legality, and/or propriety of warrantless electronic surveillance and/or warrantless physical searches in the United States;

6.  any Justice Deparment "legal reviews of the program and its legal rationale."[9]

7.  any actual or potential violations of, or deviations from, any policy, procedure or practice related to warrantless electronic surveillance and/or warrantless physical searches in the United States by the NSA;

8.  any investigation, inquiry, or disciplinary proceeding initiated in response to any actual or potential violations of, or deviations from, any policy, procedure or practice related to warrantless electronic surveillance and/or warrantless physical searches in the United States by the NSA;

9.  any Department of Justice audit of any NSA program carrying out warrantless electronic surveillance and/or warrantless physical searches in the United States;[10]

10. the number of:

    a.  individuals who have been subjected to warrantless electronic surveillance in the United States by the NSA since September 11, 2001;

---

[8] It is unclear when the NSA began its domestic surveillance program and when the President provided written authorization for it to do so. On December 18, 2005, the New York Times reported that the NSA "first began to conduct warrantless surveillance on telephone calls and e-mail messages between the United States and Afghanistan months before President Bush officially authorized a broader version of the agency's special domestic collection program." Eric Lichtblau and James Risen, *Eavesdropping Effort Began Soon After Sept. 11 Attacks,* New York Times, Dec. 18, 2005.

[9] Eric Lichtblau and David E. Sanger, *Administration Cites War Vote in Spying Case,* New York Times, Dec. 20, 2005.

[10] Risen and Lichtblau, Dec. 16, at A16 (describing such an audit as taking place on or after 2004).

4

b. individuals who have been subjected to warrantless physical searches in the United States by the NSA since September 11, 2001;

c. organizations or entities that have been subjected to warrantless electronic surveillance in the United States by the NSA since September 11, 2001;

d. organizations or entities that have been subjected to warrantless physical searches in the United States by the NSA since September 11, 2001;

IERICAN CIVIL LIBERTIES
!ION FOUNDATION

11. the average and maximum[11] number of:

a. individuals who have been the target of warrantless electronic surveillance in the United States by the NSA at any one time since September 11, 2001;

b. individuals who have been the target of warrantless physical searches in the United States by the NSA at any one time since September 11, 2001;

c. organizations or entities that have been the target of warrantless electronic surveillance in the United States by the NSA at any one time since September 11, 2001;

d. organizations or entities that have been the target of warrantless physical searches in the United States by the NSA at any one time since September 11, 2001;

12. the number of individuals who have been subjected to warrantless electronic surveillance and/or warrantless physical searches in the United States by the NSA who are United States citizens, lawful permanent residents, recipients of non-immigrant visas, lawful visitors without visas, and undocumented immigrants, respectively;

13. the types of communications that have been subjected to warrantless electronic surveillance by the NSA, including but not limited to whether such communications were carried out via telephone, email,

[11] The New York Times reports that "officials familiar with [the program] say the N.S.A. eavesdrops without warrants on up to 500 people in the United States at any time." Risen and Lichtblau, Dec. 16, at A16.

instant messaging, chat, Voice Over IP, other Internet-based communications technologies, or in-person conversation;

14. elements of the NSA's warrantless surveillance program in the United States that were suspended or revamped after, "[i]n mid-2004, concerns about the program [were] expressed by national security officials, government lawyers and a judge"; [12]

15. concerns expressed by national security officials, government lawyers, judges and others regarding the NSA's warrantless surveillance program; [13]

!ERICAN CIVIL LIBERTIES
3I0N FOUNDATION

16. the number of instances in which the Attorney General has authorized warrantless electronic surveillance and/or phsycial searches under 50 U.S.C. §§ 1802 or 1822(a), and copies of each certification; and

17. President Bush's periodic reauthorization of the NSA's warrantless surveillance in the United States, including but not limited to the frequency with which the President reviews the surveillance program, the exact number of times the President has reauthorized the program, the basis and/or criteria for continued authorization of the program, and other government officials, departments, and/or agencies involved in the review process. [14]

---

[12] Risen and Lichtblau, Dec. 16, at A16.

[13] *Id.*

[14] On December 17, 2005, President Bush said:
> The activities I authorized are reviewed approximately every 45 days. Each review is based on a fresh intelligence assessment of terrorist threats to the continuity of our government and the threat of catastrophic damage to our homeland. During each assessment, previous activities under the authorization are reviewed. The review includes approval by our nation's top legal officials, including the attorney general and the counsel to the president. I have reauthorized this program more than 30 times since the Sept. 11 attacks and I intend to do so for as long as our nation faces a continuing threat from Al Qaeda and related groups.

Transcript, President Bush's Address, December 17, 2005, available at http://www.nytimes.com/2005/12/17/politics/17text-bush.htm]. *See also* David E. Sanger, *In Address, Bush Says He Ordered Domestic Spying*, New York Times, December 18, 2005.

## II.  Limitation of Processing Fees

The ACLU requests a limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by . . . a representative of the news media . . .") and 28 C.F.R. §§ 16.11(c)(1)(i), 16.11(d)(1) (search and review fees shall not be charged to "representatives of the news media."). As a "representative of the news media," the ACLU fits within this statutory and regulatory mandate. Fees associated with the processing of this request should, therefore, be limited accordingly.

The ACLU meets the definition of a "representative of the news media" because it is "an entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience." National Security Archive v. Department of Defense, 880 F.2d 1381, 1387 (D.C. Cir. 1989).

The ACLU is a national organization dedicated to the defense of civil rights and civil liberties. Dissemination of information to the public is a critical and substantial component of the ACLU's mission and work. Specifically, the ACLU publishes newsletters, news briefings, right-to-know documents, and other educational and informational materials that are broadly disseminated to the public. Such material is widely available to everyone, including individuals, tax-exempt organizations, not-for-profit groups, law students and faculty, for no cost or for a nominal fee through its public education department. The ACLU also disseminates information through its heavily visited web site: http://www.aclu.org/. The web site addresses civil rights and civil liberties issues in depth, provides features on civil rights and civil liberties issues in the news, and contains many thousands of documents relating to the issues on which the ACLU is focused. The website specifically includes features on information obtained through the FOIA. See, e.g., www.aclu.org/patriot_foia; www.aclu.org/torturefoia; http://www.aclu.org/spyfiles. The ACLU also publishes an electronic newsletter, which is distributed to subscribers by e-mail.

In addition to the national ACLU offices, there are 53 ACLU affiliate and national chapter offices located throughout the United States and Puerto Rico. These offices further disseminate ACLU material to local residents, schools and organizations through a variety of means including their own websites, publications and newsletters. Further, the ACLU makes archived

ERICAN CIVIL LIBERTIES
ION FOUNDATION

7

material available at the American Civil Liberties Union Archives, Public Policy Papers, Department of Rare Books and Special Collections, Princeton University Library. ACLU publications are often disseminated to relevant groups across the country, which then further distribute them to their members or to other parties.

Depending on the results of the Request, the ACLU plans to "disseminate the information" gathered by this Request "among the public" through these kinds of publications in these kinds of channels. The ACLU is therefore a "news media entity." Cf. Electronic Privacy Information Ctr. v. Department of Defense, 241 F.Supp.2d 5, 10-15 (D.D.C. 2003) (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the media" for purposes of FOIA).

Finally, disclosure is not in the ACLU's commercial interest. The ACLU is a "non-profit, non-partisan, public interest organization." See Judicial Watch Inc. v. Rossotti, 326 F.3d 1309, 1310 (D.C. Cir. 2003). Any information disclosed by the ACLU as a result of this FOIA will be available to the public at no cost.

III.    **Waiver of all Costs**

The ACLU additionally requests a waiver of all costs pursuant to 5 U.S.C. §552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."). Disclosure in this case meets the statutory criteria, and a fee waiver would fulfill Congress's legislative intent in amending FOIA. See Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers for noncommercial requesters.'").

Disclosure of the requested information is in the public interest. This request will further public understanding of government conduct; specifically, the NSA's warrantless electronic surveillance and/or physical searches in the United States. This type of government activity concretely affects many individuals and implicates basic privacy, free speech, and associational rights protected by the Constitution.

8

Moreover, disclosure of the requested information will aid public understanding of the implications of the President's decision to permit the NSA to engaging in warrantless electronic surveillance and/or physical searches in the United States and, consequently, to circumvent the judicial oversight required by the Foreign Intelligence Surveillance Act of 1978.[15] Congress passed this Act in response to scandalous revelations about widespread political surveillance by the FBI under the leadership of J. Edgar Hoover. Following those revelations, Congress convened hearings and established a commission to investigate the government's abuses and explore how best to prevent future excesses. The hearings, chaired by Idaho Senator Frank Church, revealed that the government had infiltrated civil rights and peace groups, had burglarized political groups to gain information about their members and activities, and had "swept in vast amounts of information about the personal lives, views, and associations of American citizens."[16] Understanding the current scope of the NSA's warrantless surveillance is, therefore, crucial to the public's interest in understanding the legality and consequences of the President's order and the NSA's current surveillance practices.

As a nonprofit 501(c)(3) organization and "representative of the news media" as discussed in Section II, the ACLU is well-situated to disseminate information it gains from this request to the general public and to groups that protect constitutional rights. Because the ACLU meets the test for a fee waiver, fees associated with responding to FOIA requests are regularly waived for the ACLU.[17]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[15] 50 U.S.C. § 1801 *et seq.*
[16] INTELLIGENCE ACTIVITIES AND THE RIGHTS OF AMERICANS, BOOK II: FINAL REPORT OF THE SELECT COMMITTEE TO STUDY GOVERNMENTAL OPERATIONS WITH RESPECT TO INTELLIGENCE ACTIVITIES. UNITED STATES SENATE. APRIL 26, 1976. *Available at* http://www.icdc.com/~paulwolf/cointelpro/churchfinalreportIIa.htm.
[17] For example, in May 2005, the United States Department of Commerce granted a fee waiver to the ACLU with respect to its request for information regarding the radio frequency identification chips in United States passports. In March 2005, the Department of State granted a fee waiver to the ACLU with regard to a request submitted that month regarding the use of immigration laws to exclude prominent non-citizen scholars and intellectuals from the country because of their political views, statements, or associations. Also, the Department of Health and Human Services granted a fee waiver to the ACLU with regard to a FOIA request submitted in August of 2004. In addition, the Office of Science and Technology Policy in the Executive Office of the President said it would waive the fees associated with a FOIA request submitted by the ACLU in August 2003. In addition, three separate agencies -- the Federal Bureau of Investigation, the Office of Intelligence Policy and Review, and the Office of Information and Privacy in the Department of Justice -- did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002.

The records requested are not sought for commercial use, and the requesters plan to disseminate the information disclosed as a result of this FOIA request through the channels described in Section II. As also stated in Section II, the ACLU will make any information disclosed as a result of this FOIA available to the public at no cost.

## IV.    Expedited Processing Request

ERICAN CIVIL LIBERTIES
ION FOUNDATION

Expedited processing is warranted because there is "[a]n urgency to inform the public about an actual or alleged government activity" by organizations "primarily engaged in disseminating information." 28 CFR § 16.5(d)(1)(ii).[18] This request implicates an urgent matter of public concern; namely, the NSA's potentially extensive warrantless electronic surveillance and/or physical searches in the United States. Such government activity may infringe upon the public's free speech, free association, and privacy rights, which are guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Requests for information bearing upon potential Constitutional violations require an immediate response so that any violations cease and future violations are prevented.

A requestor may also demonstrate the need for expedited processing by showing that the information sought relates to "a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv). The instant request clearly meets these standards as the request relates to possible violations of Constitutional rights by federal law enforcement officials. It took less than a day for Arlen Specter, the Republican chairman of the Senate Judiciary Committee, to pledge that the Senate would hold hearings to investigate the NSA's warrantless surveillance. Jennifer Loven, *Report of NSA Spying Prompts Call for Probe*, San Francisco Chronicle, Dec. 16, 2005. That the President chose to give a rare, live radio address providing additional information about the NSA's warrantless surveillance the day after it was revealed underscores the urgency of the ACLU's request. The urgent and time sensitive nature of the request is also apparent from the widespread and sustained media coverage the NSA's warrantless domestic surveillance activities have garnered. *See, e.g.*, James Risen and Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, New

---

[18] The ACLU is "primarily engaged in disseminating information," as discussed in Sections II and III.

10

York Times, Dec. 16, 2005, at A1; Maura Reynolds and Greg Miller, *Congress Wants Answers About Spying on U.S. Citizens*, Pittsburgh Post-Gazette, Dec. 16, 2005; Steven Thomma, *Spying Could Create Backlash on Congress; Public Reaction Hinges on Identity of Targets*, San Jose Mercury News, Dec. 16, 2005; Christine Hauser, *Bush Declines to Discuss Report on Eavesdropping*, New York Times, Dec. 16, 2005; Katherine Shrader, *Lawmakers Say Reported Spy Program Shocking, Call For Investigations*, San Diego Union Tribune, Dec. 16, 2005; Caren Bohan and Thomas Ferraro, *Bush Defends Eavesdropping and Patriot Act*, ABC News, Dec. 17, 2005; Dan Eggan and Charles Lane, *On Hill, Anger and Calls for Hearing Greet News of Stateside Surveillance*, Washington Post, Dec. 17, 2005, at A1; Jennifer Loven, *Bush Defends Secret Spying in U.S.*, San Francisco Chronicle, Dec. 17, 2005; Barton Gellman and Dafna Linzer, *Pushing the Limits of Wartime Powers*, Washington Post, Dec. 18, 2005, at A1; John Diamond, *NSA's Surveillance of Citizens Echoes 1970s Controversy*, USA Today, Dec. 18, 2005; James Kuhnhenn, *Bush Defends Spying in U.S.*, San Jose Mercury News, Dec. 18, 2005; Fred Barbash and Peter Baker, *Gonzales Defends Eavesdropping Program*, Washington Post, Dec. 19, 2005; Todd J. Gillman, *Bush Assails Disclosure of Domestic Spying Program*, San Jose Mercury News, Dec. 19, 2005; David Stout, *Bush Says U.S. Spy Program is Legal and Essential*, New York Times, Dec. 19, 2005; James Gerstenzang, *Bush Vows to Continue Domestic Surveillance*, L.A. Times, Dec. 19, 2005; Terence Hunt, *Bush Says NSA Surveillance Necessary, Legal*, Washington Post, Dec. 19, 2005; George E. Condon, *Bush Says Spying Is Needed To Guard US*, San Diego Union Tribune, Dec. 20, 2005; Jeff Zeleny, *No 'Unchecked Power' In Domestic Spy Furor*, Chicago Tribune, Dec. 20, 2005; Michael Kranish, *Bush Calls Leak of Spy Program Shameful*, Boston Globe, Dec. 20, 2005; Craig Gordon, *For Bush, 9/11 Justifies Eavesdropping*, Newsday, Dec. 20, 2005; Terence Hunt, *Bush Defends Domestic Spying Program as Effective Tool in War on Terror*, Detroit Free Press, Dec. 19, 2005.

Finally, pursuant to applicable regulations and statute, the ACLU expects the determination of this request for expedited processing within 10 calendar days and the determination of this request for documents within 20 days. *See* 28 CFR § 16.5(d)(4); 5 U.S.C. § 552(a)(6)(A)(i).

If this request is denied in whole or in part, we ask that you justify all deletions by reference to specific exemptions to FOIA. The ACLU expects the release of all segregable portions of otherwise exempt material. The ACLU reserves the right to appeal a decision to withhold any information or to deny a waiver of fees.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

11

Thank you for your prompt attention to this matter. Please furnish all applicable records to:

Ann Beeson
Associate Legal Director
American Civil Liberties Union
125 Broad Street, 18th floor
New York, NY 10004

I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief.

Sincerely,

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Ann Beeson
Associate Legal Director
American Civil Liberties Union

# Exhibit B



U.S. Department of Justice

Federal Bureau of Investigation

*Washington, D.C. 20535*

MARCH 24, 2006

MS ANN BEESON
AMERICAN CIVIL LIBERTIES UNION
18ᵀᴴ FLOOR
125 BROAD STREET
NEW YORK, NY 10004 2400

Subject: NSA ELECTRONIC SURVEILLANCE/9/11/2001 TO
PRESENT

FOIPA No. 1039263- 001

Dear Requester:

The enclosed documents were reviewed under the Freedom of Information/Privacy Acts (FOIPA), Title 5, United States Code, Section 552/552a. Deletions have been made to protect information which is exempt from disclosure, with the appropriate exemptions noted on the page next to the excision. In addition, a deleted page information sheet was inserted in the file to indicate where pages were withheld entirely. The exemptions used to withhold information are marked below and explained on the enclosed Form OPCA-16a:

|  Section 552 |  |  Section 552a |
|---|---|---|
| □(b)(1) | □(b)(7)(A) | □(d)(5) |
| □(b)(2) | □(b)(7)(B) | □(j)(2) |
| □(b)(3)_____ | □(b)(7)(C) | □(k)(1) |
| _____ | □(b)(7)(D) | □(k)(2) |
| _____ | □(b)(7)(E) | □(k)(3) |
| _____ | □(b)(7)(F) | □(k)(4) |
| □(b)(4) | □(b)(8) | □(k)(5) |
| ☒(b)(5) | □(b)(9) | □(k)(6) |
| □(b)(6) |  | □(k)(7) |

257 **page(s)** were reviewed and 100 **page(s)** are being released.

☒   Document(s) were located which originated with, or contained information concerning other Government agency(ies) [OGA]. This information has been:

☐   referred to the OGA for review and direct response to you.

☒   referred to the OGA for consultation. The FBI will correspond with you regarding this information when the consultation is finished.

☒ You have the right to appeal any denials in this release. Appeals should be directed in writing to the Co-Director, Office of Information and Privacy, U.S. Department of Justice,1425 New York Ave., NW, Suite 11050, Washington, D.C. 20530-0001 within sixty days from the date of this letter. The envelope and the letter should be clearly marked "Freedom of Information Appeal" or "Information Appeal." Please cite the FOIPA number assigned to your request so that it may be easily identified.

☐ The enclosed material is from the main investigative file(s) in which the subject(s) of your request was the focus of the investigation. Our search located additional references, in files relating to other individuals, or matters, which may or may not be about your subject(s). Our experience has shown, when ident, references usually contain information similar to the information processed in the main file(s).

Because of our significant backlog, we have given priority to processing only the main investigative file(s). If you want the references, you must submit a separate request for them in writing, and they will be reviewed at a later date, as time and resources permit.

☒ See additional information which follows.

Sincerely yours,

David M. Hardy
Section Chief
Record/Information
   Dissemination Section
Records Management Division

Enclosure(s)

        This is an interim response to your Freedom of Information Act (FOIA) request dated December 20, 2005, for records dated from September 11, 2001 to the present relating to the National Security Agency ("NSA") surveillance program, which was referred by the Justice Management Division, U.S. Department of Justice and received by us on February 27, 2006. The enclosed material was located following searches in the FBI Office of Congressional Affairs. A total of 100 pages are being released in full with no redactions. A total of 156 pages have been withheld in full pursuant to Exemption 5, 5 U.S.C. 552 (b)(5). Exemption 5 pertains to certain inter- and intra-agency communications protected by the deliberative process, attorney-client, attorney work-product and presidential communications privileges. We are continuing our search efforts and will notify you if we identify any additional records responsive to your request.

        Please also be advised that we have referred a document to the Office of Legislative Affairs at the U.S. Department of Justice for consultation. We will forward this to you at the earliest possible date.

        Although we are aware that your request is the subject of ongoing litigation and that appeals are not ordinarily acted upon in such situations, I am required by statute and regulation to inform you that you have the right to file an administrative appeal.

# Exhibit C



U.S. Department of Justice

Federal Bureau of Investigation

*Washington, D.C. 20535*

July 21, 2006

Ms. Ann Beeson
Associate Legal Director
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, N.Y. 10004

Subject:  Terrorism Surveillance Program
FOIPA No. 1039263

Dear Ms. Beeson:

The enclosed documents were reviewed under the Freedom of Information Act (FOIA),
5 U.S.C. § 552. Deletions have been made to protect information which is exempt from disclosure, with the
appropriate exemptions noted on the page next to the excision. In addition, a deleted page information sheet
was inserted in the file to indicate where pages were withheld entirely. The exemptions used to withhold
information are marked below and explained on the enclosed Form OPCA-16a:

| Section 552 | | Section 552a |
|---|---|---|
| ☒(b)(1) | ☒(b)(7)(A) | ☐(d)(5) |
| ☒(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☒(b)(3) Section 102A(i)(I) of the | ☒(b)(7)(C) | ☐(k)(1) |
| Intelligence Reform and Terrorism | ☐(b)(7)(D) | ☐(k)(2) |
| Prevention Act of 2004, | ☒(b)(7)(E) | ☐(k)(3) |
| 50 U.S.C. § 403-1(i)(1) | ☒(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☒(b)(5) | ☐(b)(9) | ☐(k)(6) |
| ☒(b)(6) | | ☐(k)(7) |

___0___  pages are being released in full.

☒  Document(s) were located which originated with, or contained information concerning other
Government agencies [OGAs]. This information has been:

☐  referred to the following OGAs for review and direct response to you.

☒  referred to OGAs for consultation. The FBI will correspond with you regarding this
information when the consultation is finished.

☒ You have the right to appeal any denials in this release. Appeals should be directed in
writing to the Director, Office of Information and Privacy, U.S. Department of Justice,
1425 New York Avenue, N.W., Suite 11050, Washington, D.C. 20530-0001 within sixty (60)
days from the date of this letter. The envelope and the letter should be clearly marked
"Freedom of Information Appeal" or "Information Appeal." Please cite the FOIPA number
assigned to your request so that it may be easily identified.

☐ The enclosed material is from the main investigative file(s) in which the subject(s) of your
request was the focus of the investigation. Our search located additional references, in files
relating to other individuals, or matters, which may or may not be about your subject(s). Our
experience has shown, when ident, references usually contain information similar to the
information processed in the main file(s). Because of our significant backlog, we have given
priority to processing only the main investigative file(s). If you want the references, you must
submit a separate request for them in writing, and they will be reviewed at a later date, as time
and resources permit.

☒ See additional information which follows.

Sincerely yours,

David M. Hardy
Section Chief
Record/Information
  Dissemination Section
Records Management Division

Enclosure(s)

This is a supplemental response to the FBI's March 24, 2006 interim response to your
Freedom of Information Act (FOIA) request dated December 20, 2005, for records dated from
September 11, 2001 to the present relating to the Terrorist Surveillance Program, as described in the
President's December 17, 2005 radio address. Your request was referred to the FBI by the Justice
Management Division ("JMD"), U.S. Department of Justice ("DOJ"), for possible responsive
records, and received by the FBI on or about February 27, 2006. The additional material was
identified as a result of additional searches conducted in the Office of the Director, Office of the
General Counsel and the Counterterrorism Division at FBIHQ.

A number of documents have been identified as responsive to your request but are being
withheld in full pursuant to FOIA Exemptions 1, 2, 5, 6, 7(A), 7(C), 7(D), 7(E) and 7(F), 5 U.S.C.
§§ 552 (b)(1), (b)(2), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), (b)(7)(E) and (b)(7)(F).
Exemption 1 pertains to national security information which is properly classified pursuant to
Executive Order 12958, as amended. The information protected by this exemption is currently
properly classified because its disclosure could reasonably be expected to cause damage to the
national security. Exemption 2 exempts from disclosure information related solely to the internal
personnel rules and practices of an agency. This exemption encompasses two distinct categories of

information, both of which are present here, which are internal in nature: trivial administrative matters of no genuine public interest ("Low 2") and information the disclosure of which would risk circumvention of a statute or regulation ("High 2"). Exemption 5 pertains to certain inter- and intra-agency communications protected by the deliberative process and attorney-client privileges. Exemption 6 pertains to information the release of which would constitute a clearly unwarranted invasion of the personal privacy of third parties. Exemption 7(A) pertains to information compiled for law enforcement purposes the disclosure of which could reasonably be expected to interfere with enforcement proceedings. Exemption 7(C) pertains to records or information compiled for law enforcement purposes the release of which could reasonably be expected to constitute an unwarranted invasion of the personal privacy of third parties. Exemption 7(D) provides protection for records compiled for law enforcement purposes which could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and information furnished by a confidential source. Exemption 7(E) protects records compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure would reasonably be expected to risk circumvention of the law. Finally, Exemption 7(F) permits the withholding of law enforcement-related information necessary to protect the physical safety of a wide range of individuals. This exemption provides broad protection to "any individual" when disclosure of information about him "could reasonably be expected to endanger [his] life or physical safety."

Certain documents which originated with the FBI contain equities of other DOJ components and/or other federal agencies. We are in the process of consulting with those DOJ components and/or agencies and will advise you when the consults are completed. In addition, certain documents originated with other DOJ components and/or other federal agencies. We are also in the process of referring with those offices with regard to that material, and will advise you as to the outcome of these referrals when they have been completed.

In addition, in connection with its review for responsive records, other DOJ components (including Office of Intelligence Policy and Review ("OIPR"), Office of the Deputy Attorney General ("ODAG") and Office of the Legal Counsel ("OLC")) have referred certain documents to the FBI for consultation   We are in the process of reviewing these documents in order to ascertain whether and what exemptions, if any, apply and will advise these components as soon as that process is completed.

As we complete our search and referral efforts, we will notify you in the event that FBIHQ identifies any additional records responsive to your request.

Although we are aware that your request is the subject of ongoing litigation and that appeals are not ordinarily acted upon in such situations, I am required by statute and regulation to inform you that you have the right to file an administrative appeal. Appeals should be directed in writing to the Director, Office of Information and Privacy, U.S. Department of Justice, 1425 New York Avenue, N.W., Suite 11050, Washington, D.C. 20530-0001 within sixty (60) days from the date of this letter. The envelope and the letter should be clearly marked "Freedom of Information Appeal" or "Information Appeal." Please cite the FOIPA number assigned to your request so that it may be easily identified.