IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | ) ) ) | |
| Plaintiff, | ) ) | Civil No. 06-00096 (HHK) |
| v. | ) ) | |
| DEPARTMENT OF JUSTICE, | ) ) | |
| Defendant. | ) ) | |
| AMERICAN CIVIL LIBERTIES UNION, et al., | ) ) | Civil No. 06-00214 (HHK) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| DEPARTMENT OF JUSTICE, | ) ) | |
| Defendant. | ) ) | |

## DECLARATION OF JOSEPH B.[1]

I, Joseph B., declare as follows:

1. I am the Deputy Chief of Staff for Operations and Support for the Signals Intelligence Directorate of the National Security Agency (NSA), an intelligence agency within the Department of Defense. I oversee signals intelligence (SIGINT) operations of NSA, which includes the SIGINT units of the U.S. armed services. Under Executive Order No. 12333, 46 Fed. Reg. 59941 (1981), as amended on January 23, 2003, 68 Fed. Reg. 4075 (2003), and August 27, 2004, 69 Fed. Reg. 53593 (2004), the NSA SIGINT Directorate is responsible for the collection, processing, and dissemination of SIGINT

---

[1] This Agency official's name is not a matter of public record and pursuant to P.L. 86-36 has been withheld.

information for the foreign intelligence purposes of the United States. I am responsible for protecting NSA SIGINT activities, sources and methods against unauthorized disclosures. I have been designated an original TOP SECRET classification authority under Executive Order No. 12958, 60 Fed. Reg. 19825 (1995), as amended on March 25, 2003, 68 Fed. Reg. 15315 (2003), and Department of Defense Directive No. 5200.1-R, Information Security Program Regulation, 32 C.F.R. 159a.12 (2000).

2. My statements herein are based on my personal knowledge of SIGINT collection and NSA operations and the information available to me in my capacity as the Deputy Chief of Staff for Operations and Support for the Signals Intelligence Directorate. Moreover, as NSA's Original Classification Authority for the Terrorist Surveillance Program (TSP), I am one of the few Agency officials who have been cleared to have access to the details of the TSP and the documents related thereto. I am responsible for ensuring that these details are properly classified when necessary to protect intelligence sources and methods. Accordingly, I have knowledge of the documents reviewed by NSA upon referral by the Department of Justice in response to the Plaintiffs' FOIA requests to that agency..

## THE TERRORIST SURVEILLANCE PROGRAM (TSP)

3. Following the devastating attacks of September 11, 2001, the President of the United States authorized the NSA to intercept international communications into and out of the United States of persons linked to al Qaeda or related terrorist organizations (hereinafter, the "Terrorist Surveillance Program" or "TSP"). The TSP is a targeted and focused program intended to help "connect the dots" between known and potential terrorists and their affiliates. In order to intercept a communication under the TSP, there

must be a reasonable basis to conclude that one party to the communication must be located outside the United States and that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda. Thus, the TSP program is an "early warning" system with one purpose: to detect and prevent another catastrophic attack on the United States.

4. The TSP is a SIGINT program that is critical to the national security of the United States. The President publicly acknowledged the existence of the program on December 17, 2005. As the President has made clear, however, details about the TSP remain highly classified and subject to special access restrictions under the criteria set forth in Executive Order 12958, as amended. Unauthorized disclosure of information regarding the TSP can be expected to cause exceptionally grave damage to the national security of the United States. Thus, pursuant to the criteria outlined in Executive Order 12958, as amended, information related to the TSP is classified TOP SECRET, and is subject to the special access and handling requirements reserved for "Sensitive Compartment Information," (SCI), because it involves or derives from particularly sensitive intelligence sources and methods.

5. NSA's SIGINT operations, including the TSP, are both sensitive and fragile. As more fully described in the Declaration of Louis Giles, which I have reviewed, the critical intelligence information that is derived from NSA's SIGINT operations depends upon the collection of electronic communications, which can be easily compromised if targets are made aware of NSA capabilities and priorities. If an individual learns or suspects that his signals are or may be targeted by the NSA for collection, he can take steps to evade detection, to manipulate the information that NSA receives, or to

implement other countermeasures aimed at undermining the NSA's operations. The resulting loss of accurate intelligence from such a source deprives U.S. policy makers of information critical to U.S. interests, and in the case of the TSP, could result in the catastrophic failure of the early warning system that the President has established to detect and prevent the next terrorist attack.

6. Congress has specifically recognized the inherent sensitivity of the SIGINT activities of the NSA; thus, Congress has passed three statutes that protect the fragile nature of NSA's SIGINT efforts, including, but not limited to, the existence and depth of SIGINT-related analytical successes, weaknesses, and exploitation techniques. These statutes recognize the vulnerability of signals intelligence to countermeasures of a foreign power or terrorist party and the significance of the loss of valuable foreign intelligence information to national policymakers and the intelligence community. These statutes are: Section 6 of the National Security Agency Act of 1959 (codified at 50 U.S.C. § 402 note), Section 102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-1(i)(1), and 18 U.S.C. § 798. Under these statutes, NSA is specifically authorized to protect certain information concerning its activities, and its intelligence sources and methods, from public disclosure.

## PLAINTIFFS EPIC and ACLU'S FOIA REQUEST

7. By letter dated December 16, 2005, Plaintiff EPIC submitted a FOIA request to the Department of Justice seeking records "from September 11, 2001 to the present concerning a presidential order or directive authorizing the National Security Agency ("NSA"), or any other component of the Intelligence community, to conduct surveillance without the prior authorization of the Foreign Intelligence Surveillance Court." Exhibit

4

1. Plaintiff EPIC further set out four items to describe the information they were seeking in its FOIA request. Id. As part of its response to this request, the Department of Justice referred certain responsive records that originated at NSA and/or in which NSA had equities to the NSA for review.

8. By letter dated December 20, 2005, Plaintiff ACLU submitted a FOIA request seeking records on "any presidential order(s) authorizing the NSA to engage in warrantless electronic surveillance and/or warrantless physical searches in the United States, created from September 11, 2001 to the present." Exhibit 2. Additionally, Plaintiff ACLU sought records on seventeen (17) specific items as set forth in their FOIA request. Id. As part of its response to this request, the Department of Justice also referred certain responsive records that originated at NSA and/or in which NSA had equities to the NSA for review.

9. The purpose of this declaration is to advise the Court that my office reviewed the records that were referred by the Department of Justice in response to Plaintiffs EPIC and ACLU's FOIA request. Based on that review, NSA has determined that all responsive referred records were currently and properly classified and that they were also protected from disclosure by various statutes. Further, based on this review, my office determined that no meaningful portion of any of these records can be released to the Plaintiffs as the information is currently and properly classified and protected from disclosure by various statutes. Additionally, some responsive records are legal opinions and memoranda, as well as deliberative inter-agency exchanges relating to such legal opinion and memoranda, which in addition to being currently and properly classified and protected from disclosure by statute, also contain information that is protected from

5

disclosure by the deliberative process privilege, attorney-client privilege, and the attorney-work product doctrine.

10. Based on my knowledge of the TSP, my understanding of the exemptions provided for by FOIA, and my consultation with Louis Giles (NSA's Director of Policy and the official responsible for the processing of all requests made pursuant to FOIA), I believe, as explained in the detail below, that all of the records referred to NSA by the Department of Justice that are responsive to Plaintiffs' FOIA requests are exempt from disclosure in their entirety pursuant to Exemptions 1 and 3 of the FOIA, and also Exemption 5, for legal memoranda and opinions, and deliberative inter-agency exchanges relating to those legal memoranda and opinions.

## A. Plaintiffs EPIC and ACLU's General Requests for Records on the TSP

11. Plaintiffs EPIC and ACLU's broad FOIA requests on their face appear to seek information on operation details used by NSA to carry out the TSP. This requested information meets the criteria for classification as set forth in Subparagraphs (c) and (g) of Section 1.4 of Executive Order 12958, as amended, which authorizes the classification of information concerning "intelligence activities (including special activities), intelligence sources or methods, or cryptology," and "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection systems relating to national security, which includes defense against transnational terrorism." Information responsive to these requests is classified TOP SECRET-SCI, which means that its unauthorized disclosure "reasonably could be expected to cause exceptionally grave damage to the national security," and that the information is subject to special access and handling restrictions.

6

12. To the extent that Plaintiffs' FOIA requests encompass specific information under the program, such as the number of individuals/organizations targeted under the TSP, and/or the identity of such individuals/organizations, any disclosure of this information would obviously and immediately affect the ability of NSA to fulfill the primary purpose of the TSP: to detect and prevent the next terrorist attack against the United States. To identify targets of the TSP is to offer official confirmation that such persons have been identified as, or linked to, a potential threat. Such official confirmation is invaluable information to the enemy; its disclosure will alert the enemy that their operations may have been compromised and allow them to adopt strategies to circumvent surveillance and to otherwise evade detection, doing immeasurable damage to the national security of the United States.

13. Further, the disclosure of information about the operational details of the TSP would reveal information about NSA's success or lack of success in implementing the TSP. The disclosure of NSA's ability or lack of ability to access or monitor an individual's communications for interception reveals to that individual information about the U.S. intelligence community's capabilities, priorities, and activities. The disclosure of this information could reasonably be expected to cause exceptionally grave damage to the national security because it gives the nation's adversaries information about the nature and frequency of the Government's use of specific techniques that could assist them in undermining the NSA and the intelligence community's national security mission.

14. Specifically, because NSA's ability to produce foreign intelligence information depends on its access to foreign and international electronic communications, public disclosure of either the capability to collect specific communications, the

7

substance of the information derived from such collection, or the frequency with which such information is collected can easily alert targets to the vulnerability of their communications. Targeted individuals know how they communicated, and as such, would know, upon NSA's confirmation or denial which of their communications were vulnerable to NSA's electronic surveillance. Once alerted, SIGINT targets can frustrate SIGINT collection by using different communications techniques; or by utilizing a different communications link. This may deny access to the target's communications and therefore deny access to information crucial to the defense of the United States both here and abroad.

15. Thus, disclosing any operational details of the TSP, to include, but not limited to information on the number of individuals or organizations subject to surveillance, would provide our adversaries with critical information about the capabilities and limitations of the NSA, such as the types of communications that may be susceptible to NSA detection. Our adversaries could exploit this information in order to conduct their international terrorist activities more securely, to the detriment of the national security of the United States. Accordingly, any operational details of the TSP are exempt from disclosure pursuant to Exemption 1 of the FOIA because the information is currently and properly classified in accordance with Executive Order 12958, as amended.

16. As described above, Congress has enacted three statutes to protect the fragile nature of NSA's SIGINT efforts, to include but not limited to, the existence and depth of signal intelligence-related analytical successes, weaknesses and exploitation techniques. These statutes recognize the vulnerability of signals intelligence to countermeasures and the significance of the loss of valuable intelligence information to national policymakers

8

and the intelligence community. Given that Congress specifically prohibited the disclosure of information related to NSA's functions and activities and its communications intelligence activities, as well as the sources and methods used by the intelligence community as a whole, I have determined that NSA's SIGINT activities and functions, and its intelligence sources and methods would be revealed if information responsive to Plaintiffs EPIC and ACLU's FOIA requests were disclosed. This information is exempted from disclosure by all three statutes and thus information responsive to Plaintiffs' request is also properly withheld under Exemption 3 of FOIA.

17. I have reviewed the responsive information referred by the Department of Justice in my capacity as an Original Classification Authority. The responsive information is itself material that is currently and properly classified for the reasons set forth above. Moreover, such information is so intertwined with additional information regarding the details of operation of the program that it cannot be segregated and released without compromising the national security of the United States. Even the release of general information about the TSP poses the substantial risk that our adversaries will be able to piece together sensitive information about how the program operates. For example, disclosing the dates on which documents were created, the subjects of TSP-related documents, or the volume of documents relating to the TSP reveals information about the capabilities, scope and effectiveness of the program, which would be utilized by the enemy and allow them to plan their terrorist activities more securely. Accordingly, no segregable portion of the responsive documents may be disclosed.

9

**B. Plaintiffs' Requests for Records on NSA policies, procedures, and practices as well as audits and checklists on the TSP (EPIC's Items 1 and 2 and ACLU's Items 2, 3, 7, 8, 9. 14, and 15)**

18. Although both Plaintiffs, in their FOIA requests, seek broad information on the TSP, each Plaintiff specifies certain information they are seeking in their numerically listed items. Exhibits 1 and 2. I will explain why information responsive to each of the Plaintiffs' enumerated items is exempt from disclosure under the FOIA.

19. Both EPIC and ACLU seek information on NSA's implementation of the TSP to include seeking information on checklists for probable cause determinations, various policies, procedures, and practices of the NSA as it relates to the TSP, and audits of the TSP. Id. I have reviewed information responsive to EPIC's Items 1 and 2 and ACLU's Items 2, 3, 7, 8, 9, 14, and 15, and I have concluded that disclosure of information responsive to these item would reveal details about the operation of the TSP, and its strengths and vulnerabilities, which could have the effect of compromising the effectiveness of the program and undermining its goal of detecting and preventing the next terrorist attack on the United States. Thus, such information is properly and currently classified pursuant to the criteria set forth in Executive Order 12958, as amended, and is exempt from disclosure pursuant to the statutory prohibitions discussed above. Such information, accordingly, is exempt from disclosure under FOIA exemptions 1 and 3.

20. Further, to disclose the criteria used to identify which individuals might be subject to monitoring by the United States essentially provides the enemy with a checklist of their own, which they can implement to attempt to evade monitoring, thus potentially depriving the NSA of the opportunity to collect information essential to the detection and

10

prevention of the next terrorist attack. Such information is properly withheld under Exemption 1 of FOIA. Such information, moreover, is critical information relating to the activities and functions of the NSA, and to its methods of collecting intelligence, and is, thus, subject to statutory protection as set forth above, and properly withheld under Exemption 3 of FOIA.

21. In addition to being currently and properly classified and protected from release by various statutes as described above, the information responsive is also protected from disclosure because it is privileged and thus exempt from disclosure under FOIA Exemption 5. The privileges that apply here are the deliberative process privilege, the attorney-client privilege, and the attorney-work product doctrine.

22. Information responsive to Plaintiffs EPIC and/or ACLU's request for audits/inquiries into the TSP, probable cause checklists, and procedures and practices for collecting information under the TSP would be part of a predecisional deliberative process, and/or attorney-client privileged information, and/or attorney work product. Discussions about the performance, effectiveness, and methods for improving, or otherwise modifying the TSP are an integral part of the deliberative process. Similarly, consultation with Agency attorneys regarding the parameters of NSA's authority or other matters pertaining to the TSP fall within the attorney-client privilege and attorney-work product doctrine. The release of this information could chill the decision-making process of Agency personnel.

23. The logic behind the deliberative process privilege is that by maintaining the confidentiality of the give-and-take that occurs among agency members in the formulation of policy, the deliberative process privilege encourages frank and open

discussions of ideas, and hence, improves the decision making process. This entire

process would be harmed if participants could no longer expect confidentiality when

engaging in internal discussions.

### C.  Plaintiffs EPIC and ACLU's requests for records on the number of individuals/organizations and/or communications monitored under the TSP (EPIC's Item 3 and ACLU's Items 1, 4, 10, 11, 12, 13, 14 and 17)

24.  As stated previously, any operational details about the TSP are currently and

properly classified in accordance with Executive Order 12958, as amended, and protected

from disclosure by statute.  Accordingly, all responsive records concerning the types of

communications monitored and/or the number of individuals/organizations monitored

under the TSP is currently and properly classified, and thus exempt from disclosure under

FOIA Exemption 1.  Likewise, such information pertains to NSA's SIGINT activities and

functions, and sources and methods and thus would be exempt from disclosure pursuant

to FOIA Exemption 3 as all three statutes protect the disclosure of this information.

25.  To the extent that Plaintiffs' requests would entail disclosure of information

about particular cases in which communications were intercepted, then NSA's only

response is that it cannot confirm publicly in any particular case whether or not any

communications were collected pursuant to the TSP or, conversely, that no such

collection occurred.

26.  Confirmation by NSA that a person's activities are not of foreign intelligence

interest or that NSA is unsuccessful in collecting foreign intelligence information on their

activities on a case-by-case basis would allow our adversaries to accumulate information

and draw conclusions about NSA's technical capabilities, sources, and methods.  Our

adversaries would have a road map, instructing them which communications modes and

12

personnel remain safe or are successfully defeating NSA's capabilities. For example, if NSA were to admit publicly in response to an information request that no information about Persons X, Y or Z exists, but in response to a separate information request about Person T state only that no response could be made, this would give rise to the inference that Person T is a target of the TSP. Over time, the accumulation of these inferences would disclose the targets and capabilities (sources and methods) of the TSP and inform our adversaries of the degree to which NSA is aware of some of their operatives or can successfully exploit particular communications.

27. NSA cannot respond to each case in isolation, but must acknowledge that our adversaries will examine all released information together. This compilation of information, if disclosed, could reasonably be expected to cause exceptionally grave and irreparable damage to the national security. Therefore, the fact of the existence or nonexistence of the information concerning the specific targeting of individuals/organizations is a currently and properly classified matter in accordance with Executive Order 12958, as amended and thus the request is properly denied pursuant to FOIA Exemption 1.

28. The fact of the existence or nonexistence of targeting information is also protected from disclosure by federal statute. Acknowledging the existence or nonexistence of specific targeting information would reveal NSA's organization, functions and activities by revealing the success or failure of NSA's activities. It would also reveal the intelligence sources and methods that NSA uses to obtain this information. Revelation of this information is prohibited pursuant to Section 6 of the National Security Agency Act of 1959, 50 U.S.C. 402 note, and Section 102A(i)(1) of the Intelligence

Reform and Terrorism Prevention Act of 2004. Finally, this information would reveal

the limitations of NSA SIGINT capabilities. This revelation of communications

intelligence capabilities and limitations is prohibited by 18 U.S.C. § 798. Thus, these

disclosures are prohibited by statute, and are properly exempt from disclosure under

FOIA Exemption 3.

## D. Plaintiffs EPIC and ACLU's request for legal memoranda, opinions and reviews pertaining to the TSP (EPIC's Item 4 and ALCU's Item 5, 6, 15 and 16)

29. Similarly, the records responsive to these items are all currently and properly

classified in accordance with Executive Order 12958 for the reasons set forth in this

declaration and they are protected from disclosure by the three statutes. Accordingly, the

responsive information is exempt from disclosure pursuant to Exemption 1 and 3 of the

FOIA. Moreover, this information would be part of a predecisional deliberative process,

and/or attorney-client privileged information, and/or attorney work product. Discussions

about the legality, performance, effectiveness, and methods for improving, or otherwise

modifying the TSP are an integral part of the deliberative process. Similarly,

consultation with Agency attorneys regarding the parameters of NSA's authority or other

matters pertaining to the TSP fall within the attorney-client privilege and attorney-work

product doctrine. The release of this information could chill the decision-making process

of Agency personnel. Accordingly, the Plaintiffs' requested information is also exempt

pursuant to Exemption 5 of the FOIA.

I declare under of penalty of perjury that the foregoing is true and correct.

Signed this ___8th___ day of September 2006

JOSEPH B.
Deputy Chief of Staff
        for Operations and Support
Signals Intelligence Directorate
National Security Agency

15

# EXHIBIT 1

# epic.org

December 16, 2005

1718 Connecticut Ave NW

Suite 200

Washington DC 20009

USA

+1 202 483 1140 [tel]

+1 202 483 1248 [fax]

www.epic.org

VIA FACSIMILE — (202) 305-4211

GayLa D. Sessoms, FOIA Coordinator
Office of Intelligence Policy and Review
Department of Justice
Room 6150, 950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

    RE:   <u>Freedom of Information Act Request and Request for Expedited Processing</u>

Dear Ms. Sessoms:

This letter constitutes an expedited request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted to the Department of Justice ("DOJ") Office of Intelligence Policy and Review on behalf of the Electronic Privacy Information Center ("EPIC").

We are seeking agency records (including but not limited to electronic records) from September 11, 2001 to the present concerning a presidential order or directive authorizing the National Security Agency ("NSA"), or any other component of the intelligence community, to conduct domestic surveillance without the prior authorization of the Foreign Intelligence Surveillance Court ("FISC").

The existence of such an order and the DOJ's familiarity with it was reported in an article entitled *Bush Lets U.S. Spy on Callers Without Courts* that appeared on the front page of the New York Times this morning (see attached article). The records requested by EPIC include (but are not limited to) the following items mentioned in this article:

1. an audit of NSA domestic surveillance activities;

2. guidance or a "checklist" to help decide whether probable cause exists to monitor an individual's communications;

3. communications concerning the use of information obtained through NSA domestic surveillance as the basis for DOJ surveillance applications to the FISC; and

4. legal memoranda, opinions or statements concerning increased domestic surveillance, including one authored by John C. Yoo shortly after September 11, 2001 discussing the potential for warrantless use of enhanced electronic surveillance techniques.

Request for Expedited Processing

This request clearly meets the standard for expedited processing under applicable Department of Justice regulations because it involves a "matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv). In addition, this request pertains to a matter about which there is an "urgency to inform the public about an actual or alleged Federal government activity," and the request is made by "a person primarily engaged in disseminating information." 5 U.S.C. § 552(a)(6)(E)(v)(II). A copy of this request has been provided to the Director of Public Affairs as required by 28 C.F.R. § 16.5(d)(2).

The government activity at issue here — President Bush's authorization of warrantless domestic surveillance, and the DOJ's knowledge of and relationship to such surveillance — raises serious legal questions about the government's intelligence activity and has received considerable media attention in the past few hours. The New York Times reported on its front page this morning:

> Months after the Sept. 11 attacks, President Bush secretly authorized the National Security Agency to eavesdrop on Americans and others inside the United States to search for evidence of terrorist activity without the court-approved warrants ordinarily required for domestic spying, according to government officials.

> Under a presidential order signed in 2002, the intelligence agency has monitored the international telephone calls and international e-mail messages of hundreds, perhaps thousands, of people inside the United States without warrants over the past three years in an effort to track possible "dirty numbers" linked to Al Qaeda, the officials said.

> *      *      *

> In mid-2004, concerns about the program expressed by national security officials, government lawyers and a judge prompted the Bush administration to suspend elements of the program and revamp it.

> For the first time, the Justice Department audited the N.S.A. program, several officials said. And to provide more guidance, the Justice Department and the agency expanded and refined a checklist to follow in deciding whether probable cause existed to start monitoring someone's communications, several officials said.

2

A complaint from Judge Colleen Kollar-Kotelly, the federal judge who oversees the Federal Intelligence Surveillance Court, helped spur the suspension, officials said. The judge questioned whether information obtained under the N.S.A. program was being improperly used as the basis for F.I.S.A. wiretap warrant requests from the Justice Department, according to senior government officials. While not knowing all the details of the exchange, several government lawyers said there appeared to be concerns that the Justice Department, by trying to shield the existence of the N.S.A. program, was in danger of misleading the court about the origins of the information cited to justify the warrants.

One official familiar with the episode said the judge insisted to Justice Department lawyers at one point that any material gathered under the special N.S.A. program not be used in seeking wiretap warrants from her court.

*     *     *

[S]enior Justice Department officials worried what would happen if the N.S.A. picked up information that needed to be presented in court. The government would then either have to disclose the N.S.A. program or mislead a criminal court about how it had gotten the information.

*     *     *

The legal opinions that support the N.S.A. operation remain classified, but they appear to have followed private discussions among senior administration lawyers and other officials about the need to pursue aggressive strategies that once may have been seen as crossing a legal line, according to senior officials who participated in the discussions.

For example, just days after the Sept. 11, 2001, attacks on New York and the Pentagon, Mr. [John C.] Yoo, the Justice Department lawyer, wrote an internal memorandum that argued the government might use "electronic surveillance techniques and equipment that are more powerful and sophisticated than those available to law enforcement agencies in order to intercept telephonic communications and observe the movement of persons but without obtaining warrants for such uses."

James Risen and Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, NY Times, Dec. 15, 2005 at A1.

The matter has raised serious questions about the constitutionality of the NSA's domestic surveillance activities. According to the New York Times article, "some officials familiar with the continuing operation have questioned whether the surveillance has stretched, if not crossed, constitutional limits on legal searches." The article also states that "nearly a dozen current and former officials, who were granted anonymity because of the classified nature of the program, discussed it with reporters for The New York Times because of their concerns about the operation's legality and oversight. Furthermore, the Washington Post reported, "Congressional sources familiar with limited aspects of the

3

program would not discuss any classified details but made it clear there were serious questions about the legality of the NSA actions." Dan Eggen, *Bush Authorized Domestic Spying*, Washington Post, Dec. 16, 2005, at A01 (attached hereto).

In addition, this subject has unquestionably been the subject of widespread and exceptional media interest. In addition to the New York Times and Washington Post, hundreds of local and national media organizations reported on this matter throughout the United States this morning. In fact, a Google News search identified approximately 316 news stories on the NSA's domestic surveillance (Google News results attached hereto).

Furthermore, at least one congressional committee will be investigating the NSA's domestic surveillance activities in the coming days. Senator Arlen Specter, Chairman of the Senate Judiciary Committee, said that the surveillance at issue is "wrong, clearly and categorically wrong . . . This will be a matter for oversight by the Judiciary committee as soon as we can get to it in the new year — a very, very high priority item.'" *Specter Says Senate to Probe Report U.S. Broke Law on Spying, Bloomberg*.com, Dec. 16, 2005 (attached hereto). It is critical for Congress and the public to have as much information as possible about the DOJ's role in this surveillance to fully consider and determine its propriety.

The purpose of EPIC's request is to obtain information directly relevant to the DOJ's knowledge of and relationship to the NSA's domestic intelligence activities. The records requested therefore clearly meet both standards for expedited processing.

Further, as I explain below in support of our request for "news media" treatment, EPIC is "primarily engaged in disseminating information."

Request for "News Media" Fee Status

EPIC is a non-profit, educational organization that routinely and systematically disseminates information to the public. This is accomplished through several means. First, EPIC maintains a heavily visited Web site (www.epic.org) that highlights the "latest news" concerning privacy and civil liberties issues. The site also features scanned images of documents EPIC obtains under the FOIA. Second, EPIC publishes a bi-weekly electronic newsletter that is distributed to over 15,000 readers, many of whom report on technology issues for major news outlets. The newsletter reports on relevant policy developments of a timely nature (hence the bi-weekly publication schedule). It has been published continuously since 1996, and an archive of past issues is available at our Web site. Finally, EPIC publishes and distributes printed books that address a broad range of privacy, civil liberties and technology issues. A list of EPIC publications is available at our Web site.

For the foregoing reasons, EPIC clearly fits the definition of "representative of the news media" contained in the FOIA. Indeed, the U.S. District Court for the District of Columbia has specifically held that EPIC is "primarily engaged in disseminating information" for the purposes of expedited processing, *American Civil Liberties*

4

*Union v. Department of Justice*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004), and is a "representative of the news media" for fee waiver purposes, *Electronic Privacy Information Center v. Department of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003). Based on our status as a "news media" requester, we are entitled to receive the requested records with only duplication fees assessed. Further, because disclosure of this information will "contribute significantly to public understanding of the operations or activities of the government," as described above, any duplication fees should be waived.

Thank you for your consideration of this request. As the FOIA provides, I will anticipate your determination on our request for expedited processing within ten (10) calendar days. Should you have any questions about this request, please feel free to call me at (202) 483-1140 ext. 112.

Under penalty of perjury, I hereby affirm that the foregoing is true and correct to the best of my knowledge.

Sincerely,

Marcia Hofmann
Director, Open Government Project

Enclosures

5

# EXHIBIT 2

ANN BEESON
*ASSOCIATE LEGAL DIRECTOR*

**ACLU**

AMERICAN CIVIL LIBERTIES UNION

FOUNDATION

December 20, 2005

FOIA/PA Mail Referral Unit
Justice Management Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW.
Washington, DC 20530-0001.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2601
F/212.549.2651
ABEESON@ACLU.ORG
WWW.ACLU.ORG

Re:     **REQUEST UNDER FREEDOM OF INFORMATION ACT /
Expedited Processing Requested**

Attention:

This letter constitutes a request by the American Civil Liberties Union
and the American Civil Liberties Union Foundation ("ACLU") under the
Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and the Department of
Justice implementing regulations, 28 CFR § 16.11.[1]

## I.     The Request for Information

The ACLU seeks disclosure of any presidential order(s) authorizing
the NSA to engage in warrantless electronic surveillance[2] and/or warrantless
physical searches in the United States, created from September 11, 2001 to the
present.[3]

---

[1] The American Civil Liberties Union Foundation is a 501(c)(3) organization that provides
legal representation free of charge to individuals and organizations in civil rights and civil
liberties cases, and educates the public about civil rights and civil liberties issues.  The
American Civil Liberties Union is a separate non-profit, non-partisan, 501(c)(4) membership
organization that educates the public about the civil liberties implications of pending and
proposed state and federal legislation, provides analyses of pending and proposed legislation,
directly lobbies legislators, and mobilizes its members to lobby their legislators.
[2] The term "electronic surveillance" includes but is not limited to warrantless acquisition of
the contents of any wire or radio communication by an electronic, mechanical, or other
surveillance device, and the warrantless installation or use of an electronic, mechanical, or
other surveillance device for monitoring to acquire information, other than from a wire or
radio communication.
[3] This request does not include surveillance authorized by 50 U.S.C. §§ 1802 or 1822(a).

1

In addition, the ACLU seeks disclosure of any record(s),[4] document(s), file(s), communications, memorandum(a), order(s), agreement(s) and/or instruction(s), created from September 11, 2001 to the present, about:

1. any presidential order(s) authorizing the NSA to engage in warrantless electronic surveillance and/or warrantless physical searches in the United States;

2. the policies, procedures and/or practices of the NSA:

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

   a. for identifying individuals, organizations or entities to subject to warrantless electronic surveillance and/or warrantless physical searches in the United States, including but not limited to any "checklist to follow in deciding whether probable cause existed to start monitoring someone's communications,"[5] or a requirement that there be a "clear link" between terrorist organizations and individuals subject to such surveillance;[6]

   b. for gathering information through warrantless electronic surveillance and/or warrantless physical searches in the United States;

   c. governing the maintenance and/or storage of information described in paragraph 2(b) above;

   d. for analyzing and using information described in paragraph 2(b) above;

   e. for sharing information described in paragraph 2(b) above with other government agencies;

---

[4] The term "records" as used herein includes all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audio tapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies.
[5] James Risen and Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, New York Times, Dec. 16, 2005, at A1, A16.
[6] Transcript, President Bush's Address, Dec. 17, 2005, available at http://www.nytimes.com/2005/12/17/politics/17text-bush.html

2

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

f.  for sharing information described in paragraph 2(b) above to be "used as the basis for F.I.S.A. warrant requests from the Justice Department,"[7] or any other form of warrant;

g.  for cross referencing information described in paragraph 2(b) above with information about other individuals, organizations, or groups;

h.  for cross-referencing information described in paragraph 2(b) above with information in any database;

i.  to suspend and/or terminate warrantless electronic surveillance and/or physical searches in the United States by the NSA;

j.  governing the destruction of information described in paragraph 2(b) above;

k.  for protecting the privacy of individuals who are subject to warrantless electronic surveillance and/or warrantless physical searches in the United States;

l.  for consulting with, or obtaining approval from, the Justice Department or other departments, agencies, and/or executive branch officials before engaging in warrantless electronic surveillance and/or warrantless physical searches in the United States;

m.  any minimization procedure, as that term is defined in 50 U.S.C.§ 1801(h), for information described in paragraph 2(b) above;

3.  the name of other government agencies with whom the information described in part 2(b) above is shared;

4.  the date on which:

a.  President Bush signed an order permitting the NSA to engage in warrantless electronic surveillance and/or warrantless physical searches in the United States;

_____

[7] Risen and Lichtblau, Dec. 16., at A16.

3

b. the NSA began engaging in warrantless electronic surveillance and/or warrantless physical searches in the United States;[8]

5. the constitutionality, legality, and/or propriety of warrantless electronic surveillance and/or warrantless physical searches in the United States;

6. any Justice Deparment "legal reviews of the program and its legal rationale."[9]

7. any actual or potential violations of, or deviations from, any policy, procedure or practice related to warrantless electronic surveillance and/or warrantless physical searches in the United States by the NSA;

8. any investigation, inquiry, or disciplinary proceeding initiated in response to any actual or potential violations of, or deviations from, any policy, procedure or practice related to warrantless electronic surveillance and/or warrantless physical searches in the United States by the NSA;

9. any Department of Justice audit of any NSA program carrying out warrantless electronic surveillance and/or warrantless physical searches in the United States;[10]

10. the number of:

a. individuals who have been subjected to warrantless electronic surveillance in the United States by the NSA since September 11, 2001;

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[8] It is unclear when the NSA began its domestic surveillance program and when the President provided written authorization for it to do so. On December 18, 2005, the New York Times reported that the NSA "first began to conduct warrantless surveillance on telephone calls and e-mail messages between the United States and Afghanistan months before President Bush officially authorized a broader version of the agency's special domestic collection program." Eric Lichtblau and James Risen, *Eavesdropping Effort Began Soon After Sept. 11 Attacks*, New York Times, Dec. 18, 2005.
[9] Eric Lichtblau and David E. Sanger, *Administration Cites War Vote in Spying Case*, New York Times, Dec. 20, 2005.
[10] Risen and Lichtblau, Dec. 16, at A16 (describing such an audit as taking place on or after 2004).

4

   b.  individuals who have been subjected to warrantless physical
       searches in the United States by the NSA since September 11,
       2001;

   c.  organizations or entities that have been subjected to warrantless
       electronic surveillance in the United States by the NSA since
       September 11, 2001;

   d.  organizations or entities that have been subjected to warrantless
       physical searches in the United States by the NSA since
       September 11, 2001;

11. the average and maximum[11] number of:

   a.  individuals who have been the target of warrantless electronic
       surveillance in the United States by the NSA at any one time
       since September 11, 2001;

   b.  individuals who have been the target of warrantless physical
       searches in the United States by the NSA at any one time since
       September 11, 2001;

   c.  organizations or entities that have been the target of
       warrantless electronic surveillance in the United States by the
       NSA at any one time since September 11, 2001;

   d.  organizations or entities that have been the target of
       warrantless physical searches in the United States by the NSA
       at any one time since September 11, 2001;

12. the number of individuals who have been subjected to warrantless
    electronic surveillance and/or warrantless physical searches in the
    United States by the NSA who are United States citizens, lawful
    permanent residents, recipients of non-immigrant visas, lawful visitors
    without visas, and undocumented immigrants, respectively;

13. the types of communications that have been subjected to warrantless
    electronic surveillance by the NSA, including but not limited to
    whether such communications were carried out via telephone, email,

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[11] The New York Times reports that "officials familiar with [the program] say the N.S.A.
eavesdrops without warrants on up to 500 people in the United States at any time."  Risen and
Lichtblau, Dec. 16, at A16.

5

instant messaging, chat, Voice Over IP, other Internet-based communications technologies, or in-person conversation;

14. elements of the NSA's warrantless surveillance program in the United States that were suspended or revamped after, "[i]n mid-2004, concerns about the program [were] expressed by national security officials, government lawyers and a judge"; [12]

15. concerns expressed by national security officials, government lawyers, judges and others regarding the NSA's warrantless surveillance program; [13]

16. the number of instances in which the Attorney General has authorized warrantless electronic surveillance and/or phsycial searches under 50 U.S.C. §§ 1802 or 1822(a), and copies of each certification; and

17. President Bush's periodic reauthorization of the NSA's warrantless surveillance in the United States, including but not limited to the frequency with which the President reviews the surveillance program, the exact number of times the President has reauthorized the program, the basis and/or criteria for continued authorization of the program, and other government officials, departments, and/or agencies involved in the review process. [14]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[12] Risen and Lichtblau, Dec. 16, at A16.

[13] *Id.*

[14] On December 17, 2005, President Bush said:

> The activities I authorized are reviewed approximately every 45 days. Each review is based on a fresh intelligence assessment of terrorist threats to the continuity of our government and the threat of catastrophic damage to our homeland. During each assessment, previous activities under the authorization are reviewed. The review includes approval by our nation's top legal officials, including the attorney general and the counsel to the president. I have reauthorized this program more than 30 times since the Sept. 11 attacks and I intend to do so for as long as our nation faces a continuing threat from Al Qaeda and related groups.

Transcript, President Bush's Address, December 17, 2005, available at http://www.nytimes.com/2005/12/17/politics/17text-bush.html. *See also* David E. Sanger, *In Address, Bush Says He Ordered Domestic Spying,* New York Times, December 18, 2005.

## II.     <u>Limitation of Processing Fees</u>

The ACLU requests a limitation of processing fees pursuant to 5
U.S.C. § 552(a)(4)(A)(ii)(II) ("fees shall be limited to reasonable standard
charges for document duplication when records are not sought for commercial
use and the request is made by . . . a representative of the news media . . .")
and 28 C.F.R. §§ 16.11(c)(1)(i), 16.11(d)(1) (search and review fees shall not
be charged to "representatives of the news media."). As a "representative of
the news media," the ACLU fits within this statutory and regulatory mandate.
Fees associated with the processing of this request should, therefore, be
limited accordingly.

The ACLU meets the definition of a "representative of the news
media" because it is "an entity that gathers information of potential interest to
a segment of the public, uses its editorial skills to turn raw materials into a
distinct work, and distributes that work to an audience." <u>National Security
Archive v. Department of Defense</u>, 880 F.2d 1381, 1387 (D.C. Cir. 1989).

The ACLU is a national organization dedicated to the defense of civil
rights and civil liberties. Dissemination of information to the public is a
critical and substantial component of the ACLU's mission and work.
Specifically, the ACLU publishes newsletters, news briefings, right-to-know
documents, and other educational and informational materials that are broadly
disseminated to the public. Such material is widely available to everyone,
including individuals, tax-exempt organizations, not-for-profit groups, law
students and faculty, for no cost or for a nominal fee through its public
education department. The ACLU also disseminates information through its
heavily visited web site: http://www.aclu.org/. The web site addresses civil
rights and civil liberties issues in depth, provides features on civil rights and
civil liberties issues in the news, and contains many thousands of documents
relating to the issues on which the ACLU is focused. The website specifically
includes features on information obtained through the FOIA. See, e.g.,
www.aclu.org/patriot_foia; www.aclu.org/torturefoia;
http://www.aclu.org/spyfiles. The ACLU also publishes an electronic
newsletter, which is distributed to subscribers by e-mail.

In addition to the national ACLU offices, there are 53 ACLU affiliate
and national chapter offices located throughout the United States and Puerto
Rico. These offices further disseminate ACLU material to local residents,
schools and organizations through a variety of means including their own
websites, publications and newsletters. Further, the ACLU makes archived

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

7

material available at the American Civil Liberties Union Archives, Public Policy Papers, Department of Rare Books and Special Collections, Princeton University Library. ACLU publications are often disseminated to relevant groups across the country, which then further distribute them to their members or to other parties.

Depending on the results of the Request, the ACLU plans to "disseminate the information" gathered by this Request "among the public" through these kinds of publications in these kinds of channels. The ACLU is therefore a "news media entity." Cf. Electronic Privacy Information Ctr. v. Department of Defense, 241 F.Supp.2d 5, 10-15 (D.D.C. 2003) (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the media" for purposes of FOIA).

Finally, disclosure is not in the ACLU's commercial interest. The ACLU is a "non-profit, non-partisan, public interest organization." See Judicial Watch Inc. v. Rossotti, 326 F.3d 1309, 1310 (D.C. Cir. 2003). Any information disclosed by the ACLU as a result of this FOIA will be available to the public at no cost.

### III.    Waiver of all Costs

The ACLU additionally requests a waiver of all costs pursuant to 5 U.S.C. §552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."). Disclosure in this case meets the statutory criteria, and a fee waiver would fulfill Congress's legislative intent in amending FOIA. See Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers for noncommercial requesters.'").

Disclosure of the requested information is in the public interest. This request will further public understanding of government conduct; specifically, the NSA's warrantless electronic surveillance and/or physical searches in the United States. This type of government activity concretely affects many individuals and implicates basic privacy, free speech, and associational rights protected by the Constitution.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

8

Moreover, disclosure of the requested information will aid public understanding of the implications of the President's decision to permit the NSA to engaging in warrantless electronic surveillance and/or physical searches in the United States and, consequently, to circumvent the judicial oversight required by the Foreign Intelligence Surveillance Act of 1978.[15] Congress passed this Act in response to scandalous revelations about widespread political surveillance by the FBI under the leadership of J. Edgar Hoover. Following those revelations, Congress convened hearings and established a commission to investigate the government's abuses and explore how best to prevent future excesses. The hearings, chaired by Idaho Senator Frank Church, revealed that the government had infiltrated civil rights and peace groups, had burglarized political groups to gain information about their members and activities, and had "swept in vast amounts of information about the personal lives, views, and associations of American citizens."[16] Understanding the current scope of the NSA's warrantless surveillance is, therefore, crucial to the public's interest in understanding the legality and consequences of the President's order and the NSA's current surveillance practices.

As a nonprofit 501(c)(3) organization and "representative of the news media" as discussed in Section II, the ACLU is well-situated to disseminate information it gains from this request to the general public and to groups that protect constitutional rights. Because the ACLU meets the test for a fee waiver, fees associated with responding to FOIA requests are regularly waived for the ACLU.[17]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[15] 50 U.S.C. § 1801 *et seq.*

[16] INTELLIGENCE ACTIVITIES AND THE RIGHTS OF AMERICANS, BOOK II: FINAL REPORT OF THE SELECT COMMITTEE TO STUDY GOVERNMENTAL OPERATIONS WITH RESPECT TO INTELLIGENCE ACTIVITIES. UNITED STATES SENATE. APRIL 26, 1976. *Available at* http://www.icdc.com/~paulwolf/cointelpro/churchfinalreportIIa.htm.

[17] For example, in May 2005, the United States Department of Commerce granted a fee waiver to the ACLU with respect to its request for information regarding the radio frequency identification chips in United States passports. In March 2005, the Department of State granted a fee waiver to the ACLU with regard to a request submitted that month regarding the use of immigration laws to exclude prominent non-citizen scholars and intellectuals from the country because of their political views, statements, or associations. Also, the Department of Health and Human Services granted a fee waiver to the ACLU with regard to a FOIA request submitted in August of 2004. In addition, the Office of Science and Technology Policy in the Executive Office of the President said it would waive the fees associated with a FOIA request submitted by the ACLU in August 2003. In addition, three separate agencies – the Federal Bureau of Investigation, the Office of Intelligence Policy and Review, and the Office of Information and Privacy in the Department of Justice – did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002.

The records requested are not sought for commercial use, and the requesters plan to disseminate the information disclosed as a result of this FOIA request through the channels described in Section II. As also stated in Section II, the ACLU will make any information disclosed as a result of this FOIA available to the public at no cost.

## IV.     Expedited Processing Request

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Expedited processing is warranted because there is "[a]n urgency to inform the public about an actual or alleged federal government activity" by organizations "primarily engaged in disseminating information." 28 CFR § 16.5(d)(1)(ii).[18] This request implicates an urgent matter of public concern; namely, the NSA's potentially extensive warrantless electronic surveillance and/or physical searches in the United States. Such government activity may infringe upon the public's free speech, free association, and privacy rights, which are guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Requests for information bearing upon potential Constitutional violations require an immediate response so that any violations cease and future violations are prevented.

A requestor may also demonstrate the need for expedited processing by showing that the information sought relates to "a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv). The instant request clearly meets these standards as the request relates to possible violations of Constitutional rights by federal law enforcement officials. It took less than a day for Arlen Specter, the Republican chairman of the Senate Judiciary Committee, to pledge that the Senate would hold hearings to investigate the NSA's warrantless surveillance. Jennifer Loven, *Report of NSA Spying Prompts Call for Probe*, San Francisco Chronicle, Dec. 16, 2005. That the President chose to give a rare, live radio address providing additional information about the NSA's warrantless surveillance the day after it was revealed underscores the urgency of the ACLU's request. The urgent and time sensitive nature of the request is also apparent from the widespread and sustained media coverage the NSA's warrantless domestic surveillance activities have garnered. *See, e.g.,* James Risen and Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, New

---

[18] The ACLU is "primarily engaged in disseminating information," as discussed in Sections II and III.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

York Times, Dec. 16, 2005, at A1; Maura Reynolds and Greg Miller, *Congress Wants Answers About Spying on U.S. Citizens*, Pittsburgh Post-Gazette, Dec. 16, 2005; Steven Thomma, *Spying Could Create Backlash on Congress; Public Reaction Hinges on Identity of Targets*, San Jose Mercury News, Dec. 16, 2005; Christine Hauser, *Bush Declines to Discuss Report on Eavesdropping*, New York Times, Dec. 16, 2005; Katherine Shrader, *Lawmakers Say Reported Spy Program Shocking, Call For Investigations*, San Diego Union Tribune, Dec. 16, 2005; Caren Bohan and Thomas Ferraro, *Bush Defends Eavesdropping and Patriot Act*, ABC News, Dec. 17, 2005; Dan Eggan and Charles Lane, *On Hill, Anger and Calls for Hearing Greet News of Stateside Surveillance*, Washington Post, Dec. 17, 2005, at A1; Jennifer Loven, *Bush Defends Secret Spying in U.S.*, San Francisco Chronicle, Dec. 17, 2005; Barton Gellman and Dafna Linzer, *Pushing the Limits of Wartime Powers*, Washington Post, Dec. 18, 2005, at A1; John Diamond, *NSA's Surveillance of Citizens Echoes 1970s Controversy*, USA Today, Dec. 18, 2005; James Kuhnhenn, *Bush Defends Spying in U.S.*, San Jose Mercury News, Dec. 18, 2005; Fred Barbash and Peter Baker, *Gonzales Defends Eavesdropping Program*, Washington Post, Dec. 19, 2005; Todd J. Gillman, *Bush Assails Disclosure of Domestic Spying Program*, San Jose Mercury News, Dec. 19, 2005; David Stout, *Bush Says U.S. Spy Program is Legal and Essential*, New York Times, Dec. 19, 2005; James Gerstenzang, *Bush Vows to Continue Domestic Surveillance*, L.A. Times, Dec. 19, 2005; Terence Hunt, *Bush Says NSA Surveillance Necessary, Legal*, Washington Post, Dec. 19, 2005; George E. Condon, *Bush Says Spying Is Needed To Guard US*, San Diego Union Tribune, Dec. 20, 2005; Jeff Zeleny, *No 'Unchecked Power' In Domestic Spy Furor*, Chicago Tribune, Dec. 20, 2005; Michael Kranish, *Bush Calls Leak of Spy Program Shameful*, Boston Globe, Dec. 20, 2005; Craig Gordon, *For Bush, 9/11 Justifies Eavesdropping*, Newsday, Dec. 20, 2005; Terence Hunt, *Bush Defends Domestic Spying Program as Effective Tool in War on Terror*, Detroit Free Press, Dec. 19, 2005.

Finally, pursuant to applicable regulations and statute, the ACLU expects the determination of this request for expedited processing within 10 calendar days and the determination of this request for documents within 20 days. *See* 28 CFR § 16.5(d)(4); 5 U.S.C. § 552(a)(6)(A)(i).

If this request is denied in whole or in part, we ask that you justify all deletions by reference to specific exemptions to FOIA. The ACLU expects the release of all segregable portions of otherwise exempt material. The ACLU reserves the right to appeal a decision to withhold any information or to deny a waiver of fees.

Thank you for your prompt attention to this matter. Please furnish all applicable records to:

Ann Beeson
Associate Legal Director
American Civil Liberties Union
125 Broad Street, 18th floor
New York, NY 10004

I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief.

Sincerely,

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Ann Beeson
Associate Legal Director
American Civil Liberties Union