UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELECTRONIC PRIVACY
INFORMATION CENTER,

          Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE,

        Defendant.

Civil Action No. 06-00096 (HHK)

AMERICAN CIVIL LIBERTIES UNION,
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION,
THE NATIONAL SECURITY ARCHIVE
  FUND, INC.,

         Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE,

        Defendant.

Civil Action No.06-00214 (HHK)

Judge Henry H. Kennedy
**CONSOLIDATED CASES**

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR
*IN CAMERA* REVIEW**

Ann Beeson
Nasrina Bargzie
American Civil Liberties Union Foundation
125 Broad St., 18th Floor
New York, NY 10004
Phone: (212) 549-2500
Fax: (212) 549-2629

Meredith Fuchs (D.C. Bar No. 422825)
The National Security Archive Fund, Inc.
The George Washington University

Gelman Library, Suite 701
2130 H Street, N.W.
Washington, D.C. 20037

Marc Rotenberg (D.C. Bar No. 422825)
Electronic Privacy Information Center
1718 Connecticut Avenue, NW
Suite 200
Washington, DC 20009-1148
Phone: (202) 483-1209
Fax: (202) 483-1278

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
    of the National Capital Area
1400 20th Street, N.W. #119
Washington, D.C. 20036
Phone:  (202) 457-0800
Fax: (202) 452-1868

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

INTRODUCTION…………..…………………………………………………………..1

PROCEDURAL HISTORY……………………….……………………………………..…3

ARGUMENT ………………………………………………………………..…6

    I.    THIS COURT SHOULD APPLY THE FREEDOM OF INFORMATION ACT CONSISTENTLY WITH ITS CENTRAL PURPOSE OF GOVERNMENT DISCLOSURE…………….………………………...6

    II.    THE COURT SHOULD DENY SUMMARY JUDGMENT TO THE GOVERNMENT BECAUSE THE GOVERNMENT'S RESPONSES ARE INADEQUATE..……………………………………...………..8

        A.    The government has revealed a substantial amount of information about the Program and has overstated its secrecy privileges in the past…………………………………………………………..8

        B.    The government declarations fail to justify its broad withholding of records and deny the Court the information necessary to determine the validity of the government's claimed exemptions……….…12

            1.    The government's declarations and indices violate the policy underlying *Vaughn v. Rosen*………………….…12

            2.    The government's use of redacted declarations leaves plaintiffs without an adequate index………………....15

            3.    The government's failure to provide specifically tailored *Vaughn* explanations for each document is inadequate………………………………….…………...17

            4.    Inconsistent applications of FOIA exemptions by different government agencies suggest that the government's exemption claims are unjustified…….22

            5.    The government's segregability analysis is inadequate……………………………………………23

    III.    THE COURT SHOULD ORDER THE GOVERNMENT TO RELEASE THE TOTAL NUMBER OF DOCUMENTS AND THE TOTAL NUMBER OF PAGES WITHHELD...………………………….…………27

IV.     *IN CAMERA* REVIEW OF THE WITHHELD DOCUMENTS IS
        NECESSARY FOR THE COURT TO CONDUCT A MEANINGFUL *DE
        NOVO* REVIEW OF THE GOVERNMENT'S EXTENSIVE
        EXEMPTION CLAIMS...……..………………………...……………32

        A.      *In camera* review is a vital tool to enable courts to conduct
                meaningful review and to compensate for plaintiffs' information
                disadvantage…………………………………………………..34

        B.      The Court has broad discretion to conduct *in camera* review in this
                matter for a variety of reasons…………………………………...35

        C.      The Court should conduct an *in camera* review and provide
                segregable, non-exempt documents to the plaintiffs…………….41

        D.      The Court should use representative sampling and employ a
                special master to facilitate the efficient resolution of this
                dispute…………………………………………………….…..43

CONCLUSION……………………………………………………………………..47

## INTRODUCTION

This litigation concerns three requests filed under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for records relating to a secret National Security Agency ("NSA") surveillance program, (hereinafter "the Program"), to intercept the international communications of innocent Americans without court approval.

Whether the President has the authority to conduct electronic surveillance within the United States without the approval of an Article III judge or the Foreign Intelligence Surveillance Court is one of the most important legal questions for the country today. The President's domestic surveillance program has been the focus of detailed scholarly analysis and elaborate memos prepared by the Department of Justice. The wiretap program has been the subject of numerous Congressional hearings. Legislation concerning the program is under consideration by both chambers of Congress. A public debate continues to rage, from the editorial pages to the blogs.

Whatever one's views may be as to the merits of the Administration's defense of the program, there can be no dispute that this is a question that goes to the essence of the structure of the U.S. government, the rule of law, and the purpose of the Freedom of Information Act. Given the fact that the Program allows the government to conduct surveillance of American citizens within the United States without judicial approval, the American public understandably has an intense interest in knowing how the methods of oversight and evaluation, presumably described within documents held by government agencies, compare with the procedures set out in the federal statute that governs domestic surveillance.

The government's voluminous motion for summary judgment is supported by eight heavily redacted declarations and other documents spanning hundreds of pages. The purported *Vaughn* index included with the government's motion explains neither the contents of the documents withheld nor the applicability of the exemptions claimed in sufficient detail to justify summary judgment in the government's favor.  Even without access to the unredacted declarations or documents, many aspects of the government's production suggest that it has redacted and withheld documents to an unjustified extent. Ambiguous language abounds, exemptions are categorically applied without regard to the contents of a particular record, and in several instances different agencies have applied different exemptions to the same document.  Because of the government's heavily redacted declarations plaintiffs find themselves litigating in the dark about whether the government has properly applied the exemptions it has claimed.

Given the vital importance of these FOIA requests – which seek answers to serious questions about whether the government has violated the federal laws that regulate electronic surveillance within the United States as well as the constitutional freedoms of speech and privacy – and the troubling aspects of the government's inconsistent application of FOIA exemptions, plaintiffs respectfully request that the Court order the government to state the total number of documents and the total number of pages being withheld, and order *in camera* review of at least a portion of the withheld documents.  *In camera* review in this case would allow the Court to fulfill its statutory responsibility to conduct a *de novo* review of the government's exemption claims. Moreover, *in camera* review by an impartial arbiter is the only means by which to evaluate the validity of the government's claims and to compensate for the plaintiffs'

information disadvantage that precludes meaningful review of the statutory provisions at issue.

The purpose of FOIA is to ensure that the American public has the opportunity to assess the policies of its government. It may agree with those decisions, it may disagree. But the government may not broadly assert exemptions, withhold key documents, and conceal key facts and theories so as to frustrate the purpose of the Act.  The FOIA does not exist to protect the government from embarrassment.  To the contrary: FOIA exists to enable the American people to learn what their government is up to, even if – especially if – they may not approve of what they learn.  An informed citizenry is a prerequisite to a healthy democracy.  If the government is permitted to assert FOIA exemptions without judicial review, FOIA's guarantee of broad disclosure will be thwarted, and the American people will be denied the statutory right to obtain information about the activities of their government.

For these reasons, as elaborated below, the Court should deny the government's motion for summary judgment and grant plaintiffs' cross-motion for in camera review of the withheld records.  In addition, the Court should order the government to release the total number of documents withheld, and total number of pages withheld.

## PROCEDURAL HISTORY

According to published news reports and the government's own admissions, in the fall of 2001 the NSA launched a secret surveillance program to intercept, without prior judicial authorization, the telephone and Internet communications of people within the United States.  James Risen and Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, New York Times, Dec. 16, 2005, at A1, A16; Exh. A. attached to Mem.

in Supp. of Summ. J., (hereinafter "Exh.") Bradbury Decl. 2 ¶ 4, 5-6 ¶¶ 18-20; *id.* at

Negroponte Decl. 2 ¶ 4, 5-6 ¶¶ 16-17; Exh. C. Baker Decl. 4 ¶ 14; Exh. G. Rowan Decl. 2

¶ 4; Exh. J. Hardy Decl. 4-5 ¶¶ 12-15, Exh. N. Joseph B. Decl. 2-3 ¶¶ 3-4.  After this

revelation, plaintiffs Electronic Privacy Information Center ("EPIC") on December 16,

2005, the American Civil Liberties Union and the American Civil Liberties Union

Foundation (collectively, "the ACLU") on December 20, 2005, and the National Security

Archive Fund, Inc. (the "Archive") on December 21 and 22, 2005, filed FOIA requests

seeking to obtain records held by the government related to the public news reports with

a particular interest in the legal basis for the program and the means of  oversight that had

been established.

    EPIC sought agency records "from September 11, 2001 to the present concerning

a presidential order or directive authorizing the National Security Agency (NSA) or any

other component of the intelligence community, to conduct domestic surveillance without

the prior authorization of the Foreign Intelligence Surveillance Court (FISC)."[1]  In

particular, EPIC noted that:

> [R]ecords requested by EPIC include (but are not limited to) the following items
> mentioned in the [*New York Times*] article:
> 1.  an audit of NSA domestic surveillance activities;
> 2.  guidance or a "checklist" to help decide whether probable cause exists to
> monitor an individual's communications;
> 3.  communications concerning the use of information obtained through the NSA
> domestic surveillance as to the basis for the DOJ surveillance applications to the
> FISC; and
> 4.  legal memoranda, opinions or statements concerning increased domestic
> surveillance, including one authored by John C. Yoo shortly after September 11,
> 2001 discussing the potential for warrantless use of enhanced electronic
> surveillance techniques.

---

[1] A copy of EPIC's FOIA request can be found in Exhibit A on pages 22-26 of the
Defendant's Summary Judgment Motion.

The ACLU requested any presidential orders authorizing the NSA to engage in warrantless electronic surveillance.[2]  It also requested records relating to the policies, practices and procedures of the NSA (1) for selecting individuals to subject to warrantless domestic surveillance; (2) for gathering, maintaining, storing, and sharing information generated through such surveillance; (3) for using gathered information as the basis for FISA requests; and (4) for consulting with, or obtaining approval from, defendant, the Department of Justice ("DOJ"), before engaging in warrantless electronic surveillance. The ACLU also requested any DOJ "legal reviews of the program and its legal rationale," any DOJ audit of the program, and any other records on the constitutionality, legality, and/or propriety of the NSA's warrantless domestic spying.

The Archive sought copies of "[a]ll memoranda, legal opinions, directives or instructions from the Attorney General, Assistant Attorney General, or the Office of Legal Counsel (OLC), issued between September 11, 2001, and December 21, 2005, regarding the government's legal authority for surveillance activity, wiretapping, eavesdropping, and other signals intelligence operations directed at communications to or from U.S. citizens."[3]  The Archive also sought the inclusion of "all documents discussing the President's surveillance authority under the September 2001 congressional use of force resolution as well as the President's independent ability to authorize signals intelligence activities."

---

[2] A copy of the ACLU's FOIA request can be found in Exhibit A on pages 27-38 of the Defendant's Summary Judgment Motion.

[3] A copy of Archive's FOIA request can be found in Exhibit A on pages 39-41of the Defendant's Summary Judgment Motion.

On January 19, 2006, EPIC filed this lawsuit seeking production of documents. The ACLU and the Archive together filed a joint lawsuit seeking production of documents on February 7, 2006. On that same date the ACLU and the Archive filed a motion for consolidation of their case with EPIC's. EPIC and counsel for the government consented to the consolidation. The Court granted the motion on February 9, 2006. Between March 8, 2006, and September 14, 2006, the government released some documents in whole, a few redacted documents, and withheld a large number of documents in full based on various FOIA exemptions.[4] The few documents provided to the plaintiffs early in this litigation were almost all publicly available records that had been generated post hoc by the government in response to the controversy surrounding the public revelation of the Program.

On September 15, 2006, the government filed its motion for summary judgment. Plaintiffs now respond to the government's motion for summary judgment.

## ARGUMENT

### I.    THE COURT SHOULD APPLY THE FREEDOM OF INFORMATION ACT CONSISTENTLY WITH ITS CENTRAL PURPOSE OF GOVERNMENT DISCLOSURE.

The Freedom of Information Act is grounded in the "fundamental principle of public access to Government documents," *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989), and in the American public's right to know "what their Government is

---

[4] Plaintiffs do not dispute any of the purely factual statements regarding the chronology of the letters and documents received by plaintiffs from the government in defendant's "Statement of Facts as to Which There is No Genuine Issue." Exh. O. 3-14 ¶¶ 10-49. Thus plaintiffs have not filed a separate statement of disputed facts. To the extent defendant' account of the factual and procedural background includes conclusory *legal* characterizations regarding the Program, or the applicability of FOIA exemptions, plaintiffs dispute these purported "facts." This disagreement is, of course, the subject of this brief.

6

up to." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (citation and internal quotation marks omitted).  The basic purpose of the statute is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed.'" *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Accordingly, the drafters of the FOIA intended "that the courts interpret this legislation broadly, as a disclosure statute and not as an excuse to withhold information from the public."  112 Cong. Rec. 13654 (June 20, 1966) (statement of then-Rep. Donald Rumsfeld).

    The FOIA directs government agencies to disclose certain types of records upon request.  *See* 5 U.S.C. § 552(a)(3).  The statute contains nine exemptions from its broad mandate of disclosure.  *See* 5 U.S.C. § 552(b).  "'But these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.' Accordingly, these exemptions 'must be narrowly construed.'" *John Doe Agency*, 493 U.S. at 152 (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976)).

    In a FOIA case, "[t]he government is entitled to summary judgment if no material facts are in dispute and if it demonstrates either that withheld or redacted documents are not required to be disclosed under § 552(a) or are exempt from disclosure under § 552(b)."  *Billington v. U.S. Dep't of Justice*, 233 F.3d 581, 583-84 (D.C. Cir. 2000). "Very importantly, 'the burden is on the agency to sustain its action.'" *Founding Church of Scientology of Wash., D.C., Inc. v. NSA*, 610 F.2d 824, 830 (D.C. Cir. 1979) (quoting 5 U.S.C. § 552(a)(4)(B)).  Consequently, when the government contends that documents

are exempt from disclosure, "[t]he government bears the burden of proving that the withheld information falls within the exemptions it invokes," *Ctr. for Nat. Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003), "even when the underlying facts are viewed in the light most favorable to the requester." *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983).

The FOIA directs trial courts to review *de novo* the applicability of the exemptions claimed by the government.  5 U.S.C. § 552(a)(4)(B).

## II.    THE COURT SHOULD DENY SUMMARY JUDGMENT TO THE GOVERNMENT BECAUSE THE GOVERNMENT'S RESPONSES ARE INADEQUATE.

### A.    The government has revealed a substantial amount of information about the Program and has overstated its secrecy privileges in the past.

Throughout its motion for summary judgment and the attached declarations, the government claims that releasing any information, even innocuous information, about the Program would be harmful to national security.  Yet the government has publicly acknowledged, described, and defended this surveillance program.  In acknowledging the existence of the Program, President Bush, in a radio address, provided substantial details about the scope and operations of the Program.  President Bush stated:

> In the weeks following the terrorists attacks on our Nation, I authorized the National Security Agency, consistent with U.S. law and the Constitution, to intercept the international communications of people with known links to Al Qaida and related terrorist organizations.  Before we intercept these communications, the Government must have information that establishes a clear link to these terrorists networks.[5]

In the same address President Bush also noted that:

---

[5] *The President's Radio Address*, 41 WEEKLY COMP. PRES. DOC. 1880, 1881 (Dec. 17, 2005).

8

The activities I authorized are reviewed approximately every 45 days. Each
review is based on a fresh intelligence assessment of terrorist threats to the
continuity of our government and the threat of catastrophic damage to our
homeland.  During each assessment, previous activities under the authorization
are reviewed. The review includes approval by our nation's top legal officials,
including the attorney general and the counsel to the president.  I have
reauthorized this program more than 30 times since the Sept. 11 attacks and I
intend to do so for as long as our nation faces a continuing threat from Al Qaeda
and related groups.[6]

Not only has the government acknowledged the existence of the Program but it

has also engaged in an aggressive public relations campaign to convince the American

public that the NSA Program is both lawful and necessary to protect national security.

On January 19, 2006, the Department of Justice issued a 42-page White Paper discussing

in detail its legal defenses and justifications for the NSA Program.  *See* Dep't of Justice,

*Legal Authorities Supporting the Activities of the National Security Agency Described by*

*the President* (Jan. 19, 2006), *available at*

http://www.usdoj.gov/opa/whitepaperonnsalegalauthorities.pdf.  Government officials

have publicly testified before Congress four times about the legality, scope, and basis for

the NSA surveillance program.[7]  Executive branch officials have also given numerous

---

[6] *Id.*

[7] *The Worldwide Terror Threat: Hearing Before the S. Select Comm. on Intelligence*,
109th Cong. (2006), *available at* 2006 WL 246499 (testimony of John Negroponte, Dir.
of Nat'l Intelligence and Gen. Michael Hayden, then Principal Deputy Dir. of Nat'l
Intelligence); *Wartime Executive Power and the National Security Agency's Surveillance
Authority: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. (2006), *available
at* 2006 WL 270364 (testimony of Alberto Gonzales, Att'y Gen. of the United States);
*Oversight on the Department of Justice: Hearing Before the H. Comm. on the Judiciary*,
109th Cong. (2006), *available at* 2006 WL 896707 (testimony of Alberto Gonzales, Att'y
Gen. of the United States); *Hearing on the Nomination of General Michael V. Hayden to
be the Director of the Central Intelligence Agency Before the S. Select Comm. on
Intelligence,* 109th Cong. (2006).

public speeches defending the legality of the Program. For example, President Bush has discussed and promoted the NSA Program at least eight times through radio addresses, at news conferences, and at public events.[8] Vice President Cheney has promoted the NSA domestic surveillance Program during a commencement address at the U.S. Naval Academy and at four separate rallies for servicemen and servicewomen.[9] Administration officials have even participated in public web discussions in defense of the NSA Program.[10] The former director of the National Security Agency, the person responsible for the implementation of the Program, described it in a speech at the National Press Club on January 23, 2006 and took questions from the audience.[11] The Program has also been

---

[8] *The President's Radio Address*, 41 WEEKLY COMP. PRES. DOC. 1880, 1881 (Dec. 17, 2005); *President's News Conference*, 41 WEEKLY COMP. PRES. DOC. 1885 (Dec. 19, 2005); Remarks on the War on Terror and a Question-and-Answer Session in Louisville, Kentucky, 42 WEEKLY COMP. PRES. DOC. 40, 46-47 (Jan. 11, 2006); Remarks on the War on Terror and a Question-and-Answer Session in Manhattan, Kansas, 42 WEEKLY COMP. PRES. DOC. 101, 109 (Jan. 23, 2006); Remarks Following a Visit to the National Security Agency at Fort Meade, Maryland, 42 WEEKLY COMP. PRES. DOC. 121, 122-23 (Jan. 25, 2006); The President's News Conference, 42 WEEKLY COMP. PRES. DOC. 125, 128-29 (Jan. 26, 2006); Remarks on the Terrorist Surveillance Program, 42 WEEKLY COMP. PRES. DOC. 911 (May 11, 2006); *The President's Radio Address*, 42 WEEKLY COMP. PRES. DOC. 926 (May 13, 2006).

[9] Richard Cheney, Vice President of the U.S., Commencement Address at the United States Naval Academy (May 26, 2006); Richard Cheney, Vice President of the U.S., Remarks at a Rally for the Troops at Fort Leavenworth (Jan. 6, 2006); Richard Cheney, Vice President of the U.S., Remarks at a Rally for the Troops at Charleston Air Force Base (Mar. 17, 2006); Richard Cheney, Vice President of the U.S., Remarks at a Rally for the Troops at Scott Air Force Base (Mar. 21, 2006); Richard Cheney, Vice President of the U.S., Rally for the Troops at Fairchild Air Force Base (Apr. 17, 2006).

[10] In January 2006, for example, Attorney General Gonzales conducted a web discussion — part of the White House's online interactive forum called "Ask the White House"— where he answered questions from members of the public regarding the NSA program. Alberto Gonzales, "Ask the White House" (Jan. 25, 2006), http://www.whitehouse.gov/ask/20060125.html.

[11] Remarks by General Michael V. Hayden, Principal Deputy Director of National Intelligence and Former Director of the National Security Agency, Address To The

widely discussed in Congress and in the media.  Members of Congress have repeatedly

discussed details about the NSA Program in press releases and in the media.[12]  More than

250 editorials have been published on the subject in the nation's newspapers.  In sum, the

government has acknowledged the existence of the Program, described its scope,

defended its legality, and engaged in a public campaign to convince the American people

of the Program's necessity.  The administration has taken every opportunity to ensure that

its view of the Program receives the broadest possible public exposure.  Notwithstanding

this unprecedented public relations campaign, the government alleges that the documents

at issue in this case are exempt and non-segregable under the FOIA.  In assessing the

government's broad claims of exemption which would effectively frustrate the central

purpose of the FOIA, the Court should consider the government's willingness to discuss

the Program at length when it serves the government's purposes.  The Court should also

consider the improbability that every page of every single document is appropriately

withheld, when exemptions are broadly asserted and petitioner is denied the opportunity

to meaningfully evaluate the government's claims.

---

National Press Club, "What American Intelligence and Especially the NSA  have been Doing to Defend the Nation," National Prsss Club, Washington, DC., Jan. 23, 2006, transcript available at http://www.globalsecurity.org/intell/library/news/2006/intell-060123-dni01.htm.

[12] *See, e.g.*, Peter Hoekstra (R-MI), Representative from Michigan, U.S. House of Representatives, Holds a News Conference on the NSA Authorizations (Dec. 21, 2005), *available at* 2005 WL 3486002; Press Release, Jay Rockefeller (D-WV), Senator from West Virginia, U.S. Senate, Vice Chairman Rockefeller Reacts to Reports of NSA Intercept Program in United States (Dec. 19, 2005), *available at* http://www.senate.gov/~rockefeller/news/2005/pr121905a.html; *Meet the Press with Tim Russert, Interview with Peter Hoekstra, Jane Harman, Pat Roberts & Tom Daschle* (NBC television broadcast Feb. 12, 2006), transcript *available at* http://www.msnbc.msn.com/id/11272634/.

In addition, the Court should consider that three federal courts have recently ruled in parallel litigation about the Program that the government has overstated its invocations of the state secrets privilege. *See Am. Civil Liberties Union v. Nat'l Sec. Agency*, 438 F. Supp. 2d 754 (E.D.Mich. Aug. 17, 2006); *see also Al-Haramain Islamic Found., Inc. v. Bush*, --- F. Supp. 2d ----, 2006 WL 2583425 (D.Or. Sept. 7, 2006); *Hepting v. AT & T Corp.*, 439 F. Supp. 2d 974 (N.D.Cal. July 20, 2006). Though not controlling, these cases bear directly on the government's practice of overstating its need to withhold information from the public. In order to stem similar overreaching by the government in this case, the Court should review at least a sample of the disputed documents *in camera* before ruling on the government's summary judgment motion.

## B. The government declarations fail to justify its broad withholding of records and deny the Court the information necessary to determine the validity of the government's claimed exemptions.

In support of its motion for summary judgment the government has submitted eight declarations, spanning 136 pages, with nearly 40% of the paragraphs being redacted. In addition, two of the agencies have provided charts/indices tracking "records or categories of records" by document number. Though not lacking in length, the declarations are vague and confusing.

### 1. The government's declarations and indices violate the policy underlying *Vaughn v. Rosen.*

In *Vaughn v. Rosen*, the D.C. Circuit fashioned a partial solution for the information asymmetry in FOIA cases in which the "lack of knowledge by the party seeking disclosure seriously distorts the traditional nature of our legal system's form of dispute resolution." 484 F.2d 820, 824 (D.C. Cir. 1973). The Court held that in order to meet its burden of proving that the documents at issue have been properly withheld, the

government must submit a declaration and index that describe the documents "in adequate specificity" and set forth a "proper justification" for its exemption claims. *Id.* at 826-28. The Court further provided that, given the tendency of federal agencies to "claim the broadest possible grounds for exemption for the greatest amount of information," defendant agencies are required to produce "a relatively detailed analysis" of the withheld material "in manageable segments" without resort to "conclusory and generalized allegations of exemptions." *See id.* at 826-27. Therefore, under *Vaughn*, the government must "specifically identify[] the reasons why a particular exemption is relevant and correlat[e] those claims with the particular part of a withheld document to which they apply." *King v. U.S. Dep't of Justice*, 830 F.2d 210, 219 (D.C. Cir. 1987).

The *Vaughn* index is now an indispensable part of FOIA litigation and serves three purposes. First, it "'permit[s] adequate adversary testing of the agency's claimed right to an exemption.'" *King*, 830 F.2d at 218. Second, it enables "'the District Court to make a rational decision whether the withheld material must be produced without actually viewing the documents themselves.'" *Id.* at 219. Third, it "'produce[s] a record that will render the District Court's decision capable of meaningful review on appeal.'" *Id.*; *see also Lykins v. U.S. Dep't of Justice*, 725 F.2d 1455, 1463 (D.C. Cir. 1984); *Fiduccia v. U.S. Dep't of Justice*, 185 F.3d 1035, 1042 (9th Cir. 1999) ("'[T]he purpose of the index is to afford [the] FOIA requester a meaningful opportunity to contest, and the district court an adequate opportunity to review, the soundness of the withholding.'" (quoting *Weiner v. FBI*, 943 F.2d 972, 977 (9th Cir. 1991))).

Though the government is not prohibited from providing multiple declarations as a *Vaughn* index in a single litigation, the declarations must "interlock without confusion,"

must have been drafted with each other in mind, and, most importantly, "it must be clear and easy to find the description of any particular piece of information and the claimed justification for withholding that piece." *Afshar v. U.S. Dep't of State*, 702 F.2d 1125, 1144-45 (D.C. Cir. 1983). Here, the government fails to meet that standard. The government's declarations and indices are both confusing and internally inconsistent. Each agency has taken its own distinct approach to producing declarations and indices. The Office of Legal Counsel ("OLC"), for example, has provided both a declaration organized by category of documents and an index organized by "record or category of record" number; meanwhile, the Federal Bureau of Investigation ("FBI") has provided an entirely separate declaration organized only by redacted categories; and the Criminal Division has provided a declaration and a chart organized by criminal case. *See* Exh. A. 1-21, 61-78; Exh. J. 1-44; Exh. G. 1-22. The result is an index that is well over a hundred pages long, is composed of many declarations that refer to each other without specificity, and is so heavily redacted that plaintiffs are left without any clear notion of even the total number of documents or pages being withheld, much less any substantive information about the nature of the withholdings.

Failure to provide a *Vaughn* index that permits plaintiffs the opportunity to test the government's claims eviscerates plaintiffs' opportunity to challenge the government's withholdings and also makes the Court's review painful and slow. *See Founding Church of Scientology of Wash. D.C. v. Bell*, 603 F.2d 945, 948 (D.C. Cir. 1979) (as amended) (noting that the government's assertion that if one simultaneously consults several different affidavits he can divine the government's withholdings violated the central purposes of *Vaughn*). The inscrutable web of vague descriptions and generalized

14

justifications from the government violates not only the spirit, but also the letter, of

*Vaughn*.

### 2. The government's use of redacted declarations leaves plaintiffs without an adequate index.

*In camera* declarations, like those submitted by the government in this case, are disfavored by courts because "[t]he lack of adversariness in this procedure presents special dangers . . . especially if it is not accompanied by at least some form of in camera inspection." *Ray v. Turner*, 587 F.2d 1187, 1211 n.43 (D.C. Cir. 1978) (as amended). Even when appellate courts have permitted the government to submit *in camera* affidavits to justify the withholding of information, district courts have been required to first "create as complete a public record as is possible," *Phillippi v. CIA*, 546 F.2d 1009, 1013 (D.C. Cir. 1976), to give the plaintiff "'a meaningful opportunity to contest, and the district court an adequate foundation to review' the soundness of the withholding." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1999) (quoting *King*, 830 F.2d at 218). In such cases, "[t]he description and explanation the agency offers should reveal as much detail as possible as to the nature of the document without actually disclosing information that deserves protection." *Oglesby v. U.S. Dep't of the Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996). Thus, this Court has declared inadequate a government affidavit justifying the withholding of a broad category of legal documents, where "[n]o specific documents were identified" or correlated with specific claims of exemption. *Boggs v. U.S. Secret Serv.*, 987 F. Supp. 11, 22 (D.D.C. 1997). Similarly, courts have rejected government indices that did not provide basic descriptive information about the documents in question. *See Oglesby*, 79 F.3d at 1184 (NSA affidavits inadequate under *Vaughn* where they "offer[ed] no functional description of the

documents; NSA has failed to disclose the types of documents, dates, authors, number of pages, or any other identifying information for the records it has withheld."); *Scott v. CIA*, 916 F. Supp. 42, 48 (D.D.C. 1996) (general statement of exemptions for documents withheld in full is "entirely inadequate as it fails to provide the date of the documents, the number of documents withheld, and, most importantly, the nature and type of material contained in the documents").

While *in camera* declarations have been permitted in the national security context, *see Hayden v. National Security Agency*, 608 F.2d 1381, 1385 (D.C. Cir. 1979), these redacted declarations deny plaintiffs the ability to respond to the government's exemption claims. For example, the only information available to plaintiffs regarding "OLC 1," a document withheld by the DOJ Office of Legal Counsel, is that it is a "draft," it is claimed to be exempted simultaneously under Exemptions (b)(1), (b)(3), and (b)(5) without further discussion, that one should look to the Office of Intelligence Policy and Review's ("OIPR") declaration in general (though for what remains unstated), and that one should reference paragraphs 54-58 of OLC's declaration, though these paragraphs are in turn completely redacted. Exh. A. Bradbury Decl. 14-15, ¶¶ 54-58; *id.* at Index 61; Exh. C. Baker Decl. 1-10. After following these directions, plaintiffs are left with only the most general description of the Program, the fact that government lawyers gave advice regarding the Program, and that the Program is alleged to be vitally necessary for national security. Thus, as to specific documents, and even categories of documents, plaintiffs cannot discern the basic contents of the document or the justification for the withholding.

Plaintiffs are therefore left with eight declarations that repeat statements about the Program that have already been aired by the government as part of its public relations campaign, and untethered legal claims about what is required for the various exemptions without references to clearly defined documents.  Under these circumstances, plaintiffs are effectively precluded from challenging most of the government's exemption claims.  Nonetheless, plaintiffs are able to point to numerous shortcomings in the government's declarations and indices that raise further questions about the adequacy of the government's claims to withhold the documents sought in this proceeding.

### 3. The government's failure to provide specifically tailored *Vaughn* explanations for each document is inadequate.

"Specificity is the defining requirement of the *Vaughn* index and affidavit; affidavits cannot support summary judgment if they are conclusory, merely reciting statutory standards, or if they are too vague or sweeping."  *King*, 830 F.2d at 219 (footnote and internal quotation marks omitted).  Furthermore, "[w]here documents are withheld altogether, the requester needs a *Vaughn* index of considerable specificity to know what the agency possess but refuses to produce."  *Fiduccia*, 185 F.3d at 1043.  Moreover, in the national security context, "the court will accord that affidavit substantial weight," *Oglesby*, 79 F.3d at 1178, only "[i]f an affidavit submitted by an agency contains sufficient detail to forge the 'logical connection between the information [withheld] and the claimed exemption.'" *Id.* (quoting *Goldberg v. U.S. Dep't of State,* 818 F.2d 71, 78 (D.C. Cir. 1987)).  Judged against these standards, the government's declarations and indices are plainly inadequate, and granting summary judgment in the absence of *in camera* review would be wholly inappropriate.

The purported *Vaughn* index in this case is replete with vague and sometimes contradictory descriptions that shed little or no light on the contents of the documents it purports to describe.  The index does not come close to satisfying the government's burden to "specifically identify[] the reasons why a particular exemption is relevant and correlat[e] those claims with the particular part of a withheld document to which they apply."  *Oglesby*, 79 F.3d at 1178.[13]

The inadequacy of the government's declarations and indices is further demonstrated by the failure of the government to state the number of documents at issue. Several of the agencies use the phrase "records or categories of records."  *See e.g.*, Exh. A. Bradbury Decl. 4 ¶ 11; Exh. G. Rowan Decl. 5 ¶ 16.  This phrase is not defined and at first blush one might be inclined to believe that "records or categories of records" refers to a single document.  In at least one instance, this is not so.  OIPR "record or category of record" 56 is not a single document, rather it contains "OLC 16, 41, 51, 54, 56, 55, 57, 63, 64, 85, 113, 114, 126, 127, 128, 130, 131, 132, and 133, and ODAG 2, 5, 7, 38, and 51."  Exh. C. Baker Decl. 10 ¶ 42.  While OIPR explains that this "document" is in fact

---

[13] *See* Exh. C. Baker Decl. 6 ¶ 21, 8 ¶ 36 (after stating that it cannot release documents because "the vast majority of documents withheld by OIPR concern the dealings with the Foreign Intelligence Surveillance Court ('FISC')" -- thus implicitly acknowledging the existence of at least some documents relating to FISC -- OIPR then states that it "can neither admit nor deny the existence of records pertaining to [the Foreign Intelligence Surveillance Act] without disclosing classified information"); Exh. E. McIntyre Decl. 11 n.5 (summarily stating that "to the extent" the criminal leak investigation documents are classified they also fall under Exemption (b)(1) without providing any elaboration); Exh. G. Rowan Decl. 7-8 ¶¶ 21, 23 (in justifying exemption claims relating to information sought by criminal defendants as to whether they were being monitored the declaration uses ambiguous language such as "to the extent these documents" relate to "x" then "y"); *id.* at 8 ¶ 22 (noting that "many of the documents contained information that must be withheld to prevent unwarranted invasion of personal privacy," without indicating how many of the cases fall within this category).

"a collection" of documents, it is unclear whether any other agency may have similar "collections" that are not disclosed as such.

In addition, while the government may use categories, as opposed to individual descriptions of each document, *see Maydak v. United States Department of Justice*, 218 F.3d 760, 765-67 (D.C. Cir. 2000), "[t]he test is the aptness of the criteria." *Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 347 (D.C. Cir. 1987). Throughout its declarations the government has opted for the use of broad categorical claims rather than individual document descriptions. Plaintiffs are unable even to challenge the government's categorization approach because in several instances the government has redacted the categories within which the documents fall.[14] Notwithstanding the government's redaction of certain categories, an analysis of some of the remaining categories proves that the criteria chosen by the government is anything but "apt." For example, OLC Category F bunches together documents it believes are "Briefing Materials or Talking Points." Exh. A. Bradbury Decl. 19-20. This highly general characterization lumps together a large number of documents under a broad category that provides little insight as to the appropriate application of the claimed exemptions. The OLC declaration explains that these documents relate to the Program, but does not expand beyond that. *See id.* at 19-20 ¶¶ 72-73. Thus, among other uncertainties, it is unclear for whom these materials were prepared, whether they were prepared for public disclosure or internal

---

[14] *See* Exh. A. Bradbury Decl. 12, 14 (redacting two of the seven categories into which OLC documents are divided); Exh. A. Negroponte Decl. 48 ¶ 22 (redacting four of the seven categories the DNI believes must be exempted from disclosure); Exh. J. Hardy Decl. 11 ¶ 33 (redacting all nine categories within which the withheld FBI documents fall).

debate, or even if they included materials that were already available to the public, such as news stories that are often included in "briefing materials."

Furthermore, the government has shown itself entirely capable of providing individually detailed *Vaughn* index entries, but has chosen to do so only with respect to a few documents sprinkled throughout the declarations. For example, OLC explains that "OLC 27 is a one-page handwritten note recording that an OLC attorney recommended to the NSA General Counsel that certain language be included in documentation supporting collection of various communications under the TSP." Exh. A. Bradbury Decl. 18 ¶ 70. The same OLC entry provides that "OLC 208 is a facsimile transmission from an attorney at OLC to an attorney at NSA seeking factual clarification regarding the operation of a particular technical aspect of the TSP so as to inform future advice regarding the Program." *Id.* Both OLC 27 and OLC 208 are withheld based on Exemptions (b)(1), (b)(2), (b)(3), (b)(5), and (b)(6). *Id.* at Index 62, 72. OLC does not explain why, notwithstanding their allegedly classified status, details can be released regarding these documents, yet not other documents sought by plaintiffs. OIPR has likewise provided detailed information about some records while refusing to do so for the remainder.[15] While OIPR 12/OLC 128 (they are the same document) is withheld based on Exemptions (b)(1), (b)(3), and (b)(5), OIPR 63 is withheld based on Exemptions (b)(5), and (b)(6). *Id.* at Index 70; Exh. C. Index 15, 18. Despite the differing

---

[15] *See* Exh. C. Baker Decl. 7 ¶ 32 ("OIPR 12 and OLC 128 . . . are several copies of a four page memorandum authored by [James A. Baker] that seeks legal advice from others at the Department); *id.* at 8 ¶ 34 ("OIPR 63, in particular, is a draft of the Attorney General's remarks to be delivered at Georgetown University Law Center, on which OIPR comments were sought. . . . [T]he draft, however, which contains OIPR's internal suggestions and notes, must remain protected.").

withholding claims, additional information was released about these two documents

beyond that released for others.  No justification for this inconsistent treatment is

obvious, and the government has provided none.

The FBI's declaration is particularly vague and unhelpful.  First, the FBI has

redacted all nine of the categories that are asserted for the documents.  *See* Exh. J.  Hardy

Decl. 11 ¶ 33.  Without the benefit of a guide, the plaintiffs are forced to navigate blindly

through the remainder of the declaration.  Second, the FBI's declaration is full of vague

language that frustrates meaningful review.[16]  Finally, the FBI's approach to Exemptions

(b)(2), (b)(5), (b)(6), and (b)(7), is virtually useless.  In relation to these exemptions, the

FBI describes a specific exemption and then lists the documents that fall under that

exemption.  However, the FBI then explicitly states that the documents listed may not be

the only documents subject to the stated exemption.[17]  If the FBI itself is unable to

---

[16] *See id.* at 20-21 ¶ 63 (referring to "various e-mails, draft documents, notes, deliberative internal memorandum and internal reports" without numerical precision); *id.* at 22 ¶ 67(a) (referring to "numerous email trails" without numerical precision).

[17]*See id.* at 19 ¶ 58 ("[T]his information has been properly withheld pursuant to Exemption (b)(2) in, but not limited to, the following non-serialized documents: *FBI 98-100, 102, 104, 107, 108, 113, 116 , 117, 124, 131-133, 135-140, 142-145, 147-149, 157-159, 161-165, 167, 171, 172, 185, 186, 198-211, 214-220, 225-230, 236-238, 241-246, 254-256, 263, 265, 266, 268, 278-280, 306 and 307.*") (underlining added);  *id.* at 23 ¶ 67(c) ("[M]aterial in non-serialized documents, including, but not limited to: *FBI 1, 9-13, 15, 20-22, 24-28, 30, 31, 45, 49, 54-57, 60-113, 116-172, 180-284, 286-298, and 300,* consists of material which is deliberative and has been withheld appropriately pursuant to Exemption 5.") (underlining added); *id.* at 24-25 ¶ 72 ("[T]he FBI has asserted Exemption 5, the attorney-client privilege, to protect these confidential communications in non-serialized documents, including but not limited to: *FBI 17, 27, 28, 31-34, 36, 39, 43, 44, 58, 60-79, 88-93, 116-121, 125, 128, 137, 138, 142, 144, 145, 147-157, 160, 169, 183, 184, 198-211, 214-220, 223-230, 239-284, 286-298, 301 and 302.*") (underlining added); *id.* at 25 ¶ 76 ("[M]aterial in non-serialized documents, including, but not limited to *FBI 91-93, 105, 112, 247, 267, 277, 281, 293, 294, 301 and 302,* consists of attorney work product and it has been withheld appropriately pursuant to Exemption 5.") (underlining added); *id.* at 26 ("As a result, Exemption (b)(6) has been asserted in

---

21

determine the boundaries of the exemptions it claims, how can the plaintiffs be expected

to challenge the determination? Clearly, the FBI's declaration frustrates meaningful

review of the exemption authority the agency seeks to assert. The government's failure

to provide a specifically tailored *Vaughn* is relation to the FBI and the other agencies is

therefore inadequate.

> **4. Inconsistent applications of FOIA exemptions by different government agencies suggest that the government's exemption claims are unjustified.**

A trial judge may order *in camera* review "on the basis of an uneasiness, on a

doubt he wants satisfied before he takes responsibility for a de novo determination." *Ray*,

587 F.2d at 1195. Inconsistent application of the FOIA exemptions should give rise to

just such an "uneasiness" here.

For example, according to OLC's index, OLC 116 is withheld based on

Exemptions (b)(1), (b)(3), and (b)(5). Exh. A. Index 9. OLC's index also states that this

document is the same as OIPR 60. *Id.* Unlike OLC 116, however, OIPR 60 is withheld

only on the basis of Exemption (b)(5). *Id.* at 16. Thus, either OLC or OIPR is

misapplying Exemptions (b)(1) and (b)(3).

Another document, Office of the Deputy Attorney General ("ODAG") 7 is

withheld based on Exemptions (b)(1), (b)(3), and (b)(5). *Id.* at 12. ODAG 7 is noted as

---

conjunction with Exemption (b)(7)(C) to protect information included in, but not limited to, the following non-serialized documents: *FBI 1, 12-13, 20-22, 24, 29, 32-36, 44, 49, 52, 54, 60-91, 94-113, 115-130, 130-174, 177, 179-190, 194, 196-269, 272-285, 287-294, 296, 300, 302-308, 1000, 1008, 1016, 1020, 1030, 1032-1034, 1051, 1055, 1099, and 1102.*") (underlining added); *id.* at 40 ¶ 131 ("Thus, the information provided by, as well as the identities of these sources, has been protected pursuant to Exemption (b)(7)(D) in non-serialized documents, including, but not limited to: *FBI 1, 95-97, 99-101, 154, 170, 181, 182, 196, 198, 210, 215, 217, 219, 227, 230, 231, 234, 235, 237, 238, 238, 250, and 308.*") (underlining added).

being the same as OLC 130.  *Id.*  OLC 130 is claimed exempted only based on

Exemptions (b)(1), and (b)(3).  *Id.* at 10.  Therefore, either ODAG or OLC is misapplying

Exemption (b)(5).

In another instance, ODAG 16 is withheld based on Exemptions (b)(1), (b)(3),

and (b)(5).  *Id.* at 13.  ODAG 16 is the same document as OLC 145.  *Id.*  OLC 145 is

claimed exempted only on the basis of Exemptions (b)(1), and (b)(3).  *Id.* at 11.  Thus,

yet again, either ODAG or OLC is misapplying Exemption (b)(5).

These three examples show a pattern of inconsistent application of the FOIA

exemptions.  The Court should not grant summary judgment in the government's favor

when the government has itself inconsistently and in a contradictory fashion asserted the

FOIA exemptions to the withheld documents.  Not only is the inconsistent application

troubling, but it also happens to be in relation to three of the most widely utilized

exemptions in this case, namely Exemptions (b)(1), (b)(3), and (b)(5).

As the D.C. Circuit has observed, even "[g]overnment officials who would not

stoop to misrepresentation" may nonetheless "reflect an inherent tendency to resist

disclosure, and judges may take this natural inclination into account."  *Ray*, 587 F.2d at

1195.  To ensure that the public's right to obtain vital information about the workings of

its government is fully vindicated, this Court should order *in camera* review of the

documents.

### 5.  The government's segregability analysis is inadequate.

FOIA requires that "[a]ny reasonably segregable portion of a record shall be

provided . . . after deletion of the portions which are exempt." 5 U.S.C. § 552(b).  The

D.C. Circuit has made clear that "[t]he 'segregability' requirement applies to all

documents and all exemptions in the FOIA." *Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 21 (D.C. Cir. 1984); *see also Schiller v. NLRB*, 964 F.2d 1205, 1209 (D.C. Cir. 1992). This comports with the policy of disclosure and prevents the withholding of entire documents, *see Billington*, 233 F.3d at 586, unless the agency can demonstrate that the non-exempt portions of a document are "inextricably intertwined with exempt portions." *Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1027 (D.C. Cir. 1999) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1976)).

So important is the segregability requirement to FOIA's broad disclosure mandate that trial courts have an affirmative duty to consider the issue of segregability *sua sponte*. *Trans-Pacific Policing Agreement*, 177 F.3d at 1028; *see also Billington*, 233 F.3d at 586. In fact, "[i]t is error for a district court to simply approve the withholding of an entire document without entering a finding on segregability, or the lack thereof." *Schiller*, 964 F.2d at 1210 (citations and internal quotation marks omitted); *see also Billington*, 233 F.3d at 586.

In this case, the government does not appear to have conducted any segregation analysis and certainly has made no genuine effort to segregate non-exempt, releasable material from the withheld records, instead hoping the general assertion that the records relate to the Program is sufficient to persuade the Court to assume blanket withholding is appropriate. The government's memorandum in support of summary judgment does not address segregability at all, offering only passing reference to legal analysis being

intertwined with facts, Mem. in Supp. of Summ. J. at 51, and only three of its eight

declarations mention a segregability analysis, and there only in passing.[18]

Nonetheless, the government has invoked unbounded FOIA exemptions to

conceal every word of every document that is the subject of its summary judgment

motion.  With respect to records generated during the formulation and execution phases

of the Program, the government has refused to release a single sentence from any one of

the potentially hundreds of responsive documents that exist, not even their titles (and in

many cases not even their length).  Critically, the government withholds in full what may

amount to several thousand documents despite the fact that it has released substantial

information in other contexts about the Program.[19]  *See supra*, Argument Section II.A.

Its all-purpose approach to withholding is applied with equal breadth to memoranda,

letters, orders, notes, and other forms of documents.

The government's indiscriminate approach plainly warrants judicial scrutiny.

FOIA's segregability requirement obliges an agency to perform a "segregability analysis"

that distinguishes exempt from non-exempt material *within* each document that is

responsive to the FOIA request.  *See Vaughn*, 484 F.2d at 825 ("An entire document is

not exempt merely because an isolated portion need not be disclosed.  Thus, the agency

---

[18] Exh. E. McIntyre Decl. 13 ¶ 25 ("As it is well settled that the attorney work product privilege protects all information, including factual information, no such information is required to be segregated for disclosure"); Exh. M. Giles Decl. 9 ¶ 21 ("Moreover, I am confident that the responsive information cannot be segregated so as to release any non-exempt information."); Exh. N. Joseph B. Decl. 9 ¶ 17.  The other declarations rely broadly on the alleged sensitivity of the Program, at least in the context of open government litigation, and the need to keep all of its details classified.  Exh. C. Baker Decl. 9 ¶ 39; Exh. N. Joseph B. Decl. 5-6 ¶ 9.

[19] As discussed in further detail below, plaintiffs estimate that there are at least 1,463 classified "documents or categories of documents" responsive to their FOIA requests that have been withheld by the government.

may not sweep a document under a general allegation of exemption, even if that general allegation is correct with regard to part of the information."). Furthermore, even if an agency can show that certain material in a document is exempt but cannot be reasonably segregated from non-exempt information, that agency must also "describe what proportion of the information is non-exempt and how that material is dispersed throughout the document," such that "both litigants and judges will be better positioned to test the validity of the agency's claim that the non-exempt material is not segregable." *Mead Data Cent., Inc.*, 566 F.2d at 261.

The government has not demonstrated that it made any effort to comply with these standards. Moreover, the circumstances of this particular case reinforce the conclusion that the government's generalized explanation are wholly inadequate as a basis for finding that no reasonably segregable portions exist. As discussed at length above, the government has acknowledged the existence of the Program. It has explained some of the operational details of the Program and has engaged in an aggressive public relations campaign to defend the Program.

Plaintiffs do not dispute that the government has met its burden of demonstrating that the documents contain some exempt material. That showing, however, is not enough to meet the segregability standard set forth by the D.C. Circuit: "the focus in the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead Data Cent., Inc.*, 566 F.2d at 260. As the D.C. Circuit has long recognized, "unless the segregability provision of the FOIA is to be nothing more than a precatory precept, agencies must be required to provide the reasons behind their conclusions in order that they may be

challenged by FOIA plaintiffs and reviewed by the courts." *Id.* at 261.  The fact that the

documents concern a matter of national security does not insulate the government from

FOIA's segregability command or permit it to submit vague, nonspecific declarations

about segregability.  To the contrary, the public interest in obtaining access to the non-

exempt information that should be disclosed is greater.

### III.  THE COURT SHOULD ORDER THE GOVERNMENT TO RELEASE THE TOTAL NUMBER OF DOCUMENTS AND THE TOTAL NUMBER OF PAGES WITHHELD.

The government's summary judgment motion and accompanying exhibits fail to

provide even the total number of responsive documents or pages at issue in this case,

thereby showing no regard for its obligations: (1) to facilitate judicial review of withheld

records, (2) to rebalance the adversarial process so that plaintiffs can respond to its FOIA

exemption claims, or (3) to carefully consider its decision to withhold records to ensure

the maximum disclosure of information to the public as required under FOIA.[20]  To

correct these shortcomings, plaintiffs request that the Court order the government to

release the total number of documents withheld, as well as the total number of pages

withheld.

Numerous courts, including the D.C. Circuit, have held that plaintiffs are entitled

to basic identifying information about the records responsive to their FOIA requests,

including the total volume of material being withheld, so that the requester can

adequately respond to the government's motion for summary judgment.  *See, e.g.*,

---

[20] *See, e.g.* Exh. A. Bradbury Decl. 9-10 ¶ 32; Exh. J. Hardy Decl. 11-13 ¶ 34 (listing generally types of information withheld under applicable FOIA exemptions, without reference to specific documents or page totals falling into each category).  As noted, the government also does not specify the total number of responsive documents being withheld, referring instead to "records or categories of records."  *See, e.g.,* Exh. A. Bradbury Decl.; Exh. K.

*Hayden v. Nat'l Sec. Agency*, 452 F. Supp. 247, 252 (D.D.C. 1978); *see also Frydman v. Dep't of Justice*, No. 78-4257, 1990 WL 170992, at *3 (D. Kan. Oct. 3, 1990). The government's failure to provide this basic information demonstrates the insufficiency of its summary judgment motion and signals to the Court the need for more probing review.

As discussed above, the D.C. Circuit requires that agencies provide "adequate, or rather less conclusory, justification[s]" and "more specificity by separating and indexing the assertedly exempt documents," *Vaughn*, 484 F.2d at 828, for cases such as this one, where there is a large mass of documents touching on a sensitive issue. The whole purpose of the *Vaughn* index is to ward off the practice of the government "contend[ing] that large masses of information are exempt, when in fact part of the information should be disclosed." *Id*. at 825. The number of pages of material withheld is one of the "elements typically found in a Vaughn index." *Boggs*, 987 F. Supp. at 22; *see also John Doe Corp. v. John Doe Agency*, 850 F.2d 105, 107 n.1 (2d Cir. 1988). The requirement that a *Vaughn* index must describe the specific number of documents withheld is likewise inherent in the standards elaborated in the *Vaughn* case and its progeny, namely that "[t]he index must adequately describe *each* withheld document." *Founding Church of Scientology*, 603 F.2d at 949. Thus, even in national security related cases, *Vaughn* indices submitted and held to be adequate by this Court and others generally have included, among other details, the total number of individual documents withheld and the pages comprising each. *See, e.g., Judicial Watch v. Dep't of Justice*, --- F. Supp. 2d ---, 2006 WL 2038513 (D.D.C. July 19, 2006); *Billington v. Dep't of Justice*, 11 F. Supp. 2d 45, 77-78 (D.D.C. 1998); *Nat'l Sec. Archive v. FBI*, 759 F. Supp. 872, 876 (D.D.C. 1991).

At least two courts have specifically ordered a defendant agency to disclose the number of pages being withheld when the government had refused to do so.  In *Hayden v. National Security Agency*, this Court considered whether the government could properly conceal the number of documents withheld and the number of pages contained in each and determined that the government could not, because the Court "failed to see how the revelation of this information could result in disclosing intelligence methods or sources." 452 F. Supp. at 252; *see also Frydman*, No. 78-4257, 1990 WL 170992, at *3 ("the court can see no prejudice to the government from supplying the information" about number of pages, number of pages mentioning plaintiff, and year of origination of documents).

In this case, as in *Hayden* and *Frydman,* the defendant's redaction of "innocuous," non-substantive details, such as document and page totals, violates FOIA's "basic policy that disclosure, not secrecy, is the dominant objective of the Act."  *Rose*, 425 U.S. at 361.  Further, failing to provide document and page totals obstructs judicial review by hampering plaintiffs' ability to specifically respond to the government's exemption claims or to recommend alternative methods to determine whether records can be released.  While there may be information in some of the requested records that could reveal the intelligence sources or methods the agency seeks to protect, a simple count of the total number of responsive documents and pages that have been denied to plaintiffs is clearly not the type of sensitive information that "deserves protection" under FOIA. *Oglesby*, 79 F.3d at 1176.

Indeed, the motivation for the government's refusal to disclose the volume and other details of the withheld materials is questionable.  In their Notice of Lodging of Classified Exhibits, the government indicates that the portions of their exhibits redacted

in the public version are those that are "classified pursuant to Executive Order 12958, . . . as amended." Def.'s Notice of Classified Ex. Supp. Summ. J. Further, Steven Bradbury, Acting Assistant Attorney General for OLC, relies on the assertion of the Director of National Intelligence, John D. Negroponte, that "disclosing . . . the volume of documents maintained by agencies involved in the Program has the potential to reveal information about the capabilities, scope and effectiveness of the Program, which would be utilized by the enemy to allow them to plan their terrorist activities more securely." Exh. A. Negroponte Decl. 48-49 ¶ 24 (referenced in Exh. A. Bradbury Decl. 10 n.5); *see also* Exh. N. Joseph B. Decl. 9 ¶ 17 (same).

Courts have in some circumstances deferred to agency assertions that particular information, seemingly innocent on its own, could cause harm to national security when analyzed by adversaries in conjunction with other public information. *CIA v. Sims*, 471 U.S. 159 (1985). This mosaic theory, however, does not justify withholding the total number of documents or the total number of pages withheld. In *Gerstein v. Department of Justice*, a recent case involving counterterrorism strategies employed by the government under the USA Patriot Act, the court rejected as "dubious" the government's claim that revealing the number of times each U.S. Attorney's Office had used so-called "sneak-and-peek searches" would allow terrorists to learn enough about the law enforcement technique to circumvent it in the future. 2005 U.S. Dist. LEXIS 41276, No. C-03-04893 (N.D.Cal. Sept. 30, 2005) ("the 'procedure' here is a matter of common knowledge and . . . the court does not believe that disclosing the compilation would reduce Section 213's effectiveness").

The skepticism about general and overbroad redaction of innocuous information expressed in *Gerstein* is even more pertinent here.  Like the law enforcement provisions of the Patriot Act, the Program is not a secret.  It has been acknowledged by the government, has generated internal government dissent, and has been the subject of congressional, judicial and media scrutiny.  *See supra*, Argument Section II.A.  The level of interest it has generated alone would impact the number of records generated in relation to the Program, without giving any indication of how the Program is conducted or how many people have been the targets of the Program.  Further, as evidenced by the government's declarations, there are numerous duplicates and drafts of records held by the various offices with responsibility related to the Program; these variants further interfere with the possibility that anyone could draw meaningful conclusions from the volume or length of withheld records.  The Court should reject this ill-conceived mosaic theory that would undermine the public's right to access records held by federal agencies. *See Detroit Free Press v. Ashcroft*, 303 F.3d 681, 709 (6th Cir. 2002) (concluding that "speculation should [not] form the basis for … a drastic restriction" on the right to access immigration hearings, and warning against the harmful impact on fundamental values of secrecy that is justified by limitless mosaic arguments).  Without knowing the technical details of the Program, the public nonetheless has a significant interest in understanding the extent to which government officials engaged in serious deliberation and reasoned decision-making about the Program.  This is particularly so since the Program is alleged to be, and has recently been held to be, in violation of the Constitution.  *Am. Civil Liberties Union*, 438 F. Supp. 2d at 754.  The Court should not permit the government to stretch its mosaic argument so far as to encompass superficial details regarding all

documents that may contain classified information about the Program.

Here, the refusal to provide the total number of documents and the total number of pages withheld is unwarranted. For example, in the Bradbury Declaration, the number of pages is redacted even for a group of "advisory and pre-decisional" legal documents withheld solely on the basis of Exemption (b)(5). Exh. A. Bradbury Decl. 16-17 ¶¶ 62-64. There is nothing to suggest, and indeed it is astounding to imagine, that information about the length or volume of that set of documents could "be utilized by the enemy to allow them to plan their terrorist activities more securely," therefore justifying withholding. Exh. A. Negroponte Decl. 48-49 ¶ 24. The government has therefore not fulfilled its responsibility to conduct a careful review of responsive materials and justify each withholding with a reasonable degree of specificity.

The government's motion and exhibits reveal the broad and imprecise review that the government undertook in denying plaintiffs the "functional" details about their requests that courts have mandated should be provided to enable the adversarial process in FOIA cases. Therefore, the Court should order the government to release the total number of documents and the total number of pages withheld.

## IV. *IN CAMERA* REVIEW OF THE WITHHELD DOCUMENTS IS NECESSARY FOR THE COURT TO CONDUCT A MEANINGFUL *DE NOVO* REVIEW OF THE GOVERNMENT'S EXTENSIVE EXEMPTION CLAIMS.

In addition to ordering the government to release the total number of documents and page totals, plaintiffs also request that the Court conduct an *in camera* review of the withheld records. In reviewing the validity of an agency's exemption claim, the Court "may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld." 5 U.S.C. § 552(a)(4)(B). The decision

whether to undertake *in camera* review is left to the trial court's discretion. *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 996 (D.C. Cir. 1998). Where the quantity of documents at issue is large, the Court may undertake *in camera* review of a portion of the documents and rule on the entire FOIA request by extrapolating from its findings on the limited sample. *See*, *e.g.*, *Bonner v. Dep't of State*, 928 F.2d 1148, 1151 (D.C. Cir. 1991) (representative sampling); *Meeropol v. Meese*, 790 F.2d 942, 958 (D.C. Cir. 1986); *Weisberg*, 745 F.2d at 1490 (random sampling).

Summary judgment without *in camera* review is appropriate only where the government's affidavits "provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith." *Ctr. for Auto Safety*, 731 F.2d at 22; *see also Allen v. CIA*, 636 F.2d 1287, 1291 (D.C. Cir. 1980), *overruled on other grounds*, *Founding Church of Scientology of Wash. D.C., Inc. v. Smith*, 721 F.2d 828, 830 (D.C. Cir. 1983). "While in camera examination need not be automatic, in many situations it will plainly be necessary and appropriate." *Ray*, 587 F.2d at 1191 (quoting the Conference Report on the 1974 FOIA Amendments, S. Rep. No. 93-1200 at 2 (1974), as reprinted in 1974 U.S.C.C.A.N. 6285, 6287) (internal quotation marks omitted).

In this case, as described above, the government's declarations – both what they say and what they fail to say – should leave the Court profoundly concerned that the government has withheld documents to an extent unjustified by the FOIA exemptions. In light of the serious questions about the propriety of the government's exemption claims, and of the strong public interest in the FOIA request at issue, the Court should exercise its discretion to review *in camera* at least some portion of the documents at issue – either

the entire group of documents, or a representative or random sample.  The government's

showing alone is insufficient to meet its burden to justify summary judgment in its favor.

**A.**     ***In camera* review is a vital tool to enable courts to conduct meaningful review and to compensate for the plaintiffs' information disadvantage.**

As the D.C. Circuit has explained, Congress intended that "the de novo review

mandated by the Freedom of Information Act be extremely thorough so as to insure that

agencies do not impermissibly expand by unreviewed interpretations the particular types

of matters Congress has exempted from disclosure."  *Allen*, 636 F.2d at 1297 (citation

and internal quotation marks omitted).  Thus, even in the context of matters classified for

national security reasons the courts are empowered to conduct an *in camera* review in

order to satisfy their obligation to conduct a *de novo* review.  *See Ray*, 587 F.2d at 1201-

15 (Wright, J. concurring) (discussing the legislative history of the 1974 amendments to

the FOIA).  Thus, not even a national security claim can require courts to "relinquish[]

their independent responsibility" to undertake a thorough *de novo* evaluation of the

government's exemption claims, reviewing documents *in camera* if necessary.

*Goldberg*, 818 F.2d at 77.

Thorough judicial review of the government's exemption claims is particularly

appropriate in light of the requester's informational disadvantage, peculiar to the context

of FOIA litigation:

> [I]t is anomalous but obviously inevitable that the party with the greatest
> interest in obtaining disclosure is at a loss to argue with desirable legal precision
> for the revelation of the concealed information. Obviously the party seeking
> disclosure cannot know the precise contents of the documents sought; secret
> information is, by definition, unknown to the party seeking disclosure. . . .

> In a very real sense, only one side to the controversy (the side opposing disclosure) is in a position confidently to make statements categorizing information . . . .

*Vaughn*, 484 F.2d at 823; *see also Jones v. FBI*, 41 F.3d 238, 242 (6th Cir. 1994) ("[T]he plaintiff is handicapped in this endeavor by the fact that only the agency truly knows the content of the withheld material. Except in cases in which the court takes the entire set of responsive documents in camera, even the court does not know." (citations omitted)). "In an effort to compensate" for this disadvantage on the part of FOIA requesters, "the trial court, as the trier of fact, may and often does examine the document in camera to determine whether the Government has properly characterized the information as exempt." *Vaughn*, 484 F.2d at 825.

**B.    The Court has broad discretion to conduct *in camera* review in this matter for a variety of reasons.**

The D.C. Circuit has encouraged *in camera* review of FOIA documents in a variety of circumstances. The Circuit has long held *in camera* review to be appropriate where "agency affidavits are insufficiently detailed to permit meaningful review of exemption claims" or "evidence of agency bad faith is before the court." *Lam Lek Chong v. U.S. Drug Enforcement Admin.*, 929 F.2d 729, 735 (D.C. Cir. 1991); *see also, e.g.*, *Allen*, 636 F.2d at 1298. At the same time, the Court has made clear that these are not the only cases in which *in camera* review is justified. *See, e.g.*, *Spirko*, 147 F.3d at 996 ("[i]n camera inspection does not depend on a finding or even tentative finding of bad faith" (quoting *Ray*, 587 F.2d at 1195) (internal quotation marks omitted)). On the contrary, as the Circuit has repeatedly emphasized, trial courts have broad discretion over whether to conduct *in camera* review. *See, e.g.*, *Carter v. U.S. Dep't of Commerce*, 830 F.2d 388,

35

392 (D.C. Cir. 1987); *Ctr. for Auto Safety*, 731 F.2d at 20; *see also Spirko*, 147 F.3d at

996 ("With such broad discretion vested in the district court, this court has yet to identify

particular circumstances under which in camera inspection would be inappropriate . . . ."

(emphasis in original)).  "The ultimate criterion is simply this: Whether the district judge

believes that in camera inspection is needed in order to make a responsible de novo

determination on the claims of exemption." *Spirko*, 147 F.3d at 996 (quoting *Ray*, 587

F.2d at 1195) (internal quotation marks omitted); *see also Carter*, 830 F.2d at 392; *Ctr.*

*for Auto Safety*, 731 F.2d at 21.

This case justifies *in camera* review for a variety of reasons.  First, there is a

"greater call for in camera inspection" in "cases that involve a strong public interest in

disclosure."  *Allen*, 636 F.2d at 1299; *see also Jones*, 41 F.3d at 243.  As the D.C. Circuit

has explained:

> When citizens request information to ascertain whether a particular agency
> is properly serving its public function, the agency often deems it in its best
> interest to stifle or inhibit the probes. It is in these instances that the judiciary
> plays an important role in reviewing the agency's withholding of information. But
> since it is in these instances that the representations of the agency are most likely
> to be protective and perhaps less than accurate, the need for in camera inspection
> is greater.

*Allen*, 636 F.2d at 1299.

The public interest in the contents of the withheld documents is exceptionally

high.  The FOIA requests at issue seek records related to an NSA program that intercepts

the communications of Americans without prior court approval.  The subject of this

request – government spying on communications – has serious implications for the

constitutionally protected rights of speech and privacy and the statutory regime that

regulates electronic surveillance within the United States.

36

The legality and propriety of the Program is the subject of sustained, intense public concern. It took less than a day after its first public disclosure for Senator Arlen Specter, chairman of the Senate Judiciary Committee, to pledge that the Senate would hold hearings to investigate the NSA's warrantless surveillance. Jennifer Loven, *Report of NSA Spying Prompts Call for Probe*, San Francisco Chronicle, Dec. 16, 2005. Within just a few days of the revelation of the Program; there were dozens of news stories across the country.[21]

---

[21] *See, e.g.,* James Risen and Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, New York Times, Dec. 16, 2005, at A1; Maura Reynolds and Greg Miller, *Congress Wants Answers About Spying on U.S. Citizens*, Pittsburgh Post-Gazette, Dec. 16, 2005; Steven Thomma, *Spying Could Create Backlash on Congress; Public Reaction Hinges on Identity of Targets*, San Jose Mercury News, Dec. 16, 2005; Christine Hauser, *Bush Declines to Discuss Report on Eavesdropping*, New York Times, Dec. 16, 2005; Katherine Shrader, *Lawmakers Say Reported Spy Program Shocking, Call For Investigations*, San Diego Union Tribune, Dec. 16, 2005; Caren Bohan and Thomas Ferraro, *Bush Defends Eavesdropping and Patriot Act*, ABC News, Dec. 17, 2005; Dan Eggan and Charles Lane, *On Hill, Anger and Calls for Hearing Greet News of Stateside Surveillance*, Washington Post, Dec. 17, 2005, at A1; Jennifer Loven, *Bush Defends Secret Spying in U.S.*, San Francisco Chronicle, Dec. 17, 2005; Barton Gellman and Dafna Linzer, *Pushing the Limits of Wartime Powers*, Washington Post, Dec. 18, 2005, at A1; John Diamond, *NSA's Surveillance of Citizens Echoes 1970s Controversy*, USA Today, Dec. 18, 2005; James Kuhnhenn, *Bush Defends Spying in U.S.*, San Jose Mercury News, Dec. 18, 2005; Fred Barbash and Peter Baker, *Gonzales Defends Eavesdropping Program*, Washington Post, Dec. 19, 2005; Todd J. Gillman, *Bush Assails Disclosure of Domestic Spying Program*, San Jose Mercury News, Dec. 19, 2005; David Stout, *Bush Says U.S. Spy Program is Legal and Essential*, New York Times, Dec. 19, 2005; James Gerstenzang, *Bush Vows to Continue Domestic Surveillance*, L.A. Times, Dec. 19, 2005; Terence Hunt, *Bush Says NSA Surveillance Necessary, Legal*, Washington Post, Dec. 19, 2005; George E. Condon, *Bush Says Spying Is Needed To Guard US*, San Diego Union Tribune, Dec. 20, 2005; Jeff Zeleny, *No 'Unchecked Power' In Domestic Spy Furor*, Chicago Tribune, Dec. 20, 2005; Michael Kranish, *Bush Calls Leak of Spy Program Shameful*, Boston Globe, Dec. 20, 2005; Craig Gordon, *For Bush, 9/11 Justifies Eavesdropping*, Newsday, Dec. 20, 2005.

Since then, concern by Congress, the media and the public has continued

unabated.[22] As noted in Argument Section II.A. the Administration has been on the

---

[22] *See also* Scott Shane, *At Security Agency, News of Surveillance Program Gives Reassurances a Hollow Ring*, New York Times, Dec. 22, 2005, at A22; Robert Gehrke, *Secretive court in the dark on spying; Utah judge says answers from Bush are crucial; Judge Benson wants details on spying*, Salt Lake Tribune, Dec. 23, 2005, at A1; Stewart M. Powell, *Secret Court Modified Wiretap Requests, Seattle Post-Intelligencer*, Dec. 24, 2005, at A9; Philip Dine, *Is eavesdropping a symptom of illness or signal of strength?*, St. Louis Post-Dispatch, Dec. 25, 2005, at B1; Editorial, *Defense of wiretaps still falling short; Privacy should get benefit of the doubt*, Rocky Mountain News, Jan. 4, 2006, at 32A; Jim VandeHei and Dan Eggen, *Cheney Cites Justifications For Domestic Eavesdropping; Secret Monitoring May Have Averted 9/11, He Says*, Washington Post, Jan. 5, 2006, at A02; Bob Egelko, *SPY POWERS; Can the president eavesdrop on private citizens without a judge's ok? The high court said 'no' in 1972 Wiretaps: Ruling requires warrants for spying at home*, San Francisco Chronicle, Jan. 8, 2006, at A1; Eric Lichtblau, *Judges and Justice Dept. Meet Over Eavesdropping Program*, New York Times, Jan. 10, 2006, at A14; Julie Hirschfeld Davis, *In reversal, Bush backs hearings on wiretaps*, Baltimore Sun, Jan. 12, 2006, at 6a; Editorial, *End the end run; President wrong to bypass courts in ordering domestic wiretaps*, Columbus Dispatch, Jan. 14, 2006, at 12A; Maura Reynolds, *The Nation; Specter Remains Doubtful of Spy Program's Legality; He says Bush was not given a 'blank check' when Congress OKd the use of force after 9/11*, L.A. Times, Jan. 16, 2006, at A15; Frank James, *Gore accuses president of breaking the law*, Chicago Tribune, Jan. 17, 2006; *Bob Deans, Wiretap battle lines harden,* Atlanta Journal-Constitution, Jan. 26, 2006, *at 3A;* Jake Thompson, *Scrutiny on surveillance issue backed*, Omaha World-Herald, Jan. 27, 2006, at 01A; Jim Puzzanghera, *Experts challenge need for warrantless spying*, Mercury News, Jan. 28, 2006; Carol D. Leonnig, *Gonzales Is Challenged on Wiretaps*, Washington Post, Jan. 31, 2006, at A07; Tom Brune, *NSA Supporter Opposes Wiretaps*, Newsday, Feb. 5, 2006; Edward Alden, *Licence to Listen In?*, Financial Times, Feb. 6, 2006; Joel Bleifuss, *FBI, DoD, NSA: All Spying On You*, In These Times, Feb. 6, 2006; Liz Holloran, *Everyone's Spinning the Spying*, U.S. News & World Report, Feb. 13, 2006; Adam Liptak, *U.S. Asks Judge to Drop Suit on N.S.A. Spying*, New York Times, June 12, 2006; Harry Weinstein, *Domestic Spying Program Comes Under Legal Scrutiny*, Los Angeles Times, June 12, 2006; Andrew Cohen, *Domestic Surveillance Goes to Court*, Washington Post, June 12, 2006; David Ashenfelter, *Battle Over Wiretaps to Begin Today*, Detroit Free Press, June 12, 2006; Daniel Trotta, *NSA's Eavesdropping Without Warrants Faces Legal Challenge*, Reuters, June 12, 2006; *ACLU Tells Judge Not Even President Above Law*, North Country Gazette, June 12, 2006; Niraj Warikoo, *Wiretap Suit All About Power*, Detroit Free Press, June 13, 2006; Gregg Krupa, *Bush Says No to Spy Defense*, Detroit News, June 13, 2006; Henry Weinstein, *Challenge to Domestic Surveillance Mounted*, Los Angeles Times, July 10, 2006; Gail Gibson, *NSA Says it's Too Secret to Be Sued*, Baltimore Sun, July 11, 2006; Jui Chakravorty, *White House Asks for Dismissal of NSA Wiretap Suit*, Reuters, July 10, 2006; Kevin Krolicki, *Judge Orders Halt to NSA Wiretap*

offensive and defensive ever since the existence of the Program was revealed.  In

addition, the Eastern District of Michigan has recently ruled on the legality of the

Program, and has held that it violates the Constitution.  *Am. Civil Liberties Union*, 438 F.

Supp. 2d at 754.

As the D.C. Circuit has explained, "[w]hen citizens request information to

ascertain whether a particular agency is properly serving its public function, the agency

often deems it in its best interest to stifle or inhibit the probes. . . . [S]ince it is in these

instances that the representations of the agency are most likely to be protective and

perhaps less than accurate, the need for in camera inspection is greater."  *Allen*, 636 F.2d

at 1299.  Accordingly, the strong public interest in the subject of these FOIA requests

weighs heavily in favor of *in camera* review of the withheld documents.

Second, *in camera* review is particularly appropriate in a national security FOIA

case involving the issue of segregability.  In such cases, the agencies may improperly

stretch the fact that there may be some exempt material in the records to justify

withholding entire records and even broad categories of records.  Government officials

may "reflect an inherent tendency to resist disclosure, and judges may take this natural

inclination into account."  *Ray*, 587 F.2d at 1195.  Returning the matter to the agencies

for more detailed *Vaughn* indices may not get behind overbroad exemption claims, as the

D.C. Circuit recognized when it remanded *Krikorian v. Department of State* to the district

court to determine "whether more detailed affidavits are appropriate or whether an

*Program*, Reuters, Aug. 17, 2006; David Strout, *Federal Judge Orders End to Warrantless Wiretapping*, New York Times, Aug. 17, 2006; Gail Gibson, *NSA Spying Ruled Illegal*, Baltimore Sun, Aug. 18, 2006; Adam Liptak and Eric Lichtblau, *Judge Finds Wiretap Actions Violate the Law*, New York Times, Aug. 18, 2006; *Ruling for the Law*, New York Times, Aug. 18, 2006; Jonathan Weisman, *Political Fallout Follows NSA Ruling*, Washington Post, Aug. 19, 2006.

alternative such as in camera review would better strike the balance between protecting sensitive foreign relations information and disclosing non-exempt information as required by the FOIA." 984 F.2d 461, 467 (D.C. Cir. 1993).

Third, the inadequacy of the government's *Vaughn* affidavits is a well-recognized justification for *in camera* review. In fact, *in camera* review is required when the *Vaughn* affidavits are too vague to permit meaningful review. *Spirko*, 147 F.3d at 996; *see also Quinon v. FBI*, 86 F.3d 1222, 1229 (D.C. Cir. 1996). As the D.C. Circuit has admonished, "[t]o accept an inadequately supported exemption claim would constitute an abandonment of the trial court's obligation under the FOIA to conduct a de novo review." *King*, 830 F.2d at 219 (footnote and internal quotation marks omitted). As shown above, the government's declarations and indices are plainly inadequate, and granting summary judgment in the absence of *in camera* review would be wholly inappropriate.

Finally, the submission of conclusory affidavits by the agency is also cause for *in camera* review because, "[w]here the agency affidavits merely parrot the language of the statute and are drawn in conclusory terms, the court's responsibility to conduct de novo review is frustrated." *King*, 830 F.2d at 1298; *see also Carter*, 830 F.2d at 392. In fact, the D.C. Circuit has suggested that the agency's submission of "affidavits [that] are insufficiently detailed to permit meaningful review of exemption claims" constitutes a "circumstance[] under which it would be error for the district court not to review the documents in camera." *Spirko*, 147 F.3d at 996 (emphasis in original); *see also Quinon*, 86 F.3d at 1229 ("[W]here an agency's affidavits merely state in conclusory terms that documents are exempt from disclosure, an *in camera review is necessary*." (emphasis added)).

**C.    The Court should conduct an *in camera* review and provide segregable, non-exempt documents to the plaintiffs.**

As currently articulated, the government's limited, and conclusory assertions regarding segregability do not provide enough information to allow the Court to conduct the required *de novo* review of the accuracy of these claims.  A district court that "simply approve[s] the withholding of an entire document without entering a finding on segregability, or the lack thereof," errs.  *Powell v. U.S. Bureau of Prisons*, 927 F.2d 1239, 1242 n.4 (D.C. Cir. 1991) (internal quotation and citation omitted); *see Schiller*, 964 F.2d at 1209 (remanding case because NLRB had failed to "correlate[] the claimed exemptions to particular passages in the [exempt] memos").  In this case, the only information before the Court is the government's unsupported statements – made only in passing and only with respect to a few of the documents – that there are no segregable portions; therefore, the Court cannot make the necessary finding.  To do so based solely on such conclusory statements would "constitute an abandonment of the trial court's obligation under FOIA to conduct a *de novo* review."  *Allen*, 636 F.2d at 1293.

A detailed justification for non-segregability is also vital to the Court's review because plaintiffs do not have access to the records at issue and cannot effectively challenge conclusory assertions.  *Vaughn*, 484 F.2d at 824.[25]  In these non-adversarial

---

[23] It is likely that a side-by-side comparison of the withheld records with the publicly available information would demonstrate that much of the information in the withheld records already has been publicly aired by the government in officially authorized testimony, speeches, publications and other forums.  In *Afshar*, the D.C. Circuit held that although an agency bears the burden of proving that a FOIA exemption applies to a given document, "a plaintiff asserting a claim of prior disclosure must bear the initial burden pointing to specific information in the public domain that appears to duplicate that being

proceedings where the government possesses exclusive access to the disputed records and plaintiffs cannot know the precise content of the documents they seek, rigorous *de novo* review by the Court constitutes the only opportunity for independent scrutiny of the subject records.  Following *EPA v. Mink*, Congress amended FOIA to make clear that "courts act as an independent check on challenged classification decisions."  410 U.S. 73 (1973); *Goldberg*, 818 F.2d at 76.  The lack of any supporting explanation for the government's claims on segregation makes it difficult for the Court to engage in a searching review of the government's segregability decisions and hinders plaintiffs' ability to present contrary evidence that segregable portions of the text are not properly classified.

Where, as here, the government has not released any part of the requested documents and the government's declarations and indices are inadequate to review the accuracy of its claims, "in camera inspection is needed in order to make a responsible de novo determination on the claims of exemption."  *Ray*, 587 F.2d at 1195-96; *id*. at 1215, 1218 (Wright, J., concurring) (where exemption claim is not clearly proven by detailed affidavits and testimony, court may not sustain withholding without *in camera* review); *Mead Data Cent., Inc*., 566 F.2d at 262, n.59 (suggesting selective *in camera* inspection in cases involving segregation challenges "to verify the agency's descriptions and provide assurances, beyond a presumption of administrative good faith, to FOIA plaintiffs that the descriptions are accurate and as complete as possible").  Plaintiffs urge

---

withheld."  702 F.2d at 1130.  Here, plaintiffs are prevented from making such a showing because of the limited information and extreme generality of the government declarations.  Nonetheless, the information described above regarding government-authorized disclosures of information is sufficient to challenge the government's failure to segregate disclosable portions of the records.

the Court to fulfill its required *de novo* review of the disputed withholdings through *in camera* scrutiny of the government's blanket exemption claims.

### D. The Court should use representative sampling and employ a special master to facilitate the efficient resolution of this dispute.

In a case such as this one, where it appears that the quantity of documents at issue is large, the Court may undertake *in camera* review of only a portion of the documents and rule on the entire FOIA request by extrapolating from its findings on the limited sample.[26] *See, e.g., Bonner*, 928 F.2d at 1151 (sampling is an "appropriate procedure to test an agency's FOIA exemption claims" over "a large number of documents"); *Meeropol*, 790 F.2d at 958; *Weisberg*, 745 F.2d at 490 (D.C. Cir. 1984); *Wash. Post v. Dep't of Def.*, 766 F. Supp. 1, 15 (D.D.C. 1991). Where a limited sample is reviewed, the sample may be a portion of the documents designated as representative or a portion selected at random. *Compare Bonner*, 928 F.2d at 1151 (representative), *with Weisberg*, 745 F.2d at 1490 (random).

This case calls for use of both techniques to develop an appropriate sample. In this instance, where there are three plaintiffs with three different FOIA requests, where the records identified by the Department of Justice originate from six different Department of Justice offices (OLC, ODAG, OIPR, Office of Information and Policy, FBI, and the Criminal Division), where there are a wide range of classes of documents at

---

[24] Although the government does not quantify the number of documents at issue or the total pages at issue, plaintiffs estimate that there at least 1,463 classified "documents or categories of documents" responsive to their FOIA requests that have been withheld by the government. This estimate was arrived at by compiling the total number of "documents or categories of documents" identified or suggested by the government for each agency, less the number of identified duplicate documents. Given that each document or category likely consists of multiple pages, the total number of withheld pages at issue is almost certainly far higher than the document total described here.

issue, including memoranda, letters, and talking points, and where six exemptions from FOIA are invoked, it would be appropriate to determine initially the contours of a representative distribution of the records. Such a distribution should be determined after first excluding groups of records that the plaintiffs have decided not to challenge or exemptions that the plaintiffs will not seek to dispute.[27] Then, a proportion of the overall withheld records from each office can be calculated. In determining such a proportion, special attention should be paid to the records of the Office of Legal Counsel, as these are the only records that the government appears to be referencing when they claim that non-exempt information is inextricably intertwined with exempt information, Mem. in Supp. of Summ. J. at 51, and they thus raise significant issues regarding segregability of non-exempt material, in addition to the exemption claims themselves. Once a representative distribution is determined, then the selection of records for *in camera* review can be fairly randomized according to accepted standards in FOIA cases.

Further, plaintiffs recommend that the Court appoint a special master with expert knowledge in the national security field to evaluate the disputed documents and to summarize opposing arguments for their exemption under FOIA. The Court has the authority to appoint a special master under Fed. R. Civ. Pro. 53 to assist it in compiling a manageable sample of documents for *in camera* review and in assessing the salient

---

[25] Plaintiffs will accept the redaction of names and identifying information pursuant to Exemptions (b)(6) and (b)(7)(C), as well as the redaction of internal Department of Justice business telephone, fax and pager numbers pursuant to Exemption (b)(2). In addition, plaintiffs will not challenge the withholding of the following information: (1) draft documents and discussion about drafts and the drafting process (withheld under Exemption (b)(5)), (2) duplicates of records already released or duplicates of records being withheld by another office, (3) records that are not "agency" records within the meaning of FOIA 5 U.S.C. Sec. 552(f)(1), and (4) records of the Criminal Division of the Department of Justice.

arguments on both sides. The D.C. Circuit has held repeatedly that district courts possess

broad discretion to appoint special masters in FOIA cases, particularly in suits featuring

large numbers of classified intelligence and national security documents. *Vaughn*, 484

F.2d at 828 ("it is within the discretion of a trial court to designate a special master to

examine documents and evaluate an agency's contention of exemption."); *see also*

*Meeropol*, 790 F.2d at 961 ("[t]he decision whether to appoint a master lies within the

discretion of the trial court").[29]

In fact, the D.C. Circuit upheld the appointment of a special master in strikingly

similar circumstances in a FOIA suit concerning a large number of classified intelligence

documents about American hostage-rescue operations in Iran. *In re Dep't of Defense*,

848 F.2d 232 (D.C. Cir. 1988). In affirming the appointment of a special master, the

court acknowledged that "[o]ur circuit has recognized the propriety under Rule 53(b) of

designating masters in certain exceptional FOIA cases." *Id.* at 235. The district court in

that case had deliberately restricted the duties of the master to "developing [a] sample and

summarizing to the court the arguments that each party has made, or could make with

---

[26] Other courts have declared a willingness to appoint qualified experts to help untangle
complex issues with potential national security consequences. *See, e.g.*, *Clift v. United
States*, 597 F.2d 826, 829 (2d Cir. 1979) ("[W]hile we sympathize with the judge's
admission that she would be unable to understand the significance of the documents
without the aid of an independent expert, efforts could be made to locate such an expert
with appropriate clearances."); *Bay Area Lawyers Alliance for Nuclear Arms Control v.
Dep't of State*, 818 F. Supp. 1291, 1301 (N.D.Cal. 1992) (ruling in FOIA suit seeking
secret treaty documents that the court "will not hesitate" to assign a special master to help
make "an in camera, de novo review of government withholdings"); *Hepting v. AT&T
Corp.*, Order to Show Cause, No. C-06-672-VRW at 69 (N.D.Cal. filed July 20, 2006)
(proposing in challenge to NSA wiretapping program that court appoint expert to assist
"in determining whether disclosing particular evidence would create a 'reasonable
danger' of harming national security"). Congress has also endorsed the use of special
masters as a tool for district courts handling extensive FOIA litigation. *See* S. REP. NO.
93-854, 93d Cong., at 15 (1974).

respect to the exemptions claimed by defendants." *Id.* at 234. The special master made *no* recommendations on the merits of the claimed exemptions. On appeal, the D.C. Circuit concluded that this narrow mandate "clearly met the requirements of Rule 53." *Id.* at 239.

Plaintiffs propose a special master to serve in the mold adopted by the D.C. Circuit in *In re Department of Defense*. Here, as there, plaintiffs seek the release of a large number of highly classified documents, which may amount to thousands of pages. A special master could wade through this mass of documents and select a representative sample for the Court to determine whether additional *in camera* scrutiny of the withheld documents is required. In addition, a special master could unravel conflicting arguments for and against the government's claimed exemptions, summarizing them in a coherent report for both the Court and the parties. The D.C. Circuit, in *In re Department of Defense*, characterized the district court's decision to direct the master to compile arguments for and against exemption as "rather unremarkable." 848 F.2d at 237. Plaintiffs here presume that the Court will make all final decisions regarding the continued classification of individual documents. Nonetheless, a special master with intelligence expertise could assist the Court in identifying meritorious arguments and could provide specialized insights into the practical consequences of releasing certain documents.

Finally, an independent special master would restore a measure of adversarial balance to this inherently non-adversarial process, where the government possesses all of the contested documents while plaintiffs must litigate in the dark against classified pleadings and redacted declarations. Among the specific justifications cited by the D.C.

Circuit in upholding the use of a special master in a national security FOIA case was the fact that the "[district court] had no access to impartial expert evidence or even the benefit of the traditional adversary process to illuminate the nature of the documents in question." *In re Dep't of Defense*, 848 F.2d at 239.  This case presents the same one-sided dynamic in favor of the government.  Appointing a special master would strengthen the Court's ability to judge the propriety of the government's exemption claims.  If the Court is inclined to appoint a special master, plaintiffs request an opportunity to submit additional briefing on the qualifications and assignments that would be appropriate for a special master, including recommendations of candidates to serve as a special master.

## CONCLUSION

For the foregoing reasons, this Court should deny the defendant's motion for summary judgment and grant plaintiffs' cross-motion for *in camera* review.  The Court should review *in camera* the withheld documents, or a portion thereof, with the assistance of a special master, in order to evaluate the validity of the government's claimed exemptions.  If the Court finds that the government has withheld documents to an unjustified extent, the Court should order the release of the appropriate documents or portions thereof.  The Court should also order defendant to release the total number of documents and the total number of pages withheld.

Respectfully submitted,

/s/ *Arthur B. Spitzer*
_____
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
   of the National Capital Area
1400  20th Street, N.W. #119
Washington, D.C. 20036

47

Phone:  (202) 457-0800
Fax: (202) 452-1868

Ann Beeson
Nasrina Bargzie
American Civil Liberties Union Foundation
125 Broad St., 18th Floor
New York, NY 10004
Phone: (212) 549-2500
Fax: (212) 549-2629


Meredith Fuchs (D.C. Bar No. 422825)
The National Security Archive Fund, Inc.
The George Washington University
Gelman Library, Suite 701
2130 H Street, N.W.
Washington, D.C. 20037

Marc Rotenberg (D.C. Bar No. 422825)
Electronic Privacy Information Center
1718 Connecticut Avenue, NW
Suite 200
Washington, DC 20009-1148
Phone: (202) 483-1209
Fax: (202) 483-1278

*Counsel for Plaintiffs*

October 13, 2006