UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER,<br><br>              Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE,<br><br>              Defendant. | No. 06-ca-0096 (HHK) |
| AMERICAN CIVIL LIBERTIES UNION, *et al.*,<br><br>              Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE,<br><br>              Defendant. | No. 06-ca-0214 (HHK) |

**MOTION FOR LEAVE TO FILE EXHIBITS TO PLAINTIFFS'
SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR *IN CAMERA* REVIEW**

On May 23, 2007, plaintiffs filed a motion [Dkt. 39] for leave to file a supplemental memorandum apprising the Court of testimony provided by former Deputy Attorney General James Comey to the Senate Judiciary Committee on May 15, 2007, regarding the determination that Mr. Comey and other high-ranking officials at the DOJ had made regarding the legality of the NSA program. The defendant has requested [Dkt. 41] and received [Minute Order of June 11, 2007] an extension of time through June 13 in which to file a response to plaintiffs' motion.

Plaintiffs now seek leave to file, as attachments to their supplemental memorandum, the following three documents, which are appended hereto:

(1) James Comey's written answers to written questions on this topic posed by Senators Patrick Leahy and Charles E. Schumer. Mr. Comey's answers indicate that "OLC [the Office of Legal Counsel of the Department of Justice] prepared legal memoranda concerning th[is] matter, some of which would have been drafts. I also prepared at least one memorandum." (Response to Leahy question 1(f); see also response to Schumer question 6.) Mr. Comey also states that "Some time shortly after March 10, I received a memorandum [concerning this matter] from White House Counsel Gonzales." (Response to Leahy question 2(d)). This document is available on Senator Leahy's official website at http://leahy.senate.gov/issues/USAttorneys/index.html). The documents described by Mr. Comey would be responsive to plaintiffs' pending FOIA requests for "legal memoranda, opinions or statements concerning increased domestic surveillance," EPIC Complaint ¶ 7, and for any "legal reviews of the program and its legal rationale," ACLU Complaint ¶ 11.

(2) A letter of May 21, 2007, from Senators Patrick Leahy and Arlen Specter (Chairman and Ranking member of the Senate Committee on the Judiciary) to Attorney General Alberto Gonzales, renewing the Committee's earlier requests for, *inter alia*, documents relating to the legal justifications for the administration's warrantless wiretapping program. This letter is available on Senator Leahy's official website at http://leahy.senate.gov/press/200705/052207a.html. The letter notes that

> the Administration has offered a legislative proposal that it contends seeks to 'modernize' the Foreign Intelligence Surveillance Act (FISA) . . . The draft legislation would make dramatic and far-reaching changes to a critical national security authority. Before we can even begin to consider any such legislative proposal, we must be given appropriate access to the information necessary to carry out our oversight and legislative duties.

The Administration's proposal is of vital interest to the American people, as well as to the Senate Judiciary Committee. Like the committee, the public is entitled to appropriate access,

under the Freedom of Information Act, to these materials. The Leahy-Specter letter requested a response by June 5, but no response has yet been received. *See* http://leahy.senate.gov/press/200706/060807.html.

(3) An editorial from the May 17, 2007, edition of the Washington Post, titled "The Gonzales Coverup," available at http://www.washingtonpost.com/wp-dyn/content/article/2007/05/16/AR2007051602489_pf.html. The editorial concludes by asking, "What was the administration doing, and what was it willing to continue to do, that its lawyers concluded was without a legal basis? Without an answer to that fundamental question, the coverup will have succeeded." This editorial—and others like it—confirm the continuing validity of what this Court held sixteen months ago: that "given the great public and media attention that the government's warrantless surveillance program has garnered and the recent hearings before the Senate Judiciary committee, the public interest is particularly well-served by the timely release of the requested documents." Memorandum Opinion and Order of Feb. 16, 2006 [Dkt. 10], at 17-18.

The attached documents, like the congressional testimony of former Deputy Attorney General James Comey cited in our proposed supplemental memorandum, highlight the need for prompt *in camera* review in this case, as requested in plaintiffs' pending motion [Dkt. 34, filed October 13, 2006] for *in camera* review of the withheld records.

Counsel for the defendant has declined to consent to the granting of this motion.

Wherefore plaintiffs' pending motion for leave to file a supplemental memorandum, and this motion for leave to file exhibits with that motion, should be granted.

Respectfully submitted,

/s/ *Arthur B. Spitzer*

_____
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
   of the National Capital Area
1400 20th Street, N.W. #119
Washington, D.C. 20036
Phone: (202) 457-0800
Fax: (202) 452-1868

Jameel Jaffer
Nasrina Bargzie
American Civil Liberties Union Foundation
125 Broad St., 18th Floor
New York, NY 10004
Phone: (212) 519-7814
Fax: (212) 549-2651


/s/ *Meredith Fuchs*

_____
Meredith Fuchs (D.C. Bar No. 450325)
The National Security Archive Fund, Inc.
The George Washington University
Gelman Library, Suite 701
2130 H Street, N.W.
Washington, D.C. 20037
Phone (202) 994-7000
Fax: (202) 994-7005


/s/ *Marc Rotenberg*

_____
Marc Rotenberg (D.C. Bar No. 422825)
Electronic Privacy Information Center
1718 Connecticut Avenue, NW, Suite 200
Washington, DC 20009-1148
Phone: (202) 483-1209
Fax: (202) 483-1278

Counsel for Plaintiffs

June 12, 2007

Written Questions to
Former Deputy Attorney General James B. Comey
Submitted by Senator Patrick Leahy
May 22, 2007

1. You testified that the Department of Justice ("DoJ") completed a factual and legal evaluation of "a particular classified program" in 2004, and this review was conducted by, among others, the Office of Legal Counsel ("OLC").

   **a.** When was this review started?

   **I believe some time in late fall 2003.**

   **b.** Why was the review started? Was the review started at the request of any individual or entity? If so, who or what entity**?**

   **I believe it was started at the initiative of Jack Goldsmith and Patrick Philbin.**

   c. Who participated in the review? Other than OLC, did any other division, section, or unit at DoJ participate in the review?

   **Goldsmith and Philbin were the principal participants, as I recall. I believe they were assisted from time to time by James Baker from the Office of Intelligence Policy and Review and my chief of staff, Chuck Rosenberg. There may have been other DOJ lawyers who assisted them.**

   d. Did any individual or entity from outside DoJ participate in the review? Were there any individuals from the White House, the Department of Defense ("DoD"), or other federal agency who participated in the review? If so please identify those individuals and/or entities?

   **I believe Goldsmith and Philbin coordinated their effort with lawyers in the intelligence community.**

   e. Did the review assess the full duration of the classified program and, if not, what time frame was reviewed?

   **The review focused on current operations during late 2003 and early 2004, and the legal basis for the program.**

   f. As a result of the review, did any individual or entity at DoJ, or any other agency, prepare a legal opinion or memorandum related to the classified program, and, if so, who or what entity prepared the legal opinion or memorandum?

   **OLC prepared legal memoranda concerning the matter, some of which would have been drafts. I also prepared at least one memorandum.**

   g. Were the results of this review shared with the Federal Bureau of Investigation ("FBI"), and, if so, who at the FBI and when?

1

**It is my understanding that Goldsmith and Philbin discussed their work with officials from the General Counsel's office at the FBI, including the General Counsel, Valerie Caproni. I discussed the matter privately with FBI Director Mueller and FBI Deputy Director John Pistole.**

    h.  Other than the White House or individuals at the White House, were the results of this review shared with any individual, entity, or federal agency outside DoJ, and, if so, who or what entity and when?

**The matter was discussed with lawyers and non-lawyers in the intelligence community. I am uncomfortable going into more detail in an unclassified setting.**

2.    In your testimony, you stated that the views of DoJ related to the classified program were communicated to the White House prior to the evening of March 10, 2004.

    a.  How were these views communicated to the White House? Please identify whether the communications were made orally, in writing, by electronic communication, or other means; and to whom and when the communications were made. Please identify if any of the documents responsive to Question 1 above were included in this communication.

**The views were communicated orally prior to March 10, 2004, including at a March 9 meeting I attended at the White House. I also believe that Goldsmith and Philbin had a variety of contacts with officials at the White House in the preceding weeks or months as the review was conducted. Those contacts may have involved their sharing written materials, but I am not sure. I recall sending one memorandum to the White House, after March 10, which I believe attached a memorandum written by Goldsmith.**

    b.  Without disclosing the substance of the classified program or any legal advice, did these views include the understanding that the Attorney General, or you as Acting Attorney General, would not certify the classified program?

**Yes.**

    c.  Did you or others at DoJ receive any response to these views from the White House? If so, please identify whether the responses were made orally, in writing, by electronic communication, or other means; and to whom and when was the response was made.

**I directly received oral responses during discussions at the White House on March 9, 2004. I know there were a variety of discussions in early 2004 in which I did not participate but that involved Jack Goldsmith and Patrick Philbin.**

    d.  Did the response include any legal opinion or memorandum from the White House, or any other federal agency related to the classified program? If so, please identify what individual(s) or entities prepared and reviewed the legal opinion or memorandum.

**I am not aware of any other such memorandum or legal opinion prior to March 10, 2004. Some time shortly after March 10, I received a memorandum from White House Counsel Gonzales.**

3. You testified that after you arrived at the George Washington Hospital in Washington, D.C., on the evening of March 10, 2004, White House Counsel Alberto Gonzales and White House Chief of Staff Andrew Card came to Attorney General John Ashcroft's hospital room and spoke to him relating to the authorization of a classified program.

    a. Did any individual(s) come with Mr. Gonzales or Mr. Card to the hospital, and if so, who? Were those individuals present for the conversation between Mr. Ashcroft and Mr. Gonzales?

    **I do not know with whom Mr. Gonzales and Mr. Card arrived; only the two of them entered the room.**

    b. Upon arriving in the hospital room, did Mr. Gonzales say anything to you, either before or after his conversation with Mr. Ashcroft, and if so, what did he say?

    **He did not speak to me at any time.**

    c. Did Mr. Card speak to Mr. Ashcroft or you in the hospital room and if so, what did he say?

    **Mr. Card did not speak to me. I believe he said, "Be well," to Attorney General Ashcroft as he turned to depart.**

    d. To your knowledge, did Mr. Gonzales or Mr. Card consult with Mr. Ashcroft's physician or any medical staff prior to entering the hospital room?

    **Not to my knowledge.**

    e. In your presence, did Mr. Gonzales or Mr. Card ask Mr. Ashcroft questions to elicit his state of mind and/or medical condition prior to discussing their request for authorization of the classified program?

    **I believe Mr. Gonzales began the conversation by asking, "How are you General?" to which the Attorney General replied, "Not well."**

    f. To your knowledge, did Mr. Gonzales or Mr. Card take any steps to ensure that facts related to the classified program were not disclosed to individuals without proper clearances or an actual need to know who were present in the hospital room?

    **Not to my knowledge.**

4. In your testimony, you stated that FBI Director Robert Mueller also arrived at the George Washington Hospital that night.

    a. To your knowledge, did Mr. Mueller have any conversation with Mr. Gonzales or Mr. Card at the hospital that night? If so, what was that conversation?

    **Not to my knowledge.**

    b. In your testimony, you indicated that Mr. Mueller had a "memorable" exchange with Mr. Ashcroft after Mr. Gonzales and Mr. Card left. Please describe that exchange.

       **It was a private conversation in which Mr. Mueller expressed his admiration for the Attorney General's conduct that evening.**

5.    You testified that the President met with you privately, and then, at your urging, he also met with Mr. Mueller privately, on the morning of March 12, 2004 following your daily counter-terrorism briefing. After these discussions, you stated that the President indicated to Mr. Mueller that you were now authorized to make changes to the classified program in response to the Department of Justice's views.

     a.  Following your meetings, did the President direct you or Mr. Mueller to discontinue or suspend any portion of classified program immediately until the appropriate changes were made to bring it into legal compliance?

     **No.**

     b.  How long did the classified program continue without legal certification from DoJ?

     **I don't recall exactly, but believe it was approximately several weeks.**

6.    You testified that you discussed DoJ's views on the classified program with Vice President Dick Chaney and members of his staff, including his Chief of Staff David Addington.

     a.  Where and when did those discussions take place?

     **March 9, 2004 at the White House.**

     b.  Who else was present for those discussions?

     **Jack Goldsmith, Patrick Philbin, Vice President Cheney, Mr. Addington, Mr. Card, Mr. Gonzales, and members of the intelligence community.**

     c.  If those discussions were on or before March 10, 2004, was the Vice President and/or his staff aware of DoJ's decision not to certify the classified program? If so, how were they aware?

     **Yes. The Vice President was aware of DOJ's decision to not certify the program, because I had communicated this orally during a March 9 meeting. That meeting was a culmination of ongoing dialogue between DOJ and the White House.**

     d.  If those discussions were on or before March 10, 2004, was the Vice President and/or his staff aware of your intention to resign if the classified program was authorized without DoJ certification? If so, how were they aware?

     **No. I had not made a decision to resign yet.**

     e.  To your knowledge, did the Vice President or his staff have any role in the decision to have Mr. Card and Mr. Gonzales visit Mr. Ashcroft in the hospital? If so, what role did they have and what is the source for your information?

       **I have no knowledge about that.**

7. You testified that Mr. Philbin, who was with you in the hospital, was "blocked from promotion," as a result of the position taken by DoJ related to this classified program.

    a. Did any individual or individuals from the White House have any input into his potential promotion at DoJ? If so who, and in relation to what promotion?

    **Mr. Philbin was considered for principal Deputy Solicitor General after Paul Clement became Solicitor General. It was my understanding that the Vice President's office blocked that appointment.**

    b. Who was involved in blocking Mr. Philbin's promotion, and what did they do?

    **I understood that someone at the White House communicated to Attorney General Gonzales that the Vice President would oppose the appointment if the Attorney General pursued the matter. The Attorney General chose not to pursue it.**

8. When did the Administration first conclude that the Authorization for Use of Military Force ("AUMF") authorized warrantless electronic surveillance of the type involved in what the Administration has called the "terrorism surveillance program" or TSP? If you do not recall a specific date, please provide as close an approximation as is possible.

    **I don't think it is appropriate for me to discuss legal advice by the Department of Justice or any particular classified program.**

9. What legal standard for intercepting communications was the National Security Agency ("NSA") applying in its warrentless electronic surveillance program before March 2004? Was it a "probably cause" standard? What standard was the NSA applying when the program was first authorized? What standard was applied after March 2004?

    **I don't think it is appropriate for me to discuss legal advice by the Department of Justice or any particular classified program.**

10. Has the warrantless electronic surveillance program always required before authorizing interception of a communication that at least one party to the communication be located outside of the United States? If not, approximately when did this become a requirement?

    **I don't think it is appropriate for me to discuss legal advice by the Department of Justice or any particular classified program.**

11. Has the warrantless electronic surveillance program always required before authorizing interception of a communication that at least one party to the communication be a member or agent of Al Queda or an affiliate terrorist organization? If not, approximately when did this become a requirement?

    **I don't think it is appropriate for me to discuss legal advice by the Department of Justice or any particular classified program.**

**Written Questions from Senator Charles E. Schumer to James B. Comey**
**May 15, 2007 Hearing**

1. When the Attorney General testified before the Senate Judiciary Committee on February 6, 2006, he stated that there was little or no dissent within the Administration with respect to the program that "the President has confirmed."

   - **Was the classified program over which you and others almost resigned in March 2004 the program that the President confirmed in early 2006? Was it a variant of the program the President confirmed in early 2006?**

**I do not believe I can answer these questions in an unclassified environment.**

2. You testified that in March of 2004, while Attorney General Ashcroft was hospitalized with pancreatitis, the powers of the Attorney General were transferred to you.

   - **Please describe the mechanism by which that power was transferred to you, what documentation was created, what public statements were made about the transfer, and what communications were had with White House personnel about the transfer.**

**David Ayres, the Attorney General's Chief of Staff, handled the documentation and notifications to the White House. He would have worked with my Chief of Staff, Chuck Rosenberg. I do not recall what specific documents were created. There was media coverage about the fact that I was acting Attorney General and I believe DOJ Public Affairs made public statements to that effect.**

3. Please identify all the officials at the Department of Justice or elsewhere whom you have a basis to believe were prepared to resign in March 2004 over the classified program you alluded to in your testimony.

**I believe the following individuals were prepared to resign: Jack Goldsmith, Patrick Philbin, Chuck Rosenberg, Daniel Levin, James Baker, David Ayres, David Israelite, Robert Mueller. Although not involved with the matter, I believe a large portion of my staff would have resigned were I to depart.**

4. You testified that you believed that your former aide, Patrick Philbin, had been blocked from promotion as a result of his participation in the dispute over the classified program you alluded to. Specifically, it has been reported in the press that Mr. Philbin was blocked from taking the position of Principal

1

    Deputy Solicitor General because of the objections of Vice President Cheney and his aide, David Addington.

- **Can you confirm the accuracy of these media accounts? If they are inaccurate, please identify the particular promotion that was denied to Mr. Philbin, the individuals who objected, and the circumstances surrounding Mr. Philbin's being rejected for the promotion.**

**I believe they are accurate.**

5. You testified that during the visit to Attorney General Ashcroft's hospital room on the evening of March 10, 2004, Mrs. Ashcroft was present when you first arrived and also later when Messrs. Gonzales and Card arrived.

- **Did you reveal classified information in Mrs. Ashcroft's presence?**

**No.**

- **Did either Mr. Gonzales or Mr. Card reveal classified information in Mrs. Ashcroft's presence?**

**Mr. Card did not. I do not recall whether Mr. Gonzales mentioned any aspects of the matter that would be considered classified, including the name of the program – which was itself classified, as I recall – when addressing Mr. Ashcroft.**

6. You testified that in or about March 2004, the Justice Department's Office of Legal Counsel determined that it could not certify the legality of the classified program you alluded to in your testimony.

- **Did the Office of Legal Counsel or any other office prepare a written opinion providing the basis for concerns about the legality of the classified program you alluded to in your testimony? If so, please identify the approximate date(s) of any such opinion, the author(s), and the recipients of any such opinion, inside and outside the Justice Department.**

**Yes. OLC prepared legal memoranda concerning the matter during early 2004, some of which would have been drafts. I also prepared at least one memorandum that I recall. The Department of Justice would be in the best position to supply dates and information about recipients.**

7. As you may know, Todd Graves has recently said that he was asked to resign in January of 2006, making him at least the 9th United States Attorney who was dismissed last year.

2

> - **Did you form an opinion of the quality of Mr. Graves's work when you were the Deputy Attorney General? If so, what was it?**

**I had a positive impression of Mr. Graves and believed he was performing well as U.S. Attorney.**

> - **What was John Ashcroft's opinion of Mr. Graves, if you know?**

**I believe Attorney General Ashcroft shared my opinion of Mr. Graves, although I do not recall a specific conversation with Mr. Ashcroft concerning Todd's performance.**

8. I know that you are familiar with the highest-ranking career official at the Justice Department, David Margolis. He has testified that in November of 2006, Kyle Sampson read him a list of several names of U.S. Attorneys who would be asked to resign. In response, Mr. Margolis made clear that so long as people were being dismissed, there were two U.S. Attorneys who were very poor performers who deserved to be fired. One, he said, was Kevin Ryan, who by many accounts had management and other issues in the Northern District of California. The other U.S. Attorney, whom Mr. Margolis did not identify, was not dismissed and continues to serve as a U.S. Attorney today.

   > - **What do you make of the fact that the same people who decided to fire Dan Bogden of Nevada for no apparent reason also refused to heed Mr. Margolis's advice with respect to this other U.S. Attorney?**
   >
   > **I don't know what to make of it. Mr. Margolis is a wise person with significant experience in personnel matters, whose advice is always worthy of serious consideration.**

9. You are the Department official who decided – after I called for it – to appoint a Special Prosecutor in the Valerie Plame affair. After John Ashcroft recused himself from the issue, you appointed your former colleague, Patrick Fitzgerald. And you performed the delegation of duties to Mr. Fitzgerald with respect to the Plame investigation.

   > - **If Mr. Fitzgerald were fired as U.S. Attorney, would he have been able to continue as Special Prosecutor under your delegation of authority?**

**I don't believe so because he was appointed in his capacity as United States Attorney.**

10. You testified before the House a few weeks ago that you had a 15-minute conversation with Mr. Sampson on February 28, 2005 – shortly after Alberto

3

>  Gonzales took over as Attorney General. You testified that you discussed two things. One was a conversation about who you thought were the weakest U.S. Attorneys. You were never asked about the second topic.
>
>    - **What was the second subject? Please provide details of that portion of your conversation with Mr. Sampson.**

**This conversation occurred shortly after Attorney General Gonzales's confirmation. Mr. Sampson explained to me a vision for the operation of the Attorney General's office and the Office of the Deputy Attorney General that would involve operating those respective staffs as essentially one staff. My understanding was that this vision would entail the Deputy Attorney General and staff acting in much closer coordination with the Attorney General and his staff. I responded that I believed it was very valuable to the Attorney General and the Department for the Deputy Attorney General to act as a separate office and that I did not support this vision.**

**I thought such an arrangement risked elimination of the separate vetting and advice function of the DAG and his or her staff. There is great value in having that office – called ODAG -- available to make decisions that need not reach the Attorney General or to review and advise on matters headed to the Attorney General for decision. The risk inherent in combining the staffs is that the separate review and advice function is lost, which would not be in the interest of the Attorney General or the Department.**

4

# U.S. SENATOR PATRICK LEAHY

**CONTACT: Office of Senator Leahy, 202-224-4242**          **VERMONT**

Leahy, Specter Press For Answers On Administration's Domestic Spying Program

*...Leading Judiciary Committee Senators Continue To Seek Information On Legal Justification For Warrantless Wiretapping Program*

WASHINGTON (Tuesday, May 22) – Senate Judiciary Committee Chairman Patrick Leahy (D-Vt.) and Ranking Member Arlen Specter (R-Pa.) sent a letter to Attorney General Alberto Gonzales seeking answers to longstanding questions about the Bush Administration's warrantless wiretapping program.

Leahy and Specter renewed earlier requests made by the Committee relating to the legal justifications for the warrantless wiretapping program. The request follows testimony last week by former Deputy Attorney General James Comey, who revealed that the Justice Department had concerns about the legal basis for the program and refused to certify it for a period of time in 2004.

"This Committee has made no fewer than eight formal requests over the past 18 months – to the White House, the Attorney General, or other Department of Justice officials – seeking documents and information related to this surveillance program. These requests have sought the Executive Branch legal analysis of this program and documents reflecting its authorization by the President," the senators wrote. "You have rebuffed all requests for documents and your answers to our questions have been wholly inadequate and, at times, misleading."

Leahy and Specter noted that the information is crucial for the Committee to have before consideration of any of the Administration's proposed changes to the Foreign Intelligence Surveillance Act (FISA). They set a deadline of June 5 for the Justice Department to respond to the inquiry.

A PDF is also available.


May 21, 2007

The Honorable Alberto Gonzales
Attorney General of the United States
U.S. Department of Justice

950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dear Attorney General Gonzalez:

Last week we heard dramatic and deeply troubling testimony from former Deputy Attorney General Comey. He testified that in March 2004, when he was Acting Attorney General, he informed the White House that the Department of Justice had concluded an ongoing classified surveillance program had "no legal basis" and would not certify it. He then described how you, then Counsel to the President, and former White House Chief of Staff Andrew Card arrived at the hospital bedside of an extremely ill Attorney General Ashcroft and attempted to persuade him to certify the program. When you failed, because Mr. Ashcroft refused, Mr. Comey testified that the program was nonetheless certified over the objections of the Department of Justice. That apparently prompted a number of high-ranking Justice officials to consider resigning en masse.

This incident obviously raises very serious questions about your personal behavior and commitment to the rule of law. Mr. Comey's testimony also demonstrates vividly how essential it is that this Committee understands the legal underpinnings of the surveillance program that was the subject of that incident, and how the legal justification evolved over time. The stonewalling by you and the Administration must end. The Committee on the Judiciary is charged with overseeing and legislating on constitutional protections, civil and criminal justice, civil liberties, and the Judiciary, all subjects that this matter impacts. We intend to do our job.

This Committee has made no fewer than eight formal requests over the past 18 months – to the White House, the Attorney General, or other Department of Justice officials – seeking documents and information related to this surveillance program. These requests have sought the Executive Branch legal analysis of this program and documents reflecting its authorization by the President. You have rebuffed all requests for documents and your answers to our questions have been wholly inadequate and, at times, misleading.

We note also that the Administration has offered a legislative proposal that it contends seeks to "modernize" the Foreign Intelligence Surveillance Act (FISA). As you know, the Judiciary Committee has historically overseen changes to FISA and it is this Committee's responsibility to review the Administration's proposal with great care. The draft legislation would make dramatic and far-reaching changes to a critical national security authority. Before we can even begin to consider any such legislative proposal, we must be given appropriate access to the information necessary to carry out our oversight and legislative duties.

This Administration has asserted that it established its program of warrantless wiretapping by the NSA because it deemed FISA's requirements to be incompatible with the needs of the intelligence community in fighting terrorism. You testified in January that the warrantless wiretapping program had been terminated and that henceforth surveillance would be conducted pursuant to

authorization from the FISA Court. To consider any changes to FISA, it is critical that this Committee understand how the Department and the FISA Court have interpreted FISA and the perceived flaws that led the Administration to operate a warrantless surveillance program outside of FISA's provisions for over five years.

Your consistent stonewalling and misdirection have prevented this Committee from carrying out its constitutional oversight and legislative duties for far too long. We understand that much of the information we seek may currently be classified, but that can be no excuse for failing to provide relevant information to all members of this Committee and select, cleared staff. We will, of course, handle it with the greatest care and consistent with security requirements.

Therefore, we reiterate our requests for the following documents and ask that you provide them to this Committee no later than June 5, 2007:

1) Please provide all documents that reflect the President's authorization and reauthorization of the warrantless electronic surveillance program that you have called the Terrorist Surveillance Program, including any predecessor programs, from 2001 to the present;

2) Please provide all memoranda or other documents containing analysis or opinions from the Department of Justice, the National Security Agency, the Department of Defense, the White House, or any other entity within the Executive Branch on legality of or legal basis for the warrantless electronic surveillance program, including documents that describe why the desired surveillance would not or could not take place consistent with the requirements and procedures of FISA from 2001 to the present;

3) Please provide all documents reflecting communications with the Foreign Intelligence Surveillance Court (FISC) about the warrantless electronic surveillance program or the types of surveillance that previously were conducted as part of that program, that contain legal analysis, arguments, or decisions concerning the interpretation of FISA, the Fourth Amendment, the Authorization for the Use of Military Force, or the President's authority under Article II of the Constitution, including the January 2007 FISC orders to which you refer in your January 17, 2007 letter to us and all other opinions or orders of the FISA court with respect to this surveillance;

4) If you do not consider the surveillance program that was the subject of discussion during the hospital visit and other events that former Deputy Attorney General James Comey described in his May 15, 2007 testimony before the Senate Judiciary Committee to be covered by the requests made above, please provide all documents described in those requests relevant to that program, as well.

We emphasize that we are seeking the legal justifications and analysis underlying these matters and not the specific operational details or information obtained by the surveillance.

Sincerely,

      PATRICK LEAHY                       ARLEN SPECTER
      Chairman                                 Ranking Member

# # # # #

Home | Biography | Vermont | Issues | Press | Office | Services | Search

# washingtonpost.com

## The Gonzales Coverup

Congress must find out what the administration was doing that its own lawyers wouldn't approve.

Advertisement

Thursday, May 17, 2007; A16

WHY IS IT only now that the disturbing story of the Bush administration's willingness to override the legal advice of its own Justice Department is emerging? The chief reason is that the administration, in the person of Attorney General Alberto R. Gonzales, stonewalled congressional inquiries and did its best to ensure that the shameful episode never came to light.

In February 2006, the Senate Judiciary Committee was inquiring into the warrantless wiretapping program whose existence had been revealed just two months before. Sketchy details had also begun to emerge of the March 2004 hospital room ambush, in which Mr. Gonzales, then the White House counsel, and then-White House chief of staff Andrew H. Card Jr. tried to browbeat the gravely ill Attorney General John D. Ashcroft, who had temporarily yielded his office to his deputy, into approving the warrantless surveillance program.

Sen. Arlen Specter (R-Pa.), who was then chairing the Judiciary Committee, got Mr. Gonzales to agree to have Mr. Ashcroft testify. But when Mr. Specter followed up with a letter asking as well that the department approve the appearance of former deputy attorney general James B. Comey, Mr. Gonzales balked.

If called to testify, Mr. Ashcroft and Mr. Comey wouldn't be allowed to reveal "confidential Executive Branch information," William E. Moschella, an assistant attorney general, wrote to Mr. Specter. "In light of their inability to discuss such confidential information . . . we do not believe that Messrs. Ashcroft and Comey would be in a position to provide any new information to the committee."

If you were Mr. Gonzales, you'd certainly want to make sure they stayed quiet. Consider: Mr. Gonzales, as the president's lawyer, went to the hospital room of a man so ill he had temporarily relinquished his authority. There, Mr. Gonzales tried to persuade Mr. Ashcroft to override the views of the attorney general's own legal counsel. When the attorney general refused, Mr. Gonzales apparently took part in a plan to go forward with a program that the Justice Department had refused to certify as legal.

Then, when part of the story became public, Mr. Gonzales resorted to word-parsing. "[W]ith respect to what the president has confirmed, I believe -- I do not believe that these DOJ officials that you're identifying had concerns about this program," he said.

Mr. Gonzales's lack of candor is no longer surprising. What's critical here is that lawmakers get a full picture of what happened, obtaining whatever documents -- Office of Legal Counsel opinions -- and testimony are necessary, behind closed doors if need be. "Jim Comey gave his side of what transpired that day," White House press secretary Tony Snow said yesterday. If there's another side to the story, we'd like to hear it.

What was the administration doing, and what was it willing to continue to do, that its lawyers concluded was without a legal basis? Without an answer to that fundamental question, the coverup will have succeeded.

© 2007 The Washington Post Company