## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | ) ) | |
| | ) | Civil Action No. 06-0096 (HHK) |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| DEPARTMENT OF JUSTICE, | ) ) | |
| Defendant. | ) ) | |
| ———————————————— | ) | |
| | ) | |
| AMERICAN CIVIL LIBERTIES UNION, et al., | ) ) | |
| | ) | Civil Action No. 06-00214 (HHK) |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| DEPARTMENT OF JUSTICE, | ) ) | |
| | ) | **CONSOLIDATED CASES** |
| Defendant. | ) ) | |
| ———————————————— | ) | |

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE A SUPPLEMENTAL MEMORANDUM AND TO PLAINTIFFS' MOTION FOR LEAVE TO FILE EXHIBITS IN SUPPORT OF SUPPLEMENTAL MEMORANDUM

On May 23, 2007, the plaintiffs in these consolidated cases under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, sought leave to file a supplemental memorandum in further opposition to defendant's pending Motion for Summary Judgment (Docket No. 29), otherwise fully briefed as of November 9, 2006, and in further support of plaintiffs' Motion for In Camera Review of Withheld Records (Docket No. 34), otherwise fully briefed as of November 27, 2006.  See Docket No. 39.  Plaintiffs' proposed supplemental memorandum seeks to apprise the Court of recent congressional testimony by former Deputy Attorney General James B. Comey which, plaintiffs contend, addressed "the government program about which these FOIA lawsuits

seek information," Pls' Motion for Leave at 1, and, allegedly, "confirm[ed] that at least some of the records at issue here relate to unlawful government activity." Pls' Proposed Supp. Mem. at 2. Plaintiffs also seek leave, by motion filed June 12, 2007, to file several exhibits in support of their proposed supplemental memorandum. Docket No. 42.

Defendant objects to plaintiffs' motions for two reasons. As a preliminary matter, plaintiffs' effort to offer Mr. Comey's testimony in support of their pending motion for in camera review of the withheld documents related to the Terrorist Surveillance Program ("TSP")[1] is curious, because, throughout his testimony, Mr. Comey repeatedly indicated that he did not intend to expose classified information, and did not confirm that he was discussing any specific activity. See Ex. B hereto. Plaintiffs' characterizations concerning this testimony and its implications, accordingly, are necessarily speculative.[2]

More importantly, as defendant has already explained, see Deft's Reply Br. (Docket No. 36) at 23-26, the wide-ranging in camera review that plaintiffs demand is neither necessary nor appropriate. As the Court of Appeals has admonished, in camera review of documents at issue in a FOIA case is "generally disfavored," PHE, Inc. v. Dept. of Justice, 983 F.2d 248, 253 (D.C.

---

[1] As the Attorney General announced several months ago, as a result of orders issued by the Foreign Intelligence Surveillance Court on January 10, 2007, any electronic surveillance that was occurring as part of the Terrorist Surveillance Program will now be conducted subject to the approval of that Court. Under these circumstances, the President has determined not to reauthorize the TSP. See Ex. A hereto.

[2] Should the Court determine that additional context concerning the events discussed in Mr. Comey's testimony is required in order for it to resolve defendant's claims of exemption under FOIA, defendant can submit a declaration for the Court's in camera, ex parte, review to provide further information concerning these highly classified activities. See, e.g. Declaration of Steven G. Bradbury, Office of Legal Counsel ("Bradbury Declaration"), filed as Ex. A to the Defendant's Motion for Summary Judgment (Docket No. 29) ¶¶ 5, 22 & n.2; see also id. ¶ 65; Declaration of John D. Negroponte, former Director of National Intelligence (filed as Ex. C to the Bradbury Declaration) ¶¶ 5, 30.

Cir. 1993), and should not be "resorted to as a matter of course, simply on the theory that 'it can't hurt.'" Quinon v. Fed. Bureau of Investigation, 86 F.3d 1222, 1228 (D.C. Cir. 1996); see also Hayden v. Nat'l Security Agency, 608 F.2d 1381, 1387 (D.C. Cir. 1979) (in camera review is a "last resort"). This is particularly so in cases involving national security. See Armstrong v. Exec. Ofc. of the President, 97 F.3d 575, 580 (D.C. Cir. 1996) ("In national security cases, a district court exercises a wise discretion when it limits the number of documents it reviews in camera. This has two clear benefits. First, it makes it less likely that sensitive information will be disclosed. Second, if there is an unauthorized disclosure, having reduced the number of people with access to the information makes it easier to pinpoint the source of the leak").

Instead, in cases such as this one, reliance on agency submissions in lieu of in camera review "is in accordance with congressional intent that courts give agency affidavits 'substantial weight' in recognition of the agency's expertise." Hayden, 608 F.2d at 1387. As defendant's filings demonstrate, the declarations submitted in this case comprehensively detail the reasons for the withholding of every record or category of records that remains at issue following plaintiffs' various concessions. See Deft's Reply Br. at 3-5 (detailing plaintiffs' concessions); id. at 6-23 (explaining the adequacy of defendant's submissions as to the remaining documents). Moreover, the statements made in these declarations concerning the necessity of classifying information relating to intelligence sources and methods such as the TSP, and the significant harms to national security that would result from the public disclosure of such information, are uncontradicted. See, e.g., Deft's Reply Br. at 8-9 (explaining that plaintiffs have failed to challenge or offer any evidence to contradict the specific determinations made by the former Director of National Intelligence and two experienced NSA officials concerning the harms that

would result from disclosure of the withheld documents).[3]  Indeed, as defendant has explained, plaintiffs have failed to make any substantive effort to identify inadequacy in any specific claim of exemption by DOJ as to any specific record or category of records; they have failed to make any substantive response to the public record information contained in the declarations submitted by DOJ that provide substantial and adequate justifications for the determinations to withhold various categories of documents; and they do not challenge DOJ's statement of the law governing the applicability of any FOIA exemption.  Plaintiffs thus have failed utterly to meet their burden to oppose defendant's properly supported motion for summary judgment and nothing in either the supplemental memorandum plaintiffs propose to file or its various proposed exhibits satisfies that burden.

As the Court of Appeals has determined, "[t]he ultimate criterion is [w]hether the district judge believes that in camera inspection is needed in order to make a responsible de novo determination on the claims of exemption."  Center for Auto Safety v. EPA, 731 F.2d 16, 20 (D.C. Cir. 1984).  Thus – far from the wide-ranging in camera review plaintiffs suggest – it is well established that in camera review is not appropriate where the submissions by the withholding agencies are sufficiently specific to demonstrate that the material "withheld is logically within the domain of the exemption claimed."  See King U.S. Dept. of Justice, 830 F.2d 210, 217 (D.C. Cir. 1987); Deft's Reply Br. at 5-7 (discussing the requirements of an adequate Vaughn submission).  Here, defendant's submissions provide a more than adequate basis from which this Court may conduct the necessary review.  See Deft's Mot. for Summary Judgment (Docket No. 29), at 24-77; Deft's Reply Br. at 6-23.  And should the Court determine that these

---

[3]  In February 2007, J. Michael McConnell replaced Ambassador Negroponte as the Director of National Intelligence.

submissions are inadequate to permit such review as to the determination to withhold any

particular records or categories of records, the proper recourse would be to remand to the agency

and order submission of a more detailed index as to any documents that remain of concern, not to

conduct the sort of unlimited review suggested by plaintiffs.  See. e.g., Campbell v. Dept. of

Justice, 164 F.3d 20, 31 (D.C. Cir. 1998) ("On remand, the district court can either review the

documents in camera or require the [agency] to provide a new declaration. . . . The latter course

is favored when agency affidavits are facially inadequate") (emphasis added).  Until and unless

the Court makes such a determination, however, and allows additional submissions as necessary,

plaintiffs' request for in camera review should be rejected.

<div style="margin-left: 40%;">

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General, Civil Division

JEFFREY A. TAYLOR
United States Attorney

JOSEPH H. HUNT
Director, Federal Programs Branch

JOHN R. TYLER
Senior Trial Counsel
Federal Programs Branch


____/s/ Rupa Bhattacharyya_____
RUPA BHATTACHARYYA (VA# 38877)
Senior Trial Counsel
Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, D.C.  20044
Tel: (202) 514-3146
Fax: (202) 318-7593
Email: rupa.bhattacharyya@usdoj.gov

</div>

Dated:  June 15, 2007.

# EXHIBIT A



# The Attorney General
Washington, D.C.

January 17, 2007

The Honorable Patrick Leahy
Chairman
Committee on the Judiciary
United States Senate
Washington, D.C. 20510

The Honorable Arlen Specter
Ranking Minority Member
Committee of the Judiciary
United States Senate
Washington, D.C. 20510

Dear Chairman Leahy and Senator Specter:

I am writing to inform you that on January 10, 2007, a Judge of the Foreign Intelligence Surveillance Court issued orders authorizing the Government to target for collection international communications into or out of the United States where there is probable cause to believe that one of the communicants is a member or agent of al Qaeda or an associated terrorist organization. As a result of these orders, any electronic surveillance that was occurring as part of the Terrorist Surveillance Program will now be conducted subject to the approval of the Foreign Intelligence Surveillance Court.

In the spring of 2005—well before the first press account disclosing the existence of the Terrorist Surveillance Program—the Administration began exploring options for seeking such FISA Court approval. Any court authorization had to ensure that the Intelligence Community would have the speed and agility necessary to protect the Nation from al Qaeda—the very speed and agility that was offered by the Terrorist Surveillance Program. These orders are innovative, they are complex, and it took considerable time and work for the Government to develop the approach that was proposed to the Court and for the Judge on the FISC to consider and approve these orders.

The President is committed to using all lawful tools to protect our Nation from the terrorist threat, including making maximum use of the authorities provided by FISA and taking full advantage of developments in the law. Although, as we have previously explained, the Terrorist Surveillance Program fully complies with the law, the orders the Government has obtained will allow the necessary speed and agility while providing substantial advantages. Accordingly, under these circumstances, the President has

Letter to Chairman Leahy and Senator Specter
January 17, 2007
Page 2

determined not to reauthorize the Terrorist Surveillance Program when the current authorization expires.

The Intelligence Committees have been briefed on the highly classified details of these orders. In addition, I have directed Steve Bradbury, Acting Assistant Attorney General for the Office of Legal Counsel, and Ken Wainstein, Assistant Attorney General for National Security, to provide a classified briefing to you on the details of these orders.

Sincerely,

Alberto R. Gonzales
Attorney General

cc:    The Honorable John D. Rockefeller, IV
       The Honorable Christopher Bond
       The Honorable Sylvester Reyes
       The Honorable Peter Hoekstra
       The Honorable John Conyers, Jr.
       The Honorable Lamar S. Smith

# EXHIBIT B

**TRANSCRIPT**

May 15, 2007

COMMITTEE HEARING

SEN. PATRICK J. LEAHY
CHAIRMAN

SENATE JUDICIARY COMMITTEE
WASHINGTON, D.C.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY
FIRINGS

CQ Transcriptions, LLC
1255 22nd Street N.W.
Washington, D.C. 20037
Transcript/Programming: Tel. 301-731-1728
Sales: Tel. 202-419-8500  ext 599
sales@cq.com
www.cq.com

Copyright 2007 CQ Transcriptions, LLC
All materials herein are protected by United States copyright law
and may not be reproduced, distributed, transmitted, displayed,
published or broadcast without the prior written permission of
CQ Transcriptions. You may not alter or remove any trademark,
copyright or other notice from copies of the content.

**U.S. SENATE JUDICIARY COMMITTEE HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS**

MAY 15, 2007

SPEAKERS:

SEN. PATRICK J. LEAHY, D-VT.
CHAIRMAN

SEN. EDWARD M. KENNEDY, D-MASS.

SEN. JOSEPH R. BIDEN JR., D-DEL.

SEN. HERB KOHL, D-WIS.

SEN. DIANNE FEINSTEIN, D-CALIF.

SEN. RUSS FEINGOLD, D-WIS.

SEN. CHARLES E. SCHUMER, D-N.Y.

SEN. RICHARD J. DURBIN, D-ILL.

SEN. SHELDON WHITEHOUSE, D-R.I.

SEN. BENJAMIN L. CARDIN, D-MD.

SEN. ARLEN SPECTER, R-PA.

RANKING MEMBER

SEN. ORRIN G. HATCH, R-UTAH

SEN. CHARLES E. GRASSLEY, R-IOWA

SEN. JON KYL, R-ARIZ.

SEN. JEFF SESSIONS, R-ALA.

SEN. LINDSEY GRAHAM, R-S.C.

SEN. JOHN CORNYN, R-TEXAS

SEN. SAM BROWNBACK, R-KAN.

SEN. TOM COBURN, R-OKLA.

WITNESSES:

FORMER DEPUTY ATTORNEY GENERAL JAMES B. COMEY

SCHUMER:  I have a brief opening statement.  I'm sure Senator Specter does.  And then we'll get right into the questions.

First, I want to thank and commend Chairman Leahy for his continued leadership on the critically important issue of the politicization of the Justice Department.   This is our committee's fifth hearing in four months focusing on the mass firing of almost 10 percent of our country's top federal prosecutors.

At our last hearing, on April 19th, Attorney General Gonzales attempted to justify the dismissals, explain his role, and put the matter behind him.  He failed miserably in that attempt.

Indeed, four weeks later, the dismissals remain unexplained, the attorney general's role is murkier than ever, and with each new revelation, retraction and resignation the issue remains planted on the front pages, hobbling the department's ability to get its important work done.

Let me briefly review some of the developments since the attorney general's ill-fated appearance before this committee on April 19th.

Since April 19th, the former deputy attorney general, who is here today, has contradicted other DOJ officials by testifying that most of the fired U.S. attorneys performed well.  We will be hearing more about that today.

Since April 19th, former Missouri U.S. attorney Todd Graves has come forward to say that he was also asked to resign in 2006.  That brings the number of dismissals to at least nine and counting, not the eight that Mr. Gonzales testified to.

We'll be hearing more about that situation when the committee considers authorizing Chairman Leahy to subpoena Mr. Graves and his replacement, Bradley Schlozman.

Since April 19th, we've learned that a political corruption case involving Republicans in Arizona may have been slow-walked until after the 2006 election, as the Wall Street Journal has reported.

U.S. Attorney Paul Charlton's unhappiness with the pace of approvals from Washington may have led to his ouster. We'll be hearing more about that if and when the department responds to our request for information and documents.

And since April 19th, we have learned that one of the attorney general's top advisers, Monica Goodling, may have been doing the unthinkable: imposing a political and ideological litmus test in the hiring of career-level prosecutors and department lawyers.

We'll be hearing more about that when Ms. Goodling soon testifies under a grant of immunity.

And, of course, just yesterday, we learned of the latest and most high-ranking casualty of the current imbroglio. Mr. Comey's successor to the number two position at the department, Paul McNulty, announced his resignation.

The attorney general could almost wallpaper his office with the resignation letters of those who he was supposed to be supervising.

SCHUMER: The majority of people in his top circle are now no longer at the Justice Department.

Kyle Sampson, who was responsible for putting together the final firing list, has resigned. Monica Goodling, who helped with the list and served as the department's liaison to the White House, has resigned. Mike Battle, who was ordered to fire seven U.S. attorneys last December 7th, has resigned. And, of course, now the deputy attorney general himself has decided to resign.

I heard today that Attorney General Gonzales was trying to assign blame to Paul McNulty for the firings of the U.S. attorneys, saying that he relied on McNulty's advice. That's ironic, because Paul McNulty came clean with this committee and gave us some valuable information while the attorney general stonewalled.

The attorney general is trying to make Mr. McNulty into the next Scooter Libby, but we all know the buck stops with the attorney general.

Mr. Gonzales said at this hearing -- at that these -- Mr. Gonzales said in this hearing room that he accepts responsibility for the firings. Well, he should live up to his words and not keep pointing the finger today at Mr. McNulty.

There's been a -- there's long been reason to be concerned about Attorney General Gonzales given his close connection with the White House and his apparent misconception of this current role. He seems to many in this country to embody a disrespect for the rule of law and intolerance of independence at the Justice Department.

He's presided over a Justice Department where being a, quote, "loyal Bushie" seems to be more important than being a seasoned professional, where what the White House wants is more important than what the law requires or what prudence dictates.

The current scandal merely crystallizes this problem, namely that loyalty to the White House trumps allegiance to the law, the truth and common sense.

For example, Attorney General Gonzales' former chief of staff has testified that one of the principal reasons the A.G. was upset after listening to Mr. McNulty's testimony on February 6th was that Mr. McNulty had talked too much about the White House's role in appointing Karl Rove's deputy as U.S. attorney in Arkansas.

SCHUMER: Specifically, Mr. Sampson said Gonzales was upset that McNulty had, quote, "put so much emphasis on the White House's role in Griffin being promoted in favor of Cummins," unquote. Gonzales was upset because Mr. McNulty, quote -- said, quote -- Gonzales was upset because Mr. McNulty, quote, "had really brought the White House's role in Griffin into the public sphere."

So it appears that the attorney general was apparently not upset that Mr. McNulty had overstated the White House's role or misstated that role. He was only upset that he had exposed it. And now it appears that Mr. McNulty is gone because of it.

We've only begun to understand the White House's role in the firings and the attorney general's role in accomplishing the White House's bidding. So far, however, we know this at least.

It was the White House that initially raised the prospect of firing all 93 U.S. attorneys.

It was the White House that promoted the idea of removing Bud Cummins in favor of a former aide to Karl Rove.

It was the White House that was upset at the department's belated rejection of a plan to bypass homestate senators in Arkansas to keep Tim Griffin installed indefinitely as U.S. attorney.

It was the White House that had the best opportunity to correct
the record of its own involvement in the firing at a March 5th meeting
attended by Karl Rove before Mr. Moschella gave incomplete testimony
to Congress.

It was the White House that entertained complaints from
Republican Party officials about David Iglesias which apparently led
to his ouster.

It was the White House that had brought overblown complaints
about voter fraud prosecutions to the attention of the Justice
Department.

There'll be time for us to hear from those White House witnesses
who can shed light on what transpired here, and I hope the day comes
soon.

Senator Specter?

SPECTER:  Thank you, Mr. Chairman.

I join in the welcome of you, Mr. Comey.

SPECTER:  It is ironic in a sense that the former deputy attorney
general should be with the Judiciary Committee today, on the same day
that we learn of the resignation of the present deputy attorney
general.

Earlier today, I wrote to Deputy Attorney General Paul McNulty
congratulating him on his service with the Department of Justice, and
wishing him well in his new career.

I did not say in the note to him what I'm about to say, but I
think he found it difficult -- really, impossible -- to continue to
serve in the Department of Justice as a professional, which Paul
McNulty is, because it's embarrassing for a professional to work for
the Department of Justice today.

We had the attorney general before a hearing.  The testimony he
gave was hard to understand, incredible in a sense -- to say that he
was not involved in discussions and not involved in deliberations,
when his three top deputies said he was and the documentary evidence
supported that.

It is the decision of Mr. Gonzales as to whether he stays or

goes.  But it is hard to see how the Department of Justice can function and perform its important duties with Mr. Gonzales remaining where he is.  And beyond Mr. Gonzales's decision, it's a matter for the president as to whether the president will retain the attorney general or not.

I think that the operation of the executive branch is a decision for the president.  I don't want him telling me how to vote in the Senate on separation of powers, and I'm not going to tell him or make a recommendation to him as to what he ought to do with Mr. Gonzales.

SPECTER:  But I think the resignation of Mr. McNulty is another significant step and evidence that a department really cannot function with the continued leadership or lack of leadership of Attorney General Gonzales.

As I view the situation, we really don't know yet what has happened, whether it is politicization or whether it is an ideological bent or what.  There is no doubt that the president has the authority to fire all the attorneys general -- pardon me -- in order to fire the attorney general; Freudian slips are sometimes more revealing than the planned statements.

The president does have the authority to replace all of the 93 U.S. attorneys, as President Clinton did when he took office.

And prosecutions for voter fraud are very, very important.  When I was district attorney of Philadelphia, I prosecuted both Republicans and Democrats for voter fraud:  have a lot of it in Philadelphia.

In 1972, the Democrats and Republicans made a deal in South Philadelphia, a spot where many deals are made, to give the Republicans the top of the ticket -- President Nixon running for reelection -- and the Democrats the rest of the ticket.

A common pleas judge signed in at city hall at 6 a.m. that morning as evidenced by the registry roll, issued injunctions barring all of the McGovern poll watchers from the polling places.  He was prosecuted, as were many other top city officials.

So, voter fraud prosecutions are very, very important.

SPECTER:  But you can't bring a prosecution unless you have a case.

And now we have to determine if there was chicanery, whether

there were efforts at voter prosecutions -- vote fraud prosecutions for investigations when there was no basis for doing so.

It may well be that when we get to the end of the rainbow we will find the explanation may be as simple as outright incompetence -- outright incompetence.  To consider firing Peter Fitzgerald, which is what Kyle Sampson testified to, is patently ridiculous.

It is my hope that we will finish these investigations soon, because the continuing investigations are a harm to the -- we have to do our job.  But the sooner we finish, the sooner the Department of Justice can return to its work.

If we had a new attorney general and concluded this investigation, made our findings public, it would be very important. Because those U.S. attorneys perform enormously important functions on fighting drugs and crime and terrorism and the administration of both civil and criminal justice in this country.

And I'm glad to see you're here today, Mr. Comey, because I know you can shed some additional light on this important subject.

Thank you, Mr. Chairman.

SCHUMER:  Thank you, Senator Specter.

It's now my privilege to introduce our witness today, James B. Comey.

He is almost a man who needs no introduction.  He's well known to this committee, which has twice favorably considered his nomination for important offices:  first for the U.S. attorney in the Southern District of New York in 2002, then as deputy attorney general of the United States in 2003.

SCHUMER:  Mr. Comey was educated at the College of William and Mary and the University of Chicago Law School.  After law school, he served as a law clerk for then-U.S. District Judge John M. Walker Jr. in Manhattan.  After that he spent most of the next 20 years as a dedicated public servant in the Justice Department.

Besides serving ably as U.S. attorney and deputy attorney general, Mr. Comey earned a reputation as a hard-nosed prosecutor in a number of high-profile and important cases, including Khobar Towers terrorist bombing case arising out of the June 1996 attack on a U.S. military facility in Saudi Arabia in which 19 airmen were killed.

Mr. Comey is currently the senior vice president and general counsel of the Lockheed Martin Corporation.

Now, I know it is not easy for you, Mr. Comey, to be here and talk about some of the recent travails at the department which you hold so dear.

I especially appreciate Mr. Comey's coming to testify here without the formality of a subpoena.  In order to secure Mr. Comey's presence, I would have moved for consideration of a subpoena by the committee, but I'm glad that wasn't necessary because of your cooperation.

As far as I'm concerned, when the Justice Department lost Jim Comey, it lost a towering figure.  And I don't say that because he stands 6'8" tall.

When Jim left the department, we lost a public servant of the first order, a man of unimpeachable integrity, honestly, character and independence.

And now I'd like to administer the oath of office.  Would you please rise?

I sorry.  I wish we were administering the oath of office.

(LAUGHTER)

The oath.

Do you affirm that the testimony you are about to give before the committee will be the truth, the whole truth and nothing but the truth so help you, God?

COMEY:  I do.

SCHUMER:  Thank you.

OK, we're going to get right into the questioning because Mr. Comey does not have an opening statement.

SCHUMER:  As I said in my opening remarks, many have been concerned that Alberto Gonzales has made the Justice Department a mere extension of the White House where independence takes a back seat to service to the White House, where the rule of law takes a back seat to

the political needs of the president's party.

Before we get to the other issues, I want to go back to an incident from the time that Mr. Gonzales served as White House counsel.

There have been media reports describing a dramatic visit by Alberto Gonzales and Chief of Staff Andrew Card to the hospital bed of John Ashcroft in March 2004, after you, as acting attorney general, decided not to authorize a classified program.

First, can you confirm that a night-time hospital visit took place?

COMEY:  Yes, I can.

SCHUMER:  OK.

Can you remember the date and the day?

COMEY:  Yes, sir, very well.  It was Wednesday, March the 10th, 2004.

SCHUMER:  And how do you remember that date so well?

COMEY:  This was a very memorable period in my life; probably the most difficult time in my entire professional life.  And that night was probably the most difficult night of my professional life.  So it's not something I'd forget.

SCHUMER:  Were you present when Alberto Gonzales visited Attorney General Ashcroft's bedside?

COMEY:  Yes.

SCHUMER:  And am I correct that the conduct of Mr. Gonzales and Mr. Card on that evening troubled you greatly?

COMEY:  Yes.

SCHUMER:  OK.

Let me go back and take it from the top.

You rushed to the hospital that evening.  Why?

COMEY:  I'm only hesitating because I need to explain why.

SCHUMER:  Please.  I'll give you all the time you need, sir.

COMEY:  I've actually thought quite a bit over the last three
years about how I would answer that question if it was ever asked,
because I assumed that at some point I would have to testify about it.

The one thing I'm not going to do and be very, very careful about
is,  because this involved a classified program, I'm not going to get
anywhere near classified information.  I also am very leery of, and
will not, reveal the content of advice I gave as a lawyer, the
deliberations I engaged in.  I think it's very important for the
Department of Justice that someone who held my position not do that.

SCHUMER:  In terms of privilege.

COMEY:  Yes, sir.

SCHUMER:  Understood.

COMEY:  Subject to that, I -- and I'm uncomfortable talking about
this...

SCHUMER:  I understand.

COMEY:  ... but I'll answer the question.

I -- to understand what happened that night, I, kind of, got to
back up about a week.

SCHUMER:  Please.

COMEY:  In the early part of 2004, the Department of Justice was
engaged -- the Office of Legal Counsel, under my supervision -- in a
reevaluation both factually and legally of a particular classified
program.  And it was a program that was renewed on a regular basis,
and required signature by the attorney general certifying to its
legality.

And the -- and I remember the precise date.  The program had to
be renewed by March the 11th, which was a Thursday, of 2004.  And we
were engaged in a very intensive reevaluation of the matter.

And a week before that March 11th deadline, I had a private
meeting with the attorney general for an hour, just the two of us, and

I laid out for him what we had learned and what our analysis was in this particular matter.

And at the end of that hour-long private session, he and I agreed on a course of action. And within hours he was stricken and taken very, very ill...

SCHUMER: (inaudible) You thought something was wrong with how it was being operated or administered or overseen.

COMEY: We had -- yes. We had concerns as to our ability to certify its legality, which was our obligation for the program to be renewed.

The attorney general was taken that very afternoon to George Washington Hospital, where he went into intensive care and remained there for over a week. And I became the acting attorney general.

And over the next week -- particularly the following week, on Tuesday -- we communicated to the relevant parties at the White House and elsewhere our decision that as acting attorney general I would not certify the program as to its legality and explained our reasoning in detail, which I will not go into here. Nor am I confirming it's any particular program.

That was Tuesday that we communicated that.

COMEY: The next day was Wednesday, March the 10th, the night of the hospital incident. And I was headed home at about 8 o'clock that evening, my security detail was driving me. And I remember exactly where I was -- on Constitution Avenue -- and got a call from Attorney General Ashcroft's chief of staff telling me that he had gotten a call...

SCHUMER: What's his name?

COMEY: David Ayers.

That he had gotten a call from Mrs. Ashcroft from the hospital. She had banned all visitors and all phone calls. So I hadn't seen him or talked to him because he was very ill.

And Mrs. Ashcroft reported that a call had come through, and that as a result of that call Mr. Card and Mr. Gonzales were on their way to the hospital to see Mr. Ashcroft.

SCHUMER:  Do you have any idea who that call was from?

COMEY:  I have some recollection that the call was from the president himself, but I don't know that for sure.  It came from the White House.  And it came through and the call was taken in the hospital.

So I hung up the phone, immediately called my chief of staff, told him to get as many of my people as possible to the hospital immediately.  I hung up, called Director Mueller and -- with whom I'd been discussing this particular matter and had been a great help to me over that week -- and told him what was happening.  He said, "I'll meet you at the hospital right now."

Told my security detail that I needed to get to George Washington Hospital immediately.  They turned on the emergency equipment and drove very quickly to the hospital.

I got out of the car and ran up -- literally ran up the stairs with my security detail.

SCHUMER:  What was your concern?  You were in obviously a huge hurry.

COMEY:  I was concerned that, given how ill I knew the attorney general was, that there might be an effort to ask him to overrule me when he was in no condition to do that.

SCHUMER:  Right, OK.

COMEY:  I was worried about him, frankly.

And so I raced to the hospital room, entered.  And Mrs. Ashcroft was standing by the hospital bed, Mr. Ashcroft was lying down in the bed, the room was darkened.  And I immediately began speaking to him, trying to orient him as to time and place, and try to see if he could focus on what was happening, and it wasn't clear to me that he could. He seemed pretty bad off.

SCHUMER:  At that point it was you, Mrs. Ashcroft and the attorney general and maybe medical personnel in the room.  No other Justice Department or government officials.

COMEY:  Just the three of us at that point.

I tried to see if I could help him get oriented.  As I said, it

wasn't clear that I had succeeded.

I went out in the hallway.  Spoke to Director Mueller by phone.
He was on his way.  I handed the phone to the head of the security
detail and Director Mueller instructed the FBI agents present not to
allow me to be removed from the room under any circumstances.  And I
went back in the room.

I was shortly joined by the head of the Office of Legal Counsel
assistant attorney general, Jack Goldsmith, and a senior staffer of
mine who had worked on this matter, an associate deputy attorney
general.

So the three of us Justice Department people went in the room.  I
sat down...

SCHUMER:  Just give us the names of the two other people.

COMEY:  Jack Goldsmith, who was the assistant attorney general,
and Patrick Philbin, who was associate deputy attorney general.

I sat down in an armchair by the head of the attorney general's
bed.  The two other Justice Department people stood behind me.  And
Mrs. Ashcroft stood by the bed holding her husband's arm.  And we
waited.

And it was only a matter of minutes that the door opened and in
walked Mr. Gonzales, carrying an envelope, and Mr. Card.  They came
over and stood by the bed.  They greeted the attorney general very
briefly.  And then Mr. Gonzales began to discuss why they were there
-- to seek his approval for a matter, and explained what the matter
was -- which I will not do.

And Attorney General Ashcroft then stunned me.  He lifted his
head off the pillow and in very strong terms expressed his view of the
matter, rich in both substance and fact, which stunned me -- drawn
from the hour-long meeting we'd had a week earlier -- and in very
strong terms expressed himself, and then laid his head back down on
the pillow, seemed spent, and said to them, "But that doesn't matter,
because I'm not the attorney general."

SCHUMER:  But he expressed his reluctance or he would not sign
the statement that they -- give the authorization that they had asked,
is that right?

COMEY:  Yes.

And as he laid back down, he said, "But that doesn't matter, because I'm not the attorney general.  There is the attorney general," and he pointed to me, and I was just to his left.

The two men did not acknowledge me.  They turned and walked from the room.  And within just a few moments after that, Director Mueller arrived.  I told him quickly what had happened.  He had a brief -- a memorable brief exchange with the attorney general and then we went outside in the hallway.

SCHUMER:  OK.

Now, just a few more points on that meeting.

First, am I correct that it was Mr. Gonzales who did just about all of the talking, Mr. Card said very little?

COMEY:  Yes, sir.

SCHUMER:  OK.

And they made it clear that there was in this envelope an authorization that they hoped Mr. Ashcroft -- Attorney General Ashcroft would sign.

COMEY:  In substance.  I don't know exactly the words, but it was clear that's what the envelope was.

SCHUMER:  And the attorney general was -- what was his condition?  I mean, he had -- as I understand it, he had pancreatitis.  He was very, very ill; in critical condition, in fact.

COMEY:  He was very ill.  I don't know how the doctors graded his condition.  This was -- this would have been his sixth day in intensive care.  And as I said, I was shocked when I walked in the room and very concerned as I tried to get him to focus.

SCHUMER:  Right.

OK.  Let's continue.

What happened after Mr. Gonzales and Card left?  Did you have any contact with them in the next little while?

COMEY:  While I was talking to Director Mueller, an agent came up

to us and said that I had an urgent call in the command center, which was right next door. They had Attorney General Ashcroft in a hallway by himself and there was an empty room next door that was the command center.

And he said it was Mr. Card wanting to speak to me.

COMEY: I took the call. And Mr. Card was very upset and demanded that I come to the White House immediately.

I responded that, after the conduct I had just witnessed, I would not meet with him without a witness present.

He replied, "What conduct? We were just there to wish him well."

And I said again, "After what I just witnessed, I will not meet with you without a witness. And I intend that witness to be the solicitor general of the United States."

SCHUMER: That would be Mr. Olson.

COMEY: Yes, sir. Ted Olson.

"Until I can connect with Mr. Olson, I'm not going to meet with you."

He asked whether I was refusing to come to the White House. I said, "No, sir, I'm not. I'll be there. I need to go back to the Department of Justice first."

And then I reached out through the command center for Mr. Olson, who was at a dinner party. And Mr. Olson and the other leadership of the Department of Justice immediately went to the department, where we sat down together in a conference room and talked about what we were going to do.

And about 11 o'clock that night -- this evening had started at about 8 o'clock, when I was on my way home. At 11 o'clock that night, Mr. Olson and I went to the White House together.

SCHUMER: Just before you get there, you told Mr. Card that you were very troubled by the conduct from the White House room (ph), and that's why you wanted Mr. Olson to accompany you.

Without giving any of the details -- which we totally respect in terms of substance -- just tell me why. What did you tell him that so

upset you?  Or if you didn't tell him just tell us.

COMEY:  I was very upset.  I was angry.  I thought I just witnessed an effort to take advantage of a very sick man, who did not have the powers of the attorney general because they had been transferred to me.

I thought he had conducted himself, and I said to the attorney general, in a way that demonstrated a strength I had never seen before.  But still I thought it was improper.

And it was for that reason that I thought there ought to be somebody with me if I'm going to meet with Mr. Card.

SCHUMER:  Can you tell us a little bit about the discussion at the Justice Department when all of you convened?  I guess it was that night.

COMEY:  I don't think it's appropriate for me to go into the substance of it.  We discussed what to do.  I recall the associate attorney general being there, the solicitor general, the assistant attorney general in charge of the Office of Legal Counsel, senior staff from the attorney general, senior staff of mine.  And we just -- I don't want to reveal the substances of those...

SCHUMER:  I don't want you to reveal the substance.

They all thought what you did -- what you were doing was the right thing, I presume.

COMEY:  I presume.  I didn't ask people.  But I felt like we were a team, we all understood what was going on, and we were trying to do what was best for the country and the Department of Justice.  But it was a very hard night.

SCHUMER:  OK.

And then did you meet with Mr. Card?

COMEY:  I did.  I went with Mr. Olson driving -- my security detail drove us to the White House.  We went into the West Wing.  Mr. Card would not allow Mr. Olson to enter his office.  He asked Mr. Olson to please sit outside in his sitting area.  I relented and went in to meet with Mr. Card alone.  We met, had a discussion, which was much more -- much calmer than the discussion on the telephone.

After -- I don't remember how long, 10 or 15 minutes -- Mr. Gonzales arrived and brought Mr. Olson into the room. And the four of us had a discussion.

SCHUMER: OK.

And was Mr. -- were you and Mr. Card still in a state of anger at one another at that meeting, or is it a little calmer, and why?

COMEY: Not that we showed.

SCHUMER: Right.

COMEY: It was much more civil than our phone conversation, much calmer.

SCHUMER: Why? Why do you think?

COMEY: I don't know. I mean, I had calmed down a little bit. I'd had a chance to talk to the people I respected. Ted Olson I respect enormously.

SCHUMER: Right. OK.

Was there any discussion of resignations with Mr. Card?

COMEY: Mr. Card was concerned that he had heard reports that there were to be a large number of resignations at the Department of Justice.

SCHUMER: OK. OK.

And the conversations, the issue, whatever it was, was not resolved.

COMEY: Correct. We communicated about it. I communicated again the Department of Justice's view on the matter. And that was it.

SCHUMER: Right.

And you stated that the next day, Thursday, was the deadline for reauthorization of the program, is that right?

COMEY: Yes, sir.

SCHUMER: OK.

Can you tell us what happened the next day?

COMEY:  The program was reauthorized without us and without a signature from the Department of Justice attesting as to its legality. And I prepared a letter of resignation, intending to resign the next day, Friday, March the 12th.

SCHUMER:  OK.

And that was the day, as I understand it, of the Madrid train bombings.

COMEY:  Thursday, March 11th, was the morning of the Madrid train bombings.

SCHUMER:  And so, obviously, people were very concerned with all of that.

COMEY:  Yes.  It was a very busy day in the counterterrorism aspect.

SCHUMER:  Yet, even in light of that, you still felt so strongly that you drafted a letter of resignation.

COMEY:  Yes.

SCHUMER:  OK.

And why did you decide to resign?

COMEY:  I just believed...

SCHUMER:  Or to offer your resignation, is a better way to put it?

COMEY:  I believed that I couldn't -- I couldn't stay, if the administration was going to engage in conduct that the Department of Justice had said had no legal basis.  I just simply couldn't stay.

SCHUMER:  Right.  OK.

Now, let me just ask you this.  And this obviously is all troubling.

As I understand it, you believed that others were also prepared

to resign, not just you, is that correct?

COMEY:  Yes.

SCHUMER:  OK.

Was one of those Director Mueller?

COMEY:  I believe so.  You'd have to ask him, but I believe so.

SCHUMER:  You had conversations with him about it.

COMEY:  Yes.

SCHUMER:  OK.

How about the associate attorney general, Robert McCallum?

COMEY:  I don't know.  We didn't discuss it.

SCHUMER:  How about your chief of staff?

COMEY:  Yes.  He was certainly going to go when I went.

SCHUMER:  Right.

How about Mr. Ashcroft's chief of staff?

COMEY:  My understanding was that he would go as well.

SCHUMER:  And how...

COMEY:  I should say...

SCHUMER:  Please.

COMEY:  ... to make sure I'm accurate, I...

SCHUMER:  This is your surmise, not...

COMEY:  Yes.

I ended up agreeing -- Mr. Ashcroft's chief of staff asked me
something that meant a great deal to him, and that is that I not
resign until Mr. Ashcroft was well enough to resign with me.  He was
very concerned that Mr. Ashcroft was not well enough to understand

fully what was going on.  And he begged me to wait until -- this was
Thursday that I was making this decision -- to wait til Monday to give
him the weekend to get oriented enough so that I wouldn't leave him
behind, was his concern.

SCHUMER:  And it was his view that Mr. Ashcroft was likely to
resign as well?

COMEY:  Yes.

SCHUMER:  So what did you do when you heard that?

COMEY:  I agreed to wait.  I said that what I would do is -- that
Friday would be last day.  And Monday morning I would resign.

SCHUMER:  OK.

Anything else of significance relevant to this line of
questioning occur on Thursday the 11th, that you can recall?

COMEY:  No, not that I recall.

SCHUMER:  Thank you.

Now, let's go to the next day, which was March 12.  Can you tell
us what happened then?

COMEY:  I went to the Oval Office -- as I did every morning as
acting attorney general -- with Director Mueller to brief the
president and the vice president on what was going on on Justice
Department's counterterrorism work.

We had the briefing.  And as I was leaving, the president asked
to speak to me, took me in his study and we had a one-on-one meeting
for about 15 minutes -- again, which I will not go into the substance
of.  It was a very full exchange.  And at the end of that meeting, at
my urging, he met with Director Mueller, who was waiting for me
downstairs.

He met with Director Mueller again privately, just the two of
them.  And then after those two sessions, we had his direction to do
the right thing, to do what we...

SCHUMER:  Had the president's direction to do the right thing?

COMEY:  Right.

We had the president's direction to do what we believed, what the Justice Department believed was necessary to put this matter on a footing where we could certify to its legality.

And so we then set out to do that.  And we did that.

SCHUMER:  OK.

So let me just (inaudible) -- this is an amazing story, has an amazing pattern of fact that you recall.

SPECTER:  Mr. Chairman, could you give us some idea when your first round will conclude?

SCHUMER:  As soon as I ask a few questions here.  Fairly soon.

(OFF-MIKE)

SCHUMER:  Yes.

And, Senator Specter, you will get the same amount of time.

SCHUMER:  I thought with Mr. Comey's telling what happened...

(CROSSTALK)

SPECTER:  Just may the record show that you're now 16 minutes and 35 seconds over the five minutes and...

SCHUMER:  I think the record will show it.

SPECTER:  Well, it does now.

(LAUGHTER)

SCHUMER:  OK, thank you.

And I think most people would think that those 16:35 minutes were worth hearing.

SPECTER:  Well, Mr. Chairman, we do have such a thing as a second round, and there are a lot of senators waiting...

SCHUMER:  Yes, OK.

Let me ask you these few questions...

SPECTER:  ... including a Republican.

SCHUMER:  I'm glad you're here, Senator Specter.  I know you're concerned with the issue.

SPECTER:  Lonely, but here.

(LAUGHTER)

SCHUMER:  Let me ask you this:  So in sum, it was your belief that Mr. Gonzales and Mr. Card were trying to take advantage of an ill and maybe disoriented man to try and get him to do something that many, at least in the Justice Department, thought was against the law?  Was that a correct summation?

COMEY:  I was concerned that this was an effort to do an end-run around the acting attorney general and to get a very sick man to approve something that the Department of Justice had already concluded -- the department as a whole -- was unable to be certified as to its legality.  And that was my concern.

SCHUMER:  OK.

And you also believe -- and you had later conversations with Attorney General Ashcroft when he recuperated, and he backed your view?

COMEY:  Yes, sir.

SCHUMER:  Did you ever ask him explicitly if he would have resigned had it come to that?

COMEY:  No.

SCHUMER:  OK.

But he backed your view over that what was being done, or what was attempting to being done, going around what you had recommended, was wrong, against the law?

COMEY:  Yes.

And I already knew his view from the hour we had spent together going over it in great detail a week before the hospital incident.

SCHUMER:  Yes.

And the FBI director, Mueller, backed your view over that of Mr. Gonzales as well -- is that right? -- in terms of whether the program could continue to be implemented the way Counsel Gonzales wanted it to be.

COMEY:  The only reason I hesitate is it was never Director Mueller's job or position to be drawing a legal conclusion about the program; that he was very supportive to me personally.  He's one of the finest people I've ever met and was a great help to me when I felt a tremendous amount of pressure and felt a bit alone at the Department of Justice.

But it was not his role to opine on the legality.

SCHUMER:  How about Jack Goldsmith, the head of the Office of Legal Counsel?  Did he opine on the legality?

COMEY:  Yes.  He had done a substantial amount of work on that issue.  And it was largely OLC, the Office of Legal Counsel's work, that I was relying upon in drawing my -- in making my decision.

SCHUMER:  OK.  Just two other questions.

Have you ever had the opportunity to recall these events on the record in any other forum?

COMEY:  No.

SCHUMER:  OK.  And...

COMEY:  I should...

SCHUMER:  Go ahead.

COMEY:  I was interviewed by the FBI and discussed these events in connection with a leak investigation the FBI was conducting.

SCHUMER:  And you gave them these details then.

COMEY:  Yes.

SCHUMER:  Thank you.

COMEY:  But not -- by forum I've never testified about it.

SCHUMER:  And after you stood your ground in March of 2004, did you suffer any recriminations or other problems at the department?

COMEY:  I didn't.  Not that I'm aware of.

SCHUMER:  OK.

Well, let me just say this, and then I'll call on Senator Specter who can have as much time as he thinks is appropriate.

The story is a shocking one.  It makes you almost gulp.

And I just want to say, speaking for myself, I appreciate your integrity and fidelity to rule of law.  And I also appreciate Attorney General Ashcroft's fidelity to the rule of law as well, as well as the men and women who worked with you and stuck by you in this.

When we have a situation where the laws of this country -- the rules of law of this country are not respected because somebody thinks there's a higher goal, we run askew of the very purpose of what democracy and rule of law are about.

SCHUMER:  And this -- again, this story makes me gulp.

Senator Specter?

SPECTER:  May the record now show that we're 21 minutes and 22 seconds beyond the five-minute allocation.

And I raise it not to in any way suggest that the questioning hasn't been very important, but only to suggest that we have a practice for having a five-minute round.  And it is exceeded on some occasions.  I've only been here 27 years; I can't remember it being exceeded by about 23 minutes.

And we do have second rounds.  And we do have eight -- seven Democrats here.  It is now 9:48 -- 10:48.  And at the start of this hearing I asked my colleagues among the Republicans to join me here.

I repeat that request now, since it's televised -- internally, at least -- that my colleagues should know that there are seven Democrats here who will all have turns asking questions.  And it would be appropriate to have a little balance here, if some Republicans would show up to participate in this hearing.  It would be helpful if we had

some balance, if some other Republicans would show up to participate in this hearing.

Mr. Comey, I join Senator Schumer in commending you for what you did here.  The terrorist surveillance program has been the subject of quite a number of hearings in this committee:  strenuous efforts to bring the issue before the Foreign Intelligence Surveillance Court, efforts at changing legislation; some of it is now pending, co-sponsored by Senator Feinstein and myself.  The matter is wending its way through the federal courts, and it's the 6th Circuit now.

So this is a very important, substantive matter.

SPECTER:  And as the acting attorney general, you were doing exactly what you should do in standing up for your authority and to stand by your guns and to do what you thought was right.

It has some characteristics of the Saturday Night Massacre, when the other officials stood up and they had to be fired in order to find someone who would -- deputy attorney general and others would not fire the special prosecutor.  So that was commendable.

When you finally got to the place where the buck doesn't stop, when you got to the president -- as I understand your testimony -- the president told you to do what you thought was right.  Is that correct?

COMEY:  Yes, sir.

SPECTER:  So the president backed you up.  And it was necessary to make changes in the terrorist surveillance program to get the requisite certification by the acting attorney general -- that is you?

COMEY:  And I may be being overly cautious, but I'm not comfortable confirming what program it was that this related to.

And I should be clear.  The direction -- as I said, I met with the president first, the Director Mueller did.

COMEY:  And it was Director Mueller who carried to me the president's direction to do what the Department of Justice thinks is right to get this where the department believes it ought to be.  And we acted on that direction.

SPECTER:  Director Mueller told you to -- the president said to do what you thought was right?

COMEY:  Correct.

SPECTER:  Well, how about what the president himself told you?

COMEY:  I don't want to get into what -- the reason I hesitate, Senator Specter, is the right thing was done here, in part -- in large part because the president let somebody like me and Bob Mueller meet with him alone.

And if I talk about that meeting, I worry that the next president who encounters this is not going to let the next me get close to them to talk about something this important.

So I'm -- I want to be very careful that I don't talk about what the president and I talked about.

I met with the president.  We had a full and frank discussion, very informed.  He was very focused.

Then Director Mueller met with the president alone.  I wasn't there.

Director Mueller carried to me the president's direction that we do what the Department of Justice wanted done to put this on a sound legal footing.

SPECTER:  So you met first with the president alone for 15 minutes?

COMEY:  Yes, sir.

SPECTER:  And then Director Mueller met separately with the president for 15 minutes?

COMEY:  I don't remember exactly how long it was.  It was about the same length as my meeting.  I went down and waited for him, as he...

SPECTER:  And then Director Mueller, as you've testified, said to you, the president told Director Mueller to tell you to do what the Department of Justice thought was right?

COMEY:  Correct.

SPECTER:  Well -- but you won't say whether the president told you to do what the Department of Justice said was right?

COMEY:  Yes, I...

SPECTER:  You're not slicing hair.  There's no hair there.

COMEY:  You're a good examiner.

And that...

SPECTER:  Well, thank you.

COMEY:  Yes.  I -- the president and I -- I don't think the conversation was finished.  We discussed the matter in some detail. And then I urged him to talk to Bob Mueller about it.

And I don't know the content of Director Mueller's communication with him, except that Director Mueller -- the president didn't give me that -- I can answer that question.

The president didn't give me that direction at the end of our 15 minutes.

SPECTER:  He did not?

COMEY:  He did not.  Instead, he said, "I'll talk to Director Mueller," as I had suggested.

Director Mueller came and met with him, then Director Mueller came to me and said that, "The president told me that the Department of Justice should get this where it wants to be, to do what the department thinks is right."

And I took that mandate and set about to do that, and accomplished that.

SPECTER:  I thought you testified, in response to Senator Schumer's questions, that after meeting with the president for 15 minutes, he told you to do what you thought was right.

COMEY:  If I did, I misspoke, because that direction came from the president to Director Mueller to me.

SPECTER:  Well, when you had the discussions with Chief of Staff Card, what did he say to you by way of trying to pressure you, if, in fact, he did try to pressure you, to give the requisite certification?

COMEY:  Again, I'm reluctant to talk about the substance of those kind of deliberative discussions.  We discussed...

SPECTER:  And I'm not asking about the substance, carefully not. I'm going to, but not yet.

What did he say which constituted what you thought was pressure?

COMEY:  I don't know that he tried to pressure me, other than to engage me on the merits and to make clear his strong disagreement with my conclusion.

SPECTER:  So then Mr. Card ultimately left it up to you to decide whether to give the certification or not?

COMEY:  I don't know that he left it up to me.  I had already made a decision and communicated it on that Tuesday, that I was not going to.  And it didn't change in the course of my discussions with Mr. Card.

SPECTER:  Did not change?

COMEY:  Did not change.

SPECTER:  Well, he didn't threaten to fire you, did he?  I'm going to have to lead the witness now, Mr. Comey.

COMEY:  Right.

SPECTER:  I'm -- I haven't led you up until now.  And now I'm going to have to lead you.

COMEY:  That's fine.

SPECTER:  He didn't threaten to fire you?

COMEY:  No, he didn't.

And Mr. Card, as I said, was very civil to me in our face-to-face meeting.  The only time...

SPECTER:  Well, you can suggest being fired and be civil about it.

COMEY:  Right.

Either civilly or uncivilly, he never suggested that to me.

SPECTER:  Attorney General Gonzales could be fired in a civil way.  No incivility in suggesting you're going to be replaced as acting attorney general.

Well, all right then.  That substance -- I don't want to question you as long as Senator Schumer did, notwithstanding my rights here.  But the long and short of it was, he didn't threaten you.

COMEY:  No, sir.  I didn't feel threatened.  Nor did he say anything that I thought could reasonably be read...

SPECTER:  And when you talked to White House Counsel Gonzales, did he try to pressure you to reverse your judgment?

COMEY:  No.

He disagreed, again, on the merits of the decision.  And we had engaged on that, had full discussions about that.

But he never tried to pressure me, other than to convince me that I was wrong.

SPECTER:  Well, Mr. Comey, did you have discussions with anybody else in the administration who disagreed with your conclusions?

COMEY:  Yes, sir.

SPECTER:  Who else?

COMEY:  Vice president.

SPECTER:  Anybody else?

COMEY:  Members of his staff.

SPECTER:  Who on his staff?

COMEY:  Mr. Addington disagreed with the conclusion.  And I'm sure there were others who disagreed, but...

SPECTER:  Well, I don't want to know who disagreed.  I want to know who told you they disagreed.

COMEY:  OK.

SPECTER:  Addington?

COMEY:  Mr. Addington.  The vice president told me that he disagreed.  I don't remember any other White House officials telling me they disagreed.

SPECTER:  OK.  So you've got Card, Gonzales, Vice President Cheney and Addington who told you they disagreed with you.

COMEY:  Yes, sir.

SPECTER:  Did the vice president threaten you?

COMEY:  No, sir.

SPECTER:  Did Addington threaten you?

COMEY:  No, sir.

SPECTER:  So all these people told you they disagreed with you?

Well, why in this context, when they say they disagreed with you and you're standing by your judgment, would you consider resigning?  You were acting attorney general.  They could fire you if they wanted to.  The president could replace you.  But why consider resigning?

You had faced up to Card and Gonzales and Vice President Cheney and Addington, had a difference of opinion.  You were the acting attorney general, and that was that.  Why consider resigning?

COMEY:  Not because of the way I was treated but because I didn't believe that as the chief law enforcement officer in the country I could stay when they had gone ahead and done something that I had said I could find no legal basis for.

SPECTER:  When they said you could find no legal basis for?

COMEY:  I had reached a conclusion that I could not certify as...

SPECTER:  Well, all right, so you could not certify it, so you did not certify it.

But why resign?  You're standing up to those men.  You're not going to certify it.  You're the acting attorney general.  That's that.

COMEY:  Well, a key fact is that they went ahead and did it without -- the program was reauthorized without my signature and without the Department of Justice.  And so I believed that I couldn't stay...

SPECTER:  Was the program reauthorized without the requisite certification by the attorney general or acting attorney general?

COMEY:  Yes.

SPECTER:  So it went forward illegally.

COMEY:  Well, that's a complicated question.  It went forward without certification from the Department of Justice as to its legality.

SPECTER:  But the certification by the Department of Justice as to legality was indispensable as a matter of law for the program to go forward, correct?

COMEY:  I believed so.

SPECTER:  Then it was going forward illegally.

COMEY:  Well, the only reason I hesitate is that I'm no presidential scholar.

But if a determination was made by the head of the executive branch that some conduct was appropriate, that determination -- and lawful -- that determination was binding upon me, even though I was the acting attorney general, as I understand the law.

And so, I either had to go along with that or leave.  And I believed that I couldn't stay -- and I think others felt this way as well -- that given that something was going forward that we had said we could not certify as to its legality.

SPECTER:  Well, I can understand why you would feel compelled to resign in that context, once there had been made a decision by the executive branch, presumably by the president or by the president, because he was personally involved in the conversations, that you would resign because something was going forward which was illegal.

The point that I'm trying to determine here is that it was going forward even though it was illegal.

COMEY:  And I know I sound like I'm splitting hairs, but...

SPECTER:  No, I don't think there's a hair there.

COMEY:  Well, something was going forward without the Department of Justice's certification as to its legality.  It's a very complicated matter, and I'm not going to go into what the program was or what the dimensions of the program...

SPECTER:  Well, you don't have to.

If the certification by the Department of Justice as to legality is required as a matter of law, and that is not done, and the program goes forward, it's illegal.  How can you -- how can you contest that, Mr. Comey?

COMEY:  The reason I hesitate is I don't know that the Department of Justice's certification was required by statute -- in fact, it was not, as far as I know -- or by regulation, but that it was the practice in this particular program, when it was renewed, that the attorney general sign off as to its legality.

There was a signature line for that.  And that was the signature line on which was adopted for me, as the acting attorney general, and that I would not sign.

So it wasn't going forward in violation of any -- so far as I know -- statutory requirement that I sign off.  But it was going forward even though I had communicated, "I cannot approve this as to its legality."

And given that, I just -- I couldn't, in good conscience, stay.

SPECTER:  Well, Mr. Comey, on a matter of this importance, didn't you feel it necessary to find out if there was a statute which required your certification or a regulation which required your certification or something more than just a custom?

COMEY:  Yes, Senator.  And I...

SPECTER:  Did you make that determination?

COMEY:  Yes, and I may have understated my knowledge.  I'm quite certain that there wasn't a statute or regulation that required it, but that it was the way in which this matter had operated since the

beginning.

I don't -- I think the administration had sought the Department of Justice, the attorney general's certification as to form and legality, but that I didn't know, and still don't know, the source for that required in statute or regulation.

SPECTER:  OK.  Then it wasn't illegal.

COMEY:  That's why I hesitated when you used the word "illegal."

SPECTER:  Well, well, OK.

Now I want your legal judgment.  You are not testifying that it was illegal.  Now, as you've explained that there's no statute or regulation, but only a matter of custom, the conclusion is that even though it violated custom, it is not illegal.

It's not illegal to violate custom, is it?

COMEY:  Not so far as I'm aware.

SPECTER:  OK.  So what the administration, executive branch of the president, did was not illegal.

COMEY:  I'm not saying -- again, that's why I kept avoiding using that term.  I had not reached a conclusion that it was.

The only conclusion I reached is that I could not, after a whole lot of hard work, find an adequate legal basis for the program.

SPECTER:  OK.

Well, now I understand why you didn't say it was illegal.  What I don't understand is why you now won't say it was legal.

COMEY:  Well, I suppose there's an argument -- as I said, I'm not a presidential scholar -- that because the head of the executive branch determined that it was appropriate to do, that that meant for purposes of those in the executive branch it was legal.

I disagreed with that conclusion.  Our legal analysis was that we couldn't find an adequate legal basis for aspects of this matter.  And for that reason, I couldn't certify it to its legality.

SPECTER:  OK.

I will not ask you -- I have a rule never to ask the same question more than four times...

(LAUGHTER)

... so I will not ask you again whether necessarily from your testimony the conclusion is that what the president did was legal -- not illegal.

Let me move on.  I only have 35 minutes left.

(LAUGHTER)

How long did you continue to serve as deputy attorney general after this incident?

COMEY:  Until August of 2005, so almost a year and a half, 16 months.

SPECTER:  And during the course of that continued service, you got along OK with the president and the vice president and Card and Addington and all the rest of those fellows in the White House?

COMEY:  I think so.  I mean, we didn't have much contact with them other than professional matters.  But I think so.

SPECTER:  But they weren't out to get you because you stood out to them?

COMEY:  I hope not.  I don't have any reason to believe...

SPECTER:  Well, never mind hoping.  They didn't do anything to be out to get you or to make your life uncomfortable, or make it difficult for you to perform your duties as deputy attorney general?

COMEY:  No.

SPECTER:  There was some speculation that -- well, I'll eliminate the word "speculation."

Did you have any sense that you were not considered to be permanent attorney general on Mr. Ashcroft's departure because of your having stood up to the White House on this issue?

COMEY:  No.

And I don't have any reason to believe I was ever considered. But I certainly have no reason to believe that there was any connection between consideration of who would be the next attorney general and this matter.

SPECTER:  Well, on this issue, Mr. Comey, I commend you again. You did exactly the right thing.

SPECTER:  And I think the president did the right thing.  In effect, he overruled Card and he overruled Vice President Cheney and he overruled Addington and he overruled Gonzales.  And when it came to him -- came to the president's desk where the buck stops he said to Mueller to tell you, "Follow your conscience.  Do the right thing." And that was that.

Mr. Comey, it's my hope that we will have a closed session with you to pursue the substance of this matter further.  Because your standing up to them is very important, but it's also very important what you found on the legal issue on this unnamed subject, which I infer was the terrorist surveillance program.  And you're not going to comment about it.  I think you could.

I think you could even tell us what the legalisms were.  Doesn't involve a matter of your advice or what the president told you, et cetera.

But I'm going to discuss it with Senator Leahy later and see about pursuing that question to try to find out about it.

Now, Mr. Comey, on to the subject of the hearing.  You have been reported as commenting on a number of U.S. attorneys who were asked to resign.  You thought they were doing a good job.  One was U.S. Attorney David (sic) Bogden of Nevada.

What judgment did you -- do you have as to his capabilities as U.S. attorney?

COMEY:  Dan Bogden was an excellent U.S. attorney.  He was a career guy who had become U.S. attorney, and I thought very highly of him.

SPECTER:  Do you have any insights as to why he was asked to resign?

COMEY:  I don't.  I've read things in the paper, but I certainly

have no personal knowledge of why he was asked to resign.  When I left in August of 2005, I couldn't have thought of a reason why he should be asked to resign.

SPECTER:  And as to John McKay, do you have a judgment as to the quality, the competency of his performance?

COMEY:  Yes.  Again, it was excellent in my experience.  I had worked with him, as with the others, as a peer when I was U.S. attorney in Manhattan and then as the deputy attorney general.  So I had a very positive sense of John McKay.

SPECTER:  And as to Paul Charlton, Arizona U.S. attorney, what is your view as to his competence?

COMEY:  The same.  I don't want to make it sound like I love everybody, but I did like him a great deal.

(LAUGHTER)

He was very strong.

SPECTER:  Well, since you don't want to sound like you love everybody, anybody you didn't love who you thought should have been replaced?

(LAUGHTER)

LEAHY:  Outside of members of the committee.

COMEY:  There was one U.S. attorney...

(CROSSTALK)

SPECTER:  I'd like to ask you about that now that Senator Leahy has opened the door.  Which members of the committee don't you love?

(LAUGHTER)

COMEY:  You're asking Senator Leahy, I hope.

SPECTER:  Start with the chairman.

(LAUGHTER)

LEAHY:  Careful.  We may be bringing (ph) the clock back again.

SPECTER:  What you think of Charlton?

COMEY:  Very strong, very strong U.S. attorney.

SPECTER:  And David Iglesias, U.S. attorney for New Mexico?

COMEY:  Same thing.  I had dealt with him quite a bit, both as a peer and as his supervisor, and had a high opinion of him.  I thought he did a very good job.

SPECTER:  What did you make of Kyle Sampson's testimony that he had recommended calling for the resignation of Peter Fitzgerald?

COMEY:  Of Patrick Fitzgerald.

SPECTER:  Patrick Fitzgerald.  Peter Fitzgerald was the senator.

(UNKNOWN):  No relation.

SPECTER:  No relation.

COMEY:  I only know about that what I read in the newspaper.  I was surprised by it, would be a fair description.

SPECTER:  And what did you think of the competency of Kyle Sampson?

COMEY:  I thought Kyle was very smart.  My dealings with him had always been pleasant.  He seemed to work very, very hard.

SPECTER:  What did you think of the competency or smarts of Kyle Sampson after you heard he wanted to ask for the resignation of Patrick Fitzgerald?

COMEY:  Well, I don't think that was an exercise of good judgment, if it's something he really meant.  It...

SPECTER:  Can you give us an illustration of an exercise in good judgment by Kyle Sampson?

I withdraw that question.

Can you give us an example of an exercise of good judgment by Alberto Gonzales?

Let the record show a very long pause.

COMEY:  It's hard -- I mean, I'm sure there are examples.  I'll think of some.

I mean, it's hard when you look back.  We worked together for eight months.

SPECTER:  That's a famous statement of President Eisenhower about Vice President Nixon:  "Say something good."  "Give me two weeks."

COMEY:  Right.

I -- in my experience with Attorney General Gonzales, he was smart and engaged.  And I had no reason to question his judgment during our time together at the Department of Justice.

We had a good working relationship.  He seemed to get issues.  I would make a recommendation to him.  He would discuss it with me and make a decision.

As I sit here today, I'll probably five minutes from now think of an example.  But I did not have reason to question his judgment as attorney general.

SPECTER:  Are you sufficiently familiar with what happened in the issue of the U.S. attorneys resignations to give an evaluation of Attorney General Gonzales' statement that he was no involved in discussions or deliberations, in the context of being contradicted by three of his top deputies and the documentary evidence on the e-mails?

COMEY:  I am probably more versed in this than the average person, because I've read what's in the newspaper and looked at some of the documents online.

But I gather he's corrected that statement that he originally made about not being involved in deliberations or discussions.

But I'm not -- I don't know the facts as well as members of this committee, and haven't studied it.  So I don't think I have a...

SPECTER:  No, I don't think he has corrected that.  I think he continues to say that he was involved in a -- his words are "limited" -- quote, "limited," unquote.

SPECTER:  That's what he has said.

I think that -- and I've said this to Mr. Gonzales privately and publicly -- that if he would tell us what the reasons were for asking these U.S. attorneys to resign, that it would shed considerable light on what's going on here, on how the program got started, and what the aims of the program were, and what his involvement was.

That can -- that can all be -- this proceeding is still in midstream. He can recant all of what he's said and come forward.

Well, Mr. Chairman, I'm going to yield the balance of my minutes. Thank you.

SCHUMER: Thank you, Mr. Chairman. And you went about, I think, a minute more than I did.

SPECTER: Oh, no I didn't. I'm at 21:35.

SCHUMER: OK. I just...

LEAHY: So we can get on to others, I'm also -- as a member of this committee, let me just go back to the time. I'm not going to use a great deal of time so that...

SPECTER: Senator Schumer and I didn't either, Senator Leahy.

LEAHY: ... so that -- God love you -- so that others here can.

Just one question comes to mind.

Senator Specter spoke to you about legal or illegal. Did it comply with the FISA law?

COMEY: If I -- I've tried, Senator, not to confirm that I'm talking about any particular program. I just don't feel comfortable in an open forum...

LEAHY: OK.

Then on that -- with that answer, I think I agree with -- if I could have Senator Specter's attention just for a moment. With that answer -- and I can understand. I'm well aware of the program, well aware of what happened. And I can understand your reluctance -- very appropriately, your reluctance to answer that specifically.

We will have a closed-door hearing on this. Senator Specter and

I are about to have a briefing on aspects of this.

LEAHY:  I am very, very troubled by what the Department of Justice is going today -- not on your watch, Mr. Comey, but they're doing today.  We have several members of the Intelligence Committee on this committee on both sides.  And they will also be looking at it.

Mr. Comey, I have a lot of respect for you.  I have less and less respect for the way the Department of Justice is being handled today.  This is a dysfunctional Department of Justice.  It is being run like a political arm of the White House.  That is highly inappropriate.

I've been here for 32 years.  I've seen good attorneys general and poor attorneys general.  I have always thought that there would at least be the understanding that the professionals in the Department of Justice have to be allowed to do a professional job.  And when I see them being overridden time and time again.

Now, I realize there are some things you cannot go into in this session.  But you know and I know that there is the overriding of the professional judgment of good men and women in that department to do things that are not proper.  And I think this is wrong.

One of my first experiences in the Department of Justice was as a young law clerk working while a student at Georgetown here meeting with the then-attorney general.  The then-attorney general was a close to the president as anyone could.  He was his brother.  This was Attorney General Robert Kennedy.

But I remember what he said to several of the students who were there, because he was hoping we were a cadre, because of our grades and whatnot, he wanted to recruit for the Department of Justice.  And he emphasized over and over again on significant matters -- civil rights, criminal, (inaudible) areas and whatnot -- that neither the White House nor his brother would be allowed to influence the professional judgment.

That always stuck in my mind.

LEAHY:  And I've seen that happen over and over again.  We saw it with Elliot Richardson and Archibald Cox.  We saw it with you.

And I am very, very frustrated.  I won't go into further questions, because the questions I do want to ask you will be in closed session.

But I hope -- I hope somebody will wake up at the White House at
the terrible, terrible precedent they are starting and have started.
And I hope whoever the next president is will make a solemn vow never,
never, never to allow this politicization of the Department of
Justice.  Because it hurts every one of us.

It's not the secretary of justice.  It's not a member of the
president's staff that should be running that.  It is the attorney
general of the United States.  And this attorney general is doing an
abysmal job.

SCHUMER:  Thank you, Mr. Chairman.

Senator Kohl?

Senator Feinstein was next.  I apologize.

FEINSTEIN:  Thank you very much, Mr. Chairman.

And thank you very much, Mr. Comey.

I read the transcript of your testimony before the House.  And
it's clear that you're a very straight shooter and very well
respected.  And I, for one, really appreciate your point of view.

If I can, I'd like to go back to the event in the hospital room
for just a minute.  You felt -- and you were presented with something
that you had to sign to certify a certain program.  That program was
initially done outside of the existing law, which is the Foreign
Intelligence Surveillance Act, which provides -- which says it's the
exclusive authority for all electronic surveillance.

The president used his Article II powers.  He said he used the
authorization to use military force as the definitive basis for his
action, to essentially move outside the law.

However, you were faced -- and the president said when this all
came to light that he asked the program -- asked that the program be
authorized every 45 days, or certified by the attorney general.

What did you actually have to sign to certify it?  What were you
confronted with?

COMEY:  Senator, I want to be careful in this forum, again, that
I'm not confirming the existence of any particular program or that
this dispute...

FEINSTEIN:  I'm not asking you to.  I'm asking you, what piece of paper did you have to sign?

COMEY:  It was a signature line on a presidential order.

FEINSTEIN:  OK.  All right.

And you said that the program was later changed so that it could be signed.  But it went ahead at that time without your certification on it.

COMEY:  Yes.

FEINSTEIN:  And what was the elapsed period of time from that meeting, the denial of DOJ to certify the program and the time when it was essentially certified?

COMEY:  It was reauthorized on Thursday, March the 11th, without the department's -- without my signature, without the department's approval.

And it was the next day -- so less than 24 hours later -- that we received the direction from the president to make it right.

And then we set about -- I don't remember exactly how long it was -- over the next few weeks making changes so that it accorded with our judgment about what could be certified as to legality.

And so it was really only that period from Thursday, when it was reauthorized, until I got the direction from the president the next day that it operated outside the Department of Justice's approval.

FEINSTEIN:  For approximately two weeks?

COMEY:  I don't remember exactly.  It was two or three weeks I think that it took us to get the analysis done and make the changes that needed to be made.

FEINSTEIN:  And then who signed for DOJ?

COMEY:  It was either the attorney general, Ashcroft, or myself who signed.  I may have signed that first one after the hospital incident.

FEINSTEIN:  OK.

And you then became satisfied that the program conformed with what, essentially?

COMEY:  That it was operated consistently with the Office of Legal Counsel's judgment about what was lawful.  So we were in a position -- given OLC's opinion, the attorney general and I were in a position to certify the program as to its legality.

FEINSTEIN:  Mr. Chairman, it would be very interesting if we could obtain those legal opinions.  Because the program we're talking about was originally done outside of law.  The executive order of the president was really the prevailing authority.

But even so, I'm a little puzzled because the program was changed.  And I'd be very interested in what the legal advise on that program was if that would be possible for us to request.

SCHUMER:  I'm sure if the senator makes the request we can make it part of the record.

FEINSTEIN:  Fine, I've made that request...

(CROSSTALK)

SCHUMER:  I think to the Office of Legal Counsel, which had already stated its opinion on this particular issue.

(CROSSTALK)

FEINSTEIN:  Thank you.  Thank you.

If I can, I'd like to move on to the United States attorneys.

To the  best of your knowledge, has there been any time in the history of our country when as many U.S. attorneys have been fired at one time?

COMEY:  The only other incident I know of was during the change of administrations from Bush I to President Clinton's administration.

FEINSTEIN:  Which is fairly typical...

(CROSSTALK)

COMEY:  Right, it was a change out...

(CROSSTALK)

FEINSTEIN:  With a change.  But I'm talking during the term of a president has there been any time when a number of U.S. attorneys had been selected and summarily fired without cause?

COMEY:  I'm not aware of a similar-size removal of U.S. attorneys.

FEINSTEIN:  Thank you very much.

As you know, we've had the EARS reports.  Are you familiar with those reports?

COMEY:  Yes.

FEINSTEIN:  And they have described the performance of U.S. attorneys -- and I gather there's a panel of people that go in and put these reports together.  They have subsequently been -- we've been told that they're very, very perfunctory.

Are they, in fact, a document that's utilized within DOJ?

COMEY:  Oh, yes.

(LAUGHTER)

And they're not perfunctory.  They come -- big team of people.

When I was U.S. attorney in New York, I think 30 or more people came from all over the country -- experienced people, civil lawyers and prosecutors -- and they basically live with you in your office for a couple of weeks and go stem to stern, inspect the whole place. There's an out-briefing.

It's very much like an audit by a big accounting firm, except they audit not just your numbers, but your conduct of cases and your priorities.  So it's from top to bottom, and then they issue a detailed report.

FEINSTEIN:  Well, let me ask you this question:  How then could they be fired for performance reasons if at least seven -- excuse me -- six out of the seven terminated on December 7th had excellent EARS reports?

COMEY:  I don't know.  I was not aware at the time I left, in
August of 2005, of performance-related issues with most of these U.S.
attorneys.

FEINSTEIN:  And you've said that.  You said that today.  You said
that in your testimony before the House.  And I appreciate it.

Can you ever remember any discussion where an individual U.S.
attorney's loyalty or political instincts were questioned?

COMEY:  I don't remember ever discussing or having it discussed
in my presence the loyalty or political instincts of a U.S. attorney,
no.

FEINSTEIN:  Now, there was apparently a list put together.

FEINSTEIN:  And Mr. Sampson had indicated that he was the
aggregator of the list.  He put the list together.

But everyone that we've asked in the higher levels of the
department have said they did not put the names on the list.  Mr.
Battle, Mr. Ellston, Mr. Sampson -- virtually everyone we have asked
have denied placing a name on that list.

If that is in fact the case, where would you surmise the list
would come from?

COMEY:  I wouldn't know.  It came from someplace, but I don't
know from where.

FEINSTEIN:  I'd like to just clear the air with one thing.

You had two meetings with Carol Lam, I believe -- one about the
Project Neighborhood program, the other about gun cases.  Were you
satisfied with her responses to your questions?

COMEY:  Yes.

I think I had one meeting that was about Project Safe
Neighborhoods, which was the name given to our gun program.  And I
think it was on the telephone.  I spoke to -- I think by telephone --
to each of the 10 U.S. attorneys whose districts on a per capita basis
were at the bottom end of our gun prosecutions.

And I thought she understood.  And, again, I wasn't telling her
to do cases for the sake of doing cases.  I was saying, "This is

important.  I think this saves lives.  If there's a difference you can make that the local prosecutors are not making in your jurisdiction, look for an opportunity to make it."

And she said she got it.  And that was the end of it.

FEINSTEIN:  Were any of the other 10 people with whom you communicated fired?

COMEY:  No, not to my knowledge.

FEINSTEIN:  So if someone had an excellent performance report, it's very difficult for me to figure out a reason other than dissatisfaction with a case they were either going to file or not file if the severance is not performance-related.

Would that be a fair assumption on my part?

COMEY:  I suppose so.  Right.  If there's no reasons that are apparent -- performance-related reasons -- it's hard to understand why.

FEINSTEIN:  Thank you very much, Mr. Comey.  Appreciate it.

Thank you.

SCHUMER:  Senator Kohl?

KOHL:  Thank you, Mr. Chairman.

Mr. Comey, you're a person of course who has been very close to law enforcement in our country for many years.  And obviously, you're here today as a person who was the second-ranking person in the department from 2003 to 2005.

KOHL:  And no question about your concern for the fair administration of justice in our country.  And with the kind of experience you have, your opinions matter more than the opinions of most others.  And I'm sure you've thought about this; would you give us your opinion?

Would our country be well-served if we could start fresh tomorrow with an attorney general who was not in any way as tainted as this present attorney general?  Would we be better off as a country?

You must have an opinion.  Would you care to share that opinion

with us?

COMEY:  I would very much like not to.

(LAUGHTER)

KOHL:  But would you, please?

COMEY:  I would hope -- there are a lot of things I miss about government.  A lot of things I love about being a private citizen.

I would hope you wouldn't care what my opinion is.

I appreciate what you said, Senator.  I'm not here to dump on Attorney General Gonzales.  I...

KOHL:  Well, this isn't a question of jumping on -- we're talking about our country and its future and the importance of law, the importance of the Department of Justice.  And you have been closer than most.

And you are here to serve your country; that's why you're here today.

And that's a very important question, obviously.  And your opinion matters much more than most, because of who you are and your experience.

And I'm sure, or I presume, you do have an opinion.  Would you share that opinion with us today?

COMEY:  I do have an opinion.  I would prefer not to share it. I'm just not sure that -- it makes me very uncomfortable to express my opinion about something, especially now that I'm outside of government and that I have not followed this as closely as many people have.

I have formulated an opinion, but I would ask the senator's indulgence not to make me give it.  I just don't think that's my place.

KOHL:  Well, I'm concluding -- and correct me if I'm incorrect -- I'm concluding that your unwillingness to express an opinion that you do say -- you say that you have -- is an indication that you believe we would be better served.  I think that's a clear inference from what you're saying.

COMEY:  I appreciate that, Senator.

COMEY:  If I could, I'd like not to offer that.

KOHL:  To me, you have expressed that opinion.  I mean, without having expressed it, you expressed it.

Mr. Comey, when you testified in the House a few weeks ago, you were asked about the U.S. attorney for the Eastern District of Wisconsin, Steve Biskupic.  At that time, you said that Mr. Biskupic was, quote, "an absolutely straight guy," unquote.

When you were asked whether you knew that Mr. Biskupic was on a list for weak performers and potentially slated for dismissal, you said -- and I quote -- "No, and I think very highly of him."

Having had time to reflect on your testimony, do you have anything to add to what you said at that time?  Do you know why he was put on a list of weak performers, and why he came off the list?

Did it have anything to do with the prosecution of voter fraud cases that he was taken off the list, or the prosecution of Georgia Thompson, an employee of the Democratic governor's administration at that time?

COMEY:  I don't know from firsthand knowledge that he was on a list.  I can't imagine why he would be put on a list (inaudible).

I think very highly of him, as you quoted.  I think he is what you want in a U.S. attorney.  And I'm not saying that because he's tall and skinny...

(LAUGHTER)

... but he is a very solid person, who is as honest as the day is long, cares passionately about the independence of the Department of Justice.  I know this from talking to him.

So I can't imagine -- I know he's gotten beat on because a case he prosecuted was reversed in the 7th Circuit Court of Appeals.  I tried to explain to somebody who asked me about that -- not in a hearing, but a private citizen.

I said, "It happens.  And it's not an indictment of the good faith of the prosecutor, of the district judge who denied a motion for a directed verdict or the jury that convicted.  Sometimes appeals

courts disagree about the inferences to be drawn from the evidence and reverse a conviction.  That doesn't tell you that the prosecutor is a bad guy.  In fact, I know this one, and this is a good guy."

KOHL:  Mr. Comey, yesterday's Washington Post reported that White House and Republican Party concerns regarding voter fraud prosecutions were the cause of many of the U.S. attorney dismissals.  Can you confirm this?

During the time you served as deputy attorney general were you aware of concerns from the White House that U.S. attorneys were not active enough in prosecuting voter fraud cases?  Did the White House exert any effort to encourage the Justice Department to remove U.S. attorneys whom it believed were not prosecuting voter fraud cases vigorously enough?

COMEY:  I'm not aware of any issue that came to my attention regarding voter fraud when I was deputy attorney general, complaints or otherwise.

KOHL:  While you served at the Justice Department, were you aware of any pressure from the White House to bring voter fraud cases?

COMEY:  No, sir.

KOHL:  Thank you so much.

COMEY:  Thank you, Senator.

KOHL:  Mr. Chairman, thank you.

SCHUMER:  Senator Feingold?

FEINGOLD:  Mr. Chairman, first, I want to praise you for your questioning.  It was very long.  I hope you don't make it a habit.

But I'll tell you something:  I think it was some of the most important and valuable questioning that I've heard from a senator in the years that I've been here.  And I just want to thank you for your leadership on this.

Mr. Comey, I want to commend you for your service, for your courage, for your testimony, some of the most dramatic testimony that I've heard in 25 years that I've been a legislator.  Your courage at the time and today in defense of the rule of law is truly admirable.

Let me add, your account of Attorney General Ashcroft is the same.

FEINGOLD:  This has been my experience with Mr. Ashcroft, despite our fundamental differences.

And I have great disagreement with this administration.  But there's a difference in this administration between people like you and Attorney General Ashcroft, who do fundamentally respect the rule of law, and many others who have shown some of the most blatant disrespect for the rule of law I think in American history.

So I think it's only fair that we make these distinctions.  And I know that's not your purpose in being here.  But I simply want it noted in the record that here's somebody that literally stood tall for the rule of law.  And I praise you for it.

I want to highlight one point you alluded to in answer to a question from Senator Specter.

This reauthorization process and the need for certification from the attorney general was only an internal control, not a statutory requirement.  I think that that testimony makes it all the more clear that this committee must pursue this issue, and must be supplied with the relevant documents.

So, Mr. Comey, are you aware of any documents produced by the White House Counsel's Office with regard to this program?

COMEY:  Not specifically.  Yes, not specifically.  I don't remember...

FEINGOLD:  You don't recall reviewing any...

COMEY:  I don't remember reviewing any from the White House Counsel's Office that related to this.  I mean, it's possible.  But I don't remember it.

FEINGOLD:  What about documents from the Office of the Vice President?  Do you know if any such documents exist regarding this program?

COMEY:  I don't, no.

FEINGOLD:  Did Mr. Gonzales or Mr. Card indicate -- ever indicate that they were acting on the direction or the knowledge of the

president when they came to see the attorney general in the hospital?

COMEY:  Not that I recall.  I don't think so.

FEINGOLD:  They never stated that, to your recollection.

COMEY:  I don't think so.

FEINGOLD:  Did something in particular occur that led to this issue coming to a head in March of 2004?  Why not at an earlier point, in connection to one of the earlier reauthorizations?

COMEY:  It was simply the pace at which the work went on in the Office of Legal Counsel.

We had a new assistant attorney general as of, I think, October of 2003.  And there were a number of issues that he was looking at.  And this reevaluation, this particular program was among those issues.  And the work got done in the beginning part of 2004.  And that's what brought it to a head with this particular...

FEINGOLD:  So it was at this point that the office was able to get around to these concerns, these legal concerns and these internal concerns?

COMEY:  I think that's right.

Concerns had reached the ears of the new assistant attorney general.  And he undertook an examination -- with my approval and Attorney General Ashcroft's approval -- of this matter.

FEINGOLD:  You made quite a moving farewell address to your colleagues in the department in August of 2005.  In it, you thanked some of your colleagues for being, quote, "people committed to getting it right and to doing the right thing, whatever the price," unquote, and stated that some of those people, quote, "did pay a price for their commitment to right," unquote.

What were you referring to?

COMEY:  I had in mind one particular senior staffer of mine who had been in the hospital room with me and had been blocked from promotion, I believed, as a result of this particular matter.

FEINGOLD:  And so you were, in fact, referring to this incident in the hospital and somebody who was there and consequences that

accrued to this person as a result of that?

COMEY:  Yes.

FEINGOLD:  Is that Mr. Goldsmith?

COMEY:  No, it's Mr. Philbin.

FEINGOLD:  Thank you, Mr. Chairman.

SCHUMER:  Senator Specter wants to make a concluding statement or...

SPECTER:  Well, I just wanted to confirm with you, Mr. Chairman, that we're not going to have a second round.

SCHUMER:  We're not going to have -- I have one question, which I've showed you, and that's it.

SPECTER:  There's a vote scheduled in five minutes, so I'm going to go to the floor at this point.

And I conclude by thanking you for your service, Mr. Comey.  And I thank you for standing up.  That's in the finest tradition of the Department of Justice and I hope we can reinstate it.  Thank you.

COMEY:  Thank you, Senator.

SCHUMER:  Well said.

Senator Whitehouse?

WHITEHOUSE:  Thank the chairman.

Mr. Comey, good morning.  It's still morning.

I'd like to ask you -- you are obviously a person who cares very deeply about the Department of Justice and its institutions.  And I worry about some of the institutional legacy of what we've been through.

In particular, I'd like to ask you for your thoughts on where the standards should be of what is proper versus what is improper in the context of bringing political influence or partisan influence into the Department of Justice.  And while you -- that's, sort of, the framing part of the question.

More specifically, I've been very concerned at some of the statements that have come out of the Department of Justice that have been the department's efforts to define that level of impropriety.

And I'll tell you, it began first with Kyle Sampson who told this committee that, "The limited category of improper reasons for these dismissals would include an effort to interfere with or influence the investigation or prosecution of a particular case for political or partisan advantage."

And then, not too much later, Attorney General Gonzales came before us, and in nearly verbatim words, he said that, "It would be improper to ask for a resignation of any individual in order to interfere with or influence a particular prosecution for partisan political gain."

And in the wake of the attorney general's testimony in the House, the Justice Department issued a statement saying that, "It is clear that the attorney general" -- again, defining the standard of what's improper -- "did not ask for the resignation of any individual in order to interfere with or influence a particular prosecution for partisan political gain."

WHITEHOUSE:  Now, when I read those things I hearken back to the elements of obstruction of justice, which I recall as being three. One is the awareness of a particular case.  Two is the effort to influence or interfere with it.  And three is that that be done for a corrupt or improper motive, such as partisan political gain.

Let me ask it to you two ways.

The first way would be, if it became clear to you that somebody in the department had tried to interfere with or influence a particular prosecution for partisan political gain, would you consider that to be the basis for opening -- at least opening an obstruction of justice investigation?

And if the facts were proven, would that not even be the basis for a conviction for criminal obstruction of justice?

COMEY:  I think it potentially could be, yes -- certainly for looking at the matter.

WHITEHOUSE:  Yes.

And in that context, do you think that is where the bar should be set for what is improper versus not improper in terms of political influence coming into the Department of Justice?  Is that the right standard?

COMEY:  No.  If the standard is whether we're running afoul of the obstruction of justice statute, I think it's set way too low.

Senator, as you know...

WHITEHOUSE:  What should be?  You've had the chance to think about this.  You care about this department deeply.  You've shown through what is probably a difficult experience for you that you're willing to think about these things without bias and really try to get to the right answer.

How would you phrase where the standard for what is improper should be in terms of where and when the department should allow political influence to enter into its deliberations or its conduct?

COMEY:  I think that you have to talk about it in two pieces.  One is main Justice and the other is the U.S. attorneys.

And although both of those parts of the institution are led by political appointees, I think they are -- have to be different in terms of what political means.

I think it is the job of the Department of Justice to be responsive to the policy priorities of the president, who's elected and who has appointed the folks to run the department.

COMEY:  But I think it is main Justice's job to see to it that U.S. attorneys can operate in an environment where there is a little or no politics -- big P or little p -- at all entering into their considerations.

I think once they walk through the door and become the U.S. attorney, although they're politically appointed, they've got to call, as someone said, balls and strikes without regard to whether the person in the dock is a Democrat or a Republican or a Green or a who cares?  They have to make the judgment the judgment on the facts.

I think the job of the department is, to the extent that there are complaints or their political issues, to receive those and figure out what to do about them without polluting the work of the U.S. attorney.  And that's why I think they're different.

I think the hard thing to define in the abstract is certainly not obstruction of justice as the standard. I think the department needs to make its decisions about what to do with political interests or information by looking at what is the mission of the Department of Justice.

WHITEHOUSE: And do you agree with me that this standard that they've been articulating about efforts to interfere with or influence a particular prosecution for partisan political gain effectively restate the standard for a criminal obstruction of justice?

COMEY: It sounds like it does. And that's certainly something that should be avoided at all costs.

But I think it sets the bar a little too low in terms of what the department's mission is in protecting the historical autonomy of the entire department, especially the U.S. attorneys.

WHITEHOUSE: Mr. Chairman, my time has expired.

Thank you, Mr. Comey.

SCHUMER: Thank you, Senator Whitehouse.

Mr. Comey, I just want to follow up on one final question. I showed it to Senator Specter ahead of time because he had to leave.

But he was asking about legality/illegality, within law/not (ph). The key point here is isn't it the Office of Legal Counsel that makes a determination about whether something is within the law or not within the Justice Department?

COMEY: Yes. And its opinions are binding throughout the executive branch.

SCHUMER: And didn't that office make a decision and advise you that what was attempting to be done was not within the law?

COMEY: The conclusion was that they could not find an adequate legal basis for...

SCHUMER: OK. Let's put it that way.

COMEY: Yes.

SCHUMER:  So they could not find an adequate legal basis for
doing it that way?

COMEY:  Correct.

SCHUMER:  And you felt that if they couldn't, you couldn't
preside over the Department of Justice if you were going to be
overruled by the White House to do it anyway.

COMEY:  Yes.

SCHUMER:  I think that's OK.

Let me conclude, then, by just thanking you.  You are a profile
in courage.  You are what our government is all about.  In this case,
it has nothing to do with Democrat, Republican, liberal, conservative.
It has to do with doing a job well and caring about the rule of law.

And I would say what happened in that hospital room crystallized
Mr. Gonzales' view about the rule of law:  that he holds it in minimum
low regard.

And it's hard for me to understand -- I'm going to say something
that you won't say:  It's hard to understand after hearing this story
how Attorney General Gonzales could remain as attorney general, how
any president, Democrat, Republican, liberal, conservative, could
allow him to continue.

But I want to thank you for being here.  I know it wasn't easy.
I know that if we didn't have the power of subpoena you wouldn't be
here.  I know you have a conscience that obviously you've wrestled
with in all this and it's very difficult to be here.

But a profile in courage, by definition, is difficult.  And I
think I speak on behalf of almost every American:  We thank you for
being here and having the courage to speak the truth.

(APPLAUSE)

END

May 15, 2007 12:34 ET
.