UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELECTRONIC PRIVACY
INFORMATION CENTER,

                    Plaintiff,

        v.                                              No. 06-cv-0096 (HHK)

UNITED STATES DEPARTMENT OF
JUSTICE,

                    Defendant.

AMERICAN CIVIL LIBERTIES UNION,
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION,
THE NATIONAL SECURITY ARCHIVE
    FUND, INC.,

                    Plaintiffs,                         No.06-cv-0214 (HHK)

        v.

UNITED STATES DEPARTMENT OF
JUSTICE,

                    Defendant.                          **CONSOLIDATED CASES**

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S
RENEWED MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF PLAINTIFFS' RENEWED
CROSS-MOTION FOR *IN CAMERA* REVIEW**

# TABLE OF CONTENTS

INTRODUCTION………….…………………………………………………………………..1

STATEMENT OF FACTS………………………………………………………....……5

ARGUMENT………………………………………………………………………..…6

    I.     DEFENDANT HAS NOT MET ITS BURDEN OF PROVING THAT IT MAY
          WITHHOLD OLC RECORDS AND LEGAL OPINIONS REGARDING THE
          PROGRAM………….…………………………………………………………8

          A.    Defendant's Submissions are Insufficient to Support Withholding the
                Records Under Exemption 1 and Exemption 3…………………………....9

          B.    Defendant's Submissions are Insufficient to Support Withholding the
                Records Under Exemption
                5……………………………………….............................................…15

                1.  OLC Has Not Demonstrated That The Deliberative Process Privilege
                      Applies To The Records At Issue………………..……………16

                      a.  Opinions and Legal Conclusions Of OLC Prepared For The
                          White House Or Other Agencies Constitute Final Opinions Of
                          The DOJ and Are Not Deliberative
                          Records………………………………………………17

                      b.  Defendant Has Not Provided Sufficient Information to Support
                          Its Contention that the OLC Records Are
                          Predecisional…………………………………………23

                2.  OLC Has Not Demonstrated That The Attorney-Client Privilege
                        Applies To The Records At Issue…………………………….....26

                3.  OLC Has Not Demonstrated That The Attorney Work Product
                        Privilege Applies To The Records At Issue…………………………29

                  4.  OLC Has Not Demonstrated That The Presidential Communications
                        Privilege Applies To The Records At
                      Issue…………………………………………………………29

II.    DEFENDANT HAS NOT MET ITS BURDEN OF PROVING THAT IT MAY
        WITHOLD FBI RECORDS CONCERNING ITS POLICIES AND LEGAL
        OPINIONS REGARDING THE PROGRAM………………………………...31

III.    SEGREGABLE FACTUAL AND NON-EXEMPT PORTIONS OF THE
        RECORDS MUST BE RELEASED……………………………………………33

IV.    THE COURT SHOULD REVIEW THE OLC RECORDS AND FBI RECORDS
        IDENTIFIED ABOVE AND SHOULD ALSO REVIEW THE REMAINING
        DOCUMENTS *IN CAMERA*…………………………………………….……35

CONCLUSION…………………………………………………………………………..39

## INTRODUCTION

This brief is being filed on the second anniversary, almost to the day, of the media's disclosure that the National Security Agency ("NSA") was secretly intercepting the telephone and Internet communications of people within the United States without prior judicial authorization and in violation of the Foreign Intelligence Surveillance Act ("FISA").  *See* James Risen and Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, N.Y. Times, Dec. 16, 2005.  Although that disclosure led to a volcano of public and congressional debate about the legality and wisdom of that practice – a volcano that continues to erupt almost daily – plaintiffs' efforts to obtain relevant documents about the NSA's program pursuant to the Freedom of Information Act ("FOIA") have largely been stymied, even though defendant has yet to carry its burden of showing that all the documents it is withholding are exempt from disclosure.  After two years, it is time for this Court to examine the remaining documents *in camera* and to order disclosure of those as to which defendant has not carried its burden.[1]

Throughout this litigation, defendant has resisted public disclosure of almost all records relating to the NSA's illegal Terrorist Surveillance Program ("Program") that was in operation for more than six years.  Most disturbingly, defendant continues to insist that even final legal and policy memoranda pertaining to the administration's legal justification for ignoring FISA and spying on U.S. citizens and residents without any judicial oversight must be shielded from public view.

---

[1] Just two days ago, the New York Times disclosed additional information about warrantless domestic wiretapping by the National Security Agency that should leave the Court deeply troubled.  Reportedly, the NSA has been engaged in such activities since the 1990s – long before September 11, 2001 – and the NSA's spying has not been limited to international telephone calls, but, for example, has been used in run-of-the-mill drug investigations that have nothing to do with terrorism.  *See* Eric Lichtblau, James Risen and Scott Shane, *Wider Spying Fuels Aid Plan for Telecom Industry*, N.Y. Times, Dec. 16. 2007.

The public's interest in these documents is manifest.  First, the documents concern the circumstances in which the government should be permitted to use its profoundly intrusive surveillance powers to intercept the communications of U.S. citizens and residents without any judicial oversight, a question of great constitutional import.  Second, the documents would shed desperately needed light on the government's decision to purposely violate the law, and then to keep that decision – and the justification for it – completely secret.  Third, the documents will help inform the vigorous and ongoing debate in Congress, in the media, and in the already-begun 2008 election campaign as to whether FISA should be permanently amended in a manner that essentially sanctions the Program and radically expands the executive branch's power to conduct surveillance without meaningful judicial oversight.

Although defendant maintains that these important records must be withheld from the public, administration officials have continued selectively to disclose, discuss, and reference information and records about the Program on many occasions in the service of their own legislative and political agenda.[2]  Relying on those secret materials, the administration has conducted a vigorous lobbying campaign that led Congress to pass a law temporarily sanctioning the Program.  *See* Protect America Act of 2007, Pub. L. No. 110-55 (2007); Scott Shane and Eric Lichtblau, *Panel Approves Eavesdropping Bill*, N.Y. Times, Oct. 19, 2007.  At this very moment, the administration is working hard to gain permanent authorization for its expanded

---

[2] For example, Director of National Intelligence J. Michael McConnell has given interviews, written letters and appeared before Congress; he has characterized and discussed the Program in details in an effort to protect then-Attorney General Alberto Gonzales and the administration's public advocacy campaign.  *See Hearing before the S. Intelligence Comm. on the Foreign Intelligence Surveillance Modernization Act of 2007*, 110th Cong. (May 1, 2007); Letter from Director of National Intelligence McConnell to Congressional Leaders, July 27, 2007, *available at* http://action.eff.org/site/DocServer/dni_20070727.pdf; Chris Roberts, *Transcript: Debate On The Foreign Intelligence Surveillance Act*, El Paso Times, Aug. 22, 2007.

warrantless surveillance program.  *See, e.g.*, Pamela Hess, *Congress Takes Up Terrorist Surveillance*, Wash. Post, Nov. 15, 2007.

Defendant's assertion that blanket secrecy (except for its own politically-selective disclosures) is necessary to protect national security is disingenuous at best – particularly with respect to final legal and policy memoranda – and the Court should view such claims with great skepticism.  The executive branch is institutionally inclined to overstate the need for secrecy. This has been borne out historically.  In seeking to prevent the disclosure of the Pentagon Papers, the government made the same arguments it asserts here, insisting that courts were in no position to second guess the executive branch's determination that release of information would harm the nation:

> In the present cases high government officials have explained the reasons for their concern; that judgment is enough to support the Executive Branch's conclusion, reflected in the top secret classification of the documents and in the in camera evidence, that disclosure would pose the threat of serious injury to the national security.

*See* Brief for the United States at *18, *N.Y. Times, Co. v. United States*, 403 U.S. 713 (1971), (Nos. 1873, 1885) *available at* 1971 WL 167581.  But twenty years later, former Solicitor General Erwin Griswold, who had argued the case on behalf of the United States, conceded:  "I have never seen any trace of a threat to the national security from the publication.  Indeed, I have never seen it even suggested that there was such a threat."  Erwin N. Griswold, Editorial, *Secrets Not Worth Keeping:  The Courts and Classified Information*, Wash. Post, Feb. 15, 1989.

Without disclosure of the records sought here, the public will remain uninformed, unable to participate meaningfully in the legislative and political debate, and dependent upon the good graces of the executive branch to learn what its government is up to.  But, as Justice Stewart wrote in 1971, "the only effective restraint upon executive policy and power in the areas of

national defense and international affairs may lie in an enlightened citizenry – in an informed and critical public opinion which alone can here protect the values of democratic government." *N.Y. Times Co.*, 403 U.S. at 728 (Stewart, J., concurring).

In a continuing effort to overwhelm the Court with dire warnings of possible harm, defendant has now filed a renewed motion for summary judgment that fails to meet the basic standards for justifying withholding of information under the FOIA and the case law in this Circuit. Though it makes passing references to various exemptions and privileges as a basis for withholding records sought by plaintiffs, defendant fails to assert those privileges specifically and clearly with respect to the much smaller group of records still at issue in this case. While this tactic may have been useful when the number of records at issue was large, when plaintiffs had almost no information with which to rebut defendant's claims, and when the Program was still active, this approach falls flat today.

The Court can easily see through defendant's effort to obscure its analysis of the releasability of the records. General references to the attorney work product privilege and the presidential communications privilege should be rejected. Vague invocations of the deliberative process privilege for final, binding legal opinions, without any explanation of the role the records played in a decision-making process, should not be permitted to stand. A broad application of the attorney-client privilege, which would essentially condone the invocation of that privilege for all work done by government lawyers, should be denied. Defendant's complete failure to explain why legal opinions and policy positions cannot be segregated and released in redacted form, particularly in light of the Court's specific inquiry about segregability, should be an indicator to the Court that defendant cannot back up its claims. When faced with such vague, conclusory, and unsupported assertions, the Court, having already given defendant a second

opportunity to make its arguments, should now order *in camera* review of the remaining records at issue. *In camera* review is specifically authorized by the FOIA and is particularly appropriate in a case such as this one.

## STATEMENT OF FACTS

In the fall of 2001, the NSA launched a secret surveillance program to intercept the telephone and Internet communications of people within the United States without prior judicial authorization. *See* James Risen and Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, N.Y. Times, Dec. 16, 2005. The Program operated in blatant violation of statutory law that had been enacted specifically to prohibit such actions by the executive branch. *See* FISA, Pub. L. No. 95-511, Title I, 92 Stat. 1783 (1978) (codified as amended at 50 U.S.C. §§ 1801-1871). Within days after the Program's existence was revealed by the New York Times, plaintiffs Electronic Privacy Information Center ("EPIC"), the American Civil Liberties Union and the American Civil Liberties Union Foundation (collectively, the "ACLU"), and the National Security Archive Fund, Inc. (the "Archive") filed separate FOIA requests seeking to obtain records held by the government related to the public news reports with a particular interest in the legal basis for the Program and the means of oversight that had been established.[3]

When those FOIA requests did not bear fruit, EPIC filed the first of these lawsuits on January 19, 2006. The ACLU and the Archive filed a joint lawsuit on February 7, 2006, and the cases were consolidated on February 9. On September 15, 2006, defendant filed a motion for summary judgment. On October 13, 2006, plaintiffs filed an opposition and a cross-motion for *in camera* review.

---

[3] EPIC's request was filed on December 16, 2005, the ACLU's request was filed on December 20, 2005, and the Archive's requests were filed on December 21 and 22, 2005.

In an opinion and order issued on September 5, 2007, the Court granted in part, denied in part, and held in abeyance in part, defendant's motion for summary judgment, and denied plaintiffs' cross-motion for *in camera* review without prejudice. The Court ordered defendant to submit a renewed motion for summary judgment and noted that "[i]f these submissions are unsatisfactory, the court will order *in camera* review." *EPIC v. Dep't of Justice*, 511 F. Supp. 2d 56, 74 n.16 (D.D.C. 2007).

Pursuant to the Court's order, defendant filed a renewed motion for summary judgment on October 19, 2007, and submitted papers on behalf of the Office of the Deputy Attorney General ("ODAG"); the Office of Legal Counsel ("OLC"); the Office of Intelligence and Policy Review ("OIPR"); and the NSA. On November 21, 2007, defendant filed a supplemental submission on behalf of the Federal Bureau of Investigation ("FBI"). Plaintiffs now respond to defendant's renewed motion for summary judgment.

## ARGUMENT

The Freedom of Information Act is grounded in the "fundamental principle of public access to Government documents," *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989), and in the American public's right to know "what their Government is up to." *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (citation and internal quotation marks omitted). The central purpose of the statute is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Accordingly, the drafters of the FOIA intended "that the courts interpret

this legislation broadly, as a disclosure statute and not as an excuse to withhold information from the public." 112 Cong. Rec. 13654 (June 20, 1966) (statement of then-Rep. Donald Rumsfeld).[4]

The FOIA directs government agencies to disclose certain types of records upon request. *See* 5 U.S.C. § 552(a)(3). The statute contains nine exemptions from its broad mandate of disclosure. *See* 5 U.S.C. § 552(b). "'But these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.' Accordingly, these exemptions 'must be narrowly construed.'" *John Doe Agency*, 493 U.S. at 152 (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976)).

In a FOIA case, "[t]he government is entitled to summary judgment if no material facts are in dispute and if it demonstrates either that withheld or redacted documents are not required to be disclosed under § 552(a) or are exempt from disclosure under § 552(b)." *Billington v. Dep't of Justice*, 233 F.3d 581, 583-84 (D.C. Cir. 2000). "Very importantly, 'the burden is on the agency to sustain its action.'" *Founding Church of Scientology of Wash., D.C., Inc. v. NSA*, 610 F.2d 824, 830 (D.C. Cir. 1979) (quoting 5 U.S.C. § 552(a)(4)(B)). Consequently, when the government contends that documents are exempt from disclosure, "[t]he government bears the burden of proving that the withheld information falls within the exemptions it invokes," *Center for National Security Studies v. Department of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003), "even when the underlying facts are viewed in the light most favorable to the requester." *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983).

The FOIA directs trial courts to review *de novo* the applicability of the exemptions claimed by the defendant. 5 U.S.C. § 552(a)(4)(B).[5]

---

[4] Indeed, a recent public decision of the Foreign Intelligence Surveillance Court has emphasized that the FOIA is a proper mechanism for seeking public access to records relating to the Program. *See In re Motion for Release of Court Records*, No. 07-01 (F.I.S.C. Dec. 11, 2007), *available at* http://www.aclu.org/pdfs/safefree/fisc_order_2007_1211.pdf.

## I.  DEFENDANT HAS NOT MET ITS BURDEN OF PROVING THAT IT MAY WITHHOLD OLC RECORDS AND LEGAL OPINIONS REGARDING THE PROGRAM

Defendant has improperly withheld 18 OLC records on the basis of Exemptions 1, 3 and 5 of the FOIA.[6]  According to defendant, these records concern the President's Authorization of the Program (7 documents) and opinions of the Office of Legal Counsel (11 documents).[7]  As such, these records go to the heart of this lawsuit – whether the government acted legally in instituting and administering the Program and the integrity of the government's explanations of the Program to the public.

---

[5] Defendant filed a notice of supplemental authority on July 11, 2007, concerning a lawsuit captioned *New York Times Company v. United States Department of Defense*, No. 06-1553 (S.D.N.Y. filed Feb. 27, 2006).  In that suit the New York Times sought records under FOIA concerning the Program.  Defendant contends that a portion of the records at issue in that suit are the same as a portion of records at issue in this suit.  While there may be some overlap between the records in the two cases, the decision in that case, *New York Times Co. v. Department of Defense*, 499 F. Supp. 2d 501 (S.D.N.Y. 2007), is not binding on this Court.  *See Am. Council of the Blind v. WMATA*, 133 F. Supp. 2d 66, 74 (D.D.C. 2001).  Moreover, in light of the fact that the *New York Times* case involved additional defendants, many different records, different declarations, and legal issues such as adequacy of search that are not at issue in this case, the Court here should conduct its own *de novo* review as required by FOIA.  In addition, to the extent the Court does believe that *New York Times* bears on this case, the Court should be aware that after defendant informed the Court of the order in *New York Times*, another order was issued requiring *in camera* review and the release of certain documents.  *N.Y. Times Co. v. Dep't of Def.*, 2007 WL 2609572, *1 (S.D.N.Y. Aug. 28, 2007).

[6] As previously noted, Plaintiffs' First Opposition to Defendant's Motion for Summary Judgment at 44 n.25, plaintiffs are not contesting the withholding of draft materials.  Accordingly, plaintiffs do not contest the withholding of the following records:  OLC 107, OLC 139, OLC 144, OLC 84, OLC 116, OLC 201, OIPR 60, and OLC 202.  Plaintiffs also do not challenge OIPR 138, which defendant now states is not an agency record under the FOIA.

[7] Defendant refers to these as categories (A) and (E).  The 18 documents include the following: OLC 51, OLC 63/FBI 4, OLC 114, OLC 115/ODAG 3, OIPR 139, OIPR 140, FBI 7, OLC 16/ODAG 38,OLC 54/ODAG 1/OIPR 28, OLC 59/OIPR 29, OLC 62/ODAG 52, OLC 85, OLC 129/ODAG 6, OLC 131/ODAG 2/OIPR 37/FBI 51, OLC 132/ODAG 5, OLC 146, OLC 113/FBI 42, and ODAG 42.

Despite significant indicators of illegality in the institution and administration of the Program, the extensive public discussion engaged in by government officials concerning the Program, and the fact that the Program has been terminated, defendant continues to insist that it needs secrecy for the Program's legal justification.  Defendant's motion for summary judgment should be denied as to these records for at least four reasons.  First, defendant has failed to provide any detailed support behind its bald assertion that the records should be withheld pursuant to FOIA Exemptions 1 and 3 in order to protect national security.  Under the case law in this Circuit, such conclusory assertions are not sufficient to justify withholding of records.  In light of strong indications that the records likely include information bearing on the possible illegality of the Program, and the fact that the Program and many details of the Program already are public as a result of government statements, the Court should demand more.  Second, defendant has failed to show that the records are in any way deliberative or that they were part of a decision-making process such that the rationale behind Exemption 5's deliberative process privilege – to prevent inhibition of internal agency decision-making processes – comes into play.  Third, defendant has failed to show that the records involve a litigation or legal transaction of the type that qualifies for protection under the attorney client privilege or the attorney work product doctrine.  Fourth, defendants have improperly invoked the presidential communications privilege without standing to do so and with respect to records whose release would not inhibit the presidential decision-making process.

### A.  Defendant's Submissions are Insufficient to Support Withholding the Records Under Exemption 1 and Exemption 3

Under Exemption 1, the government may withhold records or portions of records if disclosure would be expected to cause damage to national security and the records are properly classified.  5 U.S.C. § 552(b)(1).  Under Exemption 3, the government may withhold records or

portions of records "specifically exempted from disclosure by [certain] statute[s][.]" 5 U.S.C. §

552(b)(3).  While these exemptions must, of course, be respected, the Court should also bear in

mind that there is "an unfortunate tendency of government officials to over-classify information,

frequently keeping secret that which the public already knows, or that which is more

embarrassing than revelatory of intelligence sources or methods."  *ACLU v. Dep't of Def.*, 389 F.

Supp. 2d 547, 561 (S.D.N.Y. 2005).  The examples of over-classification are legion, from the

Pentagon Papers to the claim that internment of U.S. citizens and residents of Japanese descent

during World War II was necessary for secondary reasons.[8]  The Program bears all the signs of

being just such an instance of secrecy used to shield from public scrutiny poor judgment or

illegal conduct by government officials.[9]

 This case is not about the disclosure of secret operational details of the Program.

Plaintiffs seek no such details.  Instead it is principally about the public's access to records

---

 [8] As already noted, Solicitor General Griswold later conceded that publication of the
Pentagon Papers did not threaten national security in any way, despite the government's claims
at the time.  *See supra* section Introduction.  In the *Korematsu* case, a document released five
decades after the Supreme Court upheld the internment of Japanese Americans revealed that
government attorneys had suppressed key evidence and authoritative reports from the Office of
Naval Intelligence, the FBI, the Federal Communications Commission, and Army intelligence
that flatly contradicted the government claim that Japanese Americans were a threat to security.
*Korematsu v. United States*, 584 F. Supp. 1406, 1416-19 (N.D. Cal. 1984).

 [9] A review of classified OLC legal opinions "related to surveillance" by Senator Sheldon
Whitehouse, a member of the Senate Select Committee on Intelligence, led him to conclude that
"[t]his is an administration that hates answering to an American court, that wants to grade its
own papers, and OLC is the inside place the administration goes to get legal support for its
spying program."  Statement of Sheldon Whitehouse, Dec. 7, 2007, *available at*
http://whitehouse.senate.gov/record.cfm?id=288537&.  Among the material from those
memoranda that were declassified at Senator Whitehouse's request was the assertion that "[a]n
executive order cannot limit a President.  There is no constitutional requirement for a President
to issue a new executive order whenever he wishes to depart from the terms of a previous
executive order.  Rather than violate an executive order, the President has instead modified or
waived it."  *Id.*

regarding the legality or illegality of the Program.  The American people must understand

whether the Program was lawfully created and administered in order to exercise their own voice

regarding how their nation is run and regarding the need for additional checks and balances to

prevent abuse by those in power.  These concerns are not frivolous.  Serious questions about the

Program's legality have been raised by members of Congress, federal officials including the

Attorney General and other Department of Justice ("DOJ") officials,[10] and the courts.  Indeed,

the only two judges in the country to have addressed the legality of the Program have found that

it to be illegal.  *See ACLU v. NSA*, 493 F.3d 644, 713-20 (6th Cir. 2007) (Gilman, J., dissenting);

*ACLU v. NSA*, 438 F. Supp. 2d 754 (E.D. Mich. Aug. 17, 2006), *vacated on other grounds*, 493

F.3d 644 (6th Cir. 2007).

      Defendant has failed to meet the legal test for establishing that the records at issue are

properly withheld in full under Exemption 1 or Exemption 3.[11]  Contrary to defendant's

characterization of the proper standard for judicial review of these claims, *see* Memorandum in

Support of Defendant's Renewed Motion for Summary Judgment ("Def. Second Mem.") at 5-7,

the courts in this Circuit have repeatedly recognized that judicial review of national security

claims is appropriate.  Indeed, Congress has explicitly directed courts to conduct a *de novo*

review of government withholding determinations and, in appropriate circumstances, to conduct

---

[10]  Testimony by FBI Director Robert S. Mueller III, supports former Deputy Attorney General James Comey's account of a shocking scene at the hospital bed of then-Attorney General John Ashcroft, where administration officials attempted to pressure the ailing Attorney General to authorize the Program, that then-acting Attorney General James Comey had determined was illegal.  *See* David Johnston and Scott Shane, *F.B.I. Chief Gives Account at Odds With Gonzales's*, N.Y. Times, July 27, 2007.  Former head of the Office of Legal Counsel Jack Goldsmith has published a book about the illegal nature of the Program and has appeared before Congress.  *See* Neil A. Lewis, *Panel Is Told of 'Mess' Over Eavesdropping*, N.Y. Times, Oct. 3, 2007; Jeffrey Rosen, *Conscience of a Conservative*, N.Y. Times, Sept. 9, 2007.

[11]  Defendant claims that Exemptions 1 and 3 protect every document still at issue within categories (A) and (E) except for OLC 51.

*in camera* reviews of records withheld because of a claim of harm to national security.  *See* 5

U.S.C. § 552(a)(4)(B).  While declarations from agencies concerning materials classified for

protection of national security are accorded "substantial weight," no amount of deference can

permit withholdings based on agency allegations that display, for example, a "lack of detail and

specificity, bad faith, [or] failure to account for contrary record evidence," since "deference is

not equivalent to acquiescence."  *Campbell v. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998).

"No matter how much a court defers to an agency, its review is not vacuous.  An agency cannot

meet its burden of justifying non-disclosure simply by invoking the phrase 'national security.'"

*Coldiron v. Dep't of Justice*, 310 F. Supp. 2d 44, 53 (D.D.C. 2004).  Thus, defendant's

declarations must "afford the FOIA requester a meaningful opportunity to contest, and the

district court an adequate foundation to review, the soundness of the withholding."  *Campbell*,

164 F.3d at 30 (internal citation omitted); *see also Coldiron*, 310 F. Supp. 2d at 49.

> To support an Exemption 1 claim, an agency declaration must do the following:
>
> [F]or each redacted document or portion thereof, (1) identify the document, by
> type and location in the body of documents requested; (2) note that Exemption 1
> is claimed; (3) describe the document withheld or any redacted portion thereof,
> disclosing as much information as possible without thwarting the exemption's
> purpose; (4) explain how this material falls within one or more of the categories
> of classified information authorized by the governing executive order; and (5)
> explain how disclosure of the material in question would cause the requisite
> degree of harm to the national security.

*King v. Dep't of Justice*, 830 F.2d 210, 224 (D.C. Cir. 1987) (FBI declarations asserting

Exemption 1 deemed inadequate).  To support an Exemption 3 claim, the withholding agency

"must point to an appropriate nondisclosure statute" and must also "demonstrate that the

withheld materials are covered by that particular statute."  *People for the Am. Way Found. v.*

*NSA*, 462 F. Supp. 2d 21, 28 (D.D.C. 2006) (citing *CIA v. Sims*, 471 U.S. 159, 167 (1985)).

Defendant's declarations here fall far short of these standards.  In support of its

Exemption 1 claims, defendant cites Executive Order 12958, as amended by Executive Order

13292.  Section 1.4 of that Executive Order enumerates the categories of information that are

subject to security classification and Section 1.3 describes the classification process.  Section 1.8

of the Executive Order, however, prohibits classification of information in order to:

> (1) conceal violations of law, inefficiency, or administrative error;
> (2) prevent embarrassment to a person, organization, or agency;
> (3) restrain competition; or
> (4) prevent or delay the release of information that does not require protection in the
> interest of national security.

*Id.*  Defendant's invocation of Exemption 3 in turn appears to rely on three statutes: the

Intelligence Reform and Terrorism Prevention Act of 2004 § 102A(i)(1), Pub. L. No. 108-458,

118 Stat. 3638 (2004) (codified at 50 U.S.C. § 403-1(i)(1)) (requiring protection of intelligence

sources and methods from unauthorized disclosure); the National Security Agency Act of 1959 §

6, Pub. L. No. 86-36, 73 Stat. 63, 64 (codified at 50 U.S.C. § 402 note); and 18 U.S.C. § 798

(prohibiting disclosure of classified information).

Defendant's declarations are almost entirely redacted with respect to its Exemption 1 and

Exemption 3 claims, to the extent any justification for those withholdings can even be discerned

from the declarations.  *See, e.g.*, Second Redacted Declaration of Steven G. Bradbury

("Bradbury Second Decl.") ¶¶ 34, 35, 41, 45, 47 (redacted paragraphs concerning the

applicability of Exemptions 1 and 3 to category (A) TSP authorization records); Def. Second

Mem. at 14; Bradbury Second Decl. ¶¶ 84, 99, 100 (redacted paragraphs concerning the

applicability of Exemptions 1 and 3 to category (E) Legal Opinions of OLC).[12]  Thus,

---

[12] Nor do statements made in the declarations in support of defendant's first motion for
summary judgment offer defendant any assistance.  Since the time that those were filed in

defendant's public submissions fail to provide any details (a) about the subject matter of the underlying memoranda, (b) about whether the memoranda discuss operational details of the Program, or (c) about why these memoranda, as legal opinions, cannot be released with operational or sensitive details removed. Defendant therefore has failed to justify the withholding in a manner that permits plaintiffs to respond in a meaningful way to the invocation of Exemptions 1 and 3. On such bare bones justifications, it is impossible to determine whether the withheld material logically falls within the classification categories established by Executive Order 12958, as amended, or whether the records were properly classified. It is just this sort of distortion of the adversary process in FOIA cases that has been criticized by the courts and caused the courts in this Circuit to adopt methods such as detailed *Vaughn* indexes and *in camera* review of records to counter defendant's conclusory assertions. *See, e.g.*, *Vaughn v. Rosen*, 484 F.2d 820, 824 (D.C. Cir. 1973) ("lack of knowledge by the party seeking disclosure seriously distorts the traditional adversary nature of our legal system's form of dispute resolution"). The lack of any supporting explanation for the defendant's claims on Exemptions 1 and 3 makes it difficult for plaintiffs to show that the records are not properly classified.

Moreover, to the extent defendant claims that release of these records, or portions of these records, would cause "exceptionally grave harm to U.S. national security," Bradbury Second Decl. ¶ 12, those contentions merit significant judicial scrutiny.[13] As documented by the court in *Hepting v. AT&T*, 439 F. Supp. 2d 974, 986-89 (N.D. Cal. 2006), numerous government officials, including the President and Attorney General, have confirmed the existence of the

_____

September 2006, even more information about the Program has reached the public, and, according to defendant, Bradbury Second Decl. ¶ 11, the Program itself has been terminated.

[13] Notably, defendant's summary judgment memorandum fails to make any argument in its text that the category (E) Legal Opinions of OLC are exempt pursuant to Exemptions 1 and 3. Def. Second Mem. at 17.

Program and substantial details of the Program have been exposed, including by the telecommunications operators that participated in the Program.  Those facts led that court to comment that "it might appear that none of the subject matter in this litigation could be considered a secret given that the alleged surveillance programs have been so widely reported in the media," *id.* at 989, and to conclude solely on the basis of government representations and the admissions of the telecommunications company that participated in the program that "the very subject matter of [that] action is not a 'secret'[.]"  *Id.* at 994; *see Al-Haramain Islamic Found., Inc. v. Bush*, --- F.3d ---, 2007 WL 3407182, *2 (9th Cir. Nov. 16, 2007) ("Unlike a truly secret or 'black box' program that remains in the shadows of public knowledge, the government has moved affirmatively to engage in public discourse about the TSP.").  This Court, similarly, need not blindly accept defendant's asserted risk of harm that could result as a consequence of disclosure of the legal justifications for the Program, particularly in light of the fact that the Program is publicly acknowledged and is no longer authorized or in use by the government. Bradbury Second Decl. ¶ 13.[14]

### B.  Defendant's Submissions are Insufficient to Support Withholding the Records Under Exemption 5

Exemption 5 permits withholding of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  This provision of the FOIA is construed "to exempt those documents, and only those documents, normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  Congress intended Exemption 5 to be applied "as narrowly as consistent with efficient Government operation," because an overbroad

---

[14] Two of the records withheld – memoranda prepared by OLC for the Director of the FBI – are subject only to claims of withholding pursuant to Exemptions 1 and 3.  These are FBI 7 from category (A) and OLC113/FBI 42 from category (E).

application could swallow the mandate of disclosure inherent in the FOIA. *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 252 n.16 (D.C. Cir. 1977) (quoting S. Rep. No. 813, 89th Cong., 1st Sess. 9 (1965)).

Here, OLC cites the deliberative process privilege, attorney-client privilege, attorney work product doctrine, and presidential communications privilege to justify withholding a number of records under Exemption 5. However, OLC has not sustained its burden of demonstrating that these records are properly withheld pursuant to these privileges.

## 1. OLC Has Not Demonstrated That The Deliberative Process Privilege Applies To The Records At Issue

"The deliberative process privilege is designed to promote the quality of agency decisions by preserving and encouraging candid discussion between officials." *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005). To invoke the deliberative process privilege, an agency must show that the record in question is **both predecisional _and_ deliberative**. It must be (1) "antecedent to the adoption of an agency policy," *Jordan v. Department of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978), *overruled on other grounds*, *Crooker v. Bureau of Alcohol, Tobacco and Firearms*, 670 F.2d 1051 (D.C. Cir. 1981), and (2) "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Vaughn*, 523 F.2d at 1144. The deliberative process privilege generally applies to "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). The Defendant has failed to make either showing.[15]

---

[15] Defendants claim that the following records are withheld pursuant to the deliberative process privilege: OLC 51, OLC 63/FBI 4, OLC 114, OLC 115/ODAG 3, OIPR 139, OIPR 140,

### a.  Opinions and Legal Conclusions Of OLC Prepared For The White House Or Other Agencies Constitute Final Opinions Of The DOJ and Are Not Deliberative Records

Material is deliberative if it "'reflects the give-and-take of the consultative process.'" *Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (internal citations omitted).  The deliberative process privilege does not protect "final agency actions that constitute statements of policy or final opinions that have the force of law."  *Taxation Without Representation Fund v. IRS*, 646 F.2d 666, 677 (D.C. Cir. 1981).

Thus, where a record sets forth an agency's final legal position, it is not deliberative even though it may precede policies or decisions subsequently made based on the record's legal conclusions.  *Tax Analysts v. IRS (Tax Analysts II)*, 294 F.3d 71, 81 (D.C. Cir. 2002) (legal advice memos from Office of Chief Counsel to IRS field officers not protected by deliberative process privilege where they represented "OCC's final legal position," even though the memos did not necessarily "reflect the final *programmatic* decisions of the program officers that request[ed] them") (emphasis in original); *Evans v. Office of Personnel Mgmt.*, 276 F. Supp. 2d 34, 39 (D.D.C. 2003) (holding deliberative process privilege inapplicable to memorandum issued by agency General Counsel's office that "contains legal determinations relevant to the adoption of a government-wide policy" and "conclusively sets forth the agency's legal position" on an issue).  Legal opinions, even those that may be followed or rejected later by agency employees who apply them, must be disclosed because "there is nothing premature or misleading about" conclusive interpretations of law and "the public can only be enlightened by knowing what the

---

OLC 16/ODAG 38,OLC 54/ODAG 1/OIPR 28, OLC 59/OIPR 29, OLC 62/ODAG 52, OLC 85, OLC 129/ODAG 6, OLC 131/ODAG 2/OIPR 37/FBI 51, OLC 132/ODAG 5, OLC 146, and ODAG 42.

national office believes the law to be." *Tax Analysts v. IRS* (*Tax Analysts I*), 117 F.3d 607, 618 (D.C. Cir. 1997).

Moreover, the privilege does not apply, even to legal interpretations not considered formally "binding" on agency employees, if "in fact the advice was regularly and consistently followed by the non-legal staff," suggesting that in practice the advice constituted a policy adopted and consistently applied by the agency. *Coastal States Gas Corp.*, 617 F.2d at 859-60; *see Tax Analysts I*, 117 F.3d at 617; *Evans*, 276 F. Supp. 2d at 40. Agencies simply may not adopt a legal position that governs their conduct "while shielding from public view the analysis that yielded that position." *Nat'l Council of La Raza*, 411 F.3d at 360.[16]

OLC itself does not serve a policy or recommendatory function. Pursuant to statute and DOJ regulations, the Office of Legal Counsel is responsible for preparing formal legal opinions of the Attorney General, issuing informal opinions on legal questions to executive branch agencies, and providing legal interpretations and resolving disputes with DOJ and throughout the federal government. 28 C.F.R. § 0.25. OLC opinions, in turn, are binding on the executive branch, *Tenaska Wash. Partners II v. United States*, 34 Fed. Cl. 434, 439 (Ct. Fed. Cl. 1995) ("Memoranda issued by the OLC . . . are binding on the Department of Justice and other Executive Branch agencies and represent the official position of those arms of government."), and represent the final opinion of the DOJ as to the interpretation of the law.[17] Moreover, OLC

---

[16] Disclosure of the working law of the agency also is supported by the FOIA's automatic disclosure provision, 5 U.S.C. § 552(a)(2), which in particular mandates that agencies must make available all "statements of policy and interpretations which have been adopted by the agency."

[17] *See also* Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel*, 52 Admin. L. Rev. 1303, 1305 (2000) ("When the views of the Office of Legal Counsel are sought on the question of the legality of a proposed executive branch action, those views are typically treated as conclusive and binding, within the executive branch.") (authored by former Assistant Attorney General for the Office of Legal Counsel);

interpretations, some of which are published, constitute a "body of law" which has been a source of continuity, tradition, and respect across administrations.[18]

OLC's legal opinions "embody the . . . effective law and policy" of the Department of Justice as to whether executive branch activities are legal. *Sears, Roebuck & Co.*, 421 U.S. at 153. Thus, when OLC reaches a conclusion as to "whether something is within the law or not within the Justice Department," it is a final decision. *Hearing before the Sen. Judiciary Comm. On Preserving Prosecutorial Independence: Is the Department of Justice Politicizing the Hiring and Firing of U.S. Attorneys?* (May 15, 2007) (questioning of James B. Comey, Former Deputy Attorney General, U.S. Department of Justice) (for text citation see Exh. B at 65 Defendant's Opposition to Plaintiffs' Motion for Leave to File Supplemental Memorandum, *EPIC v. Dep't of Justice*, Nos. 06-00096, 06-00214 (D.D.C.)) (hereinafter "Comey Testimony").[19]

_____

*Guidelines for the President's Legal Advisors*, 81 Indiana L. J. 1345 (2006) (introduction by Dawn E. Johnsen, former Acting Assistant Attorney General for the Office of Legal Counsel); Jack Goldsmith, *The Terror Presidency*, 96 (2007) ("If OLC interprets a law to allow a proposed action, then the Justice Department won't prosecute those who rely on the OLC ruling. . . . One consequence of OLC's authority to interpret the law is the power to bestow on government officials what is effectively an advance pardon for actions taken at the edges of vague criminal laws. This is the flip side of OLC's power to say 'no,' and to put a brake on governmental operations.") (authored by former Assistant Attorney General for the Office of Legal Counsel); *see also* Goldsmith at 154 ("[T]he Defense Department, like the rest of the executive branch, was bound by OLC's legal rulings.").

[18] *Guidelines for the President's Legal Advisors*, 81 Indiana L. J. 1345 (2006) (introduction by Dawn E. Johnsen); *see* Goldsmith at 33 ("[T]he office has developed powerful cultural norms about the importance of providing the President with detached, apolitical legal advice, as if OLC were an independent court inside the executive branch.").

[19] Thus, OLC opinions are very different than the "views of individual members of the [Federal Power] Commission's staff," that were at issue in *International Paper Co. v. Federal Power Commission*, 438 F.2d 1349 (2d Cir. 1971), which is relied on by defendant. In that case, the court stated that individual staff memoranda "are not legally germane, either individually or collectively to the actual making of final orders." *Id.* at 1358. Nor are the OLC opinions analogous to the legal opinions of the State Department's Office of the Legal Advisor in *Brinton v. Department of State*, 636 F.2d 600 (D.C. Cir. 1980), which is also cited by defendant. There

The fact that the President or another executive branch official may later make a policy decision after considering the OLC's legal conclusion is irrelevant because "OLC speaks for the Justice Department." Goldsmith at 96; *see Evans*, 276 F. Supp. 2d at 40 (holding that a "considered and conclusive declaration of [an] agency's legal position" is not shielded by deliberative process privilege merely because it is issued before a "programmatic decision" based on that legal opinion). Former Assistant Attorney General for the OLC Jack Goldsmith has described OLC's role in giving the stamp of approval of the Department of Justice to certain counterterrorism programs. Goldsmith at 142 ("Each of the programs . . . had been approved by OLC and backed by an OLC opinion."). Thus, to the extent that DOJ authorization for the Program may have been required before the Program could go forward, OLC's legal opinion on that authorization constitutes a final DOJ decision as to the Program's legality.

Based on OLC's submission, it appears that several of the withheld records still at issue are legal opinions transmitted from OLC to the White House (OLC 63/FBI 4, OIPR 140, OLC 132/ODAG 5, OLC 146) or from OLC to other agency heads (OLC 62/OIPR 29, ODAG 42). Because these opinions are binding and conclusive final opinions of OLC and of DOJ as to an interpretation of the law that applies throughout the executive branch, they may not properly be described as deliberative.

---

the court concluded that the records "bear no indicia of finality," *id*. 605, and explained that "[t]he important criterion is whether those who consult the opinions have discretion to follow the opinions or not, based on their persuasive value rather than their character as working law of the Department." *Id*. Further, the brief, unpublished decision in *Morrison v. Department of Justice*, 1988 U.S. Dist. LEXIS 17906 (D.D.C. 1988), is not even relevant. In *Morrison*, the plaintiff did not dispute "that the records at issue would ordinarily be exempt from disclosure" under FOIA, but instead argued that the privilege had been waived. Accordingly, the Court never analyzed the legal issued raised here, but instead focused on whether two newspaper articles presented evidence that the records had been disclosed to a journalist and the privilege waived.

Moreover, the nature of these records, based on the descriptions provided by Mr. Bradbury, are more akin to final opinions than deliberative documents that reflect the back-and-forth of the decision-making process. First, it appears that many of the OLC memoranda were written in response to questions of legal interpretation and intended to provide dispassionate, objective analysis of the issue. These documents are not recommendatory in nature, nor do they reveal "suggestions or recommendations" about agency policy or "subjective, personal thoughts" of the OLC attorneys regarding the legal issues in question. *See Coastal States Gas Corp.*, 617 F.2d at 868-69 (holding that the privilege does not apply to legal opinion memoranda that constitute "straightforward explanations of agency regulations in specific factual situations"). Rather, they are "statements of an agency's legal position and, as such, cannot be viewed as predecisional." *Tax Analysts I*, 117 F.3d at 617 ("Representing the considered view of the Chief Counsel's national office on significant tax law issues, FSAs do not reflect the 'give-and-take' that characterizes deliberative materials.").

The specific facts provided in OLC's supplemental *Vaughn* indexes, moreover, suggest that at least some of the records at issue are OLC opinions on legal questions. Although OLC asserts that the nine "final memoranda" it withholds under Exemption 5 were "prepared in OLC's advisory capacity" and "none of these advisory memoranda announced or established Administration policy," Bradbury Second Decl. ¶ 82, defendant does not contend that these records represent anything other than OLC's and DOJ's final legal position on the issues treated therein. In fact two of the opinions that were sent to the White House, OLC 132/ODAG 5 and OLC 146, are described as "final memoranda" dated shortly after September 11, 2001, that provided OLC views on legality or applicable legal standards related to counter-terrorism activities. Bradbury Second Decl. ¶¶ 83h, 83i. To the extent that these are conclusive legal

opinions applied by executive branch officials implementing surveillance activities, they are not deliberative. *See, e.g., Tax Analysts II*, 294 F.3d at 82. In light of the regular renewal of the Program, the fact that there are OLC opinions that appear to postdate the start of the Program, suggests independent determinations of legality by DOJ. Similarly, opinions that were provided to other agencies or to components within DOJ (OLC 62/ODAG 52, ODAG 42) about the Program bind those agencies receiving them and do not appear to fit into a deliberative process scenario. It is the authoritative and objective character of these communications that makes clear these are not deliberative documents.

Two other records that were prepared by OLC for the White House are significant because they are dated just after March 11, 2004, the date on which the White House reauthorized the Program without DOJ certification because Acting Attorney General Comey had declined to provide such certification on the basis of OLC's finding that the Program was of questionable legality. As reported through testimony to Congress and media reports, those decisions were reached after a last ditch effort by White House officials to obtain the hospital-bed signature of Attorney General Ashcroft. Comey Testimony at 21-22, 28. Mr. Comey's testimony makes clear that the decisions of the President and of the Attorney General were independent, and that the President decided on March 11, when he failed to get DOJ approval, that he would nonetheless move forward with the Program. Therefore, the communications from OLC following that date likely represent DOJ's independent opinion about the Program's legality, and thus represent the final opinion of the agency on these questions and not part of the President's decision-making process.[20]

---

[20] According to published reports, including testimony of Acting Attorney General Comey, subsequent to DOJ's refusal to certify the Program, the President directed DOJ officials to make changes to the Program in order that the Department could then certify its legality,

The defendant's argument that any document containing its legal advice provided in an advisory capacity should be considered a deliberative document would potentially transform all legal opinions rendered in the government into records protected by the deliberative process. That position has not been accepted by the courts of this or any other Circuit. Such a determination would be directly contrary to the FOIA's admonitions against secret law. *See Sears, Roebuck & Co.*, 421 U.S. at 153 (finding that the construction of the FOIA demonstrates "a strong congressional aversion to secret (agency) law" and "an affirmative congressional purpose to require disclosure of documents which have the force and effect of law"). It is particularly troubling when viewed against the role that government lawyers play in a system governed almost entirely by regulation and statute, where every program requires some legal authorization to exist. *See Coastal States Gas Corp.*, 617 F.2d at 867 ("an agency will not be permitted to develop a body of 'secret law.'").

### b. Defendant Has Not Provided Sufficient Information to Support Its Contention that the OLC Records Are Predecisional

Against this background, defendant's assertion that the records at issue are a predecisional part of a decision-making process is unsubstantiated and implausible. As this Court has explained, an agency must identify with specific and detailed proof the role of the contested document in a specific deliberative process. *Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252 (D.D.C. 2004). An agency cannot simply assert that records are predecisional, which is all that the defendant has done here. Courts have made clear that an

_____

although the Program was proceeding nonetheless pursuant to the President's authorization. *See* Comey Testimony at 31 ("We had the president's direction to do what we believed, what the Justice Department believed was necessary to put this matter on a footing where we could certify to its legality. And so we then set out to do that. And we did that."). Any records from that time period which reflect DOJ's conclusions and final decision ultimately to certify the altered program are not protected by the deliberative process privilege.

agency cannot shield its records merely by *claiming* they are part of a process.  *See, e.g.*, *Assembly of Cal. v. Dep't of Justice*, 968 F.2d 916, 921 (9th Cir. 1992) (holding that the fact that a document may be used in a hypothetical future determination does not make it predecisional).

OLC's declarations in this case do no more than describe the withheld memoranda as "part of an ongoing decisionmaking process, whereby certain advice and recommendations were provided by OLC and the Department in the course of decisions by the President concerning the continued authorization of particular foreign intelligence activities."  Bradbury Second Decl. ¶ 39.

To the extent the OLC records were memoranda prepared for either the Attorney General or the Deputy Attorney General (OLC 51, OLC 114, OLC 115/ODAG 3, OIPR 139, OLC 54/OGAD 1/OIPR 28, OLC 85, OLC 129/ODAG 6, OLC 131/ODAG 2/OIPR 37/FBI 51), the declarations do not provide sufficient detail to support the claim that they are predecisional. They may well have been adopted – indeed it is likely that they were adopted – by the Attorney General or incorporated into official DOJ policy or transmitted to the White House.

Second, if the Attorney General or the agency adopted any OLC opinions that the Court finds were at one time covered by the deliberative process privilege, these opinions are no longer entitled to protection.  The fact that a memorandum may at one time have been predecisional is not dispositive.  The document ceases being exempt "if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public."  *Coastal States Gas. Corp*, 617 F.2d at 866.  The interests sought to be protected by the deliberative process privilege are no longer threatened when an agency adopts a legal opinion as its final policy because "when adopted, the reasoning becomes that of the agency and becomes its responsibility to defend. . . .  Moreover, the public interest in knowing the reasons for a policy

actually adopted by an agency supports [disclosure]." *Sears, Roebuck & Co.*, 421 U.S. at 161. Where "the Department embrace[s] the OLC's reasoning as its own," the documents at issue are no longer covered by Exemption 5. *Nat'l Council of La Raza*, 411 F.3d at 359. Thus, for example, a document such as OLC 115/ODAG 3, which is described as "a two-page memorandum for the Attorney General from a Deputy Assistant Attorney General, OLC, dated January 9, 2002, which relates to the Attorney General's review of the legality of the President's order authorizing the Program in the course of considering that program's authorization, which was done approximately every 45 days," Bradbury Second Decl. ¶ 40, may well be an adopted position of the Attorney General. Without specifics about the individual record's ultimate fate, the Court is left with the mere suggestion that withholding is appropriate.

    This reasoning is particularly applicable here because it appears from publicly available information that the decision-making process at DOJ and that of the President with regard to the Program were independent from one another. According to Mr. Comey's testimony, in March 2004 the Attorney General determined, on the basis of an OLC opinion, that DOJ could not certify the Program and informed the White House of that decision. Comey Testimony at 33 (stating that in denying certification to the Program, "it was largely OLC, the Office of Legal Counsel's work, that I was relying upon . . . in making my decision."). Thereafter, the President reauthorized the Program anyway, without regard to the lack of DOJ certification. *Id.* at 28. Subsequently, features of the program were changed and a subsequent opinion from OLC finding the altered program to be legal led to DOJ's eventual certification.[21] It appears, at least on this occasion, that the relevant final decisions of the Attorney General regarding certification of the

---

[21] *See, e.g., id.* at 53 ("FEINSTEIN: And you then became satisfied that the program conformed with what, essentially? COMEY: That it was operated consistently with the Office of Legal Counsel's judgment about what was lawful. So we were in a position – given OLC's opinion, the attorney general and I were in a position to certify the program as to its legality.").

Program adopted or incorporated OLC's reasoning each time. *See Nat'l Council of La Raza*, 411 F.3d at 352, 359 (rejecting Exemption 5 deliberative process privilege claim because DOJ had incorporated the reasoning of the requested OLC memorandum through "repeated reference to, and reliance on," the memorandum). "In these circumstances, 'the public can only be enlightened by knowing what the [agency] believes the law to be.'" *Id.* at 360 (quoting *Tax Analysts I*, 117 F.3d at 618). Thus, records such as the nine "final memoranda" cannot be properly considered predecisional for the purposes of the deliberative process privilege.

Several of the specific records at issue here (OLC 114, OIPR 139) date from the period following DOJ's failure to certify the Program in March 2004. With regard to these records, it is clear from public testimony that the Attorney General agreed with and incorporated OLC's reasoning in making his final decision about denying certification and subsequently certifying the altered Program. In those circumstances, OLC's opinions later adopted as the DOJ position are not protected by the deliberative process privilege. Moreover, to the extent that other OLC opinions presented to the Attorney General were adopted by him as the department's position, these records also lose protection under the deliberative process privilege.[22]

### 2. OLC Has Not Demonstrated That The Attorney-Client Privilege Applies To The Records At Issue

Defendant has also invoked the attorney client privilege pursuant to Exemption 5.[23] The attorney-client privilege applies in the FOIA context to confidential communications between a

---

[22] On other occasions, at least during the time when Jack Goldsmith served as Assistant Attorney General for OLC, it is apparent that the Attorney General adopted OLC positions. *See* Goldsmith at 160 ("It was immediately clear that the Attorney General had accepted my decision to withdraw the August 2002 opinion and had made the decision the department's official position.").

[23] Those documents for which OLC claims protection of the attorney-client privilege include: in Category A (TSP authorization), OLC 51, OLC 63/FBI 4, OLC 114, OLC

client agency and an attorney, or from an attorney to a client, "but only if that communication is based on confidential information provided by the client." *Mead Data Cent. Inc.*, 566 F.2d at 254. To qualify for the privilege, an agency must show "confidentiality both at the time of the communication and maintained since." *Coastal States Gas Corp.*, 617 F.2d at 863. "Confidential information" refers to "private information concerning the agency" but not, for example, "neutral, objective analyses of agency regulations." *Id.*

Although the privilege "extends to all situations in which an attorney's counsel is sought on a legal matter," it is narrowly construed and "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Id.* at 862 (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)). Thus, courts have been careful to circumscribe the use of the attorney client privilege when the attorneys are employed by government agencies responding to FOIA requests. The attorney client privilege "does not exempt a document from disclosure simply because the communication involves the government's counsel." *Judicial Watch, Inc. v. Dep't of the Army*, 435 F. Supp. 2d 81, 89 (D.D.C. 2006). Instead the communication "must concern a legal matter for which the client sought professional advice." *Id.* Consistent with that approach, the privilege has been held not to apply when an agency attorney is, for example, simply providing analysis of agency regulations. *Coastal States Gas Corp.*, 617 F.2d at 863. Similarly, in *Tax Analysts I*, 117 F.3d at 619, the attorney client privilege was held not to apply to answers of the national office of the IRS's Office of Chief Counsel to legal questions submitted by IRS and Chief Counsel personnel in the field, on the ground that the legal conclusions of the Office of Chief Counsel provided to

---

115/ODAG 3, OIPR 139, OIPR 140; in Category E (Legal Opinions), OLC 16/ODAG 38, OLC 54/ODAG 1/OIPR 28, OLC 59/OIPR 29, OLC 62/ODAG 52, OLC 85, OLC 129/ODAG 6, OLC 131/ODAG 2/OIPR 37/FBI 51, OLC 132/ODAG 5, OLC 146, ODAG 42.

field personnel "create[d] a body of private law, applied routinely as the government's legal position in its dealings with taxpayers."

In this case, although the government's submissions state generally that disclosure of the legal memoranda "would fundamentally disrupt the attorney-client relationship and would deter federal agencies and officials in the White house from seeking timely and appropriate legal advice," Bradbury Second Decl. ¶ 85, OLC has not shown that each document at issue contains confidential information provided by a client in the course of seeking the type of legal advice that can form the basis of the privilege for the purpose of withholding records under FOIA.

Moreover, the government does not make any effort to explain why, if the attorney client privilege will be severely harmed by release of final legal opinions authored by the OLC, it has released so many OLC memoranda in the past. [24]  Defendant's "conclusory assertions of privilege [do] not suffice" to carry its burden of justifying withholding under Exemption 5.  *See Coastal States Gas Corp.*, 617 F.2d at 861.  For these reasons, its withholding on the basis of attorney client privilege should be rejected.

---

[24] *See* Bradbury Decl. ¶ 81; Leon Ulman, *Forward to 1 Op. Off. Legal Counsel*, at v (1977) ("The Attorney General has directed the Office of Legal Counsel to publish selected opinions on an annual basis for the convenience of the executive, legislative, and judicial branches of the Government, and for the convenience of the professional bar and the general public.").  The fact that many OLC opinions may be appropriate for public disclosure, and that such disclosure is generally beneficial, is also reflected in a set of guidelines drafted by 19 former OLC attorneys.  Walter E. Dellinger, Dawn Johnsen, *et al.*, *Principles to Guide the Office of Legal Counsel* (Dec. 21, 2004), reprinted at 81 Ind. L.J. 1345 (2006) ("OLC should follow a presumption in favor of timely publication of its written legal opinions," which "helps to ensure executive branch adherence to the rule of law guard against excessive claims of executive authority.").

### 3.  OLC Has Not Demonstrated That The Attorney Work Product Privilege Applies To The Records At Issue

The attorney work product doctrine protects documents prepared by attorneys, or non-attorneys supervised by attorneys, in contemplation of litigation that reveal information about an attorney's preparation and strategy relating to a client's case.[25]  *Coastal States Gas Corp.*, 617 F.2d at 866. The work product doctrine is limited in scope.  It protects only records prepared for litigation, not every record prepared by an attorney.  *Jordan*, 591 F.2d at 775; *U.S. Postal Serv.*, 297 F. Supp. 2d at 268.  "[D]ocuments that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation" are not protected as attorney work product.  *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998).

The records at issue here are not the type of records that would fall within the attorney work product doctrine.  Legal memoranda and authorizations are the type of records that are necessary for any governmental program to be established and to function.  Such records were not created as a basis for future litigation, because it was never contemplated that the Program would be exposed to litigation.  Accordingly, to the extent defendant seeks attorney work product protection for the remaining records, the Court should deny the defendant's motion for summary judgment.

### 4.  OLC Has Not Demonstrated That The Presidential Communications Privilege Applies To The Records At Issue

Defendant's passing references to the presidential communications privilege as a reason to shield documents should not be permitted.  It is unclear from defendant's submissions whether

---

[25] Plaintiffs read defendant's submissions to indicate that the attorney work product doctrine is invoked only with respect to category (C) Targets of the TSP.  While this withholding, if properly invoked, is not subjected to a segregability analysis, for reasons discussed *infra* section IV, the Court should review documents in this category *in camera*.

the privilege has actually been invoked, and it certainly does not appear to have been invoked by the President. The references to the privilege are so vague and generic that they do not meet any test for the invocation of a constitutionally-based privilege. The Bradbury Second Declaration fails to even identify precisely those OLC memoranda to which the privilege is applicable, stating generally, "those [documents] provided to inform a decision to be made by the President are also subject to the presidential communications privilege." Bradbury Second Decl. ¶ 87.[26] Plaintiffs and the Court are left to speculate from this artful wording whether defendant is actually relying on the privilege for any of the records still at issue in this case.

This vague invocation of a presidential privilege by agency employees should not be accepted by this Court. When Congress enacted Exemption 5 into law, it did so in the context of an established framework that recognized that litigation privileges must be invoked by a person or entity with standing to invoke it. *See, e.g.*, *Landry v. Fed. Deposit Ins. Corp.*, 204 F.3d 1125, 1135 (D.C. Cir. 2000) (holding that supervisory personnel of sufficient rank must assert a privilege). These procedural requirements are designed to "ensure that the privilege[s are] presented in a deliberate, considered, and reasonably specific manner." *Id*. at 1135. Allowing the privilege to be asserted by agency employees without direction from the President – the privilege holder whose interests may be different – fails to protect the integrity of the presidential privilege.[27]

---

[26] The only other reference to the privilege, in Bradbury Second Decl. ¶ 46, relates to ODAG 40 and for the reasons stated in this section the privilege does not apply.

[27] In *Lardner v. Department of Justice*, 2005 WL 758267, *11 (D.D.C. Mar. 31, 2005), a district court held that under FOIA the President need not personally invoke the presidential communications privilege. In that case the privilege was specifically invoked and the records were "reports from the Attorney General or his designee to the President advising whether to grant or deny requests for pardons." *Id.* at *1. Thus, those records differed significantly from the non-deliberative records at issue here.

30

Moreover, these records are not the type of communications that fall within the presidential communications privilege. It is clear from defendant's own descriptions of the records that they will not disclose the decision-making processes of the President. The presidential communications privilege was never intended to cover every communication between the President and other executive branch officials. Courts have not extended the presidential communication privilege beyond that necessary to "preserve the President's access to candid *advice*." *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997) (emphasis added). That the OLC may in certain instances provide legal opinions to the President does not mean that the memoranda at issue here were advisory and deliberative, *see supra* I.B.1.a, or would reveal the mental processes of the President. To expand the presidential communications privilege to final opinions of the Department of Justice that may be reviewed by the President would permit any communication from an agency to the President to be covered by the privilege, a view that has never been endorsed by any court. *See, e.g.*, *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004) (rejecting expansion of presidential privilege to all documents prepared by those within the Justice Department).

## II. DEFENDANT HAS NOT MET ITS BURDEN OF PROVING THAT IT MAY WITHOLD FBI RECORDS CONCERNING ITS POLICIES AND LEGAL OPINIONS REGARDING THE PROGRAM

Defendant has improperly withheld 12 FBI records on the basis of Exemptions 1 and 3.[28] According to the FBI, these records concern an "internal memorandum from the Assistant

---

[28] The 12 records include the following: FBI 301, FBI 302, FBI 303, FBI 8, FBI 173, FBI 175, FBI 176, FBI 178, FBI 193, FBI 194, FBI 195, and FBI 310. Seven of the withheld records – FBI 173, FBI 175, FBI 176, FBI 178, FBI 193, FBI 194, FBI 195, and FBI 310 – are subject only to claims of withholding pursuant to Exemption 1 and Exemption 3. *See* Second Redacted Declaration of David M. Hardy ("Hardy Second Decl.") ¶¶ 83, 85, 87, 89, 91, 93, 95, 99. The remaining records are also withheld under additional exemption claims and are further discussed *infra*.

Director of the Counterterrorism Division to the FBI Director" and a "memorandum concerning the use of the TSP in counterterrorism investigations." Supplemental Submission of the FBI in Support of Defendant's Renewed Motion for Summary Judgment ("Def. Supp. Mem.") at 8. It is quite likely that these records contain final policies and discussions of the legal framework governing the FBI's involvement in the Program. Indeed, the records may well contain formal policies and legal positions with respect to the FBI's use of evidence derived through the Program – evidence plaintiffs believe to be illegally obtained – in criminal cases. These final legal policies should be made public for the reasons explained *supra* section I. Accordingly, the Court should deny defendant's motion for summary judgment and conduct an *in camera* review of these documents.

As with the OLC records discussed above, defendant's submissions are insufficient to support withholding the records under Exemption 1 and Exemption 3. The declaration defendant relies upon is virtually entirely redacted with respect to Exemption 1 and Exemption 3 claims. *See* Hardy Second Decl. ¶¶ 72, 101 (redacted paragraph concerning the applicability of Exemptions 1 and 3). Thus, the defendant has withheld in its entirety FBI 175 – "Undated internal memorandum concerning certain aspects and procedures of the FBI's participation in the TSP and the use of TSP information in FBI counterterrorism investigations" – and has redacted the Exemption 1 and Exemption 3 rationale supporting withholding. *Id.* ¶ 85. Plaintiffs cannot discern why such a document, which likely sets the framework of the final policy position of the FBI on the Program, cannot be released with any operational and other properly classified or

exemptible information redacted. The Court should deny defendant's motion with respect to its withholding of records pursuant to Exemptions 1 and 3.[29]

## III. SEGREGABLE FACTUAL AND NON-EXEMPT PORTIONS OF THE RECORDS MUST BE RELEASED

In light of the Court's expressed concern about the segregability of these records, defendant's failure to provide additional explanation is unacceptable. Defendant's generalized declarations do not demonstrate that any non-exempt material that could be released has been segregated. To the contrary, defendant's declarations merely assert that the records are "exempt in their entirety," *see, e.g.*, Bradbury Second Decl. ¶ 87; Hardy Second Decl. ¶¶ 216, 217, and thus are completely inadequate.[30]

---

[29] FBI 301, FBI 302, FBI 303 and FBI 8 are also withheld under Exemption 5's deliberative process privilege. To the extent that these records contain information about final legal frameworks or policies, they are not subject to the deliberative process privilege and must be released to plaintiffs. *See supra* section I. FBI 8 is also withheld under Exemption 5's attorney client privilege. FBI 8, which is described as an "internal FBI Routing Slip dated December 16, 2005, from the GC to the FBI Director, forwarding an undated internal memorandum which contains a discussion of operational details and statistics related to the use and reliance on the TSP by the FBI," Hardy Second Decl. ¶ 81, should not be afforded protection under the attorney client privilege which contemplates protection only for "those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Coastal States Gas Corp.*, 617 F.2d at 863. Under the broad interpretation that would be necessary to extend the privilege to FBI 8, any document forwarded by counsel to a client could be protected. FBI 8 is also withheld under Exemption 7(E). Because the reasoning for this withholding is completely redacted, and Def. Supp. Mem. simply parrots the language of the exemption, plaintiffs are unable to substantively attack the withholding. Hardy Second Decl. ¶ 109; Def. Supp. Mem. at 8-9 n.6. FBI 195 is also withheld under Exemption 7(D). FBI 195 is described as an "undated internal memorandum provided by the FBI Unit in CTD that is responsible for the administration of the TSP concerning the use of TSP information in certain counterterrorism investigations. This memorandum also discusses in detail the operational aspects and detailed leads and actions taken in specific FBI counterterrorism investigations." Hardy Second Decl. ¶ 95. While plaintiffs' do not challenge the withholding of "information provided to the FBI by foreign law enforcement," the defendant's submissions contains no analysis of why segregable portions cannot be released to plaintiffs.

[30] In his first declaration in this case, Assistant Attorney General Bradbury for the OLC stated only: "I am confident that no portion of any of the documents withheld in full by OLC . . .

As this Court explained in its earlier opinion, the segregability analysis is mandatory for all documents and all exemptions. *EPIC*, 511 F. Supp. 2d at 64 (citing *Schiller v. NLRB*, 964 F.2d 1205, 1209 (D.C. Cir. 1992)). Factual information contained in an otherwise protected record must be disclosed unless it is "inextricably intertwined" or otherwise cannot be segregated from any deliberative material in the document. *See Army Times Publ'g Co. v. Dep't of the Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993) ("Exemption 5 applies only to the deliberative portion of a document and not to any purely factual, non-exempt information the document contains. Non-exempt information must be disclosed if it is reasonably segregable from exempt portions of the record, and the agency bears the burden of showing that no such segregable information exists.") (internal quotations omitted). Defendant has utterly failed to meet its segregability obligations.

Moreover, defendant's extremely limited and conclusory assertions regarding segregability do not provide enough information to allow the Court to conduct the required *de novo* review of the accuracy of these claims. A district court errs if it "simply approve[s] the withholding of an entire document without entering a finding on segregability, or the lack thereof." *Powell v. Bureau of Prisons*, 927 F.2d 1239, 1242 n.4 (D.C. Cir. 1991) (internal

---

may be disclosed without compromising the exemptions discussed at length herein." First Bradbury Decl. ¶ 78. In his subsequent declaration providing more detailed material supporting OLC's withholding, Bradbury makes no further claims regarding segregability, stating only that specific documents are properly withheld in their entirety under the claimed exemptions. Bradbury Second Decl. ¶¶ 63, 69, 88. Similarly, the only document-by-document segregability analysis the FBI has decided to engage in has been to inform plaintiffs and the Court that a particular document is being withheld in its entirety, *see, e.g.*, Hardy Second Decl. ¶¶ 19, 31, 33, 35, 41, 43, 49, 51, 53, 55, 66, 70, 75, 81, 83, 85, 87, 89, 91, 93, 95, 97, 99, 111, 113, 115, 117, 124, 126, 128, 130, 132, 134, 136, 146, 148, 152, 154, 165, 169, 171, 173, 175, 183, 185, 187, 189, 191, 193, 201, 203, 214, 216, 217, while simultaneously asserting exemptions because "portions" of documents "contain" exempted information. *Id.* at ¶¶ 216, 217; Hardy Second Decl. Exhibit A at 36, 36 n.50, 45, 45 n.73, 46, 46 n.75, 46 n.76, 19, 19 n.15, 19 n.16, 19 n.17, 45, 45 n.72, 50, 50 n.82, 50 n.83, 50 n.84, 1, 1 n.1; Def. Second Mem. at 12, 14.

quotation and citation omitted); *see Schiller*, 964 F.2d at 1209 (remanding case because NLRB had failed to "correlate the claimed exemptions to particular passages in the [exempt] memos"). In this case, the only information before the Court is the government's general statement that there are no segregable portions of the withheld records; therefore, the Court cannot make the necessary finding.  To do so based solely on such conclusory statements would "constitute an abandonment of the trial court's obligation under FOIA to conduct a *de novo* review."  *Allen v. CIA*, 636 F.2d 1287, 1293 (D.C. Cir. 1980), *overruled on other grounds, Founding Church of Scientology v. Smith*, 721 F.2d 828 (D.C. Cir. 1983).

 This Court has provided defendants with ample opportunity to "demonstrate . . . that the withheld information is clearly exempt and contains no segregable, nonexempt portions," *id.* at 1298, as it ought to have done, but defendant has been unable or unwilling to provide sufficiently detailed justifications for withholding each document still at issue.  Defendant has not met this obligation as to any documents still at issue in this litigation.

## IV.  THE COURT SHOULD REVIEW THE OLC RECORDS AND FBI RECORDS IDENTIFIED ABOVE AND SHOULD ALSO REVIEW THE REMAINING DOCUMENTS *IN CAMERA*

Trial courts have broad discretion over whether to conduct *in camera* review in FOIA cases.  *See*, *e.g.*, *Carter v. Dep't of Commerce*, 830 F.2d 388, 392 (D.C. Cir. 1987); *Ctr. for Auto Safety*, 731 F.2d at 20; *see also Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 996 (D.C. Cir. 1998) ("With such broad discretion vested in the district court, this court has yet to identify particular circumstances under which in camera inspection would be inappropriate. . . .  The ultimate criterion is simply this: Whether the district judge believes that in camera inspection is needed in order to make a responsible de novo determination on the claims of exemption."  (internal quotation marks omitted)); *Carter*, 830 F.2d at 392; *Ctr. for Auto Safety*, 731 F.2d at 21.

The Court should conduct an *in camera* review of the 18 OLC records and the 12 FBI records identified above. These records, in particular, are likely to contain the type of information plaintiffs have shown should not be subjected to withholding under FOIA.

In addition to the 18 OLC documents and the 12 FBI records above, and excluding the documents plaintiffs have explicitly stated they are no longer challenging, plaintiffs also urge the Court to review *in camera* all of the remaining records for which the Court has not granted summary judgment, for several reasons. First, defendant has once again failed to conduct an adequate segregablity analysis. Second, defendant's submissions should leave the Court in a state of unease that justifies *in camera* review. Third, the strong public interest in this matter counsels in favor of *in camera* review. Fourth, because entire records have been withheld and the dispute between plaintiffs and defendant concerns the content of the records, *in camera* review is appropriate. And finally, because large portions of defendant's submissions continue to be redacted, only *in camera* review will ensure some measure of an adversary process.[31]

FOIA's segregability requirement obliges an agency to perform a "segregability analysis" that distinguishes exempt from non-exempt material *within* each document that is responsive to the FOIA request. *See Vaughn*, 484 F.2d at 825 ("An entire document is not exempt merely because an isolated portion need not be disclosed."). As plaintiffs have explained, *supra* section III, defendant has woefully failed to meet this requirement.

---

[31] There are far fewer records at issue now than there were before the Court's September 5, 2007 order. Particularly if the Court chooses only to review the 18 OLC records and 12 FBI records *in camera,* the burden on the Court will be far less onerous than when this litigation began. *See Allen*, 636 F.2d at 1298 ("when the requested documents are few in number and of short length, . . . [a]n examination of the documents themselves in those instance will typically involve far less time than would be expended in presentation and evaluation of further evidence").

In addition, a trial judge may order *in camera* review "on the basis of an uneasiness, on a doubt he wants satisfied before he takes responsibility for a de novo determination." *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978). The FBI's submissions alone should give rise to such "uneasiness" here. The FBI has (1) acknowledged that it lost records at issue in this litigation, Hardy Second Decl. ¶ 18, but then in the attached exhibit log in relation to those records is able to describe the records briefly and makes no mention that the records have been lost, Hardy Second Decl. Exhibit A at 3, 3 n.6, 5 & 6; (2) in relation to a large portion of the FBI records, both those for which the Court has already granted summary judgment and for those still at issue in this litigation, the FBI has either withdrawn previously-asserted grounds or asserted new grounds for withholding of records, *see e.g.*, *id.* at 6, 6 n.7, 7, 7 n.8, 26, 26 n.33, 36, 36 n.50, 38, 38 n.53, 45, 45 n.72; (3) has noted that some records that it had previously identified don't in reality exist, *id.* at 9, 9 n.10, 42, 42 n.65, 60, 60 n.107, 60 n.108; and (4) there are a series of records for which absolutely no description is provided. *Id.* at 66, 76, 76. The sheer sloppiness of the FBI's approach to the submissions in this case should counsel the Court to review the remaining documents *in camera*.

Moreover**,** because there is a "greater call for in camera inspection" in "cases that involve a strong public interest in disclosure," *Allen*, 636 F.2d at 1299, the Court should review the remaining documents *in camera*. As the Court is well aware the public interest in the contents of the withheld documents is exceptionally high.

Furthermore, where, as here, the defendant has not released any part of the requested documents and the defendant's *Vaughn* index is inadequate to review the accuracy of its claims, "*in camera* inspection is needed in order to make a responsible *de novo* determination on the claims of exemption." *Ray*, 587 F.2d at 1195-96; *id*. at 1215, 1218 (Wright, J., concurring)

(where exemption claim is not clearly proven by detailed affidavits and testimony, court may not

sustain withholding without *in camera* review); *Mead Data Cent. Inc.*, 566 F.2d at 262 n.59

(suggesting selective *in camera* inspection in cases involving segregation challenges "to verify

the agency's descriptions and provide assurances, beyond a presumption of administrative good

faith, to FOIA plaintiffs that the descriptions are accurate and as complete as possible").  Where,

as here, the dispute turns on the contents of the withheld documents, and not the parties'

interpretations of those documents, *in camera* review may be more appropriate.  *See Carter*, 830

F.2d at 393; *see also Allen*, 636 F.2d at 1298.

Finally, in these non-adversarial proceedings where the defendant possesses exclusive

access to the disputed records and plaintiffs cannot know the precise content of the documents

they seek, rigorous *de novo* review by the Court constitutes the only opportunity for independent

scrutiny of the subject records.  *See EPA v. Mink*, 410 U.S. 73 (1973); *Goldberg v. Dep't of

State*, 818 F.2d 71, 76 (D.C. Cir. 1987). [32]

---

[32] Indeed, in relation to the FBI submission, defendant continues to withhold even innocuous information about the number of pages of each record from plaintiffs while revealing this information to the Court.  Hardy Second Decl. ¶ 17.  Plaintiffs renew their request for the number of pages of each record.  *See e.g.*, *Judicial Watch v. Dep't of Justice*, 2006 WL 2038513 (D.D.C. July 19, 2006); *Billington*, 11 F. Supp. 2d at 77-78; *Nat'l Sec. Archive v. FBI*, 759 F. Supp. 872, 876 (D.D.C. 1991).  In addition, plaintiffs request that the defendant be ordered to reveal the title of Category B of the Bradbury declaration.

## CONCLUSION

For the reasons stated above, the Court should deny defendant's renewed motion for summary judgment and grant plaintiffs' renewed cross-motion for *in camera* review.

Respectfully submitted,

/s/ *Arthur B. Spitzer*
_____
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
    of the National Capital Area
1400 20th Street, N.W., Suite119
Washington, D.C. 20036
Phone: (202) 457-0800
Fax: (202) 452-1868

/s/ *Nasrina Bargzie*
_____
Nasrina Bargzie
Melissa Goodman
Jameel Jaffer
American Civil Liberties Union Foundation
125 Broad St., 18th Floor
New York, NY 10004
Phone: (212) 519-7814
Fax: (212) 549-2683

/s/ *Meredith Fuchs*
_____
Meredith Fuchs (D.C. Bar No. 422825)
The National Security Archive Fund, Inc.
The George Washington University
Gelman Library, Suite 701
2130 H Street, N.W.
Washington, D.C. 20037

/s/ *Marc Rotenberg*
_____
Marc Rotenberg (D.C. Bar No. 422825)
Electronic Privacy Information Center
1718 Connecticut Avenue, NW, Suite 200
Washington, DC 20009
Phone: (202) 483-1209
Fax: (202) 483-1278

December 18, 2007                    Counsel for Plaintiffs

39