

**U.S. Department of Justice**

Office of Legal Counsel

---

Office of the Deputy Assistant Attorney General                    *Washington, D.C. 20530*

March 14, 2003

### Memorandum for William J. Haynes II, General Counsel of the Department of Defense

*Re: Military Interrogation of Alien Unlawful Combatants Held Outside the United States*

You have asked our Office to examine the legal standards governing military interrogations of alien unlawful combatants held outside the United States. You have requested that we examine both domestic and international law that might be applicable to the conduct of those interrogations.[1]

In Part I, we conclude that the Fifth and Eighth Amendments, as interpreted by the Supreme Court, do not extend to alien enemy combatants held abroad. In Part II, we examine federal criminal law. We explain that several canons of construction apply here. Those canons of construction indicate that federal criminal laws of general applicability do not apply to properly-authorized interrogations of enemy combatants, undertaken by military personnel in the course of an armed conflict. Such criminal statutes, if they were misconstrued to apply to the interrogation of enemy combatants, would conflict with the Constitution's grant of the Commander in Chief power solely to the President.

Although we do not believe that these laws would apply to authorized military interrogations, we outline the various federal crimes that apply in the special maritime and territorial jurisdiction of the United States: assault, 18 U.S.C. § 113 (2000); maiming, 18 U.S.C. § 114 (2000); and interstate stalking, 18 U.S.C. § 2261A (2000). In Part II.C., we address relevant criminal prohibitions that apply to conduct outside the jurisdiction of the United States: war crimes, 18 U.S.C. § 2441 (2000); and torture, 18 U.S.C. § 2340A (2000 & West Supp. 2002).

In Part III, we examine the international law applicable to the conduct of interrogations. First, we examine the U.N. Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Apr. 18, 1988, 1465 U.N.T.S. 113 ("CAT") and conclude that U.S. reservations, understandings, and declarations ensure that our international obligations mirror the standards of 18 U.S.C. § 2340A. Second, we address the U.S. obligation under CAT to undertake to prevent the commission of "cruel, inhuman, or degrading treatment or punishment." We conclude that based on its reservation, the United States' obligation extends only to conduct

---

[1] By delimiting the legal boundaries applicable to interrogations, we of course do not express or imply any views concerning whether and when legally-permissible means of interrogation should be employed. That is a policy judgment for those conducting and directing the interrogations.

Declassify under authority of Executive Order 1958
By Acting General Counsel, Department of Defense
By Daniel J. Dell'Orto
31 March 2008

**UNCLASSIFIED**    ~~SECRET/NOFORN~~

SECRET/NOFORN

2

that is "cruel and unusual" within the meaning of the Eighth Amendment or otherwise "shocks the conscience" under the Due Process Clauses of the Fifth and Fourteenth Amendments.

Third, we examine the applicability of customary international law. We conclude that as an expression of state practice, customary international law cannot impose a standard that differs from U.S. obligations under CAT, a recent multilateral treaty on the same subject. In any event, our previous opinions make clear that customary international law is not federal law and that the President is free to override it at his discretion.

In Part IV, we discuss defenses to an allegation that an interrogation method might violate any of the various criminal prohibitions discussed in Part II. We believe that necessity or self-defense could provide defenses to a prosecution.

## I.    U.S. Constitution

Two fundamental constitutional issues arise in regard to the conduct of interrogations of al Qaeda and Taliban detainees. First, we discuss the constitutional foundations of the President's power, as Commander in Chief and Chief Executive, to conduct military operations during the current armed conflict. We explain that detaining and interrogating enemy combatants is an important element of the President's authority to successfully prosecute war. Second, we address whether restraints imposed by the Bill of Rights govern the interrogation of alien enemy combatants during armed conflict. Two constitutional provisions that might be thought to extend to interrogations—the Fifth and Eighth Amendments—do not apply here. The Fifth Amendment provides in relevant part that "[n]o person . . . shall be deprived of life, liberty, or property, without due process of law." U.S. Const., amend V.[2] The Eighth Amendment bars the "inflict[ion]" of "cruel and unusual punishments." U.S. Const., amend. VIII. These provisions, however, do not regulate the interrogation of alien enemy combatants outside the United States during an international armed conflict. This is clear as a matter of the text and purpose of the Amendments, as they have been interpreted by the federal courts.[3]

## A.    The President's Commander-in-Chief Authority

We begin by discussing the factual and legal context within which this question arises. The September 11, 2001 terrorist attacks marked a state of international armed conflict between the United States and the al Qaeda terrorist organization. Pursuant to his Commander-in-Chief power, as supported by an act of Congress, the President has ordered the Armed Forces to carry out military operations against al Qaeda, which includes the power both to kill and to capture

---

[2] The Fifth Amendment further provides that "No person shall be held to answer for a capital crime, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[,]" that no person "shall . . . be subject for the same offense to be twice put in jeopardy," "nor shall be compelled in any criminal case to be a witness against himself," "nor shall private property be taken for public use, without just compensation." These provisions are plainly inapplicable to the conduct of interrogations.

[3] As we explain in Part III, U.S. obligations under international law are limited to the prevention of conduct that would constitute cruel, unusual or inhuman treatment prohibited by the Fifth, Eighth, and Fourteenth Amendments. *See id.* The applicable standards under the Fifth, Fourteenth, and Eighth Amendments are thus useful to understanding U.S. obligations under international law, which we discuss in Part III.

**UNCLASSIFIED**                SECRET/NOFORN

members of the enemy. Interrogation arises as a necessary and legitimate element of the detention of al Qaeda and Taliban members during an armed conflict.

1.     The War with al Qaeda

The situation in which these issues arise is unprecedented in recent American history. Four coordinated terrorist attacks, using hijacked commercial airliners as guided missiles, took place in rapid succession on the morning of September 11, 2001. These attacks were aimed at critical government buildings in the Nation's capital and landmark buildings in its financial center, and achieved an unprecedented level of destruction. They caused thousands of deaths. Air traffic and communications within the United States were disrupted; national stock exchanges were shut for several days; and damage from the attack has been estimated to run into the tens of billions of dollars. Government leaders were dispersed to ensure continuity of government operations. These attacks are part of a violent campaign by the al Qaeda terrorist organization against the United States that is believed to include an unsuccessful attempt to destroy an airliner in December 2001; a suicide bombing attack in Yemen on the *U.S.S. Cole* in 2000; the bombings of the United States Embassies in Kenya and in Tanzania in 1998; a truck bomb attack on a U.S. military housing complex in Saudi Arabia in 1996; an unsuccessful attempt to destroy the World Trade Center in 1993; and the ambush of U.S. servicemen in Somalia in 1993.

The September 11, 2001 attacks triggered the Nation's right under domestic and international law to use force in self-defense.[4] In response, the Government has engaged in a broad effort at home and abroad to counter terrorism. Pursuant to his authorities as Commander in Chief, the President in October, 2001, ordered the Armed Forces to attack al Qaeda personnel and assets in Afghanistan, and the Taliban militia that harbored them. Although the breadth of that campaign has lessened, it is still ongoing. Congress has provided its support for the use of forces against those linked to the September 11 attacks, and has recognized the President's constitutional power to use force to prevent and deter future attacks both within and outside the United States. S. J. Res. 23, Pub. L. No. 107-40, 115 Stat. 224 (2001). The Justice Department and the FBI have launched a sweeping investigation in response to the September 11 attacks, and Congress enacted legislation to expand the Justice Department's powers of surveillance against terrorists. *See* The USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001). Last year, Congress enacted the President's proposed new cabinet department for homeland security in

---

[4]  Article 51 of the U.N. Charter declares that "[n]othing in the present Charter shall impair the inherent right of individual or collective self-defense if an armed attack occurs against a Member of the United Nations until the Security Council has taken the measures necessary to maintain international peace and security." The attacks of September 11, 2001 clearly constitute an armed attack against the United States, and indeed were the latest in a long history of al Qaeda sponsored attacks against the United States. This United Nations Security Council recognized this on September 28, 2001, when it unanimously adopted Resolution 1373 explicitly "reaffirming the inherent right of individual and collective self-defence as recognized by the charter of the United Nations." This right of self-defense is a right to effective self-defense. In other words, the victim state has the right to use force against the aggressor who has initiated an "armed attack" until the threat has abated. The United States, through its military and intelligence personnel, has a right recognized by Article 51 to continue using force until such time as the threat posed by al Qaeda and other terrorist groups connected to the September 11th attacks is completely ended." Other treaties re-affirm the right of the United States to use force in its self-defense. *See, e.g.*, Inter-American Treaty of Reciprocal Assistance, art. 3, Sept. 2, 1947, T.I.A.S. No. 1838, 21 U.N.T.S. 77 (Rio Treaty); North Atlantic Treaty, art. 5, Apr. 4, 1949, 63 Stat. 2241, 34 U.N.T.S. 243.

order to implement a coordinated domestic program against terrorism. The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135.

Leaders of al Qaeda and the Taliban, with access to active terrorist cells and other resources, remain at large. It has been reported that they have regrouped and are communicating with their members. *See, e.g.,* Cam Simpson, *Al Qaeda Reorganized, German Official Says, Minister Fears Reprisals if U.SA attacks Iraq,* Star-Ledger, Jan. 26, 2003, at 18. In his recent testimony to the Senate Select Committee on Intelligence on February 11, 2003, the Director of the Central Intelligence Agency, testified that another al Qaeda attack was anticipated as early as mid-February. *See* Rowan Scarborough & Jerry Seper, *Bin Laden Tape Vows Al Qaeda Will Aid Iraq; Says U.S. Bombing Nearly Killed Him,* Wash. Times, Feb. 12, 2003, at A1. It appears that al Qaeda continues to enjoy information and resources that allow it to organize and direct active hostile forces against this country, both domestically and abroad.

Given the ongoing threat of al Qaeda attacks, the capture and interrogation of al Qaeda operatives is imperative to our national security and defense. Because of the asymmetric nature of terrorist operations, information is perhaps the most critical weapon for defeating al Qaeda. Al Qaeda is not a nation-state, and has no single country or geographic area as its base of operations. It has no fixed, large-scale military or civilian infrastructure. It deploys personnel, material, and finances covertly and attacks without warning using unconventional weapons and methods. As the September 11, 2001 attacks and subsequent events demonstrate, it seeks to launch terror attacks against purely civilian targets within the United States, and seeks to acquire weapons of mass destruction for such attacks. Because of the secret nature of al Qaeda's operations, obtaining advance information about the identity of al Qaeda operatives and their plans may prove to be the only way to prevent direct attacks on the United States. Interrogation of captured al Qaeda operatives could provide that information; indeed, in many cases interrogation may be the only method to obtain it. Given the massive destruction and loss of life caused by the September 11 attacks, it is reasonable to believe that information gained from al Qaeda personnel could prevent attacks of a similar (if not greater) magnitude from occurring in the United States.

2.    **Commander-in-Chief Authority**

In a series of opinions examining various legal questions arising after September 11, we have explained the scope of the President's Commander-in-Chief power.[5] In those opinions, we explained that the text, structure and history of the Constitution establish that the Founders entrusted the President with the primary responsibility, and therefore the power, to protect the security of the United States. The decision to deploy military force in the defense of U. S. interests is expressly placed under Presidential authority by the Vesting Clause, U.S. Const. art. I, § 1, cl. 1, and by the Commander-in-Chief Clause, *id.,* § 2, cl. 1.[6] The Framers understood the

---

[5]    *See, e.g.,* Memorandum for Timothy E. Flanigan, Deputy Counsel to the President, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: The President's Constitutional Authority to Conduct Military Operations Against Terrorists and Nations Supporting Them* (Sept. 25, 2001) ("*Flanigan Memorandum*"); Memorandum for Alberto R. Gonzales, Counsel to the President, from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Legality of the Use of Military Commissions to Try Terrorists* (Nov. 6, 2001).

[6]    *See Johnson v. Eisentrager,* 339 U.S. 763, 789 (1950) (President has authority to deploy United States armed forces "abroad or to any particular region"); *Fleming v. Page,* 50 U.S. (9 How.) 603, 614-15 (1850) ("As

Commander-in-Chief Clause to grant the President the fullest range of power recognized at the time of the ratification as belonging to the military commander. In addition, the structure of the Constitution demonstrates that any power traditionally understood as pertaining to the executive—which includes the conduct of warfare and the defense of the nation—unless expressly assigned to Congress, is vested in the President. Article II, Section 1 makes this clear by stating that the "executive Power shall be vested in a President of the United States of America." That sweeping grant vests in the President the "executive power" and contrasts with the specific enumeration of the powers—those "herein"—granted to Congress in Article I. Our reading of the constitutional text and structure are confirmed by historical practice, in which Presidents have ordered the use of military force more than 100 times without congressional authorization, and by the functional consideration that national security decisions require a unity in purpose and energy that characterizes the Presidency alone.[7]

As the Supreme Court has recognized, the Commander-in-Chief power and the President's obligation to protect the nation imply the ancillary powers necessary to their successful exercise. "The first of the enumerated powers of the President is that he shall be Commander-in-Chief of the Army and Navy of the United States. And, of course, the grant of war power includes all that is necessary and proper for carrying those powers into execution." *Johnson v. Eisentrager*, 339 U.S. 763, 788 (1950). In wartime, it is for the President alone to decide what methods to use to best prevail against the enemy. *See, e.g., Flanigan Memorandum* at 3; Memorandum for Charles W. Colson, Special Counsel to the President, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: The President and the War Power: South Vietnam and the Cambodian Sanctuaries* (May 22, 1970).[8] The President's

___

commander-in-chief, [the President] is authorized to direct the movements of the naval and military forces placed by law at his command, and to employ them in the manner he may deem most effectual"); *Loving v. United States*, 517 U.S. 748, 776 (1996) (Scalia, J., concurring in part and concurring in judgment) (The "inherent powers" of the Commander in Chief "are clearly extensive."); *Maul v. United States*, 274 U.S. 501, 515–16 (1927) (Brandeis & Holmes, JJ., concurring) (President "may direct any revenue cutter to cruise in any waters in order to perform any duty of the service"); *Commonwealth of Massachusetts v. Laird*, 451 F.2d 26, 32 (1st Cir. 1971) (the President has "power as Commander-in-Chief to station forces abroad"); *Ex parte Vallandigham*, 28 F.Cas. 874, 922 (C.C.S.D. Ohio 1863) (No. 16,816) (in acting "under this power where there is no express legislative declaration, the president is guided solely by his own judgment and discretion"); *Authority to Use United States Military Forces in Somalia*, 16 Op. O.L.C. 6, 6 (1992).

[7] Judicial decisions since the beginning of the Republic confirm the President's constitutional power and duty to repel military action against the United States and to take measures to prevent the recurrence of an attack. As Justice Joseph Story said long ago, "[i]t may be fit and proper for the government, in the exercise of the high discretion confided to the executive, for great public purposes, to act on a sudden emergency, or to prevent an irreparable mischief, by summary measures, which are not found in the text of the laws." *The Apollon*, 22 U.S. (9 Wheat.) 362, 366–67 (1824). If the President is confronted with an unforeseen attack on the territory and people of the United States, or other immediate, dangerous threat to American interests and security, it is his constitutional responsibility to respond to that threat with whatever means are necessary. *See, e.g., The Prize Cases*, 67 U.S. (2 Black) 635, 668 (1862) ("If a war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force . . . without waiting for any special legislative authority."); *United States v. Smith*, 27 F. Cas. 1192, 1229–30 (C.C.D.N.Y. 1806) (No. 16,342) (Paterson, Circuit Justice) (regardless of statutory authorization, it is "the duty . . . of the executive magistrate . . . to repel an invading foe"); *see also* 3 Story, *Commentaries* § 1485 ("[t]he command and application of the public force . . . to maintain peace, and to resist foreign invasion" are executive powers).

[8] *See also* Memorandum for William J. Haynes, II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Legal Constraints to Boarding and Searching Foreign Vessels on the High Seas* at 3 (June 13, 2002) ("*High Seas Memorandum*") ("[T]he Commander-in-Chief and

complete discretion in exercising the Commander-in-Chief power has been recognized by the courts. In the *Prize Cases*, 67 U.S. (2 Black) 635, 670 (1862), for example, the Court explained that whether the President "in fulfilling his duties as Commander in Chief" had appropriately responded to the rebellion of the southern states was a question "to be decided *by him*" and which the Court could not question, but must leave to "the political department of the Government to which this power was entrusted." *See also Hamilton v. Dillin*, 88 U.S. (21 Wall.) 73, 87 (1874) (by virtue of the Commander-in-Chief Clause, it is "the President alone[] who is constitutionally invested with the entire charge of hostile operations.").

One of the core functions of the Commander in Chief is that of capturing, detaining, and interrogating members of the enemy. *See, e.g.*, Memorandum for William J. Haynes II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: The President's Power as Commander in Chief to Transfer Captured Terrorists to the Control and Custody of Foreign Nations* at 3 (Mar. 13, 2002) ("*Transfers Memorandum*") ("the Commander-in-Chief Clause constitutes an independent grant of substantive authority to engage in the detention and transfer of prisoners captured in armed conflicts"). It is well settled that the President may seize and detain enemy combatants, at least for the duration of the conflict, and the laws of war make clear that prisoners may be interrogated for information concerning the enemy, its strength, and its plans.[9] Numerous Presidents have ordered the capture, detention, and questioning of enemy combatants during virtually every major conflict in the Nation's history, including recent conflicts such as the Gulf, Vietnam, and Korean wars. Recognizing this authority, Congress has never attempted to restrict or interfere with the President's authority on this score. *Id.*

## C.    Fifth Amendment Due Process Clause

We conclude below that the Fifth Amendment Due Process Clause is inapplicable to the conduct of interrogations of alien enemy combatants held outside the United States for two independent reasons. First, the Fifth Amendment Due Process Clause does not apply to the President's conduct of a war. Second, even if the Fifth Amendment applied to the conduct of war, the Fifth Amendment does not apply extraterritorially to aliens who have no connection to the United States. We address each of these reasons in turn.

First, the Fifth Amendment was not designed to restrict the unique war powers of the President as Commander in Chief. As long ago as 1865, Attorney General Speed explained the unquestioned rule that, as Commander in Chief, the President waging a war may authorize

---

Vesting Clauses grant the President the authority not just to set broad military strategy, but also to decide all operational and tactical plans."); Memorandum for Daniel J. Bryant, Assistant Attorney General, Office of Legislative Affairs, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of 18 U.S.C. § 4001(a) to Military Detention of United States Citizens* at 2 (June 27, 2002) (The Constitution "vests full control of the military operations of the United States in the President.").

[9] Although Article 17 of the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3517, places restrictions on interrogation of enemy combatants, members of al Qaeda and the Taliban militia are not legally entitled to the status of prisoners of war under the Convention. *See generally* Memorandum for Alberto R. Gonzales, Counsel to the President and William J. Haynes, II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Application of Treaties and Laws to al Qaeda and Taliban Detainees* (Jan. 22, 2002) ("*Treaties and Laws Memorandum*").

**UNCLASSIFIED**

soldiers to engage in combat that could not be authorized as a part of the President's role in enforcing the laws. The strictures that bind the Executive in its role as a magistrate enforcing the civil laws have no place in constraining the President in waging war:

> Soldiers regularly in the service have the license of the government to deprive men, the active enemies of the government, of their liberty and lives; their commission so to act is as perfect and legal as that of a judge to adjudicate . . . . *Wars never have been and never can be conducted upon the principle that an army is but a posse comitatis of a civil magistrate.*

*Military Commissions,* 11 Op. Att'y Gen. 297, 301–02 (1865) (emphasis added); *see also The Modoc Indian Prisoners,* 14 Op. Att'y Gen. 249, 252 (1873) ("it cannot be pretended that a United States soldier is guilty of murder if he kills a public enemy in battle, which would be the case if the municipal law was in force and applicable to an act committed under such circumstances"). As Attorney General Speed concluded, the Due Process Clause has no application to the conduct of a military campaign:

> That portion of the Constitution which declares that 'no person shall be deprived of his life, liberty, or property without due process of law,' has such direct reference to, and connection with, trials for crime or criminal prosecutions that comment upon it would seem to be unnecessary. Trials for offences against the laws of war are not embraced or intended to be embraced in those provisions. . . . The argument that flings around offenders against the laws of war these guarantees of the Constitution would convict all the soldiers of our army of murder; no prisoners could be taken and held; the army could not move. The absurd consequences that would of necessity flow from such an argument show that it cannot be the true construction—it cannot be what was intended by the framers of the instrument. One of the prime motives for the Union and a federal government was to confer the powers of war. If any provisions of the Constitution are so in conflict with the power to carry on war as to destroy and make it valueless, then the instrument, instead of being a great and wise one, is a miserable failure, a felo de se.

11 Op. Att'y Gen. at 313–14.

Moreover, the Supreme Court's reasoning in *United States v. Verdugo-Urquidez,* 494 U.S. 259 (1990), addressing the extra-territorial application of the Fourth Amendment is equally instructive as to why the Fifth Amendment cannot be construed to apply to the President's conduct of a war:

> The United States frequently employs Armed Forces outside this country—over 200 times in our history—for the protection of American citizens or national security. . . . Application of the Fourth Amendment to those circumstances could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest. Were respondent to prevail, aliens with no attachment to this country might well bring actions for damages to remedy

claimed violations of the Fourth Amendment in foreign countries or in international waters. . . . [T]he Court of Appeals' global view of [the Fourth Amendment's] applicability would plunge [the political branches] into a sea of uncertainty as to what might be reasonable in the way of searches and seizures conducted abroad.

*Id.* at 273–74 (citations omitted).[10]  If each time the President captured and detained enemy aliens outside the United States, those aliens could bring suit challenging the deprivation of their liberty, such a result would interfere with and undermine the President's capacity to protect the Nation and to respond to the exigencies of war.[11]

The Supreme Court has repeatedly refused to apply the Due Process Clause or even the Just Compensation Clause to executive and congressional actions taken in the direct prosecution of a war effort against enemies of the Nation. It has long been settled that nothing in the Fifth Amendment governs wartime actions to detain or deport alien enemies and to confiscate enemy property. As the Court has broadly stated in *United States v. Salerno*, 481 U.S. 739, 748 (1987), "in times of war or insurrection, when society's interest is at its peak, the Government may detain individuals whom the government believes to be dangerous" without violating the Due Process Clause. *See also Ludecke v. Watkins*, 335 U.S. 160, 171 (1948). Similarly, as the Supreme Court has explained with respect to enemy property, "[b]y exertion of the war power, and untrammeled by the due process or just compensation clause," Congress may "enact[] laws directing seizure, use, and disposition of property in this country belonging to subjects of the enemy." *Cummings v. Deutsche Bank Und Discontogesellschaft*, 300 U.S. 115, 120 (1937). These authorities of the federal government during armed conflict were recognized early in the Nation's history. Chief Justice Marshall concluded for the Court in 1814 that "war gives to the sovereign full right to take the persons and confiscate the property of the enemy wherever found." *Brown v. United States*, 12 U.S. (8 Cranch) 110, 122 (1814). *See also Eisentrager*, 339 U.S. at 775 ("The resident enemy alien is constitutionally subject to summary arrest, internment and deportation whenever a 'declared war' exists."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 587 (1952). As the Court explained in *United States v. Chemical Found., Inc.*, 272 U.S. 1, 11 (1926), Congress is "untrammeled and free to authorize the seizure, use or appropriation of [enemy] properties without any compensation. . . . There is no constitutional prohibition against confiscation of enemy properties." *See also White v. Mechs. Sec. Corp.*, 269 U.S. 283, 301 (1925) (Holmes, J.) (when U.S. seizes property from an enemy it may "do with it what it liked").

---

[10]  Indeed, drawing in part on the reasoning of *Verdugo-Urquidez*, as well as the Supreme Court's treatment of the destruction of property for the purposes of military necessity, our Office recently concluded that the Fourth Amendment had no application to *domestic* military operations. *See* Memorandum for Alberto R. Gonzales, Counsel to the President, and William J. Haynes, II, General Counsel, Department of Defense, from John C. Yoo, Deputy Assistant Attorney General and Robert J. Delahunty, Special Counsel, *Re: Authority for Use of Military Force to Combat Terrorist Activities Within the United States* at 25 (Oct. 23, 2001).

[11]  Our analysis here should not be confused with a theory that the Constitution somehow does not "apply" during wartime. The Supreme Court squarely rejected such a proposition long ago in *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 119–20 (1866), and at least that part of the *Milligan* decision is still good law. *See, e.g., Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 164–65 (1963); *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 88 (1921) ("[T]he mere existence of a state of war could not suspend or change the operation upon the power of Congress of the guaranties and limitations of the Fifth and Sixth Amendments . . . ."). Instead, we conclude that the restrictions outlined in the Fifth Amendment simply do not address actions the Executive takes in conducting a military campaign against the Nation's enemies.

The Supreme Court has also stated a general rule that, notwithstanding the compensation requirement for government takings of property under the Fifth Amendment, "the government cannot be charged for injuries to, or destruction of, private property caused by military operations of armies in the field." *United States v. Pacific R.R.*, 120 U.S. 227, 239 (1887). For "[t]he terse language of the Fifth Amendment is no comprehensive promise that the United States will make whole all who suffer from every ravage and burden of war. This Court has long recognized that in wartime many losses must be attributed solely to the fortunes of war, and not to the sovereign." *United States v. Caltex, Inc. (Philippines)*, 344 U.S. 149, 155–56 (1952). *See also Herrera v. United States*, 222 U.S. 558 (1912); *Juragua Iron Co. v. United States*, 212 U.S. 297 (1909); *Ford v. Surget*, 97 U.S. 594 (1878). These cases and the untenable consequences for the President's conduct of a war that would result from the application of the Due Process Clause demonstrate its inapplicability during wartime—whether to the conduct of interrogations or the detention of enemy aliens.

Second, even if the Fifth Amendment applied to enemy combatants in wartime, it is clear that that the Fifth Amendment does not operate outside the United States to regulate the Executive's conduct toward aliens. The Supreme Court has squarely held that the Fifth Amendment provides no rights to non-citizens who have no established connection to the country and who are held outside sovereign United States territory. *See Verdugo-Urquidez*, 494 U.S. at 269 ("[W]e have rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States."). *See also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("It is well established that certain constitutional protections[, such as the Fifth Amendment,] available to persons inside the United States are unavailable to aliens outside of our geographic borders.") (citing *Verdugo-Urquidez*, 494 U.S. at 269; and *Eisentrager*, 339 U.S. at 784). As the Supreme Court explained in *Eisentrager*, construing the Fifth Amendment to apply to aliens who are outside the United States and have no connection to the United States:

> would mean that during military occupation irreconcilable enemy elements, guerrilla fighters, and 'werewolves' could require the American Judiciary to assure them freedoms of speech, press, and assembly as in the First Amendment, right to bear arms as in the Second, security against 'unreasonable' searches and seizures as in the Fourth, as well as rights to jury trial as in the Fifth and Sixth Amendments. Such extraterritorial application of organic law would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view.

339 U.S. at 784. *See also Harbury v. Deutch*, 233 F.3d 596, 603–04 (D.C. Cir. 2000), *rev'd on other grounds, Christopher v. Harbury*, 122 S. Ct. 2179 (2002); *Rasul v. Bush*, 215 F. Supp. 2d 55, 72 n.16 (D.D.C. 2002) ("The Supreme Court in *Eisentrager, Verdugo-Urquidez*, and *Zadvydas*, and the District of Columbia Circuit in *Harbury*, have all held that there is no extraterritorial application of the Fifth Amendment to aliens."). Indeed, in *Harbury v. Deutch*, the D.C. Circuit expressly considered a claim that various U.S. officials had participated in the torture of a non-U.S. citizen outside the sovereign territory of the United States during peacetime. *See* 233 F.3d at 604–05. The D.C. Circuit rejected the contention that the Due

Process clause applied extraterritorially to a person in such circumstances. The court found *Verdugo-Urquidez* to be controlling on the question, and determined that the Supreme Court's rejection of the extraterritorial application the Fifth Amendment precluded any claim by an alien held outside the United States even when the conduct at issue had not occurred in wartime. *See id.* at 604 (finding that "the Supreme Court's extended and approving citation of *Eisentrager* [in *Verdugo-Urquidez*] suggests that its conclusions regarding the extraterritorial application of the Fifth Amendment are not . . . limited" to wartime). We therefore believe that it is clear that the Fifth Amendment does not apply to alien enemy combatants held overseas.

D.    **Eighth Amendment**

A second constitutional provision that might be thought relevant to interrogations is the Eighth Amendment. The Eighth Amendment, however, applies solely to those persons upon whom criminal sanctions have been imposed. As the Supreme Court has explained, the Cruel and Unusual Punishments Clause "was designed to protect those convicted of crimes." *Ingraham v. Wright*, 430 U.S. 651, 664 (1977). As a result, "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Id.* at 671 n.40. The Eighth Amendment thus has no application to those individuals who have not been punished as part of a criminal proceeding, irrespective of the fact that they have been detained by the government. *See Bell v. Wolfish*, 441 U.S. 520, 536 n.16 (1979) (holding that condition of confinement claims brought by pretrial detainee must be considered under the Fifth Amendment, not the Eighth Amendment). The Eighth Amendment therefore cannot extend to the detention of wartime detainees, who have been captured pursuant to the President's power as Commander in Chief. *See Transfers Memorandum* at 2 (concluding that "the President has since the Founding era exercised exclusive and virtually unfettered control over the disposition of enemy soldiers and agents captured in time of war"). *See also Hamdi v. Rumsfeld*, 316 F.3d 450, 463 (4th Cir. 2003) (the President's powers as Commander in Chief "include the authority to detain those captured in armed struggle").

The detention of enemy combatants can in no sense be deemed "punishment" for purposes of the Eighth Amendment. Unlike imprisonment pursuant to a criminal sanction, the detention of enemy combatants involves no sentence judicially imposed or legislatively required and those detained will be released at the end of the conflict. Indeed, it has long been established that "'[c]aptivity [in wartime] is neither a punishment nor an act of vengeance,' but 'merely a temporary detention which is devoid of all penal character.'" William Winthrop, *Military Law and Precedents* 788 (2d ed. 1920) (quoting British War Office, *Manual of Military Law* (1882)). Moreover, "[t]he object of capture is to prevent the captured individual from serving the enemy." *In re Territo*, 156 F.2d 142, 145 (9th Cir. 1946). *See also Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950); Marco Sassoli & Antoine A. Bouvier, *How Does Law Protect in War? Cases Documents and Teaching Materials on Contemporary Practice in International Humanitarian Law* 125 (1999) (the purpose of detaining enemy combatants "is not to punish them, but . . . to hinder their direct participation in hostilities"). Detention also serves another vital military objective—i.e., obtaining intelligence from captured combatants to aid in the prosecution of the war. Accordingly, the Eighth Amendment has no application here.

**UNCLASSIFIED**

## II.    Federal Criminal Law

### A.    Canons of Construction

We discuss below several canons of construction that indicate that ordinary federal criminal statutes do not apply to the properly-authorized interrogation of enemy combatants by the United States Armed Forces during an armed conflict.[12] These canons include the avoidance of constitutional difficulties, inapplicability of general criminal statutes to the conduct of the military during war, inapplicability of general statutes to the sovereign, and the specific governs the general. The Criminal Division concurs in our conclusion that these canons of construction preclude the application of the assault, maiming, interstate stalking, and torture statutes to the military during the conduct of a war.

### 1.    Interpretation to Avoid Constitutional Problems

As the Supreme Court has recognized, and as we will explain further below, the President enjoys complete discretion in the exercise of his Commander-in-Chief authority in conducting operations against hostile forces. Because both "[t]he executive power and the command of the military and naval forces is vested in the President," the Supreme Court has unanimously stated that it is *the President alone* [] who is constitutionally invested with the *entire charge of hostile operations*." *Hamilton v. Dillin*, 88 U.S. (21 Wall.) 73, 87 (1874) (emphasis added).

In light of the President's complete authority over the conduct of war, in the absence of a clear statement from Congress otherwise, we will not read a criminal statute as infringing on the President's ultimate authority in these areas. We presume that Congress does not seek to provoke a constitutional confrontation with an equal, coordinate branch of government unless it has unambiguously indicated its intent to do so. The Supreme Court has recognized, and this Office has similarly adopted, a canon of statutory construction that statutes are to be construed in a manner that avoids constitutional difficulties so long as a reasonable alternative construction is available. *See, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (citing *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 499–501, 504 (1979)) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, [courts] will construe [a] statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). *Cf. United States Assistance to Countries That Shoot Down Civil Aircraft Involved in Drug Trafficking*, 18 Op. O.L.C. 148, 149 (July 14, 1994) ("*Shoot Down Opinion*") (requiring "careful examination of each individual [criminal] statute" before concluding that generally applicable statute applied to the conduct of U.S. government officials). This canon of construction applies especially where an act of Congress could be read to encroach upon powers constitutionally committed to a coordinate branch of government. *See, e.g., Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) (citation omitted) ("Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the [Administrative Procedure Act]. We would require an express statement by

---

[12] One exception to this general statement is the War Crimes Statute, 18 U.S.C. § 2441, which expressly applies to the military's conduct of war. This statute does not apply to the interrogations in the current conflict for the reasons we explain *infra* Part II.C.1.

Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion."); *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 465–67 (1989) (construing Federal Advisory Committee Act not to apply to advice given by American Bar Association to the President on judicial nominations, to avoid potential constitutional question regarding encroachment on Presidential power to appoint judges).

In the area of foreign affairs and war powers in particular, the avoidance canon has special force. In contrast to the domestic realm, foreign affairs and war clearly place the President in the dominant constitutional position due to his authority as Commander in Chief and Chief Executive and his plenary control over diplomatic relations. There can be little doubt that the conduct of war is a matter that is fundamentally executive in nature, the power over which the Framers vested in a unitary executive. "The direction of war implies the direction of the common strength," Alexander Hamilton observed, "and the power of directing and employing the common strength forms a usual and essential part in the definition of the executive authority." *The Federalist No. 74*, at 415. Thus, earlier in this current armed conflict against the al Qaeda terrorist network, we concluded that "[t]he power of the President is at its zenith under the Constitution when the President is directing military operations of the armed forces." *Flanigan Memorandum* at 3. Correspondingly, during war Congress plays a reduced role in the war effort and the courts generally defer to executive decisions concerning the conduct of hostilities. *See, e.g., The Prize Cases*, 67 U.S. (2 Black) 635, 670 (1862).

Construing generally-applicable statutes so as not to apply to the conduct of military operations against the enemy during an armed conflict respects the Constitution's basic allocation of wartime authority. As our Office recently explained in rejecting the application of 18 U.S.C. § 2280, which prohibits the seizure of vessels, to conduct during the current war:

> we have previously concluded that the President's authority in the areas of foreign relations and national security is very broad, and that in the absence of a clear statement in the text or context of a statutory prohibition to suggest that it was Congress's intent to circumscribe this authority, we do not believe that a statute should be interpreted to impose such a restriction on the President's constitutional powers.

*High Seas Memorandum* at 8 n.5. Federal courts similarly have agreed that federal statutes should not be read to interfere with the Executive Branch's control over foreign affairs unless Congress specifically and clearly seeks to do so. *See, e.g., Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."); *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 232–33 (1986) (construing federal statutes to avoid curtailment of traditional presidential prerogatives in foreign affairs). Courts will not lightly assume that Congress has acted to interfere with the President's constitutionally superior position as Chief Executive and Commander in Chief in the area of military operations. *See Egan*, 484 U.S. at 529 (quoting *Haig v. Agee*, 453 U.S. 280, 293–94 (1981)). *See also Agee*, 453 U.S. at 291 (deference to executive branch is "especially" appropriate "in the area . . . of . . . national security").

SECRET/NOFORN

13

In order to respect the President's inherent constitutional authority to direct a military campaign against al Qaeda and its allies, general criminal laws must be construed as not applying to interrogations undertaken pursuant to his Commander-in-Chief authority. Congress cannot interfere with the President's exercise of his authority as Commander in Chief to control the conduct of operations during a war. *See, e.g.*, Memorandum for Daniel J. Bryant, Assistant Attorney General, Office of Legislative Affairs, from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Swift Justice Authorization Act* (Apr. 8, 2002); *Flanigan Memorandum* at 6; Memorandum for Andrew Fois, Assistant Attorney General, Office of Legislative Affairs, from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Defense Authorization Act* (Sept. 15, 1995). As we have discussed above, the President's power to detain and interrogate enemy combatants arises out of his constitutional authority as Commander in Chief. Any construction of criminal laws that regulated the President's authority as Commander in Chief to determine the interrogation and treatment of enemy combatants would raise serious constitutional questions whether Congress had intruded on the President's constitutional authority. Moreover, we do not believe that Congress enacted general criminal provisions such as the prohibitions against assault, maiming, interstate stalking, and torture pursuant to any express authority that would allow it to infringe on the President's constitutional control over the operation of the Armed Forces in wartime. In our view, Congress may no more regulate the President's ability to detain and interrogate enemy combatants than it may regulate his ability to direct troop movements on the battlefield. In fact, the general applicability of these statutes belies any argument that these statutes apply to persons under the direction of the President in the conduct of war.[13]

To avoid this constitutional difficulty, therefore, we will construe potentially applicable criminal laws, reviewed in more detail below, not to apply to the President's detention and interrogation of enemy combatants pursuant to his Commander-in-Chief authority. We believe that this approach fully respects Congress's authority. First, we will not read a statute to create constitutional problems because we assume that Congress fully respects the limits of its own constitutional authority and would not knowingly seek to upset the separation of powers. Second, we will not infer a congressional attempt to spark a constitutional confrontation with the executive branch in wartime unless Congress clearly and specifically seeks to do so.

---

[13] It might be thought that Congress could enact legislation that regulated the conduct of interrogations under its authority to "make Rules for the Government and Regulation of the land and naval Forces." U.S. Const. art. I, § 8, cl. 14. The question whether Congress could use this power to regulate military commissions was identified and reserved by the Supreme Court. *Ex Parte Quirin*, 317 U.S. 1, 29 (1942). Our Office has determined that Congress cannot exercise its authority to make rules for the Armed Forces to regulate military commissions. Memorandum for Daniel J. Bryant, Assistant Attorney General, Office of Legislative Affairs, from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Swift Justice Authorization Act* at 7 (Apr. 8, 2002). If military commissions are considered an integral part of the conduct of military operations, , then the conduct of interrogations of enemy combatants during wartime must be as much a core element of the President's power to successfully prosecute war. Any effort by Congress to use its power to make rules for the armed forces would thus be just as unconstitutional as such rules would be with regard to military commissions.

**UNCLASSIFIED**         SECRET/NOFORN

2.    Application of Laws of General Applicability to the Conduct of the Military During War

Not only do we construe statutes to avoid intruding upon the President's power as Commander in Chief, but we also apply a more specific and related canon to the conduct of war. As this Office has previously opined, unless "Congress by a clear and unequivocal statement declares otherwise" a criminal statute should not be construed to apply to the properly authorized acts of the military during armed conflict. *Shoot Down Opinion*, 18 Op. O.L.C. at 164. *See* Memorandum for Alan Kreczko, Legal Adviser to the National Security Council, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of 47 U.S.C. § 502 to Certain Broadcast Activities* at 3 (Oct. 15, 1993) ("In the absence of a clear statement of [the] intent [to apply the statute to military personnel acting under the President as Commander in Chief], we do not believe that a statutory provision of this generality should be interpreted so to restrict the President's constitutional powers."); *Application of the Neutrality Act to Official Government Activities*, 8 Op. O.L.C. 58, 81 (1984) (concluding that in absence of a express statement, the Neutrality Act does not apply to U.S. "Government officials acting within the course and scope of their official duties," in light of the legislative history and historical practice that demonstrated a contrary intent). For many years, our Office has also applied this canon in several highly classified contexts that cannot be discussed in this memorandum.

This canon of construction is rooted in the absurdities that the application of such laws to the conduct of the military during a war would create. If those laws were construed to apply to the properly-authorized conduct of military personnel, the most essential tasks necessary to the conduct of war would become subject to prosecution. A soldier who shot an enemy combatant on the battlefield could become liable under the criminal laws for assault or murder; a pilot who bombed a military target in a city could be prosecuted for murder or destruction of property; a sailor who detained a suspected terrorist on the high seas might be subject to prosecution for kidnapping. As we noted in the *Shoot Down Opinion*, the application of such laws to the military during wartime "could [also] mean in some circumstances that military personnel would not be able to engage in reasonable self-defense without subjecting themselves to the risk of criminal prosecution." *Id.* at 164. The mere potential for prosecution could impair the military's completion of its duties during a war as military officials became concerned about their liability under the criminal laws. Such results are so ridiculous as to be untenable and must be rejected to allow the President and the Armed Forces to successfully conduct a war.

This canon of construction, of course, establishes only a presumption. While the federal criminal statutes of general applicability reviewed below do not overcome that presumption, in some cases it has been done. For example, it is clear that the War Crimes Statute, 18 U.S.C. § 2441, which we address below, is intended to apply to the conduct of the U.S. military. It expressly provides that the statute applies where the perpetrator of the crime "is a member of the Armed Forces of the United States" and the conduct it prohibits is conduct that occurs during war. *Id.* § 2441(b). That presumption has not, however, been overcome with respect to the assault, maiming, interstate stalking, or the torture statutes. We will not infer an intention by Congress to interfere with the conduct of military operations in an armed conflict without a clear statement otherwise.

3.    Generally Applicable Statutes Are Not Construed to Apply to the Sovereign

It is also a canon of construction that laws of general applicability are not read to apply to the sovereign. In *United States v. Nardone*, 302 U.S. 379 (1937), the Supreme Court explained its application: (1) where it "would deprive the sovereign of a recognized or established prerogative title or interest," *id.* at 383; or (2) "where a reading which would include such officers would work obvious absurdity[,]" *id.* at 384. As the Court explained, "[a] classical instance" of the deprivation of a recognized or established prerogative title or interest "is the exemption of the state from the operation of general statutes of limitation." *Id.* at 383.

Here, the application of these statutes to the conduct of interrogations of unlawful combatants would deprive the sovereign of a recognized prerogative. Historically, nations have been free to treat unlawful combatants as they wish, and in the United States this power has been vested in the President through the Commander-in-Chief Clause. As one commentator has explained, unlawful belligerents are "more often than not treated as war or national criminals liable to be treated *at will by the captor. There are almost no regulatory safeguards with respect to them and the captor owes no obligation towards them.*" R.C. Hingorani, *Prisoners of War* 18 (1982) (emphasis added). *See* Ingrid Detter, *The Law of War* 148 (2d ed. 2000) ("Unlawful combatants . . . enjoy no protection under international law); William Winthrop, *Military Law and Precedents* 784 (2d ed. 1920) (unlawful belligerents are "[n]ot . . . within the protection of the laws of war"); A. Berriedale Keith, 2 *Wheaton's Elements of International Law* 716 (6th ed. 1929) ("irregular bands of marauders are . . . not entitled to the protection of the mitigated usages of war as practised by civilized nations"); L. Oppenheim, 2 *International Law*, § 254, at 454 (6th ed. 1944) ("Private individuals who take up arms and commit hostilities against the enemy do not enjoy the privileges of armed forces, and the enemy has, according to a customary rule of International Law, the right to treat such individuals as war criminals.").[14] The United States Supreme Court has recognized the important distinction between lawful and unlawful combatants. As the Supreme Court unanimously stated 60 years ago, "[b]y universal agreement and practice the law of war draws a distinction between the armed forces and the peaceful populations of belligerent nations *and also between those who are lawful and unlawful combatants.*" *Ex parte Quirin*, 317 U.S. 1, 30–31 (1942) (emphasis added).

---

[14]   *See also* Alberico Gentili, 2 *De Iure Belli Libri Tres* 22 (1612) (John C. Rolfe translation 1933) ("malefactors do not enjoy the privileges of a law to which they are foes"); E. de Vattel, 3 *The Law of Nations or the Principles of Natural Law* 318 (1758) (Charles G. Fenwick translation 1916) ("The troops alone carry on the war and the rest of the people remain at peace. . . . [I]f the peasantry commit of their own accord any acts of hostility, the enemy treats them without mercy, and hangs them as he would robbers or brigands."); Sir Robert Phillimore, 3 *Commentaries Upon International Law* 164 (2d ed. 1873) (listing "[b]ands of marauders, acting without the authority of the Sovereign or the order of the military commander," "[d]eserters," and "[s]pies" as examples of unlawful belligerents who "have no claim to the treatment of prisoners of War"); Sir G. Sherston Baker, 1 *Halleck's International Law* 614–17 (4th ed. 1908) (noting distinction between lawful and unlawful belligerency and concluding unlawful combatants are "not entitled to the mitigated rules of modern warfare"); Pasquale Fiore, *International Law Codified*, § 1459, at 548 (1918) ("Any act of hostility, any armed violence against the person or property of the hostile sovereign or state and of its citizens, even though legitimate under the laws of war, shall be deemed unlawful and punishable according to 'common' law, if committed by one who is not properly a belligerent."); *id.* § 1475, at 552 ("Armed bands committing hostile acts in time of war by engaging in operations on their own account and without authorization of the Government and, when necessary, concealing their identity as combatants, cannot invoke the application of the laws of war nor be recognized as belligerents.").

Under traditional practice as expressed in the customary laws of war, the treatment of unlawful belligerents is left to the sovereign's discretion. As one commentator has stated, the treatment of "unprivileged belligerents . . . [is] left to the discretion of the belligerent threatened by their activities." Julius Stone, *Legal Controls of International Conflict* 549 (1954). Under our Constitution, the sovereign right of the United States on the treatment of enemy combatants is reserved to the President as Commander-in-Chief. In light of the long history of discretion given to each nation to determine its treatment of unlawful combatants, to construe these statutes to regulate the conduct of the United States toward such combatants would interfere with a well-established prerogative of the sovereign. While the Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, T.I.A.S. 3364 ("GPW"), imposes restrictions on the interrogations of prisoners of war, it does not provide prisoner of war status to those who are unlawful combatants. *See Treaties and Laws Memorandum* at 8–9. Those restrictions therefore would not apply to the interrogations of unlawful belligerents such as al Qaeda or Taliban members.

The second exception recognized by the Supreme Court arises where the application of general laws to a government official would create absurd results, such as effectively preventing the official from carrying out his duties. In *Nardone*, the Supreme Court pointed to "the application of a speed law to a policeman pursuing a criminal or the driver of a fire engine responding to an alarm" as examples of such absurd results. *Nardone*, 302 U.S. at 384. *See also United States v. Kirby*, 74 U.S. (7 Wall.) 482, 486–87 (1868) (holding that statute punishing obstruction of mail did not apply to an officer's temporary detention of mail caused by his arrest of the carrier for murder). In those situations and others, such as undercover investigations of narcotics trafficking, the government officer's conduct would constitute a literal violation of the law. And while "[g]overnment law enforcement efforts frequently require the literal violation of facially applicable statutes[,] . . . courts have construed prohibitory laws as inapplicable when a public official is engaged in the performance of a necessary public duty." Memorandum for Maurice C. Inman, Jr., General Counsel, Immigration and Naturalization Service, from Larry L. Simms, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Visa Fraud Investigation* at 2 (Nov. 20, 1984). Indeed, to construe such statutes otherwise would undermine almost all undercover investigative efforts. *See also id.* For the reasons we explain above, the application of these general laws to the conduct of the military during the course of a war would create untenable results.

Like the canon of construction against the application of general criminal statutes to the conduct of the military during war, this canon of construction is not absolute. The rule excluding the sovereign is only one of construction. It may be overcome where the legislative history or obvious policies of the statue demonstrate that the sovereign and its officers should be included. With respect to assault, maiming, or interstate stalking, no such history or obvious legislative policy indicates an intention to regulate lawful military activities in an armed conflict. Although the torture statute, as we explain below, applies to persons acting under color of law, the legislative history indicates no intent to apply this to the conduct of military personnel. Indeed, as we explained in discussing the prerogative of the sovereign, it is well established that the sovereign retains the discretion to treat unlawful combatants as it sees fit.

4.    **Specific Governs the General**

The canon of construction that specific statutes govern general statutes also counsels that generally applicable criminal statutes should not apply to the military's conduct of interrogations in the prosecution of a war. Where a specific statute or statutory scheme has been enacted, it and not a more general enactment will govern. *See, e.g., Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 445 (1987). Here, the UCMJ provides a detailed regulatory regime for the conduct of military personnel apart from the federal criminal code. Congress enacted the UCMJ pursuant to its constitutional authority "[t]o make Rules for the government and Regulation of the land and naval Forces." U.S. Const. art. I, sec. 8, cl. 14. As the specific code of conduct, the UCMJ governs the conduct of the military during a war, not the general federal criminal laws.

The Military Extraterritorial Jurisdiction Act makes clear that it is the UCMJ—not the criminal code—that governs the conduct of the members of the Armed Forces. As explained above, 18 U.S.C. § 3261(d) ensures that the military punishes and disciplines its members. To be sure, section 3261(a)(1) provides that members of the Armed Forces may be punished for conduct that would constitute a felony if committed in the special maritime and territorial jurisdiction. But section 3261(d) precludes the prosecution of such persons in an Article III court, with only two exceptions: (1) where an individual is no longer a member of the Armed Forces, though he was a member at the time of the offense the individual; and (2) where the member committed the offense with someone who was not a member of the Armed Forces.

It could be argued that Congress specifically enacted section 3261 to extend special maritime and territorial jurisdiction crimes to the members of the Armed Forces and those accompanying or employed by them. Such a contention would, however, be incorrect. Nothing in that provision, or its legislative history suggests an intention to impose general criminal liability on the military for properly-authorized acts undertaken in the prosecution of a war. Rather, the legislative history reveals a desire to ensure that when persons accompanying or employed by the Armed Forces, acting solely in their personal capacity, commits a felony, they can be punished for those crimes.[15] We therefore believe that this canon of construction, as with the others outlined above, supports our conclusion that the statutes outlined in this opinion, with the exception of the war crimes statute, do not govern the properly authorized interrogation of enemy combatants during an armed conflict.

5.    **Application of the Canons of Construction**

The assault, maiming, interstate stalking, and torture statutes discussed below are generally applicable criminal prohibitions, applying on their faces to "whoever" engages in the

---

[15] Congress enacted the Military Extraterritorial Jurisdiction Act of 2000 to fill a jurisdictional gap. In a series of cases, the Supreme Court held that the Constitution barred the military from trying civilians accompanying the military in military courts during peacetime. *See, e.g., Reid v. Covert,* 354 U.S. 1 (1957). Because of these decisions, and the frequent failure of other nations to prosecute such individuals, persons employed by or accompanying the Armed Forces outside the United States often escaped prosecution for crimes committed on bases or against other U.S. nationals. *See* Military Extraterritorial Jurisdiction Act of 2000, H. Rep. No. 106-778(I), at 10–11 (July 20, 2000). *See also* H. R. Rep. No. 106-1048, at 120 (2001); *United States v. Gatlin,* 216 F.3d 207, 209 (2d Cir. 2000). Though this gap was long recognized, *see Gatlin,* 216 F.3d at 208–09, it was not until 2000 that Congress closed it.

conduct they proscribe. 18 U.S.C. § 113; *id.* § 114; *id.* § 2261A; *id.* § 2340A. Each of the canons outlined above counsels against the application of these statutes to the conduct of the military during war. As we explained above, the application of these statutes to the President's conduct of the war would potentially infringe upon his power as Commander in Chief. Furthermore, the conduct at issue here—interrogations—is a core element of the military's ability to prosecute a war. As a general matter, we do not construe generally applicable criminal statutes to reach the conduct of the military during a war. Moreover, the application of these statutes to the conduct of the military during war would touch upon a prerogative of the sovereign, namely its discretion regarding the treatment of unlawful belligerents.[16] Congress has not provided a clear statement with respect to any of these statutes that would suggest that these canons of construction do not apply. Additionally, as we explained above, the UCMJ provides a specific statutory scheme that governs the conduct of the military and as the more specific enactment it governs here.

To be sure, section 2340 applies to individuals who are acting "under color of law." 18 U.S.C. § 2340(1). As such, it applies to governmental actors and it could be argued that Congress enacted it with the intention of restricting the ability of the Armed Forces to interrogate enemy combatants during an armed conflict. We believe that these canons of construction nevertheless counsel against the application of this statute to the conduct of the military during the prosecution of a war. As we explained above, applying this statute to the President's conduct of the war would raise grave separation of powers concerns. Such a construction is unnecessary to give effect to the criminal prohibition. Though we believe that the statute would not apply to the conduct of the military during the prosecution of a war, it would reach the conduct of other governmental actors in peacetime. We further note that where Congress intends to apply statutes to the conduct of our military it has done so far more clearly than by requiring the individuals act "under color of law." For example, the War Crimes Statute, 18 U.S.C. § 2441 applies to the conduct "any member of the Armed Forces of the United States." 18 U.S.C. § 2441(b). Moreover, here, it is the UCMJ, a specific statutory scheme, that governs the conduct of the Armed Forces rather than this general statute.

6.    **Commander-in-Chief Authority**

Even if these statutes were misconstrued to apply to persons acting at the direction of the President during the conduct of war, the Department of Justice could not enforce this law or any of the other criminal statutes applicable to the special maritime and territorial jurisdiction against federal officials acting pursuant to the President's constitutional authority to direct a war. Even if an interrogation method arguably were to violate a criminal statute, the Justice Department could not bring a prosecution because the statute would be unconstitutional as applied in this context. This approach is consistent with previous decisions of our Office involving the application of federal criminal law. For example, we have previously construed the congressional contempt statute not to apply to executive branch officials who refuse to comply with congressional subpoenas because of an assertion of executive privilege. In a published 1984 opinion, we concluded:

---

[16] We emphasize that this opinion concerns the application of these statutes solely to the President's conduct of a war. We express no opinion as to their applicability outside of this context.

[I]f executive officials were subject to prosecution for criminal contempt whenever they carried out the President's claim of executive privilege, it would significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties. Therefore, the separation of powers principles that underlie the doctrine of executive privilege also would preclude an application of the contempt of Congress statute to punish officials for aiding the President in asserting his constitutional privilege.

*Prosecution for Contempt of Congress of an Executive Branch Offical Who Has Asserted A Claim of Executive Privilege,* 8 Op. O.L.C. 101, 134 (1984). *Cf. Shoot Down Memorandum* at 163–64. And should the statute not be construed in this manner, our Office concluded that the Department of Justice could not enforce the statute against federal officials who properly execute the President's constitutional authority. "The President, through a United States Attorney, need not, indeed may not, prosecute criminally a subordinate for asserting on his behalf a claim of executive privilege. Nor could the Legislative Branch or the courts require or implement the prosecution of such an individual." 8 Op. O.L.C. at 141. We opined that "courts . . . would surely conclude that a criminal prosecution for the exercise of a presumptively valid, constitutionally based privilege is not consistent with the Constitution." *Id.*

 We have even greater concerns with respect to prosecutions arising out of the exercise of the President's express authority as Commander in Chief than we do with prosecutions arising out of the assertion of executive privilege. Any effort by Congress to regulate the interrogation of enemy combatants would violate the Constitution's sole vesting of the Commander-in-Chief authority in the President. There can be little doubt that intelligence operations, such as the detention and interrogation of enemy combatants and leaders, are both necessary and proper for the effective conduct of a military campaign. Indeed, such operations may be of more importance in a war with an international terrorist organization than one with the conventional armed forces of a nation-state, due to the former's emphasis on covert operations and surprise attacks against civilians. It may be the case that only successful interrogations can provide the information necessary to prevent future attacks upon the United States and its citizens. Congress can no more interfere with the President's conduct of the interrogation of enemy combatants than it can dictate strategic or tactical decisions on the battlefield. Just as statutes that order the President to conduct warfare in a certain manner or for specific goals would be unconstitutional, so too are laws that would prevent the President from gaining the intelligence he believes necessary to prevent attacks upon the United States.

## B.    Special Maritime and Territorial Jurisdiction of the United States

### 1.    Jurisdiction

Before turning to the specific federal criminal statutes that may be relevant to the conduct of interrogations, we must examine whether these statutes apply. Federal criminal statutes generally do not apply within the special maritime and territorial jurisdiction of the United States. *See United States v. Bowman,* 260 U.S. 94, 98 (1922). As noted above, this opinion addresses solely those alien enemy combatants held outside the United States. The application of federal criminal laws to the conduct of interrogations overseas is determined by the complex


interaction of 18 U.S.C.A. § 7 (2000 & West Supp. 2002) and 18 U.S.C. § 3261 (2000), which is part of the Military Extraterritorial Jurisdiction Act of 2000, Pub. L. No. 106-523, 114 Stat. 2488 (2001). Section 7 defines the term "special maritime and territorial jurisdiction," which we conclude includes permanent U.S. military bases outside the United States, like the U.S. Naval Station, Guantanamo Bay ("GTMO"). Section 3261 defines military extraterritorial jurisdiction. We conclude that all persons who are neither members of the Armed Forces nor persons accompanying or employed by the Armed Forces are subject to the special maritime and territorial jurisdiction of the United States when they are in locations that Section 7 defines as part of that jurisdiction. Members of the Armed Forces and persons accompanying or employed by them, however, are subject to a slightly different rule. Members of the Armed Forces are subject to military discipline under the UCMJ anyplace outside the United States for conduct that would constitute a felony if committed within the special maritime and territorial jurisdiction of the United States. Those accompanying or employed by the Armed Forces can be prosecuted in an Article III court for their conduct outside the United States that would constitute a felony offense if committed within the special maritime and territorial jurisdiction of the United States. Finally, members of the Armed Forces and those accompanying or employed by the military are punishable for misdemeanor offenses in an Article III court when they commit such offenses within the special maritime and territorial jurisdiction of the United States.

As a general matter, GTMO and other U.S. military bases outside the United States fall within the special maritime and territorial jurisdiction of the United States.[17] Section 7(9) of Title 18 of the U.S. Code provides, in relevant part, that the special maritime and territorial jurisdiction of the United States includes:

> offenses committed by or against a national of the United States . . . on the premises of United States . . . military . . . missions or entities in foreign States, including the buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership.

18 U.S.C.A. § 7(9)(A).[18] By its terms, this section applies to GTMO and other U.S. military bases in foreign states, although no court has interpreted the scope of section 7(9)'s reach.[19]

---

[17] The United States occupies GTMO under a lease entered into with the Cuban Government in 1903. Agreement Between the United States and Cuba for the Lease of Lands for Coaling and Naval Stations, Feb. 16–23, 1903, U.S.-Cuba, art. III, T.S. No. 418, 6 Bevans 1113. In 1934, the United States and Cuba entered into a new treaty that explicitly reaffirmed the continuing validity of the 1903 Lease of Lands Agreement. See Relations With Cuba, May 29, 1934, U.S.-Cuba, T.S. No. 866, 6 Bevans 1161.

[18] The USA PATRIOT Act, Pub. L. No. 107-56, § 804, 115 Stat. 272, 377 (2001) amended the special maritime jurisdiction statute to include subsection 9. Congress added this section to resolve a circuit split on the reach of section 7(3), which provides that the special maritime and territorial jurisdiction of the United States includes "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building." 18 U.S.C. § 7(3). There was some question as to whether section 7(3) reached lands outside of United States territory. Compare United States v. Gatlin, 216 F.3d 207 (2d Cir. 2000) (section 7(3) applies only to land acquired within U.S. territorial borders) with United States v. Erdos, 474 F.2d 157 (4th Cir. 1973) (section 7(3) covers American Embassy in Equatorial Guinea). See Provide Appropriate Tools Required to Intercept and Obstruct Terrorism (PATRIOT) Act of 2001, H.R. Rep. No. 107-236, pt. 1, at 74 (2001) (noting the circuit split and that "[t]his [sub]section would

SECRET/NOFORN

Section 7(9) further provides that it "does not apply with respect to an offense committed by a person described in" 18 U.S.C. § 3261(a). Persons described in section 3261(a) are those "employed by or accompanying the Armed Forces outside the United States" or "member[s] of the Armed Forces subject to chapter 47 of title 10 (the Uniform Code of Military Justice)," who engage in "conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States[.]" *Id.* The interaction of section 7(9) and section 3261(a) in effect differentiates between three classes of persons: (1) all persons who are neither members of the Armed Forces nor persons accompanying or employed by the Armed Forces; (2) members of the Armed Forces subject to the UCMJ; (3) those persons employed by or accompanying the Armed Forces.

First, those persons who are neither members of the Armed Forces nor are employed by or accompanying the Armed Forces are subject to prosecution for violations of federal criminal law when they are at a location that is included within the special maritime and territorial jurisdiction. Conversely, when the acts in question are committed outside of the special maritime and territorial jurisdiction, these individuals are not subject to those federal criminal laws. So, for example, a federal, non-military officer who is conducting interrogations in a foreign location, one that is not on a permanent U.S. military base or diplomatic establishment, would not be subject to the federal criminal laws applicable in the special maritime and territorial jurisdiction.

The rules that apply to the second and third classes of persons are more complicated. Section 7(9), in conjunction with 18 U.S.C. § 3261, provides that members of the Armed Forces subject to the UCMJ are not within the special maritime and territorial jurisdiction when they, while outside the United States, engage in conduct that would constitute a felony if committed within the special maritime and territorial jurisdiction. Section 3261(a) exempts such persons, however, only if their conduct constitutes a felony. If they were to commit a misdemeanor offense while stationed at GTMO, they would fall outside section 3261(a)'s exception and would be subject to the special maritime and territorial jurisdiction. *See* 18 U.S.C. § 3261(a).[20]

Section 7(9), in conjunction with 18 U.S.C. § 3261, likewise provides that those persons employed by or accompanying members of the Armed Forces subject to the UCMJ are not within the special maritime and territorial jurisdiction of the United States when they, while outside the United States, engage in conduct that would constitute a felony if committed within the special maritime and territorial jurisdiction.[21] And, like members of the Armed Forces, if

make it clear that embassies and embassy housing of the United States in foreign states are included in the special maritime and territorial jurisdiction of the United States.").

[19] We express no opinion as to the full scope of the meaning of subsection (9)'s phrase "military . . . missions or entities in foreign states." We simply note that it is clear that permanent U.S. military bases such as the one at GTMO fall within subsection (9).

[20] Under 18 U.S.C. § 3559(a), any offense for which the maximum sentence is more than one year is defined as a felony. Offenses for which the maximum sentence is one year or less are classified as misdemeanors. *See* 18 U.S.C. § 3559(a) (2000).

[21] The term "accompanying the Armed Forces outside the United States" is further defined by statute. Section 3267 defines "accompanying the Armed Forces outside the United States" as:

SECRET/NOFORN

such persons commit a misdemeanor offense while in an area that falls within the special maritime and territorial jurisdiction, they are within the special maritime and territorial jurisdiction.

Although these two classes of persons are not within the special maritime and territorial jurisdiction when they engage in conduct that would constitute a felony if engaged in within the special maritime and territorial jurisdiction, they are in fact punishable for such conduct when they are outside the United States—whether they are in an area that is otherwise part of the special maritime and territorial jurisdiction or elsewhere outside the United States, such as in a foreign state. Section 3261(a) provides that when such persons are outside the United States and they engage in conduct that would be a felony if committed in the special maritime and territorial jurisdiction, those persons "shall be punished as provided for that offense." 18 U.S.C. § 3261(a). Section 3261(a) therefore gives extraterritorial effect to the criminal prohibitions applicable to the special maritime and territorial jurisdiction of the United States. Thus, with respect to interrogations, members of the Armed Forces and those employed by or accompanying the Armed Forces will be subject to the felony criminal prohibitions that apply in the special maritime and territorial jurisdiction irrespective of whether the interrogations occur at, for example, a U.S. military base or at the military facilities of a foreign state.

Although members of the Armed Forces are to be punished for conduct that would constitute a felony if committed in the special maritime and territorial jurisdiction, they can only be prosecuted under the UCMJ for that conduct. Section 3261 prohibits the prosecution of members of the Armed Forces under the laws applicable to the special maritime and territorial jurisdiction. For persons who are members of the Armed Forces subject to the UCMJ, section 3261(d) provides that "no prosecution may be commenced against" them "under section

---

    (A)    A dependent of—
           (i)      a member of the Armed Forces;
           (ii)     a civilian employee of the Department of Defense (including a nonappropriated fund instrumentality of the Department); or
           (iii)   a Department of Defense contractor (including a subcontractor at any tier) or an employee of a Department of Defense contractor (including a subcontractor at any tier);
    (B)    residing with such member, civilian employee, contractor, or contractor employee outside the United States; and
    (C)    not a national of or ordinarily resident in the host nation.

18 U.S.C. § 3267 (2000).

Likewise, the statute also defines "employed by the Armed forces." Section 3267(1) provides that this term includes those persons:

    (A) employed as a civilian employee of the Department of Defense (including a nonappropriated fund instrumentality of the Department), as a Department of Defense contractor (including a subcontractor at any tier), or as an employee of a Department of Defense contractor (including a subcontractor at any tier);
    (B) present or residing outside the United States in connection with such employment; and
    (C) not a national of or ordinarily resident in the host nation.

*Id.*

SECRET/NOFORN

3261(a)." 18 U.S.C. § 3261(d).[22]    Section 3261(d) is subject to two exceptions. First, the bar
on prosecutions applies only so long as the member continues to be subject to the UCMJ. *See* 18
U.S.C. § 3261(d)(1).    Second, if "an indictment or information charges that the member
committed the offense with one or more other defendants, at least one of whom is not subject" to
the UCMJ, the bar does not apply. 18 U.S.C. § 3261(d)(2). In limited circumstances, namely in
time of war, persons employed by or accompanying the Armed Forces are subject to the UCMJ.
*See* 10 U.S.C. § 802 (a)(11) (2000) (providing that "persons serving with, employed by, or
accompanying the armed forces outside the United States" are subject to the UCMJ); *Reid v.
Covert*, 354 U.S. 1 (1957).[23] If the indictment charged that such persons committed the offense
in wartime with members of the Armed Forces subject to the UCMJ, this bar on prosecution
would not be removed for the member. The indictment would, for example, have to charge that
the member of the Armed Forces committed the offense with, for example, a government official
not subject to the UCMJ (and not physically accompanying the Armed Forces in the field) to
survive.

2.    **Criminal Statutes Applicable in the Special Maritime and Territorial Jurisdiction of
the United States**

Because the interaction of 18 U.S.C. § 7 and 18 U.S.C. § 3261(a) renders the criminal
statutes that apply in special maritime and territorial jurisdiction applicable to the conduct of
members of the Armed Forces, and those accompanying or employed by the Armed Forces, we
have examined below the criminal statutes that could conceivably cover interrogation conduct.
Specifically, we have addressed: assault, 18 U.S.C. § 113; maiming, 18 U.S.C. § 114; and
interstate stalking, 18 U.S.C. § 2261A. Of course, as we explained above, various canons of
construction preclude the application of these laws to authorized military interrogations of alien
enemy combatants during wartime.

---

[22] Section 3261 ensures that the military can prosecute its members under the UCMJ. Section 3261(c) makes clear
that neither section 3261(d)'s bar nor any other portion of the statute precludes proceeding against persons covered
by section 3261(a) in a military commission. It provides that "[n]othing in this chapter may be construed to deprive
a court-martial, military commission, provost court, or other military tribunal of concurrent jurisdiction with respect
to offenders or offenses that by statute or by the law of war may be tried by a court-martial, military commission,
provost court, or other military tribunal." 18 U.S.C. § 3261(d).

[23] Although in construing 10 U.S.C. § 802(a)(10), which provides that persons subject to the UCMJ includes "[i]n
time of war, persons serving with or accompanying an armed force in the field," we opined that "in time of war"
meant both declared and undeclared wars, we found that due to ambiguity in the case law we could not predict
whether the Court of Military Appeals or the Supreme Court would agree with our reading of the phrase. *See*
Memorandum for William J. Haynes, II, General Counsel, Department of Defense, from John C. Yoo, Deputy
Assistant Attorney General, *Re: Possible Criminal Charges Against American Citizen Who Was a Member of the Al
Qaeda Terrorist Organization or the Taliban Militia* at 18 (Dec. 21, 2001).
Additionally, we note that with respect to meaning of the term "employed by or accompanying the Armed
Forces," we have construed those terms to have essentially the same meaning as that which 18 U.S.C. § 3267
provides. Specifically, we have opined that "the phrase 'employed by or accompanying' is a well understood
reference to civilian employees of the military establishment and to the dependents of military personnel."
Memorandum for Fred M. Vinson, Jr., Assistant Attorney General, Criminal Division from Frank M. Wozencraft,
Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 11244, A Bill To Amend Title 18 of the United States
Code to Give United States District Courts Jurisdiction of Certain Offenses Committed by Americans Outside The
United States, and for Other Purposes* (Aug. 23, 1967). It is, however, unclear whether the meaning of "employed
by the armed forces" for purposes of the UCMJ extends to Department of Defense contractors as does section 3267.

**UNCLASSIFIED**

a.     Assault

Section 113 of Title 18 proscribes assault within the special maritime and territorial jurisdiction of the United States.[24]  Although section 113 does not define assault, courts have construed the term "assault" in accordance with its common meaning.  *See, e.g., United States v. Estrada-Fernandez*, 150 F.3d 491, 494 n.1 (5th Cir. 1998); *United States v. Juvenile-Male*, 930 F.2d 727, 728 (9th Cir. 1991).  At common law, an assault is an attempted battery or an act that puts another person in reasonable apprehension of bodily harm.  *See, e.g., United States v. Bayes*, 210 F.3d 64, 68 (1st Cir. 2000).  Section 113, as we explain below, sweeps more broadly than the common law definition of simple assault and sweeps within its ambit acts that would at common law constitute battery.  We analyze below each form of assault section 113 proscribes.

First, we begin with the least serious form of assault:  simple assault, which section 113(a)(5) proscribes.[25]  This form of assault includes attempted battery.  *See, e.g., United States v. Dupree*, 544 F.2d 1050 (9th Cir. 1976).[26]  Courts have employed various formulations of what constitutes an attempted battery.  By the far most common formulation is that attempted battery is "a willful attempt to inflict injury upon the person of another."  *United States v. Fallen*, 256

---

[24]  18 U.S.C. § 113 provides in full:

(a) Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows:

    (1) Assault with intent to commit murder, by imprisonment for not more than twenty years.

    (2) Assault with intent to commit any felony, except murder or a felony under chapter 109A, by a fine under this title or imprisonment for not more than ten years, or both.

    (3) Assault with a dangerous weapon, with intent to do bodily harm, and without just cause or excuse, by a fine under this title or imprisonment for not more than ten years, or both.

    (4) Assault by striking, beating, or wounding, by a fine under this title or imprisonment for not more than six months, or both.

    (5) Simple assault, by a fine under this title or imprisonment for not more than six months, or both, or if the victim of the assault is an individual who has not attained the age of 16 years, by fine under this title or imprisonment for not more than 1 year, or both.

    (6) Assault resulting in serious bodily injury, by a fine under this title or imprisonment for not more than ten years, or both.

    (7) Assault resulting in substantial bodily injury to an individual who has not attained the age of 16 years, by fine under this title or imprisonment for not more than 5 years, or both.

(b) As used in this subsection—

    (1) the term "substantial bodily injury" means bodily injury which involves—

        (A) a temporary but substantial disfigurement; or

        (B) a temporary but substantial loss or impairment of the function of any bodily member, organ, or mental faculty; and

    (2) the term "serious bodily injury" has the meaning given that term in section 1365 of this title.

[25]  Simple assault carries a penalty of not more than six months' imprisonment, a fine, or both.  If, however, the victim under age 16, the defendant faces a penalty of up to one year's imprisonment, a fine, or both.  *See* 18 U.S.C. § 113(a)(5).

[26]  As the Seventh Circuit has explained, this latter type of assault is drawn from tort law.  *See United States v. Bell*, 505 F.2d 539, 540–41 (7th Cir. 1974).  *See also* LaFave at 746 (same).

F.3d 1082, 1088 (11th Cir. 2001), *cert. denied*, 534 U.S. 1170 (2002). *See United States v. McCulligan*, 256 F.3d 97, 102–03 (3d Cir. 2001) (same); *Juvenile Male*, 930 at 728 (same). An assault at common law does not require actual physical contact. If the defendant does make such contact, it does not preclude a charge of simple assault. *See Dupree*, 544 F.2d at 1052 ("[A]n assault is an attempted battery and proof of a battery will support conviction of assault"); *Cf. Bayes*, 210 F.3d at 69 ("in a prosecution for simple assault . . . , it is sufficient to show that the defendant deliberately touched another in a patently offensive manner without justification or excuse"). The attempted battery form of assault is, like all other forms of attempt, a specific intent crime. *See* Wayne R. LaFave and Austin W. Scott, Jr., *Substantive Criminal Law* § 7.16, at 312 (1986) ("LaFave & Scott"). Thus, the defendant must have specifically intended to commit a battery—i.e., he must have specifically intended to "to cause physical injury to the victim." *See id.* Some courts construe that physical injury to extend to offensive touchings. An offensive touching can be anything from attempting to spit on someone to trying to touch someone's buttocks. *See Bayes*, 210 F.3d at 69; *United States v. Frizzi*, 491 F.2d 1231, 1232 (1st Cir. 1974). *See also United States v. Whitefeather*, 275 F.3d 741, 743 (8th Cir. 2002) (urinating on victim was an offensive touching). And as one of the leading commentators explains, "[a]n attempt to commit any crime requires that the attempting party come pretty close to committing it." Wayne R. LaFave, *Criminal Law*, § 7.16, at 745 (3d ed. 2000) ("LaFave"). In the context of interrogations, if, for example, an interrogator attempted to slap the detainee, such an act would constitute simple assault. On the other hand, changing the detainee's environment such as by altering the lighting or temperature would not constitute simple assault.

Simple assault also includes the placement of another in reasonable apprehension of immediate bodily harm. To convict a defendant of this type of assault, the prosecution must establish that: (1) the defendant intended to cause apprehension of immediate bodily harm; (2) the victim actually experienced such apprehension; and (3) the defendant engaged in some conduct that reasonably arouses such apprehension. *See, e.g., United States v. Skeet*, 665 F.2d 983, 986–87 (9th Cir. 1982) (defendant's actions must actually cause victim apprehension); *United States v. Sampson*, No. 00-50689, 2002 WL 1478552, at *2 (9th Cir. July 10, 2002) (where defendant's firing of a gun failed to frighten police officer because he had not heard the gun fire or seen the defendant fire the gun the defendant had not committed simple assault); LaFave, § 7.16, at 747.[27] In interrogating a detainee, if interrogators were to, for example, show a detainee a device for electrically shocking him and to threaten to use it should he refuse to divulge information, such an action would constitute this type of assault. In so doing, the interrogator would have intended to cause apprehension of immediate bodily harm, it would have been reasonable for the detainee to experience such apprehension, and more than likely he would have experienced such apprehension.

Second, section 113(a)(4) proscribes assault by "striking, beating, or wounding."[28] This crime requires only general intent. *See, e.g., United States v. Felix*, 996 F.2d 203, 207 (8th Cir.

---

[27] Some courts have labeled this requirement of reasonable apprehension as the requirement that the defendant had the "present apparent ability" to inflict harm. *See Fallen*, 256 F.3d at 1088 (defendant's "repeated assertion that he had a gun and was willing to use it" sufficed to establish that the defendant had the "present apparent ability" to harm victim). Under either formulation, the inquiry is still one that looks to whether the circumstances would have caused a reasonable person to think that the defendant would harm her.

[28] This form of assault carries a penalty of up to six months' imprisonment, a fine, or both. 18 U.S.C. § 113(a)(4).

1993) (general intent crime). Courts have construed this section to preclude essentially what at common law would have been simple battery. *See, e.g., United States v. Chavez,* 204 F.3d 1305, 1317 (11th Cir. 2000); *United States v. Duran,* 127 F.3d 911, 915 (10th Cir. 1997). By contrast to the simple assault section 113(a)(5) proscribes, this subsection requires that a defendant make physical contact with the victim. *See Estrada-Fernandez,* 150 F.3d at 494; *United States v. Johnson,* 637 F.2d 1224, 1242 n.26 (9th Cir. 1980). Notably, however, assault by striking, beating, or wounding "requires no particular degree of severity in the injury" to the victim. *Felix,* 996 F.2d at 207. *See Chavez,* 204 F.3d at 1317 (same). Because this section requires physical contact, interrogation methods that do not involve physical contact will not run afoul of this section.

Before turning to the remaining types of assault that section 113 proscribes, it bears noting that both simple assault and assault by striking, beating or wounding are punishable by a maximum sentence of six months' imprisonment, a fine, or both. *See* 18 U.S.C. § 113(a)(5); *id.* § 113(a)(4).[29] Because the maximum sentence for each of these crimes is less than a year, charges brought against a member of the Armed Forces subject to the UCMJ or those employed by or accompanying the Armed Forces for either of these crimes would not bring that member within the scope of 18 U.S.C. § 3261(a). As a result, a member of the Armed Forces engaging in such conduct at a military base, such as GTMO, would be within the special maritime and territorial jurisdiction of the United States and could be prosecuted for this offense in an Article III court, subject, of course, to any defenses or any protections stemming from the exercise of the President's constitutional authority. If, however, members of the Armed Forces were engaging in such conduct on a foreign state's military base, they would not be covered by 3261(a) nor would they be within the special maritime and territorial jurisdiction. The remaining types of assault prohibited under section 113(a) addressed below would, however, bring a member of the Armed Forces or someone employed by or accompanying the Armed Forces squarely within section 3261(a).

Section 113 proscribes assault resulting in "serious bodily injury" and assault resulting in "substantial bodily injury to an individual who has not attained the age of 16 years." 18 U.S.C. § 113(a)(6); *id.* § 113(a)(7). These crimes are general intent crimes. *See, e.g., United States v. Belgard,* 894 F.2d 1092, 1095 n.1 (9th Cir. 1990); *Felix,* 996 F.2d at 207. To establish assault resulting in serious bodily injury, the prosecution must prove that the defendant "assault[ed] the victim and that the assault happen[ed] to result" in the necessary level of injury. *United States v. Davis,* 237 F.3d 942, 944 (8th Cir. 2001). "Serious bodily injury" is defined as "bodily injury which involves . . . a substantial risk of death; . . . extreme physical pain; . . . protracted and obvious disfigurement; or . . . protracted loss or impairment of the function of a bodily member, organ, or mental faculty." 18 U.S.C. § 1365(g)(3) (2000); *see id.* § 113(b)(2) ("[T]he term 'serious bodily injury' has the meaning given that term in section 1365 of this title.").[30] By contrast, section 113(b)(1) defines "substantial bodily injury" as "bodily injury which involves . .

---

[29] If, however, an individual were charged with the simple assault of a person "who has not attained the age of 16 years," that individual would face a maximum sentence of up to one year in prison. This charge still would not bring a member of the Armed Forces or those accompanying or employed by the Armed Forces within section 3261(a)'s coverage because the conduct must constitute an offense punishable by more than a year in prison.
[30] 18 U.S.C. § 1365(g)(4) further defines "bodily injury" to mean: (1) "a cut, abrasion, bruise, burn, or disfigurement"; (2) "physical pain"; (3) "illness"; (4) "impairment of the function of a bodily member, organ, or mental faculty"; (5) "or any other injury to the body no matter how temporary."

SECRET/NOFORN

. a temporary or substantial disfigurement; or . . . a temporary but substantial loss or impairment of the function of any bodily member, organ, or mental faculty." *Id.* § 113(b)(1). Thus, an assault resulting in serious bodily injury requires a more severe injury, that in some instances may have a more lasting impact on the victim than that which might be considered "substantial bodily injury."

No court has definitively addressed the minimum thresholds of injury necessary to rise to the level of "substantial bodily injury" or "serious bodily injury," respectively. Nonetheless, reported opinions regarding these crimes offer some idea as to the severity and type of injuries that would be sufficient to establish violations of these subsections. With respect to substantial bodily injury, for example, a defendant was convicted of assault resulting in substantial bodily injury for injuries to the victim that included: fracturing the victim's skull, burning his face, and biting him, which left a human bite mark on the victim's leg. *See United States v. Brown*, 287 F.3d 684, 687 (8th Cir. 2002). And in *In re Murphy*, No. 98-M-168, 1998 WL 1179109 (W.D.N.Y. June 30, 1998), the magistrate concluded that "a loss of consciousness and a two-day stay in the sick room could qualify as allegations of substantial bodily injury." *Id.* at *6. With respect to serious bodily injury, evidence establishing that the victim's cheekbone and eye socket were fractured, and a large laceration created, requiring the victim to undergo reconstructive surgery and leaving her suffering from a permanent disfigurement, established that she had suffered serious bodily injury. *See United States v. Waloke*, 962 F.2d 824, 827 (8th Cir. 1992). With respect to "serious bodily injury," in *United States v. Dennison*, 937 F.2d 559 (10th Cir. 1991), the Tenth Circuit concluded that the infliction of seven lacerations over the victim's neck and chest that required extensive suturing and had produced scarring "involve[ing] a 'substantial risk of . . . protracted and obvious disfigurement.'" *Id.* at 562. And in *United States v. Brown*, 276 F.3d 930 (7th Cir.), *cert. denied*, 123 S. Ct. 126 (2002), the Seventh Circuit concluded that the tearing of a muscle in the victim's calf and leg that required hospitalization and crutches did not constitute protracted loss or impairment of the function of the leg nor did it cause disfigurement within the meaning of section 1365(g). *See id.* at 931–32. Nonetheless, the court concluded that because the victim had suffered from extreme pain for eight days due to the injuries sustained to his leg, he had suffered serious bodily injury. *See id.*

It bears emphasizing that for the purposes of sections 113(a)(6) and 113(a)(7) the concepts of serious bodily injury and substantial bodily injury include injury to an individual's mental faculties. *See, e.g., United States v. Lowe*, 145 F.3d 45, 53 (1st Cir. 1998); 18 U.S.C. § 113(b)(1)(B); *id.* § 1365(g)(3). We have not, however, found any reported cases in which a mental harm absent physical contact constituted assault. For example, in *Lowe*, the only reported case in which mental harm fulfilled the serious bodily injury requirement for the purposes of assault under this section, the defendant kidnapped and raped the victim and this physical brutality caused her mental harm. *See id.* at 48. We note that with the exception of the undefined reference to "mental faculties," all of the injuries described in the statute connote some (and more likely extensive) physical contact with the victim. In defining substantial bodily injury, for example, the statute speaks in terms of disfigurement, or loss of the function of some bodily member or organ. In the case of serious bodily injury, the statute reaches more serious injuries to include those injuries that bear a substantial risk of death, result in extreme physical pain, as well as protracted disfigurement or the impairment of a bodily member or organ. The "impairment" of one's "mental faculty" might be construed in light of the obvious physical

SECRET/NOFORN

SECRET/NOFORN

contact required for all other injuries listed in the statute. Moreover, these crimes must be construed consistently with the common law definitions of assault and battery. Simple assault, as we explained above, is a specific intent crime and requires no physical contact. By contrast, battery is a general intent crime and requires physical contact. Courts have construed assault resulting in serious bodily harm to require only general intent, rendering it akin to battery in that regard and thereby suggesting that it too requires actual physical contact. Indeed, the only other general intent crime under section 113 is assault by striking, beating, or wounding. Courts have construed that form of assault to be the equivalent of simple battery, requiring actual physical contact as an element. Thus, given the requisite intent and remainder of the other injuries that constitute serious bodily injury or substantial bodily injury, we believe the better view of these forms of assault is that they require actual physical contact. Indeed, no court has found mental harm in the absence of physical contact sufficient to satisfy the requisite injury. Nonetheless, we cannot conclude with certainty that no court would make such a finding.

In the context of interrogations, we believe that interrogation methods that do not involve physical contact will not support a charge of assault resulting in substantial injury or assault resulting in serious bodily injury or substantial bodily injury. Moreover, even minimal physical contact, such as poking, slapping, or shoving the detainee, is unlikely to produce the injury necessary to establish either one of these types of assault.

Section 113(a)(3) prohibits "assault with a dangerous weapon, with intent to do bodily harm, and without just cause or excuse." To establish this type of assault, the prosecution must prove that the defendant "(1) assaulted the victim (2) with a dangerous weapon (3) with the intent to do bodily harm." *Estrada-Fernandez*, 150 F.3d at 494. *See also United States v. Gibson*, 896 F.2d 206, 209 (6th Cir. 1990) (to establish assault with a dangerous weapon, the prosecution must establish that the defendant acted with the specific intent to commit bodily harm). It does not, however, require the defendant to make physical contact with the victim. *See Estrada-Fernandez*, 150 F.3d at 494; *United States v. Duran*, 127 F.3d 911 (10th Cir. 1997). It is also therefore not necessary for the victim to have suffered actual bodily injury. *See United States v. Phelps*, 168 F.3d 1048, 1056 (8th Cir. 1999) ("The government is required to present sufficient evidence only that the appellant assaulted the victim with an object capable of inflicting bodily injury, *and not that the victim actually suffered bodily injury* as a result of the assault.") (emphasis added).

Although the statutory text provides that this type of assault must be committed "without just cause or excuse," courts have held that the prosecution is not required to establish the absence of just cause or excuse. Instead, these are affirmative defenses for which the defendant bears the burden. *See United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982); *United States v. Phillippi*, 655 F.2d 792, 793 (7th Cir. 1981); *Hockenberry v. United States*, 422 F.2d 171, 173 (9th Cir. 1970); *United States v. Peters*, 476 F. Supp. 259, 262 (E.D. Wis. 1979). *See also United States v. Jackson*, No. 99-4388, 2000 WL 194284, at *2 (4th Cir. Feb. 18, 2000) (unpublished opinion) (following *Guilbert*).[31]

---

[31] Although it could be argued that this subsection's express mention of "just cause or excuse" indicate that such defenses are not available with respect to the other types of assault under section 113, we believe that the better view is that these affirmative defenses remain available. As we explain *infra* Part IV, absent a clear statement eliminating such defenses, they remain available.

SECRET/NOFORN

An item need not fall within the classic examples of dangerous weapons—e.g., a knife or a gun—to constitute a "dangerous weapon" for the purposes of section 113(a)(3). Instead, the touchstone for whether an object is a "dangerous weapon" is whether it has been used in a manner likely to cause serious injury. *See Guilbert*, 692 F.2d at 1343; *United States v. LeCompte*, 108 F.3d 948 (8th Cir. 1997); *United States v. Bey*, 667 F.2d 7, 11 (5th Cir. 1982) ("[W]hat constitutes a dangerous weapon depends not on the nature of the object itself but on its capacity, given the manner of its use to endanger life or inflict great bodily harm.") (internal quotation marks and citation omitted). *See also United States v. Riggins*, 40 F.3d 1055, 1057 (9th Cir. 1994) (quoting *Guilbert* with approval). For example, courts have found that a telephone receiver and a broom handle can be, under certain circumstances, "dangerous weapons." *See LeCompte*, 108 F.3d at 952 (telephone receiver); *Estrada-Fernandez*, 150 F.3d 491 (broom or mop handle). For that matter, a speeding car could constitute a dangerous weapon. *See United States v. Gibson*, 896 F.2d 206, 209 n.1 (6th Cir. 1990). At a minimum, however, it requires that a defendant employ some object as a dangerous weapon. Ultimately, whether or not an item constitutes a dangerous weapon is a question of fact for a jury. *See Riggins*, 40 F.3d at 1057; *Phelps*, 168 F.3d at 1055. As the Fourth Circuit has explained, "[t]he test of whether a particular object was used as a dangerous weapon is not so mechanical that it can be readily reduced to a question of law. Rather, it must be left to the jury to determine whether, under the circumstances of each case, the defendant used some instrumentality, [or] object, . . . to cause death or serious injury." *United States v. Sturgis*, 48 F.3d 784, 788 (4th Cir. 1995).[32]

Here, so long as the interrogation method does not involve a dangerous weapon, this type of assault has not been committed. Physical contact would be insufficient to demonstrate this type of assault. Methods of interrogation that involve alterations to the detainee's cell environment would not be problematic under this section, not only because no dangerous weapon would have been used, but also because such alterations are unlikely to involve the necessary intent to inflict bodily injury.

Finally, section 113 prohibits assault with intent to commit murder and assault with the intent to commit any other felony except murder or sexual abuse crimes.[33] 18 U.S.C. § 113(a)(1)–(2). Both of these crimes are specific intent crimes—the former requiring that the individual specifically intend to commit murder and the latter requiring the intent to commit a felony, such as maiming or torture. *See, e.g., United States v. Perez*, 43 F.3d 1131, 1137–38 (7th Cir. 1994). *See also* 18 U.S.C. § 114 (prohibiting maiming within the special maritime jurisdiction); *id.* § 2340A (prohibiting torture outside the United States). Although neither of these crimes requires actual physical contact with the victim, demonstrating the requisite intent may be more difficult to establish absent such contact. Here, as long as the interrogators do not intend to murder the detainee, they will not have run afoul of section 113(a)(1). Moreover, as to

---

[32] We note that one court has construed "dangerous weapon" to include the use of one's body parts. In *Sturgis*, the Fourth Circuit concluded that the defendant's teeth and mouth constituted a dangerous weapon where an HIV positive inmate bit the officer in an effort to infect the officer with HIV and the bites inflicted wounds that bled "profusely." 48 F.3d at 788.

[33] Assault with intent to commit murder carries a maximum penalty of 20 years' imprisonment. *See* 18 U.S.C. § 113(a)(1). Assault with the intent to commit any other felony may be punished by up to 10 years' imprisonment, a fine, or both. *See id.* § 113(a)(2).

**UNCLASSIFIED**          SECRET/NOFORN

SECRET//NOFORN

section 113(a)(2), the intent to torture appears to be the most relevant. As we will explain *infra* Part II.C.2, to satisfy this intent element, the interrogator would have to intend to cause other severe physical pain or suffering or to cause prolonged mental harm. Absent such intent, the interrogator would not have committed assault with intent to torture. We caution, however, that specific intent, as will be discussed in more detail in Part II.C.2., can be inferred from the factual circumstances. *See also United States v. Hinton*, 31 F.3d 817, 822 (9th Cir. 1994).[34]

### b. Maiming

Another criminal statute applicable in the special maritime and territorial jurisdiction is 18 U.S.C. § 114. Section 114 makes it a crime for an individual (1) "with the intent to torture (as defined in section 2340), maim, or disfigure" to (2) "cut[], bite[], or slit[] the nose, ear, or lip, or cut[] out or disable[] the tongue, or put[] out or destroy[] an eye, or cut[] off or disable[] a limb or any member of another person." 18 U.S.C. § 114. It further prohibits individuals from "throw[ing] or pour[ing] upon another person any scalding water, corrosive acid, or caustic substance" with like intent. *Id.*[35]

The offense requires the specific intent to torture, maim or disfigure. *See United States v. Chee*, No. 98-2038, 1999 WL 261017 at *3 (10th Cir. May 3, 1999) (maiming is a specific intent crime) (unpublished opinion); *see also United States v. Salamanca*, 990 F.2d 629, 635 (D.C. Cir. 1993) (where defendant inflicted "enough forceful blows to split open [the victim's] skull, shatter his eye socket, knock out three of his teeth, and break his jaw" requisite specific intent had been established.). Moreover, the defendant's method of maiming must be one of the types the statute specifies—i.e., cutting, biting, slitting, cutting out, disabling, or putting out—and the injury must be to a body part the statute specifies—i.e., the nose, ear, lip, tongue, eye, or limb. *See United States v. Stone*, 472 F.2d 909, 915 (5th Cir. 1973). Similarly, the second set of acts applies to a very narrow band of conduct. It applies only to the throwing or pouring of some sort of scalding, corrosive, or caustic substance. *See id.*

---

[34] Although section 113 appears to encompass a wide range of conduct, particularly simple assault and assault by striking, beating or wounding, we note that there are no reported cases in which section 113 charges have been brought against a federal officer—FBI, DEA, correctional officer or any other federal officer. Certainly, in the course of completing their duties, federal officers will invariably at some point touch or attempt to touch individuals in a way that they would view as offensive, such as during the course of an arrest or in restraining an unruly inmate. Nonetheless, charges are not brought against officers for such conduct. For reasons explained in Part II.A., such actions by officers are not acts that we view as criminal.

[35] Section 114 provides in full:

> Whoever, within the special maritime and territorial jurisdiction of the United States, and with intent to torture (as defined in section 2340), maim, or disfigure, cuts, bites, or slits the nose, ear, or lip, or cuts out or disables the tongue, or puts out or destroys an eye, or cuts off or disables a limb or any member of another person; or
>
> Whoever, within the special maritime and territorial jurisdiction of the United States, and with like intent, throws or pours upon another person, any scalding water, corrosive acid, or caustic substance—
> Shall be fined under this title or imprisoned not more than twenty years, or both.

**UNCLASSIFIED**        SECRET//NOFORN

SECRET/NOFORN

Here, so long as the interrogation methods under contemplation do not involve the acts enumerated in section 114, the conduct of those interrogations will not fall within the purview of this statute. Because the statute requires specific intent, i.e., the intent to maim, disfigure or torture, the absence of such intent is a complete defense to a charge of maiming.

### c.    Interstate Stalking

Section 2261A of Title 18 prohibits "[w]hoever . . . travels in interstate or foreign commerce or within the special maritime and territorial jurisdiction of the United States . . . with the intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel places that person in reasonable fear of the death of, or serious bodily injury to that person."[36] Thus, there are three elements to a violation of section 2261A: (1) the defendant traveled in interstate or foreign commerce or within the special maritime and territorial jurisdiction; (2) he did so with the intent to injure, harass, intimidate another person; (3) the person he intended to harass or injure was reasonably placed in fear of death or serious bodily injury as a result of that travel. *See United States v. Al-Zubaidy*, 283 F.3d 804, 808 (6th Cir.), *cert. denied*, 122 S. Ct. 2638 (2002).

To establish the first element, the prosecution need only show that the defendant engaged in interstate travel. Section 2261A also applies to "travel[] . . . *within* the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 2261A(1) (emphasis added). *See also* National Defense Authorization Act for Fiscal Year 1997, H. Conf. Rep. No. 104-724, at 793 (1996) (the statute was intended to apply to "any incident of stalking involving interstate

---

[36] Section 2261A provides in full:

Whoever—
> (1) travels in interstate or foreign commerce or within the special maritime and territorial jurisdiction of the United States, or enters or leaves Indian country, with the intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel places that person in reasonable fear of the death of, or serious bodily injury to, that person, a member of the immediate family (as defined in section 115) of that person, or the spouse or intimate partner of that person; or

> (2) with the intent—

>> (A) to kill or injure a person in another State or tribal jurisdiction or within the special maritime and territorial jurisdiction of the United States; or
>> (B) to place a person in another State or tribal jurisdiction, or within the special maritime and territorial jurisdiction of the United States, in reasonable fear of the death of, or serious bodily injury to—

>>> (i) that person;
>>> (ii) a member of the immediate family (as defined in section 115) of that person; or
>>> (iii) a spouse or intimate partner of that person,
>> uses the mail or any facility of interstate or foreign commerce to engage in a course of conduct that places that person in reasonable fear of the death of, or serious bodily injury to, any of the persons described in clauses (i) through (iii),

shall be punished as provided in section 2261(b).

**UNCLASSIFIED**    SECRET/NOFORN

Case 1:06-cv-00096-HHK     Document 63-2     Filed 04/03/2008     Page 32 of 81
SECRET/NOFORN                                                   32

movement or which occurs on federal property"). Thus, travel simply *within* the special maritime and territorial jurisdiction satisfies this element. As a result, proof that an individual traveled within a military base in a foreign state would be sufficient to establish this element.

To establish the requisite intent, the prosecution must demonstrate that the defendant undertook the travel with the specific intent to harass, or intimidate another. *See Al-Zubaidy*, 283 F.3d at 809 (the defendant "must have intended to harass or injure [the victim] at the time he crossed the state line"). Thus, for example, a member of the Armed Forces who traveled to a base solely pursuant to his orders to be stationed there, and subsequently came to be involved in the interrogation of operatives, would lack the requisite intent. He would have traveled for the purpose of complying with his orders but not for the purpose of harassment. Nevertheless, because travel within the special maritime and territorial jurisdiction is also covered, the intent to travel within that base for the purpose of intimidating or harassing another person would satisfy the intent element.

In determining whether the third element has been demonstrated, a court will look to the defendant's entire course of conduct. *See id.* This third element is not fulfilled by the mere act of travel itself. *See United States v. Crawford*, No. 00-CR-59-B-S, 2001 WL 185140, at *2 (D. Me. Jan. 26, 2001) ("A plain reading of the statute makes clear that the statute requires the actor to place the victim in reasonable fear, rather than, as Defendant would have it, that his travel place the victim in reasonable fear."). Additionally, serious bodily injury has the same meaning as it does for assault resulting in serious bodily injury. *See* 18 U.S.C. § 2266(6) (for the purposes of section 2261A "[t]he term 'serious bodily injury' has the meaning stated in [18 U.S.C. §] 2119(2)"); *id.* § 2119(2) ("serious bodily injury" is defined in 18 U.S.C. § 1365); *id.* § 113 (section 1365 defines "serious bodily injury" for the purposes of "assault resulting in serious bodily injury"). Thus, an individual must have a reasonable fear of death or a reasonable fear of "bodily injury which involves . . . a substantial risk of death; . . . extreme physical pain . . . protracted and obvious disfigurement; or . . . protracted loss or impairment of the function of a bodily member, organ, or mental faculty." *Id.* § 1365(g).[37]

## C.  Criminal Prohibitions Applicable to Conduct Occurring Outside the Jurisdiction of the United States

There are two criminal prohibitions that apply to the conduct of U.S. persons outside the United States: the War Crimes Act, 18 U.S.C. § 2441, and the prohibition against torture, 18 U.S.C. §§ 2340–2340A. We conclude that the War Crimes Act does not apply to the interrogation of al Qaeda and Taliban detainees because, as illegal belligerents, they do not qualify for the legal protections under the Geneva or Hague Conventions that section 2441 enforces. In regard to section 2340, we conclude that the statute, by its terms, does not apply to interrogations conducted within the territorial United States or on permanent military bases outside the territory of the United States. Nonetheless, we identify the relevant substantive

---

[37] The use of such interrogation techniques as alterations in the lighting, e.g., around the clock lighting of the cell, or changes in the detainee's diet, e.g., using something akin to the Nutraloaf used in prisons, could not be said to reasonably cause a detainee to fear for his life or to fear that he will suffer serious bodily injury. It is important, however, to bear in mind that the entire course of the interrogations must be examined to determine whether the person has been reasonably placed in fear of death or serious bodily injury.

standards regarding the prohibition on torture should interrogations occur outside that jurisdictional limit.

### 1.     War Crimes

Section 2441 of Title 18 criminalizes the commission of war crimes by U.S. nationals and members of the U.S. Armed Forces.[38] It criminalizes such conduct whether it occurs inside or outside the United States, including conduct within the special maritime and territorial jurisdiction. *See id.* § 2441(a). Subsection (c) of section 2441 defines "war crimes" as (1) grave breaches of any of the Geneva Conventions; (2) conduct prohibited by certain provisions of the Hague Convention IV, Hague Convention IV Respecting the Laws and Customs of War on Land, Oct.18, 1907, 36 Stat. 2277;[39] or (3) conduct that constitutes a violation of common Article 3 of the Geneva Conventions. We have previously concluded that this statute does not apply to conduct toward the members of al Qaeda and the Taliban. *See Treaties and Laws Memorandum* at 8–9. We reached this conclusion because we found al Qaeda to be a non-governmental terrorist organization whose members are not legally entitled to the protections of

---

[38] Section 2441 provides in full:

> (a) Offense.—Whoever, whether inside or outside the United States, commits a war crime, in any of the circumstances described in subsection (b), shall be fined under this title or imprisoned for life or any term of years, or both, and if death results to the victim, shall also be subject to the penalty of death.

> (b) Circumstances.—The circumstances referred to in subsection (a) are that the person committing such war crime or the victim of such war crime is a member of the Armed Forces of the United States or a national of the United States (as defined in section 101 of the Immigration and Nationality Act).

> (c) Definition.—As used in this section the term 'war crime' means any conduct—
> (1) defined as a grave breach in any of the international conventions signed at Geneva 12 August 1949, or any protocol to such convention to which the United States is a party;
> (2) prohibited by Article 23, 25, 27, or 28 of the Annex to the Hague Convention IV, Respecting the Laws and Customs of War on Land, signed 18 October 1907;
> (3) which constitutes a violation of common Article 3 of the international conventions signed at Geneva, 12 August 1949, or any protocol to such convention to which the United States is a party and which deals with non- international armed conflict; or
> (4) of a person who, in relation to an armed conflict and contrary to the provisions of the Protocol on Prohibitions or Restrictions on the Use of Mines, Booby-Traps and Other Devices as amended at Geneva on 3 May 1996 (Protocol II as amended on 3 May 1996), when the United States is a party to such Protocol, willfully kills or causes serious injury to civilians.

[39] With respect to the Hague Convention IV, section 2441(c)(2) criminalizes conduct barred by articles 23, 25, 27, 28, of the Annex to the Hague Convention IV. Under the Hague Convention, the conduct in these articles, like all of the regulations the Annex contains, is prohibited solely as between parties to the Convention. Hague Convention IV, art. 2 ("The provisions contained in the Regulations referred to in Article 1, as well as in the present Convention, do not apply except between Contracting Powers, and then only if all the belligerents are parties to the Convention."). Since Afghanistan is not a party to the Hague Convention IV, no argument could be made that the Convention covers the Taliban. As a non-state, al Qaeda is likewise not a party to the Hague Convention IV. Moreover, Hague Convention IV requires that belligerents meet the same requirements that they must meet in order to receive the protections of GPW, which al Qaeda and the Taliban do not meet. Thus, conduct toward enemy combatants in the current war would not fall within the conduct proscribed by these articles.

GPW. Since its members cannot be considered to be POWs under the Convention, conduct toward members of al Qaeda could not constitute a grave breach of the Geneva Conventions. *See* 18 U.S.C. § 2441(c)(1). We further found that common Article 3 of the Geneva Conventions covers either traditional wars between state parties to the convention or non-international civil wars, but not an international conflict with a non-governmental terrorist organization. As a result, conduct toward members of al Qaeda could not constitute a violation of common Article 3, see *Treaties and Law Memorandum* at 9, and thus could not violate Section 2441(c)(3).

We also concluded that the President had reasonable grounds to find that the Taliban had failed to meet the requirements for POW status under GPW. *See* Memorandum for Alberto R. Gonzales, Counsel to the President, from Jay S. Bybee, Assistant Attorney General, *Re: Status of Taliban Forces Under Article 4 of the Third Geneva Convention of 1949* at 3 (Feb. 7, 2002). On February 7, 2002, the President determined that these treaties did not protect either the Taliban or al Qaeda. *See* Statement by White House Press Secretary Ari Fleischer, *available at* http://www.us-mission.ch/press2002/0802fleischerdetainees.htm (Feb. 7, 2002).[40]

Thus, section 2441 is inapplicable to conduct toward members of the Taliban or al Qaeda. We further note that the *Treaties and Law Memorandum* is the Justice Department's binding interpretation of the War Crimes Act, and it will preclude any prosecution under it for conduct toward members of the Taliban and al Qaeda. *See* Letter for William H. Taft, IV, Legal Adviser, Department of State, from John C. Yoo, Deputy Assistant Attorney General, and Robert J. Delahunty, Special Counsel, Office of Legal Counsel (Jan. 14, 2002).

2.    18 U.S.C. §§ 2340–2340A

Section 2340A of Title 18 makes it a criminal offense for any person "outside the United States [to] commit[] or attempt[] to commit torture."[41] The statute defines "the United States" as "all areas under the jurisdiction of the United States including any of the places described in" 18 U.S.C. § 5,[42] and 18 U.S.C.A. § 7.[43] 18 U.S.C. § 2340(3).[44] Therefore, to the extent that

---

[40] *See also* Fact Sheet: Status of Detainees at Guantanamo *available at* http://www.whitehouse.gov/news/releases/2002/02/20020207-13.html.

[41] If convicted of torture, a defendant faces a fine or up to twenty years' imprisonment or both. If, however, the act resulted in the victim's death, a defendant may be sentenced to life imprisonment or to death. *See* 18 U.S.C.A. § 2340A(a). Whether death results from the act also affects the applicable statute of limitations. Where death does not result, the statute of limitations is eight years; if death results, there is no statute of limitations. *See* 18 U.S.C.A. § 3286(b) (West Supp. 2002); *id.* § 2332b(g)(5)(B) (West Supp. 2002). Section 2340A as originally enacted did not provide for the death penalty as a punishment. *See* Omnibus Crime Bill, Pub. L. No.103-322, Title VI, Section 60020, 108 Stat. 1979 (1994) (amending section 2340A to provide for the death penalty); H. R. Conf. Rep. No. 103-711, at 388 (1994) (noting that the act added the death penalty as a penalty for torture).

Most recently, the USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001), amended section 2340A to expressly codify the offense of conspiracy to commit torture. Congress enacted this amendment as part of a broader effort to ensure that individuals engaged in the planning of terrorist activities could be prosecuted irrespective of where the activities took place. *See* H. R. Rep. No. 107-236, at 70 (2001) (discussing the addition of "conspiracy" as a separate offense for a variety of "Federal terrorism offense[s]").

[42] 18 U.S.C. § 5 (2000) provides: "The term 'United States', as used in this title in a territorial sense, includes all places and waters, continental or insular, subject to the jurisdiction of the United States, except the Canal Zone." As we understand it, the persons discussed in this memorandum are not within United States as it is defined in section 5.

interrogations take place within the special maritime and territorial jurisdiction, such as at a U.S. military base in a foreign state, the interrogations are not subject to sections 2340–2340A. If, however, the interrogations take place outside the special maritime and territorial jurisdiction and are otherwise outside the United States, the torture statute applies. Thus, for example, interrogations conducted at GTMO would not be subject to this prohibition, but interrogations conducted at a non-U.S. base in Afghanistan would be subject to section 2340A.[45]

Moreover, we note that because the statute criminalizes conduct only when it is committed outside the United States—which under section 2340(3) means it must be committed outside the special maritime jurisdiction—the proviso contained in 18 U.S.C.A. § 7(9) excluding those persons covered by 18 U.S.C. § 3261(a) does *not* apply. As discussed above, this proviso excluding members of the Armed Forces, those employed by the Armed Forces or the Department of Defense, and those persons accompanying members of the Armed Forces or their employees applies *only* when their conduct is a felony if committed *within* the special maritime and territorial jurisdiction of the United States. *See id.* Here, the conduct under section 2340A is a felony only when committed outside the special maritime and territorial jurisdiction. Thus, so long as members of the Armed Forces and those accompanying or employed by the Armed Forces are in an area that 18 U.S.C. § 7 defines as part of the special maritime and territorial jurisdiction, they too are within the special maritime and territorial jurisdiction for the purposes

---

[43] 18 U.S.C. § 7, as discussed *supra* Part II.B., defines the special maritime and territorial jurisdiction of the United States.

[44] The statute further includes those places described in 49 U.S.C. § 46501(2) (2000), which sets forth the special aircraft jurisdiction. Under section 46501(2), the special aircraft jurisdiction includes "any of the following aircraft *in flight*":

    (A) a civil aircraft of the United States.
    (B) an aircraft of the armed forces of the United States.
    (C) another aircraft in the United States.
    (D) another aircraft outside the United States—
        (i) that has its next scheduled destination or last place of departure in the United States, if the aircraft next lands in the United States;
        (ii) on which an individual commits an offense (as defined in the Convention for the Suppression of Unlawful Seizure of Aircraft) if the aircraft lands in the United States with the individual still on the aircraft; or
        (iii) against which an individual commits an offense (as defined in subsection (d) or (e) of article I, section I of the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation) if the aircraft lands in the United States with the individual still on the aircraft.
    (E) any other aircraft leased without crew to a lessee whose principal place of business is in the United States or, if the lessee does not have a principal place of business, whose permanent residence is in the United States.

(Emphasis added).

[45] We also note that there are several statutes that would permit the prosecution of individuals who, while not conducting the interrogations themselves, were otherwise involved in the interrogations. Section 2340A(c) expressly criminalizes conspiracy to commit torture. 18 U.S.C. § 2339A makes it an offense to "provide[] material support or resources or conceal[] or disguise[] the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or carrying out, a violation of section . . . 2340A." *Id.* § 2339A(a). As a general matter, the federal criminal code also provides for accessory liability. *See* 18 U.S.C. § 2 (accessory punishable as principal); 18 U.S.C. § 3 (accessory after the fact).

of the conduct section 2340A criminalizes. Accordingly, they are considered to be within the United States for purposes of that statute. The criminal prohibition against torture therefore would not apply to their conduct of interrogations at U.S. military bases located in a foreign state. If, however, such persons are involved in interrogations outside the special maritime and territorial jurisdiction and outside the United States, they are subject to the prohibition against torture as well as those criminal statutes applicable to the special maritime and territorial jurisdiction.

Section 2340 defines the act of torture as an:

act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control.

18 U.S.C.A. § 2340(1); *see id.* § 2340A. Thus, to establish the offense of torture, the prosecution must show that: (1) the torture occurred outside the United States; (2) the defendant acted under the color of law; (3) the victim was within the defendant's custody or physical control; (4) the defendant specifically intended to cause severe physical or mental pain or suffering; and (5) that the act inflicted severe physical or mental pain or suffering. *See also* S. Exec. Rep. No. 101-30, at 6 (1990) ("For an act to be 'torture,' it must . . . cause severe pain and suffering, and be intended to cause severe pain and suffering.").[46]

At the outset we note that no prosecutions have been brought under section 2340A. There is therefore no case law interpreting sections 2340–2340A. In light of this paucity of case law, we have discussed at length below the text of the statute, its legislative history, and the judicial interpretation of a closely related statute—the Torture Victims Protection Act—in order to provide guidance as to the meaning of the elements of torture.

a.    "Specifically Intended"

To violate section 2340A, the statute requires that severe pain and suffering be inflicted with specific intent. *See* 18 U.S.C. § 2340(1). For a defendant to act with specific intent, he must expressly intend to achieve the forbidden act. *See United States v. Carter*, 530 U.S. 255, 269 (2000); *Black's Law Dictionary* at 814 (7th ed. 1999) (defining specific intent as "[t]he intent to accomplish the precise criminal act that one is later charged with"). For example, in *Ratzlaf v. United States*, 510 U.S. 135, 141 (1994), the statute at issue was construed to require that the defendant act with the "specific intent to commit the crime." (Internal quotation marks and citation omitted). As a result, the defendant had to act with the express "purpose to disobey the law" for the *mens rea* element to be satisfied. *Id.* (internal quotation marks and citation omitted)

Here, because section 2340 requires that a defendant act with the specific intent to inflict severe pain, the infliction of such pain must be the defendant's precise objective. If the statute

---

[46] For the purposes of our analysis, we have assumed that interrogators would be acting under color of law and that the person interrogated would be within the custody or control of those interrogators.

A

had required only general intent, it would be sufficient to establish guilt by showing that the defendant "possessed knowledge with respect to the *actus reus* of the crime." *Carter*, 530 U.S. at 268. If the defendant acted knowing that severe pain or suffering was reasonably likely to result from his actions, but no more, he would have acted only with general intent. *See id.* at 269; *Black's Law Dictionary* 813 (7th ed. 1999) (explaining that general intent "usu[ally] takes the form of recklessness (involving actual awareness of a risk and the culpable taking of that risk) or negligence (involving blameworthy inadvertence)." The Supreme Court has used the following example to illustrate the difference between these two mental states:

> [A] person entered a bank and took money from a teller at gunpoint, but deliberately failed to make a quick getaway from the bank in the hope of being arrested so that he would be returned to prison and treated for alcoholism. Though this defendant knowingly engaged in the acts of using force and taking money (satisfying "general intent"), he did not intend permanently to deprive the bank of its possession of the money (failing to satisfy "specific intent").

*Carter*, 530 U.S. at 268 (citing 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 3.5, at 315 (1986)).

As a theoretical matter, therefore, knowledge alone that a particular result is certain to occur does not constitute specific intent. As the Supreme Court explained in the context of murder, "the . . . common law of homicide distinguishes . . . between a person who knows that another person will be killed as a result of his conduct and a person who acts with the specific purpose of taking another's life[.]" *United States v. Bailey*, 444 U.S. 394, 405 (1980). "Put differently, the law distinguishes actions taken 'because of' a given end from actions taken 'in spite' of their unintended but foreseen consequences." *Vacco v. Quill*, 521 U.S. 793, 802–03 (1997). Thus, even if the defendant knows that severe pain will result from his actions, if causing such harm is not his objective, he lacks the requisite intent. While as a theoretical matter such knowledge does not constitute specific intent, juries are permitted to infer from the factual circumstances that such intent is present. *See, e.g., United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001); *United States v. Karro*, 257 F.3d 112, 118 (2d Cir. 2001); *United States v. Wood*, 207 F.3d 1222, 1232 (10th Cir. 2000); *Henderson v. United States*, 202 F.2d 400, 403 (6th Cir. 1953). Therefore, when a defendant knows that his actions will produce the prohibited result, a jury will in all likelihood conclude that the defendant acted with specific intent.

Further, an individual who acts with a good faith belief that his conduct would not produce the result that the law prohibits would not have the requisite intent. *See, e.g., South Atl. Lmtd. Ptrshp. of Tenn. v. Reise*, 218 F.3d 518, 531 (4th Cir. 2002). Where a defendant acts in good faith, he acts with an honest belief that he has not engaged in the proscribed conduct. *See Cheek v. United States*, 498 U.S. 192, 202 (1991); *United States v. Mancuso*, 42 F.3d 836, 837 (4th Cir. 1994). A good faith belief need not be a reasonable one. *See Cheek*, 498 U.S. at 202.

Although a defendant theoretically could hold an unreasonable belief that his acts would not constitute the actions the statute prohibits, even though they would as a certainty produce the prohibited effects, as a matter of practice it is highly unlikely that a jury would acquit in such a situation. Where a defendant holds an unreasonable belief, he will confront the problem of

proving to the jury that he actually held that belief. As the Supreme Court noted in *Cheek*, "the more unreasonable the asserted beliefs or misunderstandings are, the more likely the jury . . . will find that the Government has carried its burden of proving" intent. *Id.* at 203–04. As we explained above, a jury will be permitted to infer that the defendant held the requisite specific intent. As a matter of proof, therefore, a good faith defense will prove more compelling when a reasonable basis exists for the defendant's belief.

      b.     "Severe Pain or Suffering"

      The key statutory phrase in the definition of torture is the statement that acts amount to torture if they cause "severe physical or mental pain or suffering." In examining the meaning of a statute, its text must be the starting point. *See INS v. Phinpathya*, 464 U.S. 183, 189 (1984). Section 2340 makes plain that the infliction of pain or suffering per se, whether it is physical or mental, is insufficient to amount to torture. Instead, the pain or suffering must be "severe." The statute does not, however, define the term "severe." "In the absence of such a definition, we construe a statutory term in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994). The dictionary defines "severe" as "[u]nsparing in exaction, punishment, or censure" or "[I]nflicting discomfort or pain hard to endure; sharp; afflictive; distressing; violent; extreme; as *severe* pain, anguish, torture." *Webster's New International Dictionary* 2295 (2d ed. 1935); *see American Heritage Dictionary of the English Language* 1653 (3d ed. 1992) ("extremely violent or grievous: *severe* pain") (emphasis in original); IX *The Oxford English Dictionary* 572 (1978) ("Of pain, suffering, loss, or the like: Grievous, extreme" and "of circumstances . . .: hard to sustain or endure"). Thus, the adjective "severe" conveys that the pain or suffering must be of such a high level of intensity that the pain is difficult for the subject to endure.

      Congress's use of the phrase "severe pain" elsewhere in the U. S. Code can shed more light on its meaning. *See, e.g., West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100 (1991) ("[W]e construe [a statutory term] to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law."). Significantly, the phrase "severe pain" appears in statutes defining an emergency medical condition for the purpose of providing health benefits. *See, e.g.,* 8 U.S.C. § 1369 (2000); 42 U.S.C. § 1395w-22 (2000); *id.* § 1395x (2000); *id.* § 1395dd (2000); *id.* § 1396b (2000); *id.* § 1396u-2 (2000). These statutes define an emergency condition as one "manifesting itself by acute symptoms of sufficient severity (including *severe pain*) such that a prudent lay person, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in—placing the health of the individual . . . (i) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part." *Id.* § 1395w-22(d)(3)(B) (emphasis added). Although these statutes address a substantially different subject from section 2340, they are nonetheless helpful for understanding what constitutes severe physical pain. They treat severe pain as an indicator of ailments that are likely to result in permanent and serious physical damage in the absence of immediate medical treatment. Such damage must rise to the level of death, organ failure, or the permanent impairment of a significant body function. These statutes suggest that to constitute torture "severe pain" must rise to a similarly high level—the level that would ordinarily be associated

with a physical condition or injury sufficiently serious that it would result in death, organ failure, or serious impairment of body functions.[47]

### c.    "Severe mental pain or suffering"

Section 2340 gives more express guidance as to the meaning of "severe mental pain or suffering." The statute defines "severe mental pain or suffering" as:

> the prolonged mental harm caused by or resulting from—
> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
> (B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
> (C) the threat of imminent death; or
> (D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality.

18 U.S.C. § 2340(2). To prove "severe mental pain or suffering," the statute requires proof of "prolonged mental harm" that was caused by or resulted from one of four enumerated acts. We consider each of these elements.

### i.    "Prolonged Mental Harm"

As an initial matter, section 2340(2) requires that the severe mental pain must be evidenced by "prolonged mental harm." To prolong is to "lengthen in time" or to "extend the duration of, to draw out." *Webster's Third New International Dictionary* 1815 (1988); *Webster's New International Dictionary* 1980 (2d ed. 1935). Accordingly, "prolong" adds a temporal dimension to the harm to the individual, namely, that the harm must be one that is endured over some period of time. Put another way, the acts giving rise to the harm must cause some lasting, though not necessarily permanent, damage. For example, the mental strain experienced by an

---

[47] One might argue that because the statute uses "or" rather than "and" in the phrase "pain or suffering" that "severe physical suffering" is a concept distinct from "severe physical pain." We believe the better view of the statutory text is, however, that they are not distinct concepts. The statute does not define "severe mental pain" and "severe mental suffering" separately. Instead, it gives the phrase "severe mental pain or suffering" a single definition. Because "pain or suffering" is a single concept for the purposes of "severe mental pain or suffering," it should likewise be read as a single concept for the purposes of "severe physical pain or suffering." Moreover, dictionaries define the words "pain" and "suffering" in terms of each other. *Compare, e.g., Webster's Third New International Dictionary* 2284 (1993) (defining suffering as "the endurance of . . . pain" or "a pain endured"); *Webster's Third New International Dictionary* 2284 (1986) (same); XVII *The Oxford English Dictionary* 125 (2d ed. 1989) (defining suffering as "the bearing or undergoing of pain"); *with, e.g., Random House Webster's Unabridged Dictionary* 1394 (2d ed. 1999) (defining "pain" as "physical suffering"); *The American Heritage Dictionary of the English Language* 942 (College ed. 1976) (defining pain as "suffering or distress"). Further, even if we were to read the infliction of severe physical suffering as distinct from severe physical pain, it is difficult to conceive of such suffering that would not involve severe physical pain. Accordingly, we conclude that "pain or suffering" is a single concept in section 2340.

individual during lengthy and intense questioning by law enforcement would not violate section 2340(2). On the other hand, the development of a mental disorder such as posttraumatic stress disorder, which can last months or even years, or even chronic depression, which also can last for a considerable period of time if untreated, might satisfy the prolonged harm requirement. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 426, 439–45 (4th ed. 1994) ("DSM-IV"). *See also* Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 509 (1997) (noting that posttraumatic stress disorder is frequently found in torture victims); *cf.* Sana Loue, *Immigration Law and Health* § 10:46 (2001) (recommending evaluating for post-traumatic stress disorder immigrant-client who has experienced torture).[48] By contrast to "severe pain," the phrase "prolonged mental harm" appears nowhere else in the U.S. Code nor does it appear in relevant medical literature or international human rights reports.

Not only must the mental harm be prolonged to amount to severe mental pain and suffering, but also it must be caused by or result from one of the acts listed in the statute. In the absence of a catchall provision, the most natural reading of the predicate acts listed in section 2340(2)(A)–(D) is that Congress intended it to be exhaustive. In other words, other acts not included within section 2340(2)'s enumeration are not within the statutory prohibition. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) ("*Expressio unius est exclusio alterius.*"); Norman Singer, 2A *Sutherland on Statutory Construction* § 47.23 (6th ed. 2000) ("[W]here a form of conduct, the manner of its performance and operation, and the persons and things to which it refers are designated, there is an inference that all omissions should be understood as exclusions.") (footnotes omitted). We conclude that torture within the meaning of the statute requires the specific intent to cause prolonged mental harm by one of the acts listed in section 2340(2).

A defendant must specifically intend to cause prolonged mental harm for the defendant to have committed torture. It could be argued that a defendant needs to have specific intent only to commit the predicate acts that give rise to prolonged mental harm. Under that view, so long as the defendant specifically intended to, for example, threaten a victim with imminent death, he would have had sufficient *mens rea* for a conviction. According to this view, it would be necessary for a conviction to show only that the victim suffered prolonged mental harm, rather than that the defendant intended to cause it. We believe that this approach is contrary to the text of the statute. The statute requires that the defendant specifically intend to inflict severe mental pain or suffering. Because the statute requires this mental state with respect to the infliction of severe mental pain, and because it expressly defines severe mental pain in terms of prolonged

---

[48] The DSM-IV explains that posttraumatic disorder ("PTSD") is brought on by exposure to traumatic events, such as serious physical injury or witnessing the deaths of others and during those events the individual felt "intense fear" or "horror." *Id.* at 424. Those suffering from this disorder reexperience the trauma through, *inter alia*, "recurrent and intrusive distressing recollections of the event," "recurrent distressing dreams of the event," or "intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event." *Id.* at 428. Additionally, a person with PTSD "[p]ersistent[ly]" avoids stimuli associated with the trauma, including avoiding conversations about the trauma, places that stimulate recollections about the trauma; and they experience a numbing of general responsiveness, such as a "restricted range of affect (e.g., unable to have loving feelings)," and "the feeling of detachment or estrangement from others." *Id.* Finally, an individual with PTSD has "[p]ersistent symptoms of increased arousal," as evidenced by "irritability or outbursts of anger," "hypervigilance," "exaggerated startle response," and difficulty sleeping or concentrating. *Id.*

mental harm, that mental state must be present with respect to prolonged mental harm. To read the statute otherwise would read the phrase "the prolonged mental harm caused by or resulting from" out of the definition of "severe mental pain or suffering."

A defendant could negate a showing of specific intent to cause severe mental pain or suffering by showing that he had acted in good faith that his conduct would not amount to the acts prohibited by the statute. Thus, if a defendant has a good faith belief that his actions will not result in prolonged mental harm, he lacks the mental state necessary for his actions to constitute torture. A defendant could show that he acted in good faith by taking such steps as surveying professional literature, consulting with experts, or reviewing evidence gained from past experience. *See, e.g., Ratzlaf,* 510 U.S. at 142 n.10 (noting that where the statute required that the defendant act with the specific intent to violate the law, the specific intent element "might be negated by, e.g., proof that defendant relied in good faith on advice of counsel.") (citations omitted). All of these steps would show that he has drawn on the relevant body of knowledge concerning the result proscribed by the statute, namely prolonged mental harm. Because the presence of good faith would negate the specific intent element of torture, it is a complete defense to such a charge. *See, e.g., United States v. Wall,* 130 F.3d 739, 746 (6th Cir. 1997); *United States v. Casperson,* 773 F.2d 216, 222–23 (8th Cir.1985).

### ii.    Harm Caused By Or Resulting From Predicate Acts

Section 2340(2) sets forth four basic categories of predicate acts. First on the list is the "intentional infliction or threatened infliction of severe physical pain or suffering." This provision might at first appear superfluous because the statute already provides that the infliction of severe physical pain or suffering can amount to torture. This provision, however, actually captures the infliction of physical pain or suffering when the defendant inflicts physical pain or suffering with general intent rather than the specific intent that is required where severe physical pain or suffering alone is the basis for the charge. Hence, this subsection reaches the infliction of severe physical pain or suffering when it is but the means of causing prolonged mental harm. Or put another way, a defendant has committed torture when he intentionally inflicts severe physical pain or suffering with the specific intent of causing prolonged mental harm. As for the acts themselves, acts that cause "severe physical pain or suffering" can satisfy this provision.

Additionally, the threat of inflicting such pain is a predicate act under the statute. A threat may be implicit or explicit. *See, e.g., United States v. Sachdev,* 279 F.3d 25, 29 (1st Cir. 2002). In criminal law, courts generally determine whether an individual's words or actions constitute a threat by examining whether a reasonable person in the same circumstances would conclude that a threat had been made. *See, e.g., Watts v. United States,* 394 U.S. 705, 708 (1969) (holding that whether a statement constituted a threat against the president's life had to be determined in light of all the surrounding circumstances); *Sachdev,* 279 F.3d at 29 ("a reasonable person in defendant's position would perceive there to be a threat, explicit, or implicit, of physical injury"); *United States v. Khorrami,* 895 F.2d 1186, 1190 (7th Cir. 1990) (to establish that a threat was made, the statement must be made "in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates a statement as a serious expression of an intention to inflict bodily harm upon [another individual]") (citation and internal quotation marks omitted); *United*

*States v. Peterson*, 483 F.2d 1222, 1230 (D.C. Cir. 1973) (perception of threat of imminent harm necessary to establish self-defense had to be "objectively reasonable in light of the surrounding circumstances"). Based on this common approach, we believe that the existence of a threat of severe pain or suffering should be assessed from the standpoint of a reasonable person in the same circumstances.

Second, section 2340(2)(B) provides that prolonged mental harm, constituting torture, can be caused by "the administration or application or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality." The statute provides no further definition of what constitutes a mind-altering substance. The phrase "mind-altering substances" is found nowhere else in the U.S. Code nor is it found in dictionaries. It is, however, a commonly used synonym for drugs. *See, e.g., United States v. Kingsley*, 241 F.3d 828, 834 (6th Cir.) (referring to controlled substances as "mind-altering substance[s]") *cert. denied*, 122 S. Ct. 137 (2001); *Hogue v. Johnson*, 131 F.3d 466, 501 (5th Cir. 1997) (referring to drugs and alcohol as "mind-altering substance[s]"), *cert. denied*, 523 U.S. 1014 (1998). In addition, the phrase appears in a number of state statutes, and the context in which it appears confirms this understanding of the phrase. *See, e.g.*, Cal. Penal Code § 3500(c) (West Supp. 2000) ("Psychotropic drugs also include mind-altering . . . drugs . . . ."); Minn. Stat. Ann. § 260B.201(b) (West Supp. 2002) ("'chemical dependency treatment'" define as programs designed to "reduc[e] the risk of the use of alcohol, drugs, or other mind-altering substances").

This subparagraph, however, does not preclude any and all use of drugs. Instead, it prohibits the use of drugs that "disrupt profoundly the senses or the personality." To be sure, one could argue that this phrase applies only to "other procedures," not the application of mind-altering substances. We reject this interpretation because the terms of section 2340(2) indicate that the qualifying phrase applies to both "other procedures" *and* the "application of mind-altering substances." The word "other" modifies "procedures calculated to disrupt profoundly the senses." As an adjective, "other" indicates that the term or phrase it modifies is the remainder of several things. *See Webster's Third New International Dictionary* 1598 (1986) (defining "other" as "the one that remains of two or more") *Webster's Ninth New Collegiate Dictionary* 835 (1985) (defining "other" as "being the one (as of two or more) remaining or not included"). Or put another way, "other" signals that the words to which it attaches are of the same kind, type, or class as the more specific item previously listed. Moreover, where statutes couple words or phrases together, it "denotes an intention that they should be understood in the same general sense." Norman Singer, 2A *Sutherland on Statutory Construction* § 47:16 (6th ed. 2000); *see also Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). Thus, the pairing of mind-altering substances with procedures calculated to disrupt profoundly the senses or personality and the use of "other" to modify "procedures" shows that the use of such substances must also cause a profound disruption of the senses or personality.

For drugs or procedures to rise to the level of "disrupt[ing] profoundly the senses or personality," they must produce an extreme effect. And by requiring that they be "calculated" to produce such an effect, the statute requires that the defendant has consciously designed the acts to produce such an effect. 28 U.S.C. § 2340(2)(B). The word "disrupt" is defined as "to break

asunder; to part forcibly; rend," imbuing the verb with a connotation of violence. *Webster's New International Dictionary* 753 (2d ed. 1935); *see Webster's Third New International Dictionary* 656 (1986) (defining disrupt as "to break apart: Rupture" or "destroy the unity or wholeness of"); IV *The Oxford English Dictionary* 832 (1989) (defining disrupt as "[t]o break or burst asunder; to break in pieces; to separate forcibly"). Moreover, disruption of the senses or personality alone is insufficient to fall within the scope of this subsection; instead, that disruption must be profound. The word "profound" has a number of meanings, all of which convey a significant depth. *Webster's New International Dictionary* 1977 (2d ed. 1935) defines profound as: "Of very great depth; extending far below the surface or top; unfathomable[;] . . . [c]oming from, reaching to, or situated at a depth or more than ordinary depth; not superficial; deep-seated; chiefly with reference to the body; as a *profound* sigh, wound, or pain[;] . . . [c]haracterized by intensity, as of feeling or quality; deeply felt or realized; as, *profound* respect, fear, or melancholy; hence, encompassing; thoroughgoing; complete; as, *profound* sleep, silence, or ignorance." *See Webster's Third New International Dictionary* 1812 (1986) ("having very great depth: extending far below the surface . . . not superficial"). *Random House Webster's Unabridged Dictionary* 1545 (2d ed. 1999) also defines profound as "originating in or penetrating to the depths of one's being" or "pervasive or intense; thorough; complete" or "extending, situated, or originating far down, or far beneath the surface." By requiring that the procedures and the drugs create a *profound* disruption, the statute requires more than that the acts "forcibly separate" or "rend" the senses or personality. Those acts must penetrate to the core of an individual's ability to perceive the world around him, substantially interfering with his cognitive abilities, or fundamentally alter his personality.

The phrase "disrupt profoundly the senses or personality" is not used in mental health literature nor is it derived from elsewhere in U.S. law. Nonetheless, we think the following examples would constitute a profound disruption of the senses or personality. Such an effect might be seen in a drug-induced dementia. In such a state, the individual suffers from significant memory impairment, such as the inability to retain any new information or recall information about things previously of interest to the individual. *See* DSM-IV at 134.[49] This impairment is accompanied by one or more of the following: deterioration of language function, e.g., repeating sounds or words over and over again; impaired ability to execute simple motor activities, e.g., inability to dress or wave goodbye; "[in]ability to recognize [and identify] objects such as chairs or pencils" despite normal visual functioning; or "[d]isturbances in executive level functioning," i.e., serious impairment of abstract thinking. *Id.* at 134–35. Similarly, we think that the onset of "brief psychotic disorder" would satisfy this standard. *See id.* at 302–03. In this disorder, the individual suffers psychotic symptoms, including among other things, delusions, hallucinations, or even a catatonic state. This can last for one day or even one month. *See id.* We likewise think that the onset of obsessive-compulsive disorder behaviors would rise to this level. Obsessions are intrusive thoughts unrelated to reality. They are not simple worries, but are

---

[49]    Published by the American Psychiatric Association, and written as a collaboration of over a thousand psychiatrists, the DSM-IV is commonly used in U.S. courts as a source of information regarding mental health issues and is likely to be used in trial should charges be brought that allege this predicate act. *See, e.g., Atkins v. Virginia*, 122 S. Ct. 2242, 2245 n.3 (2002); *Kansas v. Crane*, 534 U.S. 407, 413–14 (2002); *Kansas v. Hendricks*, 521 U.S. 346, 359–60 (1997); *McClean v. Merrifield*, No. 00-CV-0120E(SC), 2002 WL 1477607, at *2 n.7 (W.D.N.Y. June 28, 2002); *Peeples v. Coastal Office Prods.*, 203 F. Supp. 2d. 432, 439 (D. Md. 2002); *Lassiegne v. Taco Bell Corp.*, 202 F. Supp. 2d 512, 519 (E.D. La. 2002).

**UNCLASSIFIED**

repeated doubts or even "aggressive or horrific impulses." *See id.* at 418. The DSM-IV further explains that compulsions include "repetitive behaviors (e.g., hand washing, ordering, checking)" and that "[b]y definition, [they] are either clearly excessive or are not connected in a realistic way with what they are designed to neutralize or prevent." *See id.* Such compulsions or obsessions must be "time-consuming." *See id.* at 419. Moreover, we think that pushing someone to the brink of suicide, particularly where the person comes from a culture with strong taboos against suicide, and it is evidenced by acts of self-mutilation, would be a sufficient disruption of the personality to constitute a "profound disruption." These examples, of course, are in no way intended to be exhaustive list. Instead, they are merely intended to illustrate the sort of mental health effects that we believe would accompany an action severe enough to amount to one that "disrupt[s] profoundly the senses or the personality."

The third predicate act listed in section 2340(2) is threatening a prisoner with "imminent death." 18 U.S.C. § 2340(2)(C). The plain text makes clear that a threat of death alone is insufficient; the threat must indicate that death is "imminent." The "threat of imminent death" is found in the common law use as an element of the defense of duress. *See Bailey*, 444 U.S. at 409. "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them." *Morissette v. United States*, 342 U.S. 246, 263 (1952). Common law cases and legislation generally define imminence as requiring that the threat be almost immediately forthcoming. 1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 5.7, at 655 (1986). By contrast, threats referring vaguely to things that might happen in the future do not satisfy this immediacy requirement. *See United States v. Fiore*, 178 F.3d 917, 923 (7th Cir. 1999). Such a threat fails to satisfy this requirement not because it is too remote in time but because there is a lack of certainty that it will occur. Indeed, timing is an indicator of certainty that the harm *will* befall the defendant. Thus, a vague threat that someday the prisoner *might* be killed would not suffice. Instead, subjecting a prisoner to mock executions or playing Russian roulette with him would have sufficient immediacy to constitute a threat of imminent death. Additionally, as discussed earlier, we believe that the existence of a threat must be assessed from the perspective of a reasonable person in the same circumstances.

Fourth, if the official threatens to do anything previously described to a third party, or commits such an act against a third party, that threat or action can serve as the necessary predicate for prolonged mental harm. *See* 18 U.S.C. § 2340(2)(D). The statute does not require any relationship between the prisoner and the third party.

### d.    Summary

Section 2340's definition of torture must be read as a sum of these component parts. *See Argentine Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434–35 (1989) (reading two provisions together to determine statute's meaning); *Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 405 (1988) (looking to "the language and design of the statute as a whole" to ascertain a statute's meaning). Each component of the definition emphasizes that torture is not the mere

**UNCLASSIFIED**

infliction of pain or suffering on another, but is instead a step well removed. The victim must experience intense pain or suffering of the kind that is equivalent to the pain that would be associated with serious physical injury so severe that death, organ failure, or permanent damage resulting in a loss of significant body function will likely result. If that pain or suffering is psychological, that suffering must result from one of the acts set forth in the statute. In addition, these acts must cause long-term mental harm. Indeed, this view of the criminal act of torture is consistent with the term's common meaning. Torture is generally understood to involve "intense pain" or "excruciating pain," or put another way, "extreme anguish of body or mind." *Black's Law Dictionary* 1498 (7th Ed. 1999); *Random House Webster's Unabridged Dictionary* 1999 (1999); *Webster's New International Dictionary* 2674 (2d ed. 1935). In short, reading the definition of torture as a whole, it is plain that the term encompasses only extreme acts.

### e.    Legislative History

The legislative history of sections 2340–2340A is scant. Neither the definition of torture nor these sections as a whole sparked any debate. Congress criminalized this conduct to fulfill U.S. obligations under CAT, which requires signatories to "ensure that all acts of torture are offenses under its criminal law." CAT art. 4. Sections 2340–2340A appeared only in the Senate version of the Foreign Affairs Authorization Act, and the conference bill adopted them without amendment. *See* H. R. Conf. Rep. No. 103-482, at 229 (1994). The only light that the legislative history sheds reinforces what is obvious from the texts of section 2340 and CAT: Congress intended Section 2340's definition of torture to track the definition set forth in CAT, as elucidated by the United States' reservations, understandings, and declarations submitted as part of its ratification. *See* S. Rep. No. 103-107, at 58 (1993) ("The definition of torture emanates directly from article 1 of the Convention."); *id.* at 58–59 ("The definition for 'severe mental pain and suffering' incorporates the understanding made by the Senate concerning this term.").

### f.    U.S. Judicial Interpretation

As previously noted, there are no reported cases of prosecutions under section 2340A. *See* Beth Stephens, *Corporate Liability: Enforcing Human Rights Through Domestic Litigation*, 24 Hastings Int'l & Comp. L. Rev. 401, 408 & n.29 (2001); Beth Van Schaack, *In Defense of Civil Redress: The Domestic Enforcement of Human Rights Norms in the Context of the Proposed Hague Judgments Convention*, 42 Harv. Int'l L.J. 141, 148–49 (2001); Curtis A. Bradley, *Universal Jurisdiction and U.S. Law*, 2001 U. Chi. Legal F. 323, 327–28. Nonetheless, we are not without guidance as to how United States courts would approach the question of what conduct constitutes torture. Civil suits filed under the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 note (2000), which supplies a tort remedy for victims of torture, provide insight into what acts U.S. courts would conclude constitute torture under the criminal statute.

The TVPA contains a definition similar in some key respects to the one set forth in section 2340. Moreover, as with section 2340, Congress intended for the TVPA's definition of torture to follow closely the definition found in CAT. *See Xuncax v. Gramajo*, 886 F. Supp. 162,

**UNCLASSIFIED**

176 n.12 (D. Mass 1995) (noting that the definition of torture in the TVPA tracks the definitions in section 2340 and CAT).[50] The TVPA defines torture as:

> (1). . . any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and
> (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—
> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
> (C) the threat of imminent death; or
> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

28 U.S.C. § 1350 note § 3(b).  This definition differs from section 2340's definition in two respects.  First, the TVPA definition contains an illustrative list of purposes for which such pain may have been inflicted.  *See id.*  Second, the TVPA includes the phrase "arising only from or inherent in, or incidental to lawful sanctions"; by contrast, section 2340 refers us to pain or suffering "incidental to lawful sanctions."  *Id.*  Because the purpose of our analysis here is to ascertain acts that would cross the threshold of producing "severe physical or mental pain or suffering," the list of illustrative purposes for which it is inflicted generally would not affect this analysis.[51]  Similarly, to the extent that the absence of the phrase "arising only from or inherent in" from section 2340 might affect the question of whether pain or suffering was part of lawful sanctions and thus not torture, the circumstances with which we are concerned here are solely that of interrogations, not the imposition of punishment subsequent to judgment.  These

---

[50] *See also* 137 Cong. Rec. 34,785 (1991) (statement of Rep. Mazzoli) ("Torture is defined in accordance with the definition contained in [CAT]"); *see also Torture Victims Protection Act: Hearing and Markup on H.R. 1417 Before the Subcomm. On Human Rights and International Organizations of the House Comm. on Foreign Affairs,* 100th Cong. 38 (1988) (Prepared Statement of the Association of the Bar of the City of New York, Committee on International Human Rights) ("This language essentially tracks the definition of 'torture' adopted in the Torture Convention.").

[51] While this list of purposes is illustrative only, demonstrating that a defendant harbored any of these purposes "may prove valuable in assisting in the establishment of intent at trial." Matthew Lippman, *The Development and Drafting of the United Nations Convention Against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment,* 17 B.C. Int'l & Comp. L. Rev. 275, 314 (1994).

differences between the TVPA and section 2340 are therefore not sufficiently significant to undermine the usefulness of TVPA cases here.[52]

In suits brought under the TVPA, courts have not engaged in any lengthy analysis of what acts constitute torture. In part, the absence of such analysis is due to the nature of the acts alleged. Almost all of the cases involve physical torture, some of which is of an especially cruel and even sadistic nature. Nonetheless, courts appear to look at the entire course of conduct rather than any one act, making it somewhat akin to a totality-of-the-circumstances analysis. Because of this approach, it is difficult to take a specific act out of context and conclude that the act in isolation would constitute torture. Certain acts do, however, consistently reappear in these cases or are of such a barbaric nature, that it is likely a court would find that allegations of such treatment would constitute torture: (1) severe beatings using instruments such as iron barks, truncheons, and clubs; (2) threats of imminent death, such as mock executions; (3) threats of removing extremities; (4) burning, especially burning with cigarettes; (5) electric shocks to genitalia or threats to do so; (6) rape or sexual assault, or injury to an individual's sexual organs, or threatening to do any of these sorts of acts; and (7) forcing the prisoner to watch the torture of others. While we cannot say with certainty that acts falling short of these seven would *not* constitute torture under Section 2340, we believe that interrogation techniques would have to be similar to these acts in their extreme nature and in the type of harm caused to violate the law.

### III.    International Law

In this Part, we examine CAT. Additionally, we examine the applicability of customary international law to the conduct of interrogations. At the outset, it is important to emphasize that the President can suspend or terminate any treaty or provision of a treaty. *See generally* Memorandum for John Bellinger, III, Senior Associate Counsel to the President and Legal Adviser to the National Security Council, from John C. Yoo, Deputy Assistant Attorney General and Robert J. Delahunty, Special Counsel, Office of Legal Counsel, *Re: Authority of the President to Suspend Certain Provisions of the ABM Treaty* (Nov. 15, 2001); Memorandum for Alberto R. Gonzales, Counsel to the President, from Jay S. Bybee, Assistant Attorney General, *Re: Authority of the President to Denounce the ABM Treaty* (Dec. 14, 2001). Any presidential decision to order interrogation methods that are inconsistent with CAT would amount to a suspension or termination of those treaty provisions. Moreover, as U.S. declarations during CAT's ratification make clear, the Convention is non-self-executing and therefore places no legal obligations under domestic law on the Executive Branch, nor can it create any cause of action in federal court. Letter for Alberto R. Gonzales, Counsel to the President from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, 1 (July 22, 2002). Similarly, customary international law lacks domestic legal effect, and in any event can be overridden by the President at his discretion.

---

[52] The TVPA also requires that an individual act "intentionally." As we noted with respect to the text of CAT, this language might be construed as requiring general intent. It is not clear that this is so. We need not resolve that question, however, because we review the TVPA cases solely to address the acts that would satisfy the threshold of inflicting "severe physical or mental pain or suffering."

A.    **U.N. Convention Against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment ("CAT").**

The most relevant international convention here is CAT.[53]    The treaty's text and negotiating history establish that the definition of torture is limited only to the most egregious conduct.    Further, because the United States' instrument of ratification defined torture in exactly the same manner as in 18 U.S.C. §§ 2340–2340A, the United States' treaty obligation is no different than the standard set by federal criminal law.    With respect to CAT's provision concerning cruel, inhuman, or degrading treatment or punishment, the United States' instrument of ratification defined that term as the cruel, unusual and inhuman treatment prohibited by the Eighth, Fifth, and Fourteenth Amendments.    We review the substantive standards established by those Amendments in order to fully identify the scope of the United States' CAT obligations.

1.    CAT's Text

We begin our analysis with the treaty's text. *See Eastern Airlines Inc. v. Floyd*, 499 U.S. 530, 534–35 (1991) ("When interpreting a treaty, we begin with the text of the treaty and the context in which the written words are used.) (quotation marks and citations omitted).    CAT defines torture as:

> any act by which *severe* pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or

---

[53]    You have also asked whether U.S. interrogation of al Qaeda and Taliban detainees could lead to liability and potential prosecution before the International Criminal Court ("ICC").    The ICC cannot take action against the United States for its conduct of interrogations for two reasons.    First, under international law a state cannot be bound by treaties to which it has not consented.    Although President Clinton signed the Rome Statute, which establishes the ICC, the United States has withdrawn its signature from that agreement and has not submitted it to the Senate for advice and consent—effectively terminating it. *See* Letter for Kofi Annan, U.N. Secretary General, from John R. Bolton, Under Secretary of State for Arms Control and International Security (May 6, 2002) (notifying the U.N. of U.S. intention not to be a party to the treaty); Rome Statute of the International Criminal Court, 37 I.L.M. 999, U.N. Doc. A/Conf.183/9 (1998).    The United States cannot, therefore, be bound by the provisions of the ICC treaty nor can U.S. nationals be subject to ICC prosecution.    Second, even if the ICC could in some way act upon the United States and its citizens, interrogation of an al Qaeda or Taliban operative could not constitute a crime under the Rome Statute.    The Rome Statute makes torture a crime subject to the ICC's jurisdiction in only two contexts.    Under article 7 of the Rome Statute, torture may fall under the ICC's jurisdiction as a crime against humanity if it is committed as "part of a widespread and systematic attack directed against any civilian population."    Here, however, the interrogation of al Qaeda or Taliban operatives is part of an international armed conflict against a terrorist organization, not an attack on a civilian population.    Indeed, our conflict with al Qaeda does not directly involve any distinct civilian population.    Rather, al Qaeda solely constitutes a group of illegal belligerents who are dispersed around the world into cells, rather than being associated with the civilian population of a nation-state.    Under article 8 of the Rome Statute, torture can fall within the ICC's jurisdiction as a war crime.    To constitute a war crime, torture must be committed against "persons or property protected under the provisions of the relevant Geneva Conventions."    Rome Statute, art. 8.    As we have explained, neither members of the al Qaeda terrorist network nor Taliban soldiers are entitled to the legal status of prisoners of war under the GPW. *See Treaties and Laws Memorandum* at 8 (Jan. 22, 2002); *see also United States v. Lindh*, 212 F.2d 541, 556–57 (E.D. Va. 2002).    Interrogation of al Qaeda or Taliban members, therefore cannot constitute a war crime because article 8 of the Rome Statute applies only to those protected by the Geneva Conventions.

**UNCLASSIFIED**          ~~SECRET/NOFORN~~

SECRET/NOFORN

> a third person, or for any reason based on discrimination of any
> kind, when such pain or suffering is inflicted by or at the
> instigation of or with the consent or acquiescence of a public
> official or other person acting in an official capacity.

Article 1(1). Unlike section 2340, this definition includes a list of purposes for which pain and suffering cannot be inflicted. The prefatory phrase "such purposes as" makes clear that this list is illustrative rather than exhaustive. Severe pain or suffering need not be inflicted for those specific purposes to constitute torture. Instead, the perpetrator must simply have a purpose of the same kind. More importantly, as under section 2340, the pain and suffering must be severe to reach the threshold of torture. As with section 2340, the text of CAT makes clear that torture must be an extreme act.

CAT also distinguishes between torture and other acts of cruel, inhuman, or degrading treatment or punishment.[54] Article 16 of CAT requires state parties to "undertake to prevent . . . other acts of cruel, inhuman or degrading treatment or punishment *which do not amount to torture* as defined in article 1." (Emphasis added). CAT thus establishes a category of acts that states should endeavor to prevent but need not criminalize. CAT reserves for torture alone the criminal penalties and the stigma attached to those penalties. In so doing, CAT makes clear that torture is at the farthest end of impermissible actions, and that it is distinct and separate from the lower level of "cruel, inhuman, or degrading treatment or punishment." This approach is in keeping with the earlier, but non-binding, U.N. Declaration on the Protection from Torture, which defines torture as "an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment." Declaration on Protection from Torture, UN Res. 3452, Art. 1(2) (Dec. 9, 1975).

2.    **Ratification History**

Executive branch interpretation of CAT further supports our conclusion that the treaty prohibits only the most extreme forms of physical or mental harm. As we have previously noted, the "division of treaty-making responsibility between the Senate and the President is essentially the reverse of the division of law-making authority, with the President being the draftsman of the treaty and the Senate holding the authority to grant or deny approval." *Relevance of Senate Ratification History to Treaty Interpretation*, 11 Op. O.L.C. 28, 31 (1987) ("*Sofaer*

---

[54] Common article 3 of GPW contains somewhat similar language. Article 3(1)(a) prohibits "violence to life and person, in particular murder of all kinds, mutilation, *cruel treatment and torture*." (Emphasis added). Article 3(1)(c) additionally prohibits "outrages upon personal dignity, in particular, humiliating and degrading treatment." Subsection (c) must forbid more conduct than that already covered in subsection (a) otherwise subsection (c) would be superfluous. Common article 3 does not, however, define either of the phrases "outrages upon personal dignity" or "humiliating and degrading treatment." International criminal tribunals, such as those respecting Rwanda and former Yugoslavia have used common article 3 to try individuals for committing inhuman acts lacking any military necessity whatsoever. These tribunals, however, have not yet articulated the full scope of conduct prohibited by common article 3. Memorandum for John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, from James C. Ho, Attorney-Advisor, Office of Legal Counsel, *Re: Possible Interpretations of Common Article 3 of the 1949 Geneva Convention Relative to the Treatment of Prisoners of War* (Feb. 1, 2002). We note that section 2340A and CAT protect any individual from torture. By contrast, the standards of conduct established by common article 3 do not apply to "an armed conflict between a nation-state and a transnational terrorist organization." *Treaties and Laws Memorandum* at 8.

SECRET/NOFORN

*Memorandum*"). In his capacity as the "sole organ of the federal government in the field of international relations," *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936), the President alone decides whether to initiate treaty discussions and he alone controls the course and substance of negotiations. The President conducts the day-to-day interpretation of a treaty and may terminate a treaty unilaterally. *See Goldwater v. Carter*, 617 F.2d 697, 707–08 (D.C. Cir.) (en banc), *vacated and remanded with instructions to dismiss on other grounds*, 444 U.S. 996 (1979). Courts accord the Executive Branch's interpretation the greatest weight in ascertaining a treaty's intent and meaning. *See, e.g., United States v. Stuart*, 489 U.S. 353, 369 (1989) ("'the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight'") (quoting *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982)); *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the department of government particularly charged with their negotiation and enforcement is given great weight."); *Charlton v. Kelly*, 229 U.S. 447, 468 (1913) ("A construction of a treaty by the political departments of the government, while not conclusive upon a court . . . , is nevertheless of much weight.").

A review of the Executive branch's interpretation and understanding of CAT reveals that the United States understood that torture included only the most extreme forms of physical or mental harm. When it submitted the Convention to the Senate, the Reagan administration took the position that CAT reached only the most heinous acts. The Reagan administration included the following understanding:

> The United States understands that, in order to constitute torture, an act must be a deliberate and calculated act of an extremely cruel and inhuman nature, specifically intended to inflict excruciating and agonizing physical or mental pain or suffering.

S. Treaty Doc. No. 100-20, at 4–5. Focusing on the treaty's requirement of "severity," the Reagan administration concluded, "[t]he extreme nature of torture is further emphasized in [this] requirement." S. Treaty Doc. No. 100-20, at 3 (1988); S. Exec. Rep. No. 101-30, at 13 (1990). The Reagan administration determined that CAT's definition of torture was consistent with "United States and international usage, [where it] is usually reserved for extreme deliberate and unusually cruel practices, for example, sustained systematic beatings, application of electric currents to sensitive parts of the body and tying up or hanging in positions that cause extreme pain." S. Exec. Rep. No. 101-30, at 14 (1990).

Further, the Reagan administration clarified the distinction between torture and lesser forms of cruel, inhuman, or degrading treatment or punishment. In particular, the administration declared that article 1's definition of torture ought to be construed in light of article 16. *See* S. Treaty Doc. No. 100-20, at 3. "'Torture' is thus to be distinguished from lesser forms of cruel, inhuman, or degrading treatment or punishment, which are to be deplored and prevented, but are not so universally and categorically condemned as to warrant the severe legal consequences that the Convention provides in case of torture." *Id.* at 3. This distinction was "adopted in order to emphasize that torture is at the extreme end of cruel, inhuman and degrading treatment or

punishment." *Id.* at 3. Given this definition, "rough treatment as generally falls into the category of 'police brutality,' while deplorable, does not amount to 'torture.'" *Id.* at 4.

Although the Reagan administration relied on CAT's distinction between torture and "cruel, inhuman, or degrading treatment or punishment," it viewed the phrase "cruel, inhuman, or degrading treatment or punishment" as vague and lacking in a universally accepted meaning. The vagueness of this phrase could even be construed to bar acts not prohibited by the U.S. Constitution. The Administration pointed to *Case of X v. Federal Republic of Germany* as the basis for this concern. In that case, the European Court of Human Rights determined that the prison officials' refusal to recognize a prisoner's sex change might constitute degrading treatment. *See* S. Treaty Doc. No. 100-20, at 15 (citing European Commission on Human Rights, *Dec. on Adm.*, Dec. 15, 1977, *Case of X v. Federal Republic of Germany* (No. 6694/74), 11 Dec. & Rep. 16)). As a result of this concern, the Administration added the following understanding to its proposed instrument of ratification:

> The United States understands the term, 'cruel, inhuman or degrading treatment or punishment,' as used in Article 16 of the Convention, to mean the cruel, unusual, and inhumane treatment or punishment prohibited by the Fifth, Eighth and/or Fourteenth Amendments to the Constitution of the United States."

S. Treaty Doc. No. 100-20, at 15–16. Under this understanding, treatment or punishment must rise to the level of action that U.S. courts have found to be in violation of the U.S. Constitution in order to constitute cruel, inhuman, or degrading treatment or punishment. That which fails to rise to this level must fail, *a fortiori*, to constitute torture under section 2340 or CAT.

The Senate consented to the Convention during the first Bush administration. The Bush administration agreed with the Reagan administration's cruel, inhuman, and degrading treatment or punishment understanding and upgraded it from an understanding to a reservation. The Senate consented to the reservation in consenting to CAT. Although using less vigorous rhetoric, the Bush administration joined the Reagan administration in interpreting torture as reaching only extreme acts. To ensure that the Convention's reach remained limited, the Bush administration submitted the following understanding:

> The United States understands that, in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering and that mental pain or suffering refers to prolonged mental pain caused by or resulting from (1) the intentional infliction or threatened infliction of severe physical pain or suffering; (2) administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality; (3) the threat of imminent death; or (4) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality.

SECRET/NOFORN

S. Exec. Rep. No. 101-30, at 36. This understanding accomplished two things. First, it ensured that the term "intentionally" would be understood as requiring specific intent. Second, it defined the amorphous concept of *mental* pain or suffering. In so doing, this understanding ensured that mental torture would rise to a severity seen in the context of physical torture. The Senate ratified CAT with this understanding, and Congress codified it in 18 U.S.C. § 2340.

To be sure, the Bush administration's language differs from the Reagan administration understanding. The Bush administration said that it had altered the CAT understanding in response to criticism that the Reagan administration's original formulation had raised the bar for the level of pain necessary to constitute torture. *See Convention Against Torture: Hearing Before the Senate Comm. on Foreign Relations*, 101st Cong. 9–10 (1990) ("*1990 Hearing*") (prepared statement of Hon. Abraham D. Sofaer, Legal Adviser, Department of State). While it is true that there are rhetorical differences, both administrations consistently emphasized the extreme acts required to constitute torture. As we have seen, the Bush understanding as codified in section 2340 reaches only extreme acts. The Reagan understanding, like the Bush understanding, declared that "intentionally" would be understood to require specific intent. Though the Reagan administration required that the "act be deliberate and calculated" *and* that it be inflicted with specific intent, in operation there is little difference between requiring specific intent alone and requiring that the act be deliberate and calculated. The Reagan administration's understanding also made express what is obvious from the plain text of CAT: torture is an extreme form of cruel and inhuman treatment. The Reagan administration's understanding that the pain be "excruciating and agonizing" does not substantively deviate from the Bush administration's view.

The Bush understanding simply took an amorphous concept—excruciating and agonizing mental pain—and gave it a more concrete form. Executive branch representations made to the Senate support our view that there was little difference between these two understandings. *See 1990 Hearing*, at 10 (prepared statement of Hon. Abraham D. Sofaer, Legal Adviser, Department of State) ("no higher standard was intended" by the Reagan administration understanding than was present in the Convention or the Bush understanding); *id.* at 13–14 (statement of Mark Richard, Deputy Assistant Attorney General, Criminal Division, Department of Justice) ("In an effort to overcome this unacceptable element of vagueness [in the term "mental pain"], we have proposed an understanding which defines severe mental pain constituting torture with sufficient specificity . . . to protect innocent persons and meet constitutional due process requirements.") Accordingly, we believe that the two definitions submitted by the Reagan and Bush administrations had the same purpose in terms of articulating a legal standard, namely, ensuring that the prohibition against torture reaches only the most extreme acts.

Executive branch representations made to the Senate confirm that the Bush administration maintained the view that torture encompassed only the most extreme acts. Although the ratification record, such as committee hearings, floor statements, and testimony, is generally not accorded great weight in interpreting treaties, authoritative statements made by representatives of the Executive Branch are accorded the most interpretive value. *See Sofaer Memorandum* at 35–36. Hence, the testimony of the executive branch witnesses defining torture, in addition to the reservations, understandings and declarations that were submitted to the Senate by the Executive branch, should carry the highest interpretive value of any of the statements in

SECRET/NOFORN

the ratification record. At the Senate hearing on CAT, Mark Richard, Deputy Assistant Attorney General, Criminal Division, Department of Justice, offered extensive testimony as to the meaning of torture. Echoing the analysis submitted by the Reagan administration, he testified that "[t]orture is understood to be that barbaric cruelty which lies at the top of the pyramid of human rights misconduct." *1990 Hearing* at 16 (prepared statement of Mark Richard). He further explained, "As applied to physical torture, there appears to be some degree of consensus that the concept involves conduct, the mere mention of which sends chills down one's spine[.]" *Id.* Richard gave the following examples of conduct satisfying this standard: "the needle under the fingernail, the application of electrical shock to the genital area, the piercing of eyeballs, etc." *Id.* In short, repeating virtually verbatim the terms used in the Reagan understanding, Richard explained that under the Bush administration's submissions with the treaty "the essence of torture" is treatment that inflicts "excruciating and agonizing physical pain." *Id.* (emphasis added).

As to mental torture, Richard testified that "no international consensus had emerged [as to] what degree of mental suffering is required to constitute torture[,]" but that it was nonetheless clear that severe mental pain or suffering "does not encompass the normal legal compulsions which are properly a part of the criminal justice system[:] interrogation, incarceration, prosecution, compelled testimony against a friend, etc,—notwithstanding the fact that they may have the incidental effect of producing mental strain." *Id.* at 17. According to Richard, CAT was intended to "condemn as torture intentional acts such as those designed to damage and destroy the human personality." *Id.* at 14. This description of mental suffering emphasizes the requirement that any mental harm be of significant duration and supports our conclusion that mind-altering substances must have a profoundly disruptive effect to serve as a predicate act.

Apart from statements from Executive branch officials, the rest of a ratification record is of little weight in interpreting a treaty. *See generally Sofaer Memorandum.* Nonetheless, the Senate understanding of the definition of torture largely echoes the administrations' views. The Senate Foreign Relations Committee Report on CAT opined: "[f]or an act to be 'torture' it must be an *extreme* form of cruel and inhuman treatment, cause *severe* pain and suffering and be *intended to cause severe* pain and suffering." S. Exec. Rep. No. 101-30, at 6 (emphasis added). Moreover, like both the Reagan and Bush administrations, the Senate drew upon the distinction between torture and cruel, inhuman or degrading treatment or punishment in reaching its view that torture was extreme.[55] Finally, concurring with the administration's concern that "cruel, inhuman, or degrading treatment or punishment" could be construed to go beyond constitutional standards, the Senate supported the inclusion of the reservation establishing the Constitution as the baseline for determining whether conduct amounted to cruel, inhuman, degrading treatment or punishment. *See* 136 Cong. Rec. 36,192 (1990); S. Exec. Rep. No. 101-30, at 39.

---

[55] Hearing testimony, though the least weighty evidence of meaning of all of the ratification record, is not to the contrary. Other examples of torture mentioned in testimony similarly reflect acts resulting in intense pain: the "gouging out of childrens' [sic] eyes, the torture death by molten rubber, the use of electric shocks," cigarette burns, hanging by hands or feet. *1990 Hearing* at 45 (Statement of Winston Nagan, Chairman, Board of Directors, Amnesty International USA); *id.* at 79 (Statement of David Weissbrodt, Professor of Law, University of Minnesota, on behalf of the Center for Victims of Torture, the Minnesota Lawyers International Human Rights Committee).

SECRET/NOFORN

### 3. Negotiating History

CAT's negotiating history also supports interpreting torture to include only the extreme acts defined in section 2340. The state parties endeavored to craft a definition that reflected the term's gravity. During the negotiations, state parties offered various formulations to the working group, which then proposed a definition. Almost all of these suggested definitions illustrate the consensus that torture is an extreme act designed to cause agonizing pain. For example, the United States proposed that torture be defined as "includ[ing] any act by which extremely severe pain or suffering . . . is deliberately and maliciously inflicted on a person." J. Herman Burgers & Hans Danelius, *The United Nations Convention Against Torture: A Handbook on the Convention Against Torture and Other Cruel Inhuman and Degrading Treatment or Punishment* 41 (1988) ("*CAT Handbook*"). The United Kingdom suggested that torture be defined even more narrowly as the "*systematic and intentional* infliction of *extreme* pain or suffering rather than *intentional* infliction of *severe* pain or suffering." *Id.* at 45 (emphasis in original). Ultimately, in choosing the phrase "severe pain," the parties concluded that this phrase "sufficient[ly] . . . convey[ed] the idea that only acts of a certain gravity shall . . . constitute torture." *Id.* at 117.

State parties were acutely aware of the distinction they drew between torture and cruel, inhuman, or degrading treatment or punishment. The state parties considered and rejected a proposal that would have defined torture merely as cruel, inhuman or degrading treatment or punishment. *See id.* at 42. Mirroring the U.N. Declaration on Protection From Torture, some state parties proposed the inclusion of a paragraph defining torture as "an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment." *See id.* at 41; *see also* S. Treaty Doc. No. 100-20, at 2 (the U.N. Declaration on Protection from Torture (1975) served as "a point of departure for the drafting of [CAT]"). In the end, the parties concluded that the proposal was superfluous because Article 16 "impl[ies] that torture is the gravest form of such treatment or punishment." *CAT Handbook* at 80; *see* S. Exec. Rep. No. 101-30, at 13 ("The negotiating history indicates that [the phrase 'which do not amount to torture'] was adopted in order to emphasize that torture is at the extreme end of cruel, inhuman and degrading treatment or punishment and that Article 1 should be construed with this in mind.").

Additionally, the parties could not reach a consensus about the meaning of "cruel, inhuman, or degrading treatment or punishment." *See CAT Handbook* at 47. Without a consensus, the parties viewed the term as simply "'too vague to be included in a convention which was to form the basis for criminal legislation in the Contracting States.'" *Id.* This view reaffirms the interpretation of CAT as purposely reserving criminal penalties for torture alone.[56]

---

[56] CAT's negotiating history offers more than just support for the view that pain or suffering must be extreme to amount to torture. First, the negotiating history suggests that the harm sustained from the acts of torture need not be permanent. In fact, "the United States considered that it might be useful to develop the negotiating history which indicates that although conduct resulting in permanent impairment of physical or mental faculties is indicative of torture, it is not an essential element of the offence." *CAT Handbook* at 44. Second, the state parties to CAT rejected a proposal to include in CAT's definition of torture the use of truth drugs, where no physical harm or mental suffering was apparent. This rejection at least suggests that such drugs were not viewed as amounting to torture per se. *See id.* at 42.

SECRET/NOFORN

4.    U.S. Obligations Under CAT

a.    Torture

Despite the apparent differences in language between the Convention and 18 U.S.C. § 2340, the U.S. obligations under both are identical. As discussed above, the first Bush administration proposed an understanding of torture that is identical to the definition of that term found in section 2340. S. Exec. Rep. No. 101-30, at 36. The Senate approved CAT based on this understanding, and the United States included the understanding in its instrument of ratification.[57] As we explained above, the understanding codified at section 2340 accomplished two things. First, it made crystal clear that torture requires specific intent. Second, it added form and substance to the otherwise amorphous concept of *mental* pain or suffering. Because the understanding was included in the instrument of ratification, it defines the United States' obligation under CAT.

It is one of the basic principles of international law that a nation cannot be bound to a treaty without its consent. *See* Advisory Opinion on Reservations to the Convention on Genocide, 1951 I.C.J. 15, 21 (May 28, 1951) ("Genocide Convention Advisory Opinion"). *See also* 1 *Restatement (Third) of the Foreign Relations Law of the United States* pt. I, introductory note at 18 (1987) ("*Restatement (Third)*") ("Modern international law is rooted in acceptance by states which constitute the system."); Anthony Aust, *Modern Treaty Law and Practice* 75 (2000) (a state can only be bound by a treaty to which it has consented to be bound). In other words, the United States is only bound by those obligations of the Torture Convention to which it knowingly agreed. The United States cannot be governed either by provisions of the Convention from which it withheld its consent, or by interpretations of the Convention with which it disagreed, just as it could not be governed by the Convention itself if it had refused to sign it.

This does not mean that in signing the Torture Convention, the United States bound itself to every single provision. Rather, under international law, a reservation made when ratifying a treaty validly alters or modifies the treaty obligation. Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331, 8 I.L.M. 679 (entered into force Jan. 27, 1980); *Restatement (Third)* at § 313.[58] The right to enter reservations applies to multilateral agreements just as to the

---

[57] *See* http://www.un.org/Depts/Treaty/final/ts2/newfiles/part_boo/iv_boo/iv_9.html.

[58] A reservation is generally understood to be a unilateral statement that modifies a state party's obligations under a treaty. The ratifying party deposits this statement with its instrument of ratification. *See, e.g.*, Memorandum for the Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Genocide Convention* at 1 n.1 (Jan. 20, 1984). By contrast, an understanding is defined as a statement that merely clarifies or interprets a State party's legal obligations under the treaty. Such a statement does not alter the party's obligations as a matter of international law. How a party characterizes a statement it deposits at ratification is not, however, dispositive of whether it is reservation or understanding. *See* Letter for Hon. Frank Church, Chairman, Ad Hoc Subcommittee on the Genocide Convention, Committee on Foreign Relations, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel at 2–3 (May 8, 1970). Instead, whether a statement is a reservation or understanding depends on the statement's substance. *See* Memorandum for the Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Genocide Convention*, at 2 n.4 (June 1, 1982). Here, although under domestic law, the Bush administration's definition of torture was categorized as an "understanding," it was deposited with the instrument of ratification as a condition of the United States' ratification, and so under international law we consider it to be a reservation if it indeed modifies CAT's standard. *See Restatement (Third)*, at § 313 cmt. g. Under either characterization, the section 2340 standard governs.

SECRET//NOFORN

more familiar context of bilateral agreements. *Restatement (Third)* at § 313. Under international law, therefore, the United States is bound only by the text of CAT as modified by the Bush administration's understanding.[59] As is obvious from its text, and as discussed at length above, Congress codified the understanding almost verbatim when it enacted section 2340. The United States' obligation under CAT is thus identical to the standard set by section 2340. Conduct that does not violate the latter does not violate the former. So long as the interrogation methods do not violate section 2340, they also do not violate our international obligations under CAT.

To be sure, the Vienna Convention on Treaties recognizes several exceptions to the power to make reservations. None of them, however, apply here. First, a reservation is valid and effective unless it purports to defeat the "object and purpose" of the treaty. Vienna Convention, art. 19.[60] International law provides little guidance regarding the meaning of the "object and purpose" test. *See* Curtis A. Bradley & Jack L. Goldsmith, *Treaties, Human Rights, and Conditional Consent*, 149 U. Penn. L. Rev. 399, 432–33 (2000) (explaining that "[n]either the Vienna Convention nor the [Genocide Convention Advisory Opinion] provides much guidance regarding the 'object and purpose' test" and that "there has been no subsequent judicial analysis of the test under either the Vienna Convention or customary international law, and no binding official determination that a reservation has ever violated the test."). Nonetheless, it is clear that here the United States did not defeat the object and purpose of the Convention. In fact, it enacted section 2340 to expand the prohibition on torture in its domestic criminal law. The United States could only have defeated the object and purpose of the Convention if it had *narrowed* the existing prohibitions on torture under its domestic law. Rather than defeat the object of CAT, the United States accepted its terms and attempted, through the Bush administration's understanding, to make clear the scope and meaning of the treaty's obligations.

Second, a treaty reservation will not be valid if the treaty itself prohibits states from taking reservations. CAT nowhere prohibits state parties from entering reservations. Two provisions of the Convention—the competence of the Committee Against Torture in Article 28, and the mandatory jurisdiction of the International Court of Justice in Article 30—specifically note that nations may take reservations from their terms. The Convention, however, contains no provision that explicitly attempts to preclude states from exercising their basic right under international law to enter reservations to other provisions. Other treaties are quite clear when they attempt to prohibit any reservations. Without such a provision, we do not believe that CAT precludes reservations.

---

[59] Further, if we are correct in our suggestion that CAT itself creates a heightened intent standard, then the understanding the Bush Administration attached is less a modification of the Convention's obligations and more of an explanation of how the United States would implement its somewhat ambiguous terms.

[60] The United States is not a party to the Vienna Convention on Treaties. Nonetheless, as we have previously explained, "some lower courts have said that the Convention embodies the customary international law of treaties," and the State Department has at various times taken the same view. *See* Letter for John Bellinger, III, Senior Associate Counsel to the President and Legal Advisor to the National Security Council, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, at 1 (Nov.15, 2001). *See also* Memorandum for John H. Shenefield, Associate Attorney General, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, Re: *The Application of Sections 212(a)(27) and 212(a)(29) of the Immigration and Nationality Act of 1952 to Persons Within the Scope of the United Nations Headquarters Agreement and the Convention on the Privileges and Immunities of the United Nations* 22 (Oct. 20, 1980) (noting that the Vienna Convention is "generally accepted as the universal guide for the interpretation of treaties").

**UNCLASSIFIED**          SECRET//NOFORN

SECRET/NOFORN

Third, in regard to multilateral agreements, a treaty reservation may not be valid if other parties object in a timely manner. Vienna Convention, art. 20. If another state does not object within a certain period of time, it is deemed to have acquiesced in the reservation. If another nation objects, then the provision of the treaty to which the reservation applies is not in force between the two nations, unless the objecting nation opposes entry into force of the treaty as whole between the two nations. *Id.* art. 21(3). *See also* Genocide Convention Advisory Opinion, 1951 I.C.J. 15, 26 (May 28, 1951) (an objection "will only affect the relationship between the State making the reservation and the objecting State"). Here, no nation objected to the United States' further definition of torture.[61] Even if any nation had properly objected, that would mean only that there would be no provision prohibiting torture in effect between the United States and the objecting nation—effectively mooting the question whether an interrogation method violates the Torture Convention.

We conclude that the Bush administration's understanding created a valid and effective reservation to CAT. Even if it were otherwise, there is no international court that could take issue with the United States' interpretation of the Convention. In an additional reservation, the United States refused to accept the jurisdiction of the ICJ to adjudicate cases under the Convention. Although CAT creates a committee to monitor compliance, it can only conduct studies and has no enforcement powers.

Some may argue that permitting the assertion of justification defenses under domestic law, such as necessity or self-defense, would place the United States in violation of its international obligations. Such an argument would point to article 2(2) of CAT, which provides that "[n]o exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture." We do not believe, however, that a treaty may eliminate the United States' right, under international law, to use necessary measures for its self-defense. The right of national self-defense is well established under international law. As we have explained elsewhere, it is a right that is inherent in international law and in the international system. *See* Memorandum for Alberto R. Gonzales, Counsel to the President, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Authority of the President under Domestic and International Law to Use Force Against Iraq* at 30 (Oct. 23, 2002) ("*Iraq Memorandum*"). And, as we explained above, Article 51 of the U.N. Charter recognizes and reaffirms this inherent right:

> Nothing in the present Charter shall impair the inherent right of individual or collective self-defense if an armed attack occurs against a Member of the United Nations, until the Security Council has taken the measures necessary to maintain international peace and security.

---

[61] Three nations commented. Finland and Sweden asserted that the understanding did not alter U.S. obligations under CAT. While the Netherlands noted that the understanding "appear[ed] to narrow" article 1's definition of torture, it too asserted that this understanding did not alter U.S. obligations under CAT. Comments such as these have no effect under international law. Moreover, even if these comments could be termed objections, they were in fact untimely and thus are invalid. An objection to a reservation must be raised within twelve months of the notification of the reservation or by the date on which the objecting party consented to be bound, whichever is later. *See Restatement (Third)*, at § 313 cmt. e. None of these countries entered their comments within that time frame.

**UNCLASSIFIED**              SECRET/NOFORN

SECRET//NOFORN

U.N. Charter art. 51; *see also* North Atlantic Treaty, Apr. 4, 1949, art. 5, 63 Stat. 2241, 2244, 34 U.N.T.S. 243, 246 (agreeing that if an armed attack occurs against one of the parties, the others will exercise the right of individual or collective self-defense recognized by article 51); Inter-American Treaty of Reciprocal Assistance, Sept. 2, 1947, art. 3, 62 Stat. 1681, 1700, 21 U.N.T.S. 77, 93 (Rio Treaty) (same).

Although recognized by these agreements, the United States has long held the view that the right to self-defense is broader in scope, and could not be limited by these treaty provisions. Our Office has observed, for example, that Article 51 merely reaffirms a right that already existed independent of the Charter. As this Office explained forty years ago:

> The concept of self-defense in international law of course justifies more than activity designed merely to resist an armed attack which is already in progress. Under international law every state has, in the words of Elihu Root, "the right . . . to protect itself by preventing a condition of affairs in which it will be too late to protect itself."

Memorandum for the Attorney General, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, *Re: Legality under International Law of Remedial Action Against Use of Cuba as a Missile Base by the Soviet Union* at 2 (Aug. 30, 1962); *cf. Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 29 (1827) ("the [domestic] power to provide for repelling invasions includes the power to provide against the attempt and danger of invasion"). We have opined that "it is likely that under international law no treaty could prevent a nation from taking steps to defend itself." *High Seas Memorandum* at 10. As Secretary of State Frank Kellogg explained, "The right of self-defense . . . is inherent in every sovereign state and implicit in every treaty. Every nation is free at all times and regardless of treaty provisions to defend its territory from attack or invasion and it alone is competent to decide whether circumstances require recourse to war in self-defense." *Id.* (internal quotation marks and citation omitted). Indeed, the United States has consistently defended the doctrine of anticipatory self-defense, even though the text of Article 51 of the United Nations Charter itself seems to permit the use of force only after an armed attack has occurred. We believe that Article 51 is only expressive of one element of the broader right to self-defense, and that it could not derogate from a nation's right to use force to prevent an imminent attack.

Thus, if interrogation methods were inconsistent with the United States' obligations under CAT, but were justified by necessity or self-defense, we would view these actions still as consistent ultimately with international law. Although these actions might violate CAT, they would still be in service of the more fundamental principle of self-defense that cannot be extinguished by CAT or any other treaty. Further, if the President ordered that conduct, such an order would amount to a suspension or termination of the Convention. In so doing, the President's order and the resulting conduct would not be a violation of international law because the United States would no longer be bound by the treaty.

The right to self-defense, of course, cannot be invoked in any and all circumstances. As this Office has recently explained, the use of force must meet two requirements to be legitimate.

**UNCLASSIFIED**          SECRET//NOFORN

*See Iraq Memorandum* at 33.  First, "the use of force must be necessary because the threat is imminent and thus pursuing peaceful alternatives is not an option." *Id.* "Second, the response must be proportionate to the threat[.]" *Id.* We further explained that to determine whether a threat is sufficiently imminent to make the use of force necessary, "[f]actors to be considered include: the probability of an attack; the likelihood that this probability will increase, and therefore the need to take advantage of a window of opportunity; whether diplomatic alternatives are practical; and the magnitude of the harm that could result from the threat." *Id.* at 44.

### b.    Cruel, Inhuman, or Degrading Treatment or Punishment

CAT provides that "[e]ach State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture." Art. 16.[62]  CAT does not require state parties to criminalize such conduct, nor does CAT (in contrast to the prohibition against torture) preclude its justification by exigent circumstances.  Thus, the United States is within its international law obligations even if it uses interrogation methods that might constitute cruel, inhuman, or degrading treatment or punishment, so long as their use is justified by self-defense or necessity.

In its instrument of ratification to the Torture Convention, the United States expressly defined the term "cruel, inhuman, or degrading treatment or punishment" for purposes of Article 16 of the Convention.  The reservation limited "cruel and unusual or inhumane treatment or punishment" to the conduct prohibited under the Fifth, Fourteenth and Eighth Amendments.  This reservation cannot be said to defeat CAT's object and purpose.  As with the U.S. definition of torture, it does not expand the right to engage in cruel, inhuman, or degrading treatment.  Rather, the reservation merely reaffirmed the United States' consistent interpretation of this ambiguous term.[63]  While several countries commented on this reservation, those objections, if valid, mean simply that Article 16 is not in force between the United States and the objecting states.[64]  As to the remaining countries, this reservation is a binding obligation.

The U.S. reservation is important in light of the lack of international consensus regarding the meaning of cruel, inhuman or degrading treatment.  *See, e.g., Forti v. Suarez-Mason,* 694 F.

---

[62]  Article 16, like the other first 15 articles in the treaty, is non-self executing.  The United States took a reservation to this section, as with the other first fifteen articles, that this section was non-self executing.  As explained in text, therefore they not only "are not federal law cognizable in federal court, they also place no obligations on the Executive Branch."  Letter for Alberto R. Gonzales, Counsel to the President, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, at 1 (July 22, 2002).  *See also Buell v. Mitchell,* 274 F.3d 337, 372 (6th Cir. 2001) ("Courts in the United States are bound to give effect to international law and to international agreements, except that a non-self-executing agreement will not be given effect as law in the absence of necessary authority.") (internal quotation marks and citation omitted).

[63]  The United States took the same reservation with respect to a provision in the International Covenant on Civil and Political Rights, Dec. 19, 1966, 999 U.N.T.S. 171, that prohibited cruel, inhuman, or degrading treatment or punishment.

[64]  Three countries objected to this reservation.  Finland and the Netherlands objected to this reservation on the ground that it was incompatible with the object and purpose of the treaty.  Additionally, these two countries, along with Sweden objected to this reservation because of its reference to national law, which these countries found to fail to clearly define U.S. treaty obligations.  A fourth country, Germany, merely commented that this reservation d[id] not touch upon the obligations of the United States of America as State Party to the Convention."  These objections and comments, as noted earlier, were untimely and thus invalid.

Supp. 707, 711–12 (N.D. Cal. 1988) (sustaining earlier dismissal of cruel, inhuman, or degrading treatment or punishment because the court concluded that there was insufficient consensus defining the prohibited conduct). *Cf. Knight v. Florida*, 528 U.S. 990 (1999) (Thomas, J. concurring in the denial of cert.) (noting that international courts were not in agreement as to whether a lengthy delay between sentencing and execution constituted "cruel inhuman or degrading treatment or punishment" and that every court of appeals to have addressed such a claim had rejected it). Indeed, the drafters of CAT expressly recognized the absence of any consensus as to what kind of treatment or punishment rose to the level of "cruel, inhuman, or degrading treatment or punishment." As noted above, it is precisely because this term had no coherent meaning under international law that the drafters chose not to require the criminalization of such conduct. *See CAT Handbook* at 47. *Compare* CAT, art. 4 ("Each State Party shall ensure that all acts of torture are offences under its criminal law.") *with id.* art. 16 ("Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, human, or degrading treatment or punishment which do not amount to torture . . . ."). Given the wide-ranging nature of international decisions regarding this phrase, some international decisions might give the phrase almost limitless application. For example, in *Iwanczuk v. Poland* (Eur. Ct. H.R. 2001), the European Court of Human Rights concluded that a strip search, undertaken because a prisoner had once been found with a knife, as well as certain humiliating remarks the guards allegedly made about the prisoner's body (which the government disputed), "amounted to degrading treatment . . . ." *Id.* at ¶ 59. In reaching that conclusion, the court reasoned, "[I]t is sufficient if the victim is humiliated in his or her own eyes." *Id.* at ¶ 51 (citations omitted). And in *Ireland v. United Kingdom* (Eur. Ct. H.R. 1977), a decision discussed in more detail below, the court concluded that actions that "arouse . . . feelings of fear, anguish and inferiority capable of humiliating and debasing [the prisoners] and possibly breaking their physical or moral resistance" constitutes degrading treatment. *Id.* at ¶ 167. Under these decisions anything that *a detainee* finds humiliating or offensive, or anything geared toward reducing that person's moral or physical resistance to cooperating could constitute degrading treatment or punishment. These opinions would reach conduct far below the standard articulated in the U.S. reservation and would produce precisely the expansive and limitless results that the United States sought to avoid. Ultimately, as explained above, the United States is bound only by the treaty obligations to which it has consented. We explain below the substantive standards that this reservation to the definition of cruel, inhuman, and degrading treatment or punishment establishes. We address first the Eighth Amendment and then the standard established by the Fifth and Fourteenth Amendments.[65]

### i.   Eighth Amendment

Under the Supreme Court's "cruel and unusual punishment" jurisprudence, there are two lines of analysis that might be relevant to the conduct of interrogations: (1) when prison officials use excessive force; and (2) when prisoners challenge their conditions of confinement. As a general matter, the excessive force analysis often arises in situations in which an inmate has attacked another inmate or a guard. Under this analysis, "a prisoner alleging excessive force must demonstrate that the defendant acted 'maliciously and sadistically'" for the very purpose of causing harm. *Porter v. Nussle*, 534 U.S. 516, 528 (2002) (quoting *Hudson v. McMillian*, 503

---

[65]  As we explained in Part I, neither the Fifth Amendment nor the Eighth Amendment apply of their own force to the interrogations of alien enemy combatants held abroad.

U.S. 1, 7 (1992)). Actions taken in "good-faith . . . to maintain or restore discipline" do not constitute excessive force. *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986) ("[W]e think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.") (internal quotation marks and citation omitted). To determine whether an official has met this standard, factors such as "the need for the application of force, the relationship between the need and the amount of force that was used, [] the extent of injury inflicted[,]" are to be considered as well as "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Id.* at 321 (internal quotation marks and citation omitted). Put another way, the actions must be necessary and proportional in light of the danger that reasonably appears to be posed. Moreover, the Supreme Court has emphasized that deference must be accorded to the decisions of prison officials "taken in response to an actual confrontation with riotous inmates" as well as "to prophylactic or preventative measures intended to reduce the incidence of these or any other breaches of prison discipline." *Id.* at 322.

This standard appears to be most potentially applicable to interrogation techniques that may involve varying degrees of force. As is clear from above, the excessive force analysis turns on whether the official acted in good faith or maliciously and sadistically for the very purpose of causing harm. For good faith to be found, the use of force should, among other things, be necessary. Here, depending upon the precise factual circumstances, such techniques may be necessary to ensure the protection of the government's interest here—national security. As the Supreme Court recognized in *Haig v. Agee*, 435 U.S. 280 (1981), "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Id.* at 307 (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 509 (1964)). In the typical excessive force case, the protection of other inmates and officers or the maintenance of order are valid government interests that may necessitate the use of force. If prison administration or the protection of one person can be deemed to be valid governmental interests necessitating the use of force, then the interest of the United States here—obtaining intelligence vital to the protection of thousands of American citizens—can be no less valid.

To be sure, no court has encountered the precise circumstances here. Nonetheless, Eighth Amendment cases most often concern instances in which the inmate is a threat to safety, and here force would be used to prevent a threat to the safety of the United States that went beyond a single inmate or a single prison. We believe it is beyond question that there can be no more compelling government interest than that which is presented here. Just as prison officials are given deference in their response to rioting inmates or prison discipline, so too must the Executive be given discretion in its decisions to respond to the grave threat to national security posed by the current conflict. Whether the use of more aggressive techniques that involve force is permissible will depend on the information that relevant officials have regarding the nature of the threat and the likelihood that the particular detainee has information relevant to that threat.

Whether the interrogators have acted in good faith would turn in part on the injury inflicted. For example, if the technique caused minimal or minor pain, it is less likely to be problematic under this standard. The use of force must also be proportional, i.e., there should

SECRET/NOFORN

also be some relationship between the technique used and the necessity of its use. So, if officials had credible threat information that a U.S. city was to be the target of a large-scale terrorist attack a month from now and the detainee was in a position to have information that could lead to the thwarting of that attack, physical contact such as shoving or slapping the detainee clearly would not be disproportionate to the threat posed. In such an instance, those conducting the interrogations would have acted in good faith rather than maliciously and sadistically for the very purpose of causing harm.

We also note that the excessive force analysis might also apply to the use of threats. Some courts have held that threats can state an excessive force claim. For example, in *Chandler v. District of Columbia Dept. of Corrections*, 145 F.3d 1355 (D.C. Cir. 1998), the D.C. Circuit found that a correctional officer's threat to the inmate had put him in "imminent fear of his life because she was in a position to carry it out." *Id.* at 1361. The court concluded that "[d]epending upon the gravity of the fear, the credibility of the threat, and on [the inmate's] psychological condition, the threat itself could have caused more than *de minimis* harm and therefore could have been sufficient to state a claim of excessive use of force." *Id.* at 1361. *See also Northington v. Jackson*, 973 F.2d 1518 (10th Cir. 1992) (holding that allegation that officer put a gun to the inmate's head and threatened to kill him stated an excessive force claim). *But see Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (sheriff's idle threat to hang prisoner did not state a claim for an Eighth Amendment violation); *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) (allegations that defendants threatened inmate with physical harm, where plaintiff also alleged the defendants had beaten him, did not state an Eighth Amendment claim).

The conditions of confinement cases provide a useful analogue to interrogation techniques that alter the conditions of a detainee's cell and surrounding environment. The conditions of confinement analysis often arises in claims concerning the use of administrative segregation and conditions attendant that segregation. In those cases, a condition of confinement is not "cruel and unusual" unless it (1) is "sufficiently serious" to implicate constitutional protection, *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), and (2) reflects "deliberate indifference" to the prisoner's health or safety, *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The failure to demonstrate either one of these components is fatal to the claim. The first element is objective, and inquires whether the challenged condition is cruel and unusual. The second, so-called "subjective" element requires an examination of the actor's intent and inquires whether the challenged condition is imposed as a punishment. *Wilson v. Seiter*, 501 U.S. 294, 300 (1991) ("The source of the intent requirement is not the predilections of this Court, but the Eighth Amendment itself, which bans only cruel and unusual *punishment*. If the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify.").

The Supreme Court has noted that "[n]o static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes*, 452 U.S. at 346 (1981) (internal quotations marks and citation omitted). *See also Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (stating that the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency"). Despite

SECRET/NOFORN
63

this broad language, in recent years the Supreme Court clearly has sought to limit the reach of the Eighth Amendment in the prison context and certain guidelines emerge from these cases.

As to the objective element, the Court has established that "only those deprivations denying 'the minimal civilized measures of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson*, 501 U.S. at 298 (quoting *Rhodes*, 452 U.S. at 347). It is not enough for a prisoner to show that he has been subjected to conditions that are merely "restrictive and even harsh," as such conditions are simply "part of the penalty that criminal offenders pay for their offenses against society." *Rhodes*, 452 U.S. at 347. *See also id.* at 349 ("the Constitution does not mandate comfortable prisons"). Rather, a prisoner must show that he has suffered a "serious deprivation of basic human needs," *id.* at 347, such as "essential food, medical care, or sanitation," *id.* at 348. *See also Wilson*, 501 U.S. at 304 (requiring "the deprivation of a single, identifiable human need such as food, warmth, or exercise"). "The Amendment also imposes [the duty on officials to] provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832 (internal quotation marks and citations omitted). The Court has also articulated an alternative test inquiring whether an inmate was exposed to "a substantial risk of serious harm." *Id.* at 837. *See also DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001) ("In order to satisfy the [objective] requirement, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.") (internal quotation marks and citation omitted).

In these recent cases, the Court has made clear that the conditions of confinement are not to be assessed under a totality-of-the-circumstances approach. In *Wilson v. Seiter*, 501 US. 294 (1991), the Supreme Court expressly rejected the contention that "each condition must be considered as part of the overall conditions challenged." *Id.* at 304 (internal quotation marks and citation omitted). Instead, the Court concluded that "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Id.* As the Court further explained, "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* at 305.

To show deliberate indifference under the subjective element of the conditions of confinement test, a prisoner must show that " the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837. This standard requires greater culpability than mere negligence. *See id.* at 835; *Wilson*, 501 U.S. at 305 ("mere negligence would satisfy neither [the *Whitley* standard of malicious and sadistic infliction] nor the more lenient deliberate indifference standard") (internal quotation marks omitted). Deliberate indifference is, however, "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. Moreover, the Court has emphasized that there need not be direct evidence of such intent. Instead, the "existence of this subjective state of mind [may be

inferred] from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 122 S. Ct. 2508, 2514 (2002).

One of its most recent opinions on conditions of confinement—*Hope v. Pelzer*, 122 S. Ct. 2508 (2002)—illustrates the Court's focus on the necessity of the actions undertaken in response to a disturbance in determining the officer's subjective state of mind.[66] In *Hope*, following an "exchange of vulgar remarks" between the inmate Hope and an officer, the two got into a "wrestling match." *Id.* at 2512. Additional officers intervened and restrained Hope. *See id.* These officers then took Hope back to the prison. Once there, they required him to take off his shirt and then attached him to the hitching post, where he remained in the sun for the next seven hours. *See id.* at 2512–13. During this time, Hope received no bathroom breaks. He was given water only once or twice and at least one guard taunted him about being thirsty. *See id.* at 2513. The Supreme Court concluded that the facts Hope alleged stated an "obvious" Eighth Amendment violation. *Id.* at 2514. The obviousness of this violation stemmed from the utter lack of necessity of the guard's actions. The Court emphasized that "[a]ny safety concerns" arising from the scuffle between Hope and the officer "had long since abated by the time [Hope] was handcuffed to the hitching post" and that there was a "clear lack of an emergency situation." *Id.* As a result, the Court found that "[t]his punitive treatment amount[ed] to [the] gratuitous infliction of 'wanton and unnecessary' pain that our precedent clearly prohibits." *Id.* at 2515. Thus, the necessity of the governmental action bears upon both the conditions of confinement analysis as well as the excessive force analysis.

Here, interrogation methods that do not deprive enemy combatants of basic human needs would not meet the objective element of the conditions of confinement test. For example, a deprivation of a basic human need would include denial of adequate shelter, such as subjecting a detainee to the cold without adequate protection. *See Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). A brief stay in solitary confinement alone is insufficient to state a deprivation. *See, e.g., Leslie v. Doyle*, 125 F.3d 1132, 1135 (7th Cir. 1997) ("A brief stay in disciplinary segregation[, here 15 days,] is, figuratively, a kind of slap on the wrist that does not lead to a cognizable Eighth Amendment claim."). Such things as insulting or verbally ridiculing detainees would not constitute the deprivation of a basic human need. *See Somers v. Thurman*, 109 F.3d 614, 624 (9th Cir. 1997) ("To hold that gawking, pointing, and joking [about nude prisoners] violates the prohibition against cruel and unusual punishment would trivialize the objective component of the Eighth Amendment test and render it absurd."). Additionally, the clothing of a detainee could also be taken away for a period of time without necessarily depriving him of a basic human need that satisfies this objective test. *See, e.g., Seltzer-Bey v. Delo*, 66 F.3d 961, 964 (8th Cir. 1995). While the objective element would not permit the deprivation of food altogether, alterations in a detainee's diet could be made that would not rise to the level of a denial of life's necessities. As the Ninth Circuit has explained, "The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing." *LaMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993).

---

[66] Although the officers' actions in *Hope* were undertaken in response to a scuffle between an inmate and a guard, the case is more properly thought of as a conditions of confinement case rather than as an "excessive force" case. By examining the officers' actions under the "deliberate indifference standard" the Court analyzed it as a conditions of confinement case. As explained in text, the deliberate indifference standard is inapplicable to claims of excessive force.

SECRET/NOFORN

Even if an interrogation method amounted to a deprivation of life's necessities under the objective test, the subjective component would still need to be satisfied, i.e., the interrogators would have to act with deliberate indifference to the detainee's health or safety. We believe that if an interrogator acts with the honest belief that the interrogation methods used on a particular detainee do not present a serious risk to the detainee's health or safety, he will not have acted with deliberate indifference. An honest belief might be demonstrated by due diligence as to the effects of a particular interrogation technique combined with an assessment of the prisoner's psychological health.

Finally, the interrogation methods cannot be unnecessary or wanton. As we explained regarding the excessive force analysis, the government interest here is of the highest magnitude. In the typical conditions of confinement case, the protection of other inmates or officers, the protection of the inmate alleged to have suffered the cruel and unusual punishment, or even the maintenance of order in the prison, provide valid government interests that may justify various deprivations. *See, e.g., Anderson v. Nosser*, 438 F.2d 183, 193 (5th Cir. 1971) ("protect[ing] inmates] from self-inflicted injury, [] protect[ing] the general prison population and personnel from violate acts on his part, [and] prevent[ing] [] escape" are all legitimate penological interests that would permit the imposition of solitary confinement); *McMahon v. Beard*, 583 F.2d 172, 175 (5th Cir. 1978) (prevention of inmate suicide is a legitimate interest). As with excessive force, no court has encountered the precise circumstances here under conditions of confinement jurisprudence. Nonetheless, we believe it is beyond question that there can be no more compelling government interest than that which is presented here and depending upon the precise factual circumstances of an interrogation, e.g., where there was credible information that the enemy combatant had information that could avert a threat, deprivations that may be caused would not be wanton or unnecessary.

## ii.      Fifth and Fourteenth Amendments

Under the Due Process clauses of the Fifth and Fourteenth Amendments,[67] substantive due process protects an individual from "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Under substantive due process "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* at 846 (internal quotation marks and citation omitted). That conduct must "shock[] the conscience." *See generally id.; Rochin v. California*, 342 U.S. 165 (1952).[68] Unlike government actions subjected

---

[67]   The substantive due process standard discussed in this section applies to both the Fourteenth and Fifth Amendment Due Process Clauses.

[68]   In the seminal case of *Rochin v. California*, 342 U.S. 165 (1952), the police had some information that the defendant was selling drugs. Three officers went to and entered the defendant's home without a warrant and forced open the door to the defendant's bedroom. Upon the opening door, the officers saw two pills and asked the defendant about them. The defendant promptly put them in his mouth. The officers "jumped upon him and attempted to extract the capsules." *Id.* at 166. The police tried to pull the pills out of his mouth but despite considerable struggle the defendant swallowed them. The police then took the defendant to a hospital, where a doctor forced an ermetic solution into the defendant's stomach by sticking a tube down his throat and into his stomach, which caused the defendant to vomit up the pills. The pills did in fact contain morphine. *See id.* The

**UNCLASSIFIED**          SECRET/NOFORN

~~SECRET/NOFORN~~                                                                66

to scrutiny under procedural due process, which are constitutionally permissible so long as the government affords adequate processes, government actions that "shock the conscience" are prohibited irrespective of the procedures that the government may employ in undertaking those actions. *See generally Rochin v. California*, 342 U.S. 165 (1952). The Supreme Court has limited the use of the nebulous standards of substantive due process and sought to steer constitutional claims to more specific amendments. *See, e.g., Graham v. Connor*, 490 U.S. 386, 393–95 (1989) (holding that damages claim for injuries sustained when officers used physical force during a stop should be analyzed under the Fourth Amendment rather than substantive due process); *Whitley v. Albers*, 475 U.S. 312, 327 (1986) (holding that substantive due process provides no greater protection to prisoner shot during a prison riot than does the Eighth Amendment). *See also Matta-Ballesteros v. Henman*, 896 F.2d 255, 261 (7th Cir. 1990) (declining to analyze claim under the "shock-the-conscience" standard because Fourth Amendment provided that court with an explicit textual constitutional protection under which to analyze the plaintiff's claim of excessive force). As the Court explained in *Albright v. Oliver*, 510 U.S. 266 (1994), "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of governmental behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Id.* at 273 (plurality opinion of Rehnquist, C.J.). *See also County of Sacramento*, 523 U.S. at 843 ("[s]ubstantive due process analysis is therefore inappropriate" if the claim is covered by a specific Amendment). Thus, although substantive due process offers another line of analysis, it does not provide any protection greater than that which the Eighth Amendment provides. *See Whitley*, 475 U.S. at 327.

To shock the conscience, the conduct at issue must involve more than mere negligence by the executive official. *See County of Sacramento*, 523 U.S. at 849. *See also Daniels v. Williams*, 474 U.S. 327 (1986) ("Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property.") (collecting cases). Instead, "[i]t is . . . behavior on the other end of the culpability spectrum that would most probably support a substantive due process claim: conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *County of Sacramento*, 523 U.S. at 849. In some circumstances, however, recklessness or gross negligence may suffice. *See id.* The requisite level of culpability is ultimately "not . . . subject to mechanical application in unfamiliar territory." *Id.* at 850. As the Supreme Court has explained: "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.* As a general matter, deliberate indifference would be an appropriate standard where there is a real possibility for actual deliberation. In other circumstances, however, where quick decisions must be made (such as responding to a prison riot), a heightened level of culpability is more appropriate. *See id.* at 851–52.

The shock-the-conscience standard appears to be an evolving one. The Court's most recent opinion regarding this standard emphasized that the conscience shocked was the

---

Court found that the actions of the police officers "shocked the conscience" and therefore violated *Rochin's* due process rights. *Id.* at 170.

SECRET/NOFORN

"*contemporary* conscience." *Id.* at 847 n.8 (emphasis added). The Court explained that while a judgment of what shocks the conscience "may be informed by a history of liberty protection, [] it necessarily reflects an understanding of traditional executive behavior, of contemporary practice, and of the standards of blame generally applied to them." *Id.* Despite the evolving nature of the standard, it is objective rather than subjective. The Supreme Court has cautioned that although "the gloss has . . . not been fixed" as to what substantive due process is, judges "may not draw on [their] merely personal and private notions and disregard the limits that bind judges in their judicial function. . . . [T]hese limits are derived from considerations that are fused in the whole nature of our judicial process." 342 U.S. at 170. *See United States v. Lovasco*, 431 U.S. 783 (1973) (reaffirming that the test is objective rather than subjective). As the Court further explained, the conduct at issue must "do more than offend some fastidious squeamishness or private sentimentalism" to violate due process. *Rochin*, 342 U.S. at 172.

Additionally, *Ingraham v. Wright*, 430 U.S. 651 (1977), clarified that under substantive due process, "[t]here is, of course, a *de minimis* level of imposition with which the Constitution is not concerned." *Id.* at 674. And as the Fourth Circuit has noted, it is a "principle" "inherent in the Eighth [Amendment] and [substantive due process]" that "[n]ot . . . every malevolent touch by a prison guard gives rise to a federal cause of action. *See Johnson v. Glick*, 481 F.2d at 1033 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights")." *Riley v. Dorton*, 115 F.3d 1159, 1167 (4th Cir. 1997) (quoting *Hudson*, 503 U.S. at 9). Instead, "the [shock-the-conscience] . . . inquiry . . . [ is] whether the force applied caused injury so severe, and was so disproportionate to the need presented and so inspired by malice or sadism . . . that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987). Examples of physical brutality that "shock the conscience" include: the rape of a plaintiff by a uniformed officer, see *Jones v. Wellham*, 104 F.3d 620 (4th Cir. 1997); a police officer striking the plaintiff in retaliation for the plaintiff photographing the police officer, see *Shillingford v. Holmes*, 634 F.2d 263 (5th Cir. 1981); police officer shooting a fleeing suspect's legs without any probable cause other than the suspect's running and failure to stop, see *Aldridge v. Mullins*, 377 F. Supp. 850 (M.D. Tenn. 1972) *aff'd*, 474 F.2d 1189 (6th Cir. 1973). Moreover, beating or sufficiently threatening someone during the course of an interrogation can constitute conscience-shocking behavior. *See Gray v. Spillman*, 925 F.2d 90, 91 (4th Cir. 1991) (plaintiff was beaten and threatened with further beating if he did not confess). By contrast, for example, actions such as verbal insults and an angry slap of "medium force" did not constitute behavior that "shocked the conscience." *See Riley*, 115 F.3d at 1168 n.4 (4th Cir. 1997) (finding claims that such behavior shocked the conscience "meritless").

Physical brutality is not the only conduct that may meet the shock-the-conscience standard. In *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992) (en banc), the Ninth Circuit held that certain psychologically-coercive interrogation techniques could constitute a violation of substantive due process. The interrogators techniques were "designed to instill stress, hopelessness, and fear, and to break [the suspect's] resistance." *Id.* at 1229. The officers planned to ignore any request for a lawyer and to ignore the suspect's right to remain silent, with the express purpose that any statements he might offer would help keep him from testifying in his own defense. *See id.* at 1249. It was this express purpose that the court found to be the "aggravating factor" that led it to conclude that the conduct of the police "shocked the

SECRET/NOFORN

~~SECRET/NOFORN~~                                                    68

conscience." *Id.* at 1249. The court reasoned that while "[i]t is a legitimate purpose of police investigation to gather evidence and muster information that will surround a guilty defendant and make it difficult if not impossible for him to escape justice[,]" "when the methods chosen to gather such evidence and information are deliberately unlawful and flout the Constitution, the legitimacy is lost." *Id.* at 1250. In *Wilkins v. May*, 872 F.2d 190 (7th Cir. 1989), the Seventh Circuit found that severe mental distress inflicted on a suspect could be a basis for a substantive due process claim. *See id.* at 195. *See also Rhodes v. Robinson*, 612 F.2d 766, 771 (3d Cir. 1979) (claim of emotional harm could be the basis of a substantive due process claim). The *Wilkins* court found that under certain circumstances interrogating a suspect with gun at his head could violate those rights. *See* 872 F.2d at 195. Whether it would rise to the level of a violation depended upon whether the plaintiff was able to show "misconduct that a reasonable person would find so beyond the norm of proper police procedure as to shock the conscience, and that it is calculated to induce not merely momentary fear or anxiety, but severe mental suffering, in the plaintiff." *Id.* On the other hand, we note that merely deceiving the suspect does not shock the conscience, see, e.g., *United States v. Byram*, 145 F.3d 405 (1st Cir. 1998) (assuring defendant he was not in danger of prosecution did not shock the conscience), nor does the use of sympathy or friends as intermediaries, see, e.g., *United States v. Simtob*, 901 F.2d 799, 809 (9th Cir. 1990).

Although the substantive due process case law is not pellucid, several principles emerge. First, whether conduct is conscience-shocking turns in part on whether it is without any justification, i.e., it is "inspired by malice or sadism." *Webb*, 828 F.2d at 1158. Although enemy combatants may not pose a threat to others in the classic sense seen in substantive due process cases, the detainees here may be able to prevent great physical injury to countless others through their knowledge of future attacks. By contrast, if the interrogation methods were undertaken solely to produce severe mental suffering, they might shock the conscience. Second, the official must have acted with more than mere negligence. Because, generally speaking, there will be time for deliberation as to the methods of interrogation that will be employed, it is likely that the culpability requirement here is deliberate indifference. *See County of Sacramento*, 523 U.S. at 851–52. Thus, an official must know of a serious risk to the health or safety of a detainee and he must act in conscious disregard for that risk in order to violate due process standards. Third, this standard permits some physical contact. Employing a shove or slap as part of an interrogation would not run afoul of this standard. Fourth, the detainee must sustain some sort of injury as a result of the conduct, e.g., physical injury or severe mental distress.

### 5.    International Decisions on the Conduct of Interrogations

Although decisions by foreign or international bodies are in no way binding authority upon the United States, they provide guidance about how other nations will likely react to our interpretation of the CAT and Section 2340. As this Part will discuss, other Western nations have generally used a high standard in determining whether interrogation techniques violate the international prohibition on torture. In fact, these decisions have found various aggressive interrogation methods to, at worst, constitute cruel, inhuman, and degrading treatment, but not torture. These decisions only reinforce our view that there is a clear distinction between the two standards and that only extreme conduct, resulting in pain that is of an intensity often accompanying serious physical injury, will violate the latter.

a.   **European Court of Human Rights**

An analogue to CAT's provisions can be found in the European Convention on Human Rights and Fundamental Freedoms (the "European Convention"). This convention prohibits torture, though it offers no definition of it. It also prohibits cruel, inhuman, or degrading treatment or punishment, again without definition. By barring both types of acts, the European Convention implicitly distinguishes between them and further suggests that torture is a grave act beyond cruel, inhuman, or degrading treatment or punishment.

The leading European Court of Human Rights case explicating the differences between torture and cruel, inhuman, or degrading treatment or punishment is *Ireland v. the United Kingdom* (1978).[69] In that case, the European Court of Human Rights examined interrogation techniques somewhat more sophisticated than the rather rudimentary and frequently obviously cruel acts described in the TVPA cases. Careful attention to this case is worthwhile not just because the case examines methods not used in the TVPA cases, but also because the Reagan administration relied on this case in reaching the conclusion that the term torture is reserved in international usage for "extreme, deliberate, and unusually cruel practices." S. Treaty Doc. No. 100-20, at 4.

The methods at issue in *Ireland* were:

(1) Wall Standing. The prisoner stands spread eagle against the wall, with fingers high above his head, and feet back so that he is standing on his toes such that his all of his weight falls on his fingers.
(2) Hooding. A black or navy hood is placed over the prisoner's head and kept there except during the interrogation.
(3) Subjection to Noise. Pending interrogation, the prisoner is kept in a room with a loud and continuous hissing noise.
(4) Sleep Deprivation. Prisoners are deprived of sleep pending interrogation.
(5) Deprivation of Food and Drink. Prisoners receive a reduced diet during detention and pending interrogation.

The European Court of Human Rights concluded that these techniques used in combination, and applied for hours at a time, were inhuman and degrading but did not amount to torture. In analyzing whether these methods constituted torture, the court treated them as part of a single program. *See Ireland.* ¶ 104. The court found that this program caused "if not actual bodily injury, at least intense physical and mental suffering to the person subjected thereto and also led to acute psychiatric disturbances during the interrogation." *Id.* ¶ 167. Thus, this program "fell into the category of inhuman treatment[.]" *Id.* The court further found that "[t]he techniques were also degrading since they were such as to arouse in their victims feeling of fear,

---

[69] According to one commentator, the Inter-American Court of Human Rights has also followed this decision. *See* Julie Lantrip, *Torture and Cruel, Inhuman and Degrading Treatment in the Jurisprudence of the Inter-American Court of Human Rights*, 5 ILSA J. Int'l & Comp. L. 551, 560–61 (1999). The Inter-American Convention to Prevent and Punish Torture, however, defines torture much differently from CAT or U.S. law and, as such, any cases under that treaty are not relevant here. *See* Inter-American Convention to Prevent and Punish Torture, *opened for signature* Dec. 9, 1985, art. 2, OAS T.S. No. 67, 25 I.L.M. 419 (1985) (entered into force Feb. 28, 1987 but the United States has never signed or ratified it).

anguish and inferiority capable of humiliating and debasing them and possible [sic] breaking their physical or moral resistance." *Id.* Yet, the court ultimately concluded:

> Although the five techniques, as applied in combination, undoubtedly amounted to inhuman and degrading treatment, although their object was the extraction of confession, the naming of others and/or information and although they were used systematically, they did not occasion suffering of the particular *intensity* and *cruelty* implied by the word torture . . . .

*Id.* (emphasis added). Thus, even though the court had concluded that the techniques produce "intense physical and mental suffering" and "acute psychiatric disturbances," they were not of sufficient intensity and cruelty to amount to torture.

The court reached this conclusion based on the distinction the European Convention drew between torture and cruel, inhuman, or degrading treatment or punishment. The court reasoned that by expressly distinguishing between these two categories of treatment, the European Convention sought to "attach a special stigma to deliberate inhuman treatment causing very serious and cruel suffering." *Id.* ¶ 167. According to the court, "this distinction derives principally from a difference in the intensity of the suffering inflicted." *Id.* The court further noted that this distinction paralleled the one drawn in the U.N. Declaration on the Protection From Torture, which specifically defines torture as "'an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment.'" *Id.* (quoting U.N. Declaration on the Protection From Torture).

The court relied on this same "intensity/cruelty" distinction to conclude that some physical maltreatment fails to amount to torture. For example, four detainees were severely beaten and forced to stand spread eagle up against a wall. *See id.* ¶ 110. Other detainees were forced to stand spread eagle while an interrogator kicked them "continuously on the inside of the legs." *Id.* ¶ 111. Those detainees were beaten, some receiving injuries that were "substantial" and, others received "massive" injuries. *See id.* Another detainee was "subjected to . . . 'comparatively trivial' beatings" that resulted in a perforation of the detainee's eardrum and some "minor bruising." *Id.* ¶ 115. The court concluded that none of these situations "attain[ed] the particular level [of severity] inherent in the notion of torture." *Id.* ¶ 174.

### b.    Israeli Supreme Court

The European Court of Human Rights is not the only other court to consider whether such a program of interrogation techniques was permissible. In *Public Committee Against Torture in Israel v. Israel*, 38 I.L.M. 1471 (1999), the Supreme Court of Israel reviewed a challenge brought against the General Security Service ("GSS") for its use of five techniques. At issue in *Public Committee Against Torture In Israel* were: (1) shaking, (2) the Shabach, (3) the Frog Crouch, (4) the excessive tightening of handcuffs, and (5) sleep deprivation. "Shaking" is "the forceful shaking of the suspect's upper torso, back and forth, repeatedly, in a manner which causes the neck and head to dangle and vacillate rapidly." *Id.* ¶ 9. The "Shabach" is actually a combination of methods wherein the detainee

is seated on a small and low chair, whose seat is tilted forward, towards the ground. One hand is tied behind the suspect, and placed inside the gap between the chair's seat and back support. His second hand is tied behind the chair, against its back support. The suspect's head is covered by an opaque sack, falling down to his shoulders. Powerfully loud music is played in the room.

*Id.* ¶ 10.

The "frog crouch" consists of "consecutive, periodical crouches on the tips of one's toes, each lasting for five minute intervals." *Id.* ¶ 11. The excessive tightening of handcuffs simply referred to the use handcuffs that were too small for the suspects' wrists. *See id.* ¶ 12. Sleep deprivation occurred when the Shabach was used during "intense non-stop interrogations."[70] *Id.* ¶ 13.

While the Israeli Supreme Court concluded that these acts amounted to cruel, and inhuman treatment, the court did not expressly find that they amounted to torture. To be sure, such a conclusion was unnecessary because even if the acts amounted only to cruel and inhuman treatment the GSS lacked authority to use the five methods. Nonetheless, the decision is still best read as indicating that the acts at issue did not constitute torture. The court's descriptions of and conclusions about each method indicate that the court viewed them as merely cruel, inhuman or degrading but not of the sufficient severity to reach the threshold of torture. While its descriptions discuss necessity, dignity, degradation, and pain, the court carefully avoided describing any of these acts as having the severity of pain or suffering indicative of torture. *See id.* at ¶¶ 24–29. Indeed, in assessing the *Shabach* as a whole, the court even relied upon the European Court of Human Right's *Ireland* decision for support and it did not evince disagreement with that decision's conclusion that the acts considered therein did not constitute torture. *See id.* ¶ 30.

In sum, both the European Court on Human Rights and the Israeli Supreme Court have recognized a wide array of acts that constitute cruel, inhuman, or degrading treatment or punishment, but do not amount to torture. Thus, they appear to permit, under international law, an aggressive interpretation as to what amounts to torture, leaving that label to be applied only where extreme circumstances exist.

## B.    Customary International Law

CAT constitutes the United States' primary international obligation on the issue of torture. Some, however, might argue that the United States is subject to a second set of obligations created by customary international law. Customary international law and treaties are often described as the two primary forms of international law. Unlike treaties, however, customary international law is unwritten, arises from the practice of nations, and must be followed out of a sense of legal obligation. While it may be the case that customary international

---

[70] The court did, however, distinguish between this sleep deprivation and that which occurred as part of routine interrogation, noting that some degree of interference with the suspect's regular sleep habits was to be expected. *Public Committee Against Torture in Israel* ¶ 23.

law prohibits torture, we believe that it cannot impose a substantive obligation that would vary from that which CAT creates. As a broad, recent multilateral agreement, CAT *is* the very state practice allegedly represented by customary international law, and thus customary international law could not functionally be any different from CAT.

As our Office has previously explained, customary international law "evolves through a dynamic process of state custom and practice." *Authority of the Federal Bureau of Investigation to Override International Law in Extraterritorial Law Enforcement Activities*, 13 Op. O.L.C. 163, 170 (1989). As one authority has described it, customary international law can be defined as a "general and consistent practice of states followed by them from a sense of legal obligation." *Restatement (Third)*, at § 102(2). The best evidence of customary international law is proof of state practice. *Id.* § 103 cmt. a; *see also Iraq Memorandum* at 23. Authorities observe that multilateral treaties are important evidence of state practice. *See Restatement (Third)*, pt. III introductory note at 144–45 ("Multilateral treaties are increasing used also to codify and develop customary international law. . . ."); *Military and Paramilitary Activities in and Against Nicaragua (Nicaragua v. U.S.)*, 1986 I.C.J. 14 (June 27) (relying on multilateral treaties as evidence of customary international law).

First, this must be the case because CAT, like other treaties, is the written expression of an agreement among signatories that willingly are bound by its terms. It provides a carefully crafted definition of the obligation regarding torture that nations, including the United States, have agreed to obey. By contrast, customary international law has no written definition, and the sources from which it can be drawn, such as the opinion of scholars, non-binding declarations by various meetings and assemblies, diplomatic notes and domestic judicial decisions, do not yield a defined and universal definition of the prohibited conduct. It is also unclear how universal and uniform state practice must be in order to crystallize into a norm of customary international law. Indeed, scholars will even argue that a norm has entered into customary international law, such as the prohibition on torture, while admitting that many states practice torture on their own citizens. *See, e.g., Filartiga v. Pena-Irala*, 630 F.2d 876, 882 (2d Cir. 1980); B. Simma & P. Alston, *The Sources of Human Rights Law: Custom, Jus Cogens, and General Principles*, 12 Australian Y. B. Int'l L. 82, 90–93 (1992). International law itself provides no guide for determining when the almost 200 nations in the world follow the same state practice sufficiently to create a new norm of customary international law. Even under the ambiguous methodology of international law, it is difficult to see how this form of law, which is never enacted through any accountable process nor accepted by any written form of consent, could supercede the obligations recently established through a carefully negotiated and written multilateral treaty on the identical subject.

Second, even if there is a uniform and universal state practice concerning torture sufficient to raise it to the level of customary international law, we believe it analytically incoherent to establish a norm of customary international law that differs from a recent, broadly accepted, multilateral agreement on the same exact issue. CAT provides substantive content to the prohibition on torture and cruel, inhuman, or degrading treatment or punishment. CAT is a multilateral agreement, ultimately joined by 132 state parties, to establish a definition of torture. In this context, we cannot see evidence of customary international law that could be a more compelling or conclusive definition of state practice. *See Restatement (Third)*, at § 102 cmt. i.

("[i]nternational agreements constitute practice of states and as such can contribute to the growth of customary international law"). Indeed, any effort to draw forth a norm of customary international law at odds with the Torture Convention would ignore the most basic evidence of state practice—that of broad agreement to a written text—in favor of more speculative, ambiguous, and diverse definitions of dubious legitimacy.

Thus, it is CAT's substantive obligations as defined by our reservations, understandings, and declarations that govern the United States' international law obligations on torture. CAT not only governs U.S. obligations with respect to torture but it also does so with respect to cruel, inhuman, or degrading treatment or punishment. Thus, even if customary international law prohibits cruel, inhuman, or degrading treatment or punishment, CAT and the reservations, understandings, and declarations that the United States has taken with respect to the scope of that term's reach are definitive of United States' obligations. Customary international law cannot override carefully defined U.S. obligations through multilateral treaties on the exact same subject.

Finally, even if customary international law on torture created a different standard than that which the Torture Convention creates, and even if such a standard were somehow considered binding under international law, it could not bind the President as a matter of domestic law. We have previously concluded that customary international law is not federal law. *See Treaties and Laws Memorandum* at 32–33. This has been the longstanding view of this Office and of the Department of Justice. *See Authority of the Federal Bureau of Investigation to Override International in Extraterritorial Law Enforcement Activities*, 13 Op. O.L.C. at 168–171. The constitutional text provides no support for the notion that customary international law is part of federal law. *See id.* at 33. Indeed, because customary international has not undergone the processes the Constitution requires for "the enactment of constitutional amendments, statutes, or treaties," it is not law and "can have no legal effect on the government or on American citizens." *Treaties and Laws Memorandum* at 33–34. As we explained, to elevate customary international law to federal law would "raise deep structural problems" by "import[ing] a body of law to restrain the three branches of American government that never underwent any approval by our democratic political process." *Id.* at 36. Further, treating customary international law as federal law would directly invade "the President's discretion as the Commander in Chief and Chief Executive to determine how best to conduct the Nation's military affairs." *Id.* at 36. Thus, we concluded that "customary international law does not bind the President or the U.S. Armed Forces in their decisions concerning the detention conditions of al Qaeda and Taliban prisoners." *Id.* at 37. That conclusion is no less true there than here. Customary international law cannot interfere, as a matter of domestic law, with the President and the U.S. Armed Forces as they carry out their constitutional duties to successfully prosecute war against an enemy that has conducted a direct attack on the United States.

Even if one were to accept the notion that customary international law has some standing within our domestic legal system, the President may decide to override customary international law at his discretion. "It is well accepted that the political branches have ample authority to override customary international law within their respective spheres of authority." *Id.* at 34 (discussing *The Schooner Exchange v. McFadden*, 11 U.S. (7 Cranch) 116 (1812) and *Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814)); *The Paquete Habana*, 175 U.S. 677 (1900). Our

SECRET/NOFORN

Office has made clear its agreement with these Supreme Court cases that the President can unilaterally order the violation of customary international law. 13 Op. O.L.C. at 170. Indeed, there is a strong argument under international law that nations must have the ability to violate customary international law. Because the very essence of customary international law is that it evolves through state custom and practice, "'[s]tates necessarily must have the authority to contravene international norms.'" *Id.* at 36 (quoting *Authority of the Federal Bureau of Investigation to Override International Law in Extraterritorial Law Enforcement Activities*, 13 Op. OL.C. at 170). Otherwise, custom itself could not change. Thus, if the President were to order interrogation methods that were inconsistent with some notion of customary international law, he would have the authority to override the latter as a matter of domestic law, and he could also argue that as a matter of international law such conduct was needed to shape a new norm to address international terrorism.

## IV.    Defenses

Even if an interrogation method might arguably cross the line drawn in one of the criminal statutes described above, and application of the statute was not held to be an unconstitutional infringement of the President's Commander-in-Chief authority, we believe that under the current circumstances certain justification defenses might be available. Standard criminal law defenses of necessity and self-defense could justify interrogation methods needed to elicit information to prevent a direct and imminent threat to the United States and its citizens. The availability of these defenses would depend upon the precise factual circumstances surrounding a particular interrogation.

### A.    Necessity

We believe that a defense of necessity might be raised in certain circumstances. Often referred to as the "choice of evils" defense, necessity has been defined as follows:

> Conduct that the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable, provided that:
>
> > (a) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged; and
> > (b) neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and
> > (c) a legislative purpose to exclude the justification claimed does not otherwise plainly appear.

Model Penal Code § 3.02. *See also* LaFave & Scott, § 5.4 at 627. Although there is no federal statute that generally establishes necessity or other justifications as defenses to federal criminal laws, the Supreme Court has recognized the defense. *See United States v. Bailey*, 444 U.S. 394, 410 (1980) (relying on LaFave & Scott and Model Penal Code definitions of necessity defense).

The necessity defense might prove especially relevant in the current conflict. As it has been described in the case-law and literature, the purpose behind necessity is one of public

SECRET/NOFORN

policy. According to LaFave and Scott, "the law ought to promote the achievement of higher values at the expense of lesser values, and sometimes the greater good for society will be accomplished by violating the literal language of the criminal law." LaFave & Scott, at 629. In particular, the necessity defense can justify the intentional killing of one person to save two others because "it is better that two lives be saved and one lost than that two be lost and one saved." *Id.* Or, put in the language of a choice of evils, "the evil involved in violating the terms of the criminal law (. . . even taking another's life) may be less than that which would result from literal compliance with the law ( . . . two lives lost)." *Id.*

Additional elements of the necessity defense are worth noting here. First, the defense is not limited to certain types of harms. Therefore, the harm inflicted by necessity may include intentional homicide, so long as the harm avoided is greater (i.e., preventing more deaths). *Id.* at 634. Second, it must actually be the defendant's intention to avoid the greater harm; intending to commit murder and then learning only later that the death had the fortuitous result of saving other lives will not support a necessity defense. *Id.* at 635. Third, if the defendant reasonably believed that the lesser harm was necessary, even if, unknown to him, it was not, he may still avail himself of the defense. As LaFave and Scott explain, "if A kills B reasonably believing it to be necessary to save C and D, he is not guilty of murder even though, unknown to A, C and D could have been rescued without the necessity of killing B." *Id.* Fourth, it is for the court, and not the defendant to judge whether the harm avoided outweighed the harm done. *Id.* at 636. Fifth, the defendant cannot rely upon the necessity defense if a third alternative is open and known to him that will cause less harm.

It appears to us that the necessity defense could be successfully maintained in response to an allegation of a violation of a criminal statute. Al Qaeda's September 11, 2001 attack led to the deaths of thousands and losses in the billions of dollars. According to public and governmental reports, al Qaeda has other sleeper cells within the United States that may be planning similar attacks. Indeed, we understand that al Qaeda seeks to develop and deploy chemical, biological and nuclear weapons of mass destruction. Under these circumstances, a particular detainee may possess information that could enable the United States to prevent imminent attacks that could equal or surpass the September 11 attacks in their magnitude. Clearly, any harm that might occur during an interrogation would pale to insignificance compared to the harm avoided by preventing such an attack, which could take hundreds or thousands of lives.

Under this calculus, two factors will help indicate when the necessity defense could appropriately be invoked. First, the more certain that government officials are that a particular individual has information needed to prevent an attack, the more necessary interrogation will be. Second, the more likely it appears to be that a terrorist attack is likely to occur, and the greater the amount of damage expected from such an attack, the more that an interrogation to get information would become necessary. Of course, the strength of the necessity defense depends on the particular circumstances, and the knowledge of the government actors involved, when the interrogation is conducted. While every interrogation that might violate a criminal prohibition does not trigger a necessity defense, we can say that certain circumstances could support such a defense.

We note that legal authorities identify an important exception to the necessity defense. The defense is available "only in situations wherein the legislature has not itself, in its criminal statute, made a determination of values." *Id.* at 629. Thus, if Congress explicitly has made clear that violation of a statute cannot be outweighed by the harm avoided, courts cannot recognize the necessity defense. LaFave and Israel provide as an example an abortion statute that made clear that abortions even to save the life of the mother would still be a crime; in such cases the necessity defense would be unavailable. *Id.* at 630. Here, however, Congress has not explicitly made a determination of values vis-à-vis torture. It has not made any such determination with respect to the federal criminal statutes applicable in the special maritime and territorial jurisdiction.

In fact, in enacting the torture statute to implement CAT, Congress declined to adopt language from the treaty's definition of torture that arguably seeks to prohibit the weighing of values. As discussed above CAT defines torture as the intentional infliction of severe pain or suffering "for such purpose[] as obtaining from him or a third person information or a confession." CAT art. 1.1. It could be argued that this definition means that the good of obtaining information—no matter what the circumstances—cannot justify an act of torture. In other words, necessity would not be a defense. In enacting section 2340, however, Congress removed the purpose element in the definition of torture, defining torture in terms of conduct rather than by reference to the purpose for which it was carried out. By leaving section 2340 silent as to the harm done by torture in comparison to other harms, Congress allowed the necessity defense to go forward when appropriate.

Further, CAT contains an additional provision that "no exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture." CAT art. 2.2. Given that Congress enacted 18 U.S.C. §§ 2340–2340A in light of CAT, Congress presumably was aware of this provision of the treaty, and of the definition of the necessity defense that allows the legislature to provide for an exception to the defense, see Model Penal Code § 3.02(b), yet Congress did not incorporate CAT article 2.2 into section 2340. Nor did Congress amend any of the generally applicable criminal statutes to eliminate this defense in cases of torture. Given that Congress omitted CAT's effort to bar a necessity or wartime defense, we read section 2340 and the federal criminal statutes applicable to the special maritime and territorial jurisdiction as permitting the defense.

Additionally, criminal statutes are to be "strictly construed in favor of the defendant." LaFave, at § 2.2(d). As noted above, sections 2340–2340A do not expressly preclude the common law defenses of necessity nor as we explain below do they preclude the defense of self-defense. To find the necessity defense barred based on art. 2, which is not part of our domestic law because it is non-self-executing, would be a gross breach of this fundamental tenet. Indeed, such a conclusion would raise constitutional concerns. It would not only raise the specter that section 2340A is unconstitutionally vague, in violation of a defendant's Fifth Amendment right to due process, but invoking this article to preclude either self-defense or necessity defenses could also raise ex post facto-like concerns that may implicate a defendant's Fifth Amendment right to due process. *See Rogers v. Tennessee*, 532 U.S. 451, 462 (2001) ("[W]e conclude that a judicial alteration of a common law doctrine of criminal law violates the principle of fair

warning, and hence must not be given retroactive effect, only where it is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.") (internal quotation marks and citations omitted).  *Cf.* U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed").

**B.    Self-Defense**

Even if a court were to find that necessity did not justify the violation of a criminal statute, a defendant could still appropriately raise a claim of self-defense.  The right to self-defense, even when it involves deadly force, is deeply embedded in our law, both as to individuals and as to the nation as a whole.  As the Court of Appeals for the D.C. Circuit has explained:

> More than two centuries ago, Blackstone, best known of the expositors of the English common law, taught that "all homicide is malicious, and of course amounts to murder, unless . . . excused on the account of accident or self-preservation. . . ."  Self-defense, as a doctrine legally exonerating the taking of human life, is as viable now as it was in Blackstone's time.

*United States v. Peterson*, 483 F.2d 1222, 1228–29 (D.C. Cir. 1973).  Self-defense is a common-law defense to federal criminal offenses, and nothing in the text, structure or history of section 2340A precludes its application to a charge of torture.  Similarly, in light of Congress's failure to eliminate this defense for defendants accused of torture but charged with one of the offenses applicable to the special maritime and territorial jurisdiction, we believe that nothing precludes the assertion of this defense.  In the absence of any textual provision to the contrary, we assume self-defense can be an appropriate defense to an allegation of torture, irrespective of the offense charged.

The doctrine of self-defense permits the use of force to prevent harm to another person.  As LaFave and Scott explain, "one is justified in using reasonable force in defense of another person, even a stranger, when he reasonably believes that the other is in immediate danger of unlawful bodily harm from his adversary and that the use of such force is necessary to avoid this danger."  *Id.* at 663–64.  Ultimately, even deadly force is permissible, but "only when the attack of the adversary upon the other person reasonably appears to the defender to be a deadly attack."  *Id.* at 664.  As with our discussion of necessity, we will review the significant elements of this defense.[71]  According to LaFave and Scott, the elements of the defense of others are the same as those that apply to individual self-defense.

First, self-defense requires that the use of force be *necessary* to avoid the danger of unlawful bodily harm.  *Id.* at 649.  A defender may justifiably use deadly force if he reasonably believes that the other person is about to inflict unlawful death or serious bodily harm upon another, and that it is necessary to use such force to prevent it.  *Id.* at 652.  Looked at from the opposite perspective, the defender may not use force when the force would be as equally effective at a later time and the defender suffers no harm or risk by waiting.  *See* Paul H.

---

[71]  Early cases had suggested that in order to be eligible for defense of another, one should have some personal relationship with the one in need of protection.  That view has been discarded.  LaFave & Scott at 664.

Robinson, 2 *Criminal Law Defenses* § 131(c) at 77 (1984). If, however, other options permit the defender to retreat safely from a confrontation without having to resort to deadly force, the use of force may not be necessary in the first place. La Fave & Scott at 659–60.

Second, self-defense requires that the defendant's belief in the necessity of using force be reasonable. If a defendant honestly but unreasonably believed force was necessary, he will not be able to make out a successful claim of self-defense. *Id.* at 654. Conversely, if a defendant reasonably believed an attack was to occur, but the facts subsequently showed no attack was threatened, he may still raise self-defense. As LaFave and Scott explain, "one may be justified in shooting to death an adversary who, having threatened to kill him, reaches for his pocket as if for a gun, though it later appears that he had no gun and that he was only reaching for his handkerchief." *Id.* Some authorities, such as the Model Penal Code, even eliminate the reasonability element, and require only that the defender honestly believed—regardless of its unreasonableness—that the use of force was necessary.

Third, many legal authorities include the requirement that a defender must reasonably believe that the unlawful violence is "imminent" before he can use force in his defense. It would be a mistake, however, to equate imminence necessarily with timing—that an attack is immediately about to occur. Rather, as the Model Penal Code explains, what is essential is that, the defensive *response* must be "immediately necessary." Model Penal Code § 3.04(1). Indeed, imminence may be merely another way of expressing the requirement of necessity. Robinson at 78. LaFave and Scott, for example, believe that the imminence requirement makes sense as part of a necessity defense because if an attack is not immediately upon the defender, the defender has other options available to avoid the attack that do not involve the use of force. LaFave & Scott at 656. If, however, the fact of the attack becomes certain and no other options remain, the use of force may be justified. To use a well-known hypothetical, if A were to kidnap and confine B, and then tell B he would kill B one week later, B would be justified in using force in self-defense, even if the opportunity arose before the week had passed. *Id.* at 656; *see also* Robinson at § 131(c)(1) at 78. In this hypothetical, while the attack itself is not imminent, B's use of force becomes immediately necessary whenever he has an opportunity to save himself from A.

Fourth, the amount of force should be proportional to the threat. As LaFave and Scott explain, "the amount of force which [the defender] may justifiably use must be reasonably related to the threatened harm which he seeks to avoid." LaFave & Scott at 651. Thus, one may not use deadly force in response to a threat that does not rise to death or serious bodily harm. If such harm may result, however, deadly force is appropriate. As the Model Penal Code § 3.04(2)(b) states, "[t]he use of deadly force is not justifiable . . . unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat."

In the current conflict, we believe that a defendant accused of violating the criminal prohibitions described above might, in certain circumstances, have grounds to properly claim the defense of another. The threat of an impending terrorist attack threatens the lives of hundreds if not thousands of American citizens. Whether such a defense will be upheld depends on the specific context within which the interrogation decision is made. If an attack appears increasingly certain, but our intelligence services and armed forces cannot prevent it without the information from the interrogation of a specific individual, then the more likely it will appear

SECRET/NOFORN

that the conduct in question will be seen as necessary. The increasing certainty of an attack will also satisfy the imminence requirement. Finally, the fact that previous al Qaeda attacks have had as their aim the deaths of American citizens, and that evidence of other plots have had a similar goal in mind, would justify proportionality of interrogation methods designed to elicit information to prevent such deaths.

To be sure, this situation is different from the usual self-defense justification, and, indeed, it overlaps with elements of the necessity defense. Self-defense as usually discussed involves using force against an individual who is about to conduct the attack. In the current circumstances, however, an enemy combatant in detention does not himself present a threat of harm. He is not actually carrying out the attack; rather, he has participated in the planning and preparation for the attack, or merely has knowledge of the attack through his membership in the terrorist organization. Nonetheless, some leading scholarly commentators believe that interrogation of such individuals using methods that might violate section 2340A would be justified under the doctrine of self-defense, because the combatant by aiding and promoting the terrorist plot "has culpably caused the situation where someone might get hurt. If hurting him is the only means to prevent the death or injury of others put at risk by his actions, such torture should be permissible, and on the same basis that self-defense is permissible." Michael S. Moore, *Torture and the Balance of Evils*, 23 Israel L. Rev. 280, 323 (1989) (symposium on Israel's Landau Commission Report).[72] *See also* Alan M. Dershowitz, *Is It Necessary to Apply "Physical Pressure" to Terrorists—and to Lie About It?*, 23 Israel L. Rev. 192, 199–200 (1989). Thus, some commentators believe that by helping to create the threat of loss of life, terrorists become culpable for the threat even though they do not actually carry out the attack itself. If necessary, they may be hurt in an interrogation because they are part of the mechanism that has set the attack in motion, Moore, at 323, just as is someone who feeds ammunition or targeting information to an attacker. Under the present circumstances, therefore, even though a detained enemy combatant may not be the exact attacker—he is not planting the bomb, or piloting a hijacked plane to kill civilians—he still may be harmed in self-defense if he has knowledge of future attacks because he has assisted in their planning and execution.

In addition, we believe that a claim by an individual of the defense of another would be further supported by the fact that, in this case, the nation itself is under attack and has the right to self-defense. As *In re Neagle*, 135 U.S. 1 (1890) suggests, a federal official who has used force in self-defense may also draw upon the national right to self-defense to strengthen his claim of justification. In that case, the State of California arrested and held deputy U.S. Marshal Neagle for shooting and killing the assailant of Supreme Court Justice Field. In granting the writ of habeas corpus for Neagle's release, the Supreme Court did not rely alone upon the marshal's right to defend another or his right to self-defense. Rather, the Court found that Neagle, as an agent of the United States and of the executive branch, was justified in the killing because, in protecting Justice Field, he was acting pursuant to the executive branch's inherent constitutional authority to protect the United States government. *Id.* at 67 ("We cannot doubt the power of the president to take measures for the protection of a judge of one of the courts of the United States

---

[72] Moore distinguishes that case from one in which a person has information that could stop a terrorist attack, but who does not take a hand in the terrorist activity itself, such as an innocent person who learns of the attack from her spouse. Moore, 23 Israel L. Rev. at 324. Such individuals, Moore finds, would not be subject to the use of force in self-defense, although they might be under the doctrine of necessity.

UNCLASSIFIED
SECRET/NOFORN

SECRET/NOFORN

who, while in the discharge of the duties of his office, is threatened with a personal attack which may probably result in his death."). That authority derives, according to the Court, from the President's power under Article II to take care that the laws are faithfully executed. In other words, Neagle as a federal officer not only could raise self-defense or defense of another, but also could defend his actions on the ground that he was implementing the Executive Branch's authority to protect the United States government.

If the right to defend the national government can be raised as a defense in an individual prosecution, as *Neagle* suggests, then a government defendant, acting in his official capacity, should be able to argue that any conduct that arguably violated a criminal prohibition was undertaken pursuant to more than just individual self-defense or defense of another. In addition, the defendant could claim that he was fulfilling the Executive Branch's authority to protect the federal government and the nation from attack after the events of September 11, which triggered the nation's right to self-defense. Following the example of *In re Neagle*, a government defendant may also argue that his conduct of an interrogation, if properly authorized, is justified on the basis of protecting the nation from attack. In order to make the fullest use of this defense, the defendant would want to show that his conduct was specifically ordered by national command authorities that have the authority to decide to use force in national self-defense.

There can be little doubt that the nation's right to self-defense has been triggered under our law. The Constitution announces that one of its purposes is "to provide for the common defense." U.S. Const., Preamble. Article I, § 8 declares that Congress is to exercise its powers to "provide for the common Defence." *See also* 2 Pub. Papers of Ronald Reagan 920, 921 (1988-89) (right of self-defense recognized by Article 51 of the U.N. Charter); *supra* Part III.A.4.a. The President has a particular responsibility and power to take steps to defend the nation and its people. *In re Neagle*, 135 U.S. at 64. *See also* U.S. Const. art. IV, § 4 ("The United States shall . . . protect [each of the States] against Invasion"). As Commander –in Chief and Chief Executive, he may use the armed forces to protect the nation and its people. *See, e.g.*, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990). And he may employ secret agents to aid in his work as Commander-in-Chief. *Totten v. United States*, 92 U.S. 105, 106 (1876). As the Supreme Court observed in *The Prize Cases*, 67 U.S. (2 Black) 635 (1862), in response to an armed attack on the United States "the President is not only authorized but bound to resist force by force . . . without waiting for any special legislative authority." *Id.* at 668. The September 11 events were a direct attack on the United States that triggered its right to use force under domestic and international law in self-defense, and as we have explained above, the President has authorized the use of military force with the support of Congress.

As we have made clear in other opinions involving the war against al Qaeda, the Nation's right to self-defense has been triggered by the events of September 11. If a government defendant were to harm an enemy combatant during an interrogation in a manner that might arguably violate a criminal prohibition, he would be doing so in order to prevent further attacks on the United States by the al Qaeda terrorist network. In that case, we believe that he could argue that the executive branch's constitutional authority to protect the nation from attack justified his actions. This national and international version of the right to self-defense could supplement and bolster the government defendant's individual right.

SECRET/NOFORN

## Conclusion

For the foregoing reasons, we conclude that the Fifth and Eighth Amendments do not extend to alien enemy combatants held abroad. Moreover, we conclude that different canons of construction indicate that generally applicable criminal laws do not apply to the military interrogation of alien unlawful combatants held abroad. Were it otherwise, the application of these statutes to the interrogation of enemy combatants undertaken by military personnel would conflict with the President's Commander-in-Chief power.

We further conclude that CAT defines U.S. international law obligations with respect to torture and other cruel, inhuman, or degrading treatment or punishment. The standard of conduct regarding torture is the same as that which is found in the torture statute, 18 U.S.C. §§ 2340–2340A. Moreover, the scope of U.S. obligations under CAT regarding cruel, inhuman, or degrading treatment or punishment is limited to conduct prohibited by the Eighth, Fifth and Fourteenth Amendments. Customary international law does not supply any additional standards.

Finally, even if the criminal prohibitions outlined above applied, and an interrogation method might violate those prohibitions, necessity or self-defense could provide justifications for any criminal liability.

Please let us know if we can be of further assistance

John C. Yoo
Deputy Assistant Attorney General